# IN THE UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| RICHARD GLOSSIP, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | CIV-08-326-HE |
| | ) | |
| MARTY SIRMONS, WARDEN, | ) | |
| Oklahoma State Penitentiary, | ) | |
| | ) | |
| Respondent. | ) | |

_____

## PETITION FOR A WRIT OF HABEAS CORPUS

_____

November 3, 2008

_____

**MARK HENRICKSEN, OBA #4102**
**LANITA HENRICKSEN, OBA#15016**
HENRICKSEN & HENRICKSEN
LAWYERS, INC.
600 N. Walker, Suite 220
Oklahoma City, Oklahoma 73102-3035
     (405) 609-1970
     (405) 609-1973 (Facsimile)
mark.henricksen@coxinet.net
henricksen.lanita@coxinet.net

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

LIST OF APPENDICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xxi

PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY PURSUANT TO 28 UNITED STATES CODE, §2254 . . . . . . . . . . . 1

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      Operation of the Best Budget Inn of Oklahoma City. . . . . . . . . . . . . . . . . . 6

      Operation of the Tulsa Best Budget Inn. . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      Events of January 6-7, 1997. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      Mr. Glossip's Detention and Subsequent Arrest. . . . . . . . . . . . . . . . . . . . . 13

      Apprehension of Justin Sneed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      Mr. Sneed's varied stories. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      Mr. Glossip's conviction and sentence. . . . . . . . . . . . . . . . . . . . . . . . . . . 17

STANDARD OF REVIEW
THE ANTITERRORISM AND
EFFECTIVE DEATH PENALTY ACT IS APPLICABLE TO THIS CASE. . . . 18

i

EXHAUSTION AND PROCEDURAL BAR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

GROUND I: THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT TO SUSTAIN A CONVICTION AND SENTENCE OF DEATH UNDER THE REQUIREMENTS OF THE EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

The State's Theory. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

OCCA Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Instruction on Accomplice Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Money found in Mr. Glossip's possession. . . . . . . . . . . . . . . . . . . . . . . . 32

OCCA Decisions Regarding Petitioner's Sub-claims in Ground One: . . . 33

OCCA's Decisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Alleged "Shortages" and Financial Discrepancies. . . . . . . . . . . . . . . . . . . 37

Physical Condition of the Motel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Missing Registration Cards. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Other Allegations That Mr. Glossip Was about to Be Fired. . . . . . . . . . . . 45

Speculative Testimony Regarding the "Personalities" of Mr. Sneed and Mr. Glossip. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Mr. Sneed's Purported Lack of Motive to Kill Barry Van Treese. . . . . . . . 51

Forensic Evidence Collected at the Scene. . . . . . . . . . . . . . . . . . . . . . . . . 54

Mr. Glossip's Actions from January 7-9, 1997. . . . . . . . . . . . . . . . . . . . . . 55

Uncorroborated Evidence Provided Only by Justin Sneed. . . . . . . . . . . . 57

Mr. Glossip's Plans To Move On . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

GROUND II:   THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY
ADMITTING IRRELEVANT AND HIGHLY PREJUDICIAL EVIDENCE INTO
THE RECORD IN VIOLATION OF MR. GLOSSIP'S RIGHTS UNDER THE
FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Review of Evidentiary Errors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

A.  Evidence Intended to Evoke Sympathy for the Victim and his Family.  68

OCCA Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

The Petitioner's claims regarding First Stage Victim Impact Testimony . . 72

B.  Evidence Intended to Evoke Sympathy for the Perpetrator of the Murder. 77

Mr. Sneed's Life Story.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

C.  Evidence Regarding Operations and Condition of Best Budget Inn.  . . 80

D.  Conclusion.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

GROUND III:  THE TRIAL COURT ERRED IN PERMITTING THE STATE TO DISPLAY SELECTIVE PORTIONS OF CERTAIN WITNESSES' TESTIMONY THROUGHOUT THE TRIAL BECAUSE IT OVEREMPHASIZED THAT TESTIMONY, CONSTITUTED A CONTINUOUS CLOSING ARGUMENT, AND VIOLATED THE RULE OF SEQUESTRATION OF WITNESSES. . . . . . . . . . 82

The Selected Evidence  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

Undue Emphasis on Selected Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . 85

Continuous Closing Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

Violation of Rule of Sequestration of Witnesses. . . . . . . . . . . . . . . . . . . . 89

The Trial Court's Refusal to Allow the Defense to Include the Demonstrative Exhibits as Part of the Record.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

OCCA Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

GROUND IV:  MR. GLOSSIP WAS DEPRIVED OF A FAIR TRIAL AND A FAIR SENTENCING HEARING BY THE IMPROPER TACTICS, REMARKS, AND ARGUMENTS OF THE PROSECUTORS DURING BOTH STAGES OF TRIAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

A.  Misrepresentation of Facts and Misleading Argument Designed to Confuse the Jury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

OCCA Decision.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

B.  Evidence and Argument Intended to Evoke Sympathy for the Victim and his Family. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

OCCA Decision.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

The Remaining Errors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

Implying to the Jury that Additional Evidence Exists. . . . . . . . . . . . . . . 109

OCCA Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

Second Stage Misconduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

GROUND V:   MR. GLOSSIP WAS DENIED EFFECTIVE ASSISTANCE OF
COUNSEL IN VIOLATION OF HIS RIGHTS UNDER THE SIXTH, EIGHTH,
AND   FOURTEENTH   AMENDMENTS   TO   THE   UNITED   STATES
CONSTITUTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

*Strickland v. Washington* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

Counsel's actions were not based on "strategy". . . . . . . . . . . . . . . . . . . 118

Petitioner's claims of ineffective assistance of counsel. . . . . . . . . . . . . . 119

A.  Failure to Utilize Justin Sneed's Videotaped Interview. . . . . . . . . . . 119

1.  Manipulation of Mr. Sneed to Implicate Mr. Glossip.  . . . . . . . 120

2.   Discrepancies  Between  Mr.  Sneed's  Videotape  and  his  Trial
Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

OCCA Decision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

B. Failure to Utilize Readily Available Evidence to Cross-Examine Witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

OCCA Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126, 128

C.  Failure to Object to Irrelevant and Highly Prejudicial Evidence. . . . . 129

OCCA Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

D.  Failure to Object to the Instances of Prosecutorial Misconduct.  . . . . 130

OCCA Decision.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

GROUND VI:  THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT TO SUPPORT THE AGGRAVATING CIRCUMSTANCE OF MURDER FOR REMUNERATION.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

OCCA Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

GROUND VII:  ERRORS IN JURY INSTRUCTIONS GIVEN IN THE SECOND STAGE OF TRIAL DENIED MR. GLOSSIP'S RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO DUE PROCESS AND A RELIABLE SENTENCING PROCEEDING. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

A.  Improper Weighing Instruction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

OCCA Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

Imposition of the death sentence under the Oklahoma Statutes . . . . . . . . 140

GROUND VIII:  THE TRIAL COURT ERRED IN ALLOWING IMPROPER VICTIM IMPACT TESTIMONY DURING THE SENTENCING STAGE, VIOLATING MR. GLOSSIP'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

        A.  Improper Victim Impact Testimony  . . . . . . . . . . . . . . . . . . . . . . . . . . 147

GROUND IX:  THE TRIAL COURT'S VOIR DIRE PROCESS VIOLATED MR. GLOSSIP'S RIGHTS PROTECTED BY THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND CORRESPONDING PROVISIONS OF  THE OKLAHOMA CONSTITUTION.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

        A.  The Trial Court Improperly Questioned Prospective Jurors about Their Ability to Impose the Death Penalty.  . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

        OCCA Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

        B.  A Prospective Juror Currently Serving a Deferred Sentence Was Improperly Removed for Cause.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

        OCCA Decision.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

GROUND X:  THE ADMISSION OF A PRE-MORTEM PHOTOGRAPH OF THE VICTIM INJECTED PASSION, PREJUDICE, AND OTHER ARBITRARY FACTORS INTO THE SECOND STAGE PROCEEDINGS. . . . . . . . . . . . . . . 162

        A.  Amended Section 2403 is Unconstitutional on Its Face  . . . . . . . . . . 164

B.   The Lack of Limiting Guidelines for Admissibility of Pre-Mortem Photographs Leads to Highly Inflammatory Prosecutorial Abuse, as Occurred in this Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

C.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

GROUND XI: TRIAL AND APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE OKLAHOMA CONSTITUTION.  . . . . . . . . . . . . . . . . . . . . . . . . . . . 171

Argument and Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

Second Stage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

Counsel's actions were not based on "strategy". . . . . . . . . . . . . . . . . . . . 176

Appellate counsel failed to provide effective assistance of counsel. . . . . 177

OCCA Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

GROUND XII: TRIAL AND APPELLATE COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO ARGUE THAT JUDICIAL BIAS SO INFECTED THE PROCEEDINGS THAT MR. GLOSSIP WAS DENIED HIS DUE PROCESS RIGHT TO A FAIR TRIAL IN VIOLATION OF  THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

GROUND XIII:  THE ACCUMULATION OF ERRORS SO INFECTED THE TRIAL AND SENTENCING PROCEEDINGS WITH UNFAIRNESS THAT MR. GLOSSIP WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL, DUE PROCESS AND A RELIABLE SENTENCING PROCEEDING IN VIOLATION OF THE SIXTH,  EIGHTH AND FOURTEENTH AMENDMENTS. . . . . . . . . . . 181

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

MOTION FOR EVIDENTIARY HEARING . . . . . . . . . . . . . . . . . . . . . . . . . . . 183

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 185

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Andrews v. Deland*, 943 F.2d 1162 (10th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . 21

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) . . . . . . . . . . . . . . . . . . 139, 140, 143

*Arizona v. Fulminante*, 499 U.S. 279 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . 90, 94

*Ballard v. United States*, 329 U.S. 187 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . 161

*Bell v. Cone*, 535 U.S. 685 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Berger v. United States*, 295 U.S. 78 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

*Blackburn v. Foltz*, 828 F.2d 1177 (6th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . 130

*Bland v. Sirmons*, 459 F.3d 999 (10th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . 98

*Blumenthal v. United States*, 332 U.S. 539 (1947) . . . . . . . . . . . . . . . . . . . . . . . 67

*Booth v. Maryland*, 482 U.S. 496 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

*Brecheen v. Reynolds*, 41 F.3d 1343 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . 99

*Bruton v. United States*, 391 U.S. 123 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*Bryan v. Mullin*, 335 F.3d 1207 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . 183

*Caldwell v. Mississippi*, 472 U.S. 320 (1985) . . . . . . . . . . . . . . . . . . . . . . . 114, 115

*California v. Brown*, 479 U.S. 538 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . 118, 175

*Cannon v. Mullin*, 383 F.3d 1152 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . 183

*Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003) . . . . . . . . 174, 177, 178, 181, 182

*Chambers v. Mississippi*, 410 U.S. 284 (1973) . . . . . . . . . . . . . . . . . . . . . 117, 174

*Chapman v. California*, 386 U.S. 18 (1967) . . . . . . . . . . . . . . . . . . . . . 90, 94, 182

*Coleman v. Thompson*, 502 U.S. 722 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Darden v. Wainwright*, 477 U.S. 168 (1986) . . . . . . . . . . 71, 82, 98, 115, 167, 170

*Davis v. Georgia*, 429 U.S. 122 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

*Dennison v. Christopher*, 200 P. 783 (1921) . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974) . . . . . . . 83, 94, 95, 98, 108, 114,
                                                                            167, 170

*Duckett v. Mullin*, 306 F.3d 982 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . 182

*Eddings v. Oklahoma*, 455 U.S. 104 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . 178

*Engle v. Issac*, 456 U.S. 107 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Evans-Smith v. Taylor*, 19 F.3d 899 (4th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . 65

*Evitts v. Lucey*, 469 U.S. 387 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 173, 177, 178

*Fisk v. Venable*, 68 P.2d 425 (1937) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

*Fox v. Ward*, 200 F.3d 1286 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . 66, 83

*Furman v. Georgia*, 408 U.S. 238 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

*Geders v. United States*, 425 U.S. 80 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

*Glossip. v. Oklahoma*, 128 S.Ct. 1124 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Gravley v. Mills*, 87 F.3d 779 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

*Gray v. Mississippi*, 481 U.S. 648 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

*Gregg v. Georgia*, 428 U.S. 153 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

*Hain v. Gibson*, 287 F.3d 1224 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . 148

*Hicks v. Oklahoma*, 447 U.S. 343 (1980) . . . . . . . . . . . . . . . . . . . . 22, 67, 142, 146

*Hitchcock v. Dugger*, 481 U.S. 393 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

*Hooker v. Mullin*, 293 F.3d 1232 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . 66

*Hooper v. Mullin*, 314 F.3d 1162 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 119, 176

*In re Winship*, 397 U.S. 358 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 33, 140, 143

*Irvin v. Dowd*, 366 U.S. 717 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

*Jackson v. Virginia*, 443 U.S. 307 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . 22, 27, 133

*Jones v. United States*, 526 U.S. 227 (1999) . . . . . . . . . . . . . . . . . . . . 139, 142, 144

*Lisenba v. California*, 314 U.S. 219 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . 66, 83

*Lockett v. Ohio*, 438 U.S. 586 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

*Maes v. Thomas*, 46 F.3d 979 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . 66, 83, 84

*Marcrum v. Luebbers*, 509 F.3d 489 (8th Cir. 2007) . . . . . . . . . . . . . . . . . 118, 176

*McCullough v. Davis*, 1915 OK CR 34 (1915) . . . . . . . . . . . . . . . . . . . . . . . . . 179

*Medina v. Barnes*, 71 F.3d 363 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . 183

*Miller v. Mullin*, 354 F.3d 1288 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . 95, 96

*Morgan v. Illinois*, 504 U.S. 719 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

*Morris v. Burnett*, 319 F.3d 1254 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . 20

*Napue v. Illinois*, 360 U.S. 264 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

*Paxton  v. Ward*, 199 F.3d 1197 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . 101

*Payne v. Tennessee*, 501 U.S. 808, (1991) . . . . . . . . . . 68, 108, 146-148, 166, 170

*Penry v. Lynaugh*, 492 U.S. 302 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

*Peters v. Kiff*, 407 U.S. 493 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

*Ring v. Arizona*, 536 U.S. 584 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . 139-141, 145

*Romano v. Gibson*, 239 F.3d 1156 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . 117, 175

*Rompilla v. Beard*, 545 U.S. 374 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . 20, 171, 177

*Ross v. Oklahoma*, 487 U.S. 81 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142, 146

*Skipper v. South Carolina*, 476 U.S. 1 (1986) . . . . . . . . . . . . . . . . . . . 114, 117, 175

*Smallwood v. Gibson*, 191 F.3d 1257 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . 66

*Spears v. Mullin*, 343 F.3d 1215 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . 20, 67

*State ex rel. Conley v. Parks*, 239 P. 941 (1925) . . . . . . . . . . . . . . . . . . . . . . . . . 179

*State v. Hamilton*, 240 Kan. 539 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

*Strickland v. Washington*, 466 U.S. 668 (1984) . . . . . . . . . . . . . 116, 117, 177, 178

*Thiel v. Southern Pac. Co.*, 328 U.S. 217 (1946) . . . . . . . . . . . . . . . . . . . . . . . . 161

*Thornburg v. Mullin*, 422 F.3d 1113 (10th Cir. 2005) . . . . . . . . . . . 68, 69, 113, 170

*Tumey v. Ohio*, 273 U.S. 510 (1927) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

*United States v. Crockett*, 49 F.3d 1357 (8th Cir. 1995) . . . . . . . . . . . . . . . . . . . . 96

*United States v. Drougas*, 748 F.2d 8 (1st Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . 95

*United States v. Grajales-Montoya*, 117 F.3d 356 (8th Cir. 1997) . . . . . . . . . . . 97

*United States v. Possick*, 849 F.2d 332 (8th Cir. 1988.) . . . . . . . . . . . . . . . . . . . . 96

*United States v. Rivera*, 900 F. 2d 1462 (10th Cir. 1990) . . . . . . . . . . . . . 181, 182

*United States v. Young*, 470 U.S. 1 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 97, 113

*Vanlandingham v. Gartman*, 367 S.W.2d 111 (Ark. 1963) . . . . . . . . . . . . . 88, 89

*Wainwright v. Sykes*, 433 U.S. 72 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Wainwright v. Witt*, 469 U.S. 412 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

*Walker v. Engle*, 703 F.2d 959 (6th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . 181

*Walton v. Arizona*, 497 U.S. 639 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

*Washington v. Texas*, 388 U.S. 14 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . 117, 173

*Whitfield v. Walden*, 239 P. 266 (1925) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

*Wiggins v. Smith*, 539 U.S. 510 (2003) . . . . . . . . . . . 20, 71, 73, 111, 118, 176-178

*Williams v. Oklahoma*, 358 U.S. 576 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . 98, 115

*Williams v. Taylor*, 529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 111

*Williamson v. Ward*, 110 F.3d 1508 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . 66, 83

*Witherspoon v. Illinois*, 391 U.S. 510 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

*Woodson v. North Carolina*, 428 U.S. 280 (1976) . . . . . . . . . . . . . 82, 98, 115, 138

*Wright v. West*, 505 U.S. 277 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

*Ylst v. Nunnemaker*, 501 U.S. 797 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Young v. Sirmons*, 486 F.3d 655 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . 27

STATE CASES

*Al-Mosawi v. State*, 929 P.2d 270 (Okl. Cr. 1996) . . . . . . . . . . . . . . . . . . . . . . . 166

*Aycox v. State*, 702 P.2d 1057 (Okl. Cr. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 129

*Banks v. Tate*, 701 P.2d 418  (Okl. Cr. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

*Bechtel v. State*, 738 P.2d 559 (Okl. Cr. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . 106

*Black v. State*, 663 P.2d 22 (Okl. Cr. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

*Booker v. State*, 851 P.2d 544 (Okl. Cr.1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

*Boutwell v. State*, 659 P.2d 322 (Okl. Cr.1983) . . . . . . . . . . . . . 132, 133, 137, 162

*Bowie v. State*, 816 P.2d 1143 (Okl. Cr. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*Brewer v. State*, 650 P.2d 54 (Okl. Cr. 1982) . . . . . . . . . . . . . . . . . . . 107, 113, 169

*Brower v. State*, 221 P. 1050 (Okl. Cr. 1924) . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

*Carter v. State*, 879 P.2d 1234 (Okl. Cr. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 155

*Chaney v. State*, 612 P.2d 269 (Okl. Cr. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . 132

*Clark v. Continental Tank Company*, 744 P.2d 949 (Okla. 1987) . . . . . . . . . . . . 90

*Cody v. State*, 361 P.2d 307 (Okl. Cr. 1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166

*Coulter v. State*, 734 P.2d 295 (Okl. Cr. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . 106

*Cummings v. State*, 968 P.2d 821 (Okla. Cr. App. 1998) . . . . . . . . . . . . . 29, 63, 64

*Dyke v. State*, 716 P.2d 693 (Okl. Cr. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

*Ford v. State*, 719 P.2d 457 (Okl. Cr. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

*Frye v. State*, 606 P.2d 599 (Okl. Cr. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Garrett v. State*, 74 OK Crim. 78, 123 P.2d 283 (1942) . . . . . . . . . . . . . . . . . . . 179

*Givens v. State*, 705 P.2d 1139 (Okl. Cr. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . 87

*Glaze v. State*, 565 P.2d 710 (Okl. Cr. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

*Greathouse v. State*, 503 P.2d 239  (Okl. Cr. 1972) . . . . . . . . . . . . . . . . . . . . . . 161

*Grim v. State*, 240 P. 1093 (Okl. Cr. 1925) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

*Hain II*, 919 P.2d 1130 (Okl. Cr. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

*Johnson v. State*, 665 P.2d 815 (Okl. Cr. 1983) . . . . . . . . . . . . . . . . . . . . . . . . 132

*Jones v. State*, 555 P.2d 1061 (Okl. Cr.1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Jones v. State*, 738 P.2d 525 (Okl. Cr. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . 107

*Kirk v. State*, 10 Okl. Cr. 281, 135 P. 1156 (1913) . . . . . . . . . . . . . . . . . . . . . 62, 63

*L.E.Y. v. State*, 639 P.2d 1253 (Okla. Cr. App. 1982) . . . . . . . . . . . . . . . . . . . 31, 63

*Lanning v. Brown*, 377 S.W.2d 590 (Ky. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . 88

*Ledbetter v. State*, 933 P.2d 880 (Okl. Cr. 1997) . . . . . . . . . . . . . . . . . . . . . . . 149

*Lewis v. State*, 528 P.2d 741 (Okl. Cr. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

*Malicoat v. State*, 992 P.2d 383 (Okl. Cr. 2000) . . . . . . . . . . . . . . . . . . . . . . . . 155

*Moore v. State*, 788 P.2d 387 (Okl. Cr. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

*Patton v. State*, 989 P.2d 983 (Okl. Cr. 1999) . . . . . . . . . . . . . . . . . . . . . . . . 34, 152

*Paxton v. State*, 867 P.2d 1309 (Okla. Cr. App. 1993) . . . . . . . . . . . . . . . . . . . 144

*Pitman v. Doty*, 441 P.2d 428 (Okla. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

*Plantz v. State*, 876 P.2d 268 (Okl. Cr. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

*Powell v. State*, 906 P.2d 765 (Okla. Cr. App. 1995) . . . . . . . . . . . . . . . . . . . . . . 68

*Rawlings v. State*, 740 P.2d 153 (Okl. Cr.1987) . . . . . . . . . . . . . . . . . . . . . . . . . 164

*Rheuark v. State*, 160 P.2d 413 (Okl. Cr. 1945) . . . . . . . . . . . . . . . . . . . . . . . . . 110

*Rider v. State*, 494 P.2d 347 (Okla. Cr. App. 1972) . . . . . . . . . . . . . . . . . . . 31, 62

*Romano v. State*, 909 P.2d. 92 (Okl. Cr. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Russell v. State*, 560 P.2d 1003 (Okl. Cr. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Salazar v. State* 919 P.2d 1120 (Okl. Cr. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 155

*Staggs v. State*, 804 P.2d 456 (Okl. Cr. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . 163

*Thornburgh v. State*, 985 P.2d 1234 (Okl. Cr. 1999) . . . . . . . . . . . . . . . . . 34, 163

## FEDERAL STATUTES

28 U.S.C. § 2254 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 18, 20

28 U.S.C. § 2254(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

28 U.S.C. §2254(d) . . . . . . . . . . . . . . . . . . . . . . . . . 54, 93, 109, 111, 128, 131, 140

28 U.S.C. § 2254(d)(1) . . . . . . . . . 19, 27, 70, 94, 97, 107, 108, 125, 129, 162, 177

28 U.S.C. §2254(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 60, 70

28 U.S.C. § 2254(e)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## STATE STATUTES

Okla. Stat. tit. 21 §701.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

Okla. Stat. tit. 22 § 984 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

# LIST OF ATTACHMENTS TO APPENDIX

*(Birth dates, social security numbers, addresses, phone numbers,
e-mail addresses, and names of minor children have been redacted pursuant to the
E-Government Act of 2002.)*

Attachment 1- Oklahoma Court of Criminal Appeals Opinion Denying Post-Conviction Relief

Attachment 2- Oklahoma Court of Criminal Appeals Direct Appeal Opinion

Attachment 3- United States Supreme Court denial of certiorari

Attachment 4-Judgment and Sentence

Attachment 5- The Death Warrant

Attachment 6- State's Exhibits 79 and 65

Attachment 7- Determination of Competency to Stand Trial, Psychiatric Evaluation of Justin B. Sneed, by Edith King, Ph.D.,dated July 1, 1997.  **(Filed under seal pursuant to Order of October 21, 2008, and E-Government Act of 2002)**

Attachment 8- Affidavit of Christopher Evangelista, dated October 15, 2006

Attachment 9- Affidavit of Steve Leedy, dated October 11, 2006

Attachment 10- Affidavit of Sherry Britton, dated October 13, 2006

Attachment 11- Affidavit of Anna Rose Wilson, dated October 12, 2006

Attachment 12- Affidavit of Sara Bonnell, dated October 18, 2006

Attachment 13- Affidavit of Krystal Willis, dated October 18, 2006

Attachment 14- Affidavit of Donald Stamman, dated October 13, 2006

Attachment 15- Affidavit of Latricia Deselle, dated October 9, 2006

Attachment 16- Affidavit of Jolene Perham, dated December 15, 2005
      Re: Financial Records of Best Budget Inn

Attachment 17- Affidavit of Jolene Perham, dated December 15, 2005
      Re: Videotape of Interview with Justin Sneed  (Copy of video is filed
      conventionally)

Attachment 18- Redacted version of Affidavit of Jolene Perham, dated December 15,
      2005, Re: Transcript of Videotaped Interview with Justin Sneed
      **Portions of interview redacted pursuant to E-Government Act of
      2003**

Petitioner's Name      Richard Glossip
Prisoner's Inmate No. 267303
Place of Confinement Oklahoma State Penitentiary,        McAlester, Oklahoma

## IN THE DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **RICHARD GLOSSIP,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **Case No. CIV-08-326-HE** |
| **vs.** | ) | |
| | ) | |
| **MARTY SIRMONS, Warden,** | ) | |
| **Oklahoma State Penitentiary,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## PETITION FOR A WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY
## <u>PURSUANT TO 28 UNITED STATES CODE, §2254</u>

Petitioner, Richard Glossip, is incarcerated at the Oklahoma State Penitentiary

in the State of Oklahoma, Post Office Box 97, McAlester, Oklahoma 74502.  Mr.

Glossip is confined by the State of Oklahoma  under a sentence of death in violation

of the laws and Constitution of the United States of America.  As a result of these

violations, Mr. Glossip is entitled to have the writ of habeas corpus issue on his

behalf.  This is Mr. Glossip's first petition for a writ of habeas corpus relief pursuant

to Title 28, United States Code, §2254[1].

---

[1]This action concerns the retrial of Mr. Glossip.  He was originally tried and convicted of first degree murder and sentenced to death in June, 1988.  The conviction and sentence  were reversed and remanded for a new trial in *Glossip v. State*, 29 P.3d 597 (Okla. Cr. App. 2001).

## INTRODUCTION

Mr. Glossip's conviction and sentence resulting in his first trial were reversed by the Oklahoma Court of Criminal Appeals due to ineffective assistance of counsel. One of the bases for the reversal was the failure of Petitioner's trial counsel to utilize the videotaped interview of accomplice Justin Sneed to cross-examine and impeach Mr. Sneed and State's witness Detective Bemo. At Mr. Glossip's retrial, his new trial counsel failed to use the critical piece of evidence to cross-examine Justin Sneed and Detective Bemo.

Additionally, at retrial a substantial amount of extremely emotional and unduly prejudicial victim impact testimony was given, in first stage, by State's witness Donna Van Treese, the spouse of the victim, Barry Van Treese, and another witness of the State.

Over defense counsel's objection at the end of the first day of trial, the trial court allowed the prosecutor to write portions of the testimony of witnesses, with the portions being selected by the Prosecutor, on numerous large posters, approximately two feet by 3 feet, and display them continuously in front of the jurors, and testifying witnesses, from the first day of trial and through out the first stage of trial. At one point, defense counsel determined he needed to insert some language on the posters also as it was obviously a one-woman show at the posters. At the end the trial the Prosecutor objected to defense counsel's request to make the posters part of the

record, or even to take photographs of the posters in order to preserve them for the record. The trial court very curtly denied defense counsel's request and, therefore, defense counsel was prohibited from making the posters a part of the record, or to take photographs of the posters.

Accomplice Justin Sneed was living free of cost at the Best Budget Inn in Oklahoma City, in exchange for performing work at the motel for Mr. Glossip, manager of the motel. The motel was owned by the victim. Justin Sneed murdered Barry Van Treese as he slept in a motel room at the Best Budget Inn in the early morning hours of January 7, 1997. Then Justin Sneed took cash from Mr. Van Treese's automobile which was parked at the motel.

In an interview with law enforcement officials, Justin Sneed after first denying that he had anything to do with the murder, stated that he murdered Mr. Van Treese but that Mr. Glossip was the mastermind behind the murder[2], which was allegedly committed to obtain cash that Mr. Glossip allegedly knew that Mr. Van Treese would have. Justin Sneed stated that Mr. Glossip had promised him that they would split the cash. It was determined that forensic evidence collected at the crime scene belonged to Justin Sneed, but no forensic evidence was attributed to Mr. Glossip. Both Mr. Glossip and Justin Sneed had cash in their possession. Mr. Glossip denied that the cash in his possession was cash taken from Mr. Sneed's automobile. The State argued

---

[2]Mr. Glossip was not present when Mr. Van Treese was murdered.

that the cash in Mr. Glossip's possession was his share of the cash taken from Barry Van Treese. The Oklahoma Court of Criminal Appeals found that cash to be the overwhelming corroborating evidence that linked Mr. Glossip to the commission of the murder.

Mr. Glossip claims, among other claims, that there was insufficient evidence to convict him of first degree murder. He claims that there was insufficient corroborating evidence to connect him to the commission of the murder, as is required to corroborate the testimony of his accomplice, Justin Sneed. Mr. Glossip presents that claim in Ground I of this Petition. Mr. Glossip claims that Justin Sneed came to Glossip's apartment at the motel, woke him up, and told him he had killed Mr. Van Treese. Mr. Glossip decided not to say anything to anyone at the time, and that error was used to help convict Mr. Glossip of the murder. He claims that at the most he was an accessory after the murder for not reporting the murder once he learned of it.

## STATEMENT OF THE CASE

On January 14, 1997, Justin Blayne Sneed was charged by Information in Oklahoma County District Court Case No. CF-97-244, with Murder in the First Degree in violation of 21 O.S. 701.7(A) (2001). (O.R. 1-4) On January 23, 1997, a second Information was filed adding Richard Glossip as a co-defendant in the case. Mr. Glossip was originally charged with one count of Accessory to First Degree

4

Murder in Oklahoma County District Court, Case Number CF-1997-256.  However, that case was dismissed on January 27, 1997, after Mr. Glossip was charged as a principal in Case Number CF-1997-244.  (O.R.5-9)  Mr. Glossip was tried separately by a jury, convicted of one count of Murder in the First Degree, and sentenced to death in June 1998.  The conviction and sentence were appealed to the Oklahoma Court of Criminal Appeals[3] and on July 17, 2001, the OCCA  reversed and remanded the case for a new trial.  *See Glossip v. State,*  29 P.3d 597 (Okl. Cr. App.  2001).

On retrial, the State alleged that the murder was especially heinous, atrocious, or cruel, that the murder was committed for remuneration, and that a probability existed that Mr. Glossip would pose a continuing threat to society.   (O.R. 1044-45)  On June 1, 2004, Mr. Glossip was again convicted by a jury before the Honorable Twyla Mason Gray, District Judge, of Murder in the First Degree in violation of 21 O.S. §701.7.   The trial court struck the heinous, atrocious, or cruel aggravating circumstance and the jury rejected the continuing threat circumstance.  On June 3, 2004, having found the murder for remuneration aggravator, the jury assessed punishment at death.   Judgment and Sentence was imposed by the trial court on August 27, 2004.

The conviction and sentence were affirmed on direct appeal on April 13, 2007.

---

[3]Hereinafter "OCCA"

*Glossip v. State*, 157 P.3d 143 (Okla. Cr. App. 2007). *See* Attachment 2 to Appendix.

Post-Conviction relief was denied on December 6, 2007 in an unpublished opinion in

Case Number PCD-2004-978. *See* Attachment 1to Appendix. Certiorari was denied

on January 22, 2008, in *Glossip. v. Oklahoma*, 128 S.Ct. 1124 (2008). *See*

Attachment 3 to Appendix.

## STATEMENT OF FACTS

In the early morning hours of January 7, 1997, Justin Sneed beat Barry Van

Treese to death with a baseball bat in Room 102 of the Best Budget Inn, a motel in

Oklahoma City owned by Mr. Van Treese and his wife Donna. Richard Glossip and

his girlfriend D-Anna Wood managed the motel and lived in an apartment connected

to the motel office. (Tr. IV 32,42-43) Justin Sneed had come to the motel with a

roofing crew out of Texas in July 1996. After Mr. Sneed quit his roofing job, Mr.

Glossip had allowed him to stay on at the motel where he worked as the maintenance

man in exchange for his room. (Tr. XII 68, 73).

**Operation of the Best Budget Inn of Oklahoma City.**

The Best Budget Inn was a motel located near Interstate 40 and Council Road

in Oklahoma City. (Tr. XI 116-22) Every customer who checked into the motel was

required to fill out a registration card with basic identification information. The cards

were sequentially numbered and the manager of the motel was responsible for maintaining the cards.  (Tr. IV 52-53)  Payments for the rooms went into the cash register and at the end of the day all receipts were taken from the drawer and placed in an envelope. Rather than depositing the money into a bank, the envelopes containing each day's receipts were stored in a "safe place" of the manager's choosing which was a cabinet over the stove in the manager's apartment.  (Tr. V 82, IV 53-54) Daily reports were generated at the end of each day  which recorded, among other things, which rooms had been rented, the name of the guest, the date each individual checked in, the room rate and the amount actually collected from each guest.  (Tr. IV 53; State's Ex. 77)  The information contained in the daily report was transmitted to Donna Van Treese by telephone each day.  (Tr. IV 62-63).

Mr. Van Treese, who lived in Lawton, traveled to the Oklahoma City motel at least twice a month, on the 5th and the 20th to pay employees and to collect all receipts since his last visit.   When he arrived, he first reviewed the daily reports which were stored with the registration cards in a folder. He reviewed each day's report separately and totaled up the amount of cash and credit card receipts; auditing all records and moneys collected whenever he picked up the cash that had accumulated since his last audit.  (Tr. IV 50, 54-55)

As manager, Mr. Glossip received a salary of $1,500 per month, a free

apartment with all utilities, including telephone and cable television, and a bonus equal to 5% of total revenues in excess of $18,000 per month.  (Tr. IV 50, 55)  The $18,000 figure was set by the Van Treeses and represented the amount necessary to pay all motel and personal expenses, including their personal mortgage as well as an allowance for groceries and all other living expenses for their family.  (Tr. V 8-9)  For the year 1996, Mr. Glossip received a bonus every month except for December.  (Tr. IV 180; Def. Ex. 71)

Beginning in June, 1996, the Van Treeses endured a number of family tragedies and, as a result, Mr. Van Treese's visits to the motel during the last half of 1996 were less frequent than usual.  (Tr. IV 36-42)  He had been to the motel periodically to make payroll, audit the books and pick up receipts, but not to do any specific repairs since prior to June, 1996.  (Tr. IV 58)  Normally, January through March were the slowest months at the motel and that was the time rooms were repainted, carpets replaced, and repairs done to prepare for the spring and summer season.  (Tr. IV 58-59)  In January 1997, Mr. Van Treese intended to go room by room with a maintenance sheet to evaluate what repairs needed to be done at the Oklahoma City motel.  (Tr. IV 71-72)

**Operation of the Tulsa Best Budget Inn.**

The Van Treeses also owned a Best Budget Inn in Tulsa, Oklahoma.  While

some aspects of the operation of the Tulsa motel were the same as in Oklahoma City, others were markedly different.   For example, all registration cards had to be accounted for and a daily report was generated at the end of every day and phoned in to Donna Van Treese just as in Oklahoma City.   However, Mr. Van Treese did not review or pick up the hard copies of the daily reports for the Tulsa motel until the end of each year.  (Tr. VIII 102-03)   Mr. Van Treese only visited the Tulsa motel once every three or four months and payroll checks arrived every two weeks via UPS or Fed Ex.  Rather than being stored in a "safe place" on the premises, each day's receipts were deposited into a Tulsa bank by noon the following day.  (Tr. VIII 55-58)

**Events of January 6-7, 1997.**

Barry and Donna Van Treese returned from a family ski trip on the morning of January 5, 1997.  On January 6, 1997, Barry Van Treese drove to the Oklahoma City Best Budget Inn to make payroll, audit the records, and pick up the receipts that had accumulated since his last visit approximately nine days earlier.  In addition, Mr. Van Treese  intended to check the condition of the rooms at the motel and start the remodeling and repair process that began around this time every year.  According to Mrs. Van Treese, he also intended to speak to Mr. Glossip regarding his management of the motel.  (Tr. IV 70-71)

Mr. Van Treese arrived at the motel between 5:30 and 6:00 p.m on January 6,

1997.  According to Billye Hooper, the day clerk at the motel, he was hurried and a little gruff, but did not seem angry.  His main concern was to get the payroll done. (Tr. VII 53-54)  He made out the paychecks, checked the paperwork, and picked up the receipts.  Around 7:50 p.m., Mr. Van Treese left to check on the Tulsa motel with the intention of returning to Oklahoma City to spend the night.  Before he left, he walked over to the board and took the key to room 102, which was the room he usually stayed in while in Oklahoma City.  (Tr. V 77-79) He also took with him the envelopes containing receipts of somewhere from $2,800 to $4,000 that had accumulated since his last visit to Oklahoma City.  (Tr. VII 77, 83-85)

Barry Van Treese arrived at the Tulsa Best Budget Inn sometime between 11:00 p.m. and midnight on January 6, 1997.  William Bender, the manager of the Tulsa motel, testified that Mr. Van Treese appeared to be angry and demanded to see his daily reports.  According to Bender, Mr. Van Treese told him there were 2,500 registration cards missing at the Oklahoma City motel and the weekend receipt money had not been deposited.  Mr. Van Treese stayed in Tulsa about forty-five minutes to an hour, then left to return to Oklahoma City.  (Tr. VIII 81-82, 98)

D-Anna Wood, Mr. Glossip's girlfriend, testified that she and Mr. Glossip closed the motel office and went to bed at approximately 2:30 a.m. the morning of January 7, 1997.  (Tr. V 82-83)  Sometime around 4:15-4:30 a.m., John Beavers, a

longtime resident of the motel, left his room to go to the convenience store across the parking lot.  As he was coming down the stairs, he heard glass breaking in the area of room 102.  When he got to the edge of the parking lot, he looked back and saw the window of room 102 was broken out and glass was on the sidewalk.  (Tr. VI 20-23) Justin Sneed testified that this window was broken during his attack on Barry Van Treese.  (Tr. XII 101)

Mr. Glossip and Ms. Wood were awakened in the early morning hours of January 7 by a scraping or knocking noise along the side of their apartment.  Mr. Glossip went to the office door to see what was going on and returned a short time later.  He told D-Anna it was Justin Sneed reporting that two drunks had broken a window and that he had told Mr. Sneed to clean it up.  Mr. Glossip then came back to bed and the couple went back to sleep.  (Tr. V 82-86)  In fact, Mr. Sneed had told Mr. Glossip that he had just killed Barry Van Treese because he was afraid Mr. Van Treese was going to throw him out in the street and he had nowhere to go.  (State's Ex. 2)

Later that morning, Mr. Sneed and Mr. Glossip repeated the story about the two drunks and affixed a piece of Plexiglas over the window.  *(See, e.g.,* Tr. IX 46, XII 149)  Sometime during the attack, Mr. Sneed had gotten a black eye that he explained by saying he had slipped in the shower and hit his eye on the soap dish.  (Tr. XII 137)

11

In the early afternoon, Mr. Glossip and Ms. Wood left the motel to run errands. After cashing Mr. Glossip's paycheck, the couple went to replace Mr. Glossip's glasses that had broken a few days earlier.  They also bought an inexpensive engagement ring for Ms. Wood, and then went to Wal-Mart.  (Tr. V87-89)  While at Wal-Mart, Mr. Glossip received a page from Billye Hooper who informed him that Barry Van Treese's car had been found parked awkwardly at the Weokie Credit Union behind the motel.  Ms. Hooper was very concerned since she had not seen Mr. Van Treese all day.  (Tr. VII 72-74)

Mr. Glossip and Ms. Wood returned immediately to the motel where they met with Cliff Everhart, the part-time security guard and purported owner of 1% of the Best Budget Inn.  (Tr. V 96; XI 169-70)  Before they arrived, Mr. Everhart asked Justin Sneed to go room to room at the motel to search for Mr. Van Treese. Mr. Sneed skipped room 102 and pretended to search the other rooms.[4]  (Tr. XII 157)  Mr. Everhart, Mr. Glossip and Ms. Wood then drove around in Everhart's truck to look for Mr. Van Treese.  (Tr. V 95-97)  While they were searching, Justin Sneed gathered up his belongings and simply walked unnoticed away from the motel.  (Tr. XII 159-60)

---

[4]The evidence adduced at trial on this point is conflicting.  Ms. Wood and Mr. Sneed testified that Mr. Sneed searched the rooms alone.  (Tr. V 98; XII 157-58)  Mr. Everhart testified that he asked both Mr. Sneed and Mr. Glossip to search the rooms together.  (Tr. XI 185)  Ms. Hooper testified that Everhart instructed Mr. Sneed to check the rooms, but indicated Mr. Glossip and Mr. Sneed left together to do so.  (Tr. VII 76)

Around 4:30-5:00 p.m., Oklahoma City Police Officer Tim Brown joined in the search for Mr. Van Treese.  (Tr. IX 187, 204)  Although all of the searchers were aware that the window had been broken out of room 102 in the early morning hours, that room 102 was the room Mr. Van Treese regularly stayed in when he was at the motel, that Justin Sneed had gotten a black eye sometime in the night and had disappeared while the search for Mr. Van Treese was being conducted, no one checked room 102 until around 10:30-11:00 p.m. that night.  *(See, e.g.,* Tr. IX 214, XI225)  At that time, Mr. Everhart and Officer Brown entered the room and found Barry Van Treese's body on the floor beneath some bedclothes.  (Tr. IX 221, 224-25) Mr. Van Treese had suffered a number of blows to the head consistent with a blunt object and had bled to death as a result of those injuries.  *(See, generally,* Tr. XI 15 *et seq.)*

**Mr. Glossip's Detention and Subsequent Arrest.**

After Mr. Van Treese's body was found, Richard Glossip was detained for questioning by Officer Brown and placed in the back of his patrol car.  (Tr. IX 230) While seated in the vehicle, Mr. Glossip told Brown that early in the morning Mr. Sneed had banged on the glass front doors and then on the side wall of his apartment. Mr. Glossip said that he and Ms. Wood had suspected the whole time that Justin had something to do with what happened to Mr. Van Treese, but did not want to say

anything until they knew for sure.  (Tr. IX 233)  Mr. Glossip was then transported to the police station to be interviewed about Mr. Van Treese's death.

Mr. Glossip was questioned by Oklahoma City Police Detectives Bob Bemo and Bill Cook in a videotaped interrogation conducted in the early morning hours of January 8, 1997.  Mr. Glossip denied knowing anything about the murder, including Mr. Sneed''s statement to him that he had killed Mr. Van Treese.  (State's Ex. 1) Although Cook and Bemo made clear during the interview that they thought Mr. Glossip was not disclosing everything he knew about the murder, the detectives released him after the interrogation and he was transported back to the motel.  (State's Ex. 1; Tr. XIV 9)

Following the interrogation, Mr. Glossip knew he was a suspect in the murder. The next day, he began selling a number of his possessions to raise money.  He did not try to leave town, but instead visited a lawyer.  Immediately upon leaving the lawyer's office, Mr. Glossip and Ms. Wood were taken into custody by officers who had been conducting surveillance and the couple was transported back to the police station.  (State's Ex. 2; Tr. XII 6-8)

In a second videotaped interrogation conducted on January 9, 1997, Mr. Glossip told Bemo and Cook that Mr. Sneed had told him the morning of January 7 that he had killed Mr. Van Treese.  Mr. Glossip acknowledged that he should have said something

at that time, but denied any motivation for or involvement in a plot to murder Mr. Van Treese.  (State's Ex. 2)  After the interview, Mr. Glossip was placed in the county jail. At the time of his arrest, he was carrying $1,757.00 in cash, a sum comprised of his paycheck, proceeds from the sale of vending machines to the Best Budget Inn and personal items to other individuals, and his savings.  (State's Ex. 2, Tr. XV 16-18)

**Apprehension of Justin Sneed.**

After walking away from the Best Budget Inn the afternoon of January 7, 1997, Justin Sneed went back to work with the roofing crew.  (Tr. XII 162)  He was apprehended on January 14, 1997, and brought to the police station for questioning. In the apartment where he was arrested, police found a Crown Royal bag belonging to Mr. Sneed that contained approximately $1,680 in cash.  (Tr. XIV 13-18)  In his videotaped interview, which was never shown to the jury, the detectives told Mr. Sneed they knew the murder had not been his idea but rather Mr. Glossip's.[5]  After first denying any involvement with or knowledge of the murder, the detectives told Mr. Sneed to "get right with The Almighty" and indicated they already knew what happened and they just needed him to confirm that Mr. Glossip was the mastermind behind the murder.  After detectives told Mr. Sneed that Mr. Glossip was trying to

---

[5]A court reporter's transcript of the videotape is attached as Attachment 18 to the Appendix.  A copy of the videotape will be submitted with Petitioner's Motion For Evidentiary Hearing as Attachment 17 to the Appendix.  *See also* Ground V.

"hang him" and make him the "scapegoat," he changed his story and told the detectives that Mr. Glossip had asked him to kill Mr. Van Treese with a baseball bat and to split the cash Mr. Van Treese had under the front seat in his car.  Although he thought Mr. Van Treese was "sitting on" $7,000, the amount actually obtained from the car was less than $4,000.  The brief interview was quickly wrapped up by detectives after Mr. Sneed told them what they wanted to hear.  In exchange for a sentence of Life Without the Possibility of Parole, Mr. Sneed testified against Mr. Glossip at trial. (State's Ex. 43)  A claim of ineffective assistance of counsel in regard to trial counsel's failure to use the transcript for impeachment purposes is set forth in Ground V and the claim will be included in Petitioner's Motion For Evidentiary Hearing.

**Mr. Sneed's varied stories.**

Mr. Sneed's story has varied widely from his statement given to police on January 14, 1997 to his testimony at Mr. Glossip's 1998 trial and finally to his testimony in 2004.  Each time Mr. Sneed told the story, embellishments were added.  In 1998, Mr. Sneed testified for the first time that, among other things, Mr. Glossip had asked him to kill Barry Van Treese on more than one occasion, that Mr. Glossip had asked him to buy trash bags, a hack saw and muriatic acid to dispose of the body, and that Mr. Glossip had told him to leave the motel when the police were searching

for Mr. Van Treese.  (O.R. 604-05)  At the 2004 trial, Mr. Sneed repeated the changes from 1998 and added several more. Between the 1998 trial and the 2004 trial, the amount of money Mr. Glossip had offered Mr. Sneed to kill Mr. Van Treese increased from $7,000 to 10,000.  (Tr. XII 166-67)  Mr. Sneed also described for the first time another incident in which Mr. Glossip wanted him to kill Mr. Van Treese with a hammer in the boiler room of the motel in November or December, 1996 (Tr. XII 80-81); alleged for the first time that Mr. Glossip had taken the victim's wallet out of his pants pocket and removed a $100 bill (Tr. XII 123); and said he had tried to "push" a knife with a broken tip into Mr. Van Treese's chest during the attack.  (Tr. XII 102) These and other discrepancies in Mr. Sneed's testimony from proceeding to proceeding are discussed in more detail throughout this Petition and in Mr. Glossip's Motion for Evidentiary Hearing which will be filed pursuant to the Scheduling Order in this case.

**Mr. Glossip's conviction and sentence.**

Mr. Glossip was convicted of First Degree Murder.  (Tr. XV 183)  In second stage, the State incorporated the evidence from the first stage of trial (Tr. XVI 69), then presented two victim impact witnesses, each of whom read statements from several of Mr. Van Treese's children in addition to their own.  (Tr. XVI 70-88)  At Mr. Glossip's request, defense counsel limited presentation of mitigation evidence to five

witnesses.  After deliberating for almost five hours, the jury rejected the continuing threat aggravator, but found that the murder was committed for remuneration and sentenced Mr. Glossip to death.  Other facts will be discussed as they relate to the following claims.

## STANDARD  OF  REVIEW
### THE ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT IS APPLICABLE TO THIS CASE.

The Antiterrorism and Effective Death Penalty Act  (hereinafter "AEDPA") is applicable in this case.   The Act applies to all claims that were adjudicated on the merits in state court proceedings, and  informs a federal district court when habeas corpus relief may be granted to a state prisoner.  If the State Court did not decide the claim on the merits, the deference provisions under 28 U.S.C. § 2254 are inapplicable.  Pursuant to the AEDPA, a Petition For A Writ Of Habeas Corpus shall not be granted with respect to any claim that was adjudicated on the merits in a State Court  unless the adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

28 U.S.C. § 2254(d)(1) and (2).   The Petitioner must show that the State Court's

decision was either contrary to clearly established law of the United States Supreme Court, or involved an unreasonable application of clearly established law of the United States Supreme Court to the facts of the case under §2254(d)(1). The Supreme Court explained important provisions in *Williams v. Taylor*, 529 U.S. 362, 412 (2000):

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412-13. The Court stated that under the "unreasonable application" clause, a federal habeas court must ask whether the State Court's application of Supreme Court law was objectively unreasonable. *Id.* 529 U.S. at 411. The Court also anticipated that "there will be a variety of cases . . . in which both phrases may be anticipated" in regards to the two provisions of §2254(d)(1). *Id.* at 386. Federal Courts are not required to defer to "a state-court application of the federal law that is, in the independent judgment of the federal court, in error." *Id.* at 387. "Section 2254(d) requires us to give state courts' opinions a respectful reading, and to listen carefully to their conclusions, but when the state court addresses a legal question, it is the law 'as determined by the Supreme Court of the United States' that prevails."

19

*Id.* at 387.   "A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002).   Under the "unreasonable application" prong of §2254(d)(1) a federal habeas court may "grant the writ if the state court identifies the correct governing legal principle form this Court's decisions but unreasonably applies that principle to the facts" of Petitioner's case.   *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).   The term "unreasonable", however, does not mean "patently" unreasonable. *Williams v. Taylor*, 529 U.S. at 387, n. 14.

State Court determinations of fact "shall be presumed correct" unless the presumption is rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Spears v. Mullin*, 343 F.3d 1215, 1225 (10th Cir. 2003).

Any claim which the State Court failed to review is deemed to have not been decided "on the merits" and the deferential review set out in 28 U.S.C. § 2254 is not applied. *Morris v. Burnett,* 319 F.3d 1254, 1267 (10th Cir. 2003).  *See also Rompilla v. Beard,* 545 U.S. 374, 390 (2005) (Supreme Court reviewed the issue of prejudice . . . *de novo*" because the State Court "never reached the issue of prejudice."

## **EXHAUSTION AND PROCEDURAL BAR**

Pursuant to 28 U.S.C. § 2254(b) federal habeas corpus relief is not available to a state prisoner unless all state court remedies have been exhausted. *Wainwright v. Sykes,* 433 U.S. 72, 80-81 (1977). A state "should have the first opportunity to address and correct alleged violations of a state prisoner's rights." *Coleman v. Thompson,* 502 U.S. 722, 731 (1991). Federal habeas relief may be denied if a State disposed of a claim on adequate and independent state grounds. *Coleman*, at 750.

If a procedural bar would be applied in a State court if a Petitioner were to now present the claim in State court, a federal court may examine the claim under a procedural bar analysis rather than requiring exhaustion. *Coleman*, at 735 at n.1. A State court's finding of a procedural default is "independent if it is separate and distinct from federal law." *Andrews v. Deland,* 943 F.2d 1162, 1188 n. 40 (10th Cir. 1991).

Petitioner has set forth in his Grounds below his statement where his claims were presented in State Court.

## GROUND I

**THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT TO SUSTAIN A CONVICTION AND SENTENCE OF DEATH UNDER THE REQUIREMENTS OF THE EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.**

This claim was presented as Proposition I in direct appeal proceedings.

The Due Process Clause of the Fourteenth Amendment requires that a criminal

defendant not be convicted except upon production by the State of proof beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970). Due Process requires an examination of the sufficiency of evidence by determining whether, after reviewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the charged crimes beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319 (1979).

Additionally, this case involves accomplice testimony. No conviction can be premised upon the testimony of an accomplice unless that testimony is "corroborated by such other evidence as tends to connect the defendant *with the commission of the offense,* and the corroboration is not sufficient if it merely show the commission of the offense or the circumstances thereof." 22 O.S. §742 (2001) (emphasis added) Petitioner was entitled to have his conviction determined according to the requirements of the statute. The OCCA has acknowledged that a defendant is entitled to statutorily conferred rights, even when such rights are not protected under the federal constitution, and denial of those rights constitutes a violation of due process. *Ryan Golden*, 2006 OK CR 2, ¶ 13, citing *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980) (denial of petitioner's statutory right to have jury determine punishment constituted a violation of due process). The evidence does not meet the statutory requirements of 22 O.S. §742 and fails to meet the test set out in *Jackson v. Virginia*.

Even though the *Jackson* test appears to be a high hurdle to overcome by a defendant, the importance of *Jackson* is its protection of due process and, therefore, a mere "modicum" of evidence cannot "by itself rationally support a conviction beyond a reasonable doubt." *Id*. at 320. A mere "modicum" of evidence is the most that the State was able to show at Petitioner's trial.

The State presented an incredible amount of testimony and evidence, including even victim impact testimony in first stage, that was plainly irrelevant and highly prejudicial to Petitioner in order to obtain a conviction and death penalty in this case, as set forth in several Grounds herein. This Ground addresses the evidence, testimony, and exhibits presented at trial in connection with Petitioner's claim that the evidence was insufficient to convict Mr. Glossip of first degree murder.

Mr. Glossip was convicted by the testimony of accomplice Justin Sneed and by corroborating evidence that did not connect Mr. Glossip to the murder. The evidence amounted to mere speculation, inferences, inconsistent theories, testimony about Justin Sneed's weak disposition and inability to murder given by witnesses who hardly knew Mr. Sneed, improper victim impact evidence in first stage, inadmissible character evidence, ineffective assistance of counsel, prosecutor misconduct, and other errors. Other Grounds in this Petition also address additional issues relating to the evidence presented at trial. The following short sample of testimony is a preview of

the nature of the  evidence presented at trial in order to obtain the conviction of Mr.

Glossip:

> The State attempted through several witnesses to show that Mr.
> Sneed would not have killed Mr. Van Treese if Mr. Glossip had not told
> him to do so:
>
> Kayla Pursley:  After a series of leading questions in which the
> prosecutor was providing most of the testimony, Kayla Pursley finally
> said, **"I wouldn't have thought any of them would have done that,
> but obviously, you know, he *must have* really looked up to Rich [Mr.
> Glossip] and he would have *probably* done anything for him."**
>
> Billye Hooper:   In answer to the prosecutor's question whether it
> would "make sense to [Ms. Hooper]  that Richard Glossip was involved,
> Ms. Hooper answered:
>
> > **"In my opinion, Justin would not have murdered Barry Van
> > Treese, I don't believe because, for one, he didn't know the
> > man hardly  at all.  He probably had no – very few comments
> > even made together and I wouldn't see, in my opinion, why he
> > would have a reason to do such a violent act to someone that
> > he hardly knew."**
>
> The State even argued that the *lack* of forensic evidence
> implicated Mr. Glossip in the murder. The lengthy victim impact
> testimony in first stage was some of the most prejudicial evidence
> presented.

The State presented substantial evidence at trial but at most the evidence may

establish that Petitioner was guilty of Accessory After the Fact.   The corroborating

evidence at most connected Mr. Glossip to the accomplice Justin Sneed, and/or

showed the commission of the murder or the circumstances of the murder,  but it did

not **connect** Mr. Glossip to the commission of the murder as is required for conviction of first degree murder.

**The State's Theory.**

The state's theory was that Mr. Glossip was afraid that Barry Van Treese was about to fire him from his job as manager of the Best Budget Inn. According to the state, Mr. Glossip nevertheless thought he could talk Donna Van Treese into letting him take control of both the Oklahoma City and Tulsa motels and so he solicited Justin Sneed to kill Mr. Van Treese.

Justin Sneed provided the only evidence directly linking Mr. Glossip to the murder. In attempting to corroborate Mr. Sneed's testimony, the State presented evidence intended to show that (1) Mr. Glossip had been mismanaging the motel and was about to be fired; (2) Mr. Sneed was a naive young man who had no independent motive to kill Mr. Van Treese;[6] (3) Mr. Glossip was Mr. Sneed's boss and often told him what to do; (4) as manager of the motel, Mr. Glossip's fingerprints should have been found in room 102 where Mr. Van Treese was killed, but were not; (5) Mr.

---

[6]In regards to the State's evidence that Mr. Glossip controlled Mr. Sneed and that Mr. Sneed was naive, Petitioner has included  Ground XI claiming that trial counsel and appellate counsel were ineffective for failing to use compelling contradictory evidence contained in the psychiatric evaluation to determine competency of Mr. Sneed performed by Dr. Edith King, a copy of which was filed in the Court on July 17, 1997.  The claim was included in the Application For Post Conviction Relief.  Petitioner will include that issue in his request for evidentiary hearing when it is due.

Glossip failed to report that Mr. Sneed had confessed to killing Mr. Van Treese approximately seventeen hours before his body was found and then told inconsistent stories throughout the day to delay that discovery; (6) after selling all of his belongings, Mr. Glossip went to see a lawyer instead of coming back to the police station as instructed; and (7) at the time of his arrest Mr. Glossip had $1,757 dollars in his possession which is approximately half of the receipts the State estimated Mr. Van Treese had collected from the motel shortly before he was murdered.

Even if the State had proved everyone of these contentions was true, which, as shown below, it did not, none of this evidence independently connected Mr. Glossip to the murder of Barry Van Treese. Even viewing this evidence in the light most favorable to the State, the *most* that can be said is that Mr. Glossip *may* be an accessory after the fact to murder.

**OCCA Decision**

The OCCA correctly stated that the standard for reviewing claims of insufficiency of the evidence is whether, "after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Glossip*, at 151. The Court found that the evidence corroborated Mr. Sneed's story about Mr. Glossip's involvement in the murder and that the evidence sufficiently tied Mr. Glossip to the

commission of the offense so that the conviction is supported. *Glossip*, 157 P.3d at 153-154.

Because the OCCA applied the correct legal standard, this Court must determine whether the OCCA's "determination that the evidence was sufficient to support the jury's verdict was reasonable." *Young v. Sirmons*, 486 F.3d 655, 667 (10th Cir. 2007).

The decision that the evidence was sufficient to support Mr. Glossip's conviction of first degree murder involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court. *Jackson v. Virginia*, 443 U.S. at 319; 28 U.S.C. §2254(d)(1). Also, some of the findings of the OCCA were unreasonable determinations of the facts in light of the evidence presented at trial. 28 U.S.C. §2254(d)(2). Those instances are set out below.

**Instruction on Accomplice Testimony**

The OCCA first erroneously held that "[t]he jury was properly instructed according to the **law** in effect at the time of trial, on accomplice testimony and corroboration of the testimony." *Glossip*, 157 P.3d at 152. (emphasis added).

The conviction is unconstitutional because the jury was not required to determine, pursuant to Oklahoma law, whether the independent corroborating evidence connected Petitioner to the commission of the crime **in the absence of the**

**testimony of accomplice Justin Sneed.**   Instruction No. 14 erroneously stated:

### EVIDENCE-DETERMINING WHEN CORROBORATION BY ACCOMPLICE IS SUFFICIENT

In determining the question as to whether or not the testimony of an accomplice has been corroborated, you *may* eliminate his testimony entirely and then examine all of the remaining testimony, evidence, facts, and circumstances, and ascertain from such examination whether there is any evidence tending to show the commission of the offense charged and tending to connect the defendant with the offense.  If there is, then the testimony of the accomplice is corroborated.

(O.R. 1276) (emphasis added)   In first stage closing arguments the prosecutor stated:

"Instruction number 13 is the one that tells you that Justin Sneed is most certainly an accomplice.

Last, instruction number 14 tells you that *a way* to determine whether corroboration is sufficient is to eliminate the testimony of the accomplice entirely and then examine all the remaining testimony, evidence, facts and circumstances, and ascertain whether there is any evidence tending to show the commission of the offense charged and tending to connect the defendant with the offense.  If the answer is yes, then the testimony of the accomplice is corroborated."

(Tr. Vol. 15, p. 91)   (emphasis added)

The general rule regarding accomplice testimony is that an accomplice's testimony "*must* be corroborated with evidence, *that standing alone*, tends to link the defendant with the commission of the crime charged."  *Cummings v. State,* 968 P.2d 821 (Okla. Cr. App. 1998).  (emphasis added).   In *Pink v. State*, 104 P.3d 584 (Okla. Cr. App. 2004) the OCCA found that the jury instruction, which was  the same

28

instruction given in Petitioner's trial, erroneously instructed that "you *may* eliminate [the accomplice] testimony entirely and then examine all of the remaining testimony . . ." which the OCCA found was "not consistent with our law regarding adequate corroboration of accomplice testimony . . ." *Id*. at 592.

The OCCA did state in *Pink* that "this possible interpretation may not seem problematic in every case." *Id*. at 592-593. However, like the situation in Petitioner's case, during closing arguments the prosecutor in *Pink* told the jury that the language was correct. *Id*. The OCCA in *Pink* held "this prosecutorial argument substantially enhanced the possibility that Pink's jury would misunderstand the adequate corroboration requirement contained in its accomplice instructions, which may likewise help explain the jury's apparent, but mistaken, decision that adequate corroboration had been established." *Id*. at 592-593. The OCCA noted that the language was "not truly discretionary or optional under our law" and modified the instruction and struck out the word "*may*" and replaced it with "*must*". *Pink*, 104 P.3d at 593.

In *Pink* trial counsel had argued that the language was incorrect but the Prosecutor told the jury that the language of the instruction was the law. *Id*. at 592. Petitioner's jury was given the same  incorrect instruction and the Prosecutor explicitly told Petitioner's jury that the language of the instruction was "*a way*" to

determine the sufficiency of the corroborating evidence, clearly sending the message that was it discretionary to use that method, and it is impossible to determine whether the jury used any test whatsoever in making that critically important determination. (Tr. Vol. 15, p.90)

The OCCA noted that Petitioner had not raised any issue regarding the instruction, but nevertheless the OCCA reviewed the issue, finding that "the giving of the pre-*Pink* instruction did not affect the outcome of this trial." *Glossip*, 157 P.3d at 152, n. 5. Therefore, this Court is not precluded from reviewing the claim. "State procedural bars are not immortal, however; they may expire because of later actions by state courts. If the last state court to be presented with a particular federal claim reaches the merits, it removes any bar to federal court review that might otherwise have been available." *Ylst v. Nunnemaker,* 501 U.S. 797, 801 (1991).

Even though in *Pink* the OCCA stated that the *Pink* jury was **improperly** instructed by the use of the same instruction given to Mr. Glossip's jury, the OCCA erroneously held in Mr. Glossip's case that "[t]he jury was **properly** instructed, according to the **law** in effect at the time of trial, on accomplice testimony and corroboration of the testimony." *Glossip*, 157 P.3d at 152. (emphasis added). However, it was the instruction which was in effect at the time of both Mr. Pink's trial and Mr. Glossip's trial, but the law in effect at the time of both trials was contrary to

the existing instruction, as held in *Pink*, "[u]nder Oklahoma law, the jury *must* be able to eliminate the testimony of an accomplice, (or accomplices) and still be able to find some separate evidence that tends to connect the defendant with the commission of the charged offense." *Pink*, 104 P.3d at 593. (emphasis original)

The evidence at most may have merely connected Petitioner to Mr. Sneed, which does not rise to sufficient corroborating evidence. *See L.E.Y. v. State*, 639 P.2d 1253 (Okla. Cr. App. 1982) (corroborating evidence is "insufficient if it does no more than connect the defendant with the perpetrators but not the crime."); *Rider v. State*, 494 P.2d 347, 350 (Okla. Cr. App. 1972) ( "[T]he evidence independent of the testimony of the accomplice must tend to connect defendant with the crime itself, and not simply with its perpetrators.")

The OCCA stated that "corroborative evidence is not sufficient if it requires any of the accomplice's testimony *to form the link* between the defendant and the crime . . ." *Id.* (emphasis added) However, without Mr. Sneed's accomplice testimony there is no link between Mr. Glossip and the crime. Without Mr. Sneed's testimony the presence of money on Mr. Glossip's person is meaningless, as is the rest of the State's evidence addressed below.

The giving of the instruction prejudiced Mr. Glossip because it is likely that the jury considered only Mr. Sneed's testimony when determining Mr. Glossip's guilt.

**Money found in Mr. Glossip's possession.**

There was no other evidence connecting Mr. Glossip to the money found on his person, but the OCCA found that "[t]he most compelling corroborative evidence, in a light most favorable to the State, is the discovery of the money in Glossip's possession." *Glossip,* 157 P.3d at 152. There was insufficient evidence to show that the money found in Mr. Glossip's possession was part of the money which Justin Sneed took from Mr. Van Treese's car. . *See also* Ground IV.

In *Wright v. West*, 505 U.S. 277 (1992) the Supreme Court found sufficient evidence for conviction where fifteen specific items belonging to the larceny victim were found in the defendant's home, including a mink coat with a name embroidered on it, and a silk jacket "emblazoned 'Korea 1970,'" and the defendant could not give consistent statements regarding how he came to possess the items. *Id*. at 280. Further, the state law "permits an inference that a person who fails to explain, or falsely explains, his exclusive possession of recently stolen property is the thief." *Id*. at 282. Clearly, there was no evidence in Petitioner's trial that supported a finding that the money belonged to Mr. Van Treese.

The OCCA also noted that "[t]here was no evidence that Sneed had independent knowledge of the money under the seat of the car." *Id*. This is tantamount to requiring the Petitioner to provide proof of Sneed's independent knowledge of the

32

money when it is the burden of the State to prove each element of the crime beyond a reasonable doubt, and to provide sufficient corroborating evidence that the money, or other evidence, connected Mr. Glossip to the murder. The Due Process Clause of the Fourteenth Amendment requires a criminal defendant not be convicted except upon production by the State of proof beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970)

## OCCA Decisions Regarding Petitioner's Sub-claims in Ground One:

Petitioner set out sub-claims A through H in his appeal brief supporting his claim of insufficiency of the evidence.  See Appellant's Brief, at 10-30.  The sub-claims include the following and are addressed in detail below:

**A**.  Concerns Regarding Richard Glossip's Management of The Motel;

**B**.  Speculative Testimony Regarding the "Personalities" of Sneed and Glossip;

**C**.  Sneed's Purported Lack of Motive to Kill Barry Van Treese;

**D**.  Mr.  Glossip's Purported Motive to Kill Barry Van Treese;

**E**.   Forensic Evidence Collected at the Scene;

**F**.  Mr. Glossip's Actions From January 7-9, 1997

**G**.   Uncorroborated Evidence Provided Only by Justin Sneed

**H**.   Other Factors

The only direct evidence connecting Mr. Glossip to this crime was the testimony of Justin Sneed, the admitted killer, claiming that Mr. Glossip was the "mastermind" behind the murder of Barry Van Treese.   No physical evidence connected  Mr. Glossip to the murder and no compelling evidence corroborated Mr.

33

Sneed"s testimony. Instead, the state presented numerous witness to offer opinions and speculative testimony regarding what Barry Van Treese *likely* would have done or how Justin Sneed - *likely* would have acted under certain circumstances or what *could* have been happening at the motel. None of these witnesses provided any reliable evidence of Mr. Glossip's prior knowledge of or participation in the murder.

The State could only imply a motive for the murder. The bulk of the testimony even on this point was not enough to support a conviction, and was based entirely on innuendo and was internally inconsistent. As the OCCA has repeatedly held, "the law must concern itself with facts and evidences, not vaporous speculations." *Russell v. State,* 560 P.2d 1003, 1004 (Okl. Cr. 1977); see also *Patton v. State*, 989 P.2d 983, 990 (Okl. Cr. 1999); *Thornburgh v. State*, 985 P.2d 1234, 1251 (Okl. Cr. 1999); *Romano v. State,* 909 P.2d. 92, 123 (Okl. Cr. 1995).

## OCCA's Decisions

In addition to the OCCA's holding regarding the money found on Mr. Glossip, in reaching its decision that the evidence was sufficient to convict Mr. Glossip of the crime, the OCCA reviewed the evidence , including Mr. Sneed's testimony that Mr. Glossip instructed him to commit the acts involved in the murder, and found: "that Justin Sneed placed himself in a position where he was totally dependent on Glossip;[7]

---

[7]See also Petitioner's claim at Ground XI regarding failure to use the information contained in the  psychiatric evaluation to determine competency of Mr. Sneed.

that Glossip's actions after the murder shed light on his guilt; also that there was motive, concealment of the crime, and intended flight. *Id.* at 152-153. The OCCA also found that Mr. Glossip's "motive, along with evidence that he actively concealed Van Treese's body . . . as well as his plans to 'move on', connect him with the commission of the crime, and that "evidence of attempted flight supports an inference of consciousness of guilt." *Id.* at 153.

In regards to Mr. Glossip's motive to kill Mr. Van Treese, the OCCA found that "the State presented sufficient evidence to show that Glossip feared that he was going to be fired as manager, because the motel accounts had shortages during the end of 1996"; that the condition of the motel "was deplorable" and "filthy". *Glossip*, 157 P.3d at 153.

The vast majority of the State's evidence against Mr. Glossip was intended to show that he was about to be fired by Barry Van Treese and, thus, had a motive to kill him.   Several witnesses testified Mr. Van Treese was concerned about the management of the motel, but all had different opinions as to the reason for and the depth of that concern.   Some of this testimony involved unfounded suspicions, including Billye Hooper's testimony that Mr. Glossip was doing something vaguely unscrupulous because the daily reports showed the motel was always renting about the same number of rooms every night.  (Tr. VII 45-46) Ms. Hooper testified "more than

once I would make the comment to Donna [Van Treese] that it seemed like the old Best Budget couldn't seem to get under 19 rooms, but they couldn't seem to manage to rent anything over 21."  (Tr. VII 45)

In fact, financial records show that in December 1996, the number of rooms rented varied from a low of 12 on Christmas day to a high of 31 on December 7th and 31st. Similar variation existed in every month of 1996.[8]  Clearly, Ms. Hooper's conjecture was not based on *any* evidence and both the prosecutor and defense counsel should have known it.  (*See*  Ground V)

Other testimony was clearly contradictory.  Donna Van Treese, Billye Hooper, and William Bender all testified that Mr. Van Treese's policy was not to allow employees to have "comped" rooms, *i.e.,* a free room in exchange for work done for the motel like Justin Sneed did.  *(See, e.g.,* Tr. IV 114; VII 9-10; VIII 57) Donna Van Treese said she never knew Mr. Sneed was receiving a free room until after her husband's death, and Ms. Hooper went so far as to say Mr. Sneed appeared to hide out whenever Mr. Van Treese came to the motel because he "wasn't supposed to be there in a free room working for ... a room rather than a paycheck." (Tr. IV 42-43, VII 12)

---

[8]For example, financial records within trial counsel's possession, but not used to cross-examine Ms. Hooper, show that room rentals in August, 1996, ranged from a low of 27 to a high of 46; September, from 22 to 44; October, from 18 to 37; November, from 17 to 33.  See Attachment 16 to Appendix.  This issue will be included in Petitioner's Motion for Evidentiary Hearing.

This testimony implied that Mr. Glossip was hiding the fact that Justin was staying at the motel and this was a reason Mr. Van Treese wanted to fire him.

However, State's Ex. 77, the daily report for January 6, 1997, shows Justin Sneed, a.k.a. Justin Taylor, had been staying in room 117 since July 11 and that the room was "comped." Mr. Van Treese audited the daily reports every time he came to the motel, and knew that Mr. Sneed had a free room in exchange for doing work for the motel. Cliff Everhart, Mr. Van Treese's friend and the part-time security guard for the motel, testified that he and Mr. Van Treese had discussed Mr. Sneed's free room in exchange for work, and Mr. Van Treese was glad to have a maintenance man for the price of a room. (Tr. XI 220-21)

Other examples of unsupported or contradictory testimony regarding Mr. Glossip's management of the motel are discussed below.

### Alleged "Shortages" and Financial Discrepancies.

Donna Van Treese testified that alleged "shortages" of over $6,000 for the year 1996 were of great concern to her. (Tr. IV 63) Although by far the majority of the "shortages" (more than 70%) occurred in the first four months of the year, Mr. Glossip was not fired at that time. (Def. Ex. 71) Moreover, Def. Ex. 71A shows that the shortage at the Tulsa Best Budget Inn represented 3% of its total sales volume while

the shortage at the Oklahoma City motel was only 2%.[9] Despite the fact the Tulsa

motel showed a greater shortage for 1996, William Bender, the manager there,

testified he was never even talked to about the shortages at the Tulsa motel, much less

that anyone threatened to fire him over such a shortage.[10]  (Tr. VIII 94)  Kenneth Van

Treese, the victim's brother, testified it was unlikely an astute businessman like Barry

Van Treese would be so concerned regarding these shortages, which he described as

insignificant.  (Tr. XI 108-09, 145-47)

William Bender testified that Mr. Van Treese was angry when he arrived at the

Tulsa motel on the evening of January 6, 1997.  (Tr. VIII 63)  According to Mr.

Bender, one reason for this anger was that the weekend receipt money from Oklahoma

City had not been deposited and was missing.  (Tr. VIII 81)  However, per Mr. Van

Treese's policy, receipts from the Oklahoma City motel were *never* deposited into a

bank.  (Tr. VIII 93)  Perhaps more importantly, the state cannot simultaneously

---

[9]Defendants Ex. 71A is a document created by Donna Van Treese which the jury was never allowed to see.  See Attachment 19 to Appendix.

[10]When trial counsel first tried to introduce Def. Ex. 71A to show that similar losses had occurred in Tulsa, the state made an offer of proof that Donna Van Treese would say that Bender was also mismanaging the Tulsa motel and the Van Treeses intended to fire him as well after they had dealt with Mr. Glossip.  (Tr. IV 177-78)  Trial counsel's failure to use this information to impeach Bender's trial testimony is addressed in Ground V.  The fact that the state would make such an offer of proof and then not correct Bender's testimony that no shortages existed in Tulsa and that Mr. Van Treese was so pleased with Bender's management that he wanted to bring him to Oklahoma City after he fired Mr. Glossip is addressed in Ground IV.

contend through Bender that Mr. Glossip had stolen the weekend receipts before Mr. Van Treese went to Tulsa and through Mr. Sneed contend that he and Glossip took those same receipts from under the driver's seat of Mr. Van Treese's car.  (Tr. XII 127-28)

In fact, no one has ever been able to determine exactly how much money Mr. Van Treese picked up with the daily reports on January 6, 1997.  Billye Hooper testified at the 2004 trial that she had reviewed the financial records for the nine days that would have generated those receipts and the probable amount Mr. Van Treese picked up was somewhere between $3,500-4,000.  (Tr. VII 77)  However, in April, 1997, she testified the amount was somewhere between $2,800-3,000.  (Tr. VII 83-85) The figure most often argued by the state was $3,500.  *(See, e.g.,* Tr. XV 169)  Mr. Glossip submits the State uses this estimate because it conveniently approximates the sum of the money Mr. Glossip had on his person when he went to see a lawyer prior to his arrest on January 9 ($1,757) and Mr. Sneed had in his Crown Royal bag when he was arrested on January 14 ($1,680).  Whatever the amount, the same funds cannot have been stolen by Mr. Glossip before Mr. Van Treese's murder and then restolen by Mr. Sneed after he beat him to death.

## Physical Condition of the Motel.

Kenneth Van Treese took over management of the motel after the death of his

brother and brought in two friends to help him assess the condition of the motel and to assist with day-to-day operations.  While all three men were college graduates and knowledgeable businessmen, none of them had any experience in the motel or housing business.  (Tr. X 225-28)  In their opinion, only 23 or 24 of the fifty-four available rooms at the Best Budget Inn were suitable to be rented.  (Tr. XI 117)  The state argued that the "deplorable" condition of the motel was one more reason Mr. Glossip was about to be fired.  *(See e.g.,* Tr. XV 153,162,165)  However, Kenneth Van Treese's evaluation of the motel was made after the fact, and by individuals who had never inspected the property when Barry Van Treese was alive and in control of the motel.  In truth, the Best Budget Inn was, as its name implied, a low budget motel that catered to Interstate traffic and weekend drunks from the strip bars located behind the motel. (Tr. XI 154)  The witnesses who were at the motel on a regular basis knew the motel was in about the same condition it was usually in at the start of a new year - the time when the staff traditionally began the remodeling process necessary to get ready for the next summer season.  (Tr. IV 58-59; V 141)  Mr. Van Treese made  regular trips to the motel and constantly knew of its condition.

Billye Hooper testified that some rooms were probably in better shape than others, but only two or three were not rentable and those rooms were down because they were being worked on or under construction.  (Tr. VIII 12)  Cliff Everhart said

Barry Van Treese was aware of the condition of the rooms in the motel and that he had talked about remodeling a couple of the rooms.  (Tr. XI 233)  D-Anna Wood testified Mr. Van Treese did not like to spend money he did not feel was necessary and, because there was little money to fix things, Mr. Glossip usually had to "rig" things together to make them work. She described the motel as "nasty." (Tr. V 69, 72-73) Obviously, Kenneth Van Treese had differing opinions than his brother on the appropriate standards of a low budget motel, and Kenneth's testimony was irrelevant to the determination of Petitioner's guilt.

Donna Van Treese testified managers were never given money directly to do repairs and certainly had no access to company checkbooks to pay for repairs. Instead, Mr. Van Treese would purchase items himself, or the manager would get approval to make such purchases from the receipts of the motel.  (Tr. V 44)  Mrs. Van Treese testified Mr. Glossip had told them some painting and other work was being done and implied that this was not true.  (Tr. V 15)  However, Ms. Wood testified Mr. Glossip had, in fact, repainted some of the rooms and Ms. Hooper also indicated he was working on remodeling several rooms.  (Tr. V 141, VIII 12)  Kenneth Van Treese testified that when he took over the motel on January 9, 1997, room 112 was in the process of being modified to make it handicapped accessible.  (Tr. XV 20)

In fact, most of the evidence indicated Mr. Glossip was working hard to

improve the property.  John Beavers, who had lived at the motel for almost nine years, described Mr. Glossip as "a real go-getter. He was always working hard. . . It seemed like he always had plans to do this, that, and the other."  (Tr. VI 18)  Although Mr. Beavers could not remember the specifics, he testified Mr. Glossip "always seemed to have some project going on at the property."  (Tr. VI 18-19)  Even Ms. Hooper grudgingly testified that when Mr. Glossip was first hired in May 1995, "he was very conscientious about trying to keep the property clean, trying to fix it up, trying to make it nicer, better."  (Tr. VII 91)  When asked about the first part of 1996, Ms. Hooper said "[Glossip] always tried to keep the property looking nice.  I would never ever say anything against the way he tried to keep the property looking."  (Tr. VII 98)  Later, Ms. Hooper stated:

> [Glossip] was trying to upgrade the property both cosmetically, but also to upgrade the clientele and I really felt like that he was -- whatever the circumstances, he had the Best Budget at heart.... But after I returned from my heart surgery I began to observe not necessarily so much money discrepancies but less interest, more, not the kind of people that he had previously been trying to bring in. Less desirables.

(Tr. VIII 33)

Ms. Hooper specifically testified that up until she took medical leave in August 1996, Mr. Glossip was "doing a really good job." (Tr. VII 41)  Ms. Hooper, who was on the property almost daily during the entire time Mr. Glossip was manager, never

once mentioned that the physical condition of the motel was a problem.[11]

By all indications, Mr. Van Treese's real concern was always that the motel generate sufficient revenues to provide a nice home, good food on the table, family vacations, and the like. He had determined that the Oklahoma City motel needed to make at least $18,000 per month to provide those things and had set that figure as the amount that triggered a bonus for the manager. Under Mr. Glossip's management, the motel had reached that threshold every month in 1996 except for December. (Tr. IV 117-20; Def. Ex. 71) In contrast, the Tulsa Best Budget, with whose management Mr. Van Treese was allegedly so pleased, had met its target in only seven of the twelve months that year.[12]

In short, the State did not present any evidence of any kind that Barry Van Treese was concerned about the physical condition of the property. Rather, the State

_____

[11]In December 1994, Ms. Hooper and her sister temporarily acted as interim managers while the Van Treeses went on vacation. According to Hooper, Mr. Van Treese was "very pleased" with the way they had handled the motel, but he hired another couple to manage It the following February. After that young couple left a few months later, Ms. Hooper was again passed over when he hired Mr. Glossip and D-Anna Wood in mid-1995. (Tr. VII 6-8) When she told Mr. Van Treese in December 1996 that they needed "to have a talk outside the office," her suggestion was that she and Mr. Van Treese and her sister should go to dinner to discuss her concerns about the motel. (Tr. VII 35-36) It is reasonable to infer that Ms. Hooper simply wanted Mr. Glossip's job as manager of the Best Budget Inn.

[12]Kenneth Van Treese testified the threshold number for the Tulsa motel was $14,000. (Tr. X 231) Thus, analysis of Del. Ex. 71A shows that the Van Treeses hoped to make at least $168,000 (14,000 x 12) from the Tulsa motel each year. For 1996, Tulsa exceeded that goal by $938.38. In contrast, the Oklahoma City motel exceeded its goal of $216,000 (18,000 x 12) by $58,956.91.

relied on testimony from Kenneth Van Treese and William Sunday, who had never made even a cursory inspection of the motel prior to Barry Van Treese's death, and Justin Sneed to argue the motel was in "deplorable" condition and, for that reason, Mr. Glossip was about to be fired.[13]

## Missing Registration Cards.

## Missing Registration Cards

William Bender testified Mr. Van Treese was also upset because 2,500 registration cards were supposedly missing at the Oklahoma City motel. (Tr. VIII 81, 98)  However, other witnesses, individuals who had a much closer relationship to the Oklahoma City motel, stated the number of missing cards was much smaller.  Donna Van Treese testified "quite a few" registration cards had been voided or were missing and Kenneth Van Treese testified that "several" registration cards were out of order or missing.  (Tr. IV 76; XI 110, 142)  Clearly 2,500 cards does not equate to a "few" or "several".  Moreover, Billye Hooper testified:

Q:    Now, is there a problem with missing registration cards?

A:    Not as a rule.

---

[13]According to D-Anna Wood, when Justin Sneed heard Mr. Van Treese was coming to remodel the rooms, he expressed a fear that Mr. Glossip, Wood, and Mr. Sneed would all be fired.  (Tr. V 181)  However, there is no evidence Mr. Glossip, or even D-Anna Wood, shared this view.  To the contrary, Ms. Wood testified that, in her opinion, Mr. Sneed made that statement because *he* was not doing his job and that neither she nor Mr. Glossip were worried about getting fired at that time.  (Tr. V 191-92)

Q:     Would there be a problem if a card was missing?

A:     Well, it would just be out of the ordinary. I mean, you just - the Best
       Budget was a family-owned business, not run exactly like you would be
       running the Holiday Inn or somewhere like that.

(Tr. VII 78-79)

**Other Allegations That Mr. Glossip Was about to Be Fired.**

At most the evidence arguably shows that Mr. and Mrs. Van Treese were

concerned about the management of the motel and that they wanted some explanations

from Mr. Glossip.  It does *not* show that Barry Van Treese came to the motel on the

evening of January 6, 1997, with the intention of firing him.  In fact, Mrs. Van Treese

testified it would have been a great hardship to fire Mr. Glossip at that time as January

through March was the time to repaint, repair, and remodel the rooms at the motel to

prepare for the spring and summer season.  When Mr. Van Treese left for Oklahoma

City on January 6, 1997, he intended to spend significant time at the motel for that

purpose.  (Tr. V 24-25; 141)  The prosecutor then asked if Mr. Van Treese could have

acted as an interim manager in January 1997 until he found someone to replace Mr.

Glossip. Mrs. Van Treese responded:

Well, it is possible but it would have been a very bad hardship on him
trying to get the rooms repaired up to par that needed to be done and also
run the desk.  When you're in that office, you know, you have to have
someone there when someone comes in.

(Tr. V 25)  Earlier, Mrs. Van Treese had said the couple made a decision not to fire

45

Mr. Glossip in late 1996 because they were willing to tolerate the problems they had identified so that Mr. Van Treese could spend time with his family.  (Tr. V 19)

Witnesses described Barry Van Treese as a gruff, larger than life character, who was sometimes explosive.  As Cliff Everhart testified, "[h]e wasn't violent but he would yell and scream and he would threaten." (Tr. XI 168)  But, at his core, he was a kind and generous man who was willing to tolerate discrepancies because "he would rather have less money and more recess and time to spend with his family than a few dollars." (Tr. XI 157)   If D-Anna Wood and William Bender are to be believed, something angered Mr. Van Treese by the time he arrived in Tulsa.[14]  While in Tulsa, he apparently told Mr. Bender he wanted Bender and his wife to come to Oklahoma City to take over management of the motel there.  However, Mr. Bender's testimony indicates that, as often happens, Mr. Van Treese may have begun to calm down on his way back to Oklahoma City.  According to Bender, Mr. Van Treese called "from the bypass" and talked to Bender's wife and co-manager.  The prosecutor then asked if anything Mr. Van Treese said had changed what *they* thought their plans were going to be.  Bender answered no because "we didn't want to be the manager [in Oklahoma

---

[14]Ms. Wood testified that Mr. Van Treese did not appear to be angry when he left the Oklahoma City motel at 7:50 p.m. (Tr. V 141)  He was, however, clearly angry when he arrived in Tulsa sometime between 11:00 p.m and midnight.  (Tr. VIII 63)  However, as shown above, Mr. Bender either misunderstood the reasons Mr. Van Treese was angry, or simply exaggerated the reasons he was given for that anger.

City] anyway." (Tr. VIII 83-84)  As with so much in this case, only speculation, reinterpretation of events through hindsight, and the uncorroborated testimony of the actual killer, support the State's assertion that Mr. Glossip either was fired on January 6, 1997, or was about to be fired.

Mrs. Van Treese testified a number of times that, *in retrospect,* Mr. Glossip, the man she believed planned the murder of her husband, should have been fired.  *(See, e.g.,* Tr. IV 123-24).  But, hindsight cannot be a substitute for evidence.  This theory is merely speculation.

### Speculative Testimony Regarding the "Personalities" of Mr. Sneed and Mr. Glossip.

The OCCA found that "the State presented a compelling case which showed that Justin Sneed placed himself in a position where he was totally dependent on Glossip." *Glossip*, 157 P.3d at 152.

In its zeal to present Justin Sneed as a simple-minded person incapable of deciding to rob Mr. Van Treese on his own, the state solicited testimony from a number of witnesses about the personalities of both Mr. Sneed and Mr. Glossip, usually asking in the end whether it was more likely that Mr. Glossip would follow Mr. Sneed or Mr. Sneed would follow Mr. Glossip.  This is pure sophistry.  Mr. Glossip was the manager of the motel and it was his job to tell his employee, Justin Sneed, what to do on a regular basis.  The issue before the jury was not who would

47

more likely follow whom, but whether Mr. Sneed - acted alone when he murdered

Barry Van Treese.

In fact, the prosecutor solicited such testimony even from John Beavers, a

longtime resident of the motel.  After establishing that Mr. Beavers saw Mr. Sneed

quite often around the property for a week or two weeks and that his interactions were

limited to a nod of acknowledgment, the prosecutor· asked if Beavers was able to form

an opinion about Mr. Sneed's personality and intelligence.  After some indecisiveness,

Mr. Beavers stated "[Mr. Sneed] didn't have a lot of mental presence.  That's -- but,

I . . . could be completely wrong. **I didn't know him**."  (Tr. VI 15-16)          At the

other end of the spectrum was the testimony of Kayla Pursley.  Ms. Pursley had lived

at the Best Budget since August 1996 and worked at the Sinclair station across the

parking lot from the motel. Although Mr. Sneed testified he had only been around the

Pursleys "a few times" (Tr. XII 70-71), Ms. Pursley testified as if he was like a

member of her family, portraying him as a childlike teenager who would get down on

the floor and play with her seven and nine year old sons as if they were peers.  (Tr. IX

17)  However, Mr. Sneed thought she might have been thinking about Mr. Sneed's

brother, Wes Taylor, because Wes sometimes hung out with Mike Pursley, Kayla's ex-

husband.[15]  (Tr. XII 71)

───────────────

[15]Mr. Taylor was Mr. Sneed's step-brother who had come to Oklahoma with him as
part of a roofing crew out of Texas. After several months, Taylor's father (Mr. Sneed's step-

Kayla testified that she often saw Mr. Glossip tell Justin what to do, but would have been shocked if she heard Justin tell Mr. Glossip what to do.  (Tr. IX 20)  When asked what types of things she heard Mr. Glossip tell Mr. Sneed to do, she answered, "Rich would tell Justin what rooms to get ready to be cleaned as far as stripping the beds or what he did, doing the laundry, going to the store." *Id.* Mr. Glossip would send Mr. Sneed on errands "to get cleaning supplies, anything that they may need, laundry soap, things like this for the motel" and sometimes on personal errands to buy cigarettes.  *Id.*  However,  Mr. Glossip was Mr. Sneed's boss and these instructions were necessary in the course of business.  When asked if Mr. Sneed was dependent upon Mr. Glossip, Ms. Pursley replied, "[y] es, he had no one else at all once his parents had left him there." (Tr. IX 24) Although Mr. Sneed was just nineteen, he was himself the father of two children and had not been under the control of his parents for some time.  (Tr. XII 40-42) His parents had not "left him there." Rather, Mr. Sneed chose to quit his job with the roofing crew that had brought him to the Best Budget Inn and to stay on as the maintenance man there.

Similar testimony regarding the personalities of Mr. Glossip and Mr. Sneed was

father) came to get him because there were warrants out for Taylor's arrest in Tarrant County, Texas.  Mr. Sneed chose to stay in Oklahoma City because he did not like his step-father. (Tr. XII 42)

presented through Billye Hooper and Cliff Everhart.[16]  (Tr. VII 28-34; XI 185)  The

state used this testimony to press this fallacious argument to the jury:

> Mr. Glossip is not the kind of man -- and the evidence establishes this -
> that's going to follow Justin Sneed, 19 years of age, 8th grade education,
> when it comes to a homicide.

(Tr. XV 73)

> Another piece of corroboration is this study that you've heard, this
> conversation you've heard about the comparison of the personalities of
> these two men, Justin Sneed and Richard Glossip. You've heard from
> people that knew them and people that spent a lot of time with them that
> Richard Glossip was the boss and that he gave instructions to Justin
> Sneed, that Justin Sneed was the kind of guy that needed to be told what
> to do.

(Tr. XV 94)  This was completely deceptive and misleading to the jury.  It most

certainly did not corroborate Mr. Sneed's testimony that he had killed Mr. Van Treese

at Mr. Glossip's behest.

 **Mr. Sneed's Purported Lack of Motive to Kill Barry Van Treese.**

The State attempted through several witnesses to show that Mr. Sneed would

not have killed Mr. Van Treese if Mr. Glossip had not told him to do so.  After a series

of leading questions in which the prosecutor was providing most of the testimony,

Kayla Pursley finally said, "I wouldn't have thought any of them would have done

---

[16]This evidence is nothing more than character evidence which is inadmissible to
prove action in conformity therewith on a particular occasion.  Trial counsel's failure to
object to the evidence on this basis is discussed more thoroughly in Ground V, and is the
subject of a claim to be included in Petitioner's Motion For Evidentiary Hearing..

that, but obviously, you know, he *must have* really looked up to Rich and he would have *probably* done anything for him."  (Tr. IX 26) However, Justin Sneed testified he hardly knew Ms. Pursley.  Moreover, this opinion was derived through an inductive process, *i.e.*, if Mr. Sneed was not capable of violence, but we know he confessed to beating a man to death with a baseball bat, he *must have* been told to do it by someone he looked up to.  That is merely conjecture.

Similarly, the State solicited testimony from Billye Hooper that she did not think Mr. Sneed would have done anything that would have gotten Mr. Glossip in trouble and killing the boss *probably* would have caused problems for Mr. Glossip.[17] (Tr. VII 28-29)  After numerous attempts to formulate a proper question to determine whether it would "make sense to [Hooper] that Richard Glossip was involved," Ms. Hooper finally answered:

> In my opinion, Justin would not have murdered Barry Van Treese, I don't believe because,  for one, he didn't know the man hardly at all.  He probably had no -- very few comments even made together and I wouldn't seen, in my opinion, why he would have a reason to do such a

---

[17]For all the testimony that Mr. Sneed would never have done anything to get Mr. Glossip in trouble, the videotape of his interview with detectives on January 14, 1997, shows that after the small talk was done, the detectives spent about eight minutes telling Mr. Sneed they knew he did not do this alone, that Mr. Glossip had been arrested, and that Mr. Glossip was trying to make Mr. Sneed the scapegoat.  The detectives then asked whose idea it was and Mr. Sneed began his "Rich told me to do it" confession.  (See Attachment 18 to the Appendix, and Attachment 17 which will be submitted with the Motion For Evidentiary Hearing)  Clearly, Mr. Sneed had no problem whatsoever getting Mr. Glossip "in trouble" by accusing him of masterminding the murder so that Mr. Sneed could save his own life.

violent act to someone that he hardly knew.

(Tr. VII 34)   This in no way connects Mr. Glossip to the murder.

Even more troubling was the prosecutors' duplicitous argument that the only person who had a motive to kill Mr. Van Treese was Mr. Glossip because Justin Sneed would never have killed Barry Van Treese for money alone.

> What reason above and beyond the reasons of Richard Glossip did Justin Sneed have to kill Barry Van Treese?  Did he do it for $10,000? Was that his only reason?

(Tr. XV 68)

> You know, why would Sneed do this by himself?  I mean, why?  He's got an okay life. The only possible reason that they can even suggest to you that he would even do it by himself is because, well, you know, he's a druggy.  He needed some drug money.  Why?  He was getting it.  He was bumming it off of people.

(Tr. XV 151)

However, Mr. Sneed did need money and his situation was not "okay". The evidence presented by the State showed that after Mr. Sneed quit his roofing job he quickly spent all the money he had made - approximately $500 per week - on methamphetamine and marijuana.  At the time of the murder, he had *no* income, *no* money saved, ate only when someone invited him to dinner and, in essence, depended on strangers to provide him drugs. *(See, e.g.,* Tr. XII 47,64-72)

At the same time the State made these arguments, it had also alleged in the Bill

of Particulars that Mr. Glossip should be put to death pursuant to the "murder for remuneration" aggravator based, in large part, on Mr. Sneed's testimony that he was offered anywhere from $3,500 to $10,000 to commit the murder. (OR 1044-51; Tr. XII 80)  It is inconsistent for the State to argue on the one hand that Mr. Sneed would not have committed murder for the money and on the other that Mr. Glossip should be executed because he paid Mr. Sneed, and Mr. Sneed accepted money, to commit the crime.  *(See* Ground IV regarding prosecutor misconduct)

Mr. Glossip discussed above  the evidence the State presented in an attempt to show that he was about to be fired by the Van Treeses and  that he knew it. Paradoxically, the State also presented evidence and argument that Mr. Glossip's plan was to kill Barry Van Treese and then talk Donna Van Treese, the woman allegedly intent on firing him, into letting him take over the motels and hire Justin Sneed to manage one of the them.

> He told me at one point that with Mr. Van Treese out of the way that he would be able not only [to] manage the motel on Council but also another one they had, I think it was located in Tulsa, and be able to manage both of those and, you know, pretty much have, I guess, control of them is the way, you know, I got the idea anyway.

(Tr. XII 89) Regarding Mrs. Van Treese, Mr. Sneed testified:

> He said that he knew her real good when he was talking about operating both motels and that, you know, he thinks he could, you know talk her into letting him, you know, control both of them and everything like that once Barry was out of the way.

53

(Tr. XII 90) *(See also* Tr. XV 157) This argument was directly contradictory to the assertion Mr. Glossip knew he was going to be fired.

**Forensic Evidence Collected at the Scene.**

The OCCA, did not address this sub-claim and, therefore, this Court does not apply the deference to the OCCA's decision that is required in 28 U.S.C. §2254(d) regarding claims reviewed on the merits.

Analysis of forensic evidence taken from Room 102, Mr. Van Treese's car, and Justin Sneed's clothes showed that every blood sample taken from this evidence belonged to Mr. Van Treese. (Tr. XI 104)  Fingerprints were found on the broken glass in room 102 (Tr. XI 190-91), the Plexiglas used to repair the broken window (Tr. XI 195-97), a light switch in room 102 (Tr. XI 198), and the doorknob to the room (Tr. XI 198).  In all, eleven fingerprints were identified and all of them belonged to Justin Sneed.  (Tr. XI 203, 206)  None of the fingerprints from the crime scene matched either Mr. Glossip or Barry Van Treese.  (Tr. XI 206)  In short, not one piece of forensic evidence collected in this case connected Mr. Glossip to the murder of Mr. Van Treese.  Incredibly, the State argued this *lack* of forensic evidence implicated him in the murder. *(See,* Ground IV) If Mr. Glossip wiped off his own fingerprints then Mr. Sneed's fingerprints would likely also have been wiped away.

**Mr. Glossip's Actions from January 7-9, 1997.**

The OCCA in reaching its decision that the evidence was sufficient to convict Mr. Glossip, found that the State "presented an enormous amount of evidence that Glossip concealed Van Treese's body. . . and lied about the broken window". *Glossip* 157 P.3d at 153. Also, the Court considered that Mr. Glossip "never told anyone that he thought Sneed was involved in the murder, until after he was taken into custody", and that he lied when telling others that Van Treese left early that morning to get supplies." *Id.*

The State argued that Mr. Glossip's actions and inconsistent statements following the murder corroborated Justin Sneed's story and "connected him to the commission of the homicide of Barry Van Treese." (Tr. XV 91; *See also,* Tr. XV 94, 96, 97) All of those actions stemmed from one terrible decision not to call the police and report Justin Sneed when Mr. Sneed confessed to the murder. However misguided Mr. Glossip's actions were, they did not tend to connect him to the murder of Mr. Van Treese but, rather, to its cover up.[18]

In closing, the State argued the external circumstances of the homicide included the fact Mr. Glossip "didn't call the ambulance, he didn't call the police" but, instead "stood by and let Donna Van Treese agonize and worry over what had happened to

---

[18]Mr. Glossip had only been asleep for a few hours when he was awakened by Justin Sneed. Sneed was his friend and someone he had taken care of and fed for several months. He likely wanted to take some time to think before he decided what to do with the horrible admission made by Mr. Sneed.

Barry." (Tr. XV 78-79) The State's argument that Mr. Glossip should have called an ambulance when Mr. Sneed first told him what happened ignores the fact that Mr. Sneed specifically testified that he sat in a chair and watched Barry Van Treese take his last breath and then went and cleaned up *before* he ever went to speak to Mr. Glossip. (Tr. XII 117) And, while the agony that the Van Treese family endured is without question poignant, it does not in any way prove Mr. Glossip participated in or had knowledge of the *murder before* it was committed. Rather, it is a consequence of his deplorable initial decision not to call the police.[19]

It does not matter how many stories Mr. Glossip told in an attempt to cover up the fact Justin Sneed had committed a murder and he had failed to report it. While certainly an individual's actions after a crime may, in certain circumstances, be used to infer what happened before it was committed, the State must present something more than the uncorroborated testimony of the actual killer to show participation in the crime as a principal. When the State rhetorically asks why Mr. Glossip would cover up this crime if he had not participated in it, the response is that the state is supposed to answer that question with *evidence,* not speculation and innuendo. The state failed to do so in this case.

---

[19]Neither the prosecution nor the defense argued that Justin Sneed should have called the authorities when Mr. Glossip supposedly began to solicit him to murder Mr. Van Treese several months prior to the commission of the crime.

**Uncorroborated Evidence Provided Only by Justin Sneed.**

Much of the state's closing argument was devoted to matters with no evidentiary support other than the word of Justin Sneed, including:   "[T]he evidence in this case is that it had been discussed for months and was certainly preplanned earlier that night."(Tr. XV 66)

> There were other decisions made in this case and they weren't incidental details like should I park the car facing in or out. Should I be careful not to break the window? Should I bring a better knife? Not things like that, but big decisions like will BarryVan Treese live or die January the 7th, 1997.  Decisions such as how much money does Barry Van Treese have and how can I get it into my pocket, and how will it be divided up and among whom.
>
> * * * * *
>
> Other important decisions like how and when to dispose of the body of Barry Van Treese.  These life or death decisions, not the bad parking, not the clumsy foolishness of breaking the window.  These -- not the idiocy with the blunt knife, the knife without a point on the blade.  These important life and death decisions, the big decisions the evidence shows you were all made by Richard Glossip.

(Tr. XV 74-75) These are irrelevant and do not corroborate Mr. Sneed's testimony.

Had Mr. Glossip planned a murder it is unlikely that he would have chosen a defective knife, or left it up to Justin Sneed to come up with a murder weapon, such as the knife and/or the baseball bat.  In truth, the State did not present one bit of evidence, other than the testimony of Justin Sneed to show that these "big decisions" were made by Mr. Glossip.  Instead, the State repeatedly tried to bluff the jury into

believing Mr. Sneed's statements were corroborated:

> [T]he physical evidence ... doesn't put Richard Glossip killing Barry Van Treese, you've known that since jury selection. But when [Sneed] told you, "I hung the shower curtain after Richard Glossip told me to cover the broken window, I picked up the glass on the sidewalk after Richard Glossip told me to, I went out and bought plexiglass the next morning after Richard Glossip told me to and after he gave me the keys to his car, I moved the car over to the credit union," Richard Glossip's idea. These are things that can be corroborated.

(Tr. XV 88) These are things, if believed, occurred after the murder. The State was, in fact, able to show that Justin Sneed hung a shower curtain over the window, and picked up the glass, and moved the car.  But, none of that evidence *connects* Mr. Glossip to the murder.

Similarly, in explaining the concept of a "principal" to a crime, the prosecutor argued:

> But more to the point of the facts of this case, if you say, "Hey, listen. We need to take Barry out.  If we do that, I can take over at his level of supervision, you can start managing this motel, we'll both take a step up and we'll be in fat city from there on out. I think I can talk his wife into doing that. Here is how we're going to do it." If you do this, I'll do that, I'll pay you this, that's more than just knowing that somebody else is going to do something. That's encouragement, that's aid, that's promotion, that's counsel.

(Tr. XV 76) This is not corroborating evidence as to any piece of evidence supporting those contentions other than Justin Sneed's testimony. Nor is there even the most tangential evidence to support Mr. Sneed's testimony that Mr. Glossip asked him five

or six times to kill Mr. Van Treese or his description of one such incident in the "broiler" room of the motel with a hammer.  (Tr. XII 80, XV 155)

Even the $10,000 figure Mr. Sneed testified he was offered to kill Mr. Van Treese  appeared, for the first time in this 2004 trial.  Mr. Sneed's explanation for the increase from the $7,000 he told detectives about on January 14, 1997, and testified to on June, 8, 1998, was that the offer "just kept climbing every time we started talking about it."  (Tr. XII 167)  But this would only make sense if the offer was increasing *prior to the murder.*  An increase in the amount to be paid that occurs between the 1998 trial and the 2004 trial is simply a lie.  Blaming Mr. Glossip was nothing more than a mantra uttered by Justin Sneed as a means of insuring that he would not get the death penalty for his  crime.  There is no evidence of any sort to corroborate that self-serving statement.

### Mr. Glossip's Plans To Move On

The OCCA's finding that Mr. Glossip's plan to "move on" connected him with the commission of the crime involved an unreasonable determination of the facts in light of the evidence presented at trial.   28 U.S.C. §2254(d)(2).  The Court stated:

> "Evidence that a defendant attempted to conceal a crime and evidence of attempted flight supports an inference of consciousness of guilt, either of which can corroborate an accomplice's testimony."

Glossip, 157 P.3d at 153.  The Court relied on cases from California and Georgia,

which was criticized in the concurring opinion of Judge Lumpkin who said "the Court errs by citing as authority for the decision rendered cases from other states that are not valid precedent for this Court.   The jurisprudence from the Court is more than sufficient to sustain the analysis and decision of the Court", although no Oklahoma authority was given in the concurring opinion either.   The Court ignored the fact that Mr. Glossip did not leave town, hide, or commit any act of "flight" but went to an attorney's office instead of keeping his appointment with law enforcement officials - a most prudent act of any individual in Mr. Glossip's situation.   (Tr. Vol. XV, 16-18; State's Ex. 1)  Should this Court determine that the OCCA decision on this issue was not an unreasonable interpretation of the fact in light of the evidence presented, Petitioner submits that OCCA's decision on this sub-claim involved an unreasonable application of Supreme Court law.

The state argued the fact that Mr. Glossip told detectives he was home in bed with D-Anna Wood at the time of the murder was evidence of his guilt because no one knew the time of death at the time of the interview.  "Then ladies and gentlemen, my question to you is:  How does he know when to set his alibi at 3:15 on January 8th?" (Tr. XV 160-61)  According to the state, the only answer to this question is that he knew about the murder when it was happening.  (Tr. XV 161)  However, this ignores the state's own evidence.  D-Anna Wood testified she and Mr. Glossip closed the

office and went to bed at around 2:30 a.m., that she had not seen Mr. Van Treese return prior to that time, and that she and Mr. Glossip remained in the apartment until they were awakened by Justin Sneed knocking on the wall a few hours later.  (Tr. V 83)  Mr. Glossip admitted that when he answered that knock, Mr. Sneed confessed that he had just killed Mr. Van Treese.  (State's Ex. 2)  Thus, the only time the murder could have been committed was after 2:30 a.m. and before Justin Sneed confessed to having committed it, and Mr. Glossip was in bed with D-Anna for all of that time. There is no mystery to how Mr. Glossip knew when to give an alibi.

So much of the State's evidence not only fails to prove guilt, but is actually inconsistent with guilt.  He checked John Prittie into room 103 next door  (Tr. IV 150);  he called Billye Hooper at home and asked her to pay the cable bill to "get it turned back on before Barry came back"  (Tr. VII 59); he sent Officer Brown over to the Sinclair station to talk to Kayla Pursley because she "might have some information about the case" when he knew the information she had was about the broken window in room 102 (Tr. X 12-13); he sold all his possessions, gathered up all the money he had saved by taking cash advances to trick D-Anna into thinking his paycheck was smaller, and then went to see a lawyer on January 9, 1997, rather than skip town  (Tr. XV 16-18; state's Ex. 1).  Mr. Glossip's participation in this murder clearly began, if at all, after it was committed.  At least, that is the extent of the State's proof.

To be legally sufficient "the corroborative evidence must *of itself,* and without the aid of the testimony of the accomplice, tend in some degree to connect the defendant with the commission of the offense." *Rider v. State,* 494 P.2d 347, 350 Okl. Cr.1972) (emphasis added). In addition, "independent evidence merely consistent with the main story is not sufficient to corroborate if it requires any part of the accomplice's testimony to make it tend to connect the defendant with the crime." *Id.* Moreover, "[t]he corroborating evidence may be sufficient, although by itself slight, but it is not sufficient if it *merely tends to raise a suspicion of guilt." Id.* (citing *Kirk v. State,* 10 Okl. Cr. 281, 135 P. 1156 (1913)) (emphasis added).

It is not enough that an accomplice makes statements that can be verified by other evidence; the corroborative evidence must go to a defendant's commission of the crime itself.

> Corroborating evidence must tend to connect the defendant with the commission of the offense absent the accomplice's testimony. *Jones v. State,* 555 P.2d 1061 (Okl. Cr.1976). Even slight evidence may be sufficient, but it must do more than raise a suspicion of guilt. *Kirk v. State,* 10 Okl. Cr. 281, 135 P. 1156 (1913). It is also insufficient if it does no more than connect the defendant with the perpetrators but not the crime. *Frye v. State,* 606 P.2d 599 (Okl. Cr. 1980).

*L. E. Y. v. State*, 639 P.2d 1253, 1255 (Okl. Cr. 1982).

The evidence in this case does in fact connect Mr. Glossip to Justin Sneed, the perpetrator of the crime. It may be characterized as showing that Mr. Glossip had

knowledge of the crime *after the fact.*  However,  nothing other than the self-serving statements of Justin Sneed directly connects Mr. Glossip to the crime of murder as an aider and abettor.   That ia not enough to warrant affirmance of Mr. Glossip's conviction and sentence of death.

In *Cummings v. State,* 968 P.2d 821 (Okl. Cr. 1998), the defendant was convicted of murdering his sister. Two witnesses, one of whom was the actual killer, testified that the murder was committed because Cummings told them to do it.  The evidence showed Cummings had reported his sister missing three days after she was killed and that he admitted helping dispose of her body. Based on this evidence the Court found:

> While this evidence clearly implicates Appellant as an accessory after the fact, it does not support a finding that he acted as a principal, either by aiding and abetting his sister's murder. As Appellant contends, outside the testimony of Juanita and Sherry, the evidence only supports a finding that Appellant assisted his wives in lying to the police and in covering up the crime.  It does not independently connect him to the actual commission of Judy Mayo's murder.

968 P.2d at 830.  The same is true in Mr. Glossip's case.  The most that can be said based on the state's evidence in this case is that he assisted in delaying the discovery of the murder, not in its commission.[20]

--------

[20]*See also Hamilton v. State,* 10 P.2d 734, 735-36, (Okl. Cr. 1932) (defendant convicted of forgery via testimony of two accomplices; corroboration consisted of defendant's access to place where checks were stolen, his acquaintance with the accomplices, and act of transporting one accomplice after he negotiated the forged instrument; Court

In *Bowie v. State,* 816 P.2d 1143 (Okl. Cr. 1991), the Court set out what type of evidence would be deemed sufficient to corroborate accomplice testimony in a "murder for hire" scenario such as that alleged in the instant case:

> We find that there was sufficient evidence corroborating the testimony of both Ervin and Britt to convict Appellant; several people, other than Ervin and Britt, testified that Appellant offered five thousand dollars for the death of Traylor. Gary Fisher testified that just ten days before the murder Appellant said he found someone to kill Traylor, and after Traylor was dead, Appellant talked about how good it felt to order someone killed. Therefore, reversal is not warranted and this assignment of error must fail.

816 P.2d at 1143. Such corroborative evidence is sorely lacking in the present case. No one other than Mr. Sneed - the man who actually killed Barry Van Treese - provided testimony that Mr. Glossip engineered a plot to kill his employer.

"The very existence of the Jackson test presupposes that juries accurately charged on the elements of a crime and on the strict burden of persuasion to which they must hold the prosecution, nevertheless 'may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt.' [The test] was adopted to provide an additional safeguard against that possibility, and was to give added assurance that guilt should never be found except on a rationally

---

stated that" [t]his testimony creates a *strong suspicion,* because it shows opportunity for defendant to have aided or abetted or to have profited from the proceeds of the crime. [However,] [t]he circumstances proven are too remote. This testimony is insufficient corroboration under the requirement of the statute and many decisions of this court") (numerous citations omitted).

64

supportable 'state of near certitude.'" *Evans-Smith v. Taylor,* 19 F.3d 899, (4th Cir. 1994), citing *Engle v. Issac*, 456 U.S. 107 (1982).

Mr. Glossip's conviction and death sentence, based solely on Mr. Sneed's uncorroborated testimony, is repugnant to fundamental notions of fairness and due process. No rational trier of fact could have found beyond a reasonable doubt that Mr. Glossip was a principal in the murder of Barry Van Treese. For these reasons, the Court must set aside Mr. Glossip's conviction and sentence.

## GROUND II

**THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY ADMITTING IRRELEVANT AND HIGHLY PREJUDICIAL EVIDENCE INTO THE RECORD IN VIOLATION OF MR. GLOSSIP'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

This claim was presented as Proposition II in direct appeal proceedings.

### Review of Evidentiary Errors.

To the extent that these claims involve state law evidentiary errors, Mr. Glossip shows that it is proper for this Court to review the claims. "Federal habeas review is not available to correct state law evidentiary errors; rather it is limited to violations of constitutional rights." *Smallwood v. Gibson*, 191 F.3d 1257, 1275 (10th Cir. 1999). However, the state law evidentiary errors violated Mr. Glossip's constitutional right to due process. *See Lisenba v. California*, 314 U.S. 219, 236 (1941) which states:

> As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness  essential to the very concept of justice.  In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial.

On habeas review of a State Court's evidentiary rulings, such rulings will not be disturbed unless the Petitioner demonstrates that the Court's error was "so grossly prejudicial that it fatally infected the trial and denied  the fundamental fairness that is the essence of due process ." *Fox v. Ward,* 200 F.3d 1286, 1296 (10th Cir. 2000), quoting *Williamson v. Ward*, 110 F.3d 1508, 1522 (10th Cir. 1997).  In Petitioner's case the errors were "so grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process." *Williamson v. Ward*, 110 F.3d 1508, 1522 (10th Cir. 1997).  *See also Maes v. Thomas,* 46 F.3d 979, 987 (10th Cir. 1995); *Hooker v. Mullin*, 293 F.3d 1232, 1238 (10th Cir. 2002).

"An important element of a fair trial is that a jury consider only relevant and competent evidence bearing on the issue of guilt or innocence." *Bruton v. United States,* 391 U.S. 123, 131 (1994) citing *Blumenthal v. United States,* 332 U.S. 539, 599-560 (1947).  *See also*, *Spears v. Mullin*, 343 F.3d 1215, 1226 (10th Cir. 2003) ("An important element of a fair trial is that a jury consider only relevant and competent evidence bearing on the issue of [sentencing]).

The State presented extensive irrelevant and unfairly prejudicial testimony that

had no bearing whatsoever on the issues at Mr. Glossip's trial. Moreover, the Oklahoma Evidence Code forbids the admission of evidence having no probative value in resolving factual issues. 12 O.S. §§ 2401-2402 (2001). Even when evidence is deemed logically relevant, the probative value of that evidence must be weighed against the potential for undue prejudice or confusion of the issues. 12 O.S. § 2403 (2001). The evidence improperly admitted at Mr. Glossip's trial was also misleading and confusing to the jury. Mr. Glossip had right created by the state statutes which is enforceable under the Due Process Clause. *Hicks v. Oklahoma*, 447 U.S. 343 (1980) (State law may create rights enforceable under the Due Process Clause).

The trial was inundated with so much irrelevant evidence that reversal of Mr. Glossip's conviction is required. The evidence, which was incorporated into second stage was improper even for second stage. The emotional and irrelevant victim impact evidence in first stage and incorporated into second stage contributed not only to Petitioner's conviction but also to the imposition of the death sentence.

## A.    Evidence Intended to Evoke Sympathy for the Victim and his Family.

The state presented evidence in the guilt stage of Mr. Glossip's trial that had no purpose other than to evoke sympathy for the victim and his family. While this type of evidence may, subject to certain safeguards, be admissible in the punishment phase of a capital trial, it had little if anything to do with the issue of Mr. Glossip's guilt or

67

innocence.  "A state may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision *as to whether or not the death penalty should be imposed*." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991). (emphasis added)  Even Oklahoma law prohibits victim impact evidence in the first stage.  *Powell v. State*, 906 P.2d 765, 777 (Okla. Cr. App. 1995) ("guilt/innocense phase of trial is no place for *subtle* appeals for victim sympathy.") (emphasis added)  It can hardly be said that the victim impact evidence in first stage of Petitioner's trial was subtle.  The Tenth Circuit has stated that victim impact evidence in the first stage is improper.  *Thornburg v. Mullin*, 422 F.3d 1113, 1136 (10th Cir. 2005).  Obviously, victim impact evidence is irrelevant in proving the elements of first degree murder.  The substantial amount of victim impact evidence introduced into first stage clearly was prejudicial to Mr. Glossip.

**OCCA Decision**

Even though victim impact evidence is improper in first stage, there was much of such evidence admitted in first stage, consisting of numerous aspects of Mr. Van Treese's life and the lives of family members.  Even victim impact evidence relevant to Justin Sneed was introduced.  The OCCA reviewed the numerous types of victim impact, which is discussed below,  and made determinations regarding each type of evidence, finding as follows:

68

The OCCA reviewed the this first stage claim for plain error as trial counsel did not object to the first stage evidence[21], explaining that plain error "is that error which goes to the foundation of the case or takes away a right which is essential to a defendant's case." *Glossip*, 157 P.3d at 154.

Testimony of Donna Treese:   The Court held that Donna Van Treese's testimony, described in detail below, "was meant to show how the motel could slip into physical and financial disrepair without his knowledge." *Id*.   It is objectively unreasonable to hold that emotionally charged testimony about Barry Von Treese was relevant to the issue, and any relevancy was clearly greatly outweighed by the prejudicial impact on Petitioner.  As set out in Ground I, there was substantial evidence that Mr. Van Treese was at the motel frequently and  knew the condition of the motel. Petitioner submits that this decision was based on an unreasonable determination of the facts in light of the evidence presented at trial, and is not afforded the deference of  28 U.S.C. §2254(d)(2).  If this Court determines that the determination was not unreasonable, then the decision was contrary to or involved an unreasonable application of clearly established law as determined by the Supreme Court.   28 U.S.C. §2254(d)(1).

Testimony of Other Witnesses:

Regarding the testimony of other witnesses who gave first stage victim impact

---

[21]A claim of ineffective assistance of counsel regarding this evidence is set out in Ground V.

testimony, the OCCA held that the testimony "may have been irrelevant to the first

stage", but that "it did not rise to the level of plain error" and "did not deprive Glossip

of a fair trial." *Id*.

Regarding the testimony that Mr. Van Treese was a ham radio operator, the

OCCA found that it "was relevant to the identification of his vehicle". *Id*.

And, regarding evidence about Mr. Van Treese's diabetes, the Court found that

it "was relevant to show why Mrs. Van Treese called police, and to explain why the

discovery of his car was troublesome." *Id*.

<u>Testimony regarding Justin Sneed:</u>

The OCCA found that "[a]lthough there was some lay opinion evidence

regarding whether Sneed had the personality that would allow him to kill Mr. Van

Treese on his own, this testimony comprised only a small portion of the state's case"

and held that the testimony "did not rise to the level of plain error.[22]" *Glossip*, 157

P.3d at 154-155.

When reviewing the evidence below it becomes acutely clear that the

extraordinary amount of such evidence and its highly emotionally charged and

prejudicial impact, improper for first stage in the first place, went to the foundation

---

[22]   See also Petitioner's claim at Ground XI regarding the failure to use compelling
information in Mr. Sneed's psychiatric   to determine competency to contradict the State's
theory regarding Mr. Sneed's personality.

of the case and denied Mr. Glossip of his right to due process and a fundamentally fair trial.

"In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Payne,* 501 U.S. at 825, citing *Darden v. Wainwrigh*t, 477 U.S. 168, 179-183 (1986) (emphasis original).    The trial court dismissed one of the aggravating factors charged by the State, and the jury found the existence of only one of the remaining two aggravators.  It is clear that Justin Sneed killed Mr. Van Treese.   It would have taken only one vote to preclude the death penalty.  *Wiggins v. Smith*, 539 U.S. 510, 536 (2003).  It likely that absent  the extraordinary amount of such evidence and its highly emotionally charged and prejudicial impact, at least one juror would have voted against the imposition of the death penalty.

The decision of the OCCA was contrary to, or involved an unreasonable application of clearly established federal law as determined by the Supreme Court, and the writ should be granted on this claim.

**The Petitioner complains about the following victim impact evidence admitted in first stage:**

Donna Van Treese :        The state's first witness was the victim's wife, Donna Van Treese.   Her testimony was filled with poignant details intended to pull at the jury's

71

heartstrings.    When asked to give a general description of Barry Van Treese, she

testified:

> He had quit smoking six years prior to that, had gained a little bit of
> weight. Of course, he was 54 years old, had continued balding a little on
> the top and had gray hair and at his daughter's request he grew a full,
> white beard. And, in fact, he had shaved it off once and she cried and
> said, Daddy, daddy, please grow it back.

(Tr. IV 33)  The state then introduced, over objection, a portrait type photograph of

Mr. Van Treese taken just a few months before his death.[23]  *(Id.* at 35; State's Ex. 79)

While the photograph was being published to the jury (Tr. IV 36), Mrs. Van

Treese began to describe a series of tragic events that had taken place in the last half

of 1996.  She told the jury of how her mother had passed away in June, just a couple

of days after her fifty-fifth wedding anniversary.   Because this was traumatic to

everyone, Mr. Van Treese rented a motor home and took the family on a long vacation

through Arizona, California, British Columbia, Washington, Yellowstone Park and

Mt. Rushmore.  After they had been gone approximately sixteen days, Mr. Van Treese

felt "an urgent need" to get back to Oklahoma and so the family drove "straight

through, arriving back in Oklahoma City at the Oklahoma City motel ... [at] 2:00 a.m.

[the] morning of July 12th." (Tr. IV 36-37)

She continued the story and testified that upon arrival, the couple learned that

---

[23]The inappropriateness of admission of this photograph in the first stage of trial is
discussed in a separate Ground.

Barry Van Treese's mother was scheduled for bypass surgery at 6:00 a.m. that very

morning.   After showering, they left the motel and went straight to the hospital,

arriving in time to visit with Barry's mother for a short period of time before she went

into surgery. *Id.* Mrs. Van Treese testified:

> During that surgery she did not survive.  They tried several attempts to
> take her off the heart and lung machine and she passed away on that day.
> Her heart was not strong enough to regain.  So within a 25-day period I
> had lost my mother and Barry had lost his mother.

(Tr. IV 37-38)   In the unlikely event the premonition aspect of this tragedy was lost

on the jury, the prosecutor solicited testimony from Mrs. Van Treese that cell phones

were not available in 1996 and that they had not received any pages on the pager they

had been told was nationwide because "they were still developing the technology then

for that." (Tr. IV 38)

> Mrs. Van Treese then told the jury:
>
> [T]he entire family was devastated, both sides.  I was trying to take care
> of my father.  He had had triple bypass surgery done so I was concerned
> about his health.  My brother also had had a stroke and had to live with
> them.  And he of course was devastated.
>
> Barry's family, Barry's father lived in Lawton and he was very devastated
> by the loss, and it's understandable if you have been married to someone
> for 55 years, and so Barry was spending a lot of time with his father.  He
> wanted to make sure that he was coping with his loss.
>
> * * * * *
>
> We also had five children at home that it was devastating for them also

to have lost both of their grandmothers within such a short period of time.

* * * *

[Barry] was focusing on just having everyone - helping everyone cope, and being now the strong son, the strong son-in-law, the strong father figure for everyone that they could depend on him.

(Tr. IV 39-40)    Even if any of this testimony was relevant to the guilt of Petitioner, a very brief explanation would have been appropriate, but even still, the testimony was irrelevant and highly prejudicial to Mr. Glossip.   Clearly the heart wrenching and detailed descriptions provided by Mrs. Van Treese were not probative of guilt.   In addition, the State took every opportunity to present evidence regarding Barry Van Treese's personality and general demeanor.   The sheer volume of such evidence presented at Mr. Glossip's trial overwhelmed the evidence regarding the crime itself. For example, when asked to describe her husband, Mrs. Van Treese testified:

He was basically your Santa Claus. He was a very jolly, happy person. When we took trips, you know, he would make up silly songs with the kids and he was, you know, in some phases, you know, he was - had the demeanor and the actions of a child.  He wanted to have fun with all of us.

(Tr. IV 61)  Similarly, William Bender, the manager of the Tulsa Best Budget Inn, described Mr. Van Treese as "the most jovial person I've ever met in my life.  He was a very happy, go lucky guy. He was like Santa Claus." Cliff Everhart, the part-time security guard for the motel, testified:

74

> Barry was a kind, loving, generous person. He thought more of his family than anything in the world, but if somebody was homeless on the street, he'd pick them up and bring them to the motel and feed them, buy them clothes, give them a room, and even give them money to pick up trash occasionally. He was one of the nicest people I'd ever met.

(Tr. XI 168)

Other testimony solicited by the prosecutor to evoke sympathy included the fact that although Mrs. Van Treese had remarried, she still wore the victim's wedding ring on a chain around her neck. After showing the ring to the jury, she explained that it had been damaged and "flattened out" when she received it from the funeral home after his death. (Tr. IV 105-06) At least four witnesses testified that Mr. Van Treese's car had specialty license plates on the front and back of his car because he was an amateur radio operator and the tag represented his call sign. (Tr. IV 86-87; VIII 141, 173; X 151; State's Ex. 26, 62) According to Kenneth Van Treese:

> Barry was - he's just a great guy. You know, he had a real good sense of humor. He was a ham operator and from the time he was 13 or 14 years old he entertained himself just by striking up conversations with people all around the world and just, you know, shooting the bull with them. And he had a lot of fun messing around with his ham radio operation and, of course, his kids.

(Tr. X 218)

When Donna Van Treese was first informed that her husband had not been seen all day and his car had been found unlocked and parked "kind of cater-cornered" at the Weokie Credit Union she was understandably concerned. However, it was completely

unnecessary to inform the jury that Mr. Van Treese had been diagnosed with diabetes several months before and that they had gone to classes to learn about the disease. She told the jury she was worried about a medical problem and was on "high alert when things like this happen, as you would if a child was hurt, you go on high alert status." (Tr. IV 98) It was irrelevant and prejudicial to admit testimony that the white t-shirt Barry Van Treese was wearing when he left Lawton "had the face of Jesus on it with a crown on it that said, 'He wore the cross for us.'" (Tr. IV 85; XI 36)

Due to the extreme quantity and extremely emotionally charged victim impact testimony, the first stage became an irrelevant and distracting memorial to Mr. Van Treese rather than a trial about the guilt of the Petitioner. The testimony described above was intended to inflame the passions of the jury and confuse and distract them from the duty of determining whether Petitioner was guilty beyond a reasonable doubt. This evidence was irrelevant to the case, misleading to the jury, extremely prejudicial and, therefore, legally inadmissible.[24]

**B.      Evidence Intended to Evoke Sympathy for the Perpetrator of the Murder.**

The state took every opportunity to depict Justin Sneed as a pathetic and naive teenager who had been led astray by Mr. Glossip as opposed to the cold-blooded killer

---

[24]The fact that trial counsel failed to object to this clearly improper evidence is addressed in GROUND V.

who had beaten Barry Van Treese to death[25].   As shown in Ground I, Kayla Pursley portrayed Mr. Sneed as a peer to her young sons even though Mr. Sneed said he hardly knew her and her family.   Ms. Pursley obviously was confused regarding whether it was Mr. Sneed or his brother who had played like a child with her sons. This testimony was irrelevant to the issues at trial and unfairly prejudicial to Mr. Glossip.

**Mr. Sneed's Life Story.**

The State also presented testimony from Justin Sneed that had no purpose other than to lessen his moral culpability for the murder.   The prosecutor asked Mr. Sneed to "tell us a little bit about your family background." (Tr. XII 38)  She then led him through a series of questions to describe his upbringing in Cisco, Texas, where he had lived with his mother and stepfather.   He did not know his biological father even existed until he looked him up when he was thirteen years old.   That contact lasted only a couple of months and then his father disappeared again from his life.   Mr. Sneed had, however, reestablished contact after his incarceration and had been writing to his father for about a year when he testified in 2004.  (Tr. XII 39)

Mr. Sneed's mother had divorced his step-father when he was twelve.  Although Mr. Sneed could probably have gone back to live with his mother in January 1997, he

---

[25]This claim is also relevant to Ground XI regarding the compelling evidence contained in the psychiatric evaluation for determination of competency of Mr. Sneed.

had "left there trying to make my life better for me and my two daughters and I really

didn't want to go back at that point." (Tr. XII 40)  According to Mr. Sneed:

> I kind of got married when I was 16 and had two kids and then she took
> off for like six or seven months and I didn't know where she was at, so
> I left my kids with my mother and came to Oklahoma on a roofing crew
> to where I could get a stable job, you know, and work and everything
> like that and make a life for me and them.

(Tr. XII 40)

Mr. Sneed, his step-brother, Wes Taylor, and the roofing crew they were

working with moved into the Best Budget Inn in July 1996.  Mr. Sneed soon "lost

sight of what my goal and my purpose was" and quit the roofing crew when he "got

entangled with a little bit of drugs and stuff like that."  (Tr. XII 47)  Mr. Glossip

allowed Mr. Sneed and his brother to stay on and work at the motel in exchange for

their room.  However, there was a warrant out for Wes's arrest and his father, Justin's

step-father, tracked Wes down in Oklahoma and "conned" him into going back to

Texas and turning himself in.  (Tr. XII 42-47)

Mr. Sneed was eighteen when he came to Oklahoma. He had dropped out of

school in the eighth grade.  At first, his mother attempted to home school him, but

"that really didn't work out" and she did not pressure him.  (Tr. XII 47-48)  After he

got his wife pregnant, he was more worried about getting a job.  However, he did

obtain a GED after he was sent to prison.  He also had completed a computer Vo-Tech

course while incarcerated.  Mr. Sneed described himself as having more self-esteem and self-confidence than he had before he went to prison. (Tr. XII 48-49)

Prior to his arrest, Mr. Sneed had regularly smoked marijuana and snorted crank, the street name for methamphetamine. When he was working for the roofing crew, most of the money he made was used to buy drugs. After he quit, he had gotten to know enough people that he got his drugs simply by "mingling with them and everything."  (Tr. XII 65)  Mr. Sneed was using the drugs about twice a week depending on whether he ran into someone who was willing to share. After he was arrested, he asked for Sudafed because he had a cold. Shortly thereafter, he was given Lithium even though he did not see a psychiatrist.  (Tr. XII 64-65)  At the time of Mr. Glossip's trial, Mr. Sneed was serving a sentence of life without the possibility of parole. (Tr. XII 174)

This is classic mitigation type evidence generally presented by a defendant in the second stage of a death penalty trial.  Its purpose in this case, however, was to "humanize" the confessed killer so that the jury would hold Mr. Glossip to a higher level of responsibility for the murder and also to secure a death sentence to pay for the death of Barry Van Treese.  This evidence was irrelevant to the issues before the jury and highly prejudicial to Mr. Glossip.[26]

---

[26]Trial counsel's failure to object to this irrelevant evidence is addressed in Ground V.

**C.      Evidence Regarding Operations and Condition of Best Budget Inn.**

As discussed in Ground  I, the State presented a great deal of evidence regarding the physical condition of the motel on January 9, 1997, and thereafter. Even if  *some* evidence regarding the condition of the motel was proper for presentation to the jury, Barry Van Treese had been preoccupied with the family matters discussed above only since June 1996, seven months before his death.  Thus, testimony about replacing hundreds of sets of linens and buying forty mattresses and overflowing a huge dumpster with broken furniture *after* his death is a commentary on the way in which Mr. Van Treese's **brother** chose to run the business after the death of Barry Van Treese, and was irrelevant to how Mr. Glossip managed the motel, and even irrelevant to how  Barry Van Treese dealt with the motel, resulting in prejudice to Mr. Glossip.  (Tr. XII 26)

Similarly, Kenneth Van Treese's testimony regarding the new bookkeeping and control systems he put in place was irrelevant to a determination of whether Mr. Glossip was guilty of first degree murder.  (Tr. XI 112-15)  Moreover, testimony regarding the many items purchased when Kenneth took over the motel had nothing to do with the issues since Mr. Glossip had never had the authority to buy more towels and washcloths or to decide the motel needed two sets of sheets for each room so that one set could be laundered while the other was being used. (Tr. XI 120)   It appears

the Van Treese family did not believe all the measures Kenneth undertook to improve the motel were necessary. After he had operated the motel for two months, "there were people in my family that were starting to second guess the choices that I was making and I basically told them to go to hell and if they wanted to run it, they could."  (Tr. XI 121-22)

None of this evidence was relevant and was unfairly prejudicial to Petitioner.

## D.   Conclusion.

The state's case against Mr. Glossip was built almost entirely on speculation, innuendo, suspicion, irrelevant and highly prejudicial victim impact testimony. Moreover, the improperly admitted evidence described above and in Ground I carried the strong potential of misleading and confusing the jury.   The likelihood of resulting prejudice so infected the trial with unfairness as to make the resulting convictions a denial of due process under the state and federal Constitutions.   *Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).   Moreover, because the state incorporated all first stage evidence into the punishment phase, including that improperly admitted, the sentence of death cannot be relied upon as the product of justice and a fair adversarial process. *Woodson v. North Carolina,* 428 U.S. 280, 96 S.ct. 2978, 49 L.Ed.2d 944 (1976).   Accordingly, Mr. Glossip requests that this Court reverse his conviction and/or vacate his sentence of death.

81

## GROUND III

**THE TRIAL COURT ERRED IN PERMITTING THE STATE TO DISPLAY SELECTIVE PORTIONS OF CERTAIN WITNESSES' TESTIMONYTHROUGHOUT THE TRIAL BECAUSE IT OVEREMPHASIZED THAT TESTIMONY, CONSTITUTED A CONTINUOUS CLOSING ARGUMENT, AND VIOLATED THE RULE OF SEQUESTRATION OF WITNESSES.**

This claim was presented as Proposition III in direct appeal proceedings.

The error in permitting the pervasive use of portions of evidence, carefully selected by the Prosecutor and documented in the Prosecutor's handwriting on several large-size posters for continual consideration of the jurors, and seen by subsequent witnesses at they testified, violated Mr. Glossip's constitutional right to due process. *See Lisenba v. California*, 314 U.S. 219, 236 (1941) which states:

> As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial.

On habeas review of a State Court's evidentiary rulings, such rulings will not be disturbed unless the Petitioner demonstrates that the Court's error was "so grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process ." *Fox v. Ward,* 200 F.3d 1286, 1296 (10th Cir. 2000), quoting *Williamson v. Ward*, 110 F.3d 1508, 1522 (10th Cir. 1997); see also *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) (the error "so infected the trial with

unfairness as to make the resulting conviction a denial of due process."). In Petitioner's case constitutional violations have occurred and this claim is proper for review because the error "so infected the trial with unfairness as to make the resulting conviction a denial of due process."; *See also Maes v. Thomas,* 46 F.3d 979, 987 (10th Cir. 1995).

**The Selected Evidence**

While examining Donna Van Treese the first day testimony began in the case, the prosecutor got out an easel and placed a pad of poster paper on it.[27] She then began summarizing the portions of Ms. Van Treese's testimony that she believed were important and writing it on the poster paper. (Tr. IV 99-101) The next day, on redirect examination of Mrs. Van Treese, the prosecutor again began writing selected portions of the testimony onto the poster paper. *(See, e.g.,* Tr. V 19-22; 23-24) The prosecutor continued the practice of writing certain portions of the testimony on the posters when examining D-Anna Wood, Mr. Glossip's girlfriend and co-manager of the motel. (Tr. V 97-105; 182) When it became apparent that the prosecutor intended to keep the demonstrative aids prepared during the witnesses' testimony displayed for

---

[27]Trial counsel believes the paper was approximately 2' x 3'. Unfortunately, there is no accurate record of the size of the paper or exactly what was written on each sheet because the trial court refused to allow the posters to be marked as court's exhibits or even to allow defense counsel to photograph the posters so that they could be preserved as part of the record for review. (Tr. XV 34-37)

the jury throughout the trial, defense counsel objected, arguing:

> We want to make an objection for the record to the posting of demonstrative exhibits that are basically an accumulation of notes written by the prosecutors to remain throughout the course of the variety of witnesses.
>
> I understand the need sometimes for a demonstrative exhibit with a particular witness and then you bringing a demonstrative exhibit out with others, but basically all this does is emphasize the testimony of -- it's only part of the testimony. And as a result of that we do object.

(Tr. V 195-96)  The trial court overruled the defense objection. *Id.*  The prosecutor continued to make posters whenever there was testimony she thought would be important for the jury to remember.  *(See, e.g.,* Tr. VII 59-60; VIII 88-90, 116-17; IX 46-48, 56, 121, 206-07, 212-19, 234-36; XI 183-84)  These posters were then taped up to various places around the courtroom and remained in full view of the jury *and all subsequent witnesses* throughout the trial. (Tr. XV 34; XI 127)  According to trial counsel, at the end of the trial, there were at least twelve of the state's posters plastered up across the front of the prosecutor's table, the trial bench, and any other available space in the courtroom.

The trial court committed reversible error in permitting the State to display these demonstrative aids throughout the trial for several reasons.  The posters placed undue emphasis on certain aspects of the testimony - the parts the prosecutor felt best summarized their case against Mr. Glossip.  Because the posters remained on display

from witness to witness from the first day of testimony to the last, the State was allowed to make its closing argument throughout the trial.  Finally, because the posters were visible to the witnesses as well as the jury, their use violated the rule of sequestration of witnesses.

**Undue Emphasis on Selected Testimony.**

During voir dire, in answer to a juror's question regarding whether jurors would be allowed to take notes during the trial, the trial judge told the jury why she did not permit note taking during the trial:

> [N]ote taking is a skill. If you're in a job or a student where you take notes every day, you get pretty proficient and you have a pretty good skill level at it. If it's been years since you've taken notes, you're pretty lousy at it.
>
> Have you ever been writing something down and you hear something and you have to say, Wait a minute, wait a minute, repeat that?  Well, we can't do that during a trial.

(Tr. II 179)   The prosecutor, substituting the jury's weight and credibility of the evidence for her own,  and with the blessing of the trial court, took the notes for the jury.   The notes consisted of what the prosecutor needed for a conviction and, therefore, what the jury needed to consider to arrive at a conviction.  The prosecutor served as a biased and prejudiced note taker, thus denying the constitutionally guaranteed fair and impartial jury and fundamentally fair trial.

In almost every instance referenced above in which the prosecutor summarized

a witness's testimony on one of her posters, the witness first testified, then restated and clarified as the prosecutor wrote it on the poster and, finally, the prosecutor reread what had been written to make sure it was correct. *(See, e.g.,* Tr. IX 45-48) Thus, the jurors heard the testimony over and over again as it was being visually recorded for them and then were allowed to refer back to it whenever they wanted throughout the trial.  It genuinely usurped the role of the jurors because the  undue emphasis in the posters was clear communication to the jury that the lists were what should be considered, and bolstered the testimony of certain witnesses,  and helped determined the existence of the elements of the crime, the weight and the credibility of the testimony and evidence, and denigrated the remaining testimony and other evidence.

Certainly, there are instances in which a particular witness has prepared a summary of testimony that was used by the jury while the witness was testifying or the prosecutor has prepared such a summary either before or during argument to the jury. *See, e.g., Moore v. State,* 788 P.2d 387,398 (Okl. Cr. 1990) (written summary of expert's analysis of fiber evidence distributed to jury during testimony); *Banks v. State,* 43 P.3d 390, 399 (Okl. Cr. 2002) (summary of defendant's past crimes with heading "Trail of Terror" displayed during closing argument).  However, in those cases, the demonstrative exhibit was used only for a short period of time so the issue of undue emphasis on selected portions of the testimony was avoided.

While Mr. Glossip's jury was not allowed to take the demonstrative exhibits into the jury room, they nonetheless had unlimited review of selected testimony throughout the trial - testimony determined by the prosecutor to be important to the state's case. Courts have recognized the danger in allowing jurors to review certain testimony during deliberations. In *Givens v. State,* 705 P.2d 1139,1140-41 (Okl. Cr. 1985), the trial judge refused to allow requested testimony to be re-read to the jury during deliberations "due to the risk that it would be taken out of context with the rest of the evidence." The Court found this to be a valid reason for the refusal and, hence, not an abuse of discretion. *See also Glaze v. State,* 565 P.2d 710, 714 (Okl. Cr. 1977) (refusal to reread part of trial testimony on ground that the testimony out of context could overly stress a particular point not an abuse of judicial discretion); *Lewis v. State,* 528 P.2d 741,744 (Okl. Cr. 1974) (trial judge's refusal to reread testimony of witnesses found not an abuse of discretion "based on the determination that it would be repetitious and add undue emphasis to the testimony of those two witnesses").

It is one thing to allow a party to make a chart or summary or other demonstrative aid for use while a witness is testifying. It is quite another "to allow a particular segment of testimony to be advertised, bill-board fashion," after that witness has completed his or her testimony. *Lanning v. Brown,* 377 S.W.2d 590, 594 (Ky. 1964)

**Continuous Closing Argument.**

Demonstrative aids are, without doubt, useful tools in the presentation of evidence at trial. But the posters created by the prosecutor selected and highlighted only certain parts of the evidence presented and had the effect of allowing the state to argue its own interpretation of the evidence throughout the trial. In *Vanlandingham v. Gartman,* 367 S.W.2d 111, 113-14 (Ark. 1963), the Arkansas Supreme Court addressed use of a chart prepared by counsel in a personal injury case to illustrate his argument on the issue of damages, a relatively new concept at the time.  The court found no error in use of the chart, but stated:

> Of course it behooves the courts to see that no unfair tactics are used; for instance, although an attorney might use a chart or blackboard to illustrate his argument, it would not be fair to place the illustration where it could be seen by the jury at times when the attorney was not using it in making his argument. *If the jury could see it all day it would be the same as arguing the case all day.*

367 S.W. 2d at 114 (emphasis added).  In Mr. Glossip's case, the prosecutor employed precisely the unfair tactics warned of in  *Vanlandingham* and Mr. Glossip's right to due process and a fair trial was prejudiced as a result.

**Violation of Rule of Sequestration of Witnesses.**

Before the first witness testified in Mr. Glossip's case, the trial court granted his request that the rule of sequestration of witnesses be invoked.  (Tr. IV 25-27) Although the trial court's refusal to allow defense counsel to make a record of the

content and placement of the posters makes it difficult to illustrate how pervasive the state's placards were, the testimony of Kenneth Van Treese leaves no doubt they were clearly visible from the witness chair.  When Kenneth Van Treese was asked about what Petitioner told him on the evening of January 8 about his brother's disappearance, re responded , "*[h]e told me the same thing that these notes up here are about*. **About having seen Barry at 7:00, you know, blah, blah, and so forth."** (Tr. XI 127) (emphasis added).  The display of the  testimony in full view of subsequent witnesses clearly violated the rule of sequestration.

The United states Supreme Court discussed the origins and purposes of the rule in *Geders v. United States,* 425 U.S. 80 (1976), stating:

> The aim of imposing the rule on witnesses, as the practice of sequestering witnesses is sometimes called, is twofold.  It exercises a restraint on witnesses tailoring their testimony to that of earlier witnesses; and it aids in detecting testimony that is less than candid.

*Id.* at 87, 96 S.ct. at 1347.  *See also Clark v. Continental Tank Company,* 744 P.2d 949, 951 (Okla. 1987).  The rule has "long been recognized as a means of discouraging and exposing fabrication, inaccuracy, and collusion." *Dyke v. State,* 716 P.2d 693, 697 (Okl. Cr. 1986) (quoting I WIGMORE, EVIDENCE§§ 1837-38 (Chadvourn rev. 1976)).  In Mr. Glossip's case, those aims were thwarted by the fact the state advertised its favorite bits of evidence - the parts it most wanted the witnesses to agree on - for all subsequent witnesses to see.

The OCCA did not rule on this subclaim regarding failure to sequester the jury, and, therefore, the AEDPA deference is not applicable to the claim. The error in the failure to sequester the jury cannot be harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18 (1967); *Arizona v. Fulminante,* 499 U.S. 279, 296 (1991).

### The Trial Court's Refusal to Allow the Defense to Include the Demonstrative Exhibits as Part of the Record.

At the close of testimony in the case, recognizing that defense counsel has a duty to ensure that a sufficient record is provided to reviewing Courts, counsel requested that the many posters be included as part of the original record in the case. Counsel acknowledged that the posters might be bulky and offered to take digital photographs of the posters themselves to show what information each contained, and of the courtroom to show how they appeared to the witnesses and the jury. (Tr. XV 34-35) The prosecutor responded that she had "made sure [she] put into the record what was being written." (Tr. XV 35) As noted above, this stating and restating of the testimony was part of the problem with the state's *use* of the posters. Perhaps more importantly, however, the prosecutor's statement is not accurate. The prosecutor no doubt intended to make a record every time she went to her easel, but the exigencies of trial and human nature - the very reasons the trial judge did not want the jurors taking notes - made it impossible to ensure that every word written on the posters was

spoken into the record.  Only the actual posters or photographs of them could provide a complete record of what the witnesses and the jury saw in the courtroom.   In addition, the State argued that defense counsel had made five demonstrative aids of their own that "had been displayed various lengths of time to the jury" and that one of those, prepared during Justin Sneed's testimony was "displayed to this jury throughout Mr. Sneed and others' testimony."  (Tr. XV 35)  In the first place, the State cites just one poster that remained on display after the witness had finished testifying and the only "others" who testified after Justin Sneed were the detective who investigated the case and Kenneth Van Treese who was excluded from the rule of sequestration.  (Tr. IV 27)  Thus, the State's own argument makes clear that defense counsel did not abuse the use of demonstrative exhibits in the manner the State did in this case.  Moreover, the record is not at all clear that the defense did, indeed prepare five posters.  *(See, e.g.,* Tr. V 144; XII 204)  The trial court agreed that the prosecutor had described the exhibits "with some detail" and denied the request to make the posters part of the record.  Defense counsel then asked permission to photograph the exhibits "for our own purposes" so that an accurate record would exist if the posters were destroyed after the case.  (Tr. XV 36)  The trial court responded:

> "THE COURT:  You know what?  What you're asking me to do is for permission to make your own record outside of the Court's record. Denied.  The Court's record is what's going to stand.  And if you want to look them up, you can do so.  It's all in the transcript.  There is nothing

about this that has not been memorialized, and the transcript is the way that we make a record in Oklahoma courts.

MR. WOODYARD:   We think the better way to show actually how these things sit in the courtroom and exactly what's written would be to either have the documents or the digital photograph, so we're making that request and I understand the Court's denying our request.

THE COURT:   Your understanding is absolutely on target."

(Tr. XV 36-37)  The trial court's refusal to allow defense counsel even to photograph the exhibits has made it impossible to accurately convey to the OCCA or to this Court every instance of the selective testimony written on the posters and their pervasive positioning throughout the courtroom.  Thus, Mr. Glossip submits that if there is even any question whether he was prejudiced by this highly unusual display, prejudice must be presumed under the unique facts of this case.

**OCCA Decision**

Due to the prosecutor's objection to include the posters in the record and the trial court's refusal to do so, the OCCA was prohibited from reviewing the posters, but found that "the inclusion of the demonstrative exhibits would not affect our decision in this case", and also denied Petitioner's request for an evidentiary hearing on this claim.  *Glossip*, 157 P.3d at 164, n 8.  Petitioner submits that the inability of the OCCA to review the posters prevented a review on the merits of this claim, thereby

precluding the application of the deference provided in 28 U.S.C. §2254(d).[28]

If this Court should find that the OCCA did in fact conduct a merits review on this claim then the decision of the OCCA was based on an unreasonable application of clearly established federal law as determined by the Supreme Court.  28 U.S.C. §2254(d)(1); *Chapman v. California*, 386 U.S. 18 (1967); *Arizona v. Fulminante,* 499 U.S. 279, 296 (1991);   *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).

The OCCA found that the trial court's insistence "that everything that the prosecutor wrote on the pads was in the record" was not correct,  and found "the analysis of the pages in the transcript where notations were made tells a different story." *Glossip*, 157 P.3d at 155.  The Court stated "[w]e are extremely troubled by the trial court's attitude toward defense counsel's attempt to preserve the demonstrative aides for appellate review."  *Id*.  The Court found that the "total recalcitrance of the trial court to allow a record to be made creates error in itself."  *Id*.  Even though the OCCA made other critical statements regarding the error and the

---

[28] In a dissenting opinion Judge Chapel stated "I strongly dissent from the majority opinion's summary finding that any error in this regard was 'harmless', particularly when we do not even seek to review the actual demonstrative exhibits at issue." See dissent opinion, Chapel, *Glossip*, 157 P.3d at 172. A motion for evidentiary hearing including this claim will be filed as scheduled.  In Petitioner's Motion For Discovery to be filed  he requests production of the posters and submits that if the posters are not produced for any reason that  Petitioner be granted a new trial, especially due to the egregious action of the trial court and the objection of the Prosecutor to include the posters as part of the record.

trial court's actions, the court held that the error was harmless."[29]   *Id*. at 156.   In reaching that decision the OCCA noted that the posters"were utilized to assist the jury in understanding the testimony, considering the trial court's instructions against note-taking."   *Id*.   Petitioner points out that the trial court had already taken care of that issue by preparing a chart, referred to as an "Abstract of Proceedings" for both stages of trial, setting out the order in which witnesses testified and a description of the witness.  (See Court Exhibits 7 & 9)   The Court's abstract included an entry on June 1 listing the stipulation that was read to the jury and described as "Prior Statement of Defendant *made under oath*[30] June 9, 1998."  (emphasis added)   The trial court's error in allowing the prosecutor to write selected testimony for the jurors and allowing subsequent jurors to see the posters constituted an abuse of discretion and the error was not harmless beyond a reasonable doubt.

--------

[29]In a dissenting opinion Judge Chapel found that the "trial court's decision to allow the continuous posting of these exhibits, without any limitation and over defense objection, was an abuse of discretion, because it placed undue and unfair emphasis on the summarized testimony" as was the trial court's decision to allow the State, "over defense objection, to display the prosecutor's written summaries of selected witness testimony throughout the courtroom - and apparently visible to both jurors and testifying witnesses - without any limitation. . ."   *Glossip*, 157 P.3d at 171 (Chapel, dissenting opinion).   *See also* Judge Johnson dissenting opinion, "I dissent for the reasons well expressed in Judge Chapel's dissenting opinion."

[30]There was no necessity for the trial Court to remind the jurors that the statement was made under oath and indicates judicial bias and prejudice to Petitioner.  There was no objection by trial counsel but in reaching its decision the OCCA stated that it reviewed "the entire record" and this Court should consider the fact that the jurors already had an "abstract" that in and of itself indicated bias and was prejudicial.

The OCCA relied on *Miller v. Mullin*, 354 F.3d 1288, 1295 (10th Cir. 2004) in which the Court noted the "inherent risk" that pedagogical devices "may 'unfairly emphasize part of the proponent's proof  or create the impression that disputed facts have been conclusively established or that inferences have been directly proved'", citing *United States v. Drougas*, 748 F.2d 8, 25 (1st Cir. 1984).

In *Miller*  the Court noted that such evidence is normally used in summation and stated that such a summary "should be accompanied by a limiting instruction which informs the jury of the summary's purpose and that it does not itself constitute evidence."  *Miller*, 354 F.3d at 1295.  The Court also stated that "[t]he unsupervised use of pedagogical aids during closing arguments greatly heightens the rise of reversible error."  *Id*.  The Court cited numerous cases where pedagogical devices did not amount to reversible error due to limiting instructions, but support Petitioner's claim of denial of due process and a fundamentally fair trial.

In *United States v. Crockett*, 49 F.3d 1357, 1361 (8th Cir. 1995) the Court stated that "there are substantive limits on the use of such pedagogic visual aids" and the question on appeal is "whether the pedagogic device in question 'was so unfair and misleading as to require a reversal," citing *United States v. Possick*, 849 F.2d 332, 339 (8th Cir. 1988.)  In *Crockett* another factor noted in determining whether reversible error existed,  the Court found  that the district court "took steps to cure any undue

95

influence the transparencies might have had, *which is highly relevant to an issue of this nature*." *Id*. at 1362.  (Emphasis added)  Cases involving use of visual aids, summaries, and notes involved aids that were used only in closing arguments, and certainly not through out the trial and under the circumstances which Petitioner complains.

The testimony selected by the Prosecutor to include on the posters was an expression of the Prosecutor's personal opinions about the witnesses' credibility which is improper because it "carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence."  *United States v. Young*, 470 U.S. 1, 18-29 (1985).   See also *United States v. Grajales-Montoya*, 117 F.3d 356 (8th Cir. 1997) wherein the Court stated that a summary will be admitted "instead of, not in addition to, the documents that it summarizes", and that "it will have been prepared by a witness available for cross-examination, *not by the lawyers trying the case*." *Id*. at 361. (emphasis added)

Mr. Glossip  was denied due process and a fundamentally fair trial.  The decision of the OCCA involved an unreasonable application of clearly established federal law as determined by the Supreme Court, and Petitioner's conviction and sentence should be reversed.  28 U.S.C. §2254(d)(1).

**GROUND IV**

**MR. GLOSSIP WAS DEPRIVED OF A FAIR TRIAL AND A FAIR SENTENCING HEARING BY THE IMPROPER TACTICS, REMARKS, AND ARGUMENTS OF THE PROSECUTORS DURING BOTH STAGES OF TRIAL.**

This claim involves claims presented in Proposition IV in direct appeal proceedings.  Relative to this claim is Ground V wherein Petitioner claims ineffective assistance of counsel for the failure to object to many of the following instances of misconduct.   The claim of ineffective assistance of counsel in Ground V was exhausted by inclusion on direct appeal.

The prosecutors in this case exceeded the bounds of proper and professional prosecutorial advocacy during both stages of trial. Their contemptuous conduct resulted in a trial so infected "with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974). The errors must also be considered cumulatively:

> In death penalty cases, we review whether the improper comments as a whole so infected the trial with unfairness as to make the resulting conviction a denial of due process, or rendered the sentencing fundamentally unfair in light of the heightened degree of reliability demanded in a capital case.

*Bland v. Sirmons*, 459 F.3d 999, 1029 (10th Cir. 2006).

The prosecutor's actions are contradictory to the constitutional safeguards mandated in the imposition of a death sentence.  *See   Woodson v. North Carolina,*

428 U.S. 280, 304 (1976) ( "[I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.") *See also Williams v. Oklahoma*, 358 U.S. 576, 585 (1959) ("[i]n discharging his duty of imposing a proper sentence, the sentencing judge is authorized, if not required, to consider all of the mitigating and aggravating circumstances involved in the crime."

The primary duty of a prosecutor is not to convict, but to see that justice is done. *Berger v. United States*, 295 U.S. 78, 85 (1935).  Even if no one error discussed below warrants reversal, the cumulative effect deprived Petitioner of a fair trial and due process.   *Brecheen v. Reynolds*, 41 F.3d 1343, 1355-56 (10th Cir. 1994) (consideration of the totality of the circumstances required).

Insofar as defense counsel failed to object to all the errors, counsel was ineffective for failing to do so.  *See, Gravley v. Mills*, 87 F.3d 779, 785 (6th Cir. 1996) (counsel ineffective for failing to object to prosecutor's misconduct in closing arguments).

### A.    Misrepresentation of Facts and Misleading Argument Designed to Confuse the Jury.

As shown in GROUND I, no physical evidence of any sort tied Mr. Glossip to the murder of Barry Van Treese. Nevertheless, the State argued this *lack* of forensic

evidence implicated him in the murder.  After acknowledging that all blood from the

crime scene tested belonged to Mr. Van Treese and all fingerprints found belonged to

Mr. Sneed, the State argued:

> Richard Glossip had business in room 102 didn't he?  He was the manager of the motel. Ordinarily, wouldn't you think that the manager of a motel would at least occasionally go in every single room at one point or the other and fix something, look at something, check it over just to make sure that it was right and ready for the next paying customer that came in?
>
> *Does the absence of his fingerprints,* even though we know that in all likelihood he'd been in that room repeatedly and had legitimate business there, and even though he, himself, admits confirming John Prittie's description that he helped put the plexiglass on that broken window, *not one single Richard Glossip fingerprint can be found.* Can you think of some reasonable explanations for that looking for a reasonable inference as justified by your common sense?

(Tr. XV 83-85) (emphasis added).  After suggesting that Mr. Glossip's fingerprints

might have been smeared, and assailing his "confidence" that his prints would not be

found in room 102, the prosecutor continued:

> What did he know?  Isn't it a reasonable inference that he knew for a certainty that his fingerprints wouldn't be in that room, even innocently put there changing a lightbulb or cleaning the mirror, anything? *Because he had made certain by action or omission that his fingerprints would not be found there.*  It's not hard.  You just give them a swipe, right, with a cloth or a paper towel?  It's not hard.
>
> * * * * *
>
> And, understand, I'm not talking about fingerprints in the blood of Barry Van Treese. We've seen some of those. I'm talking about any fingerprint at all.  He had legitimate business in room 102 at times and there would

be many circumstances under which an innocent Richard Glossip could
put his fingerprint in that room.  Okay?  I'm talking about no fingerprints
of any kind at all.

(Tr. XV 85-86)(emphasis added).  Of course, fingerprints in the blood of Barry Van

Treese *were* the items collected by the police. No one took prints from the light bulbs

or the television or the bedside table or the telephone in the room - this was a motel

room and innumerable people had likely been in and out in the days, weeks, and

months prior to the murder. Understandably, the police limited their initial collection

of forensic evidence to areas obviously related to the murder *and the prosecutor knew*

*or should have known it.*

The prosecutor returned to this theme in the final closing argument:

Why isn't his fingerprints (sic) there?  *If he is innocent, why aren't they*
*there?*  He helped put up that plexiglass.  He touched it.  His fingerprints
should be there.  Why aren't they?  Because somebody wiped them off.
*Innocent people don't do that.*

(Tr. XV 167-68) (emphasis added)  It is hard to imagine how Mr. Glossip could have

selectively wiped off all of his own fingerprints; but left everyone of Justin Sneed's

prints in place. Clearly, the prosecutors distorted the testimony, misled the jury and,

in the end, stood the evidence on its head to bolster its very weak case against Mr.

Glossip.

**OCCA Decision**.    The OCCA reviewed this claim for plain error and held that the

prosecutor "was merely arguing . . . that it was suspicious that none of his fingerprints

100

were found in the room" and specifically "was not arguing that Glossip selectively

removed fingerprints after the crime." *Glossip*, 157 P.3d at 157. That decision was

based on an unreasonable determination of the facts, precluding application of the

deference provided in AEDPA. 28 U.S.C.§2254(d)(2). *See also Paxton v. Ward*,

199 F.3d 1197, 1210, (10th Cir. 1999) ("in affirming the trial court's admission of

[witness] statements  as an excited utterance . . . the state appellate court clearly

proceeded on an unreasonable determination of facts in light of the evidence presented

at trial."); *Napue v. Illinois*, 360 U.S. 264, 269 (1959) ("the district attorney has the

responsibility and duty to correct what he knows to be false and elicit the truth.")

In Petitioner's case no interpretation can reasonably be made of the

Prosecutor's statement  except that Petitioner's fingerprints should have been on the

plexiglass and were not there for the specific reason that  someone wiped them off,

and that "*innocent people do not do that*" - a clear reference to Petitioner.  It was

objectively unreasonable to determine that the Prosecutor was "was not arguing that

Glossip selectively removed fingerprints after the crime" as determined by the OCCA.

Even if this Court determines that the finding of OCCA did not involved an

unreasonable determination of the facts, still the decision involved an unreasonable

application of clearly established federal as determined by the Supreme Court, and

relief is warranted.  28 U.S.C.§2254(d)(1).

The prosecutors also argued that the only person who had a motive to kill Mr. Van Treese was Mr. Glossip because Justin Sneed would never have killed Barry Van Treese for money alone:

> **What reason above and beyond the reasons of Richard Glossip did Justin Sneed have to kill Barry Van Treese?  Did he do it for $10,000?  Was that his only reason?**

**(Tr. XV 68)**

> **What did he stand to gain besides money, which he didn't get, by killing Barry Van Treese?  Nothing.**

(Tr. XV 69)  At the same time the state made these arguments, it had alleged in the Bill of Particulars that Mr. Glossip should be put to death pursuant to the "murder for remuneration" aggravator based, in large part, on Mr. Sneed's testimony that he was offered money to commit the murder.   (OR 1044-51; Tr. XII 80)   The State's duplicitous argument that on the one hand Mr. Sneed would not have committed murder for the money and on the other that Mr. Glossip should be executed because he paid Mr. Sneed to commit the crime was clearly misleading to the jury.

The State also materially misrepresented the facts, misled the jury, and denigrated counsel in one fell swoop with its argument regarding Mr. Glossip's defense that he was, if anything, guilty only as an accessory after the fact to murder. Justin Sneed made his confession, and numerous statements that Petitioner instructed him to murder Mr. Van Treese,  on January 14, 1997. The following day, the State of

102

Oklahoma filed two Informations related to the murder of Barry Van Treese- Case No. 1997-244 charging Justin Sneed with murder in first degree and Case No. 1997-256 charging Mr. Glossip with *accessory* to murder. Eight days later, on January 23, the State filed a second Information adding Mr. Glossip as a co-defendant in Case No. 1997-244. On January 27, the State dismissed the accessory charge against Mr. Glossip.

At trial the State made an oral motion in *limine* asking the court to prevent defense counsel from "raising in any way. . . the fact that before the murder charge on trial today was filed against Defendant Glossip, he was originally charged with the offense of Accessory to Murder in CF-97-256." (Tr. XIII 103) Trial court sustained the motion. (Tr. XIII 104) Mr. Glossip argued as a defense to the State's case that if he was guilty of any offense, it was as an accessory after the fact. (Tr. XV 147-49) At Mr. Glossip's request, the trial court instructed the jury on the lesser related offense of accessory to murder. (O.R.1289-90)

When addressing the issue of the lesser related offense in its second closing argument, the Prosecutor took unfair advantage of the circumstances described above and misled the jury by arguing "[t]he state of Oklahoma did not charge Mr. Glossip of lesser related offenses because he committed the big boy offense of Murder in the First Degree." (Tr. XV 175) Trial counsel objected. When trial counsel contended the

State's argument was misleading and "a misstatement of the law and the fact of this case," the trial court responded for the State:

> [B]efore the investigation was concluded they may have done something else, but after all of the facts were in, then they selected this charge. I don't see that that's misleading. If we were dealing with the original set of facts, then I would agree with you. But there was additional evidence that was developed and that's what caused them to make decisions.

(Tr. XV 176-77)

The second Information filed on January 23, 1997, was identical to the one filed January 15 except for the addition of Richard Eugene Glossip aka "Rich" as a defendant. (OR 1-4; 5-9) The accessory charge was filed *after* Justin Sneed had implicated Mr. Glossip as the alleged "mastermind" of the murder. It was misleading to leave the jury with the impression that the State had always believed Mr. Glossip was a principal to the murder.   Moreover, the State implied that the lesser related offense instruction was a defense trick, arguing:

> I want to talk to you about this lesser related offense. I want to point out to you why you got it. You see, because it says lesser. That's why you got it. Because they wanted you to have a lesser option. I want to tell you something. We don't get to choose here, see, you all don't. The state of Oklahoma chose, right or wrong, we chose Murder in the First Degree.
>
> * * * * *
>
> Let me tell you something about lesser related offenses. Let me tell you why we just charge with one offense. Because that's what he did. Because that's what the evidence is. You know, somebody, they drive

104

drunk, they commit DUI and they slam into somebody, they run a stop sign, they slam into somebody and they kill them, you know what we charge them with? Manslaughter. Because that's what driving drunk and killing somebody is. And at trial if they get up and they go, "You got me, okay, find me guilty of, well, running the stop sign." We don't accept that offer. And that's what this is. It's an offer to plead to running the stop sign. But he did more than that.

And the State of Oklahoma respectfully declines his offer of a lesser related offense.

(Tr. XV 172-3)

Trial counsel objected and the State responded that the instruction would never have been given if the defense had not requested it. (Tr. XV 173) Counsel argued:

This instruction was given by the Court. It's proper for [the jury's] consideration and I think the jury has been misled that it's something that the Defense has done. Yes, we made a request. The state makes requests, but the Court approves and instructs.

(Tr. XV 174) The trial court expressed concern over the Prosecutor's statement and the Prosecutor grudgingly told the jury:

Ladies and gentlemen, *when we talk about lesser related offenses they are running the red stop sign and that's it.* Now, they're in your packet and they're for your consideration. I mean, they're not here because they're not for your consideration. They are for your consideration ... at the proper time.

(Tr. XV 174-75) (emphasis added) However, the damage was already done. Courts have long condemned arguments intended to impugn the defense. *Coulter v. State,* 734 P.2d 295, 302 (Okl. Cr. 1987) (condemning "air defense" argument) *(Black v.*

*State,* 663 P.2d 22, 25 (Okl. Cr. 1983) ("Counsel should refrain from casting aspersions upon opposing counsel."); *see also Bechtel v. State,* 738 P.2d 559, 562 (Okl. Cr. 1987) (Parks, J., specially concurring) (accusing defense counsel of fabricating evidence); *Jones v. State,* 738 P.2d 525, 530 (Okl. Cr. 1987) (arguing that "the 'job' of the defendant's attorneys was to get their client Richard Jones off.'"); *Brewer v. State,* 650 P.2d 54, 58 (Okl. Cr. 1982) ("Object, object, when it gets tight, he starts objecting.").

The OCCA held that the jury instructions "channeled the jury's decision making process and cured any error." *Glossip*, 157 P.3d at 158. However, when the Prosecutor finally acknowledged that the lesser related offense instruction was in the packet for the jury's consideration, he repeated the same analogy of Petitioner's request for the lesser related offense to the desire to a charge of running a stop sign instead of a DUI referenced in his previous improper argument and stated: "when we talk about lesser related offenses they are running the red stop sign *and that's it*." Clearly, he was sending the same improper message to the jury. The error denied Petitioner of due process and a fair trial, and the decision was an unreasonable application of federal law as determined by the Supreme Court. 28 U.S.C. §2254(d)(1).

**B.    Evidence and Argument Intended to Evoke Sympathy for the Victim and his Family.**

106

The prosecutor also presented argument intended to evoke sympathy for the victim and his family in first stage.  As shown in Ground II the prosecutor improperly solicited extensive  victim impact testimony in first stage.  The State distracted the jury from its crucial responsibility of determining the guilt or innocence of Mr. Glossip by playing upon the sympathy of the jury for the victim and his family.  The victim impact testimony, and argument and authority in Ground II is incorporated herein.

Prosecutorial comments that tend to overemphasize the character of the victim or impact of the homicide on the victim's family are improper in any stage of a capital murder prosecution.  *Payne v. Tennessee,* 501 U.S. 808, 827, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720, 736 (1991).  As these improper appeals to emotion likely tipped the scales in favor of the prosecution, Mr. Glossip's convictions must be reversed. *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).

**OCCA Decision**.

The OCCA held that its "resolution of proposition two also resolves this issue.[31]" *Glossip*, at 158.  The decision involved an unreasonable application of clearly established federal law as determined by the Supreme Court.  28 U.S.C.

---

[31] In Ground II the OCCA found at least two errors, and if this Court finds that any one error claimed of in this Petition does not singly warrant relief, then the errors found in Ground II should be attributed to this Ground and considered in Petitioner's claim of cumulative error.

§2254(d)(1).  The errors denied Petitioner of due process and a fair trial.

**The Remaining Errors**

The OCCA reviewed the remaining claims and held that the "prosecutor's arguments were proper comments on the evidence in order to show that . . . Glossip was a continuing threat to society."  *Glossip*, 157 P.3d at 159.  The decision involved an unreasonable application of clearly established federal law as determined by the Supreme Court.  28 U.S.C. §2254(d).

### Implying to the Jury that Additional Evidence Exists.

On redirect examination of Kayla Pursley, the prosecutor first established that Ms. Pursley had reviewed the reports of her statement given to police on January 7, 1997, that she had not been interviewed by defense counsel, but had been interviewed by the prosecutor who asked "a lot" of questions, and that all of the additional information Ms. Pursley provided had been turned over to defense counsel.  (Tr. IX 97-99)  After reiterating some of the testimony that "they [defense counsel] have had notice of" *(ld.* at 99-100), the prosecutor asked:

> **Q:     And, in fact, in the police report are some things that you don't remember right now.  Right?**
>
> **A:     Right.**
>
> **Q:     Okay.  Some things of other statements that Richard Glossip made.  Right?**
> **A:     Right.**
>
> **Q:     And when you told the police that on January 7th, you were telling them the**

**truth?**

**A:**     **Yes.**

**Q:**     **It's just that it's not before this jury right now because you don't remember it today?**

**A:**     **Right.**

**Q:**     **So those additional statements that we might be able to write up here we've just lost those because it took us seven years to get this to trial. Right?**

**A:**     **Right.**

(Tr. IX 100) (emphasis added).[32]

Of course, the prosecutor could have asked if Ms. Pursley's review of the report refreshed her recollections regarding the matters she could not remember at trial, or even have impeached her own witness with the information contained in the police report.   Instead, the prosecutor formulated a question for the express purpose of implying there was more this witness could tell the jury that would be damaging to Mr. Glossip if only she could remember what it was.   Leaving the jury with the impression that the state has additional evidence not presented to the jury has long been condemned.   *See Rheuark v. State,* 160 P.2d 413, 414 (Okl. Cr. 1945) (argument implying there was more behind the prosecution than shown by the evidence highly improper); *Brower v. State,* 221 P. 1050, 1052 (Okl. Cr. 1924) (prosecutor implied he

---

[32]The prosecutor had made a poster memorializing selected portions of Ms. Pursley's testimony. The reference to writing something "up here" is to that poster.  The improper use of these posters is addressed in Ground III.

had "better reasons" for believing defendant guilty than jury and insinuated defendant previously made conflicting statements to prosecutor).

**OCCA Decision**

The OCCA held that "[t]he fact that the jury was deprived of this evidence due to a lack of memory was not indicative of more evidence damaging to Glossip", and that "this claim does not rise to the level of plain error." *Glossip,* 157 P.3d at 158. The decision involved an unreasonable application of federal law.   28 U.S.C. §2254(d).

**Second Stage Misconduct.**

Petitioner incorporates the above authorities herein.    The jury found the existence of only the murder for remuneration aggravating factor in Petitioner's case. Even in cases where the aggravating evidence is substantial, errors in second stage may be harmful so that federal habeas corpus relief is warranted. *Williams v. Taylor*, 529 U.S. 362 (2000).  The United States Supreme Court has stated that convincing only one juror in second stage that the death penalty is not proper precludes the imposition of a death sentence.  *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).  The second stage errors complained of in this Ground as well as second stage claims in other Grounds warrant second stage relief because it is reasonable that at least one

juror would not have voted for the death sentence absent the error, or absent the cumulative effect of the errors.

During the state's second stage closing argument, the prosecutors made numerous improper statements which individually and collectively worked to deny Mr. Glossip a fair and reliable sentencing procedure in violation of the Eighth Amendment.  The prosecutors misstatedthe law, denigrated Mr. Glossip's mitigating circumstances, and injected personal beliefs into the proceeding.

The prosecutor misstated the law in arguing that death was the only appropriate penalty because we're not better off because of Mr. Glossip. We as a society are worse off because of Mr. Glossip. The Van Treese family, they are worse off because of Mr. Glossip. The Glossip family, they're worse off because  of Mr. Glossip. This system, this system of justice is worse off because of Mr. Glossip and for that he should receive punishment.  (Tr. XVII 93)  Whether society or any individual is "worse off" is not an appropriate criteria for determining punishment.  Nor is there a "cold-blooded murderer" aggravating circumstance and, thus, the State of Oklahoma does *not* always punish "cold-blooded murderers" with death as argued by the prosecution. *Id.* at 93-94, 98, 107.  Other improper criteria argued by the prosecutor to support the death penalty included her belief "he chose the option of murder in the face of other options" and that "because of that mentality [killing for hundreds, fifties, and twenties]

that's why we punish with death.  That's why it is correct to take a life for the life that

was taken." *Id.* at 94.

> The prosecutor also engaged in prejudicial theatrics:

> Because but for the actions of Richard Glossip, Justin Sneed would not
> have killed Barry Van Treese and but for the actions of Richard Glossip,
> I wouldn't be here and but for the actions of Richard Glossip, their family
> wouldn't be here, and but for the actions of Richard Glossip, the Van
> Treese's wouldn't be here and but for the actions of Richard Glossip, you
> wouldn't be here making this tough decision.

> So I don't have a problem with taking this blood and putting it right over
> here. Because this is where it goes.

(Tr. XV 102)

Expressing a personal opinion that Petitioner should pay with his life is improper.  See

*Thornburg v. Mullin*, 422 F.3d 1113, 1135-1136 (10th Cir. 2005).  Prosecutors must

"refrain from interjecting personal beliefs into the presentation of his case." *United*

*States v. Young,* 470 U.S. 1, 7 (1985).

Trial counsel's objection to the prosecutor's demonstration in which she threw

"things," presumably photographs of the victim's injuries, onto the defense table

during this argument was overruled.  *Id.* In *Brewer v. State,* 650 P.2d 54 (Okl. Cr.

1982), the Court condemned such prejudicial tactics.

Finally, the prosecutor unfairly denigrated Mr. Glossip's mitigation evidence,

arguing:

112

What's his motive while he's awaiting trial? It's to get his niece to come visit him six times after his trial is set so he can bring her in here and make her testify.

His motive is to be a good boy and to buddy up to a 23-year-old detention officer - interesting the age he chooses, I think, the age of Justin Sneed. He chooses this young kid to buddy up with so he can be free and roam the pod while everybody else is in a cell 23 hours and 45 minutes a day. And then he doesn't cause any problems because he knows we've listed as an aggravator the probability that he will be violent. He's not stupid.

(Tr. XVII 97)  The purpose of the prosecutor's comments was to inform the jurors they could ignore these mitigating circumstances because, in the prosecutor's opinion, no one could really care for Mr. Glossip unless he had manipulated them into doing so. The prosecutor's attempts to destroy Mr. Glossip's right to have the jury consider relevant mitigating evidence were in violation of *Lockett v. Ohio,* 438 U.S. 586 (1978) and *Penry v. Lynaugh,* 492 U.S. 302 (1989).  The Supreme Court has long held a defendant in a capital case has a constitutional right to the consideration of mitigating factors by the sentencer, and that the sentencer cannot be precluded from considering mitigating evidence.  *Hitchcock v. Dugger,* 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987); *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986).  Furthermore, misleading the jury about its responsibilities with regard to capital sentencing violated the Eighth Amendment.  *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).

113

**Conclusion**

None of the above instances of misconduct constitute a fair comment on the evidence, and all constitute a complete denial of due process. *Donnelly v. DeChristoforo,* 416 U.S. 637 (1974); *Darden v. Wainwright,* 477 U.S. 168 (1986).

The combined effect of the prosecutorial misconduct was so prejudicial as to adversely affect the fundamental fairness and impartiality of the proceedings and resulted in deprivation of the constitutional rights enumerated above.

The prosecutor's actions are contradictory to the constitutional safeguards mandated in the imposition of a death sentence. *See   Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) ( "[I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.") *See also Williams v. Oklahoma*, 358 U.S. 576, 585 (1959) ("[i]n discharging his duty of imposing a proper sentence, the sentencing judge is authorized, if not required, to consider all of the mitigating and aggravating circumstances involved in the crime." In capital cases, the closing argument must receive a greater degree of appellate scrutiny than in non-capital cases. *Caldwell v. Mississippi,* 472 U.S. 320 (1985).  Mr. Glossip was denied his Fourteenth Amendment right to a fair trial by the repeated

114

abuses of the prosecutor; therefore, his conviction and sentence must be reversed.

## GROUND V

## MR. GLOSSIP WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF HIS RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

This claim was presented as Proposition V in direct appeal proceedings.

### *Strickland v. Washington*

The Sixth Amendment to the United States Constitution, applied to the states through the Fourteenth Amendment, guarantees every criminal defendant the right to effective counsel, the deprivation of which constitutes a constitutional violation. Standards for effective assistance of counsel claims are set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To demonstrate an ineffective assistance of counsel claim to warrant reversal of a conviction or a sentence a defendant must meet a two-prong test by showing that counsel's representation fell below an objective standard of reasonableness, and that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*. at 688 & 694. Petitioner is not required to show proof of prejudice beyond a reasonable doubt or by clear and convincing evidence, or even by a preponderance of the evidence, as these tests are too stringent. *Id*. at 695. The "reasonable probability" test requires only that an error may reasonably have made a

difference.   When confidence in the outcome is undermined, prejudice is shown.  *Id*. at 694.

To determine whether a defendant has been prejudiced by his trial counsel's deficient performance, an appellate court must consider the totality of the evidence before the factfinder and whether "the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695.

An accused has a Sixth Amendment right to present relevant evidence favorable to his defense through defense witnesses or cross-examination of prosecution witnesses. *Washington v. Texas*, 388 U.S. 14 (1967). When assessing relevancy, trial courts as well as appellate courts must keep in mind that the validity of a defense theory is for the jury to decide. Petitioner's right to due process and a fair trial was violated when he was denied "the right to a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973).

## *Strickland*  is applicable in Second Stage

The test announced in *Strickland* applies to second stage as well as first stage of trial.  *Id.* at 696. "The sentencing stage is the most critical phase of a death penalty case.  Any competent counsel knows the importance of thoroughly investigating and presenting mitigating evidence."   *Romano v. Gibson*, 239 F.3d 1156, 1179 (10th Cir. 2001).  The Supreme Court has consistently held that "the sentencer may not refuse

to consider or be precluded from considering 'any relevant mitigating evidence.'" *Skipper v. South Carolina,* 476 U.S. 1 (1186).  Accordingly, "the sentence imposed at the penalty stage should reflect a reasoned *moral* response to the defendant's background, character, and crime."  *California v. Brown,* 479 U.S. 538, 545 (1987) (emphasis in original) (O'Connor, J., concurring).  "Consideration of such evidence is a 'constitutionally indispensable part of the process of inflicting the penalty of death.'"  *California v. Brown,* 479 U.S. at 541 (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (plurality)).

There is a reasonable probability that the outcome of the second stage of Petitioner's trial would have been different but for the ineffectiveness of his counsel.

**Counsel's actions were not based on "strategy".**

"When a petitioner has shown that counsel's actions actually resulted from inattention or neglect, rather than reasoned judgment, the petitioner has rebutted the presumption of strategy, even if the government offers a possible strategic reason that could have, but did not, prompt counsel's course of action.  *Marcrum v. Luebbers*, 509 F.3d 489, 502-503 (8th Cir. 2007) *citing Rompilla v. Beard,* 545 U.S. 374, 395-396 (2005) (O'Connor, J., concurring); *Wiggins v. Smith,* 539 U.S. 510, 526-527 (2003). Counsel's action cannot be said to be "strategic" due to the critical necessity of impeaching the State's star witness.

The Supreme Court in *Wiggins v. Smith,* has made it clear that no deference is owed to an attorney's decisions when the investigation supporting that decision is inadequate. *Wiggins v. Smith,* 539 U.S. 510, 526-527 (2003).   It cannot be said that trial counsel's decisions are strategic when counsel is unaware of the full scope of mitigating factors due to counsel's failure to perform investigation into available investigation. *See Hooper v. Mullin*, 314 F.3d 1162, 1170-71 (2002) (failure to pursue reasonable avenues of investigation without any idea of what the investigation might reveal was not an informed strategic decision and required relief from the death penalty).

**Petitioner's claims of ineffective assistance of counsel.**

**A.     Failure to Utilize Justin Sneed's Videotaped Interview.**

Mr. Glossip's 1998 conviction in this case was reversed due to the ineffective assistance of counsel. *Glossip,* 29 P.3d at 599.  That reversal was premised, in large part, on trial counsel's failure to use Justin Sneed's videotaped interview to cross-examine both Mr. Sneed and Detective Bemo. Specifically, the Court held, "[t]rial counsel's failure to utilize important impeachment evidence against Justin Sneed stands out as the most glaring deficiency in counsel's performance." *ld.* at 601 Inexplicably, trial counsel at Mr. Glossip's 2004 trial again failed to use this critical piece of evidence to cross-examine Justin Sneed and Det. Bemo.  The value of the Mr.

118

Sneed video to the defense at trial was twofold: (1) it vividly illustrates the manner in which the detectives manipulated Mr. Sneed into implicating Mr. Glossip in this crime, and (2) it points up the many discrepancies between Mr. Sneed's January 14, 1997, interview, his 1998 trial testimony and, now, his 2004 trial testimony.[33] To be sure, trial counsel cross-examined both Justin Sneed and Det. Bemo in the 2004 retrial regarding the circumstances of the interrogation and some of the discrepancies between the videotape and the trial testimony, and counsel attempted to elicit admissions regarding the same, *(See, e.g.,* Tr. XIII 25-31; XIV 70-71), but Mr. Glossip's previous counsel had tried to cross-examine these witnesses also. (O.R. 603) Moreover, as shown below, whenever the witness denied the differences in the testimony or was unsure about what was said in the initial interview on January 14, 1997, counsel simply let it go. If the jury had been allowed to view the videotape of Mr. Sneed's interview, there would have been no question what Mr. Sneed and the detectives said and why.

### 1. Manipulation of Mr. Sneed to Implicate Mr. Glossip.

On the videotape, the detectives skillfully manipulate Mr. Sneed into inculpating Mr. Glossip in the murder of Barry Van Treese. The first words out of

---

[33]The differences between Mr. Sneed's statements on the videotape and his testimony at this and the 1998 trial are discussed in more detail in the Motion for Evidentiary Hearing to be filed.

Det. Bemo's mouth after Mr. Sneed is read his *Miranda* rights are "we know that this involves more than just you" and "I personally don't think you're the only one" and other suggestions of that sort. (*See* p. 5 of Attachment 18,  to Appendix, and Attachment 17 to be included with the Motion For Evidentiary Hearing)  After some small talk, Det. Bemo suggests they "get down to business" and for the next eight minutes the detectives wheedle and coax  Mr. Sneed and telegraph what it is they want to hear:

> BEMO:  Well, they've made you the scapegoat in this.  You know, everybody is saying you're the one that did this and you did it by yourself and I don't believe that. You know Rich is under arrest, don't you?
>
> SNEED:  No.  I didn't know that.
>
> BEMO:  Yeah.  He's under arrest, too.
>
> SNEED:  Okay.
>
> BEMO:  So he's the one -- he's putting it on you the worst.  Now, I think that there's more to this than just you being by yourselfand I would like for you to tell me what - - how this got started and what happened[.]

(*See* p. 17 to Attachment 18 to Appendix, and Attachment 17)  However, at the 2004 trial, when Mr. Sneed was asked about whether he knew Mr. Glossip had been arrested when he talked to detectives he responded, "I think it was my understanding that he had been questioned, but I don't think it was any understanding that he had been arrested." (Tr. XIII 13)  Trial counsel failed to follow up on this important point,

and failed to ask the witness about how the detectives told him over and over that they believed Mr. Glossip was involved before Mr. Sneed finally implicated him. (*See* pp. 16-25 to Attachment 18 to Appendix, and Attachment 17)   Indeed, it is unclear through counsel's cross-examination whether it was Mr. Sneed or the detectives who thought "people were pointing the finger" at him. (Tr. XIII 14)

Counsel's cross-examination of Det. Bemo did not fare any better with respect to informing the jury of the circumstances surrounding Mr. Sneed's interrogation. While certainly counsel went through some of the detective's questions that led Mr. Sneed to implicate Mr. Glossip,  Det. Bemo naturally denied any intent to do so. (Tr. XIV 70-71) Only the video could convey to the jury how clearly and unambiguously the detectives telegraphed to Mr. Sneed that they wanted him to inculpate Mr. Glossip. (*see* Attachment 17 to Appendix)   There can be no genuine strategic justification for failing to impeach these crucial state witnesses with evidence so clearly probative of their credibility.

## 2.   Discrepancies Between Mr. Sneed's Videotape and his Trial Testimony.

As the Court noted in Mr. Glossip's first appeal, there were "at least seven material inconsistencies and . . . at least five things in Sneed's [1998] trial testimony that he had completely omitted from his videotaped statement." *Glossip,* 29 P.2d, 601. Again, trial counsel attempted to get the inconsistencies across to the jury

through cross-examination.  However, counsel's failure to introduce the actual tape led to the following exchange on redirect examination of Justin Sneed:

> A:  [Variations regarding times things occurred] are just approximations.

> Q:  And you know from reading and watching the videotape interview because they videotaped it, right, with the police?  Yes, they did.

> Q:  *And if it was entirely different from what you told us today, we'd have played that, right?*

> A:  Yes.

> Q:  *Well, they would have played it, right?*

> A:  Yes.

(Tr. XIII 66-67) (emphasis added).

In fact, the videotape *was* entirely different, and counsel's failure to play it for the jury left the impression it was not.  The many discrepancies are discussed in more detail in Petitioner's motion for evidentiary hearing, but several material inconsistencies - extremely prejudicial testimony that was *not* told to detectives on January 14, 1997, and was *not* testified to in 1998 bear repeating here:  Mr. Sneed testified in 2004 that Mr. Glossip offered him $10,000 to kill Barry Van Treese.  (Tr. XII 166-67)  In his interview with detectives and at his 1998 trial, the amount mentioned by Mr. Sneed, whether it was what the victim was "sitting on" as in the videotape, or what Mr. Sneed says Mr. Glossip promised him, was consistently

$7,000. Mr. Sneed never even mentioned the figure of $10,000. But, rather than *impeach* Mr. Sneed with his prior testimony, counsel offers him the prior transcripts to "refresh his recollection" and, thus, allows him to "explain" how he got to the $10,000 figure even though it had *never* been mentioned or even hinted at before he testified at the 2004 trial.[34]

This is but one example of discrepancies that appeared for the first time at Mr. Glossip's 2004 trial. Others include the fact Mr. Sneed described for the first time another incident in which Mr. Glossip wanted him to kill Mr. Van Treese with a hammer in the boiler room of the motel in November or December, 1996. (Tr. XII 80-81); alleged for the first time that Mr. Glossip had taken the victim's wallet out of his pants pocket and removed a $100 bill; (Tr. XII 123), and said for the first time he had tried to "push" a knife with a broken tip into Mr. Van Treese's chest during the attack, (Tr. XII 102).

The failure of trial counsel to cross-examine and meaningfully test the primary evidentiary bases of the State's case against Mr. Glossip clearly runs afoul of the *Strickland* standard. Trial counsel's failure to use Justin Sneed's videotaped statement simply cannot be explained and Mr. Glossip was prejudiced as a result.

---

[34]While Mr. Sneed's explanation that the offer "just kept climbing every time we started talking about it" might make sense if the price was escalating *before* the murder, an increase in the amount to be paid that occurs between the 1998 trial and the 2004 trial is disingenuous, at best (Tr. XII 167)

**OCCA Decision.**

The OCCA applied Strickland, the correct standard, and found that "use of the contents of the tape to cross-examine witnesses, without introducing the tape, was a valid strategy." *Glossip*, 157 P.3d at 160.   The decision involved an unreasonable application of clearly established federal law as determined by the Supreme Court. 28 U.S.C. §2254(d)(1).

**B.      Failure to Utilize Readily Available Evidence to Cross-Examine Witnesses.**

Donna Van Treese testified extensively regarding alleged "shortages" of over $6,000 for the year 1996 which were of great concern to her and to Mr. Van Treese as well.  (Tr. IV 63-71)  Trial counsel had in his possession a number of financial records for both the Oklahoma City and Tulsa Best Budget Inns that would have made clear to the jury that this "shortage" was not peculiar to the Oklahoma City motel. *(See* Attachment 16 to Appendix)

Counsel first attempted to introduce Def. Ex. 71, a summary of the 1996 year-end deposit versus volume report, during his cross-examination of Mrs. Van Treese. The State objected to the document because it included figures for the Tulsa motel which the prosecutor considered irrelevant.  Without further discussion, the trial court asked defense counsel to redact the Tulsa figures from the report.[35]  (Tr. 133-34)

---

[35]In redacted form, Def. Ex. 71 simply reinforced Mrs. Van Treese's testimony that a $6,100 "shortage" existed with respect to the Oklahoma City motel.

Later in the day, counsel asked the court to revisit the issue of Def. Ex. 71, arguing

that the Tulsa figures were relevant to show that Tulsa had suffered similar losses.

In response, the State made an offer of proof that DonnaVan Treese would say that

William Bender, the manager of the Tulsa Best Budget, was also mismanaging that

motel and the Van Treeses intended to fire him as well after they had dealt with Mr.

Glossip.  (Tr. IV 177-78)  Of course, as will be shown below, rather than being an

argument against admissibility of Def. Ex. 71, this was one of the primary reasons the

Tulsa records were crucial to presentation of Mr. Glossip's defense.  Although the trial

court reserved ruling on defense counsel's request, counsel never even attempted to

use the document to cross-examine either Mrs. Van Treese or William Bender.  (Tr.

IV 179)

**OCCA Decision**

The OCCA found that trial counsel attempted to introduce the evidence but the

trial court ruled it inadmissible, and that counsel "did not try to impeach witnesses

with these documents."  *Glossip*, 157 P.3d at 61.   The OCCA merely glossed over

this claim, and did not make a specific determination whether counsel was ineffective

on this specific issue, and stated that the shortages at the Tulsa motel "was not

relevant to show that Glossip intended to have Van Treese killed because he feared

termination." *Id.*

The unredacted Def. Ex. 71 showed the shortage at the Tulsa Best Budget Inn was $5,226.78, representing 3% of its total sales volume, while the $6,100 shortage at the Oklahoma City motel was only 2%. (*See* Attachment 16 to Appendix)

The State's case against Mr. Glossip, other than Justin Sneed's uncorroborated testimony, centered on his alleged motive to kill Barry Van Treese, and the $6,100 shortage was the linchpin of that allegation. *(See, e.g.,* Tr. III 210, 214; IV 63-71, XV 152, 162, 164)  Evidence showing the Tulsa motel had suffered an even greater loss was critical to Mr. Glossip's defense.

If counsel had cross-examined Donna Van Treese using this document, as he told the trial court he intended to do, she presumably would have provided the testimony the State had put forward in its offer of proof, *i.e.,* that the Van Treeses intended to fire Mr. Bender as well as Mr. Glossip. (Tr. IV 177-78)  As a result of his failure to do so, the jury only heard Bender instead testify that he was never even talked to about the shortages at the Tulsa motel, much less that anyone threatened to fire him over such a shortage. (Tr. VIII 94)  Bender's testimony offered the perfect opportunity to again attempt to use the unredacted Def. Ex. 71 for purposes of impeachment.  Mrs. Van Treese had already identified the document as one she had created.  If Bender could explain the $5,200 "shortage" in Tulsa, it would likely have

offered an explanation for the shortage in Oklahoma City as well. If he could not, his credibility would have been severely damaged.  There simply was no downside.  As things stood, because counsel did not introduce the unredacted exhibit through either Mrs. Van Treese or  Mr. Bender,  Bender's testimony that Barry Van Treese was so pleased with his management of the Tulsa motel that he wanted him to take Mr. Glossip's job in Oklahoma City went unchallenged. (Tr. VIII 83-84)

Similarly, trial counsel had within his possession documents that would have undermined completely Billye Hooper's damaging testimony that Mr. Glossip was somehow manipulating the room rentals so that there were always 19-21 rooms rented per night.  (Tr. VII 45-46)  These documents show that the number of room rentals per night varied widely for every single month of 1996.  (*See* Attachment 16 to Appendix) The documents collected in Attachment 16 to the Appendix were powerful weapons to defend against a case built on the kind of speculation and innuendo Ms. Hooper's testimony represents.  Counsel had an obligation to be knowledgeable about the documents in his files and to use them in defense of Mr. Glossip.

**OCCA Decision**

It appears that the OCCA did not review this subclaim, and therefore the deference afforded State courts is not applicable.  28 U.S.C. §2254(d).

This information would cast doubt on the State's theory that Petitioner had a

motive to murder Mr. Van Treese, and failure to use the information constituted deficient performance and prejudiced Petitioner because there is a reasonable probability that the outcome of the trial would have been different if counsel had presented the evidence to the jury to defend against the State's theory that Petitioner had a motive to kill Mr. Van Treese.

## C.  Failure to Object to Irrelevant and Highly Prejudicial Evidence.

In Ground II  Mr. Glossip set out highly emotional, completely irrelevant and unduly prejudicial testimony presented by Donna Van Treese and Justin Sneed. Defense counsel failed to object to most of this testimony.   While Mr. Glossip maintains that the presentation of this unfairly prejudicial evidence, especially when considered in conjunction with the lack of corroboration for Justin Sneed's statements, rose to a level that denied him due process, he was equally prejudiced by his trial counsel's failure to respond to the State's prejudicial tactics.

**OCCA Decision**  The OCCA stated that it had found in Ground II, regarding the same evidence, that the evidence did not rise to plain error, and the failure to object did not amount to ineffective assistance as the evidence did not affect the outcome of the case. *Id.* at 161.  The decision was an unreasonable application of federal law as established by the Supreme Court.   28 U.S.C. §2254(d)(1);   *Payne v. Tennessee*; see also argument and authorities in Ground II.

Trial counsel's failure to object to or move to suppress critical evidence which is inadmissible constitutes ineffective assistance of counsel. *Aycox v. State,* 702 P.2d 1057, 1058 (Okl. Cr. 1985). The evidence regarding the heart wrenching details of the tragedies suffered by the Van Treese family and the mitigation-style exposition on Justin Sneed's background was clearly more prejudicial than probative and, thus, was inadmissible. Failure to seek to exclude this evidence was ineffective assistance of counsel. *Blackburn v. Foltz,* 828 F.2d 1177 (6th Cir. 1987).

**D.     Failure to Object to the Instances of Prosecutorial Misconduct.**

**OCCA Decision.** The OCCA held that "[a]ny misconduct that might have occurred did not affect the outcome of this case, so there can be no ineffective assistance of counsel." *Glossip,* at 161. Mr. Glossip argued in Ground IV that the prosecutor engaged in highly improper argument and misconduct, and Petitioner incorporates his argument and authorities herein. The decision of the OCCA involved an unreasonable application of clearly established federal law as determined by the Supreme Court. 28 U.S. C. §2254(d)(1); *Strickland v. Washington*.

**Conclusion.**

A defendant may satisfy the first prong of the *Strickland* test by showing the quality of representation he received fell outside the range of reasonably competent assistance demanded of attorneys practicing criminal law. Here, trial counsel's errors

constituted deficient performance and cannot be attributed to any trial strategy.  The

second prong of *Strickland* is satisfied by showing there is a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have

been different.   The errors were relative to the critical issue of motive, and failure of

counsel to defend against the State's accusations resulted in prejudice and constituted

ineffective assistance of counsel.   The errors here create a sufficient doubt to

undermine confidence in the outcome of the trial and Mr. Glossip's conviction and

sentence of death must be reversed.

## GROUND VI

**THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT TO SUPPORT THE AGGRAVATING CIRCUMSTANCE OF MURDER FOR REMUNERATION.**

This Ground was addressed in Proposition VI on direct appeal.

**OCCA Decision**    The court did not apply any standard, but merely held that "[t]here

is sufficient evidence that Glossip promised to pay Sneed for killing Van Treese."

*Glossip*, 157 P.3d at 161.   The deference provided in 28 U.S.C. §2254(d) is

inapplicable.

In the second stage of trial, the State alleged that the following aggravating

circumstance applied in Mr. Glossip's case:

The person committed the murder for remuneration or the promise of
remuneration or employed another to commit the murder for

130

remuneration or the promise of remuneration.

(O.R. 1298); 21 O.S. § 701.12(3)(2001).  The jury was instructed on the meaning of

remuneration as follows:

> You are instructed that the terms remuneration, or the promise of
> remuneration are defined as:  Pay an equivalent for, that is to reimburse
> for a service, loss, or expense. It is also used to connote payment for
> services performed.

(O.R. 1300); *Plantz v. State,* 876 P.2d 268, 281 (Okl. Cr. 1994).  At the close of the

sentencing phase, the jury found murder for remuneration to be the sole aggravating

circumstance.[36] (O.R. 1315; Tr. XVII 111).

Murder for remuneration normally applies where a defendant has been hired or

has hired another person to commit murder. *See Johnson v. State,* 665 P.2d 815, 824

(Okl. Cr. 1983).  Murder for remuneration has been applied to situations where the

murder was committed to obtain the proceeds of an insurance policy or an inheritance.

*Johnson v. State,* 665 P.2d at 824 (Okl. Cr.1983).  It has even been found to apply

when a defendant attempted to extort ransom from a kidnap victim's family.  *See*

*Chaney v. State,* 612 P.2d 269, 282 (Okl. Cr. 1980).  However, this aggravator does

not apply to a situation where the murder merely facilitates the receipt of the money

nor to a murder committed in the course of a robbery, even if the killing was planned

---

[36]The jury rejected the continuing threat aggravating circumstance. (O.R.1315)

131

in advance.  *See Johnson,* 665 P.2d 824; *Boutwell v. State,* 659 P.2d 322, 328 (Okl. Cr.1983).  The OCCA has also rejected a definition of remuneration that encompasses all killings for monetary gain.  *See Boutwell,* 659 P.2d at 329.

The State has the burden of proving beyond a reasonable doubt any aggravating circumstance alleged to support a death sentence.  *See Booker v. State,* 851 P.2d 544, 548 (Okl. Cr.1993); 21 O.S. §701.11 (2001).   Therefore, when murder for remuneration is alleged, the jury must find, beyond a reasonable doubt, that the defendant committed the murder for payment or the promise of payment or the defendant employed another to commit the murder for payment or promise of payment.  The State's theory was that Mr. Glossip approached Justin Sneed several times about killing Barry Van Treese and offered him increasing amounts of money to commit the murder.  (Tr. XVI 65)  The only evidence to support this theory was the bartered testimony of confessed killer Justin Sneed, who saved his own life by implicating Mr. Glossip.[37]  Viewed in the light most favorable to the State, Mr. Sneed's self-serving statements are wholly insufficient to prove murder for remuneration beyond a reasonable doubt.  *Jackson v. Virginia,* 443 U.S. 307 (1979).

Mr. Sneed's testimony regarding a plan to kill Mr. Van Treese for money is highly suspect due to numerous variations and inconsistencies.  At trial, Mr. Sneed

---

[37]Mr. Sneed admitted in his testimony that he was testifying for a sentence less than death.  (Tr. XII 57)

claimed that Mr. Glossip brought up killing Mr. Van Treese five or six times.  (Tr. XII

79)  Each of these conversations was different as to "how to do it, when to do it, the

amount to do it for, and stuff like that."  (Tr. XII 80)  The amount promised varied

wildly.  In fact, when Mr. Sneed was first questioned about the crime, he stated that

Mr. Glossip told him he would pay him $7,000 to kill Mr. Van Treese.  (Tr. XII 166-

167)  At trial, he testified for the first time that when Mr. Glossip approached him

early on January 7, he offered him $10,000.  (Tr. XII 80)  When confronted with this

discrepancy, Mr. Sneed concocted the explanation that the amount escalated over

time.  He claimed that" [i] t went from like 3,500 to 5,000 to the point where he told

me he'd pay me 10,000 to do it." (Tr. XII 80)  Later in his testimony he stated, "At one

point, like I said, when it all started it started out like 3,500 and then it jumped to like

5,000 and then it jumped to 6,000 then it jumped to 7,500.  I mean it just kept

climbing every time we started talking about it."  (Tr. XII 167)[38]  The State even

assisted Mr. Sneed in accounting for the $3,000 discrepancy that had materialized

since he last testified:

> Q:    Okay.  And you have testified that Mr. Glossip was going to give
> you 7,000 and then he would rent some of the rooms off the books
> and continue to give me [sic] the other money also; is that correct?

---

[38]As discussed in Ground V and further in Mr. Glossip's Motion for Evidentiary
Hearing which will be filed, Mr. Sneed's January 14, 1997, interview contained additional
statements inconsistent with his trial testimony that related to this issue.

A:     Yes ma'am.

Q:     Was it your understanding that that's where the other $3,000 was
        coming from?

A:     Yes ma'am.

(Tr. XIII 79)   Prior to this trial, Mr. Sneed made only vague references to what

additional amount would come "off the books."   Nonetheless, the State telegraphed

to Mr. Sneed that the amount was supposed to be $3,000 in order to reach the alleged

amount of $10,000.   Mr. Sneed also stated that he did not know where Mr. Glossip

was going to get the money he allegedly promised him, he "just figured maybe he had

it or he could get it." (Tr. XII 99)   According to Mr. Sneed, "it turned out to be what

money Mr. Van Treese had in his possession under the front seat of his car." (Tr. XIII

80)

Mr. Sneed's explanation of the plan to murder Mr. Van Treese and the means

of payment for the killing was also highly inconsistent. In his first interview with

detectives, Mr. Sneed said that he only "tapped" Mr. Van Treese a couple of times

because he only wanted to knock him out.  His story then progressed to an intent to

kill. (Tr. XIII 35)  At trial, Mr. Sneed testified that after the murder, Mr. Glossip told

him the money he was "looking for" was under the front seat of Mr. Van Treese's car.

(Tr. XII 125) Mr. Glossip did not tell him how much money was under the seat but

"just said the money I was looking for would be under there."  (Tr. XII 167)  In his

previous testimony, however, Mr. Sneed said "I knew 7,000 was supposed to be in the front seat of his car." (Tr. XIII 80)  He also testified that "I was told before I had it in my possession that it was supposed to be 7,000."  (Tr. XIII 80)  When asked how much he actually got, Mr. Sneed said, "Like about 1900.  I mean he told me the guy was sitting on like 7,000, but it only come up to being a little less than 5, I think."  He then corrected the amount stating, "No, a little less than 4. Right at 4."  (Tr. XIII 80-81)  In the end, Mr. Sneed claimed that Mr. Glossip "decided that he wanted to take half of it" and the two split the money between them. (Tr. XII 128-129)

The prosecution incorrectly argued that the simple existence of the money in the possession of Mr. Sneed and Mr. Glossip supported the murder for remuneration aggravator.  In his second stage opening statement, Mr. Ackley told the jury

> That evidence about this being the deal, this is Barry Van Treese's money, that is uncontroverted and it is in the hands of Justin Sneed who has to turn half of it over to Richard Glossip.  The fact that this money was part of the deal is remuneration.

(Tr. XVI 65-66) In her closing second stage argument, Ms. Smothermon told the jury

> [Y]ou'll never have more graphic, more clear evidence that it was done for remuneration than the stack of money that you see fanned out on the table in front of you.

(Tr. XVII 71)  The mere existence of the money in no way proves remuneration.  Mr. Sneed admitted the money he had in his possession was money he stole from Mr. Van Treese's car.  Aside from Mr. Sneed's testimony, there is no proof that the money Mr.

Glossip had when he was arrested was the other half of that money. Even if it was Mr. Van Treese's money and even if a plan existed to murder Van Treese and split the money from his car, this is a murder/robbery and not murder for remuneration. *See Boutwell,* 659 P.2d at 328-329.

Proof of this aggravator is also undermined by the fact there would be no money without the commission of the crime. The money in question was in the control of the victim at all times prior to commission of the crime. Even the alleged promise of remuneration was illusory, because at no time prior to commission of the crime did Mr. Glossip have the money, either in his control or as a legal entitlement upon the victim's death. The murder of Mr. Van Treese facilitated the robbery of the money from his car.

In Mr. Glossip's case, Mr. Sneed's testimony at most indicates a plan to murder Mr. Van Treese in order to rob him of the money in his car. Even if the murder of Van Treese was planned in advance, the murder merely facilitated the robbery. This still falls outside the definition of murder for remuneration as it is not the type of fact pattern envisioned by the aggravator. Mr. Sneed's testimony was too inconsistent and incredible to support the aggravator of murder for remuneration. Even if believed, the facts do not prove the aggravator exists in this case. Mr. Glossip readily acknowledges that the evidence must be viewed in the light most favorable to the

136

State, but when the only evidence available is the self-serving and inconsistent statements of a confessed murderer who testified in exchange for his life, Mr. Glossip submits that, under the facts and circumstances of this case, no rational juror could find this aggravator proven beyond a reasonable doubt. *Cf. Bland v. State,* 4 P.3d 702, 720 (Okl. Cr. 2000) (capital murder defendant's self-serving statement held insufficient to establish even a *prima facie* case of first degree manslaughter in support of lesser included offense instruction). Moreover, permitting Mr. Glossip's death sentence to stand on such shaky evidence denigrates the heightened standards of reliability in capital cases imposed by the Eight and Fourteenth Amendments. *See Woodson v. North Carolina,* 428 U.S. 280 (1976). Accordingly, Mr. Glossip's death sentence must be vacated.

## GROUND VII

**ERRORS IN JURY INSTRUCTIONS GIVEN IN THE SECOND STAGE OF TRIAL DENIED MR. GLOSSIP'S RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO DUE PROCESS AND A RELIABLE SENTENCING PROCEEDING.**

This Ground was included in Petitioner's direct appeal brief as Proposition VII.

**A.     Improper Weighing Instruction**

Mr. Glossip's jury was given Uniform Jury Instructions 4-76 and 4-80 concerning the jury's authority in a capital sentencing proceeding. (O.R. 1301, 1302) These instructions informed the jury it had two critical facts to determine:  (1)

137

whether one or more of the aggravating circumstances exist, and (2) if one or more aggravating circumstances were found to exist, whether those outweighed the mitigating circumstances.  The jury was instructed that the first fact had to be found "beyond a reasonable doubt."  Defense counsel requested a modified version of OUJI-CR(2d)4-80 that would inform the jury that the second critical fact also had to be found *beyond a reasonable doubt.*  (O.R. 1312)  The court rejected defense counsel's proposed instruction.  (O.R. 1312; Tr. XVII 60)  This decision resulted in a death sentence that is unconstitutional and unreliable in violation of the Sixth, Eighth, and Fourteenth Amendments.

The OCCA has consistently maintained that the State is not required to prove beyond a reasonable doubt that the aggravators alleged outweigh the mitigating factors presented.  *See Harris v. State,* 84 P.3d 731, 754-55 (Okl. Cr. 2004); *Torres v. State,* 58 P.3d 214, 216 (Okl. Cr. 2002).   This position is contrary to Supreme Court precedent.  *Ring v. Arizona,* 536 U.S. 584 (2002);  *Apprendi v. New Jersey,* 530 U.S. 466, 476 (2000);  *Jones v. United States,* 526 U.S. 227, 243 (1999).

**OCCA Decision**

The OCCA stated that it "has consistently rejected this argument, and Glossip has presented no new argument which would cause this Court to reconsider our previous decision." *Glossip*, 157 P.3d at 161.  Petitioner submits that the OCCA did

138

not review the claim on the merits and that the deference in §2254(d) does not apply. Alternatively, the decision was based on an unreasonable application of clearly established federal law as determined by the Supreme Court.   28 U.S.C. §2254(d).

**Imposition of the death sentence under the Oklahoma Statutes**

The procedure used in imposing the death sentence on Petitioner was constitutionally inadequate.  See *Apprendi v. New Jersey*, 530 U.S. 466, 475(2000) The Due Process Clause of the United States Constitution requires that the finding that the aggravating factor(s) outweigh the mitigating factor(s) must be proved to the jury beyond a reasonable doubt.  *In Re Winship*, 397 U.S. 358 (1970). Because of the particularities of the Oklahoma sentencing scheme in capital cases, it is clear that pursuant to clearly established federal law as determined by the United States Supreme Court, the fact that aggravating factor(s) outweighs mitigating factor(s) must be proved beyond a reasonable doubt.  While this may not be the law in all States, it is the law in Oklahoma as clearly shown by application of Supreme Court precedent to Oklahoma statutes which provide for the imposition of the death sentence.  In *Ring v. Arizona*, 536 U.S. 584, 599 (2002) the Supreme Court overruled the holding in *Walton v. Arizona*, 497 U.S. 639 (1990) which had provided that the finding of additional facts in Arizona's  sentencing scheme "qualified as sentencing considerations, not as 'element[s] of the offense of capital murder.'"

139

In *Ring* the Supreme Court cited the dissenting opinion of Justice O'Conner in *Apprendi* which was ultimately held to be the correct statement of law: "A defendant convicted of first degree murder in Arizona cannot receive a death sentence unless a judge makes the factual determination that a statutory aggravating aggravator exists. *Without that critical finding, the maximum sentences to which the defendant is exposed is life imprisonment and not the death penalty*." *Ring*, 536 U.S. at 596. In Oklahoma, without the critical finding that the aggravating factor(s) outweigh the mitigating factors, the maximum sentence to which the defendant is exposed to is life imprisonment and not the death penalty.

In *Ring* the Supreme Court held that "[c]apital defendants . . . we conclude are entitled to a jury determination of any *fact* on which the legislature *conditions* an increase in their maximum punishment." *Ring*, 536 U.S. at 589. (emphasis added).

The Oklahoma legislature has *conditioned* the imposition of the death sentence upon the *factual* finding that the aggravating factor(s) outweigh the mitigating factor(s). Without that finding a capital defendant, at least in Oklahoma, cannot receive the death penalty even though there may be one or more aggravating factors which have been proved beyond a reasonable doubt.

In Oklahoma there is one statute setting out the procedure for imposing the death penalty. Okla. Stat. tit. 21 §701.11 provides:

> Unless at least one of the statutory aggravating circumstances enumerated in this act is so found *or* if it is found that any such aggravating circumstance is outweighed by the finding of one or more mitigating circumstances, the death penalty shall not be imposed.

The statute does not require that the first step is to determine whether an aggravator exists beyond a reasonable doubt, and then to determine the existence of mitigating factors, and then perform the weighing function.  Arguably, if the statute specifically set out as "step one" the requirement to find the existence of an aggravator beyond a reasonable doubt, and if so found to then go to "step two" it could arguably be said that the factor that subjects a defendant to the death penalty is the existence of the aggravator.  However, the statute does not say that.  The statute has two requirements to be met before the death sentence can be exposed.  In Oklahoma, after the defendant is exposed to the death sentence by determining that the aggravator(s) outweigh the mitigating factors, the jurors then decide whether or not to impose the death sentence.  The Petitioner is entitled to the provisions of the statute, and under the statute's provisions, *Apprendi*, *Ring*, and *Jones* are applicable.  *See Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980) (denial of petitioner's statutory right to have jury determine punishment constituted a violation of due process).  See also, *Ross v. Oklahoma*, 487 U.S. 81, 89 (1988).  (The denial of statutory right is impaired "only if the defendant does not receive that which state law provides".)

   *Jones v. United States,* 526 U.S. 227, 243, n. 6 (1999) predated *Ring* and

*Apprendi* and held "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt."   The Court in *Apprendi* explained that "the relevant inquiry is one not of form, but of effect - does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?"  *Apprendi,* 530 U.S. at 494.  A "sentencing factor" may merely support "a specific sentence within the range authorized by the jury's finding that the defendant is guilty of a particular offense", but  "when the term 'sentencing enhancement' is used to describe an increase beyond the maximum authorized statutory sentence, it is the functional equivalent of an element of a greater offense than the one covered by the jury's verdict."  *Apprendi*, at n. 19.

   In a concurring opinion in *Jones*, Justice Stevens gave a concise summation of the law and is on point with the facts of Petitioner's case:

> I am convinced that it is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed.  It is equally clear that such facts must be established by proof beyond a reasonable doubt. That is the essence of the Court's holding in *In re Winship* [citation omitted], *Mullaney v. Wilbur* [citation omitted] and *Patterson v. New York* [citation omitted].  To permit anything less "with respect to a fact which the State deems so important that it must be either proved or presumed is impermissible under the Due Process Clause." [citation omitted] This principle was firmly embedded in our jurisprudence

142

through centuries of common-law decisions. [citations omitted]   Indeed, in my view, a proper understanding of this principle encompasses facts that increase the minimum as well as the maximum permissible sentence, and also facts that must be established before a defendant may be put to death.

*Jones*, 526 U.S. at 252-253.

In *Paxton v. State*, 867 P.2d 1309, 1322 (Okla. Cr. App. 1993) the OCCA stated "[i]t is sufficient that the jury is instructed to weigh the mitigating and aggravating evidence, and only when the aggravating circumstances **clearly** outweigh the mitigating may the death penalty be imposed." (emphasis added).   This is an apparent acknowledgment by the OCCA that still there is some heightened burden associated with the weighing process.  Even if *Jones*, *Apprendi*, and *Ring* are ignored, according to *Paxton* Petitioner's jury should have at the least been instructed that the aggravator(s) must ***clearly*** outweigh the mitigating evidence before the death penalty could be imposed, and the failure to include this burden of proof in the instructions to the jury warrants a new sentencing hearing.

In its decision in *Murphy v. State*, 54 P.3d 556, 565-66 (Okla. Cr. App. 2002), the OCCA gave four reasons why *Apprendi* did not require a finding beyond a reasonable doubt that the aggravator(s) outweigh the mitigating circumstance(s): "First, *Apprendi* was a **five to four**, **non-capital decision** that resulted in five separate opinions from the Supreme Court justices on distinguishable facts."   Petitioner

submits that a five to four decision from the United States Supreme Court is controlling law.   Furthermore, the fact that *Apprendi* was a "non-capital" case was addressed in *Ring* wherein the Supreme Court said:

> The right to trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if it encompassed the factfinding necessary to increase a defendant's sentence by two years, but not the factfinding necessary to put him to death.  We hold that the Sixth Amendment applies to both.

*Apprendi*, 536 U.S. at 609.

The trial court's instructions failed to carry *Ring's* "beyond a reasonable doubt" requirement to the jury's weighing determination, violating Mr. Glossip's due process right to a jury finding of all the necessary elements of a capital offense beyond a reasonable doubt, as secured by the Fifth, Sixth, Eighth and Fourteenth Amendments. Accordingly, his death sentence should be vacated.

## GROUND VIII

**THE TRIAL COURT ERRED IN ALLOWING IMPROPER VICTIM IMPACT TESTIMONY DURING THE SENTENCING STAGE, VIOLATING MR. GLOSSIP'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

This claim was presented as Proposition VIII in direct appeal brief.

In reaching its decision on this claim the OCCA stated that "evidence may be introduced that 'is so unduly prejudicial that it renders the trial fundamentally unfair',

144

thus implicating the Due Process Clause of the Fourteenth Amendment," *Payne v. Tennessee*, 501 U.S. 808, 825 (1991). The Court reviewed for plain error and found none. *Glossip*, at 163.

Aside from incorporation of first stage evidence, victim impact testimony was the only evidence presented by the State in the second stage of Mr. Glossip's trial. Barrie Hall, the victim's oldest daughter, read her own statement and that of her younger sister. Donna Van Treese, the decedent's widow, read her own statement as well as statements of three of her sons. Thus, although the State called only two victim impact witnesses, the statements of six family members were included in this testimony.

At a pre-trial hearing, defense counsel's motion to exclude victim impact evidence was overruled. (O.R. 757-63, 1/10/03 M.H. 65). An *in camera* hearing was then held prior to the introduction of the evidence at trial, during which certain portions of the statements were redacted by the court. (Tr. XVI 16-37) Despite the trial court's efforts to ensure that the statements conformed to law, the victim impact evidence presented in the second stage ofMr. Glossip's trial went beyond what is allowed under Oklahoma law. *See Hicks v. Oklahoma*, 447 U.S. 343, 346, 106 S.Ct. 2227, 2229, 65 L.Ed.2d 175 (1980) (denial of petitioner's statutory right to have jury determine punishment constituted a violation of due process). See also, *Ross v.*

145

*Oklahoma*, 487 U.S. 81, 89, 108 S.Ct. 2273, 2279, 101 L.Ed.2d 80 (1988).  (The denial of statutory right is impaired "only if the defendant does not receive that which state law provides".)

Oklahoma law permits the introduction of victim impact evidence during the sentencing phase of capital murder trials. 21 O.S. § 701.10(C)(2001). The scope of victim impact evidence is strictly circumscribed by statute, the Evidence Code, and the Due Process Clause of the Fourteenth Amendment. *See Payne v. Tennessee,* 501 U.S. 808, 825 (1991).  Moreover, victim impact evidence must be probative to the issues for which its use is authorized by statute, *i.e.* the financial, emotional, psychological, or physical effects of a murder upon a specifically defined class of individuals.  The victim impact evidence in this case consisted of statements which deprived Mr. Glossip of his right to confrontation and a fair sentencing proceeding.

## A.    Improper Victim Impact Testimony

Okla. Stat. tit. 22 § 984 sets out the requirements for presentation of victim impact statements.  The statutory provisions are very specific about the limitations on the use of such victim impact statements:

> "1. 'Victim impact statements' means information about the financial, emotional, psychological, and physical effects of a violent crime on each victim and members of their immediate family, or person designated by the victim or by the family members of the victim and includes information about the victim, circumstances surrounding the crime, the manner in which the crime was perpetrated, and the victim's opinion of

146

a recommended sentence;

2. 'Members of the immediate family' means the spouse, a child by birth or adoption, a stepchild, a parent, or a sibling of each victim . . ."

The State is required to give notice and disclose that a witness will testify about a recommended sentence. *Miller v. State,* 29 P.3d 1077 (Okl. Cr. 2001), *corrected.* However, in *Hain v. Gibson,* 287 F.3d 1224, 1239 (10th Cir. 2002) the Court found admission of the victims' statements regarding the appropriate punishment for Mr. Hain were improperly admitted, as it was contrary to *Payne v. Tennessee,* 501 U.S. 808 (1991) and *Booth v. Maryland,* 482 U.S. 496 (1987). In *Hain* the Tenth Circuit noted that the OCCA had found that the witness's opinion of the appropriateness of the death penalty was in accordance with the statutory provisions, but in a footnote acknowledged that the "evidence may not pass scrutiny by the United States Supreme Court" in light of *Payne v. Tennessee*. See *Hain II,* 919 P.2d 1130, 1144 n.3 (Okl. Cr. 1996). Petitioner submits that under *Payne v. Tennessee* and *Booth v. Maryland*, even a victim cannot give an opinion on the appropriateness of the death penalty.

Statutory limitations require that any victim impact statement address the impact of the victim's death upon the victim's immediate family. *Hanson v. State,* 72 P.3d 40 (Okl. Cr. 2003) (impact on victim's nieces and nephews and the community as a whole was impermissible). The OCCA has stated that "we have not extended the statutory definition of 'immediate family' to include persons related to victims in

147

ways other than those designated by the Legislature". *Hanson v. State,* 72 P.3d 40 (Okl. Cr. 2003). In *Hanson* the OCCA stated: "[t]his Court need not decide whether, standing alone, this inadmissible evidence created an unreasonable response in juror's minds and affected the death sentence. In combination with other errors, it requires relief." *Id.* at 55. Such is the case in Petitioner's case.

Furthermore, when sentencing recommendations are properly admitted there are still further limitations on the admissibility of such recommendations. The requirement is that the recommendation be given "as long as the recommendation is given as a straight-forward, concise response to a question asking what the recommendation is". *Welch v. State,* 2 P.3d 356, (Okl. Cr. 2000).

The OCCA also held that it is constitutional error for one person to read the victim impact statement of another as such a practice violates a defendant's rights to confrontation. *See, e.g., Grant v. State,* 58 P.3d 783, 797 (Okl. Cr. 2003). Furthermore, all victim impact statements must be based on the personal observations and thoughts of the person giving the statements and such person may not receive any outside aid in preparing the statements. *See, e.g., Ledbetter v. State,* 933 P.2d 880, 893 (Okl. Cr. 1997).

All of these bedrock principles were violated in Mr. Glossip's case. First, based on the holding of *Grant, supra,* neither Ms. Hall nor Mrs. Van Treese should have

been permitted to read the statements of Mr. Van Treese's children. Their doing so violated Mr. Glossip's right to confrontation.   Second, Mrs. Van Treese's own statement was more akin to a statement given as a family representative, rather than simply her own.  For example, she began her statement by noting the number of kids and grandkids Mr. Van Treese had and that they were "all left without him, husband, father, grandfather,  son, brother, nephew, and cousin."  (Tr. XVI 83)  She knew that he would be with her "and with the kids to help us along our way through life."  *Id.* at 84.  She then described how "the children were very upset."  *Id.*  She continued about how they all went to the funeral home and described how they all said their goodbyes to their father.

> She then described how her daughter was particularly hard-hit:

> She did not want to leave her daddy. She told me that she didn't want him to be alone. Bridget stood at the casket and hugged her daddy's chest. I had to explain to her that her daddy was in heaven and was not alone.  That what she was seeing was only his earthly body and that the daddy she loved, the one that loved to play and laugh, that that was his spirit. And his spirit was in heaven.  Then with my help she kissed his cheek and said, "I will love you forever."

*Id.* at 85.  Mrs. Van Treese commented that "in our hearts he will always live and we will always remember the loving and happy times that we were blessed to share with Barry." *Id.* at 86.  She continued:

> Once our son, Joe, who was age six asked me, "When will my daddy be home?"  And I had to explain to him again and he said "Oh, I'm sorry.

149

I forgot for a minute."  This has affected the lives of all who knew and loved Barry.  This is something that will take a lifetime to be able to live with.  The important days of our lives will never be shared with him here beside us in the flesh.  The Eagle Scout ceremonies, the graduations, the weddings, the birth of grandchildren.  But you can be sure of this, that they will be told of the man that loved all of us and the man that was taken long before his time.

*Id.* at 86-87.  Finally, she concluded:

Our oldest son got married.  The pain in his eyes longing for his father to be there and to be proud of him. He's now served our country as a marine.  He and his wife are having to try - he and his wife are trying to have a baby this year. This will be another grandchild that will never get to know the love of a grandfather.

It pains me to know that the love that this baby will miss from Barry. You see, Barry's death did not just impact on me as his wife, but on his entire family.  The future family.  The impact will last a lifetime for our children and for their children.

As I sit here writing this, I am compelled to scream and cry and try to let you get a glimpse of *the impact a death can have on a family.*  The word family goes out a long way. There's a lot of impact.  There are a lot of people impacted by this, wives, children, grandchildren, father, brother, sister, and so on. So *you see, I am also their voices.*

*Id.* at 87-88.  (Emphasis added).

Almost the entirety of Mrs. Van Treese's statement was a reflection on the impact of Mr. Van Treese's death on the entire family, not just on her.  As such, no other person should have been permitted to offer a victim impact statement.  *See Lott v. State,* 98 P.3d at 347.

The result of the erroneous introduction of victim impact evidence was a jury

verdict of death based on emotion rather than reason in violation of Mr. Glossip's rights under the Fourteenth Amendment, and the OCCA's decision involved an unreasonable application of clearly established law as determined by the Supreme Court. Justice demands that the Court vacate Mr. Glossip's sentence of death.

## GROUND IX

**THE TRIAL COURT'S VOIR DIRE PROCESS VIOLATED MR. GLOSSIP'S RIGHTS PROTECTED BY THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND CORRESPONDING PROVISIONS OF THE OKLAHOMA CONSTITUTION.**

This claim was included as Proposition IX in Petitioner's direct appeal brief.

A criminal defendant is entitled to a fair trial by a panel of impartial jurors. *See Morgan v. Illinois,* 504 U.S. 719, 727 (1992). One of the purposes of voir dire is to ensure this right. *See Patton v. State,* 973 P.2d 270, 284 (Okl. Cr. 1998). "The critical fact to be determined is whether the defendant received a fair trial from jurors who could lay aside any personal opinions and base a verdict on the evidence." *Woodruff v. State,* P.2d 1124, 1132 (Okl. Cr. 1993). The voir dire process in this case resulted in the exclusion, to Mr. Glossip's disadvantage, of otherwise·qualified jurors without proper regard to whether they could be fair and impartial.

**A. The Trial Court Improperly Questioned Prospective Jurors about Their Ability to Impose the Death Penalty.**

In qualifying jurors in a capital case, Oklahoma Uniform Jury Instruction

CR(2d) 1-5 Alternate 2 provides the following question for use by trial judges:

> If you find the defendant guilty of murder in the first degree, can you consider all three legal punishments - death, imprisonment for life without parole or imprisonment for life - and impose the one warranted by the law and evidence?

Instead of this question, throughout voir dire, the trial judge in Mr. Glossip's case asked the prospective jurors whether they could give heartfelt consideration to all three sentencing options.  (Tr. I 112, 115, 134, 150, 198, 211-12; Tr. II 8, 26, 43, 119, 139; Tr. III 22, 123)   In response to a juror who expressed reservations about imposing the death penalty, the court attempted to clarify the standard for consideration of the options:

> [T]here are three options under the law and they all need to start in the same place with you.  If, in fact, your concerns about the death penalty are such that it starts at a huge deficit and might not be considered equally, then that's not fair consideration of all three options.

(Tr. I 118)

> [T]he law is that the jurors must give equal, fair consideration to all of the options.

(Tr. I 139 )

> The law is that there are three sentencing options.  All three have to have equal, heartfelt consideration.

(Tr. I 150)  On the basis of the trial court's use of this incorrect standard, two jurors in Mr. Glossip's case with reservations about the death penalty were erroneously

excluded based on their inability to consider all three punishments "equally,[39]

Prospective juror Mary Lawton even expressed her concerns using the judge's language, saying, "Your Honor, I would not be able to give the death penalty equal consideration as a sentencing option." (Tr. II 13)  The judge then followed up by asking whether her reservations were such that she would not impose the death penalty regardless of the law or the facts.  After responding, "That's correct," Ms. Lawton was removed for cause by the court.  (Tr. II 14)  Although the trial court made a more proper follow up inquiry as to Ms. Lawton's ability to impose death, her initial statement evinces reliance on the judge's erroneous standard in evaluating her own ability to do what the "law" requires.  In prospective juror Sharon Moore's case, she was struggling with the idea of imposing death and eventually told the court that she wanted to do her "civic duty" but she had "a problem with the death penalty." (Tr. II 34) In order to clarify the depth of her reservation, the judge then asked whether "regardless of the law and the evidence, you would not be able to give *equal* consideration to all three sentencing options?" After Ms. Moore answered affirmatively, she was also removed for cause by the court. (Tr. II 36) (Emphasis added.)  Requiring jurors to give "equal consideration" to all three sentencing options

---

[39]Mr. Glossip's complaint is not that the trial court deviated from the Uniform Jury Instructions.  Rather, the complaint is that the deviation did not accurately reflect the law.  Trial courts are free to deviate from the Uniform Instructions, so long as such deviation is an accurate statement of the law.  *See* 12 O.S. § 577.2 (2001).

is contrary to the holding in *Frederick v. State,* 37 P.3d 908, 926-927 (Okl. Cr. 2001). In *Frederick,* a prospective juror stated that she would lean toward the death penalty if the defendant was convicted of capital murder; nonetheless, she stated she could follow the law and consider all three punishments.  The juror was allowed to remain on the jury and the defense used a peremptory challenge to remove her.  *Id.*   On appeal, defendant relied upon language from *Malicoat v. State,* 992 P.2d 383, 393 (Okl. Cr. 2000) to the effect that the jurors' statements that they "could consider all three punishments equally" was "all that the law required." In response, the OCCA clarified that "equally" merely recounted the words used by the jurors in *Malicoat* but the law did not require that much.  Frederick, 37 P.3d at 926.  The Court went on to say that recent case law does not contain the word equal but instead says:

> "To withstand a challenge for cause concerning punishment issues, a venire person need only be willing to consider all the punishments provided by law and not be irrevocably committed to anyone punishment option before the trial has begun."

*Frederick,* 37 P.2d at 926-927 (quoting *Salazar v. State* 919 P.2d 1120, 1127 (Okl. Cr. 1999); Carter v. State, 879 P.2d 1234, 1244 (Okl. Cr. 1999). Thus, the OCCA made clear that that the law does not require that prospective jurors in a capital case be able to consider all three punishments "equally." *Id.* at 926-927.

Ms. Lawton and Ms. Moore were both struggling with the idea of imposing the death penalty. Their feelings on the death penalty then were obviously not "equal" to

sentences of life or life without parole. By instructing them that they must consider

death on an equal footing with the life options, the court improperly determined that

they were unqualified to serve on the jury. Moreover, the entire jury pool may have

been influenced by the judge's imposition of an erroneous standard as fifteen other

prospective jurors were removed due to their reservations about the death penalty after

the court explained that the three sentencing option must be "equal."[40]  (Tr. I 124-26,

202, 203: Tr. II 8-9, 13-18, 23, 36; Tr. III 17, 109-12).

**OCCA Decision**

The OCCA reviewed for plain error and "found based on the entire voir dire,

the trial court did not abuse its discretion in removing these two jurors."  *Glossip*, at

151.

The requirement that veniremen simply be willing to consider the full range of

punishment provided by law is still the basis for determining qualification to serve in

a capital case: would the juror's views on capital punishment "prevent or substantially

impair the performance of his duties as a juror in accordance with his instructions and

his oath?" *Wainwright v. Witt,* 469 U.S. 412, 424 (1985). The requirement is not that

a juror consider all three punishments "equally". The bench mark for determining

---

[40]Presumably a number of jurors had feelings regarding the death penalty, but these feelings were not "equal." However, the erroneous language of the court's instruction undoubtably influenced a number of these jurors to vocalize an inability to consider all three punishments because they could not consider them "equally."

155

whether a prospective juror may sit on a capital case is not the degree of his or her opposition to the death penalty, but whether, despite this belief, he or she can assume the opinion to the requirements of the law, follow the courts instructions, and uphold the oath as a juror by considering the death penalty, life imprisonment without parole, and life imprisonment. *Witherspoon v. Illinois*, 391 U.S. 510 (1968). In Mr. Glossip's case, the trial judge applied an erroneous standard for determining whether prospective jurors were suited for a capital jury. The use of this standard had the effect of excluding jurors with only conscientious objections to the death penalty but who might otherwise follow the law. The decision of the OCCA involved an unreasonable application of clearly established federal law as determined by the Supreme Court. Accordingly, Mr. Glossip's death sentence must be vacated. *See, e.g., Davis v. Georgia,* 429 U.S. 122 (1976) (improper excuse of juror under *Witherspoon* requires vacation of death sentence); *Gray v. Mississippi*, 481 U.S. 648 (1987).

## B.    A Prospective Juror Currently Serving a Deferred Sentence Was Improperly Removed for Cause.

During the court's questioning of the jury panel, prospective juror Sharita Miles stated that she had prior bogus check charges and was currently serving a deferred sentence for misdemeanor drug possession. (Tr. I 61) After informing the court of her situation, the following dialogue took place:

THE COURT: Okay. Well, I'm real concerned about this, Ms. Miles.

You're on a two [sic] deferred right now and I have real concerns about your ability to be fair and impartial in a case where within two years you've been prosecuted by the State of Oklahoma. I mean, doesn't that bother you?

PROSPECTIVE JUROR MILES:  Yeah, but, you know, what can I do about it?

THE COURT:  Well, I guess what I'm saying, Ms. Miles is, you know, we have all kinds of jury trials down here. We have civil trials, we have criminal trials and stuff.  When you have been prosecuted by the State, it seems to me that it's very difficult for us to ask you to serve as a juror on a criminal trial.  It would be a lot easier for you to serve on a civil case.  And I'm not criticizing you for these things.  It appears to me that you made your restitution on the '93 case.  It was dismissed.  You obviously served out your deferred sentence on the '97 case and you must be doing well on your present deferred case, but if you feel that you are best suited to serving as a juror in a case that's not being prosecuted by the State, I just need you to tell me.

PROSPECTIVE JUROR MILES:  Yeah, I can do that.  That will be fine.

THE COURT:  Well, I guess I'm asking you, do you think that you are better suited to a case in which the State is not involved since you've been prosecuted by the State on these other cases?

PROSPECTIVE JUROR MILES:  Yes.

(Tr. I 62-63) Following this exchange, the judge announced that she was excusing Ms. Miles for cause. Defense counsel objected to the dismissal, stating: "Well, I think the important question that I would have asked, had I had the opportunity, is can she - if she is required to be here, can she be fair and impartial." (Tr. I 63) To this, the judge responded:

157

Well, I've got to tell you, I just have a real problem with people who are on a deferred sentence sitting as jurors.  They've got a lot at stake and they've got to feel that they're being watched carefully. And you know, they're subject to having a sentence accelerated.  And I believe that if they're smart enough to think about it, they've got to be holding in the back of their mind that if they do something the state of Oklahoma doesn't like, even though we know that would never happen, I just think that that's always a question.  So I am more comfortable excusing Ms. Miles.

(Tr. I 63-64)

The Oklahoma legislature has enumerated those persons who are ineligible for jury service. *See* 38 O.S. §28 (2001).  Persons under a deferred sentence are not statutorily disqualified from serving as jurors.  The proper standard under applicable case law for determining whether an otherwise qualified juror's ability to serve on the jury is one of fairness and impartiality.  *See Irvin v. Dowd,* 366 U.S. 717, 722 (1961) "The purpose of the examination of a juror on his voir dire is to ascertain if there are grounds for challenge for either actual or implied bias; also, to enable the defendant to exercise intelligently his peremptory challenges." *Grim v. State,* 240 P. 1093, (Okl. Cr. 1925).

The manner and extent of voir dire rests within the trial court's discretion.  *See Banks v. Tate,* 701 P.2d  418,423  (Okl. Cr. 1985)  It is not error to deny defense counsel an opportunity to rehabilitate an excused juror if the trial court has asked the proper questions to determine whether the prospective juror should sit in a case.  *See*

*Scott v. State*, P.2d 1283, 1298-1290 (Okl. Cr. 1995)  In focusing solely on Ms. Miles's deferment, however, the court failed to ask the proper questions designed to determine bias.  Instead, the trial judge clearly conveyed her belief that Ms. Miles should not be serving on a criminal jury through suggestive inquiries that encouraged Ms. Miles to adopt the same position.  No further questioning was conducted by the judge after Ms. Miles acquiesced that she would be "better suited" to a civil jury and defense counsel was foreclosed from attempting rehabilitation.[41]  Furthermore, the judge's implication that someone who has been prosecuted by the State should not sit on a criminal jury is inconsistent with the fact that a number of other prospective jurors, including two who eventually sat on the jury, revealed prior involvement with the criminal justice system.  (Tr. I 64, 65, 66, 67, 68, 71, 73)  Each of these jurors was questioned about any impact this experience might have on their ability to be fair and impartial.  Each responded with assurances that it would not be a problem and none were removed for cause on this basis.[42]

---

[41]Miles's acquiescence is not necessarily indicative of sincere agreement why Jurors responding to judge's questions during voir dire may be driven by a desire to please the judge and may succumb to "verbal pressure to respond 'correctly'" to openly leading questions. *See Cosper, C.A.*, *Rehabilitation of the Juror: Rehabilitation Doctrine,* 37 Ga.L.Rev. 1471 (Summer 2003);see also *McGill v. Commonwealth*, 391 S.E.2d 597, 600 (Va. Ct. App. 1990) (finding that leading questions undermine reliability of juror responses) .

[42]Jury foreperson Donald Stamman had been cited for drunk driving.  (Tr. I 65)  Juror Clinton Henderson had a prior misdemeanor possession charge.  (Tr. I 73)  Prospective juror Thurman Davis had a prior public intoxication charge.  (Tr. I 67)  Prospective jurors Linda

It appears, therefore, that the judge considered only those serving a deferred sentence to be unacceptable jurors. In doing so, the court created a disqualification not founded in law. While the question of competency of a juror is within the sound discretion of the trial court, the discretion must not be abused. *See Greathouse v. State* 503 P.2d 239, 240-41 (Okl. Cr. 1972) "Juror competence is an individual rather than a group or class matter. This fact lies at the very heart of the jury system." *Thiel v. Southern Pac. Co.,* 328 U.S. 217, 220 (1946). By determining that Ms. Miles was unsuited for jury service because she is serving a deferred sentence, the judge abused her discretion by creating an entirely new class of citizens who are unable to fulfil their civic duty. Mr. Glossip readily admits that it is difficult, if not impossible, to affirmatively demonstrate harm. However, this situation is akin to those situations in which specific groups are systematically excluded from juries and the Supreme Court has held that under such circumstances, automatic reversal is required without regard to actual harm. *See, e.g., Peters v. Kiff,* 407 U.S. 493 (1972) (exclusion of blacks); *Ballard v. United States,* 329 U.S. 187 (1946) (exclusion of women); *Thiel v. Southern Pacific, Co.,* 328 U.S. 217 (1946) (exclusion of wage-laborers) .

**OCCA Decision**.

The OCCA held that the trial court "did not abuse its discretion in finding that

---

Mustari and Amber Gramon had both been charged with shoplifting. (Tr. 166; 71) Prospective jurors Jose Garcia and Charles Andrew had prior DUI convictions. (Tr. I 64; 68)

this juror could not be fair and impartial and removing her for cause." *Glossip*, at

151. The decision involved an unreasonable application of clearly established federal

law as determined by the Supreme Court. 28 U.S.C. §2254(d)(1). This Court should

reverse Mr. Glossip's judgment and sentence.

## GROUND X

**THE ADMISSION OF A PRE-MORTEM PHOTOGRAPH OF THE VICTIM INJECTED PASSION, PREJUDICE, AND OTHER ARBITRARY FACTORS INTO THE SECOND STAGE PROCEEDINGS.**

This claim was presented as Proposition X in Petitioner's direct appeal brief.

The OCCA has long recognized the potentially prejudicial impact of

photographs taken of a homicide victim prior to death. In *Boutwell v. State,* 659 P.2d

322, 326 (Okl. Cr. 1983), the Court condemned the admission of such photographic

exhibits stating:

> We fail to see the relevancy of these exhibits because the victim's
> identity was not at issue. With increasing frequency prosecutors in this
> state have been introducing for no relevant purpose photographs of the
> victim taken when they were alive. This practice should cease as it has
> little bearing on the issues of guilt or innocence to be decided by the trier
> of fact.

Moreover, the OCCA "has held that where there is no purpose in introducing such

pictures into evidence, such admission invokes the sympathy of the jury and

constitutes error." *Staggs v. State,* 804 P.2d 456, 458 (Okl. Cr. 1991) (citing *Hayes*

*v. State,* 738 P.2d 533, 538-39 (Okl. Cr. 1987), *vacated on other grounds* 486 U.S.

1050 (1988); *Whittmore v. State,* 742 P.2d 1154, 1156 (Okl. Cr. 1987)).  The Court

has also found that photographs of homicide victims taken while alive are

inadmissible "unless they are relevant to some material issue and their relevancy

outweighs the danger of prejudice to the defendant." *Thornburg v. State,* 985 P.2d

1234, 1244 (Okl. Cr. 1999) (citing *Tilley v. State,* 963 P.2d 607, 615 (Okl. Cr. 1998);

*Valdez v. State,* 900 P.2d 363, 381 (Okl. Cr. 1995).

Despite the OCCA's sound assessment of the issue, the Oklahoma legislature

passed the Kristie LeGrange Bill in 2002.  This Bill amended 12 O.S. 2001, § 2403,

to provide:  "However, in a prosecution for any criminal homicide, an appropriate

photograph of the victim while alive shall be admissible evidence when offered by the

district attorney to show the general appearance and condition of the victim while

alive."  Pursuant to amended Section 2403, the State introduced a live photograph of

Barry Van Treese into evidence *during the first stage of trial* through the testimony

of his wife, Donna Van Treese.  (Tr. IV 35; St. Ex. 79)  Defense counsel objected to

the introduction of the photograph. (Tr. IV 34)  In response, the State made no

argument as to the photo's relevance, instead simply stating the statute made no

distinction between first or second stage and the photo - a simple head shot - fell

within the statute's guidelines.  The trial court then overruled counsel's objection and

admitted the photograph.  (Tr. IV 35-36)  Through incorporation, the State was also

able to refer to the photo in second stage.  (Tr. XVII 65)

## A.      Amended Section 2403 is Unconstitutional on Its Face

The Kristie LeGrange Bill is not found in Section 2401, which defines relevant evidence, but in Section 2403, which otherwise allows for *exclusion* of unduly prejudicial evidence even *if* relevant.  The OCCA  has already made clear that pre-mortem photographs *may* be admissible *if*  they are relevant to some material issue. *See Rawlings v. State,* 740 P.2d 153, 161-62 (Okl. Cr.1987)  (finding that "although this Court does not favor admissions of photographs showing the victim alive, we are of the opinion that the photograph was relevant as to its existence and the location of its discovery").  Amended Section 2403, however, does not seek to ensure that relevant, highly probative evidence is presented to the jury, but rather ensures that a specific type of evidence is admitted without regard to relevance and without regard to whether the evidence would unfairly prejudice the defendant.

Amended Section 2403 is also decidedly one-sided in its application.  If, for instance, a criminal defendant wanted to offer a photograph of the victim, perhaps as pictorial evidence of the particular victim's bad character, the defendant could not avail himself of amended Section 2403, because admissibility under this provision is strictly limited to photographs "offered by the district attorney." Even a photograph related to some relevant issue - such as where self defense is alleged and a side-by-

163

side photographic display could show how the victim was much bigger and stronger than the defendant - is still subject to exclusion if the trial court deems the photograph too prejudicial to the State. We only throw out the basic rule of Section 2403 at the behest of the District Attorney-who represents not the State but the victim.  That is because the Kristie LeGrange Bill is not about criminal justice, but about politics. The principle sponsor of the bill described the passage of the bill as "just a great day for victims' rights advocates."  Jack Money, *House OK's Bill to Allow Court Photos,* DAILY OKLAHOMAN, Apr. 19, 2002, at 4-A.  Supporters of the bill have described it as "a reminder of the life that was taken in a horrible crime" and to "remind citizens of what a murder trial is really for - justice for the innocent victim." Editorial, *Victims' Photos in Court a Sensible Move,* DAILY OKLAHOMAN, Apr. 29, 2002, at 6-A.

A criminal trial, however, is not about "the innocent victim" or "about" the presumed-innocent defendant.  It is about a fair trial to both sides. In enacting the Kristie LeGrange Bill as it did, without reference to its relevance and potential effect on the fairness of the proceedings, the Legislature has clearly overstepped its bounds. As the OCCA has aptly noted:

> Under our system of jurisprudence there is but one standard by which our laws are interpreted and enforced. That standard is known as Due Process of Law.  It guarantees a fair and impartial trial to the guilty and innocent alike.  It is the unique symbol of freedom and democracy and when denied to any citizen, it results in a denial to all.

164

*Cody v. State,* 361 P.2d 307, 324 (Okl. Cr.1961).   Statutory enactments such as amended Section 2403 erode the fundamental right to a fair trial by injecting irrelevant and highly prejudicial "evidence" into the proceedings.   There must be a limit to admissibility by legislative fiat, and that limitation is logical relevance within the framework of the basic purposes of a criminal trial.

At least in the second stage of trial, Oklahoma has a provision allowing the jurors to see a "quick glimpse" of the victim's life.   *See* 12 O.S. 2001, § 984.1. Nevertheless, victim impact evidence could still be so prejudicial as to constitute a denial of due process.   *Payne v. Tennessee,* 501 U.S. 808, 825 (1991).   When used in the second stage of a trial, a posed photograph of the victim adds nothing to this "quick glimpse" except sympathy for the victim and yet more prejudice to the capital defendant. *See, e.g., Al-Mosawi v. State,* 929 P.2d 270, 285 (Okl. Cr. 1996) (finding admission of photos of victims while alive was error because they "did not demonstrate any information about the victims, did not show how their deaths affected the survivors and in no way showed the financial, psychological, or physical impact on their survivors. ")

Relevant evidence already has an avenue for admission into evidence in both stages of trial.   By its terms, the amendment of Section 2403 comes into play only when the probative value of such evidence is substantially outweighed by the danger

of unfair prejudice, as an exception to the rule of exclusion of such evidence.  The

inevitable result of injecting such highly prejudicial and unnecessary evidence into the

first and second stage of capital trials is to infect the proceedings with such unfairness

as to make the resulting conviction a denial of due process and to undermine the

reliability of the death sentence.  *Darden v. Wainright,* 477 U.S. 168, 181 (1986);

*Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974).

**B.**     **The Lack of Limiting Guidelines for Admissibility of Pre-Mortem Photographs Leads to Highly Inflammatory Prosecutorial Abuse, as Occurred in this Case.**

Amended Section 2403 provides no guidance for its application.  Without

procedural safeguards, the potential for abuse and undue prejudice to the defendant

is significantly heightened. As there are no guidelines for determining what constitutes

"appropriate" photograph, prosecutors are theoretically free to admit photos of the

victim in any number of contexts - in the company of small children or animals; on

their wedding day; posing for a "glamour" portrait. There is no limit on the size of the

photo, making it possible that a large poster or life-sized cut-out might be admitted.

Moreover, the amendment does not specify which stage of the proceeding in which

a life photo is admissible.  So, the photograph of the victim in life can be admitted in

the first stage of a capital trial and then referred to again in the second stage as in Mr.

Glossip's case.  Once admitted, the photo may then go back to the jury room.  Without

any corresponding instruction as to the proper consideration of a photograph that has no relationship to any relevant issue related to either guilt or victim impact, the jury is free to evaluate it for its purely emotional value. This creates a real danger of a verdict based on sympathy rather than a rational review of the evidence.[43]

The circumstances surrounding the introduction of Barry Van Treese's photo clearly highlight the problems with the statute as written. While providing the foundation for admission of the pre-mortem photograph, Mrs. Van Treese was allowed to relate to the jury an emotional tale about how Mr. Van Treese had grown a "full, white beard" at his daughter's request and that "he had shaved it off once and she cried and said, Daddy, daddy, please grow it back." (Tr. IV 33) Later, in closing arguments, Mr. Ackley made use of the pre-mortem photograph through an inflammatory and highly prejudicial "before and after" comparison, telling the jury, "In a nutshell, murder is the process by which one human being takes State's Ex. No. 79, a picture of Barry Van Treese in happier days, and deliberately hurts him with the idea to kill him, and out of that man makes State's Ex. 65 [post-mortem photograph]."

---

[43]At least one legislative body had incorporated guidelines for introduction of a life photograph into its statutory scheme. In Connecticut, CT ST§ 54-85e (2001), reads:

A photograph not to exceed eight inches by ten inches solely of a deceased victim prior to the date of the offense for which the defendant is being tried, that is a fair and accurate representation of the victim and is not of itself inflammatory in nature, may be shown to the Jury during the opening and closing arguments by the prosecutor. CT ST § 54-85e (2001).

(T.O. 58)  Such a display is obviously calculated to incite an emotional response and comes perilously close to the kind of prosecutorial conduct the OCCA  has condemned with regard to other types of exhibits.  *See e.g. Ford v. State,*719 P.2d 457, 459-460 (Okl. Cr. 1986)  (modifying sentence because prosecutor held gun and demanded that the defendant hold it during cross-examination); *Brewer v. State,* 650 P.2d 54, 57 (Okl. Cr.1982) (finding prosecutor's stabbing of victim photo during cross-examination of defense expert to be impermissible conduct).

In second stage, the prosecutor had Barry Van Treese's daughter identify his photo when she gave victim impact testimony.  (Tr. XVI  71)  He also referred to it in his closing argument.  (Tr. XVII 65)  Once again the photo had no relation to second stage issues or the allowable purposes of victim impact.  Thus, its sole purpose and effect was to elevate the emotional level of the sentencing phase.

## C.    Conclusion

Amended Section 2403 is unconstitutional, under both the state and federal constitutions, and the admission of a pre-mortem photograph of the victim, under the facts and circumstances of this case, rendered Mr. Glossip's trial fundamentally unfair, depriving him of the Due Process of Law, *see, e.g., Donnelly v. DeChristoforo,* 416 U.S. 637 (1974); *Darden v. Wainwright,* 477 U.S. 168 (1986), and unconstitutionally injected passion, prejudice, and arbitrary factors into the sentencing proceeding, *see,*

*e.g., Furman v. Georgia,* 408 U.S. 238 (1972); *Gregg v. Georgia,* 428 U.S. 153 (1976).  Therefore,  Mr. Glossip's conviction should be reversed and remanded for a new trial or, at least, his death sentence should be vacated.

**OCCA Decision**

The OCCA held that the photograph's "probative value was not substantially outweighed by the danger of unfair prejudice" and that the trial court did not abuse its discretion in allowing admission of the photograph.   *Glossip*, 157 P.3d at 157. The decision involved an unreasonable application of federal law as determined by the Supreme Court.    The Court in *Payne v. Tennessee*, 501 U.S. 808, 825 (1991) held that certain limited forms of victim impact evidence did not *per se* violate the Eighth Amendment, and that due process afforded by the Fourteenth Amendment would be violated by evidence that renders the sentencing proceeding unfair.   Id. at 832 (O'Connor, J., concurring).    Further, it is improper to allow victim impact evidence in first stage.    *See  Thornburg v. Mullin*, 422 F.3d 1113, 1136 (10th Cir. 2005). Considered with the highly prejudicial victim impact testimony given in first stage regarding Mr. Van Treese, the admission of the photograph added to the prejudicial effect of the testimony.   Petitioner's conviction and sentence should be reversed.

## GROUND XI

## TRIAL    AND    APPELLATE    COUNSEL    RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF

169

**THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE OKLAHOMA CONSTITUTION.**

This claim was presented as Proposition II in Petitioner's Application for Post Conviction Relief.

Even prior to trial, it was obvious the State's case relied almost solely on the testimony of Justin Sneed, Mr. Glossip's co-defendant in Oklahoma County Case CF-1997-244. As such, a reasonable attorney would have prepared, through investigation and interviews, to cross examine Mr. Sneed. This would include a review of the documents filed in Case CF-1997-244, discussed below. *Rompilla v. Beard*, 545 U.S. 374 (2005).

Throughout the trial the State presented Justin Sneed as a scared, poor, pitiful soul with a hard life who had easily been manipulated by Mr. Glossip into killing Barry Van Treese. (Tr. III 203-204, 208-209, 215-216, 223-224; Tr. XII 38-41, 100-101, 127-128, 130-131, 159, 188, 191-192; Tr. XV 67-73, 92, 94, 151, 157, 181) However, had trial counsel conducted additional investigation regarding evidence that was available in the court file in Oklahoma County Case CF-1997-244, and filed on July 17, 1997, and then presented this information during the cross examination of Mr. Sneed, the picture painted by the state would have been revealed as fraudulent. There is a reasonable probability that Petitioner would not have been found a principal

170

to the murder, but instead convicted of a lesser or related offense.   (*See* Attachment 7 to Appendix , a copy of a Letter from Oklahoma County Crisis Intervention Center dated July 1, 1997, and a psychiatric evaluation to determine competency to stand trial performed on Justin Sneed, and filed with the Court Clerk in this case on July 17, 1997.  The psychiatric evaluation for determination of competency  has been filed under seal in this habeas proceeding.)

The State repeatedly presented testimony and argument that Mr. Sneed was merely a "puppy" under the control of Mr. Glossip the "dog trainer" and that Mr. Sneed would have never committed the murder, but for Mr. Glossip.  The testimony and evidence presented by the State on this issue was the basis, in part, for the conviction and sentence.   The decision of the OCCA regarding the claim of insufficiency of evidence in Ground I  refers to Petitioner's control over Mr. Sneed.  However, the readily available evidence in the court file showed that  Mr. Sneed was not a "puppy".  In fact, he was a untrained vicious dog long before ever meeting Mr. Glossip.

The real Mr. Sneed was an individual that could think for himself and commit crimes without Mr. Glossip's guidance.   These included fighting, burglary and making a bomb threat.  (*See* Sealed Attachment 7 to Appendix )  Had trial counsel thoroughly investigated and cross examined Mr. Sneed, the picture painted by the

state would have been different and the weight of Mr. Sneed's testimony significantly

reduced. (Attachment 8 to Appendix , Affidavit of Christopher Evangelista)

Appellate counsel was ineffective for failing to argue that  trial counsel failed

to adequately developed and present this issue.  There is a reasonable probability that

the results of Mr. Glossip's trial would have been different.  *Evitts v. Lucey*, 469 U.S.

387(1985)

## Argument and Authority

Petition incorporates his argument and authority set out in his previous claim

of ineffective assistance of counsel in Ground V.

An accused has a Sixth Amendment right to present relevant evidence favorable

to his defense through defense witnesses or cross-examination of prosecution

witnesses. *Washington v. Texas*, 388 U.S. 14 (1967). When assessing relevancy, trial

courts as well as appellate courts must keep in mind that the validity of a defense

theory is for the jury to decide. Petitioner's right to due process and a fair trial was

violated when he was denied "the right to a fair opportunity to defend against the

State's accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973).

Counsel utterly failed to use the impeachment evidence to impeach the State's

star witness which would have resulted in the juror's lack of confidence that Petitioner

was guilty of first degree murder.  *See  Cargle v. Mullin*, 317 F.3d 1196, 1214 (10th

172

Cir. 2003) (failure to interview and call witnesses precluded counsel from showing that the case involved such witness inconsistency that "the jury could not be confident enough in any person's word to justify holding petitioner responsible for first degree murder beyond a reasonable doubt)

Petitioner's counsel's conduct was deficient and Petitioner was prejudiced as a result thereof. Due to counsel's ineffective assistance Petitioner was prohibited from presenting compelling relevant evidence favorable to his defense through witnesses or cross-examination of the State's witnesses, in violation of his Sixth, Eighth and Fourteenth Amendments.

## Second Stage

The test announced in *Strickland* applies to second stage as well as first stage of trial. *Id.* at 696. "The sentencing stage is the most critical phase of a death penalty case. Any competent counsel knows the importance of thoroughly investigating and presenting mitigating evidence." *Romano v. Gibson*, 239 F.3d 1156, 1179 (10th Cir. 2001). The Supreme Court has consistently held that "the sentencer may not refuse to consider or be precluded from considering 'any relevant mitigating evidence.'" *Skipper v. South Carolina,* 476 U.S. 1 (1186). Accordingly, "the sentence imposed at the penalty stage should reflect a reasoned *moral* response to the defendant's background, character, and crime." *California v. Brown,* 479 U.S. 538, 545 (1987)

(emphasis in original) (O'Connor, J., concurring).   "Consideration of such evidence is a 'constitutionally indispensable part of the process of inflicting the penalty of death.'"   *California v. Brown,* 479 U.S. at 541 (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (plurality)).

There is a reasonable probability that the outcome of the second stage of Petitioner's trial would have been different but for the ineffectiveness of his trial counsel and/or appellate counsel.   Although the testimony regarding Mr. Sneed was presented in first stage, the first stage evidence was incorporated into second stage. Therefore, the use of the information contained in the psychological report would have mitigated Petitioner's culpability.   Even if the jury had been presented with the evidence regarding Justin Sneed's criminal past and Petitioner still had been found guilty as a principal in first stage, there is a reasonable probability that Petitioner would have been viewed in a different light than the   State presented him, and strengthened the weight of mitigating factors in second stage.   This is especially true since only aggravating factor was found to exist by the jury.

**Counsel's actions were not based on "strategy".**

"When a petitioner has shown that counsel's actions actually resulted from inattention or neglect, rather than reasoned judgment, the petitioner has rebutted the presumption of strategy, even if the government offers a possible strategic reason that

could have, but did not, prompt counsel's course of action.   *Marcrum v. Luebbers*, 509 F.3d 489, 502-503 (8th Cir. 2007) *citing Rompilla v. Beard,* 545 U.S. 374, 395-396 (2005) (O'Connor, J., concurring); *Wiggins v. Smith,* 539 U.S. 510, 526-527 (2003). Counsel's action cannot be said to be "strategic" due to the critical necessity of impeaching the State's star witness.

The Supreme Court in *Wiggins v. Smith,* has made it clear that no deference is owed to an attorney's decisions when the investigation supporting that decision is inadequate. *Wiggins v. Smith,* 539 U.S. 510, 526-527 (2003).   It cannot be said that trial counsel's decisions are strategic when counsel is unaware of the full scope of mitigating factors due to counsel's failure to perform investigation into available investigation.     *See Hooper v. Mullin*, 314 F.3d 1162, 1170-71 (2002) (failure to pursue reasonable avenues of investigation without any idea of what the investigation might reveal was not an informed strategic decision and required relief from the death penalty).

**Appellate counsel failed to provide effective assistance of counsel.**

Appellate counsel were ineffective for failing to object to and argue on appeal that Mr. Glossip was denied a fair trial and reliable sentencing proceeding. *Strickland v. Washington*, 466 U.S. 668 (1984); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005);  *Evitts v. Lucey*, 469 U.S. 387 (1985); *Cargle v.*

175

*Mullin*, 317 F.3d 1196, 1202 (10th Cir. 2003).

**OCCA Decision**

Even though the OCCA first stated that the "proposition is merely an attempt to expand on claims made on direct appeal" and was "barred", still the OCCA subsequently reviewed the claim on the merits. (*See* Opinion as Attachment 1 to Appendix, p.6)     The Court held that neither the trial or appellate attorney was ineffective for failure to use the information and that the introduction of the information at trial or on direct appeal would not have changed the outcome of this case.  *Id.*

The Court applied *Strickland* in reaching its decision.  The decision involved an unreasonable application of clearly established federal law as determined by the Supreme Court.  28 U.S.C. §2254(d)(1).  The writ should be granted and Petitioner's conviction and sentence should be vacated.

The OCCA denied Petitioner's request for an evidentiary hearing.   See Petitioner's request  regarding an evidentiary hearing below.

## GROUND XII

**TRIAL AND APPELLATE COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO ARGUE THAT JUDICIAL BIAS SO INFECTED THE PROCEEDINGS THAT MR. GLOSSIP WAS DENIED HIS DUE PROCESS RIGHT TO A FAIR TRIAL IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE**

**UNITED STATES CONSTITUTION.**

This claim was presented as Proposition III in Petitioner's Application for Post Conviction Relief.

Trial and appellate counsel were ineffective for failing to object to and argue on appeal that Mr. Glossip was denied a fair trial and reliable sentencing proceeding. *Strickland v. Washington*, 466 U.S. 668 (1984); *Wiggins v. Smith*, 539 U.S. 510; *Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Evitts v. Lucey*, 469 U.S. 387 (1985); *Cargle v. Mullin*, 317 F.3d 1196, 1202 (10th Cir. 2003); Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  As such, Mr. Glossip was denied the effective assistance of counsel.

A defendant is entitled to fundamental fairness and justice without prejudice. *Pitman v. Doty***,** 441 P.2d 428 (Okla. 1968); Sixth Amendment to the United States Constitution. Without an impartial judge, there is no assurance of fairness and justice in a trial or the legal system as a whole.  "In order to maintain and foster proper respect and confidence of the people in the courts, the courts must be presided over by unprejudiced, unbiased, impartial, and disinterested judges and all doubt and suspicion to the contrary must be jealously guarded against." *McCullough v. Davis***,** 1915 OK CR 34 (1915); *Dennison v. Christopher*, 200 P. 783 (1921); *Whitfield v. Walden*, 239 P. 266 (1925); *State ex rel. Conley v. Parks*, 239 P. 941 (1925); *Fisk v.*

*Venable*, 68 P.2d 425 (1937).  Mr. Glossip was denied his fundamental right to due

process when he was tried in a court that through its expressed emotion was biased.

When conducting a trial, a trial judge should create an atmosphere of

impartiality and "should refrain from remarks or **conduct** that may injure a litigant."

The judge presiding over a trial occupies a high position and can easily influence the

jury "by the slightest suggestion coming from the court, whether it be a nod of the

head, a smile, a frown, or a spoken word."  Therefore, it is extremely important that

the judge use caution so as to not abuse this power.  (*Emphasis added.*)  *State v.

Hamilton*, 240 Kan. 539 (1987).

At one or more times during the trial, Judge Gray expressed emotion, by crying

or tearing up.  Her emotions could have influenced the jury by indicating her opinion

as to the merits of the evidence or the credibility of a witness.  This was improper.  *See

Garrett v. State*, 74 OK Crim. 78, 123 P.2d 283 (1942),  *citing Harrison v. State*, 11

Okl.Cr. 14, 141 P. 236; *Reed v. State*, 5 Okl.Cr. 365, 114 P. 1114; *Koontz v. State*, 10

Okl.Cr. 553, 139 P. 842.

The first suggestion of the court's bias is found after the state made its first

stage opening argument at the end of the day on May 13, 2004.  (Tr. III 201-225)  On

May 14, 2004, at the very beginning of the day, just before the defense was about to

give their first stage opening argument, the Court made the following statement at the

178

bench:

> THE COURT:     Thanks for your patience with me this morning.  I
> explained to the jury my situation because I didn't
> want them to think that it was a comment on the
> evidence.  I told them I'd like to proceed this
> morning and if I find I just can't concentrate on the
> evidence or that I'm just sitting up here unable to
> control my emotions, then I'll just be honest with
> you guys and tell you I've got to go home.  Okay?

(Tr. IV 5).[44]

In addition to the abovementioned ex parte communication with the jury regarding her

emotions, at times during the trial, several jurors, as well as an investigator for Mr.

Glossip, saw the judge either crying or with tears in her eyes.  (See Attachment 9 to

Appendix, Affidavit of Steve Leedy; Attachment 10 to Appendix , Affidavit of Sherry

Britton; Attachment 11 to Appendix, Affidavit of Anna Rose Wilson; Attachment 12

to Appendix, Affidavit of Sara Bonnell;  and Attachment 13 to Appendix, Affidavit

of Krystal Willis)

By her actions, Judge Gray was not an impartial judge; and as a result, Mr.

Glossip's trial was a violation of fundamental fairness and his due process rights were

materially affected.  Judicial bias is structural error not subject to harmless error

analysis and therefore requires reversal.  *See Tumey v. Ohio*, 273 U.S. 510 (1927).  As

---

[44]As indicated, this conversation between the judge and jury took place outside the presence
of defense counsel, Mr. Glossip, and the state.  (See also, Attachment 12 to Appendix, Affidavit of
Sara Bonnell and Attachment 13 to Appendix, Affidavit of Krystal Willis) Upon notice of this
conversation, defense counsel did not object or make any other requests.  (Tr. IV 5)

such, Mr. Glossip requests this Court reverse and remand this case for a new trial and

sentencing.  Mr. Glossip also requests an evidentiary hearing on this matter.

## GROUND XIII

### THE ACCUMULATION OF ERRORS SO INFECTED THE TRIAL AND SENTENCING PROCEEDINGS WITH UNFAIRNESS THAT MR. GLOSSIP WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL, DUE PROCESS AND A RELIABLE SENTENCING PROCEEDING IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.

This claim was presented as Proposition XI on direct appeal and as Proposition

V in the Petitioner's Application for Post Conviction Relief.

In *United States v. Rivera*, 900 F. 2d 1462 (10th Cir. 1990), the Tenth Circuit

held that the cumulative effect of two or more individually harmless errors has the

potential to prejudice a defendant to the same extent as a single reversible error.

*Rivera*, 900 F. 2d at 1469; *Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003); *Walker*

*v. Engle*, 703 F.2d 959, 963 (6th Cir. 1983).

It is proper to apply cumulative error analysis to legally diverse claims, as well

as first and second stage.   *Cargle v. Mullin*, 317 F.3d 1196, 1207, 1208 (10th Cir.

2002).

> A cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be

> determined to be harmless.  Unless an aggregate harmless
> determination can be made, collective error will mandate reversal, just
> as surely as will individual error that cannot be considered harmless.

*United States v. Rivera*, 900 F.2d 1462, 1470 (10th Cir. 1990).  *Accord, Duckett v.*

*Mullin,* 306 F.3d 982, 992 (10th Cir. 2002).  If any of the errors being combined are

constitutional in nature, the State must prove beyond a reasonable doubt that such

errors could not have contributed to the verdict rendered.  *Chapman v. California*, 386

U.S. 18, 24 (1967).

The cumulative effect of errors denied Mr. Glossip substantial statutory and

constitutional rights.

## CONCLUSION

Mr. Glossip's conviction and death sentence were obtained in violation of the

Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and

violation of state statutory rights.  This court should grant the writ on the basis of

insufficiency of evidence and remand for vacation of his conviction and sentence.

Alternatively, Mr. Glossip should be granted a new trial, a new sentencing hearing,

or such relief this court deems appropriate, including an evidentiary hearing.

## MOTION FOR EVIDENTIARY HEARING

Petitioner's Motion For Evidentiary Hearing will be filed according to the

scheduling order.

When a habeas petitioner did not fail to develop his claim in State court, the federal district court must analyze whether a hearing is required under the pre-AEDPA standard. *Bryan v. Mullin*, 335 F.3d 1207, 1214 (10th Cir. 2003).   Thus, Petitioner must first make allegations which, if proved, would entitle him to relief. *Medina v. Barnes*, 71 F.3d 363, 366 (10th Cir. 1995).   "If the petitioner does that the court must then determine whether petitioner is entitled to an evidentiary hearing to resolve any disputed fact underlying his claims." *Id.*   *See also   Cannon v. Mullin*, 383 F.3d 1152, 1175 (10th Cir. 2004) (under pre-AEDPA standard a petitioner is entitled to an evidentiary hearing "if his allegations, if true and contravened by the existing factual record, would entitle him to relief.")

Petitioner filed an Application For Evidentiary Hearing in State court and attempted to develop his claims in state court but was denied an evidentiary hearing, including counsel's failure to use utilize Justin Sneed's videotaped interview, and counsel's failure to  utilize readily available evidence consisting of financial records, to cross-examine witnesses regarding alleged "shortages" of money for the year 1996, set out in Ground 5.

Petitioner also requested an evidentiary hearing in State court regarding his claim that the trial judge became emotional and was not an unbiased judge.

Petitioner also requested an evidentiary hearing in state post-conviction proceedings, but his request was denied. Petitioner requested a hearing on ineffective assistance of counsel in connection with the failure to use available evidence to contradict the State's theory that Justin Sneed would not have murdered Mr. Van Treese but for Petitioner's instructions to do so;

Petitioner has set forth facts in this Petition which support his claims of ineffective assistance of counsel and has shown that he should have been granted a hearing in state court. He provided extra record materials which show that there are facts outside the record which support his claims. Petitioner requests, at a minimum, that this Court grant an evidentiary on his claims of ineffective assistance of counsel.

Respectfully submitted,

HENRICKSEN & HENRICKSEN

LAWYERS, INC.

s/Mark Henricksen

MARK HENRICKSEN, OBA #4102

## CERTIFICATE OF SERVICE

I hereby certify that on November 3, 2008, I electronically transmitted the attached document to the Clerk of this Court using the ECF System for filing. Based on the records currently on file, the Clerk of the Court will transmit a Notice of Electronic Filing to the following ECF registrants:

183

Seth Branham

Assistant Attorney General

313 N. E. 21st Street

Oklahoma City, Oklahoma 73105

(405) 521-3921 (Voice)

(405) 522-4534 (Fax)

Attorney for Respondent

e-mail: fhc.docket@oag.state.ok.us


                                        s/Mark Henricksen

                                        MARK HENRICKSEN




HENRICKSEN & HENRICKSEN

LAWYERS, INC.

600 North Walker, Suite 220

Oklahoma City, Oklahoma 73102-3035

(405) 609-1970

(405) 609-1973 (Facsimile)

Attorneys for Petitioner