DEATH PENALTY CASE

ORIGINAL

Case No. D-2005-310

---

# IN THE COURT OF CRIMINAL APPEALS OF THE STATE OF OKLAHOMA

---

### RICHARD EUGENE GLOSSIP

**Appellant,**

vs.

### THE STATE OF OKLAHOMA

**Appellee.**

FILED
IN COURT OF CRIMINAL APPEALS
STATE OF OKLAHOMA

DEC 15 2005

MICHAEL S. RICHIE
CLERK

Appeal from the
District Court of Oklahoma County

---

### BRIEF OF APPELLANT

---

JANET CHESLEY
Appellate Defense Counsel
Oklahoma Bar Assoc. No. 1645

KATHLEEN M. SMITH
Appellate Defense Counsel
Oklahoma Bar Assoc. No. 17935

Capital Direct Appeals Division
Oklahoma Indigent Defense System
P.O. Box 926
Norman, Oklahoma 73070
(405) 801-2666

ATTORNEYS FOR APPELLANT

December 15, 2005



Case No. D-2005-310

## IN THE COURT OF CRIMINAL APPEALS OF THE STATE OF OKLAHOMA

### RICHARD EUGENE GLOSSIP

Appellant,

vs.

### THE STATE OF OKLAHOMA

Appellee.

Appeal from the
District Court of Oklahoma County

## BRIEF OF APPELLANT

JANET CHESLEY
Appellate Defense Counsel
Oklahoma Bar Assoc. No. 1645

KATHLEEN M. SMITH
Appellate Defense Counsel
Oklahoma Bar Assoc. No. 17935

Capital Direct Appeals Division
Oklahoma Indigent Defense System
P.O. Box 926
Norman, Oklahoma 73070
(405) 801-2666

ATTORNEYS FOR APPELLANT

December 15, 2005

## TABLE OF CONTENTS

PAGE

STATEMENT OF THE CASE ........................................................ 1

STATEMENT OF THE FACTS ...................................................... 1

PROPOSITION I

    THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT TO SUSTAIN A
CONVICTION AND SENTENCE OF DEATH UNDER THE REQUIREMENTS OF THE
EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES
CONSTITUTION AND CORRESPONDING PROVISIONS OF THE OKLAHOMA
CONSTITUTION ........................................................... 10

  A.    Concerns Regarding Richard Glossip's Management of the
Motel ............................................................... 12

      1.    Alleged "Shortages" and Financial
Discrepancies ............................................... 13

      2.    Physical Condition of the Motel ............................ 15

      3.    Missing Registration Cards ................................. 18

      4.    Other Allegations That Mr. Glossip Was about
to Be Fired ................................................. 19

  B.    Speculative Testimony Regarding the "Personalities" of
Sneed and Glossip ................................................. 21

  C.    Sneed's Purported Lack of Motive to Kill Barry Van Treese
.................................................................. 23

  D.    Mr. Glossip's Purported Motive to Kill Barry Van Treese ........... 25

  E.    Forensic Evidence Collected at the Scene .......................... 26

  F.    Mr. Glossip's Actions from January 7-9, 1997 ...................... 26

  G.    Uncorroborated Evidence Provided Only by Justin Sneed .......... 28

  H.    Other Factors ..................................................... 30

PROPOSITION II

    THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY ADMITTING
IRRELEVANT AND HIGHLY PREJUDICIAL EVIDENCE INTO THE RECORD IN
VIOLATION OF MR. GLOSSIP'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND
FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND
CORRESPONDING PROVISIONS OF THE OKLAHOMA CONSTITUTION ............. 34

A.   Evidence Intended to Evoke Sympathy for the Victim and his
     Family ............................................................. 34

B.   Evidence Intended to Evoke Sympathy for the Perpetrator
     of the Murder ...................................................... 38

C.   Evidence Regarding Operations and Condition of Best
     Budget Inn ......................................................... 40

D.   Conclusion ......................................................... 41

PROPOSITION III

THE TRIAL COURT ERRED IN PERMITTING THE STATE TO DISPLAY SELECTIVE
PORTIONS OF CERTAIN WITNESSES' TESTIMONY THROUGHOUT THE TRIAL
BECAUSE IT OVEREMPHASIZED THAT TESTIMONY, CONSTITUTED A CONTINUOUS
CLOSING ARGUMENT, AND VIOLATED THE RULE OF SEQUESTRATION OF
WITNESSES ................................................................ 42

A.   Undue Emphasis on Selected Testimony ........................... 44

B.   Continuous Closing Argument ..................................... 46

C.   Violation of Rule of Sequestration of Witnesses ..................... 46

D.   The Trial Court's Refusal to Allow the Defense to Include
     the Demonstrative Exhibits as Part of the Record .................. 47

E.   Conclusion ......................................................... 49

PROPOSITION IV

MR. GLOSSIP WAS DEPRIVED OF A FAIR TRIAL AND A FAIR SENTENCING
HEARING BY THE IMPROPER TACTICS, REMARKS, AND ARGUMENTS OF THE
PROSECUTORS DURING BOTH STAGES OF TRIAL ............................ 49

A.   Misrepresentation of Facts and Misleading Argument
     Designed to Confuse the Jury ...................................... 50

B.   Evidence and Argument Intended to Evoke Sympathy for the
     Victim and his Family ............................................. 55

C.   Presentation of False and Misleading Evidence ...................... 56

D.   Implying to the Jury that Additional Evidence Exists ................ 58

E.   Second Stage Misconduct .......................................... 59

F.   Conclusion ......................................................... 61

PROPOSITION V

    MR. GLOSSIP WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF HIS RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE II, §§7,9 AND 20 OF THE OKLAHOMA CONSTITUTION ........................................................ 62

    A.    Failure to Utilize Justin Sneed's Videotaped Interview .............. 62

        1.    Manipulation of Sneed to Implicate Glossip .................. 63

        2.    Discrepancies Between Sneed's Videotape and his Trial Testimony ......................................... 64

    B.    Failure to Utilize Readily Available Evidence to Cross-Examine Witnesses ................................................ 66

    C.    Failure to Object to Improper Character Evidence .................. 68

    D.    Failure to Object to Irrelevant and Highly Prejudicial Evidence .......................................................... 70

    E.    Failure to Object to the Instances of Prosecutorial Misconduct ....................................................... 70

    F.    Conclusion ....................................................... 71

PROPOSITION VI

    THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT TO SUPPORT THE AGGRAVATING CIRCUMSTANCE OF MURDER FOR REMUNERATION ....................................................... 71

PROPOSITION VII

    ERRORS IN JURY INSTRUCTIONS GIVEN IN THE SECOND STAGE OF TRIAL DENIED MR. GLOSSIP'S RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO DUE PROCESS AND A RELIABLE SENTENCING PROCEEDING .... 77

    A.    Improper Weighing Instruction ...................................... 77

    B.    Instruction on Definition of Mitigation ............................ 80

PROPOSITION VIII

    THE TRIAL COURT ERRED IN ALLOWING IMPROPER VICTIM IMPACT TESTIMONY DURING THE SENTENCING STAGE, VIOLATING MR. GLOSSIP'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE II, §§ 7 AND 9 OF THE OKLAHOMA CONSTITUTION .......................................................... 82

    A.    Improper Victim Impact Witnesses ................................. 83

    B.    These Errors Were Not Harmless .................................. 85

PROPOSITION IX

    THE TRIAL COURT'S VOIR DIRE PROCESS VIOLATED MR. GLOSSIP'S
    RIGHTS PROTECTED BY THE SIXTH, EIGHTH AND FOURTEENTH
    AMENDMENTS TO THE UNITED STATES CONSTITUTION AND
    CORRESPONDING PROVISIONS OF THE OKLAHOMA
    CONSTITUTION ........................................................ 86

    A.    The Trial Court Improperly Questioned Prospective Jurors
        about Their Ability to Impose the Death Penalty ................... 86

    B.    A Prospective Juror Currently Serving a Deferred Sentence
        Was Improperly Removed for Cause ................................. 90

PROPOSITION X

    AMENDED SECTION 2403 OF THE OKLAHOMA EVIDENCE CODE IS
    UNCONSTITUTIONAL ON ITS FACE; THE ADMISSION OF A PRE-MORTEM
    PHOTOGRAPH OF THE VICTIM INJECTED PASSION, PREJUDICE, AND OTHER
    ARBITRARY FACTORS INTO THE SECOND STAGE PROCEEDINGS ................ 93

    A.    Amended Section 2403 is Unconstitutional on Its Face .............. 94

    B.    The Lack of Limiting Guidelines for Admissibility of Pre-
        Mortem Photographs Leads to Highly Inflammatory
        Prosecutorial Abuse, as Occurred in this Case ....................... 97

    C.    Conclusion ....................................................... 99

PROPOSITION XI

    THE ACCUMULATION OF ERRORS IN THIS CASE SO INFECTED THE TRIAL AND
    SENTENCING PROCEEDINGS WITH UNFAIRNESS THAT MR. GLOSSIP WAS DENIED
    DUE PROCESS AND A RELIABLE SENTENCING PROCEEDING IN VIOLATION OF THE
    EIGHTH AND FOURTEENTH AMENDMENTS ...................................... 99

CONCLUSION ................................................................ 101

CERTIFICATE OF SERVICE .................................................... 101

## TABLE OF AUTHORITIES

### CASES

Al-Mosawi v. State,
929 P.2d 270 (Okl.Cr. 1996) ............................................... 96

Apprendi v. New Jersey,
530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) ........................ 77

Atterberry v. State,
731 P.2d 420 (Okl.Cr. 1986) ............................................... 61

Aycox v. State,
702 P.2d 1057 (Okl.Cr. 1985) .............................................. 70

Ballard v. Undited States,
329 U.S. 187, 67 S.Ct. 261, 91 L. Ed. 181 (1946) ............................ 93

Banks v. State,
43 P.3d 390 (Okl.Cr. 2002) ................................................ 45

Banks v. State,
701 P.2d 418 (Okl.Cr. 1985) ............................................... 91

Barnett v. State,
853 P.2d 226 (Okl.Cr.1993) ............................................... 100

Bechtel v. State,
738 P.2d 559 (Okl.Cr. 1987) ........................................... 55, 99

Blackburn v. Foltz,
828 F.2d 1177 (6th Cir. 1987) ............................................. 70

Bland v. State,
4 P.3d 702 (Okl.Cr. 2000) ................................................. 76

Booker v. State,
851 P.2d 544 (Okl.Cr.1993) ............................................... 72

Boutwell v. State,
659 P.2d 322 (Okl.Cr. 1983) ........................................... 72., 93

Bowie v. State,
816 P.2d 1143 (Okl.Cr. 1991) .............................................. 33

Boyde v. California,
494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990) ....................... 81

Brewer v. State,
650 P.2d 54 (Okl.Cr. 1982) ......................................... 55, 60, 99

Brower v. State,
   221 P. 1050 (Okl.Cr. 1924) ................................................ 59

Brown v. Wainwright,
   785 F.2d 1457 (11th Cir. 1986) ............................................ 57

Caldwell v. Mississippi,
   472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) ......................... 61

Cargle v. State,
   909 P.2d 806 (Okl.Cr. 1996) ........................................... 83, 96

Carter v. State,
   879 P.2d 1234 (Okl.Cr. 1999) ............................................. 89

Chandler v. State,
   572 P.2d 285 (Okl.Cr.1977) ............................................... 99

Chaney v. State,
   612 P.2d 269 (Okl.Cr. 1980) .............................................. 72

Chapman v. California,
   386 U.S. 18 (1967) ...................................................... 100

Clark v. Continental Tank Company,
   744 P.2d 949 (Okla. 1987) ................................................ 47

Cody v. State,
   361 P.2d 307 (Okl.Cr. 1961) .............................................. 96

Commonwealth v. LaCava,
   666 A.2d 221 (Pa. 1995) .................................................. 71

Coulter v. State,
   734 P.2d 295 (Okl.Cr. 1987) .............................................. 54

Cummings v. State,
   968 P.2d 821 (Okl.Cr. 1998) .............................................. 32

Darden v. Wainwright,
   477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) ................. 41, **passim**

Davis v. Georgia,
   429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976) .......................... 90

Donnelly v. DeChristoforo,
   416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) ................. 50, **passim**

Dunagan v. State,
   734 P.2d 291 (Okl.Cr. 1987) .............................................. 41

Dyke v. State,
    716 P.2d 693 (Okl.Cr. 1986) ............................................... 47

Eddings v. Oklahoma,
    455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) ......................... 80, 81

Enmund v. Florida,
    458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) ...................... 81

Ford v. State,
    719 P.2d 457 (Okl. Cr. 1986) ............................................... 98

Fossick v. State,
    453 S.E.2d 899 (S.C. 1995) ................................................ 71

Frederick v. State,
    37 P.3d 908 (Okl.Cr. 2001) ................................................ 88

Freeman v. State,
    681 P.2d 84 (1984) ........................................................ 61

Frye v. State,
    606 P.2d 599 (Okl.Cr.1980) ................................................ 32

Furman v. Georgia,
    408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) ........................ 99

Geders v. United States,
    425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976) ......................... 47

Givens v. State,
    705 P.2d 1139 (Okl.Cr. 1985) .............................................. 45

Glaze v. State,
    565 P.2d 710 (Okl.Cr. 1977) ............................................... 45

Glidewell v. State,
    663 P.2d 738 (Okl.CR. 1983) ............................................... 76

Glossip v. State,
    2001 OK CR 21, 29 P.3d 597 (Okl.Cr. 2001) ................................. 1

Grant v. State,
    58 P.3d 783 (Okl.Cr. 2003) ................................................ 83

Gravley v. Mills,
    87 F.3d 779 (6th Cir. 1996) ............................................... 71

Gray v. Mississippi,
    481 U.S. 648, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987) ...................... 90

Greathouse v. State,
    503 P.2d 239 (Okl.Cr. 1972) ............................................... 92

Gregg v. Georgia,
    428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) .......................... 99

Grim v. State,
    240 P. 1093 (Okl.Cr. 1925) ............................................... 91

Hamilton v. State,
    10 P.2d 734 (Okl.Cr. 1932) ................................................ 33

Harris v. State,
    84 P.3d 731 (Okl.Cr. 2004) ............................................... 77

Hitchcock v. Dugger,
    481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987) ...................... 61, 81

Irvin v. Dowd,
    366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) ........................... 91

Jackson v. Virginia,
    443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) .......................... 10

Johnson v. State,
    665 P.2d 815 (Okl.Cr. 1983) .............................................. 72

Jones v. State,
    555 P.2d 1061 (Okl.Cr.1976) .............................................. 32

Jones v. State,
    738 P.2d 525 (Okl.Cr. 1987) .............................................. 55

Jones v. United States,
    526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999) ...................... 77

Kirk v. State,
    10 Okl.Cr. 281, 135 P. 1156 (1913) ........................................ 31

L. E. Y. v. State,
    639 P.2d 1253 (Okl.Cr. 1982) ............................................. 32

Lafevers v. State,
    897 P.2d 292 (Okl.Cr. 1995) .............................................. 81

Lanning v. Brown,
    377 S.W.2d 590 (Ky. 1964) ............................................... 45

Ledbetter v. State,
    933 P.2d 880 (Okl.Cr. 1997) .............................................. 83

Lewis v. State,
    528 P.2d 741 (Okl.Cr. 1974) ............................................... 45

Lockett v. Ohio,
    438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) ........................ 60, 82

Lott v. State,
    98 P.3d 318 (Okl.Cr. 2004) ............................................... 83

Malicoat v. State,
    992 P.2d 383 (Okl.Cr. 2000) .............................................. 88

McCarty v. State,
    765 P.2d 1215 (Okl.Cr. 1988) ...................................... 10, **passim**

McGill v. Commonwealth,
    391 S.E.2d 597 (Va.Ct.App. 1990) ........................................ 92

Miller v. Pate,
    386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967) ............................ 57

Mills v. Maryland,
    486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) ........................ 81

Mitchell v. State,
    120 P.3d 1196 (2005) ..................................................... 98

Moore v. State,
    788 P.2d 387 (Okl.Cr. 1990) .............................................. 44

Morgan v. Illinois,
    504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992) ....................... 86

Morris v. State,
    603 P.2d 1157 (Okl.Cr. 1979) ............................................. 41

Newlon v. Armontrout,
    693 F. Supp. 799 (W.D.Mo. 1988) ......................................... 71

Nunley v. State,
    601 P.2d 459 (Okl.Cr. 1979) .............................................. 31

Patton v. State,
    973 P.2d 270 (Okl.Cr. 1998) .............................................. 86

Patton v. State,
    989 P.2d 983 (Okl.Cr. 1999) .............................................. 11

Paxton v. State,
    867 P.2d 1309 (Okl.Cr. 1993) ............................................. 79

Payne v. Tennessee,
    501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) .................. 55, 83, 96

Penry v. Lynaugh,
    492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) ........................ 60

People v. Rogers,
    526 N.E.2d 655 (Ill.App.Ct. 1988) ......................................... 71

Peters v. Kiff,
    407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972) ........................... 93

Pierce v. State,
    495 P.2d 407 (Okl.Cr. 1972) ............................................... 41

Plantz v. State,
    876 P.2d 268 (Okl.Cr. 1994) ............................................... 72

Rawlings v. State,
    740 P.2d 153 (Okl.Cr. 1987) ............................................... 95

Rheuark v. State,
    160 P.2d 413 (Okl.Cr. 1945) ............................................... 59

Rice v. State,
    92 P.2d 857 (Okl.Cr. 1939) ................................................ 61

Rider v. State,
    494 P.2d 347 (Okl.Cr. 1972) ............................................... 31

Ring v. Arizona,
    536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) ....................... 77

Romano v. State,
    909 P.2d 92 (Okl.Cr. 1995) ................................................ 11

Rousek v. State,
    93 Okl. Cr. 366, 228 P. 668 (1951) ......................................... 41

Russell v. State,
    560 P.2d 1003 (Okl.Cr. 1977) .............................................. 11

Scott v. State,
    891 P.2d 1283 (Okl.Cr. 1995) .............................................. 91

Skipper v. South Carolina,
    476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986) ........................... 61

Spears v. State,
    900 P.2d 431 (Okl.Cr. 1995) ............................................... 55

Spees v. State,
 735 P.2d 571 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Spuehler v. State,
 709 P.2d 202 (Okl. Cr.1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Staggs v. State,
 804 P.2d 456 (Okl.Cr. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

Stanley v. State,
 513 P.2d 1330 (Okl. Cr. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

State v. Martini,
 619 A.2d 1208 (N.J. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Stewart v. State,
 757 P.2d 388 (Okl.Cr. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Strickland v. Washington,
 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) . . . . . . . . . . . . . . . . . . . . 62

Sturgis v. State,
 2 Okl. Cr. 362, 102 P. 57 (1909) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Suitor v. State,
 629 P.2d 1266 (Okl.Cr.1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

Sullivan v. Louisiana,
 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) . . . . . . . . . . . . . . . . . . . . 80

Thiel v. Southern Pacific Co.,
 328 U.S. 217, 66 S.Ct. 984, 90 L. Ed. 1181 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . 92

Thornburgh v. State,
 985 P.2d 1234 (Okl.Cr. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 94

Tison v. Arizona,
 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) . . . . . . . . . . . . . . . . . . . . . 81

Tobler v. State,
 688 P.2d 350 (Okl.Cr. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Toles v. State,
 947 P.2d 180 (Okl.Cr.1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

Torres v. State,
 58 P.3d 214 (Okl.Cr. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

United States v. Rivera,
 900 F.2d 1462 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

United States v. Salamone,
      800 F.2d 1216 (3rd Cir. 1986) ............................................... 93

Valdez v. State,
      900 P.2d 363 (Okl.Cr. 1995) ............................................... 94

Vanlandingham v. Gartman,
      367 S.W.2d 111 (Ark. 1963) ................................................ 46

Wainwright v. Witt,
      469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) .......................... 89

Witherspoon v. Illinois,
      391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) ......................... 89

Woodruff v. State,
      P.2d 1124 (Okl.Cr. 1993) .................................................. 86

Woodson v. North Carolina,
      428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) ................... 42, 50, 76

## STATUTORY AUTHORITY

12 O.S. § 577.2 (2001) ........................................................ 87

12 O.S. 2001, § 984.1 ......................................................... 96

12 O.S. § 2401 (2001) ......................................................... 34

12 O.S. § 2402 (2001) ......................................................... 34

12 O.S. § 2403 (2001) ...................................................... 34, 94

12 O.S. §2404(A) (2001) ....................................................... 69

21 O.S. § 701.7 ................................................................ 1

21 O.S. § 701.7(A)(2001) ....................................................... 1

21 O.S. § 701.10(C)(2001) ..................................................... 82

21 O.S. §701.11(2001) ..................................................... 73, 78, 79

21 O.S. § 701.12(3)(2001) ..................................................... 72

22 O.S. §742 (2001) ....................................................... 10, 31

38 O.S. §28 (2001) ............................................................ 91

## CONSTITUTIONAL AUTHORITY

### United States Constitutional Authority

U.S. Const., amend. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 80, 82

U.S. Const., amend. VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, **passim**

U.S. Const., amend. VIII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, **passim**

U.S. Const., amend. XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, **passim**

### Oklahoma Constitutional Authority

Okla. Const. Art. II, § 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62, 80, 82

Okla. Const. Art. II, § 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62, 82

Okla. Const. Art. II, § 19 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

Okla. Const. Art. II, § 20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62, 80

## OTHER AUTHORITIES

Cosper , C.A., Rehabilitation of the Juror: Rehabilitation Doctrine,
      37 Ga. L. Rev. 1471 (Summer 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

### Oklahoma Uniform Jury Instructions - Criminal

Instruction No. 4-78, OUJI-CR (2d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80, 81
Instruction No. 4-80, OUJI-CR (2d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

## STATEMENT OF THE CASE

On January 14, 1997, Justin Blayne Sneed was charged by Information in Oklahoma County District Court Case No. CF-97-244, with Murder in the First Degree in violation of 21 O.S. § 701.7(A)(2001). (O.R. 1-4) On January 23, 1997, a second Information was filed adding Appellant, Richard Glossip, as a co-defendant in the case.[1] (O.R. 5-9) Mr. Glossip was tried separately by a jury, convicted of one count of Murder in the First Degree, and sentenced to death in June 1998. The conviction and sentence was appealed to this Court and on July 17, 2001, this Court reversed and remanded the case for a new trial. *See Glossip v. State*, 2001 OK CR 21, 29 P.3d 597 (Okl.Cr. 2001). On retrial, the State alleged that the murder was especially heinous, atrocious, or cruel, that the murder was committed for remuneration, and that a probability existed that Appellant would pose a continuing threat to society. On June 1, 2004, Mr. Glossip was again convicted by a jury before the Honorable Twyla Mason Gray, District Judge, of Murder in the First Degree in violation of 21 O.S. § 701.7. The trial court struck the heinous, atrocious, or cruel aggravating circumstance and the jury rejected the continuing threat circumstance. Nonetheless, on June 3, 2004, having found the murder for remuneration aggravator, the jury assessed punishment at death by lethal injection. Judgment and Sentence was imposed by the trial court on August 27, 2004.

## STATEMENT OF FACTS

In the early morning hours of January 7, 1997, Justin Sneed beat Barry Van Treese to death with a baseball bat in Room 102 of the Best Budget Inn, a motel in Oklahoma City owned by Mr. Van Treese and his wife Donna. Appellant, Richard Glossip, and his girlfriend D-Anna Wood managed the motel and lived in an apartment connected to the motel office. (Tr. IV 32, 42-43) Justin Sneed had come to the motel with a roofing crew

---

[1]  Mr. Glossip was originally charged with one count of Accessory to First Degree Murder in Oklahoma County District Court Case No. CF-1997-256. However, that case was dismissed on January 27, 1997, after Mr. Glossip was charged as a principal in the case now under review.

out of Texas in July 1996. After Sneed quit his roofing job, Mr. Glossip had allowed him to stay on at the motel where he worked as the maintenance man in exchange for his room. (Tr. XII 68, 73)

**Operation of the Best Budget Inn of Oklahoma City.**

The Best Budget Inn was a somewhat rundown motel located near Interstate 40 and Council Road in Oklahoma City. (Tr. XI 116-22) Every customer who checked into the motel was required to fill out a registration card with basic identification information. The cards were sequentially numbered and the manager of the motel was responsible for maintaining the cards. (Tr. IV 52-53) Payments for the rooms went into the cash register and at the end of the day all receipts were taken from the drawer and placed in an envelope. Rather than depositing the money into a bank, the envelopes containing each day's receipts were simply stored in a "safe place" of the manager's choosing. (Tr. IV 53-54) While Mr. Glossip was manager, the "safe place" was a cabinet over the stove in the manager's apartment. (Tr. V 82) Daily reports were generated at the end of each day which recorded, among other things, which rooms had been rented, the name of the guest, the date each individual checked in, the room rate and the amount actually collected from each guest. (Tr. IV 53; State's Ex. 77) The information contained in the daily report was transmitted to Donna Van Treese by telephone each day. (Tr. IV 62-63).

Mr. Van Treese, who lived in Lawton, traveled to the Oklahoma City motel at least twice a month, on the 5th and the 20th, to pay employees and to collect all receipts since his last visit. As a general rule, when Mr. Van Treese arrived, he first reviewed the daily reports which were stored with the registration cards in a folder. He reviewed each day's report separately and totaled up the amount of cash and credit card receipts. In other words, he audited all records and moneys collected whenever he picked up the cash that had accumulated since his last audit. (Tr. IV 50, 54-55)

As manager, Mr. Glossip received a salary of $1,500 per month. In addition, he was provided a free apartment with all utilities, including telephone and cable television, paid by the motel. In addition, he received a bonus equal to 5% of total revenues in excess of $18,000 per month. (Tr. IV 50, 55) The $18,000 figure was set by the Van Treeses and represented the amount necessary to pay all motel and personal expenses, including their personal mortgage as well as an allowance for groceries and all other living expenses for their family. (Tr. V 8-9) For the year 1996, Mr. Glossip received a bonus every month except for December. (Tr. IV 180; Def. Ex. 71)

Beginning in June, 1996, the Van Treeses endured a number of family tragedies and, as a result, Mr. Van Treese's visits to the motel during the last half of 1996 were less frequent than usual. (Tr. IV 36-42) He had been to the motel periodically to make payroll, audit the books and pick up receipts, but not to do any specific repairs since prior to June, 1996. (Tr. IV 58) Normally, January through March were the slowest months at the motel and that was the time rooms were repainted, carpets replaced, and repairs done to prepare for the spring and summer season. (Tr. IV 58-59) In January 1997, Mr. Van Treese intended to go room by room with a maintenance sheet to evaluate what repairs needed to be done at the Oklahoma City motel. (Tr. IV 71-72)

**Operation of the Tulsa Best Budget Inn.**

The Van Treeses also owned a Best Budget Inn in Tulsa, Oklahoma. While some aspects of the operation of the Tulsa motel were the same as in Oklahoma City, others were markedly different. For example, all registration cards had to be accounted for and a daily report was generated at the end of every day and phoned in to Donna Van Treese just as in Oklahoma City. However, Mr. Van Treese did not review or pick up the hard copies of the daily reports for the Tulsa motel until the end of each year. (Tr. VIII 102-03) In fact, Mr. Van Treese only visited the Tulsa motel once every three or four months and payroll checks arrived every two weeks via UPS or Fed Ex. Rather than being stored in

3

a "safe place" on the premises, each day's receipts were required to be deposited into a Tulsa bank by noon the following day. (Tr. VIII 55-58)

**Events of January 6-7, 1997.**

Barry and Donna Van Treese returned from a family ski trip on the morning of January 5, 1997. The following evening, January 6, 1997, Barry Van Treese drove to the Oklahoma City Best Budget Inn to make payroll, audit the records, and pick up the receipts that had accumulated since his last visit approximately nine days earlier. In addition, Mr. Van Treese intended to check the condition of the rooms at the motel and start the remodeling and repair process that began around this time every year. According to Mrs. Van Treese, he also intended to speak to Mr. Glossip regarding his management of the motel. (Tr. IV 70-71)

Mr. Van Treese arrived at the motel between 5:30 and 6:00 p.m on January 6, 1997. According to Billye Hooper, the day clerk at the motel, Mr. Van Treese was clearly hurried and a little gruff, but he did not seem angry. His main concern was to get the payroll done. (Tr. VII 53-54) He made out the paychecks, checked the paperwork, and picked up the receipts as planned. Around 7:50 p.m., Mr. Van Treese left to check on the Tulsa motel with the intention of returning to Oklahoma City to spend the night. Before he left, he walked over to the board and took the key to room 102, which was the room he usually stayed in while in Oklahoma City. (Tr. V 77-79) He also took with him the envelopes containing receipts of somewhere from $2,800 to $4,000 that had accumulated since his last visit to Oklahoma City. (Tr. VII 77, 83-85)

Barry Van Treese arrived at the Tulsa Best Budget Inn sometime between 11:00 p.m. and midnight on January 6, 1997. William Bender, the manager of the Tulsa motel, testified that Mr. Van Treese appeared to be angry and demanded to see his daily reports. According to Bender, Mr. Van Treese told him there were 2,500 registration cards missing at the Oklahoma City motel and the weekend receipt money had not been

4

deposited. Mr. Van Treese stayed in Tulsa about forty-five minutes to an hour, then left to return to Oklahoma City. (Tr. VIII 81-82, 98)

D-Anna Wood testified that she and Mr. Glossip closed the Best Budget office and went to bed at approximately 2:30 a.m. the morning of January 7, 1997. (Tr. V 82-83) Sometime around 4:15-4:30 a.m., John Beavers, a longtime resident of the motel, left his room to go to the convenience store across the parking lot. As he was coming down the stairs, he heard glass breaking in the area of room 102. When he got to the edge of the parking lot, he looked back and saw the window of room 102 was broken out and glass was on the sidewalk. (Tr. VI 20-23) Justin Sneed testified that this window was broken during his attack on Barry Van Treese. (Tr. XII 101)

Mr. Glossip and Ms. Wood were awakened in the early morning hours of January 7 by a scraping or knocking noise along the side of their apartment. Mr. Glossip went to the office door to see what was going on and returned a short time later. He told D-Anna it was Justin Sneed reporting that two drunks had broken a window and that he had told Sneed to clean it up. Mr. Glossip then came back to bed and the couple went back to sleep. (Tr. V 82-86) In fact, Sneed had told Mr. Glossip that he had just killed Barry Van Treese because he was afraid Mr. Van Treese was going to throw him out in the street and he had nowhere to go. (State's Ex. 2) Later that morning, Sneed and Mr. Glossip repeated the story that the window had been broken by two drunks and affixed a piece of Plexiglas over it as a temporary fix. (See, e.g., Tr. IX 46, XII 149) Sometime during the attack, Sneed had gotten a black eye that he explained by saying he had slipped in the shower and hit his eye on the soap dish (Tr. XII 137)

In the early afternoon, Mr. Glossip and Ms. Wood left the motel to run errands. After cashing Mr. Glossip's paycheck, the couple went to replace Mr. Glossip's glasses that had broken a few days earlier. They also bought an inexpensive engagement ring for Ms. Wood, and then went to Wal-Mart. (Tr. V 87-89) While at Wal-Mart, Mr. Glossip received a page from Billye Hooper. Ms. Hooper informed him that Barry Van Treese's

5

car had been found parked awkwardly at the Weokie Credit Union behind the motel. Ms. Hooper was very concerned since she had not seen Mr. Van Treese all day. (Tr. VII 72-74)

Mr. Glossip and Ms. Wood returned immediately to the motel where they met with Cliff Everhart, the part-time security guard and purported owner of 1% of the Best Budget Inn. (Tr. V 96; XI 169-70) Before they arrived, Mr. Everhart asked Justin Sneed to go room to room at the motel to search for Mr. Van Treese. Mr. Sneed skipped room 102 and pretended to search the other rooms.[2] (Tr. XII 157) Mr. Everhart, Mr. Glossip and Ms. Wood then drove around in Everhart's truck to look for Mr. Van Treese. (Tr. V 95-97) While they were searching, Justin Sneed gathered up his belongings and simply walked unnoticed away from the motel. (Tr. XII 159-60)

Around 4:30-5:00 p.m., Oklahoma City Police Officer Tim Brown joined in the search for Mr. Van Treese. (Tr. IX 187, 204) Although all of the searchers were aware that the window had been broken out of room 102 in the early morning hours, that room 102 was the room Mr. Van Treese regularly stayed in when he was at the motel, that Justin Sneed had gotten a black eye sometime in the night and had disappeared while the search for Mr. Van Treese was being conducted, no one checked room 102 until sometime around 10:30-11:00 p.m. that night. (*See, e.g.,* Tr. IX 214, XI225) At that time, Mr. Everhart and Officer Brown entered the room and found Barry Van Treese's body on the floor beneath some bedclothes. (Tr. IX 221, 224-25) Mr. Van Treese had suffered a number of blows to the head consistent with a blunt object and had bled to death as a result of those injuries. (*See, generally,* Tr. XI 15 *et seq.*)

---

[2]  The evidence adduced at trial on this point is conflicting. Ms. Wood and Mr. Sneed testified that Sneed searched the rooms alone. (Tr. V 98; XII 157-58) Mr. Everhart testified that he asked both Mr. Sneed and Mr. Glossip to search the rooms together. (Tr. XI 185) Ms. Hooper testified that Everhart instructed Sneed to check the rooms, but indicated Glossip and Sneed left together to do so. (Tr. VII 76)

**Mr. Glossip's Detention and Subsequent Arrest.**

After Mr. Van Treese's body was found, Richard Glossip was detained for questioning by Officer Brown and placed in the back of his patrol car. (Tr. IX 230) While seated in the vehicle, Mr. Glossip told Brown that early in the morning Sneed had banged on the glass front doors and then on the side wall of his apartment. Glossip said that he and Ms. Wood had suspected the whole time that Justin had something to do with what happened to Mr. Van Treese, but did not want to say anything until they knew for sure. (Tr. IX 233) Mr. Glossip was then transported to the police station to be interviewed about Mr. Van Treese's death.

Mr. Glossip was questioned by Oklahoma City Police Detectives Bob Bemo and Bill Cook in a videotaped interrogation conducted in the early morning hours of January 8, 1997. Mr. Glossip denied knowing anything about the murder, including Sneed's statement to him that he had killed Mr. Van Treese. (State's Ex. 1) Although Cook and Bemo made clear during the interview that they thought Mr. Glossip was not disclosing everything he knew about the murder of Mr. Van Treese, the detectives released him after the interrogation and he was transported back to the Best Budget Inn. (State's Ex. 1; Tr. XIV 9)

Following the interrogation, Mr. Glossip knew he was a suspect in the murder of Mr. Van Treese. The next day, he began selling a number of his possessions to raise money. He did not try to leave town, but instead visited a lawyer. Immediately upon leaving the lawyer's office, Mr. Glossip and Ms. Wood were taken into custody by officers who had been conducting surveillance and the couple was transported back to the police station. (State's Ex. 2; Tr. XII 6-8)

In a second videotaped interrogation conducted on January 9, 1997, Mr. Glossip told Bemo and Cook that Sneed had told him the morning of January 7 that he had killed Mr. Van Treese. Mr. Glossip acknowledged that he should have said something at that time, but denied any motivation for or involvement in a plot to murder Mr. Van Treese.

7

(State's Ex. 2) After the interview, Mr. Glossip was placed in the county jail. At the time of his arrest, he was carrying $1,757.00 in cash, a sum comprised of his paycheck, proceeds from the sale of vending machines to the Best Budget Inn and personal items to other individuals, and his savings. (State's Ex. 2, Tr. XV 16-18)

**Apprehension of Justin Sneed.**

After walking away from the Best Budget Inn the afternoon of January 7, 1997, Justin Sneed tracked down the roofing crew he had originally come to Oklahoma with and went back to work. (Tr. XII 162) He was apprehended on January 14, 1997, and brought to the Oklahoma City police station for questioning. In the apartment where he was arrested, police found a Crown Royal bag belonging to Sneed that contained approximately $1,680 in cash. (Tr. XIV 13-18) In his videotaped interview, which was never shown to the jury, the detectives told Sneed they knew the murder had not been his idea but rather Mr. Glossip's.[3] (Rule 3.11(B) Application Ex. 1A) After first denying any involvement with or knowledge of Barry Van Treese's murder, the detectives told Sneed to "get right with The Almighty" and indicated they already knew what happened and they just needed him to confirm that Mr. Glossip was the mastermind behind the murder. After detectives told Sneed that Mr. Glossip was trying to "hang him" and make him the "scapegoat," he changed his story and told the detectives that Mr. Glossip had asked him to kill Mr. Van Treese with a baseball bat and to split the cash Mr. Van Treese had under the front seat in his car. Although he thought Mr. Van Treese was "sitting on" $7,000, the amount actually obtained from the car was less than $4,000. The brief interview was quickly wrapped up by detectives after Sneed told them what they wanted to hear. (Rule 3.11(B) Application Ex. 1A) In exchange for a sentence of Life Without the Possibility of Parole, Sneed testified against Mr. Glossip at trial. (State's Ex. 43)

---

[3] A copy of Mr. Sneed's videotaped statement and a court reporter's transcript of the videotape are attached as Exhibits 1A and 2 to Mr. Glossip's Application for Evidentiary Hearing Pursuant to Rule 3.11(B) (Hereafter, Rule 3.11(B) Application).

Mr. Sneed's story has varied widely from his statement given to police on January 14, 1997 to his testimony at Mr. Glossip's 1998 trial and finally to his testimony in 2004. Each time Mr. Sneed tells the story, embellishments are added. For example, in 1998, Mr. Sneed testified for the first time that, among other things, Mr. Glossip had asked him to kill Barry Van Treese on more than one occasion, that Mr. Glossip had asked him to buy trash bags, a hack saw and muriatic acid to dispose of the body, and that Mr. Glossip had told him to leave the motel when the police were searching for Mr. Van Treese. (O.R. 604-05) At the 2004 trial, Sneed repeated the changes from 1998 and added several more. For instance, between the 1998 trial and the 2004 trial, the amount of money Mr. Glossip had offered for Sneed to kill Mr. Van Treese increased from $7,000 to 10,000. (Tr. XII 166-67) Sneed also described for the first time another incident in which Mr. Glossip wanted him to kill Mr. Van Treese with a hammer in the boiler room of the motel in November or December, 1996 (Tr. XII 80-81), alleged for the first time that Mr. Glossip had taken the victim's wallet out of his pants pocket and removed a $100 bill (Tr. XII 123), and said he had tried to "push" a knife with a broken tip into Mr. Van Treese's chest during the attack (Tr. XII 102). These and other discrepancies in Sneed's testimony from proceeding to proceeding are discussed in more detail throughout this Brief and in Mr. Glossip's Rule 3.11(B) Application filed concurrently herewith.

At the conclusion of jury deliberations, Mr. Glossip was again convicted of First Degree Murder. (Tr. XV 183) In the punishment phase, the State incorporated the evidence from the first stage of trial (Tr. XVI 69), then presented two victim impact witnesses, each of whom read statements from several of Mr. Van Treese's children in addition to their own. (Tr. XVI 70-88) At Mr. Glossip's request, defense counsel limited presentation of mitigation evidence to five witnesses. After deliberating for almost five hours, the jury rejected the continuing threat aggravator, but found that the murder was commited for remuneration and sentenced Mr. Glossip to death. Other facts will be discussed as they relate to the following Propositions of Error.

## PROPOSITION I

**The Evidence Presented at Trial Was Insufficient to Sustain a Conviction and Sentence of Death under the Requirements of the Eighth and Fourteenth Amendments of the United States Constitution and Corresponding Provisions of the Oklahoma Constitution**

Due Process requires this Court to examine the sufficiency of evidence by determining whether, after reviewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the charged crimes beyond a reasonable doubt. *Spuehler v. State*, 709 P.2d 202, 203-04 (Okl. Cr.1985), adopting the standard in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). A significant corollary to this rule is that no conviction can be premised upon the testimony of an accomplice unless that testimony is "corroborated by such other evidence as tends to connect the defendant *with the commission of the offense*, and the corroboration is not sufficient if it merely show the commission of the offense or the circumstances thereof." 22 O.S. §742 (2001) (emphasis added); *see also McCarty v. State*, 977 P.2d 1131-32 (Okl.Cr. 1998).

As in Mr. Glossip's first trial, the only direct evidence connecting him to this crime was the testimony of Justin Sneed, the admitted killer, claiming that Mr. Glossip was the "mastermind" behind the murder of Barry Van Treese. No physical evidence connected Mr. Glossip to the murder and no compelling evidence corroborated Sneed's testimony. Instead, the State presented witness after witness to offer opinions and speculative testimony regarding what Barry Van Treese *likely* would have done or how Justin Sneed *likely* would have acted under certain circumstances or what *could* have been happening at the Best Budget Inn in Oklahoma City. Ultimately, none of these witnesses provided one shred of reliable evidence of Mr. Glossip's prior knowledge of or participation in the murder of Barry Van Treese.

The best the State could do at trial was imply a motive for the murder. However, the bulk of the testimony even on this point, which is not enough in and of itself to

support a conviction, was based entirely on innuendo and was, in any event, internally inconsistent. As this Court has repeatedly held, "the law must concern itself with facts and evidences, not vaporous speculations." *Russell v. State*, 560 P.2d 1003, 1004 (Okl.Cr. 1977); *see also Patton v. State*, 989 P.2d 983, 990 (Okl.Cr. 1999); *Thornburgh v. State*, 985 P.2d 1234, 1251 (Okl.Cr. 1999); *Romano v. State*, 909 P.2d. 92, 123 (Okl.Cr. 1995). No one should be convicted, let alone put to death, on the type of evidence presented in this case.

## THE STATE'S THEORY

The State's theory at trial was that Richard Glossip was afraid that Barry Van Treese was about to fire him from his job as manager of the Best Budget Inn. According to the State, Mr. Glossip nevertheless thought he could talk Donna Van Treese into letting him take control of both the Oklahoma City and Tulsa motels and so he solicited Justin Sneed to kill Mr. Van Treese.

Justin Sneed provided the only evidence directly linking Mr. Glossip to the murder. To corroborate Sneed's testimony, the State presented evidence intended to show that (1) Mr. Glossip had been mismanaging the motel and was about to be fired; (2) Sneed was a naive young man who had no independent motive to kill Mr. Van Treese; (3) Glossip was Sneed's boss and often told him what to do; (4) as manager of the motel, Mr. Glossip's fingerprints should have been found in room 102 where Mr. Van Treese was killed, but were not; (5) Glossip failed to report that Sneed had confessed to killing Mr. Van Treese approximately seventeen hours before his body was found and then told inconsistent stories throughout the day to delay that discovery; (6) after selling all of his belongings, Glossip went to see a lawyer instead of coming back to the police station as instructed; and (7) at the time of his arrest Glossip had $1,757 dollars in his possession which is approximately half of the receipts the State estimated Mr. Van Treese had collected from the motel shortly before he was murdered.

Even if the State had proved every one of these contentions was true, which, as shown below, it did not, none of this evidence independently connected Mr. Glossip to

11

the murder of Barry Van Treese. Even viewing this evidence in the light most favorable

to the State, the *most* that can be said is that Richard Glossip *may* be an accessory after

the fact to murder.

**FACTUAL BACKGROUND**

### A.   Concerns Regarding Richard Glossip's Management of the Motel.

The vast majority of the State's evidence against Richard Glossip was intended

to show that he was about to be fired by Barry Van Treese and, thus, had a motive to kill

him. Several witnesses testified Mr. Van Treese was concerned about the management

of the Oklahoma City Motel, though all appeared to have different opinions as to the

reason for and the depth of that concern. Some of this testimony involved unfounded

suspicions like Billye Hooper's testimony that Mr. Glossip was doing something vaguely

unscrupulous because the daily reports showed the motel was always renting about the

same number of rooms every night. (Tr. VII 45-46) Specifically, Ms. Hooper testified

"more than once I would make the comment to Donna [Van Treese] that it seemed like

the old Best Budget couldn't seem to get under 19 rooms, but they couldn't seem to

manage to rent anything over 21." (Tr. VII 45) In fact, financial records show that in

December 1996, the number of rooms rented at the motel was all over the board — from

a low of 12 on Christmas day to a high of 31 on December 7th and 31st. Similar variation

existed in every month of 1996.[4] (*See* Rule 3.11(B) Application Ex. 3) Clearly, Ms.

Hooper's conjecture was not based on *any* evidence and both the prosecutor and

defense counsel should have known it. (*See* Proposition V)

Other testimony was flat out contradictory. For example, Donna Van Treese,

Billye Hooper, and William Bender all told the jury that Mr. Van Treese's policy was not

to allow employees to have "comped" rooms, *i.e.*, a free room in exchange for work done

---

[4]   For example, financial records within trial counsel's possession, but not used
to cross-examine Ms. Hooper, show that room rentals in August, 1996, ranged from a low
of 27 to a high of 46; September, from 22 to 44; October, from 18 to 37; November, from 17
to 33. (*See*, Rule 3.11(B) Application Ex._3)

for the motel like Justin Sneed did. (*See, e.g.,* Tr. IV 114; VII 9-10; VIII 57) Donna Van Treese said she never knew Sneed was receiving a free room until after her husband's death and Ms. Hooper went so far as to say Sneed appeared to hide out whenever Mr. Van Treese came to the motel because he "wasn't supposed to be there in a free room working for . . . a room rather than a paycheck." (Tr. IV 42-43, VII 12) This testimony implied that Mr. Glossip was hiding the fact that Justin was staying at the motel and this was another reason Mr. Van Treese wanted to fire him. In fact, State's Ex. 77, the daily report for January 6, 1997, plainly shows Justin Sneed, aka Justin Taylor, had been staying in room 117 since July 11 and that the room was "comped." Since Mr. Van Treese audited the daily reports every time he came to the motel, he knew that Sneed was living at the Best Budget free of charge in exchange for doing work for the motel. Lest there be any doubt on this point, Cliff Everhart, Mr. Van Treese's friend and the part-time security guard for the motel, specifically testified that he and Mr. Van Treese had discussed the fact that Sneed received a free room in exchange for work, that Van Treese did not have a problem with it and was, in fact, glad to have a maintenance man he could get for the price of a room. (Tr. XI 220-21)

Other examples of unsupported or contradictory testimony regarding Mr. Glossip's management of the motel are discussed below.

### 1.    Alleged "Shortages" and Financial Discrepancies.

Donna Van Treese testified that alleged "shortages" of over $6,000 for the year 1996 were of great concern to her. (Tr. IV 63) Although by far the majority of these "shortages" (more than 70%) occurred in the first four months of the year, Mr. Glossip was not fired at that time. (Def. Ex. 71) Moreover, Def. Ex. 71A shows that the shortage at the Tulsa Best Budget Inn represented 3% of its total sales volume while the shortage at the Oklahoma City motel was only 2%.[5] Despite the fact the Tulsa motel showed a

---

[5]  Defendants Ex. 71A is a document created by Donna Van Treese which the jury was never allowed to see. (Rule 3.11(B) Application Ex. 3)

greater shortage for 1996, William Bender, the manager there, testified he was never even talked to about the shortages at the Tulsa motel, much less that anyone threatened to fire him over such a shortage.[6] (Tr. VIII 94) In any event, Kenneth Van Treese, the victim's brother, testified it was unlikely an astute businessman like Barry Van Treese would be all that concerned regarding these shortages, which he described as insignificant. (Tr. XI 108-09, 145-47) The fact is that businesses that do a large volume of sales have shortages, and a 2-3% loss is not unusual. Mr. Glossip submits that the importance of these shortages understandably increased in the mind of Mrs. Van Treese only after the manager of the motel was accused of her husband's murder.

William Bender testified that Mr. Van Treese was angry when he arrived at the Tulsa motel on the evening of January 6, 1997. (Tr. VIII 63) According to Mr. Bender, one reason for this anger was that the weekend receipt money from Oklahoma City had not been deposited and was missing. (Tr. VIII 81) In the first place, Bender was apparently unaware that, per Mr. Van Treese's policy, receipts from the Oklahoma City motel were *never* deposited into a bank. (Tr. VIII 93) Perhaps more importantly, the State cannot simultaneously contend through Bender that Mr. Glossip had stolen the weekend receipts before Mr. Van Treese went to Tulsa and through Sneed that he and Glossip took those same receipts from under the driver's seat of Mr. Van Treese's car. (Tr. XII 127-28) In other words, the State cannot first eat its cake and then have it, too.

In fact, no one has ever been able to determine exactly how much money Mr. Van Treese picked up with the daily reports in Oklahoma City on January 6, 1997. Billye Hooper testified at the 2004 trial that she had reviewed the financial records for the nine

---

[6]   When trial counsel first tried to introduce Def. Ex. 71A to show that similar losses had occurred in Tulsa, the State made an offer of proof that Donna Van Treese would say that Bender was also mismanaging the Tulsa motel and the Van Treeses intended to fire him as well after they had dealt with Mr. Glossip. (Tr. IV 177-78) Trial counsel's failure to use this information to impeach Bender's trial testimony is addressed in Proposition V. The fact that the State would make such an offer of proof and then not correct Bender's testimony that no shortages existed in Tulsa and that Mr. Van Treese was so pleased with Bender's management that he wanted to bring him to Oklahoma City after he fired Mr. Glossip is addressed in Proposition IV.

days that would have generated those receipts and the probable amount Mr. Van Treese picked up was somewhere between $3,500-4,000. (Tr. VII 77) However, in April, 1997, she testified the amount was somewhere between $2,800-3,000. (Tr. VII 83-85) The figure most often argued by the State was $3,500. (*See, e.g.*, Tr. XV 169) Mr. Glossip submits the State likes to use this particular estimate because it so conveniently approximates the sum of the money Mr. Glossip had on his person when he went to see a lawyer prior to his arrest on January 9 ($1,757) and Mr.Sneed had in his Crown Royal bag when he was arrested on January 14 ($1,680). Whatever the amount, the same funds cannot have been stolen by Mr. Glossip before Mr. Van Treese's murder and then restolen by Sneed after he beat him to death.

### 2.   Physical Condition of the Motel.

Kenneth Van Treese took over management of the motel after the death of his brother and brought in two friends to help him assess the condition of the motel and to assist with day-to-day operations.  While all three men were college graduates and knowledgeable businessmen, none of them had any experience in the motel or housing business.  (Tr. X 225-28) In their opinion, only 23 or 24 of the fifty-four available rooms at the Best Budget Inn were suitable to be rented.  (Tr. XI 117) The State argued that the "deplorable" condition of the motel was one more reason Mr. Glossip was about to be fired. (*See e.g.*, Tr. XV 153, 162, 165) However, Kenneth Van Treese's evaluation of the motel was made *after* the fact, and by individuals who had never inspected the property when Barry Van Treese was alive and in control of the motel.

In truth, the Best Budget Inn was, as its name implied, a low budget motel that catered to Interstate traffic and weekend drunks from the strip bars located behind the motel. (Tr. XI 154) The witnesses who were at the motel on a regular basis prior to Barry Van Treese's death knew the motel was in about the same condition it was usually in at the start of a new year – the time when the staff traditionally began the remodeling process necessary to get ready for the next summer season.  (Tr. IV 58-59; V 141)

For example, Billye Hooper testified that some rooms were probably in better shape than others, but only two or three were not rentable and those rooms were down because they were being worked on or under construction. (Tr. VIII 12) Cliff Everhart said Barry Van Treese was aware of the condition of the rooms in the motel and that he had talked about remodeling a couple of the rooms. (Tr. XI 233) D-Anna Wood testified Mr. Van Treese did not like to spend money he did not feel was necessary and, because there was little money to fix things, Mr. Glossip usually had to "rig" things together to make them work. She described the motel as "nasty." (Tr. V 69, 72-73)

Donna Van Treese testified managers were never given money directly to do repairs and certainly had no access to company checkbooks to pay for repairs. Instead, Mr. Van Treese would purchase items himself, or the manager would get approval to make such purchases from the receipts of the motel. (Tr. V 44) Mrs. Van Treese testified Glossip had told them some painting and other work was being done and implied that this was not true. (Tr. V 15) However, Ms. Wood testified Glossip had, in fact, repainted some of the rooms and Ms. Hooper also indicated he was working on remodeling several rooms. (Tr. V 141, VIII 12) Indeed, Kenneth Van Treese testified that when he took over the motel on January 9, 1997, room 112 was in the process of being modified to make it handicapped accessible. (Tr. XV 20)

In fact, most of the evidence indicated Mr. Glossip was working hard to improve the property. John Beavers, who had lived at the motel for almost nine years, described Mr. Glossip as "a real go-getter. He was always working hard. . . It seemed like he always had plans to do this, that, and the other." (Tr. VI 18) Although Mr. Beavers could not remember the specifics, he testified Mr. Glossip "always seemed to have some project going on at the property." (Tr. VI 18-19) Even Ms. Hooper grudgingly testified that when Mr. Glossip was first hired in May 1995, "he was very conscientious about trying to keep the property clean, trying to fix it up, trying to make it nicer, better." (Tr. VII 91) When asked about the first part of 1996, Ms. Hooper said "[Glossip] always tried to keep the

16

property looking nice. I would never ever say anything against the way he tried to keep the property looking." (Tr. VII 98) Later, Ms. Hooper stated:

> [Glossip] was trying to upgrade the property both cosmetically, but also to upgrade the clientele and I really felt like that he was -- whatever the circumstances, he had the Best Budget at heart. . . . But after I returned from my heart surgery I began to observe not necessarily so much money discrepancies but less interest, more, not the kind of people that he had previously been trying to bring in. Less desirables.

(Tr. VIII 33)

Ms. Hooper specifically testified that up until she took medical leave in August 1996, Mr. Glossip was "doing a really good job." (Tr. VII 41) Regarding the management of the motel after her return in October 1996, the only specific concerns Ms. Hooper was able to articulate were: (1) her general feeling that although Mr. Glossip was never "not nice" or mean or rude or mistreating her in any manner, he would have been "just as happy" if she had not been able to come back to work (Tr. VII 44-45); (2) her unfounded concerns, discussed above, that around the same number of rooms were being rented each day; (3) the fact that "a couple of times" her handwriting was not on the sheet that was used to compile the daily reports and that Mr. Glossip's explanation for this was that coffee had been spilled on it or some mishap had required him to write a new page (Tr. VII 48); and (4) she sometimes noticed the door open to a room that needed to be cleaned although it did not show up as rented on the daily report (Tr. VII 49). Ms. Hooper, who was on the property almost daily during the entire time Mr. Glossip was manager, never once mentioned that the physical condition of the motel was a problem.[7]

---

[7]  In December 1994, Ms. Hooper and her sister temporarily acted as interim managers while the Van Treeses went on vacation. According to Hooper, Mr. Van Treese was "very pleased" with the way they had handled the motel, but he hired another couple to manage it the following February. After that young couple left a few months later, Ms. Hooper was again passed over when he hired Mr. Glossip and D-Anna Wood in mid-1995. (Tr. VII 6-8) When she told Mr. Van Treese in December 1996 that they needed "to have a talk outside the office," her suggestion was that she and Mr. Van Treese and her sister should go to dinner to discuss her concerns about the motel. (Tr. VII 35-36) It is reasonable to infer that Ms. Hooper simply wanted Mr. Glossip's job as manager of the Best Budget Inn.

By all indications, Mr. Van Treese's real concern was always for his family, *i.e.*, that the motel generate sufficient revenues to provide a nice home, good food on the table, family vacations, and the like. He had determined that the Oklahoma City motel needed to make at least $18,000 per month to provide those things and had set that figure as the amount that triggered a bonus for the manager. Under Mr. Glossip's management, the Oklahoma City Best Budget had reached that threshold every month in 1996 except for December. (Tr. IV 117-20; Def. Ex. 71) In contrast, the Tulsa Best Budget, with whose management Mr. Van Treese was supposedly so pleased, had met its target in only seven of the twelve months that year.[8]

In short, the State did not present any evidence of any kind that Barry Van Treese was concerned about the physical condition of the property. Rather, the State relied on testimony from Kenneth Van Treese and William Sunday, who had never made even a cursory inspection of the motel prior to Barry Van Treese's death, and Justin Sneed to argue the motel was in "deplorable" condition and, for that reason, Mr. Glossip was about to be fired.[9]

### 3.   Missing Registration Cards.

William Bender testified Mr. Van Treese was also upset because 2,500 registration cards were supposedly missing at the Oklahoma City motel. (Tr. VIII 81, 98) However, other witnesses, individuals who had a much closer relationship to the Oklahoma City motel, stated the number of missing cards was much smaller. For example, Donna Van

---

[8]   Kenneth Van Treese testified the threshold number for the Tulsa motel was $14,000. (Tr. X 231) Thus, analysis of Def. Ex. 71A shows that the Van Treeses hoped to make at least $168,000 (14,000 x 12) from the Tulsa motel each year. For 1996, Tulsa exceeded that goal by $938.38. In contrast, the Oklahoma City motel exceeded its goal of $216,000 (18,000 x 12) by $58,956.91.

[9]   According to D-Anna Wood, when Justin Sneed heard Mr. Van Treese was coming to remodel the rooms, he expressed a fear that Glossip, Wood, and Sneed would all be fired. (Tr. V 181) However, there is no evidence Mr. Glossip, or even D-Anna Wood, shared this view. To the contrary, Ms. Wood testified that, in her opinion, Sneed made that statement because *he* was not doing his job and that neither she nor Mr. Glossip were worried about getting fired at that time. (Tr. V 191-92)

Treese testified "quite a few" registration cards had been voided or were missing and Kenneth Van Treese testified that "several" registration cards were out of order or missing. (Tr. IV 76; XI 110, 142) Clearly, if 2,500 registration cards were missing, these witnesses would have testified to that fact. Moreover, Billye Hooper testified:

Q:    Now, is there a problem with missing registration cards?

A:    Not as a rule.

Q:    Would there be a problem if a card was missing?

A:    Well, it would just be out of the ordinary.  I mean, you just – the Best Budget was a family-owned business, not run exactly like you would be running the Holiday Inn or somewhere like that.

(Tr. VII 78-79) While registration cards were certainly important record keeping devices, they were not the end all, be all, most critical document in the Best Budget arsenal as portrayed by the State.

### 4.    Other Allegations That Mr. Glossip Was about to Be Fired.

The evidence shows that Mr. and Mrs. Van Treese were concerned about the management of the motel and that they wanted some explanations from Mr. Glossip. It does *not* show that Barry Van Treese came to Oklahoma City on the evening of January 6, 1997, with the intention of firing him.  In fact, Mrs. Van Treese testified it would have been a great hardship to fire Mr. Glossip at that time. According to Mrs. Van Treese, January through March was the time to repaint, repair, and remodel the rooms at the motel to prepare for the spring and summer season. When Mr. Van Treese left for Oklahoma City on January 6, 1997, he intended to spend significant time at the motel for that purpose. (Tr. V 24-25; 141) The prosecutor then asked if Mr. Van Treese could have acted as an interim manager in January 1997 until he found someone to replace Mr. Glossip. Mrs. Van Treese responded:

Well, it is possible but it would have been a very bad hardship on him trying to get the rooms repaired up to par that needed to be done and also run the desk.  When you're in that office, you know, you have to have someone there when someone comes in.

19

(Tr. V 25) Earlier, Mrs. Van Treese had said the couple made a decision not to fire Mr. Glossip in late 1996 because they were willing to tolerate the problems they had identified so that Mr. Van Treese could spend time with his family. (Tr. V 19) To avoid having to hire additional help to do the remodeling, Mr. Van Treese may well have decided that he could keep Mr. Glossip in line simply by living on site while the repairs were done and, once completed, he may, or may not, have intended to fire him. Such a possibility is no more speculative than the evidence presented against Mr. Glossip at trial.

Witnesses described Barry Van Treese as a gruff, larger than life character, who was sometimes explosive. As Cliff Everhart testified, "[h]e wasn't violent but he would yell and scream and he would threaten." (Tr. XI 168) But, at his core, he was a kind and generous man who was willing to tolerate discrepancies because "he would rather have less money and more recess and time to spend with his family than a few dollars." (Tr. XI 157) It took him three to four hours to get from the Best Budget in Oklahoma City to the Best Budget in Tulsa and, if D-Anna Wood and William Bender are to be believed, something clearly set him off in that time.[10] While in Tulsa, he apparently told Mr. Bender he wanted Bender and his wife to come to Oklahoma City to take over management of the motel there. However, Mr. Bender's testimony indicates that, as often happens, Mr. Van Treese may have begun to calm down on his way back to Oklahoma City. According to Bender, Mr. Van Treese called "from the bypass" and talked to Bender's wife and co-manager. The prosecutor then asked if anything Mr. Van Treese said had changed what *they* thought their plans were going to be. Bender answered no because "we didn't want to be the manager [in Oklahoma City] anyway." (Tr. VIII 83-84) As with so much in this case, only speculation, reinterpretation of events through hindsight, and the

---

[10] Ms. Wood testified that Mr. Van Treese did not appear to be angry when he left the Oklahoma City motel at 7:50 p.m. (Tr. V 141) He was, however, clearly angry when he arrived in Tulsa sometime between 11:00 p.m and midnight. (Tr. VIII 63) However, as shown above, Mr. Bender either misunderstood the reasons Mr. Van Treese was angry, or simply exaggerated the reasons he was given for that anger.

uncorroborated testimony of the actual killer, support the State's assertion that Mr. Glossip either was fired on January 6, 1997, or was about to be fired.

Mrs. Van Treese testified a number of times that, *in retrospect,* Mr. Glossip, the man she believed planned the murder of her husband, should have been fired. (*See, e.g.,* Tr. IV 123-24). But, hindsight cannot be a substitute for evidence. Mr. Glossip may have been a very bad manager who should have been fired. Or, he may have been a very good manager – doing the best he could with a low budget motel – who made a very bad decision not to call the police in the early morning hours on January 7, 1997, and, as a result, has had every decision he ever made and every action he ever took at the Best Budget Inn scrutinized by individuals who believe he murdered Barry Van Treese. We can only speculate as to which scenario is true because *there is no evidence* to answer the question.

**B.      Speculative Testimony Regarding the "Personalities" of Sneed and Glossip.**

In its zeal to present Justin Sneed as a simpleton incapable of deciding to rob Mr. Van Treese on his own, the State solicited testimony from a number of witnesses about the personalities of both Mr. Sneed and Mr. Glossip, usually asking in the end whether it was more likely that Mr. Glossip would follow Sneed or Mr. Sneed would follow Glossip. This is, of course, pure sophistry. Mr. Glossip was the manager of the motel and it was his job to tell his employee, Justin Sneed, what to do on a regular basis. The issue before the jury was not who would more likely follow whom, but whether Sneed acted alone when he murdered Barry Van Treese.

In fact, the prosecutor solicited such testimony even from John Beavers, a longtime resident of the Best Budget. After establishing that Beavers saw Sneed quite often around the property for a week or two weeks and that his interactions were limited to a nod of acknowledgment, the prosecutor asked if Beavers was able to form an opinion about Sneed's personality and intelligence. After some hemming and hawing,

Mr. Beavers stated "[Sneed] didn't have a lot of mental presence. That's -- but, I . . . could be completely wrong. I didn't know him." (Tr. VI 15-16)

At the other end of the spectrum was the testimony of Kayla Pursley. Ms. Pursley had lived at the Best Budget since August 1996 and worked at the Sinclair station across the parking lot from the motel. Although Sneed testified he had only been around the Pursleys "a few times" (Tr. XII 70-71), Ms. Pursley testified as if he was practically a member of her family, portraying him as a childlike teenager who would get down on the floor and play with her seven and nine year old sons as if they were peers. (Tr. IX 17) Sneed thought she might have been thinking about his brother, Wes Taylor, because Wes sometimes hung out with Mike Pursley, Kayla's ex-husband.[11] (Tr. XII 71)

Kayla testified that she often saw Glossip tell Justin what to do, but would have been shocked if she heard Justin tell Mr. Glossip what to do. (Tr. IX 20) When asked what types of things she heard Mr. Glossip tell Sneed to do, she answered, "Rich would tell Justin what rooms to get ready to be cleaned as far as stripping the beds or what he did, doing the laundry, going to the store." *Id.* Glossip would send Sneed on errands "to get cleaning supplies, anything that they may need, laundry soap, things like this for the motel" and sometimes on personal errands to buy cigarettes. *Id.* This is, of course, not surprising since Mr. Glossip was Sneed's boss. When asked if Sneed was dependent upon Mr. Glossip, Ms. Pursley replied, "[y]es, he had no one else at all once his parents had left him there." (Tr. IX 24) Although Sneed was just nineteen, he was himself the father of two children and had not been under the control of his parents for some time. (Tr. XII 40-42) His parents had not "left him there." Rather, Sneed chose to quit his job

---

[11] Mr. Taylor was actually Sneed's step-brother who had come to Oklahoma with him as part of a roofing crew out of Texas. After several months, Taylor's father (Sneed's step-father) came to get him because there were warrants out for Taylor's arrest in Tarrant County, Texas. Sneed chose to stay in Oklahoma City because he did not like his step-father. (Tr. XII 42)

with the roofing crew that had brought him to the Best Budget Inn and to stay on as the maintenance man there.

Similar testimony regarding the personalities of Mr. Glossip and Mr. Sneed was presented through Billye Hooper and Cliff Everhart.[12] (Tr. VII 28-34; XI 185) The State used this testimony to press this fallacious argument to the jury:

> Mr. Glossip is not the kind of man -- and the evidence establishes this -- that's going to follow Justin Sneed, 19 years of age, 8th grade education, when it comes to a homicide.

(Tr. XV 73)

> Another piece of corroboration is this study that you've heard, this conversation you've heard about the comparison of the personalities of these two men, Justin Sneed and Richard Glossip. You've heard from people that knew them and people that spent a lot of time with them that Richard Glossip was the boss and that he gave instructions to Justin Sneed, that Justin Sneed was the kind of guy that needed to be told what to do.

(Tr. XV 94) This seemingly plausible argument was, in fact, completely deceptive and misleading to the jury. It most certainly did not corroborate Mr. Sneed's testimony that he had killed Mr. Van Treese at Glossip's behest.

### C.   Sneed's Purported Lack of Motive to Kill Barry Van Treese.

The State attempted through several witnesses to show that Sneed would not have killed Mr. Van Treese if Mr. Glossip had not told him to do so. For example, after a series of leading questions in which the prosecutor was providing most of the testimony, Kayla Pursley finally said, "I wouldn't have thought any of them would have done that, but obviously, you know, he *must have* really looked up to Rich and he would have probably done anything for him." (Tr. IX 26) Of course, as shown above, Justin Sneed testified he hardly knew Ms. Pursley so it is hard to imagine what basis she had for this "opinion." Moreover, this opinion was derived through an inductive process, *i.e.*, if Sneed was not capable of violence, but we know he confessed to beating a man to

---

[12]   This evidence is nothing more than character evidence which is inadmissible to prove action in conformity therewith on a particular occasion. Trial counsel's failure to object to the evidence on this basis is discussed more thoroughly in Proposition V.

death with a baseball bat, he *must have* been told to do it by someone he looked up to. That is conjecture, not evidence.

Similarly, the State solicited testimony from Billye Hooper that she did not think Sneed would have done anything that would have gotten Glossip in trouble and killing the boss probably would have caused problems for Glossip.[13]  (Tr. VII 28-29)  After numerous attempts to formulate a proper question to determine whether it would "make sense to [Hooper] that Richard Glossip was involved," Ms. Hooper finally answered:

> In my opinion, Justin would not have murdered Barry Van Treese, I don't believe because, for one, he didn't know the man hardly at all. He probably had no -- very few comments even made together and I wouldn't seen, in my opinion, why he would have a reason to do such a violent act to someone that he hardly knew.

(Tr. VII 34)  Sadly, people kill individuals they hardly know every day. The fact that Ms. Hooper could not believe Sneed would kill someone he did not know very well does not show that Mr. Glossip told him to do it.

Even more troubling was the prosecutors' duplicitous argument that the only person who had a motive to kill Mr. Van Treese was Glossip because Justin Sneed would never have killed Barry Van Treese for money alone.

> What reason above and beyond the reasons of Richard Glossip did Justin Sneed have to kill Barry Van Treese? Did he do it for $10,000? Was that his only reason?

(Tr. XV 68)

> You know, why would Sneed do this by himself? I mean, why? He's got an okay life. The only possible reason that they can even suggest to you that he would even do it by himself is because, well, you know, he's a druggy.

---

[13]  For all the testimony that Mr. Sneed would never have done anything to get Mr. Glossip in trouble, the videotape of his interview with detectives on January 14, 1997, shows that after the small talk was done, the detectives spent about eight minutes telling Sneed they knew he did not do this alone, that Mr. Glossip had been arrested, and that Glossip was trying to make Sneed the scapegoat. The detectives then asked whose idea it was and, having been telegraphed the answer, Sneed began his "Rich told me to do it" confession. (See Rule 3.11(B) Application Ex. 1A & 2)  Clearly, Sneed had no problem whatsoever getting Richard Glossip "in trouble" by accusing him of masterminding the murder so that Sneed could save his own skin.

> He needed some drug money. Why? He was getting it. He was bumming
> it off of people.

(Tr. XV 151)

The evidence presented by the State showed that after Sneed quit his roofing job he quickly spent all the money he had made — approximately $500 per week — on methamphetamine and marijuana. At the time of the murder, he had *no* income, *no* money saved, ate only when someone invited him to dinner and, in essence, depended on the kindness of strangers to provide the drugs he wanted. (*See, e.g.,* Tr. XII 47, 64-72) To say that Sneed had an okay life and did not need money is ridiculous.

Perhaps more importantly, at the same time the State made these arguments, it had also alleged in the Bill of Particulars that Mr. Glossip should be put to death pursuant to the "murder for remuneration" aggravator based, in large part, on Sneed's testimony that he was offered anywhere from $3,500 to $10,000 to commit the murder. (OR 1044-51; Tr. XII 80) It is the height of hypocrisy for the State to argue on the one hand that Mr. Sneed would not have committed murder for the money and on the other that Mr. Glossip should be executed because he paid Sneed to commit the crime. (*See* Proposition IV)

**D.     Mr. Glossip's Purported Motive to Kill Barry Van Treese.**

In Subproposition A, above, Mr. Glossip discussed the evidence the State presented in an attempt to show that he was about to be fired by the Van Treeses and that he knew it. Paradoxically, the State also presented evidence and argument that Mr. Glossip's plan was to kill Barry Van Treese and then talk Donna Van Treese, the woman supposedly intent on firing him, into letting him take over the motels and hire Justin Sneed to manage one of the them.

> He told me at one point that with Mr. Van Treese out of the way that he
> would be able not only [to] manage the motel on Council but also another
> one they had, I think it was located in Tulsa, and be able to manage both
> of those and, you know, pretty much have, I guess, control of them is the
> way, you know, I got the idea anyway.

(Tr. XII 89) Regarding Mrs. Van Treese, Sneed testified:

> He said that he knew her real good when he was talking about operating both motels and that, you know, he thinks he could, you know talk her into letting him, you know, control both of them and everything like that once Barry was out of the way.

(Tr. XII 90) (*See also* Tr. XV 157)  As with so many of the State's theories in this case, this argument was directly contradictory to the assertion Mr. Glossip knew he was going to be fired.

### E.   Forensic Evidence Collected at the Scene.

Technical Investigators from the Oklahoma City Police Department collected various items of forensic evidence from both room 102 and Barry Van Treese's car. Analysis of that evidence showed that every blood sample taken from room 102, from Barry Van Treese's car, and/or from Justin Sneed's clothes belonged to Mr. Van Treese. (Tr. XI 104) Fingerprints were found on the broken glass in room 102 (Tr. XI 190-91), the Plexiglas used to repair the broken window (Tr. XI 195-97), a light switch in room 102 (Tr. XI 198), and the doorknob to the room (Tr. XI 198).  In all, eleven fingerprints were identified and all of them belonged to Justin Sneed.  (Tr. XI 203, 206)  None of the fingerprints from the crime scene matched either Richard Glossip or Barry Van Treese. (Tr. XI 206)  In short, not one piece of forensic evidence collected in this case connected Mr. Glossip to the murder of Mr. Van Treese.  Incredibly, the State argued this *lack* of forensic evidence implicated him in the murder.  (*See*, Proposition IV)

### F.   Mr. Glossip's Actions from January 7-9, 1997.

The State argued that Mr. Glossip's actions and inconsistent statements following the murder corroborated Justin Sneed's story and "connected him to the commission of the homicide of Barry Van Treese." (Tr. XV 91; *See also*, Tr. XV 94, 96, 97) In fact, all of those actions stemmed from one terrible decision not to call the police and report Justin Sneed when Sneed confessed to the murder of Mr. Van Treese early in the morning on January 7, 1997. Once that fateful decision was made, any action Mr. Glossip could have taken — whether it was calling police when he got up around 8:30

a.m. as he should have done or trying to pretend the whole terrible event had never occurred as he did do — would undoubtedly have resulted in suspicion being turned his way. However misguided Mr. Glossip's actions were, they did not tend to connect him to the murder of Mr. Van Treese but, rather, to its cover up.[14]

In closing, the State argued the external circumstances of the homicide included the fact Mr. Glossip "didn't call the ambulance, he didn't call the police" but, instead "stood by and let Donna Van Treese agonize and worry over what had happened to Barry." (Tr. XV 78-79) The State's argument that Mr. Glossip should have called an ambulance when Sneed first told him what happened ignores the fact that Sneed specifically testified that he sat in a chair and watched Barry Van Treese take his last breath and then went and cleaned up *before* he ever went to speak to Mr. Glossip. (Tr. XII 117) And, while the agony that the Van Treese family endured is without question poignant, it does not in any way prove Mr. Glossip participated in or had knowledge of the murder *before* it was committed. Rather, it is a consequence of his deplorable initial decision not to call the police.[15]

It does not matter how many stories Mr. Glossip told in an attempt to cover up the fact Justin Sneed had committed a murder and he had failed to report it. While certainly an individual's actions after a crime may, in certain circumstances, be used to infer what happened before it was committed, the State must present something more than the uncorroborated testimony of the actual killer to show participation in the crime as a principal. When the State rhetorically asks why Mr. Glossip would cover up

---

[14] It should be remembered that Mr. Glossip had only been asleep for a few hours when he was awakened by Justin Sneed. Sneed was his friend and someone he had taken care of and fed for several months. He likely wanted to take some time to think before he decided what to do with the horrible admission made by Sneed. Unfortunately, the die was cast once he had let several hours pass.

[15] Interestingly, neither the prosecution nor the defense argued that Justin Sneed should have called the authorities when Mr. Glossip supposedly began to solicit him to murder Mr. Van Treese several months prior to the commission of the crime.

this crime if he had not participated in it, the response is that the State is supposed to answer that question with *evidence*, not speculation and innuendo. The State failed to do so in this case.

### G.    Uncorroborated Evidence Provided Only by Justin Sneed.

Much of the State's closing argument was devoted to matters with no evidentiary support other than the word of Justin Sneed. Examples of such argument include:

> [T]he evidence in this case is that it had been discussed for months and was certainly preplanned earlier that night.

(Tr. XV 66)

> There were other decisions made in this case and they weren't incidental details like should I park the car facing in or out. Should I be careful not to break the window? Should I bring a better knife? Not things like that, but big decisions like will Barry Van Treese live or die January the 7th, 1997. Decisions such as how much money does Barry Van Treese have and how can I get it into my pocket, and how will it be divided up and among whom.
> \* \* \* \* \*
>
> Other important decisions like how and when to dispose of the body of Barry Van Treese. These life or death decisions, not the bad parking, not the clumsy foolishness of breaking the window. These -- not the idiocy with the blunt knife, the knife without a point on the blade. These important life and death decisions, the big decisions the evidence shows you were all made by Richard Glossip.

(Tr. XV 74-75)

In truth, the State did not present one whit of evidence, other than the testimony of Justin Sneed to show that these "big decisions" were made by Richard Glossip. Instead, the State repeatedly tried to bluff the jury into believing Mr. Sneed's statements were corroborated:

> [T]he physical evidence . . . doesn't put Richard Glossip killing Barry Van Treese, you've known that since jury selection. But when [Sneed] told you, "I hung the shower curtain after Richard Glossip told me to cover the broken window, I picked up the glass on the sidewalk after Richard Glossip told me to, I went out and bought plexiglass the next morning after Richard Glossip told me to and after he gave me the keys to his car, I moved the car over to the credit union," Richard Glossip's idea. These are things that can be corroborated.

(Tr. XV 88) The State was, in fact, able to show that Justin Sneed hung a shower curtain over the window, and picked up the glass, and moved the car. But, none of that evidence *connects* Mr. Glossip to the murder. Simply putting the words "Richard Glossip told me to" before every action Justin Sneed took is not corroboration.

Similarly, in explaining the concept of a "principal" to a crime, the prosecutor argued:

> But more to the point of the facts of this case, if you say, "Hey, listen. We need to take Barry out. If we do that, I can take over at his level of supervision, you can start managing this motel, we'll both take a step up and we'll be in fat city from there on out. I think I can talk his wife into doing that. Here is how we're going to do it." If you do this, I'll do that, I'll pay you this, that's more than just knowing that somebody else is going to do something. That's encouragement, that's aid, that's promotion, that's counsel.

(Tr. XV 76) Mr. Glossip would simply add to the list "that's uncorroborated" since not one piece of evidence supports those contentions other than Justin Sneed's testimony. Nor is there even the most tangential evidence to support Sneed's testimony that Mr. Glossip asked him five or six times to kill Mr. Van Treese or his description of one such incident in the "broiler" room of the motel with a hammer. (Tr. XII 80, XV 155)

Even the $10,000 figure Sneed testified he was offered to kill Mr. Van Treese appeared for the first time in this 2004 trial. Sneed's explanation for the increase from the $7,000 he told detectives about on January 14, 1997, and testified to on June, 8, 1998, was that the offer "just kept climbing every time we started talking about it." (Tr. XII 167) But this would only make sense if the offer was increasing *prior to the murder.* An increase in the amount to be paid that occurs between the 1998 trial and the 2004 trial is simply a lie. "Richard Glossip told me to" was nothing more than a mantra uttered by Justin Sneed over and over as a means of insuring that he would not get the death penalty for his terrible crime. There is no evidence of any sort to corroborate that self-serving statement.

29

H.    **Other Factors.**

The State argued the fact that Mr. Glossip told detectives he was home in bed with D-Anna Wood at the time of the murder was evidence of his guilt because no one knew the time of death at the time of the interview. "Then ladies and gentlemen, my question to you is: How does he know when to set his alibi at 3:15 on January 8th?" (Tr. XV 160-61) According to the State, the only answer to this question is that he knew about the murder when it was happening. (Tr. XV 161) However, this ignores the State's own evidence. D-Anna Wood testified she and Mr. Glossip closed the office and went to bed at around 2:30 a.m., that she had not seen Mr. Van Treese return prior to that time, and that she and Mr. Glossip remained in the apartment until they were awakened by Justin Sneed knocking on the wall a few hours later. (Tr. V83) Mr. Glossip admitted that when he answered that knock, Sneed confessed that he had just killed Mr. Van Treese. (State's Ex. 2) Thus, the only time the murder could have been committed was after 2:30 a.m. and before Justin Sneed confessed to having committed it, and Richard Glossip was in bed with D-Anna for all of that time. There is no mystery to how Mr. Glossip knew when to give an alibi.

So much of the State's evidence not only fails to prove guilt, but is actually inconsistent with guilt. If Richard Glossip had planned to murder Barry Van Treese in room 102 on the night of January 6-7, 1997, why would he check John Prittie into room 103 next door? (Tr. IV 150) Why would he call Billye Hooper at home and ask her to pay the cable bill to "get it turned back on before Barry came back" if he knew the boss was going to be dead in the morning? (Tr. VII 59) Why would he send Officer Brown over to the Sinclair station to talk to Kayla Pursley because she "might have some information about the case" when he knew the information she had was about the broken window in room 102? (Tr. X 12-13) Why would Richard Glossip sell all his possessions, gather up all the money he had saved by taking cash advances to trick D-Anna into thinking his paycheck was smaller, and then go to see a lawyer on January 9, 1997, rather than skip

town? (Tr. XV 16-18; State's Ex. 1) There is no answer to these questions because Mr. Glossip's participation in this murder began, if at all, after it was committed.

## ARGUMENT AND AUTHORITY

A conviction in a case such as this, built solely on the uncorroborated statements of an accomplice, simply cannot stand. By statute, accomplice testimony must be supported by other competent evidence which tends to lend credibility to what is otherwise inherently suspect:

> A conviction cannot be had upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with *the commission of the offense*, and the corroboration is not sufficient if it merely show the commission of the offense or the circumstances thereof.

22 O.S. § 742 (2001) (emphasis added); *see also McCarty v. State*, 977 P.2d 1131-32 (Okl.Cr. 1998). The purpose of this statute is "[t]o prevent one guilty of crime from implicating another falsely for hope of clemency, motives of revenge or any other reason[.]" *Nunley v. State*, 601 P.2d 459, 463 (Okl.Cr. 1979) Justin Sneed is certainly guilty of first degree murder and he avoided an almost certain death penalty in exchange for his testimony against Mr. Glossip. The issue before this Court is whether the State presented evidence that corroborates Sneed's story, and the clear answer is that no such evidence exists.

To be legally sufficient, this Court has held that "the corroborative evidence must *of itself*, and without the aid of the testimony of the accomplice, tend in some degree to connect the defendant with the commission of the offense." *Rider v. State*, 494 P.2d 347, 350 Okl.Cr.1972) (emphasis added). In addition, "independent evidence merely consistent with the main story is not sufficient to corroborate if it requires any part of the accomplice's testimony to make it tend to connect the defendant with the crime." *Id.* Moreover, "[t]he corroborating evidence may be sufficient, although by itself slight, but it is not sufficient if it *merely tends to raise a suspicion of guilt*." *Id.* (citing *Kirk v. State*, 10 Okl.Cr. 281, 135 P. 1156 (1913)) (emphasis added).

It is not enough that an accomplice makes statements that can be verified by other evidence; the corroborative evidence must go to a defendant's commission of the crime itself. As this Court has stated:

> Corroborating evidence must tend to connect the defendant with the commission of the offense absent the accomplice's testimony. *Jones v. State*, 555 P.2d 1061 (Okl.Cr.1976). Even slight evidence may be sufficient, but it must do more than raise a suspicion of guilt. *Kirk v. State*, 10 Okl.Cr. 281, 135 P. 1156 (1913). It is also insufficient if it does no more than connect the defendant with the perpetrators but not the crime. *Frye v. State*, 606 P.2d 599 (Okl.Cr.1980).

*L. E. Y. v. State*, 639 P.2d 1253, 1255 (Okl.Cr. 1982).

The evidence in this case does in fact connect Mr. Glossip to Justin Sneed, the perpetrator of the crime. It may be characterized as showing that Mr. Glossip had knowledge of the crime *after the fact*. It may even raise a *suspicion* that he had something to gain from Barry Van Treese's death. However, absolutely nothing, other than the self-serving statements of Justin Sneed directly connects Glossip to the crime of murder as an aider and abettor. That is simply not enough to warrant affirmance of Mr. Glossip's conviction and attendant sentence of death.

In *Cummings v. State*, 968 P.2d 821 (Okl.Cr. 1998), the defendant was convicted of murdering his sister. Two witnesses, one of whom was the actual killer, testified that the murder was committed because Cummings told them to do it. The evidence showed Cummings had reported his sister missing three days after she was killed and that he admitted helping dispose of her body. Based on this evidence this Court found:

> While this evidence clearly implicates Appellant as an accessory after the fact, it does not support a finding that he acted as a principal, either by aiding and abetting his sister's murder. As Appellant contends, outside the testimony of Juanita and Sherry, the evidence only supports a finding that Appellant assisted his wives in lying to the police and in covering up the crime. It does not independently connect him to the actual commission of Judy Mayo's murder.

968 P.2d at 830. The same is true in Richard Glossip's case. The most that can be said based on the State's evidence in this case is that he assisted in delaying the discovery of the murder, not in its commission.[16]

In *Bowie v. State*, 816 P.2d 1143 (Okl.Cr. 1991), this Court articulated what type of evidence would be deemed sufficient to corroborate accomplice testimony in a "murder for hire" scenario such as that alleged in the instant case:

> We find that there was sufficient evidence corroborating the testimony of both Ervin and Britt to convict appellant; several people, other than Ervin and Britt, testified that appellant offered five thousand dollars for the death of Traylor. Gary Fisher testified that just ten days before the murder appellant said he found someone to kill Traylor, and after Traylor was dead, appellant talked about how good it felt to order someone killed. Therefore, reversal is not warranted and this assignment of error must fail.

816 P.2d at 1143. Such corroborative evidence is sorely lacking in the present case. No one other than Sneed – the man who actually swung the baseball that killed Barry Van Treese – provided testimony that Mr. Glossip engineered a plot to kill his employer.

Richard Glossip's conviction and death sentence, based solely on Sneed's uncorroborated testimony, is repugnant to fundamental notions of fairness and due process. No rational trier of fact could have found beyond a reasonable doubt that Mr. Glossip was a principal in the murder of Barry Van Treese. For these reasons, the Court must set aside Mr. Glossip's conviction and sentence.

---

[16] *See also Hamilton v. State*, 10 P.2d 734, 735-36,(Okl.Cr. 1932) (defendant convicted of forgery via testimony of two accomplices; corroboration consisted of defendant's access to place where checks were stolen, his acquaintance with the accomplices, and act of transporting one accomplice after he negotiated the forged instrument; Court stated that" [t]his testimony creates a *strong suspicion*, because it shows opportunity for defendant to have aided or abetted or to have profited from the proceeds of the crime. [However,][t]he circumstances proven are too remote. This testimony is insufficient corroboration under the requirement of the statute and many decisions of this court")(numerous citations omitted).

## PROPOSITION II

**The Trial Court Committed Reversible Error by Admitting Irrelevant and Highly Prejudicial Evidence into the Record in Violation of Mr. Glossip's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Corresponding Provisions of the Oklahoma Constitution.**

The State presented extensive irrelevant and unfairly prejudicial testimony that had no bearing whatsoever on the issues at Mr. Glossip's trial. The Evidence Code forbids the admission of evidence having no probative value in resolving factual issues. 12 O.S. §§ 2401-2402 (2001). Even when evidence is deemed logically relevant, the probative value of that evidence must be weighed against the potential for undue prejudice or confusion of the issues. 12 O.S. § 2403 (2001). The evidence improperly admitted at Mr. Glossip's trial was also misleading and confusing to the jury. Indeed, the trial was inundated with so much irrelevant evidence that reversal of Mr. Glossip's conviction is required.

**A.     Evidence Intended to Evoke Sympathy for the Victim and his Family.**

The State presented evidence in the guilt stage of Mr. Glossip's trial that had no purpose other than to evoke sympathy for the victim and his family. While this type of evidence may, subject to certain safeguards, be admissible in the punishment phase of a capital trial, it had little if anything to do with the issue of Mr. Glossip's guilt or innocence.

The State's first witness was the victim's wife, Donna Van Treese. Mrs. Van Treese's testimony was filled with poignant details intended to pull at the jury's heartstrings. For example, when asked to give a general description of Barry Van Treese, she testified:

> He had quit smoking six years prior to that, had gained a little bit of weight. Of course, he was 54 years old, had continued balding a little on the top and had gray hair and at his daughter's request he grew a full, white beard. And, in fact, he had shaved it off once and she cried and said, Daddy, daddy, please grow it back.

(Tr. IV 33) The State then introduced, over objection, a portrait type photograph of Mr. Van Treese taken just a few months before his death.[17] (*Id.* at 35; State's Ex. 79)

While the photograph was being published to the jury (Tr. IV 36), Mrs. Van Treese began to describe a series of tragic events that had taken place in the last half of 1996. She told the jury of how her mother had passed away in June, just a couple of days after her 55th wedding anniversary. Because this was traumatic to everyone, Mr. Van Treese rented a motor home and took the family on a long vacation through Arizona, California, British Columbia, Washington, Yellowstone Park and Mt. Rushmore. After they had been gone approximately sixteen days, Mr. Van Treese felt "an urgent need" to get back to Oklahoma and so the family drove "straight through, arriving back in Oklahoma City at the Oklahoma City motel . . . [at] 2:00 a.m. [the] morning of July 12th." (Tr. IV 36-37) Upon arrival, the couple learned that Barry Van Treese's mother was scheduled for bypass surgery at 6:00 a.m. that very morning. After showering, they left the motel and went straight to the hospital, arriving in time to visit with Barry's mother for a short period of time before she went into surgery. *Id.* Mrs. Van Treese testified:

> During that surgery she did not survive. They tried several attempts to take her off the heart and lung machine and she passed away on that day. Her heart was not strong enough to regain. So within a 25-day period I had lost my mother and Barry had lost his mother.

(Tr. IV 37-38) In the unlikely event the premonition aspect of this tragedy was lost on the jury, the prosecutor solicited testimony from Mrs. Van Treese that cell phones were not available in 1996 and that they had not received any pages on the pager they had been told was nationwide because "they were still developing the technology then for that." (Tr. IV 38)

Mrs. Van Treese then told the jury:

> [T]he entire family was devastated, both sides. I was trying to take care of my father. He had had triple bypass surgery done so I was concerned

---

[17] The inappropriateness of admission of this photograph in the first stage of trial is discussed in Proposition X.

about his health. My brother also had had a stroke and had to live with them. And he of course was devastated.

Barry's family, Barry's father lived in Lawton and he was very devastated by the loss, and it's understandable if you have been married to someone for 55 years, and so Barry was spending a lot of time with his father. He wanted to make sure that he was coping with his loss.

\* \* \* \* \*

We also had five children at home that it was devastating for them also to have lost both of their grandmothers within such a short period of time.

\* \* \* \* \*

[Barry] was focusing on just having everyone – helping everyone cope, and being now the strong son, the strong son-in-law, the strong father figure for everyone that they could depend on him.

(Tr. IV 39-40) The ostensible purpose of this testimony was to explain why the Van Treeses had not had as much hands on involvement with their motels during the last half of 1996 and some brief explanation would have been appropriate. However, the heart wrenching and detailed descriptions provided by Mrs. Van Treese were not.

In addition, the State took every opportunity to present evidence regarding Barry Van Treese's personality and general demeanor. Although some evidence of this sort might be proper, the sheer volume of such evidence presented at Mr. Glossip's trial tended to overwhelm the evidence regarding the crime itself. For example, when asked to describe her husband, Mrs. Van Treese testified:

He was basically your Santa Claus. He was a very jolly, happy person. When we took trips, you know, he would make up silly songs with the kids and he was, you know, in some phases, you know, he was – had the demeanor and the actions of a child. He wanted to have fun with all of us.

(Tr. IV 61) Similarly, William Bender, the manager of the Tulsa Best Budget Inn, described Mr. Van Treese as "the most jovial person I've ever met in my life. He was a very happy, go lucky guy. He was like Santa Claus." Cliff Everhart, the part-time security guard for the motel, testified:

Barry was a kind, loving, generous person. He thought more of his family than anything in the world, but if somebody was homeless on the street, he'd pick them up and bring them to the motel and feed them, buy them clothes, give them a room, and even give them money to pick up trash occasionally. He was one of the nicest people I'd ever met.

(Tr. XI 168)

Other testimony solicited by the prosecutor to evoke sympathy included the fact that although Mrs. Van Treese had remarried, she still wore the victim's wedding ring on a chain around her neck. After showing the ring to the jury, she explained that it had been damaged and "flattened out" when she received it from the funeral home after his death. (Tr. IV 105-06) At least four witnesses testified that Mr. Van Treese's car had specialty license plates on the front and back of his car because he was an amateur radio operator and the tag represented his call sign. (Tr. IV 86-87; VIII 141, 173; X 151; State's Ex. 26, 62) According to Kenneth Van Treese:

> Barry was – he's just a great guy.  You know, he had a real good sense of humor.  He was a ham operator and from the time he was 13 or 14 years old he entertained himself just by striking up conversations with people all around the world and just, you know, shooting the bull with them.  And he had a lot of fun messing around with his ham radio operation and, of course, his kids.

(Tr. X 218)

When Donna Van Treese was first informed that her husband had not been seen all day and his car had been found unlocked and parked "kind of cater-cornered" at the Weokie Credit Union she was understandably concerned.  However, it was completely unnecessary to inform the jury that Mr. Van Treese had been diagnosed with diabetes several months before and that they had gone to classes to learn about the disease.  She told the jury she was worried about a medical problem and was on "high alert when things like this happen, as you would if a child was hurt, you go on high alert status." (Tr. IV 98) Neither was it necessary for the jury to know that the white t-shirt the victim was wearing when he left Lawton "had the face of Jesus on it with a crown on it that said, 'He wore the cross for us.'" (Tr. IV 85; XI 36)

The testimony described above was intended to inflame the passions of the jury and distract them from the important task of determining whether Mr. Glossip had any involvement in this murder other than trying, after the fact, to protect Justin Sneed, the

actual killer. This evidence was irrelevant to the case, misleading to the jury, extremely prejudicial and, therefore, legally inadmissible.[18]

## B.   Evidence Intended to Evoke Sympathy for the Perpetrator of the Murder.

The State took every opportunity to depict Justin Sneed as a pathetic and naive teenager who had been led astray by the older Mr. Glossip as opposed to the cold-blooded killer who had beaten Barry Van Treese to death. For example, as shown in Proposition I, Kayla Pursley portrayed Sneed as a peer to her young sons even though Sneed said he hardly knew her and her family. Ms. Pursley may just have been confused regarding whether it was Sneed or his brother who had played like a child with her sons. Or, it may be that over time her recollections of Justin Sneed had been unintentionally exaggerated and embellished as often happens when a witness has had a brush with an individual who later becomes notorious. In any event, this testimony was completely irrelevant to the issues at trial and unfairly prejudicial to Mr. Glossip.

The State also presented testimony from Justin Sneed that had no purpose other than to lessen his moral culpability for the murder. The prosecutor began her questioning of Sneed by asking him to "tell us a little bit about your family background." (Tr. XII 38) She then led him through a series of questions to describe his upbringing in Cisco, Texas, where he had lived with his mother and stepfather. He did not know his biological father even existed until he looked him up when he was thirteen years old. That contact lasted only a couple of months and then his father disappeared again from his life. Sneed had, however, reestablished contact after his incarceration and had been writing to his father for about a year when he testified in 2004. (Tr. XII 39)

Mr. Sneed's mother had divorced his step-father when he was twelve. Although Sneed could probably have gone back to live with his mother in January 1997, he had

---

[18]   The fact that trial counsel failed to object to this clearly improper evidence is addressed in Proposition V.

"left there trying to make my life better for me and my two daughters and I really didn't want to go back at that point." (Tr. XII 40) According to Mr. Sneed:

> I kind of got married when I was 16 and had two kids and then she took off for like six or seven months and I didn't know where she was at, so I left my kids with my mother and came to Oklahoma on a roofing crew to where I could get a stable job, you know, and work and everything like that and make a life for me and them.

(Tr. XII 40)

Mr. Sneed, his step-brother, Wes Taylor, and the roofing crew they were working with moved into the Best Budget Inn in July 1996. Unfortunately, Mr. Sneed soon "lost sight of what my goal and my purpose was" and quit the roofing crew when he "got entangled with a little bit of drugs and stuff like that." (Tr. XII 47) Mr. Glossip allowed Sneed and his brother to stay on and work at the motel in exchange for their room. However, there was a warrant out for Wes's arrest and his father, Justin's step-father, tracked Wes down in Oklahoma and "conned" him into going back to Texas and turning himself in. (Tr. XII 42-47)

Sneed was eighteen when he came to Oklahoma. He had dropped out of school in the eighth grade. At first, his mother attempted to home school him, but "that really didn't work out" and she did not pressure him. (Tr. XII 47-48) After he got his wife pregnant, he was more worried about getting a job. However, he did obtain a GED after he was sent to prison. He also had completed a computer Vo-Tech course while incarcerated. Sneed described himself as having more self-esteem and self-confidence than he had before he went to prison. (Tr. XII 48-49)

Prior to his arrest, Mr. Sneed had regularly smoked marijuana and snorted crank, the street name for methamphetamine. When he was working for the roofing crew, most of the money he made was used to buy drugs. After he quit, he had gotten to know enough people that he got his drugs simply by "mingling with them and everything." (Tr. XII 65) Mr. Sneed was using the drugs about twice a week depending on whether he ran into someone who was willing to share. After he was arrested, he asked for Sudafed

because he had a cold. Shortly thereafter, he was given Lithium even though he did not see a psychiatrist. (Tr. XII 64-65) At the time of Mr. Glossip's trial, Sneed was serving a sentence of life without the possibility of parole. (Tr. XII 174)

This is classic mitigation type evidence generally presented by a defendant in the second stage of a death penalty trial. Its purpose in this case, however, was to "humanize" the confessed killer so that the jury would hold Mr. Glossip to a higher level of responsibility for the murder. This evidence was irrelevant to the issues before the jury and unfairly prejudicial to Mr. Glossip.[19]

C.   **Evidence Regarding Operations and Condition of Best Budget Inn.**

As discussed in Proposition I, the State presented a great deal of evidence regarding the physical condition of the Best Budget Inn on January 9, 1997, and thereafter. Certainly, it was appropriate for *some* evidence regarding the condition of the motel to be presented to the jury. But, Barry Van Treese had been preoccupied with the family matters discussed above only since June 1996, seven months before his death. Thus, testimony about replacing hundreds of sets of linens and buying forty mattresses and overflowing a huge dumpster with broken furniture *after* his death is a commentary on the way in which Mr. Van Treese chose to run his business, not Mr. Glossip's management of the motel. (Tr. XII 26)

Similarly, Kenneth Van Treese's testimony regarding the new bookkeeping and control systems he put in place was nothing more than a critique of his brother's accounting practices and was not in any way relevant to a determination of whether Mr. Glossip was guilty of first degree murder. (Tr. XI 112-15) Moreover, testimony regarding the many items purchased when Kenneth took over the motel had nothing to do with the issues at hand since Richard Glossip had never had the authority to buy more towels and washcloths or to decide the motel needed two sets of sheets for each room so that

---

[19]   Trial counsel's failure to object to this irrelevant evidence is addressed in Proposition V.

one set could be laundered while the other was being used. (Tr. XI 120) Indeed, it appears the Van Treese family did not believe all the measures Kenneth undertook to improve the motel were necessary. After he had operated the motel for two months, "there were people in my family that were starting to second guess the choices that I was making and I basically told them to go to hell and if they wanted to run it, they could." (Tr. XI 121-22)

None of this evidence had any relevance to the case. It did, however, give the *appearance* that Mr. Glossip was somehow responsible for the fact that Barry Van Treese had decided not to equip the Best Budget Inn as if it were the Radisson. This evidence was unfairly prejudicial and should not have been presented to the jury.

**D.   Conclusion.**

The State's case against Mr. Glossip was built almost entirely on speculation, innuendo, and suspicion. Evidence that does not place the defendant near the scene of the crime, nor in any way indicate the defendant's guilt is inadmissible because such evidence does nothing but cover the defendant with an unwarranted veil of suspicion and distract the jury. *Morris v. State*, 603 P.2d 1157, 1159 (Okl. Cr. 1979); *see also Dunagan v. State*, 734 P.2d 291, 294 (Okl. Cr. 1987); *Stanley v. State*, 513 P.2d 1330, 1333 (Okl. Cr. 1973); *Pierce v. State*, 495 P.2d 407, 410 (Okl. Cr. 1972); *Rousek v. State*, 93 Okl. Cr. 366, 228 P. 668, 672 (1951); and *Sturgis v. State*, 2 Okl. Cr. 362, 102 P. 57, 71 (1909). Moreover, the improperly admitted evidence described above and in Proposition I carried the strong potential of misleading and confusing the jury.

The vast majority of the evidence presented throughout Mr. Glossip's trial had little if anything to do with the State's case and was admitted for its prejudicial value only. The likelihood of resulting prejudice so infected the trial with unfairness as to make the resulting convictions a denial of due process under the state and federal Constitutions. *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Moreover, because the State incorporated all first stage evidence into the punishment

phase, including that improperly admitted, the sentence of death cannot be relied upon as the product of justice and a fair adversarial process. *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). Accordingly, Mr. Glossip requests that this Court reverse his conviction and/or vacate his sentence of death.

## PROPOSITION III

**THE TRIAL COURT ERRED IN PERMITTING THE STATE TO DISPLAY SELECTIVE PORTIONS OF CERTAIN WITNESSES' TESTIMONY THROUGHOUT THE TRIAL BECAUSE IT OVEREMPHASIZED THAT TESTIMONY, CONSTITUTED A CONTINUOUS CLOSING ARGUMENT, AND VIOLATED THE RULE OF SEQUESTRATION OF WITNESSES.**

While examining Donna Van Treese the first day testimony began in the case, the prosecutor got out an easel and placed a pad of poster paper on it. She then began summarizing the portions of Ms. Van Treese's testimony that she believed were important and writing it on the poster paper.[20] (Tr. IV 99-101) The next day, on redirect examination of Mrs. Van Treese, the prosecutor again began writing selected portions of the testimony onto the poster paper. (*See, e.g.,* Tr. V 19-22; 23-24) The prosecutor continued the practice of writing certain portions of the testimony on the posters when examining D-Anna Wood, Mr. Glossip's girlfriend and co-manager of the motel. (Tr. V 97-105; 182)

At the end of the day, after the jury was dismissed, and when it became apparent that the prosecutor intended to keep the demonstrative aids prepared during the witnesses' testimony displayed for the jury throughout the trial, defense counsel objected, arguing:

> We want to make an objection for the record to the posting of demonstrative exhibits that are basically an accumulation of notes written by the prosecutors to remain throughout the course of the variety of witnesses.

---

[20] Trial counsel believes the paper was approximately 2' x 3'. Unfortunately, there is no accurate record of the size of the paper or exactly what was written on each sheet because the trial court refused to allow the posters to be marked as court's exhibits or even to allow defense counsel to photograph the posters so that they could be preserved as part of the record for this Court's review. (Tr. XV 34-37)

> I understand the need sometimes for a demonstrative exhibit with a particular witness and then you bringing a demonstrative exhibit out with others, but basically all this does is emphasize the testimony of -- it's only part of the testimony. And as a result of that we do object.

(Tr. V 195-96) The prosecutor responded that she had a right to make a demonstrative exhibit and that she did not intend to introduce the exhibits into evidence. Referring to the information written on the posters as a "running, continuing tally of the various spins that this Defendant has put on his version of the facts," the prosecutor argued it was Mr. Glossip's fault there were so many posters because "there are so many witnesses and people that he talked to."[21] (Tr. V 196) The trial court agreed, and overruled the defense objection. *Id.*

Having been given the seal of approval by the trial court, the prosecutor began to make posters whenever there was a bit of testimony she thought would be important for the jury to remember. (*See, e.g.,* Tr. VII 59-60; VIII 88-90, 116-17; IX 46-48, 56, 121, 206-07, 212-19, 234-36; XI 183-84) These posters were then taped up to various places around the courtroom and remained in full view of the jury *and all subsequent witnesses* throughout the trial. (Tr. XV 34; XI 127) According to trial counsel, at the end of the trial, there were at least twelve of the State's posters plastered up across the front of the prosecutor's table, the trial bench, and any other available space in the courtroom.

The trial court committed reversible error in permitting the State to display these demonstrative aids throughout the trial for several reasons. First, as noted by trial counsel, the posters placed undue emphasis on certain aspects of the testimony — the parts the prosecutor felt best summarized their case against Mr. Glossip. Moreover, because the posters remained on display from witness to witness from the first day of testimony to the last, the State was, in essence, allowed to make its closing argument

---

[21] Of course, not all the information recorded on the posters related to statements made by Mr. Glossip, but that is beside the point. (Tr. V 19-22)

throughout the trial. Finally, because the posters were visible to the witnesses as well as the jury, their use violated the rule of sequestration of witnesses.

## A.   Undue Emphasis on Selected Testimony.

During voir dire, in answer to a juror's question regarding whether jurors would be allowed to take notes during the trial, the trial judge told the jury why she did not permit note taking during the trial:

> [N]ote taking is a skill. If you're in a job or a student where you take notes every day, you get pretty proficient and you have a pretty good skill level at it. If it's been years since you've taken notes, you're pretty lousy at it.
>
> Have you ever been writing something down and you hear something and you have to say, Wait a minute, wait a minute, repeat that?  Well, we can't do that during a trial.

(Tr. II 179) Despite this recognition that note taking can sometimes be a problem in a criminal trial, the court's ruling on the State's use of demonstrative aids simply allowed the prosecutor to take the notes for the jury.

Moreover, as the trial court acknowledged, even a consummate note taker needs to have certain matters repeated again and again in order to get it right. In almost every instance referenced above in which the prosecutor summarized a witness's testimony on one of her posters, the witness first testified, then restated and clarified as the prosecutor wrote it on the poster and, finally, the prosecutor reread what had been written to make sure it was correct. (*See, e.g.,* Tr. IX 45-48) Thus, the jurors heard the testimony over and over again as it was being visually recorded for them and then were allowed to refer back to it whenever they wanted throughout the trial.

Counsel has been unable to find any case directly addressing this issue and believes this may be a case of first impression with this Court. Certainly, the Court has dealt with instances in which a particular witness has prepared a summary of testimony that was used by the jury while the witness was testifying or the prosecutor has prepared such a summary either before or during argument to the jury. *See, e.g., Moore v. State,* 788 P.2d 387, 398 (Okl.Cr. 1990) (written summary of expert's analysis of fiber evidence

44

distributed to jury during testimony); *Banks v. State*, 43 P.3d 390, 399 (Okl.Cr. 2002)(summary of defendant's past crimes with heading "Trail of Terror" displayed during closing argument). However, in these cases, the demonstrative exhibit was used only for a short period of time so the issue of undue emphasis on selected portions of the testimony was avoided.

Counsel submits the closest analogy to the circumstances of this case is the determination of whether to allow the jury to have a transcript of selected testimony during deliberations.   While Mr. Glossip's jury was not allowed to take the demonstrative exhibits into the jury room, they nonetheless had limitless review of particular testimony throughout the trial — testimony determined by the prosecutor to be important to the State's case.  This Court has recognized the danger in allowing jurors to review certain testimony during deliberations. In *Givens v. State*, 705 P.2d 1139, 1140-41 (Okl.Cr. 1985), the trial judge refused to allow requested testimony to be re-read to the jury during deliberations "due to the risk that it would be taken out of context with the rest of the evidence." This Court found this to be a valid reason for the refusal and, hence, not an abuse of discretion. *See also Glaze v. State*, 565 P.2d 710, 714 (Okl.Cr. 1977) (refusal to reread part of trial testimony on ground that the testimony out of context could overly stress a particular point not an abuse of judicial discretion); *Lewis v. State*, 528 P.2d 741, 744 (Okl.Cr. 1974) (trial judge's refusal to reread testimony of witnesses found not an abuse of discretion "based on the determination that it would be repetitious and add undue emphasis to the testimony of those two witnesses"). The prosecutor's posters were similarly repetitious, taken out of context, and placed undue emphasis on selected testimony to the exclusion of other competent evidence.

It is one thing to allow a party to make a chart or summary or other demonstrative aid for use while a witness is testifying.  It is quite another "to allow a particular segment of testimony to be advertised, bill-board fashion," after that witness has completed his or her testimony. *Lanning v. Brown*, 377 S.W.2d 590, 594 (Ky. 1964)

Allowing the prosecutor to keep her posters taped up around the courtroom after the witness had completed his or her testimony unduly emphasized certain testimony to the exclusion of other evidence received throughout the trial. The trial court erred in allowing the State to display its posters in the manner in which it did.

**B.    Continuous Closing Argument.**

Demonstrative aids are, without doubt, useful tools in the presentation of evidence at trial. But the posters created by the prosecutor selected and highlighted only certain parts of the evidence presented and had the effect of allowing the State to argue its own interpretation of the evidence throughout the trial. In *Vanlandingham v. Gartman*, 367 S.W.2d 111, 113-14 (Ark. 1963), the Arkansas Supreme Court addressed use of a chart prepared by counsel in a personal injury case to illustrate his argument on the issue of damages, a relatively new concept at the time. The court found no error in use of the chart, but stated:

> Of course it behooves the courts to see that no unfair tactics are used; for instance, although an attorney might use a chart or blackboard to illustrate his argument, it would not be fair to place the illustration where it could be seen by the jury at times when the attorney was not using it in making his argument. *If the jury could see it all day it would be the same as arguing the case all day.*

367 S.W.2d at 114 (emphasis added). In Mr. Glossip's case, the prosecutor employed precisely the unfair tactics warned of in *Vanlandingham* and Mr. Glossip's right to due process and a fair trial was prejudiced as a result.

**C.    Violation of Rule of Sequestration of Witnesses.**

Before the first witness testified in Mr. Glossip's case, the trial court granted his request that the rule of sequestration of witnesses be invoked. (Tr. IV 25-27) Although the trial court's refusal to allow defense counsel to make a record of the content and placement of the posters makes it difficult to illustrate to this Court how pervasive the State's placards were, the testimony of Kenneth Van Treese leaves no doubt they were clearly visible from the witness chair. When Mr. Van Treese was asked about what Mr.

Glossip told him on the evening of January 8 about his brother's disappearance, he

responded, "He told me *the same thing that these notes up here are about*. About having

seen Barry at 7:00, you know, blah, blah, and so forth." (Tr. XI 127) (emphasis added).

The display of these snippets of testimony in full view of subsequent witnesses clearly

violated the rule of sequestration.

The United States Supreme Court discussed the origins and purposes of the rule

in *Geders v. United States*, 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976), stating:

> The aim of imposing the rule on witnesses, as the practice of sequestering
> witnesses is sometimes called, is twofold. It exercises a restraint on
> witnesses tailoring their testimony to that of earlier witnesses; and it aids
> in detecting testimony that is less than candid.

*Id.* at 87, 96 S.Ct. at 1347. *See also Clark v. Continental Tank Company*, 744 P.2d 949, 951

(Okla. 1987). The rule has "long been recognized as a means of discouraging and

exposing fabrication, inaccuracy, and collusion." *Dyke v. State*, 716 P.2d 693, 697

(Okl.Cr. 1986) (quoting I WIGMORE, EVIDENCE §§ 1837-38 (Chadvourn rev. 1976)). In Mr.

Glossip's case, those aims were thwarted by the fact the State advertised its favorite

bits of evidence — the parts it most wanted the witnesses to agree on — for all

subsequent witnesses to see.

**D.     The Trial Court's Refusal to Allow the Defense to Include the Demonstrative
        Exhibits as Part of the Record.**

At the close of testimony in the case, recognizing that defense counsel has a duty

to ensure that a sufficient record is provided to this Court, counsel requested that the

many posters be included as part of the original record in the case.   Counsel

acknowledged that the posters might be bulky and offered to take digital photographs

of the posters themselves to show what information each contained, and of the

courtroom to show how they appeared to the witnesses and the jury. (Tr. XV 34-35) The

prosecutor responded that she had "made sure [she] put into the record what was being

written." (Tr. XV 35) As noted above, this stating and restating of the testimony was

part of the problem with the State's use of the posters. Perhaps more importantly,

47

however, the prosecutor's statement is not accurate. The prosecutor no doubt intended to make a record every time she went to her easel, but the exigencies of trial and human nature — the very reasons the trial judge did not want the jurors taking notes — made it impossible to ensure that every word written on the posters was spoken into the record. Only the actual posters or photographs of them could provide a complete record of what the witnesses and the jury saw in the courtroom.

In addition, the State argued that defense counsel had made five demonstrative aids of their own that "had been displayed various lengths of time to the jury" and that one of those, prepared during Justin Sneed's testimony was "displayed to this jury throughout Sneed and others' testimony." (Tr. XV 35) In the first place, the State cites just one poster that remained on display after the witness had finished testifying and the only "others" who testified after Justin Sneed were the detective who investigated the case and Kenneth Van Treese who was excluded from the rule of sequestration. (Tr. IV 27) Thus, the State's own argument makes clear that defense counsel did not abuse the use of demonstrative exhibits in the manner the State did in this case. Moreover, the record is not at all clear that the defense did, indeed prepare five posters. (*See, e.g.,* Tr. V 144; XII 204)

The trial court agreed that the prosecutor had described the exhibits "with some detail" and denied the request to make the posters part of the record. Defense counsel then asked permission to photograph the exhibits "for our own purposes" so that an accurate record would exist if the posters were destroyed after the case. (Tr. XV 36) The trial court responded:

> THE COURT: You know what?  What you're asking me to do is for permission to make your own record outside of the Court's record. Denied. The Court's record is what's going to stand. And if you want to look them up, you can do so. It's all in the transcript. There is nothing about this that has not been memorialized, and the transcript is the way that we make a record in Oklahoma courts.
>
> MR. WOODYARD: We think the better way to show actually how these things sit in the courtroom and exactly what's written would be to either

have the documents or the digital photograph, so we're making that request and I understand the Court's denying our request.

THE COURT: Your understanding is absolutely on target.

(Tr. XV 36-37) The trial court's refusal to allow defense counsel even to photograph the exhibits has made it impossible to accurately convey to this Court every instance of the selective testimony written on the posters and their pervasive positioning throughout the courtroom. Thus, Mr. Glossip submits that if there is even any question whether he was prejudiced by this highly unusual display, prejudice must be presumed under the unique facts of this case.

E.    **Conclusion.**

Mr. Glossip was prejudiced by the undue emphasis placed on selected portions of the testimony by the State's improper use of demonstrative aids to argue their theory of the case throughout the trial. Whether trial counsel could have made more posters of his own, or insisted that the few posters he did make were left up throughout the trial, is beside the point. Trial by poster cannot be allowed in a criminal proceeding. The Due Process clause and notions of a fair trial simply will not permit it. Under the peculiar circumstances of this case, in which the trial court refused to allow defense counsel to preserve the evidence necessary for this Court's review, Mr. Glossip submits the Court must presume he was prejudiced by the actions of the prosecuting attorneys and the trial court and find that the error cannot be harmless.

## PROPOSITION IV

**MR. GLOSSIP WAS DEPRIVED OF A FAIR TRIAL AND A FAIR SENTENCING HEARING BY THE IMPROPER TACTICS, REMARKS, AND ARGUMENTS OF THE PROSECUTORS DURING BOTH STAGES OF TRIAL.**

The prosecutors in this case exceeded the bounds of proper and professional prosecutorial advocacy during both stages of trial. Their contemptuous conduct resulted in a trial so infected "with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91

49

L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)). Moreover, the prosecution's improper tactics and remarks likewise resulted in a sentencing proceeding that failed to meet the heightened standard of reliability required by the Eighth Amendment. *See Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976).

**A.  Misrepresentation of Facts and Misleading Argument Designed to Confuse the Jury.**

As shown in Proposition I, no physical evidence of any sort tied Richard Glossip to the murder of Barry Van Treese. Nevertheless, the State argued this *lack* of forensic evidence implicated him in the murder. After acknowledging that all blood from the crime scene tested belonged to Mr. Van Treese and all fingerprints found belonged to Mr. Sneed, the State argued:

> Richard Glossip had business in room 102 didn't he? He was the manager of the motel. Ordinarily, wouldn't you think that the manager of a motel would at least occasionally go in every single room at one point or the other and fix something, look at something, check it over just to make sure that it was right and ready for the next paying customer that came in?

> *Does the absence of his fingerprints,* even though we know that in all likelihood he'd been in that room repeatedly and had legitimate business there, and even though he, himself, admits confirming John Prittie's description that he helped put the plexiglass on that broken window, *not one single Richard Glossip fingerprint can be found.* Can you think of some reasonable explanations for that looking for a reasonable inference as justified by your common sense?

(Tr. XV 83-85) (emphasis added). After suggesting that Mr. Glossip's fingerprints might have been smeared, and assailing his "confidence" that his prints would not be found in room 102, the prosecutor continued:

> What did he know? Isn't it a reasonable inference that he knew for a certainty that his fingerprints wouldn't be in that room, even innocently put there changing a lightbulb or cleaning the mirror, anything? *Because he had made certain by action or omission that his fingerprints would not be found there.* It's not hard. You just give them a swipe, right, with a cloth or a paper towel? It's not hard.

\* \* \* \* \*

50

And, understand, I'm not talking about fingerprints in the blood of Barry Van Treese. We've seen some of those. I'm talking about any fingerprint at all. He had legitimate business in room 102 at times and there would be many circumstances under which an innocent Richard Glossip could put his fingerprint in that room. Okay? I'm talking about no fingerprints of any kind at all.

(Tr. XV 85-86) (emphasis added). Of course, fingerprints in the blood of Barry Van Treese *were* the items collected by the police. No one took prints from the light bulbs or the television or the bedside table or the telephone in the room — this was, after all a motel room and innumerable people had likely been in and out in the days, weeks, and months prior to the murder. Understandably, the police limited their initial collection of forensic evidence to areas obviously related to the murder *and the prosecutor knew or should have known it.*

The prosecutor returned to this theme in the final closing argument:

Why isn't his fingerprints (sic) there? *If he is innocent, why aren't they there?* He helped put up that plexiglass. He touched it. His fingerprints should be there. Why aren't they? Because somebody wiped them off. *Innocent people don't do that.*

(Tr. XV 167-68) It is hard to imagine how Mr. Glossip could have selectively wiped off all of his own fingerprints, but left every one of Justin Sneed's prints in place. Clearly, the prosecutors distorted the testimony, misled the jury and, in the end, stood the evidence on its head to bolster its very weak case against Mr. Glossip.

The prosecutors also argued that the only person who had a motive to kill Mr. Van Treese was Glossip because Justin Sneed would never have killed Barry Van Treese for money alone:

What reason above and beyond the reasons of Richard Glossip did Justin Sneed have to kill Barry Van Treese? Did he do it for $10,000? Was that his only reason?

(Tr. XV 68)

What did he stand to gain besides money, which he didn't get, by killing Barry Van Treese? Nothing.

(Tr. XV 69) At the same time the State made these arguments, it had alleged in the Bill of Particulars that Mr. Glossip should be put to death pursuant to the "murder for remuneration" aggravator based, in large part, on Sneed's testimony that he was offered anywhere from $3,500 to $10,000 to commit the murder. (OR 1044-51; Tr. XII 80) The State's duplicitous argument that on the one hand Mr. Sneed would not have committed murder for the money and on the other that Mr. Glossip should be executed because he paid Sneed to commit the crime was clearly misleading to the jury.

The State also materially misrepresented the facts, misled the jury, and denigrated counsel in one fell swoop with its argument regarding Mr. Glossip's defense that he was, if anything, guilty only as an accessory after the fact to murder. Justin Sneed made his "Richard Glossip told me to" confession on January 14, 1997. The following day, the State of Oklahoma filed two Informations related to the murder of Barry Van Treese — Case No. 1997-244 charging Justin Sneed with murder in first degree and Case No. 1997-256 charging Richard Glossip with *accessory* to murder. Eight days later, on January 23, the State filed a second Information adding Richard Glossip as a co-defendant in Case No. 1997-244. On January 27, the State dismissed the accessory charge against Mr. Glossip.

At trial, immediately before Det. Bemo testified, the State made an oral motion in *limine* asking the court to prevent defense counsel from "raising in any way in front of the jury the fact that before the murder charge on trial today was filed against Defendant Glossip, he was originally charged with the offense of Accessory to Murder in CF-97-256." (Tr. XIII 103) After defense counsel announced that he did not intend to go into that subject, the trial court sustained the motion. (Tr. XIII 104) While Mr. Glossip may have been content to forgo cross-examination on the issue of the State's charging decision, he intended to and, in fact, did argue as a defense to the State's case that if he was guilty of any offense, it was as an accessory after the fact. (Tr. XV 147-49)

At Mr. Glossip's request, the trial court instructed the jury on the lesser related offense of accessory to murder. (O.R. 1289-90)

When addressing the issue of the lesser related offense in its second closing argument, the State took unfair advantage of the circumstances described above and misled the jury by arguing "[t]he State of Oklahoma did not charge Mr. Glossip of lesser related offenses because he committed the big boy offense of Murder in the First Degree." (Tr. XV 175) Of course, the State of Oklahoma *did* originally charge Mr. Glossip with the lesser related offense. Trial counsel objected on the basis that the State's motion in *limine* prevented the defense from talking about the original charge and the prosecutor was now arguing he was never charged as an accessory. When trial counsel contended the State's argument was misleading to the jury and "a misstatement of the law and the fact of this case," the State did not have to respond because the trial court answered for them:

> [B]efore the investigation was concluded they may have done something else, but after all of the facts were in, then they selected this charge. I don't see that that's misleading. If we were dealing with the original set of facts, then I would agree with you. But there was additional evidence that was developed and that's what caused them to make decisions.

(Tr. XV 176-77)

The second Information filed on January 23, 1997, was identical to the one filed January 15 except for the addition of Richard Eugene Glossip aka "Rich" as a defendant. No new witnesses were listed and the same Affidavit of Probable Cause signed by Det. Cook was attached. (OR 1-4; 5-9) More importantly, the accessory charge was filed *after* Justin Sneed had implicated Mr. Glossip as the alleged "mastermind" of the murder. It was misleading to leave the jury with the impression that the State had always believed Glossip was a principal to the murder when, in fact, it had originally had doubts.

Moreover, the State implied that the lesser related offense instruction was a defense trick, arguing:

> I want to talk to you about this lesser related offense. I want to point out to you why you got it. You see, because it says lesser. That's why you got it. Because they wanted you to have a lesser option. I want to tell you something. We don't get to choose here, see, you all don't. The State of Oklahoma chose, right or wrong, we chose Murder in the First Degree.

*  *  *  *  *

> Let me tell you something about lesser related offenses. Let me tell you why we just charge with one offense. Because that's what he did. Because that's what the evidence is. You know, somebody, they drive drunk, they commit DUI and they slam into somebody, they run a stop sign, they slam into somebody and they kill them, you know what we charge them with? Manslaughter. Because that's what driving drunk and killing somebody is. And at trial if they get up and they go, "You got me, okay, find me guilty of, well, running the stop sign." We don't accept that offer. And that's what this is. It's an offer to plead to running the stop sign. But he did more than that.

> And the State of Oklahoma respectfully declines his offer of a lesser related offense.

(Tr. XV 172-3)

Trial counsel objected to the characterization of the lesser related offense instruction as something the defense had done and requested the jury be admonished that the instructions they had received were appropriate and proper for their consideration. (Tr. XV 173) The State responded that the instruction would never have been given if the defense had not requested it. *Id.* Counsel argued:

> This instruction was given by the Court. It's proper for [the jury's] consideration and I think the jury has been misled that it's something that the Defense has done. Yes, we made a request. The State makes requests, but the Court approves and instructs.

(Tr. XV 174) After the trial court expressed concern over the prosecutor's "let me tell you why you got this instruction" argument, the prosecutor grudgingly told the jury:

> Ladies and gentlemen, when we talk about lesser related offenses they are running the red stop sign and that's it. Now, they're in your packet and they're for your consideration. I mean, they're not here because they're not for your consideration. They are for your consideration . . . at the proper time.

(Tr. XV 174-75) However, the damage was already done. This Court has long condemned arguments intended to impugn the defense. *Coulter v. State*, 734 P.2d 295, 302 (Okl.Cr.

54

1987) (condemning "air defense" argument) (*Black v. State*, 663 P.2d 22, 25 (Okl.Cr. 1983) ("Counsel should refrain from casting aspersions upon opposing counsel."); *see also Bechtel v. State*, 738 P.2d 559, 562 (Okl.Cr. 1987) (Parks, J., specially concurring) (accusing defense counsel of fabricating evidence); *Jones v. State*, 738 P.2d 525, 530 (Okl.Cr. 1987) (arguing that "the 'job' of the appellant's attorneys was to 'get their client Richard Jones off.'"); *Brewer v. State*, 650 P.2d 54, 58 (Okl.Cr. 1982) ("Object, object, when it gets tight, he starts objecting.").

**B.     Evidence and Argument Intended to Evoke Sympathy for the Victim and his Family.**

The prosecutor also presented argument intended to evoke sympathy for the victim and his family.  As shown in Proposition II, the prosecutor solicited testimony from Donna Van Treese and, to a lesser extent, Kenneth Van Treese that can only fairly be characterized as victim impact evidence.  While it is the law in Oklahoma that victim impact can be relevant in the punishment stage of trial, there is absolutely nothing probative about such evidence in the guilt/innocence stage of a capital trial. *Spears v. State*, 900 P.2d 431, 445 (Okl.Cr. 1995).  The State had no legitimate need to distract the jury from its crucial responsibility of determining the guilt or innocence of Mr. Glossip on the basis of the evidence, but it did so in this case by playing upon the sympathy of the jury for the victim and his family.   Prosecutorial comments that tend to overemphasize the character of the victim or impact of the homicide on the victim's family are improper in any stage of a capital murder prosecution. *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720, 736 (1991).  But they are particularly forbidden in the guilt/innocence stage of trial where they have no relevance to any issue before the jury and serve only to interfere with the jury's duty to determine guilt or innocence based on admissible evidence and the applicable law. *McCarty v. State*, 765 P.2d 1215, 1221 (Okl.Cr. 1988); *Stewart v. State*, 757 P.2d 388, 396 (Okl.Cr. 1988); *Jones v. State*, 738 P.2d 525, 529 (Okl.Cr. 1987); *Tobler v. State*, 688 P.2d 350, 353

(Okl.Cr. 1984); *State v. Martini*, 619 A.2d 1208, 1244-45 (N.J. 1993). As these improper appeals to emotion likely tipped the scales in favor of the prosecution, Mr. Glossip's convictions must be reversed. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).

## C.   Presentation of False and Misleading Evidence.

One of the linchpins of the State's case against Mr. Glossip, from its opening statement through its closing argument, was that he was about to be fired because of a so-called "shortage" of approximately $6,100 for the year 1996 at Best Budget Inn of Oklahoma City. (*See, e.g.*, Tr. III ; IV 63-66, XV 152, 162, 164) Some of the evidence offered in support of that argument was nothing more that a reinterpretation of data through hindsight. *See*, Proposition I.A. One aspect of that evidence, however, involves the State's knowing use of false or misleading evidence.

During the cross-examination of Donna Van Treese, trial counsel sought to introduce Def. Ex. 71A, a document she created, which represented a summary of the 1996 year-end deposit versus volume report for both the Oklahoma City and Tulsa Best Budget Inns. (Tr. IV 133)  This summary was the genesis of the $6,100 shortage figure. When trial counsel moved to admit the document, the State argued the portion of the document showing the figures for the Tulsa motel was irrelevant. The trial court then asked counsel to redact the Tulsa figures and reoffer the exhibit. (Tr. IV 134)

Trial counsel later asked to substitute the unredacted exhibit showing the Tulsa figures, this time arguing that it was relevant because the State had used the $6,100 shortage at the Oklahoma City motel to show motive. As a result, the Tulsa records were relevant to show "the operation of the Oklahoma City motel was not out of line with what was happening in the Tulsa motel." (Tr. IV 177-78)

In response, the prosecutor made the following offer of proof:

If asked those questions, [Donna Van Treese] will say that William Bender was also mismanaging the motel, *that it was their intention to fire him as*

*well*, that they were going to take care of Richard Glossip of the Oklahoma City motel first.

And, in fact, William Bender was fired two months after, like in March. They were both taking advantage of this family at the time of their loss. And we can go there if we want to, I just think we're going down a slippery slope that we don't need to go down.

(Tr. IV 178) (emphasis added).

Six days later, the State *solicited* the following testimony from Mr. Bender:

Q:    When [Barry Van Treese] left, were you under the impression that you were going to be fired?

A:    No, ma'am. No.

Q:    When you left, did you think that you might have a job different than what you had as manager of the Tulsa motel?

A:    Yes, ma'am.

Q:    Okay. What did you think your new job might be?

A:    Well, Barry wanted us to take over the Oklahoma City motel.

(Tr. VIII 83) On cross-examination, Mr. Bender testified he had never been made aware of any shortages or losses at the Tulsa Best Budget Inn. (Tr. VIII 94)

Either Mr. Bender was in as much trouble as Mr. Glossip and Mr. Van Treese was about to fire him as well, or Mr. Van Treese was so pleased with Bender's operation of the Tulsa motel that he wanted to move him to the larger Oklahoma City Best Budget. Both scenarios cannot be true. The knowing use of false or misleading evidence important to the prosecution's case in chief violates the due process clause of the Fourteenth Amendment. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 647, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431 (1974); *Miller v. Pate*, 386 U.S. 1, 7, 87 S.Ct. 785, 788, 17 L.Ed.2d 690 (1967); *Brown v. Wainwright*, 785 F.2d 1457, 1463-64 (11th Cir. 1986); *McCarty v. State*, 765 P.2d 1215, 1220, (Okl.Cr. 1988). The prosecutor's previous offer of proof shows that she clearly knew the testimony solicited from Mr. Bender was at the very least misleading and, more likely, false.