**D.    Implying to the Jury that Additional Evidence Exists.**

On redirect examination of Kayla Pursley, the prosecutor first established that Ms. Pursley had reviewed the reports of her statement given to police on January 7, 1997, that she had not been interviewed by defense counsel, but had been interviewed by the prosecutor who asked "a lot" of questions, and that all of the additional information Ms. Pursley provided had been turned over to defense counsel.   (Tr. IX 97-99) After reiterating some of the testimony that "they [defense counsel] have had notice of" (*Id.* at 99-100), the prosecutor asked:

Q:    And, in fact, in the police report are some things that you don't remember right now. Right?

A:    Right.

Q:    Okay.  Some things of other statements that Richard Glossip made. Right?

A:    Right.

Q:    And when you told the police that on January 7th, you were telling them the truth?

A:    Yes.

Q:    *It's just that it's not before this jury right now because you don't remember it today?*

A:    Right.

Q:    So those additional statements that we might be able to write up here we've just lost those because it took us seven years to get this to trial. Right?

A:    Right.

(Tr. IX 100) (emphasis added).[22]

Of course, the prosecutor could have asked if Ms. Pursley's review of the report refreshed her recollections regarding the matters she could not remember at trial, or

---

[22]    The prosecutor had made a poster memorializing selected portions of Ms. Pursley's testimony. The reference to writing something "up here" is to that poster. The improper use of these posters is addressed in Proposition III.

EXHIBIT
*A*
PART 2

even have impeached her own witness with the information contained in the police report. Instead, the prosecutor formulated a question for the express purpose of implying there was more this witness could tell the jury that would be damaging to Mr. Glossip if only she could remember what it was. Leaving the jury with the impression that the State has additional evidence not presented to the jury has long been condemned by this Court. *See Rheuark v. State*, 160 P.2d 413, 414 (Okl.Cr. 1945) (argument implying there was more behind the prosecution than shown by the evidence highly improper); *Brower v. State*, 221 P. 1050, 1052 (Okl.Cr. 1924) (prosecutor implied he had "better reasons" for believing defendant guilty than jury and insinuated defendant previously made conflicting statements to prosecutor).

## E.    Second Stage Misconduct.

During the State's second stage closing argument, the prosecutors made numerous improper statements which individually and collectively worked to deny Mr. Glossip a fair and reliable sentencing procedure in violation of the Eighth Amendment. The prosecutors misstated the law, denigrated Mr. Glossip's mitigating circumstances, and injected personal beliefs into the proceeding.

The prosecutor misstated the law in arguing that death was the only appropriate penalty because

> we're not better off because of Richard Glossip. We as a society are worse off because of Richard Glossip. The Van Treese family, they are worse off because of Richard Glossip. The Glossip family, they're worse off because of Richard Glossip. This system, this system of justice is worse off because of Richard Glossip and for that he should receive punishment.

(Tr. XVII 93) Whether society or any individual is "worse off" is not an appropriate criteria for determining punishment.   Nor is there a "cold-blooded murderer" aggravating circumstance and, thus, the State of Oklahoma does *not* always punish "cold-blooded murderers" with death as argued by the prosecution. *Id.* at 93-94, 98, 107. Other improper criteria argued by the prosecutor to support the death penalty included

her belief "he chose the option of murder in the face of other options" and that "because

of that mentality [killing for hundreds, fifties, and twenties] that's why we punish with

death. That's why it is correct to take a life for the life that was taken." *Id.* at 94.

The prosecutor also engaged in prejudicial theatrics:

> Because but for the actions of Richard Glossip, Justin Sneed would not
> have killed Barry Van Treese and but for the actions of Richard Glossip, I
> wouldn't be here and but for the actions of Richard Glossip, their family
> wouldn't be here, and but for the actions of Richard Glossip, the Van
> Treese's wouldn't be here and but for the actions of Richard Glossip, you
> wouldn't be here making this tough decision.

> So I don't have a problem with taking this blood and putting it right over
> here. Because this is where it goes.

(Tr. XV 102) Trial counsel's objection to the prosecutor's demonstration in which she

threw "things," presumably photographs of the victim's injuries, onto the defense table

during this argument was overruled. *Id.* In *Brewer v. State*, 650 P.2d 54 (Okl.Cr. 1982),

this Court condemned such prejudicial tactics.

Finally, the prosecutor unfairly denigrated Mr. Glossip's mitigation evidence,

arguing:

> What's his motive while he's awaiting trial? It's to get his niece to come
> visit him six times after his trial is set so he can bring her in here and make
> her testify.

> His motive is to be a good boy and to buddy up to a 23-year-old detention
> officer — interesting the age he chooses, I think, the age of Justin Sneed.
> He chooses this young kid to buddy up with so he can be free and roam the
> pod while everybody else is in a cell 23 hours and 45 minutes a day. And
> then he doesn't cause any problems because he knows we've listed as an
> aggravator the probability that he will be violent. He's not stupid.

(Tr. XVII 97) The purpose of the prosecutor's comments was to inform the jurors they

could ignore these mitigating circumstances because, in the prosecutor's opinion, no

one could really care for Mr. Glossip unless he had manipulated them into doing so. The

prosecutor's attempts to destroy Mr. Glossip's right to have the jury consider relevant

mitigating evidence were in violation of *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57

L.Ed.2d 973 (1978) and *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256

(1989). The Supreme Court has long held a defendant in a capital case has a constitutional right to the consideration of mitigating factors by the sentencer, and that the sentencer cannot be precluded from considering mitigating evidence. *Hitchcock v. Dugger*, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987); *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986). Furthermore, misleading the jury about its responsibilities with regard to capital sentencing violated the Eighth Amendment. *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).

**F.    Conclusion**

None of the above instances of misconduct constitute a fair comment on the evidence, and all constitute a complete denial of due process. *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Although defense counsel failed to object to some of these tactics, the Court is asked to focus on the fundamental right Mr. Glossip had to a constitutionally fair proceeding, and to weigh that right against the combined effect of actions by the prosecutors in this case. Lack of an objection does not preclude the Court from reviewing improper comments. *Atterberry v. State*, 731 P.2d 420 (Okl.Cr. 1986).

The combined effect of the prosecutorial misconduct was so prejudicial as to adversely affect the fundamental fairness and impartiality of the proceedings and resulted in deprivation of the constitutional rights enumerated above. *See McCarty v. State*, 765 P.2d 1215, 1221 (Okl.Cr. 1988); *Spees v. State*, 735 P.2d 571, 576 (1987); *Freeman v. State*, 681 P.2d 84, 85 (1984); *Rice v. State*, 92 P.2d 857, 859 (Okl.Cr. 1939) Additionally, in capital cases, the closing argument must receive a greater degree of appellate scrutiny than in non-capital cases. *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 856 L.Ed.2d 231 (1985). Mr. Glossip was denied his Fourteenth Amendment right to a fair trial by the repeated abuses of the prosecutor; therefore, his conviction and sentence must be reversed.

## PROPOSITION V

**MR. GLOSSIP WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF HIS RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE II, §§7, 9 AND 20 OF THE OKLAHOMA CONSTITUTION.**

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the reasonably effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 687, 694, 104 S.Ct. 2052, 2064, 2068, 80 L.Ed.2d 674 (1984). In order to make out a claim of ineffective assistance of counsel, an appellant must show (1) that counsel's performance was deficient and (2) that he was prejudiced by the deficient performance. *Id.* at 687. In Mr. Glossip's case, trial counsel's deficient performance undermined the proper functioning of the adversarial process when counsel failed to utilize Justin Sneed's videotaped interview to cross-examine and impeach Sneed and Detective Bemo, failed to utilize readily available evidence to thoroughly cross-examine other witnesses, failed to object to improper character evidence, failed to object to irrelevant and highly prejudicial evidence, and failed to object to numerous instances of prosecutorial misconduct.

**A.   Failure to Utilize Justin Sneed's Videotaped Interview.**

Mr. Glossip's 1998 conviction in this case was reversed due to the ineffective assistance of counsel. *Glossip*, 29 P.3d at 599. That reversal was premised, in large part, on trial counsel's failure to use Justin Sneed's videotaped interview to cross-examine both Mr. Sneed and Detective Bemo. Specifically, the Court held, "[t]rial counsel's failure to utilize important impeachment evidence against Justin Sneed stands out as the most glaring deficiency in counsel's performance." *Id.* at 601 Inexplicably, trial counsel at Mr. Glossip's 2004 trial again failed to use this critical piece of evidence to cross-examine Justin Sneed and Det. Bemo.

The value of the Sneed video to the defense at trial was twofold: (1) it vividly illustrates the manner in which the detectives manipulated Sneed into implicating Mr.

62

Glossip in this crime, and (2) it points up the many discrepancies between Sneed's January 14, 1997, interview, his 1998 trial testimony and, now, his 2004 trial testimony.[23] To be sure, trial counsel cross-examined both Justin Sneed and Det. Bemo in the 2004 retrial regarding the circumstances of the interrogation and some of the discrepancies between the videotape and the trial testimony, and counsel attempted to elicit admissions regarding the same, (*See, e.g.,* Tr. XIII 25-31; XIV 70-71), but Mr. Glossip's previous counsel had tried to cross-examine these witnesses also. (O.R. 603) Moreover, as shown below, whenever the witness denied the differences in the testimony or was unsure about what was said in the initial interview on January 14, 1997, counsel simply let it go. If the jury had been allowed to view the videotape of Sneed's interview, there would have been no question what Sneed and the detectives said and why.

### 1.   Manipulation of Sneed to Implicate Glossip.

On the videotape, the detectives skillfully manipulate Sneed into inculpating Mr. Glossip in the murder of Barry Van Treese. The first words out of Det. Bemo's mouth after Sneed is read his *Miranda* rights are "we know that this involves more than just you" and "I personally don't think you're the only one" and other suggestions of that sort. (Rule 3.11(B) Application, Ex. 1A and Ex. 2, p.5) After some small talk, Det. Bemo suggests they "get down to business" and for the next eight minutes the detectives wheedle and coax Sneed and telegraph what it is they want to hear:

> BEMO:  Well, they've made you the scapegoat in this.  You know, everybody is saying you're the one that did this and you did it by yourself and I don't believe that.  You know Rich is under arrest, don't you?
>
> SNEED: No.  I didn't know that.
>
> BEMO: Yeah.  He's under arrest, too.
>
> SNEED: Okay.

---

[23] The differences between Sneed's statements on the videotape and his testimony at this and the 1998 trial are discussed in more detail in the Rule 3.11(B) Application.

BEMO: So he's the one -- he's putting it on you the worst. Now, I think that there's more to this than just you being by yourself and I would like for you to tell me what - - how this got started and what happened[.]

(Rule 3.11(B) Application, Ex. 1A and Ex. 2, p.17) However, at the 2004 trial, when Sneed was asked about whether he knew Mr. Glossip had been arrested when he talked to detectives he responded, "I think it was my understanding that he had been questioned, but I don't think it was any understanding that he had been arrested." (Tr. XIII 13) Trial counsel failed to follow up on this important point, and failed to ask the witness about how the detectives told him over and over that they believed Mr. Glossip was involved before Sneed finally implicated him. (Rule 3.11(B) Application Ex. 1A and Ex. 2, pp. 16-25) Indeed, it is unclear through counsel's cross-examination whether it was Sneed or the detectives who thought "people were pointing the finger" at him. (Tr. XIII 14)

Counsel's cross-examination of Det. Bemo did not fare any better with respect to informing the jury of the circumstances surrounding Sneed's interrogation. While certainly counsel went through some of the detective's questions that led Sneed to implicate Mr. Glossip, Det. Bemo naturally denied any intent to do so. (Tr. XIV 70-71) Only the video could convey to the jury how clearly and unambiguously the detectives telegraphed to Sneed that they wanted him to inculpate Glossip. (Rule 3.11(B) Application Ex.1A) There can be no genuine strategic justification for failing to impeach these crucial State witnesses with evidence so clearly probative of their credibility.

2.    **Discrepancies Between Sneed's Videotape and his Trial Testimony.**

As this Court noted in Mr. Glossip's first appeal, there were "at least seven material inconsistencies and . . . at least five things in Sneed's [1998] trial testimony that he had completely omitted from his videotaped statement." *Glossip*, 29 P.2d 601. Again, trial counsel attempted to get the inconsistencies across to the jury through cross-examination. However, counsel's failure to introduce the actual tape led to the following exchange on redirect examination of Justin Sneed:

A:   [Variations regarding times things occurred] are just approximations.

Q:   And you know from reading and watching the videotape interview - - because they videotaped it, right, with the police?

A:   Yes, they did.

Q:   *And if it was entirely different from what you told us today, we'd have played that, right?*

A:   Yes.

Q:   *Well, they would have played it, right?*

A:   Yes.

(Tr. XIII 66-67) (emphasis added).

In fact, the videotape *was* entirely different, and counsel's failure to play it for the jury left the impression it was not. The many discrepancies are discussed in more detail in Mr. Glossip's Rule 3.11(B) Application, but several material inconsistencies — extremely prejudicial testimony that was *not* told to detectives on January 14, 1997, and was *not* testified to in 1998 — bear repeating here. Sneed testified in 2004 that Mr. Glossip offered him $10,000 to kill Barry Van Treese. (Tr. XII 166-67) In his interview with detectives and at his 1998 trial, the amount mentioned by Sneed, whether it was what the victim was "sitting on" as in the videotape, or what Sneed says Glossip promised him, was consistently $7,000. Sneed never ever mentions the figure of $10,000. But, rather than *impeach* Sneed with his prior testimony, counsel offers him the prior transcripts to "refresh his recollection" and, thus, allows him to "explain" how he got to the $10,000 figure even though it had *never* been mentioned or even hinted at before he testified at the 2004 trial.[24]

This is but one example of discrepancies that appeared for the first time at Mr. Glossip's 2004 trial. Others include the fact Sneed described for the first time another

---

[24]   While Sneed's explanation that the offer "just kept climbing every time we started talking about it" might make sense if the price was escalating *before* the murder, an increase in the amount to be paid that occurs between the 1998 trial and the 2004 trial is disingenuous, at best (Tr. XII 167)

incident in which Mr. Glossip wanted him to kill Mr. Van Treese with a hammer in the boiler room of the motel in November or December, 1996, (Tr. XII 80-81), alleged for the first time that Mr. Glossip had taken the victim's wallet out of his pants pocket and removed a $100 bill, (Tr. XII 123), and said for the first time he had tried to "push" a knife with a broken tip into Mr. Van Treese's chest during the attack, (Tr. XII 102).

The failure of trial counsel to cross-examine and meaningfully test the primary evidentiary bases of the State's case against Mr. Glossip clearly runs afoul of the *Strickland* standard. Trial counsel's failure to use Justin Sneed's videotaped statement simply cannot be explained and Mr. Glossip was prejudiced as a result.

**B.   Failure to Utilize Readily Available Evidence to Cross-Examine Witnesses.**

Donna Van Treese testified extensively regarding alleged "shortages" of over $6,000 for the year 1996 which were of great concern to her and to Mr. Van Treese as well. (Tr. IV 63-71) Trial counsel had in his possession a number of financial records for both the Oklahoma City and Tulsa Best Budget Inns that would have made clear to the jury that this "shortage" was not peculiar to the Oklahoma City motel. (*See*, Rule 3.11(B) Application, Ex. 3)

Counsel first attempted to introduce Def. Ex. 71, a summary of the 1996 year-end deposit versus volume report, during his cross-examination of Mrs. Van Treese. The State objected to the document because it included figures for the Tulsa motel which the prosecutor considered irrelevant. Without further discussion, the trial court asked defense counsel to redact the Tulsa figures from the report.[25] (Tr. 133-34) Later in the day, counsel asked the court to revisit the issue of Def. Ex. 71, arguing that the Tulsa figures were relevant to show that Tulsa had suffered similar losses. In response, the State made an offer of proof that Donna Van Treese would say that William Bender, the manager of the Tulsa Best Budget, was also mismanaging that motel and the Van

---

[25]   In redacted form, Def. Ex. 71 simply reinforced Mrs. Van Treese's testimony that a $6,100 "shortage" existed with respect to the Oklahoma City motel.

Treeses intended to fire him as well after they had dealt with Mr. Glossip. (Tr. IV 177-78) Of course, as will be shown below, rather than being an argument against admissibility of Def. Ex. 71, this was one of the primary reasons the Tulsa records were crucial to presentation of Mr. Glossip's defense. Although the trial court reserved ruling on defense counsel's request, counsel never even attempted to use the document to cross-examine either Mrs. Van Treese or William Bender. (Tr. IV 179)

The unredacted Def. Ex. 71 showed the shortage at the Tulsa Best Budget Inn was $5,226.78, representing 3% of its total sales volume, while the $6,100 shortage at the Oklahoma City motel was only 2%. (Rule 3.11(B) Application, Ex. 3) The State's case against Mr. Glossip, other than Justin Sneed's uncorroborated testimony, centered on his alleged motive to kill Barry Van Treese, and the $6,100 shortage was the linchpin of that allegation. (See, e.g., Tr. III 210, 214; IV 63-71, XV 152, 162, 164) Evidence showing the Tulsa motel had suffered an even greater loss was critical to Mr. Glossip's defense.

If counsel had cross-examined Donna Van Treese using this document, as he told the trial court he intended to do, she presumably would have provided the testimony the State had put forward in its offer of proof, i.e., that the Van Treeses intended to fire Mr. Bender as well as Mr. Glossip. (Tr. IV 177-78) As a result of his failure to do so, Bender instead testified that he was never even talked to about the shortages at the Tulsa motel, much less that anyone threatened to fire him over such a shortage. (Tr. VIII 94) Bender's testimony offered the perfect opportunity to again attempt to use the unredacted Def. Ex. 71 for purposes of impeachment. Mrs. Van Treese had already identified the document as one she had created. If Bender could explain the $5,200 "shortage" in Tulsa, it would likely have offered an explanation for the shortage in Oklahoma City as well. If he could not, his credibility would have been severely damaged. There simply was no downside. As things stood, because counsel did not introduce the unredacted exhibit through either Mrs. Van Treese or Bender, Bender's testimony that Barry Van Treese was so pleased with his management of the

67

Tulsa motel that he wanted him to take Mr. Glossip's job in Oklahoma City went unchallenged. (Tr. VIII 83-84)

Similarly, trial counsel had within his possession documents that would have undermined completely Billye Hooper's damaging testimony that Glossip was somehow manipulating the room rentals so that there were always 19-21 rooms rented per night. (Tr. VII 45-46) These documents show that the number of room rentals per night varied widely for every single month of 1996. (Rule 3.11(B) Application, Ex. 3)   The files appellate counsel received from trial counsel's office include more than 35,000 pages of materials. While appellate counsel recognizes that examination of these documents is a daunting task, counsel took on the responsibility of reviewing them when he took on the representation of Mr. Glossip, regardless of how tedious the task. The documents collected in Ex. 3 to Mr. Glossip's Rule 3.11(B) Application were powerful weapons to defend against a case built on the kind of speculation and innuendo Ms. Hooper's testimony represents.   Counsel had an obligation to be knowledgeable about the documents in his files and to use them in defense of Mr. Glossip.

**C.     Failure to Object to Improper Character Evidence.**

The State went out of its way, in this case, to present the "good character" and other improper lay opinion evidence of confessed murderer Justin Sneed, *i.e.*, that he was a follower who would never have committed the brutal act of beating Barry Van Treese to death if someone, namely Richard Glossip, had not put him up to it. Specifically, the State elicited an opinion from Kayla Pursley that Sneed would not have done anything to hurt Mr. Glossip, to get him in trouble with the law, or to get him fired. She also testified, when asked, that she "couldn't believe that [Sneed] was capable of" beating Barry Van Treese to death on his own. (Tr. IX 24-25) Further, after again eliciting Pursley's opinion, based on what she knew "about the personality of Justin Sneed," that he would not have done something like that on his own, because she "never had witnessed him ever getting really upset about anything," the State was

able to elicit, over defense objection as to speculation, Ms. Pursley's opinion that Sneed "must have really looked up to Rich and he would have probably done anything for him. He was that dependent on him." (Tr. IX 26)  The State elicited similar testimony from Billye Hooper. In response to leading questioning by the prosecutor, Hooper similarly testified that she did not think Sneed would have done anything to get Mr. Glossip in trouble. (Tr. VII 28-29)  After numerous objections by the defense, again on the basis that the questions called for speculation, that were sustained by the trial court, the State was able to elicit the following opinion:

> In my opinion, Justin would not have murdered Barry Van Treese, I don't believe because, for one, he didn't know the man hardly at all. He probably had no – very few comments even made together and I wouldn't seen, in my opinion, why he would have a reason to do such a violent act to someone that he hardly knew.

(Tr. VII 34)  Hooper was allowed to express an opinion that Sneed would not have "done it acting on his own volition because he didn't know Barry that well." (*Id.*)

The prohibition against trying a criminal case on character theories is not limited to the character of the defendant. The Oklahoma Evidence Code clearly provides that "[e]vidence of *a person's* character or trait of his character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." 12 O.S. § 2404(A) (2001) (emphasis added). The statute provides for three narrow exceptions to this general rule of exclusion, none of which applies to this case. This testimony did not involve "a pertinent trait of character offered by an accused or by the prosecution to rebut the same," § 2404(A)(1); "a pertinent trait of character of the victim of the crime offered by the accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness *of the victim* ... to rebut evidence that the victim was the first aggressor," 2404(A)(2) (emphasis added); nor did it involve evidence the character of a witness, as provided in Sections 2607, 2608, or 2609 of the Code, § 2404(A)(3).

Though trial counsel did object to some of this testimony, he failed to object with sufficient specificity when he did object and indeed failed to object at all to much of this improper and prejudicial character evidence. Trial counsel's failure to object to this evidence on the proper basis allowed the State to bolster Justin Sneed's self-serving testimony with the improper character theory that, because Sneed was incapable of acting alone, Richard Glossip *must* have put him up to the crime. By allowing the State to present this improper evidence and argument to the jury, trial counsel allowed the State to undermine Appellant's defense and therefore rendered constitutionally deficient representation.

**D.     Failure to Object to Irrelevant and Highly Prejudicial Evidence.**

In Proposition II, Mr. Glossip set out highly emotional, but completely irrelevant testimony presented by Donna Van Treese and Justin Sneed. Defense counsel failed to object to most of this testimony. While Mr. Glossip maintains that the presentation of this unfairly prejudicial evidence, especially when considered in conjunction with the lack of corroboration for Justin Sneed's statements, rose to a level that denied him due process, he was equally prejudiced by his own advocate's failure to respond to the State's prejudicial tactics. If it is determined on appeal that these errors were waived in the absence of an objection, the failure to object is indicative of ineffective assistance of counsel.

Trial counsel's failure to object to or move to suppress critical evidence which is inadmissible constitutes ineffective assistance of counsel. *Aycox v. State*, 702 P.2d 1057, 1058 (Okl.Cr. 1985). The evidence regarding the heart wrenching details of the tragedies suffered by the Van Treese family and the mitigation-style exposition on Justin Sneed's background was clearly more prejudicial than probative and, thus, was inadmissible. Failure to seek to exclude this evidence was ineffective assistance of counsel. *Blackburn v. Foltz*, 828 F.2d 1177 (6th Cir. 1987).

**E.     Failure to Object to the Instances of Prosecutorial Misconduct.**

Mr. Glossip argued in Proposition IV that the prosecutor engaged in highly improper argument and misconduct. Some of these instances of misconduct were not objected to. While Mr. Glossip maintains that the prosecutor's arguments were egregious enough to deny him due process, he was equally prejudiced by his own counsel's failure to address the State's misconduct. If it is determined on appeal that these errors were waived in the absence of an objection, the failure to object is indicative of ineffective assistance of counsel. Since a reasonable trial strategy is one that advances the client's interests, neglecting to object to prejudicial remarks which may serve as the basis for reversal or modification of sentence cannot be considered a viable trial strategy. *Gravley v. Mills*, 87 F.3d 779 (6th Cir. 1996); *People v. Rogers*, 526 N.E.2d 655 (Ill.App.Ct. 1988); *Fossick v. State*, 453 S.E.2d 899 (S.C. 1995); *Newlon v. Armontrout*, 693 F.Supp. 799, 810 (W.D.Mo. 1988), *affirmed* at 885 F.2d 1328, 1337-1338 (8th Cir. 1989); *Commonwealth v. LaCava*, 666 A.2d 221, 237 (Pa. 1995).

**F.    Conclusion.**

A defendant may satisfy the first prong of the *Strickland* test by showing the quality of representation he received fell outside the range of reasonably competent assistance demanded of attorneys practicing criminal law. Here, trial counsel's errors cannot be attributed to any trial strategy. The second prong of *Strickland* is satisfied by showing there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland,* 466 U.S. at 694. The errors here create a sufficient doubt to undermine confidence in the outcome of the trial and Mr. Glossip's conviction and sentence of death must be reversed.

**PROPOSITION VI**

**THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT TO SUPPORT THE AGGRAVATING CIRCUMSTANCE OF MURDER FOR REMUNERATION.**

In the second stage of trial, the State alleged that the following aggravating circumstance applied in Mr. Glossip's case:

> The person committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration.

(O.R. 1298); 21 O.S. § 701.12(3)(2001). The jury was instructed on the meaning of remuneration as follows:

> You are instructed that the terms remuneration, or the promise of remuneration are defined as: Pay an equivalent for, that is to reimburse for a service, loss, or expense. It is also used to connote payment for services performed.

(O.R. 1300); *Plantz v. State,* 876 P.2d 268, 281 (Okl.Cr. 1994). At the close of the sentencing phase, the jury found murder for remuneration to be the sole aggravating circumstance.[26] (O.R. 1315; Tr. XVII 111).

Murder for remuneration normally applies where a defendant has been hired or has hired another person to commit murder. *See Johnson v. State,* 665 P.2d 815, 824 (Okl.Cr. 1983). Murder for remuneration has been applied to situations where the murder was committed to obtain the proceeds of an insurance policy or an inheritance. *Johnson v. State,* 665 P.2d at 824 (Okl.Cr. 1983). It has even been found to apply when a defendant attempted to extort ransom from a kidnap victim's family. *See Chaney v. State,* 612 P.2d 269, 282 (Okl.Cr. 1980). However, this aggravator does not apply to a situation where the murder merely facilitates the receipt of the money nor to a murder committed in the course of a robbery, even if the killing was planned in advance. *See Johnson,* 665 P.2d at 824; *Boutwell v. State,* 659 P.2d 322, 328 (Okl.Cr. 1983). This Court has also rejected a definition of remuneration that encompasses all killings for monetary gain. *See Boutwell,* 659 P.2d at 329.

The State has the burden of proving beyond a reasonable doubt any aggravating circumstance alleged to support a death sentence. *See Booker v. State,* 851 P.2d 544,

---

[26] The jury rejected the continuing threat aggravating circumstance. (O.R. 1315)

548 (Okl.Cr.1993); 21 O.S. §701.11(2001). Therefore, when murder for remuneration is alleged, the jury must find, beyond a reasonable doubt, that the defendant committed the murder for payment or the promise of payment or the defendant employed another to commit the murder for payment or promise of payment. The State's theory was that Richard Glossip approached Justin Sneed several times about killing Barry Van Treese and offered him increasing amounts of money to commit the murder. (Tr. XVI 65) The only evidence to support this theory was the bartered testimony of confessed killer Justin Sneed, who saved his own life by implicating Mr. Glossip.[27] Viewed in the light most favorable to the State, Sneed's self-serving statements are wholly insufficient to prove murder for remuneration beyond a reasonable doubt.

Sneed's testimony regarding a plan to kill Van Treese for money is highly suspect due to numerous variations and inconsistencies. At trial, Sneed claimed that Mr. Glossip brought up killing Van Treese five or six times. (Tr. XII 79) Each of these conversations was different as to "how to do it, when to do it, the amount to do it for, and stuff like that." (Tr. XII 80) The amount promised varied wildly. In fact, when Sneed was first questioned about the crime, he stated that Mr. Glossip told him he would pay him $7,000 to kill Van Treese. (Tr. XII 166-167) At trial, he testified for the first time that when Mr. Glossip approached him early on January 7, he offered him $10,000. (Tr. XII 80) When confronted with this discrepancy, Sneed concocted the explanation that the amount escalated over time. He claimed that "[i]t went from like 3,500 to 5,000 to the point where he told me he'd pay me 10,000 to do it." (Tr. XII 80) Later in his testimony he stated, "At one point, like I said, when it all started it started out like 3,500 and then it jumped to like 5,000 and then it jumped to 6,000 then it jumped to 7,500. I mean it just kept climbing every time we started talking about it."

---

[27] Sneed admitted in his testimony that he was testifying for a sentence less than death. (Tr. XII 57)

(Tr. XII 167)[28]  The State even assisted Sneed in accounting for the $3000 discrepancy

that had materialized since he last testified:

> Q:  Okay. And you have testified that Mr. Glossip was going to give you 7000
> and then he would rent some of the rooms off the books and continue to
> give me [sic] the other money also; is that correct?
> A:  Yes ma'am.
> Q:  Was it your understanding that that's where the other $3000 was coming
> from?
> A:  Yes ma'am.

(Tr. XIII 79) Prior to this trial, Sneed made only vague references to what additional

amount would come "off the books." Nonetheless, the State telegraphed to Sneed that

the amount was supposed to be $3,000 in order to reach the alleged amount of $10,000.

Sneed also stated that he did not know where Mr. Glossip was going to get the money

he allegedly promised him, he "just figured maybe he had it or he could get it." (Tr. XII

99) According to Sneed, "it turned out to be what money Mr. Van Treese had in his

possession under the front seat of his car." (Tr. XIII 80)

Sneed's explanation of the plan to murder Van Treese and the means of payment

for the killing was also highly inconsistent. In his first interview with detectives, Sneed

said that he only "tapped" Van Treese a couple of times because he only wanted to

knock him out. His story then progressed to an intent to kill. (Tr. XIII 35)  At trial,

Sneed testified that after the murder, Mr. Glossip told him the money he was "looking

for" was under the front seat of Van Treese's car. (Tr. XII 125) Mr. Glossip did not tell

him how much money was under the seat but "just said the money I was looking for

would be under there." (Tr. XII 167) In his previous testimony, however, Sneed said

"I knew 7,000 was supposed to be in the front seat of his car." (Tr. XIII 80) He also

testified that "I was told before I had it in my possession that it was supposed to be

7,000." (Tr. XIII 80) When asked how much he actually got, Sneed said, "Like about

---

[28]  As discussed in Proposition V and Mr. Glossip's Rule 3.11 (B) Motion, Sneed's
January 14, 1997, interview contained additional statements inconsistent with his trial
testimony that related to this issue.

1900. I mean he told me the guy was sitting on like 7,000, but it only come up to being a little less than 5, I think." He then corrected the amount stating, "No, a little less than 4. Right at 4." (Tr. XIII 80-81) In the end, Sneed claimed that Mr. Glossip "decided that he wanted to take half of it" and the two split the money between them. (Tr. XII 128-129)

The prosecution incorrectly argued that the simple existence of the money in the possession of Sneed and Mr. Glossip supported the murder for remuneration aggravator. In his second stage opening statement, Mr. Ackley told the jury

> That evidence about this being the deal, this is Barry Van Treese's money, that is uncontroverted and it is in the hands of Justin Sneed who has to turn half of it over to Richard Glossip. The fact that this money was part of the deal is remuneration.

(Tr. XVI 65-66) In her closing second stage argument, Ms. Smothermon told the jury

> [Y]ou'll never have more graphic, more clear evidence that it was done for remuneration than the stack of money that you see fanned out on the table in front of you.

(Tr. XVII 71) The mere existence of the money in no way proves remuneration. Sneed admitted the money he had in his possession was money he stole from Van Treese's car. Aside from Sneed's testimony, there is no proof that the money Mr. Glossip had when he was arrested was the other half of that money. Even if it was Van Treese's money and even if a plan existed to murder Van Treese and split the money from his car, this is a murder/robbery and not murder for remuneration. *See Boutwell*, 659 P.2d at 328-329.

Proof of this aggravator is also undermined by the fact there would be no money without the commission of the crime. The money in question was in the control of the victim at all times prior to commission of the crime. Even the alleged promise of remuneration was illusory, because at no time prior to commission of the crime did Mr. Glossip have the money, either in his control or as a legal entitlement upon the victim's death. The murder of Van Treese facilitated the robbery of the money from his car.

To find these facts, if believed, to be a murder for remuneration would be to give an overly broad interpretation to the aggravator rejected by this Court. For example, in *Glidewell v. State*, 663 P.2d 738, 740 (Okl.CR. 1983), the appellant admitted that he and his co-defendants had planned to rob a convenience store and to kill the clerk because the clerk knew them. In finding the aggravating circumstance of murder for remuneration was improperly applied under this fact pattern, this Court stated, "To hold otherwise would cause the armed robber-murderer to be placed in a situation where he would be automatically guilty of an aggravating circumstance." *Id.* at 743. *See also Boutwell*, 659 P.2d at 328-329. In Mr. Glossip's case, Sneed's testimony at most indicates a plan to murder Van Treese in order to rob him of the money in his car. Even if the murder of Van Treese was planned in advance, the murder merely facilitated the robbery. This still falls outside this Court's definition of murder for remuneration as it is not the type of fact pattern envisioned by the aggravator.

Sneed's testimony was too inconsistent and incredible to support the aggravator of murder for remuneration. Even if believed, the facts do not prove the aggravator exists in this case. Mr. Glossip readily acknowledges that the evidence must be viewed in the light most favorable to the State, but when the only evidence available is the self-serving and inconsistent statements of a confessed murderer who testified in exchange for his life, Mr. Glossip submits that, under the facts and circumstances of this case, no rational juror could find this aggravator proven beyond a reasonable doubt. *Cf. Bland v. State*, 4 P.3d 702, 720 (Okl.Cr. 2000) (capital murder defendant's self-serving statement held insufficient to establish even a *prima facie* case of first degree manslaughter in support of lesser included offense instruction). Moreover, permitting Mr. Glossip's death sentence to stand on such shaky evidence denigrates the heightened standards of reliability in capital cases imposed by the Eight and Fourteenth Amendments. *See Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). Accordingly, Mr. Glossip's death sentence must be vacated.

## PROPOSITION VII

**ERRORS IN JURY INSTRUCTIONS GIVEN IN THE SECOND STAGE OF TRIAL DENIED MR. GLOSSIP'S RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO DUE PROCESS AND A RELIABLE SENTENCING PROCEEDING.**

### A.    Improper Weighing Instruction

Mr. Glossip's jury was given Uniform Jury Instructions 4-76 and 4-80 concerning the jury's authority in a capital sentencing proceeding. (O.R. 1301, 1302) These instructions informed the jury it had two critical facts to determine: (1) whether one or more of the aggravating circumstances exist, and (2) if one or more aggravating circumstances were found to exist, whether those outweighed the mitigating circumstances. The jury was instructed that the first fact had to be found "beyond a reasonable doubt." efense counsel requested a modified version of OUJI-CR(2d) 4-80 that would inform the jury that the second critical fact also had to be found *beyond a reasonable doubt*. (O.R. 1312) The court rejected defense counsel's proposed instruction. (O.R. 1312; Tr. XVII 60) This decision resulted in a death sentence that is unconstitutional and unreliable in violation of the Sixth, Eighth, and Fourteenth Amendments.

This Court has consistently maintained that the State is not required to prove beyond a reasonable doubt that the aggravators alleged outweigh the mitigating factors presented. *See Harris v. State*, 84 P.3d 731, 754-55 (Okl.Cr. 2004); *Torres v. State*, 58 P.3d 214, 216 (Okl.Cr. 2002). Mr. Glossip would ask the Court to reconsider its prior holding as this position is contrary to Supreme Court precedent. *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); *Apprendi v. New Jersey*, 530 U.S. 466, 476, 120 S.Ct. 2348, 2355, 147 L.Ed.2d 435 (2000); *Jones v. United States*, 526 U.S. 227, 243 n.6, 119 S.Ct. 1215, 1224 n.6, 143 L.Ed.2d 311 (1999).

In *Jones v. United States*, 526 U.S. at 243 n.6; 119 S.Ct. at 1224 n.6, the Supreme Court held that "under the Due Process Clause of the Fifth Amendment and the notice

and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." The following year, the Court found that "[t]he Fourteenth Amendment commands the same answer in this case involving a state statute." *Apprendi v. New Jersey*, 530 U.S. at 476, 120 S.Ct. at 2355. Two years later, in *Ring*, the Supreme Court affirmed *Jones* and *Apprendi* and made these constitutional principles applicable to capital sentencing schemes. 536 U.S. at 607, 122 S.Ct. at 2442. *Jones, Apprendi* and *Ring* require the capital jury be instructed it must find the aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt before it may impose the punishment of death. Because the jury's critical factual determination of whether the aggravating circumstances outweigh any mitigating circumstances is just such a "fact that increases the penalty for a crime beyond the prescribed statutory maximum," *Apprendi*, 530 U.S. at 490, 120 S.Ct. at 2362-63, the uniform instructions violate the Sixth and Fourteenth Amendments.

Under Oklahoma law, a jury verdict finding all the elements of first degree murder beyond a reasonable doubt exposes the defendant to a maximum sentence of life imprisonment without parole. This is indisputable from the text of 21 O.S. § 701.11, which provides in part:

> Unless at least one of the statutory aggravating circumstances enumerated in this act is so found or if it is found that any such aggravating circumstance is outweighed by the finding of one or more mitigating circumstances, the death penalty shall not be imposed.

After the finding of guilt, the capital jury is instructed it must find one or more aggravating circumstances before it is authorized to consider increasing the penalty to death. The jury is prohibited from imposing the capital sentence unless it unanimously finds the second fact: that any such aggravating circumstances outweigh the finding of one or more mitigating circumstances. Previous cases of this Court have

also read the statutes to this effect. In *Paxton v. State*, 867 P.2d 1309, 1322 (Okl.Cr. 1993), the Court stated "only when the aggravating circumstances *clearly outweigh* the mitigating may the death penalty be imposed."

In *Torres v. State*, 53 P.3d at 216, this Court made a distinction between fact-finding that triggers death-eligibility (*i.e.*, the finding of at least one aggravating circumstance) and fact-finding that authorizes death imposition (*i.e.*, the weighing determination). This Court held:

> *Ring* describes a substantive element of a capital offense as one which makes an increase in authorized punishment contingent on a finding of fact. Using this description, the substantive element of capital murder in Oklahoma is the jury finding of the aggravating circumstance necessary to support a capital sentence. It is that finding, not the weighing of aggravating and mitigating circumstances, that authorizes the jurors to consider imposing a sentence of death. That is, the increase in punishment from life imprisonment without parole to the death penalty is contingent on the factual finding of an aggravating circumstance.

58 P.3d at 216. Respectfully, the Court's analysis in *Torres* is the very type of element versus sentencing factor formalism rejected by the Supreme Court in *Ring*. As the Supreme Court said there, "the relevant inquiry is one of effect, not form." 536 U.S. at 602, 122 S.Ct. at 2439-2440.

The crucial flaw in the *Torres* analysis is that Oklahoma's requirement of a finding of at least one aggravating circumstance only exposes the defendant to a further factual determination about whether to impose the death sentence, but not to the increased punishment itself. Oklahoma law shields the defendant from the imposition of capital punishment unless the jury makes the *further* determination that the aggravation outweighs all mitigation, 21 O.S. § 701.11. The Court's reasoning in *Torres* clearly conflicts with *Ring*, which extends the "beyond a reasonable doubt" requirement to "all the facts which must exist in order to subject the defendant to a legally prescribed punishment." 536 U.S. at 602, 122 S.Ct. at 2440. The constitutionally relevant "effect," as opposed to the constitutionally irrelevant "form," of the Oklahoma sentencing scheme is that it only permits a defendant to be legally subjected to capital

79

punishment based on the jury's weighing determination, not the mere finding of an aggravating circumstance.

The trial court's instructions failed to carry *Ring's* "beyond a reasonable doubt" requirement to the jury's weighing determination, violating Mr. Glossip's due process right to a jury finding of all the necessary elements of a capital offense beyond a reasonable doubt, as secured by the Fifth, Sixth, Eighth and Fourteenth Amendments and Article II, Sections 7, 19, and 20 of the Oklahoma Constitution. *Sullivan v. Louisiana*, 508 U.S. 275, 113 S. Ct. 2078, 124 L.Ed.2d 182 (1993). Accordingly, his death sentence should be vacated.

**B.     Instruction on Definition of Mitigation**

Oklahoma Uniform Jury Instruction CR(2d)4-78 defines mitigating circumstances as factors which "in fairness, sympathy, and mercy, may extenuate or reduce the degree of moral culpability or blame." Defense counsel objected to this instruction in a pre-trial motion, which was overruled. (O.R. 693-695; 1/10/03 MH 30) The uniform instruction was then given to the jury at the close of the second stage of Mr. Glossip's trial. (O.R. 1304)   In *Lockett v. Ohio*, the supreme court held that "the eighth and fourteenth amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 438 U.S. 586, 604, 98 S.Ct. 2954, 2964-65, 57 L.Ed.2d 973 (1978) (footnotes omitted) (emphasis in original). *See also, Eddings V. Oklahoma*, 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982). Despite this broad definition, OUJI-CR(2d)4-78, impermissibly narrows the characterization of mitigation to exclude evidence about the defendant that may warrant a sentence less than death simply because such evidence does not lessen his moral culpability or blame for the crime of which he's been convicted.

The concept of reducing moral culpability or blame evokes considerations of guilt or justification for the crime of murder, much like an affirmative defense. By second stage, the jury in a capital case has already made a determination that the defendant is guilty of first degree murder. Necessarily, as in Mr. Glossip's case, this includes rejection of any lesser offenses. Moreover, circumstances that tend to extenuate or reduce the defendant's degree of moral culpability or blame, such as an *Enmund/Tison* issue in a felony murder case,[29] can be *a* mitigating factor. However, to define *all* mitigating circumstances in this language inappropriately limits consideration of the vast majority of evidence generally offered by a defendant as a basis for a sentence less than death.

Juries cannot be instructed in such a way that precludes them from considering all pertinent mitigation. *Hitchcock V. Dugger*, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987). When jury instructions create two alternatives and only one is constitutional and proper, the verdict cannot be upheld because the jury may have relied on the invalid alternatives. *Mills V. Maryland,* 486 U.S. 367, 376-77, 108 S.Ct. 1860, 1865-66, 100 L.Ed.2d 384 (1988); *Lafevers V. State,* 897 P.2d 292, 301 (Okl.Cr. 1995). Further, a violation of the eighth amendment occurs if a reasonable likelihood exists that the jury could understand an instruction in an unconstitutional manner. *Boyde v. California,* 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990).

A sentencer cannot fail to consider a relevant mitigating circumstance without violating the eighth amendment. *Eddings v. Oklahoma*, 455 U.S. 104, 117, 102 S.Ct. 869, 878, 71 L.Ed.2d 1 (1982). Here, a reasonable likelihood exists that jurors understood OUJI-CR(2d)4-78 as foreclosing consideration of evidence which did not tend to reduce Mr. Glossip's moral culpability or blame for the crime of which he's been

---

[29] *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982); *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987).

convicted, but which nevertheless served as a legitimate reason Mr. Glossip should not have been sentenced to death. As such, the instruction "create[d] the risk that the death penalty [was] imposed in spite of factors which may call for a less severe penalty." *Lockett v. Ohio*, 438 U.S. 586, 608, 98 S.Ct. 2954, 2966, 57 L.Ed.2d 973 (1978). Accordingly, Mr. Glossip's death sentence should be vacated.

## PROPOSITION VIII

THE TRIAL COURT ERRED IN ALLOWING IMPROPER VICTIM IMPACT TESTIMONY DURING THE SENTENCING STAGE, VIOLATING MR. GLOSSIP'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE II, §§ 7 AND 9 OF THE OKLAHOMA CONSTITUTION.

Aside from incorporation of first stage evidence, victim impact testimony was the only evidence presented by the State in the second stage of Mr. Glossip's trial. Barrie Hall, the victim's oldest daughter, read her own statement and that of her younger sister. Donna Van Treese, the decedent's widow, read her own statement as well as statements of three of her sons. Thus, although the State called only two victim impact witnesses, the statements of six family members were included in this testimony.

At a pre-trial hearing, defense counsel's motion to exclude victim impact evidence was overruled. (O.R. 757-63, 1/10/03 M.H. 65). An *in camera* hearing was then held prior to the introduction of the evidence at trial, during which certain portions of the statements were redacted by the court. (Tr. XVI 16-37) Despite the trial court's efforts to ensure that the statements conformed to law, the victim impact evidence presented in the second stage of Mr. Glossip's trial went beyond what is allowed under Oklahoma law.

Oklahoma law permits the introduction of victim impact evidence during the sentencing phase of capital murder trials. 21 O.S. § 701.10(C)(2001). Although admissible, victim impact evidence is not meant to be a free-wheeling exorcism of those demons which accompany the death of a loved one. The scope of victim impact

evidence is strictly circumscribed by statute, the Evidence Code, and the Due Process Clause of the Fourteenth Amendment. *See Cargle v. State*, 909 P.2d 806, 828 (Okl.Cr. 1996); *Toles v. State*, 947 P.2d 180, 189 (Okl.Cr.1997); *Payne v. Tennessee*, 501 U.S. 808, 825, 111 S.Ct. 2597, 2608, 115 L.Ed.2d 720 (1991). Moreover, victim impact evidence must be probative to the issues for which its use is authorized by statute, *i.e.* the financial, emotional, psychological, or physical effects of a murder upon a specifically defined class of individuals. The victim impact evidence in this case consisted of improper statements which deprived Mr. Glossip of his right to confrontation and a fair sentencing proceeding.

A.    **Improper Victim Impact Witnesses**

Those who can provide victim impact testimony are strictly limited by statute. Title 22, section 984.1(A), specifies that such testimony may be provided by the "victim, or members of the immediate family of each victim or person designated by the victim or by family members of the victim . . . ." This Court has strictly construed this statute, recognizing that the Legislature's intent was to limit the categories of persons who may give such evidence to three: the victim, the victim's immediate family, or a person designated by the victim or the victim's family. *See, e.g., Lott v. State*, 98 P.3d 318, 347 (Okl.Cr. 2004). Moreover, this Court has further observed that the Legislature intended these classes of persons to be mutually exclusive and, therefore, if family members testify, it is error for another to "represent" the family in the presentation of further victim impact evidence. *Id.* This Court has also held that it is constitutional error for one person to read the victim impact statement of another as such a practice violates a defendant's rights to confrontation. *See, e.g., Grant v. State*, 58 P.3d 783, 797 (Okl.Cr. 2003). Furthermore, all victim impact statements must be based on the personal observations and thoughts of the person giving the statements and such person may not receive any outside aid in preparing the statements. *See, e.g., Ledbetter v. State*, 933 P.2d 880, 893 (Okl.Cr. 1997).

All of these bedrock principles were violated in Mr. Glossip's case. First, based on the holding of *Grant, supra,* neither Ms. Hall nor Mrs. Van Treese should have been permitted to read the statements of Mr. Van Treese's children. Their doing so violated Mr. Glossip's right to confrontation. Second, Mrs. Van Treese's own statement was more akin to a statement given as a family representative, rather than simply her own. For example, she began her statement by noting the number of kids and grandkids Mr. Van Treese had and that they were "all left without him, husband, father, grandfather, son, brother, nephew, and cousin." (Tr. XVI 83) She knew that he would be with her "and with the kids to help us along our way through life." *Id.* at 84. She then described how "the children were very upset." *Id.* She continued about how they all went to the funeral home and described how they all said their goodbyes to their father.

She then described how her daughter was particularly hard-hit:

> She did not want to leave her daddy. She told me that she didn't want him to be alone. Bridget stood at the casket and hugged her daddy's chest. I had to explain to her that her daddy was in heaven and was not alone. That what she was seeing was only his earthly body and that the daddy she loved, the one that loved to play and laugh, that that was his spirit. And his spirit was in heaven. Then with my help she kissed his cheek and said, "I will love you forever."

*Id.* at 85. Mrs. Van Treese commented that "in our hearts he will always live and we will always remember the loving and happy times that we were blessed to share with Barry." *Id.* at 86. She continued:

> Once our son, Joe, who was age six asked me, "When will my daddy be home?" And I had to explain to him again and he said "Oh, I'm sorry. I forgot for a minute."

> This has affected the lives of all who knew and loved Barry. This is something that will take a lifetime to be able to live with. The important days of our lives will never be shared with him here beside us in the flesh. The Eagle Scout ceremonies, the graduations, the weddings, the birth of grandchildren. But you can be sure of this, that they will be told of the man that loved all of us and the man that was taken long before his time.

*Id.* at 86-87. Finally, she concluded:

> Our oldest son got married. The pain in his eyes longing for his father to be there and to be proud of him. He's now served our country as a marine. He and his wife are having to try – he and his wife are trying to have a baby this year.

> This will be another grandchild that will never get to know the love of a grandfather.
>
> It pains me to know that the love that this baby will miss from Barry. You see, Barry's death did not just impact on me as his wife, but on his entire family and the future family. The impact will last a lifetime for our children and for their children.
>
> As I sit here writing this, I am compelled to scream and cry and try to let you get a glimpse of *the impact a death can have on a family*. The word family goes out a long way. There's a lot of impact. There are a lot of people impacted by this, wives, children, grandchildren, father, brother, sister, and so on. *So you see, I am also their voices.*

*Id.* at 87-88. (Emphasis added).

Almost the entirety of Mrs. Van Treese's statement was a reflection on the impact of Mr. Van Treese's death on the entire family, not just on her. As such, no other person should have been permitted to offer a victim impact statement. *See Lott v. State*, 98 P.3d at 347. This was error.

**B.    These Errors Were Not Harmless**

Victim impact evidence is intended to give a "quick" glimpse of the personal characteristics of a victim. *Cargle*, 909 P.2d at 828. This Court has warned: "The more a jury is exposed to the emotional aspects of a victim's death, the less likely their verdict will be a 'reasoned moral response' to the question whether a defendant deserves to die; and the greater the risk a defendant will be deprived of Due Process." *Id.* at 830. In this case, the jury was exposed to six statements, all of them emotionally charged, five of them inadmissible *in toto*, and one of which was a poem. (Tr. XVI 81) The prejudicial effect of these emotionally charged statements cannot be discounted.

This Court frequently finds errors in victim impact testimony to be harmless due, usually, to the overwhelming evidence of aggravating circumstances, the aggravating circumstances clearly outweigh the evidence of mitigation, and the victim impact statements are very short and far less emotional than the factual details of the death. *See e.g., Grant v. State*, 58 P.3d at 797. In this case, the evidence in support of the sole aggravator found by the jury was far from overwhelming. The only evidence

presented in support of the allegation that Mr. Glossip hired Justin Sneed to kill Mr. Van Treese was the self-serving testimony of a confessed cold-blooded murderer, testimony bartered in exchange for a chance to live. The victim impact testimony consisted of nineteen pages of transcript, the entirety of the State's second stage case. Of these nineteen pages, only five of them contained admissible testimony. Moreover, it simply cannot be said that the aggravation clearly outweighed the mitigation presented in this case.

The result of the erroneous introduction of victim impact evidence was a jury verdict of death based on emotion rather than reason in violation of Mr. Glossip's rights under the Fourteenth Amendment. Since it cannot be said that the amount of improperly admitted victim impact evidence did not influence the jury in its decision to impose the death penalty, justice demands that the Court vacate Mr. Glossip's sentence of death.

## PROPOSITION IX

**THE TRIAL COURT'S VOIR DIRE PROCESS VIOLATED MR. GLOSSIP'S RIGHTS PROTECTED BY THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND CORRESPONDING PROVISIONS OF THE OKLAHOMA CONSTITUTION.**

A criminal defendant is entitled to a fair trial by a panel of impartial jurors. *See Morgan v. Illinois*, 504 U.S. 719, 727, 112 S.Ct. 2222, 2229, 119 L.Ed.2d 492 (1992). One of the purposes of voir dire is to ensure this right. *See Patton v. State*, 973 P.2d 270, 284 (Okl.Cr. 1998). "The critical fact to be determined is whether the defendant received a fair trial from jurors who could lay aside any personal opinions and base a verdict on the evidence." *Woodruff v. State*, P.2d 1124, 1132 (Okl.Cr. 1993). The voir dire process in this case resulted in the exclusion, to Mr. Glossip's disadvantage, of otherwise qualified jurors without proper regard to whether they could be fair and impartial.

**A.    The Trial Court Improperly Questioned Prospective Jurors about Their Ability to Impose the Death Penalty.**

In qualifying jurors in a capital case, Oklahoma Uniform Jury Instruction

CR(2d)1-5 Alternate 2 provides the following question for use by trial judges:

> If you find the defendant guilty of murder in the first degree, can you consider all three legal punishments - death, imprisonment for life without parole or imprisonment for life - and impose the one warranted by the law and evidence?

Instead of this question, throughout voir dire, the trial judge in Mr. Glossip's case asked the prospective jurors whether they could give heartfelt consideration to all three sentencing options. (Tr. I 112, 115, 134, 150, 198, 211-12; Tr. II 8, 26, 43, 119, 139; Tr. III 22, 123) In response to a juror who expressed reservations about imposing the death penalty, the court attempted to clarify the standard for consideration of the options:

> [T]here are three options under the law and they all need to start in the same place with you. If, in fact, your concerns about the death penalty are such that it starts at a huge deficit and might not be considered equally, then that's not fair consideration of all three options.

(Tr. I 118)

> [T]he law is that the jurors must give equal, fair consideration to all of the options.

(Tr. I 139 )

> The law is that there are three sentencing options. All three have to have equal, heartfelt consideration.

(Tr. I 150) On the basis of the trial court's use of this incorrect standard, two jurors in Mr. Glossip's case with reservations about the death penalty were erroneously excluded based on their inability to consider all three punishments "equally."[30] Prospective juror Mary Lawton even expressed her concerns using the judge's language, saying, "Your Honor, I would not be able to give the death penalty equal consideration as a sentencing option." (Tr. II 13) The judge then followed up by asking whether her reservations were such that she would not impose the death penalty

---

[30]    Mr. Glossip's complaint is not that the trial court deviated from the Uniform Jury Instructions. Rather, the complaint is that the deviation did not accurately reflect the law. Trial courts are free to deviate from the Uniform Instructions, so long as such deviation is an accurate statement of the law. *See* 12 O.S. § 577.2 (2001).

regardless of the law or the facts. After responding, "That's correct," Ms. Lawton was removed for cause by the court. (Tr. II 14)  Although the trial court made a more proper follow up inquiry as to Ms. Lawton's ability to impose death, her initial statement evinces reliance on the judge's erroneous standard in evaluating her own ability to do what the "law" requires.

In prospective juror Sharon Moore's case, she was struggling with the idea of imposing death and eventually told the court that she wanted to do her "civic duty" but she had "a problem with the death penalty." (Tr. II 34)  In order to clarify the depth of her reservation, the judge then asked whether "regardless of the law and the evidence, you would not be able to give *equal* consideration to all three sentencing options?" After Ms. Moore answered affirmatively, she was also removed for cause by the court. (Tr. II 36) (Emphasis added.)

Requiring jurors to give "equal consideration" to all three sentencing options is contrary to this Court's holding in *Frederick v. State*, 37 P.3d 908, 926-927 (Okl.Cr. 2001). In *Frederick*, a prospective juror stated that she would lean toward the death penalty if the defendant was convicted of capital murder; nonetheless, she stated she could follow the law and consider all three punishments. The juror was allowed to remain on the jury and the defense used a peremptory challenge to remove her. *Id.* On appeal, appellant relied upon language from *Malicoat v. State,* 992 P.2d 383, 393 (Okl.Cr. 2000) to the effect that the jurors' statements that they "could consider all three punishments equally" was "all that the law required." In response, this Court clarified that "equally" merely recounted the words used by the jurors in *Malicoat* but the law did not require that much. *Frederick*, 37 P.3d at 926. The Court went on to say that recent case law does not contain the word equal but instead says:

> "To withstand a challenge for cause concerning punishment issues, a venireperson need only be willing to consider all the punishments provided by law and not be irrevocably committed to any one punishment option before the trial has begun."

*Frederick*, 37 P.2d at 926-927 (quoting *Salazar v. State* 919 P.2d 1120, 1127 (Okl.Cr. 1999); *Carter v. State*, 879 P.2d 1234, 1244 (Okl.Cr. 1999). Thus, this Court made clear that that the law does not require that prospective jurors in a capital case be able to consider all three punishments "equally." *Id.* at 926-927.

Ms. Lawton and Ms. Moore were both struggling with the idea of imposing the death penalty. Their feelings on the death penalty then were obviously not "equal" to sentences of life or life without parole. By instructing them that they must consider death on an equal footing with the life options, the court improperly determined that they were unqualified to serve on the jury. Moreover, the entire jury pool may have been influenced by the judge's imposition of an erroneous standard as fifteen other prospective jurors were removed due to their reservations about the death penalty after the court explained that the three sentencing option must be "equal."[31] (Tr. I 124-26, 202, 203: Tr. II 8-9, 13-18, 23, 36; Tr. III 17, 109-12).

The requirement that veniremen simply be willing to **consider** the full range of punishment provided by law is still the basis for determining qualification to serve in a capital case: would the juror's views on capital punishment "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath?" *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841(1985). The bench mark for determining whether a prospective juror may sit on a capital case is not the degree of his or her opposition to the death penalty, but whether, despite this belief, he or she can subsume the opinion to the requirements of the law, follow the courts instructions, and uphold the oath as a juror by considering the death penalty, life imprisonment without parole, and life imprisonment. *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). In Mr.

---

[31] Presumably a number of jurors had feelings regarding the death penalty, but these feelings were not "equal." However, the erroneous language of the court's instruction undoubtably influenced a number of these jurors to vocalize an inability to consider all three punishments because they could not consider them "equally."

Glossip's case, the trial judge applied an erroneous standard for determining whether prospective jurors were suited for a capital jury. The use of this standard had the effect of excluding jurors with only conscientious objections to the death penalty but who might otherwise follow the law. Accordingly, Mr. Glossip's death sentence must be vacated. *See, e.g., Davis v. Georgia*, 429 U.S. 122, 97 S.Ct. 399, 399-400, 50 L.Ed.2d 339 (1976)(improper excuse of juror under *Witherspoon* requires vacation of death sentence); *Gray v. Mississippi*, 481 U.S. 648, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987).

**B.    A Prospective Juror Currently Serving a Deferred Sentence Was Improperly Removed for Cause.**

During the court's questioning of the jury panel, prospective juror Sharita Miles stated that she had prior bogus check charges and was currently serving a deferred sentence for misdemeanor drug possession. (Tr. I 61) After informing the court of her situation, the following dialogue took place:

> THE COURT: Okay. Well, I'm real concerned about this, Ms. Miles. You're on a two [sic] deferred right now and I have real concerns about your ability to be fair and impartial in a case where within two years you've been prosecuted by the State of Oklahoma. I mean, doesn't that bother you?
>
> PROSPECTIVE JUROR MILES: Yeah, but, you know, what can I do about it?
>
> THE COURT: Well, I guess what I'm saying, Ms. Miles is, you know, we have all kinds of jury trials down here. We have civil trials, we have criminal trials and stuff. When you have been prosecuted by the State, it seems to me that it's very difficult for us to ask you to serve as a juror on a criminal trial. It would be a lot easier for you to serve on a civil case.
>
> And I'm not criticizing you for these things. It appears to me that you made your restitution on the '93 case. It was dismissed. You obviously served out your deferred sentence on the '97 case and you must be doing well on your present deferred case, but if you feel that you are best suited to serving as a juror in a case that's not being prosecuted by the State, I just need you to tell me.
>
> PROSPECTIVE JUROR MILES: Yeah, I can do that. That will be fine.
>
> THE COURT: Well, I guess I'm asking you, do you think that you are better suited to a case in which the State is not involved since you've been prosecuted by the State on these other cases?
>
> PROSPECTIVE JUROR MILES: Yes.

(Tr. I 62-63) Following this exchange, the judge announced that she was excusing Ms. Miles for cause. Defense counsel objected to the dismissal, stating: "Well, I think the important question that I would have asked, had I had the opportunity, is can she – if she is required to be here, can she be fair and impartial." (Tr. I 63) To this, the judge responded:

> Well, I've got to tell you, I just have a real problem with people who are on a deferred sentence sitting as jurors. They've got a lot at stake and they've got to feel that they're being watched carefully. And you know, they're subject to having a sentence accelerated. And I believe that if they're smart enough to think about it, they've got to be holding in the back of their mind that if they do something the State of Oklahoma doesn't like, even though we know that would never happen, I just think that that's always a question. So I am more comfortable excusing Ms. Miles.

(Tr. I 63-64)

The Oklahoma legislature has enumerated those persons who are ineligible for jury service. *See* 38 O.S. §28 (2001). Persons under a deferred sentence are not statutorily disqualified from serving as jurors. The proper standard under applicable case law for determining whether an otherwise qualified juror's ability to serve on the jury is one of fairness and impartiality. *See Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1942, 6 L.Ed2d 751 (1961) "The purpose of the examination of a juror on his voir dire is to ascertain if there are grounds for challenge for either actual or implied bias; also, to enable the defendant to exercise intelligently his peremptory challenges." *Grim v. State*, 240 P. 1093, (Okl.Cr. 1925).

The manner and extent of voir dire rests within the trial court's discretion. *See Banks v. State*, 701 P.2d 418, 423 (Okl.Cr. 1985) It is not error to deny defense counsel an opportunity to rehabilitate an excused juror if the trial court has asked the proper questions to determine whether the prospective juror should sit in a case. *See Scott v. State*, 891 P.2d 1283, 1298-1290 (Okl.Cr. 1995) In focusing solely on Ms. Miles's deferment, however, the court failed to ask the proper questions designed to

determine bias.  Instead, the trial judge clearly conveyed her belief that Ms. Miles should not be serving on a criminal jury through suggestive inquiries that encouraged Ms. Miles to adopt the same position.  No further questioning was conducted by the judge after Ms. Miles acquiesced that she would be "better suited" to a civil jury and defense counsel was foreclosed from attempting rehabilitation.[32]  Furthermore, the judge's implication that someone who has been prosecuted by the State should not sit on a criminal jury is inconsistent with the fact that a number of other prospective jurors, including two who eventually sat on the jury, revealed prior involvement with the criminal justice system. (Tr. I 64, 65, 66, 67, 68, 71, 73)  Each of these jurors was questioned about any impact this experience might have on their ability to be fair and impartial. Each responded with assurances that it would not be a problem and none were removed for cause on this basis.[33]

It appears, therefore, that the judge considered only those serving a deferred sentence to be unacceptable jurors.  In doing so, the court created a disqualification not founded in law.  While the question of competency of a juror is within the sound discretion of the trial court, the discretion must not be abused. *See Greathouse v. State*, 503 P.2d 239, 240-41 (Okl.Cr. 1972)  "Juror competence is an individual rather than a group or class matter. This fact lies at the very heart of the jury system." *Thiel v. Southern Pac. Co.*, 328 U.S. 217, 220, 66 S.Ct. 984, 986, 90 L.Ed. 1181 (1946).  By

[32]  Ms. Miles's acquiescence is not necessarily indicative of sincere agreement. Jurors responding to judge's questions during voir dire may be driven by a desire to please the judge and may succumb to "verbal pressure to respond 'correctly'" to openly leading questions. *See* Cosper, C.A., *Rehabilitation of the Juror: Rehabilitation Doctrine*, 37 Ga.L.Rev. 1471 (Summer 2003);*see also McGill v. Commonwealth*, 391 S.E.2d 597, 600 (Va.Ct.App. 1990)(finding that leading questions undermine reliability of juror responses).

[33]  Jury foreperson Donald Stamman had been cited for drunk driving. (Tr. I 65) Juror Clinton Henderson had a prior misdemeanor possession charge. (Tr. I 73) Prospective juror ThurmanDavis had a prior public intoxication charge. (Tr. I 67) Prospective jurors Linda Mustari and Amber Gramon had both been charged with shoplifting . (Tr. I 66; 71) Prospective jurors Jose Garcia and Charles Andrew had prior DUI convictions. (Tr. I 64; 68)

determining that Ms. Miles was unsuited for jury service because she is serving a deferred sentence, the judge abused her discretion by creating an entirely new class of citizens who are unable to fulfil their civic duty. Mr. Glossip readily admits that it is difficult, if not impossible, to affirmatively demonstrate harm. However, this situation is akin to those situations in which specific groups are systematically excluded from juries and the Supreme Court has held that under such circumstances, automatic reversal is required without regard to actual harm. *See, e.g., Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972) (exclusion of blacks); *Ballard v. Undited States*, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946) (exclusion of women); *Thiel v. Southern Pacific, Co.*, 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946) (exclusion of wage-laborers).

In a case analagous to the instant case, the Third Circuit held that it was reversible error for the trial court to automatically exclude all members of the National Rifle Association from the petit jury based solely on the assumption that members of such a class would *ipso facto* be biased. *See United States v. Salamone*, 800 F.2d 1216, 1226-29 (3rd Cir. 1986). This Court must likewise recognize the intrinsic harm caused by such an abuse of judicial discretion and reverse Mr. Glossip's judgment and sentence.

## PROPOSITION X

AMENDED SECTION 2403 OF THE OKLAHOMA EVIDENCE CODE IS UNCONSTITUTIONAL ON ITS FACE; THE ADMISSION OF A PRE-MORTEM PHOTOGRAPH OF THE VICTIM INJECTED PASSION, PREJUDICE, AND OTHER ARBITRARY FACTORS INTO THE SECOND STAGE PROCEEDINGS.

This Court has long recognized the potentially prejudicial impact of photographs taken of a homicide victim prior to death. In *Boutwell v. State*, 659 P.2d 322, 326 (Okl.Cr. 1983), this Court condemned the admission of such photographic exhibits stating:

> We fail to see the relevancy of these exhibits because the victim's identity was not at issue. With increasing frequency prosecutors in this state have been

93

> introducing for no relevant purpose photographs of the victim taken when they were alive. This practice should cease as it has little bearing on the issues of guilt or innocence to be decided by the trier of fact.

Moreover, this Court "has held that where there is no purpose in introducing such pictures into evidence, such admission invokes the sympathy of the jury and constitutes error." *Staggs v. State*, 804 P.2d 456, 458 (Okl.Cr. 1991) (citing *Hayes v. State*, 738 P.2d 533, 538-39 (Okl.Cr. 1987), *vacated on other grounds* 486 U.S. 1050, 108 S.Ct. 2815, 100 L.Ed.2d 916 (1988); *Whittmore v. State*, 742 P.2d 1154, 1156 (Okl.Cr. 1987)). This Court has also found that photographs of homicide victims taken while alive are inadmissible "unless they are relevant to some material issue and their relevancy outweighs the danger of prejudice to the defendant." *Thornburg v. State*, 985 P.2d 1234, 1244 (Okl.Cr. 1999) (citing *Tilley v. State*, 963 P.2d 607, 615 (Okl.Cr. 1998); *Valdez v. State*, 900 P.2d 363, 381 (Okl.Cr. 1995).

Despite this Court's sound assessment of the issue, the Oklahoma legislature passed the Kristie LeGrange Bill in 2002. This Bill amended 12 O.S. 2001, § 2403, to provide: "However, in a prosecution for any criminal homicide, an appropriate photograph of the victim while alive shall be admissible evidence when offered by the district attorney to show the general appearance and condition of the victim while alive." Pursuant to amended Section 2403, the State introduced a live photograph of Barry Van Treese into evidence *during the first stage of trial* through the testimony of his wife, Donna Van Treese. (Tr. IV 35; St. Ex. 79) Defense counsel objected to the introduction of the photograph. (Tr. IV 34) In response, the State made no argument as to the photo's relevance, instead simply stating the statute made no distinction between first or second stage and the photo — a simple head shot — fell within the statute's guidelines. The trial court then overruled counsel's objection and admitted the photograph. (Tr.IV 35-36) Through incorporation, the State was also able to refer to the photo in second stage. (Tr. XVII 65)

**A. Amended Section 2403 is Unconstitutional on Its Face**

It is telling that the Kristie LeGrange Bill is not found in Section 2401, which defines relevant evidence, but in Section 2403, which otherwise allows for exclusion of unduly prejudicial evidence even *if* relevant. This Court has already made clear that pre-mortem photographs *may* be admissible *if* they are relevant to some material issue. *See Rawlings v. State*, 740 P.2d 153, 161-62 (Okl.Cr. 1987) (finding that "although this Court does not favor admissions of photographs showing the victim alive, we are of the opinion that the photograph was relevant as to its existence and the location of its discovery"). Amended Section 2403, however, does not seek to ensure that relevant, highly probative evidence is presented to the jury, but rather ensures that a specific type of evidence is admitted without regard to relevance and without regard to whether the evidence would unfairly prejudice the defendant.

Amended Section 2403 is also decidedly one-sided in its application. If, for instance, a criminal defendant wanted to offer a photograph of the victim, perhaps as pictorial evidence of the particular victim's bad character, the defendant could not avail himself of amended Section 2403, because admissibility under this provision is strictly limited to photographs "offered by the district attorney." Even a photograph related to some relevant issue  - such as where self defense is alleged and a side-by-side photographic display could show how the victim was much bigger and stronger than the defendant – is still subject to exclusion if the trial court deems the photograph too prejudicial to the State. We only throw out the basic rule of Section 2403 at the behest of the District Attorney – who, we have learned, represents not the State but the victim. That is because the Kristie LeGrange Bill is not about criminal justice, but about politics. The principle sponsor of the bill described the passage of the bill as "just a great day for victims' rights advocates." Jack Money, *House OK's Bill to Allow Court Photos*, DAILY OKLAHOMAN, Apr. 19, 2002, at 4-A. Supporters of the bill have described it as "a reminder of the life that was taken in a horrible crime" and to "remind citizens

of what a murder trial is really for – justice for the innocent victim." Editorial, *Victims'*

*Photos in Court a Sensible Move,* DAILY OKLAHOMAN, Apr. 29, 2002, at 6-A.

A criminal trial, however, is not about "the innocent victim" or "about" the

presumed-innocent defendant. It is about a fair trial to both sides. In enacting the

Kristie LeGrange Bill as it did, without reference to its relevance and potential effect

on the fairness of the proceedings, the Legislature has clearly overstepped its bounds.

As this Court has aptly noted:

> Under our system of jurisprudence there is but one standard by which our laws
> are interpreted and enforced. That standard is known as Due Process of Law.
> It guarantees a fair and impartial trial to the guilty and innocent alike. It is the
> unique symbol of freedom and democracy and when denied to any citizen, it
> results in a denial to all.

*Cody v. State,* 361 P.2d 307, 324 (Okl.Cr. 1961). Statutory enactments such as amended

Section 2403 erode the fundamental right to a fair trial by injecting irrelevant and

highly prejudicial "evidence" into the proceedings. There must be a limit to

admissibility by legislative fiat, and that limitation is logical relevance within the

framework of the basic purposes of a criminal trial.

At least in the second stage of trial, we have a provision allowing the jurors to

see a "quick glimpse" of the victim's life. *See* 12 O.S. 2001, § 984.1. Nevertheless, victim

impact evidence could still be so prejudicial as to constitute a denial of due process.

*Payne v. Tennessee,* 501 U.S. 808, 825, 111 S.Ct. 2597, 2608, 115 L.Ed.2d 720 (1991). When

used in the second stage of a trial, a posed photograph of the victim adds nothing to

this "quick glimpse" except sympathy for the victim and yet more prejudice to the

capital defendant. *See, e.g., Al-Mosawi v. State,* 929 P.2d 270, 285 (Okl.Cr.

1996) (finding admission of photos of victims while alive was error because they "did

not demonstrate any information about the victims, did not show how their deaths

affected the survivors and in no way showed the financial, psychological, or physical

impact on their survivors.");*Cargle v. State,* 909 P.2d 806, 830 (Okl.Cr. 1995) (probative

value of the one "arguably" relevant photograph was substantially outweighed by the

danger of unfair prejudice; other photograph was irrelevant as it "in no way showed the financial, psychological or physical impact on their survivors or any particular information about the victim").

Relevant evidence already has an avenue for admission into evidence in both stages of trial. By its terms, the amendment of Section 2403 comes into play only when the probative value of such evidence is substantially outweighed by the danger of unfair prejudice, as an exception to the rule of exclusion of such evidence. The inevitable result of injecting such highly prejudicial and unnecessary evidence into the first and second stage of capital trials is to infect the proceedings with such unfairness as to make the resulting conviction a denial of due process and to undermine the reliability of the death sentence. *Darden v. Wainright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974).

**B.** **The Lack of Limiting Guidelines for Admissibility of Pre-Mortem Photographs Leads to Highly Inflammatory Prosecutorial Abuse, as Occurred in this Case.**

Amended Section 2403 provides no guidance for its application. Without procedural safeguards, the potential for abuse and undue prejudice to the defendant is significantly heightened. As there are no guidelines for determining what constitutes an "appropriate" photograph, prosecutors are theoretically free to admit photos of the victim in any number of contexts — in the company of small children or animals; on their wedding day; posing for a "glamour" portrait. There is no limit on the size of the photo, making it possible that a large poster or life-sized cut-out might be admitted. Moreover, the amendment does not specify which stage of the proceeding in which a life photo is admissible. So, the photograph of the victim in life can be admitted in the first stage of a capital trial and then referred to again in the second stage as in Mr. Glossip's case. Once admitted, the photo may then go back to the jury room. Without any corresponding instruction as to the proper consideration of a photograph that has no

relationship to any relevant issue related to either guilt or victim impact, the jury is free

to evaluate it for its purely emotional value.  This creates a real danger of a verdict

based on sympathy rather than a rational review of the evidence.[34]

The circumstances surrounding the introduction of Barry Van Treese's photo

clearly highlight the problems with the statute as written.  While providing the

foundation for admission of the pre-mortem photograph, Mrs. Van Treese was allowed

to relate to the jury an emotional tale about how Mr. Van Treese had grown a "full,

white beard" at his daughter's request and that "he had shaved it off once and she

cried and said, Daddy, daddy, please grow it back."  (Tr. IV 33)  Later, in closing

arguments, Mr. Ackley made use of the pre-mortem photograph through an

inflammatory and highly prejudicial "before and after" comparison, telling the jury, "In

a nutshell, murder is the process by which one human being takes State's Ex. No. 79,

a picture of Barry Van Treese in happier days, and deliberately hurts him with the idea

to kill him, and out of that man makes State's Ex. 65 [post-mortem photograph]." (Tr.

XV 58)  Such a display is obviously calculated to incite an emotional response and

comes perilously close to the kind of prosecutorial conduct this Court has condemned

with regard to other types of exhibits.[35]  *See e.g. Ford v. State*, 719 P.2d 457, 459-460

(Okl. Cr. 1986)(modifying sentence because prosecutor held gun and demanded that

---

[34] At least one legislative body had incorporated guidelines for introduction of a life photograph into its statutory scheme. In Connecticut, CT ST§ 54-85e (2001), reads:

A photograph not to exceed eight inches by ten inches solely of a deceased victim prior to the date of the offense for which the defendant is being tried, that is a fair and accurate representation of the victim and is not of itself inflammatory in nature, may be shown to the jury during the opening and closing arguments by the prosecutor. CT ST § 54-85e (2001).

[35] Nor is this an isolated instance. Mr. Glossip would ask this Court to take judicial notice of the fact that different prosecutors from this very same District Attorney's office performed the same type of stunt with the pre-mortem and gruesome post-mortem photographs of a child victim in the case of *Mitchell v. State of Oklahoma*, Oklahoma County Case No. CF-2000-4712. (This Court recently reversed Mr. Mitchell's convictions and sentences on other grounds without having to address this issue.) *See Mitchell v. State*, 120 P.3d 1196 (2005)

98

appellant hold it during cross-examination); *Brewer v. State*, 650 P.2d 54, 57 (Okl.Cr. 1982) (finding prosecutor's stabbing of victim photo during cross-examination of defense expert to be impermissible conduct).

In second stage, the prosecutor had Barry Van Treese's daughter identify his photo prior during her victim impact testimony. (Tr. XVI 71) He also referred to it in his closing argument. (Tr. XVII 65) Once again the photo had no relation to second stage issues or the allowable purposes of victim impact. Thus, its sole purpose and effect was to elevate the emotional level of the sentencing phase.

## C.   Conclusion

Mr. Glossip respectfully asks this Court to find amended Section 2403 unconstitutional, under both the state and federal constitutions; to find that the admission of a pre-mortem photograph of the victim, under the facts and circumstances of this case, rendered Mr. Glossip's trial fundamentally unfair, depriving him of the Due Process of Law, *see, e.g., Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), and unconstitutionally injected passion, prejudice, and other arbitrary factors into the sentencing proceeding, *see, e.g., Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); and therefore to reverse Mr. Glossip's conviction for a new trial or, at least, to vacate his death sentence.

### PROPOSITION XI

THE ACCUMULATION OF ERRORS IN THIS CASE SO INFECTED THE TRIAL AND SENTENCING PROCEEDINGS WITH UNFAIRNESS THAT MR. GLOSSIP WAS DENIED DUE PROCESS AND A RELIABLE SENTENCING PROCEEDING IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS.

Mr. Glossip asks this Court to review the aggregate impact of the errors in his case in addition to reviewing the errors and their prejudice in their individual capacities. *Bechtel v. State*, 738 P.2d 559, 561 (Okl.Cr.1987); *Chandler v. State*, 572 P.2d 285, 290 (Okl.Cr.1977). Sometimes the cumulative effect of two or more individually harmless errors has the potential

to prejudice a defendant to the same extent as a single reversible error. *United States v. Rivera,* 900 F.2d 1462, 1469 (10th Cir. 1990). Each of the errors described in the foregoing Propositions is sufficiently prejudicial in and of itself to warrant reversal. However, Mr. Glossip asks the Court to also analyze the errors collectively to determine their cumulative effect on his right to a fair and impartial trial and on the sentencing decision. Appellant submits that the State should be required to prove beyond a reasonable doubt that all constitutional errors could not have contributed to the verdicts rendered. *See Chapman v. California,* 386 U.S. 18 (1967). At the very least, the combined effect of all errors should result in the modification of Mr. Glossip's death sentence. *See Suitor v. State,* 629 P.2d 1266, 1268-69 (Okl.Cr.1981); *Barnett v. State,* 853 P.2d 226, 234 (Okl.Cr.1993).

**CONCLUSION**

The record of Mr. Glossip's trial plainly shows that he did not receive the fair trial and reliable sentencing proceeding to which the Constitution entitled him. Throughout this Brief, he has brought forth major trial errors that affected his ability to defend against capital murder charges and the death penalty. For those reasons, and others this Court may note *sua sponte*, Mr. Glossip respectfully asks the Court to reverse the Judgment and Sentence imposed against him or order any other relief as justice requires.

Respectfully submitted,
RICHARD EUGENE GLOSSIP

By: _____
JANET CHESLEY
Appellate Defense Counsel
Oklahoma Bar Assoc. No. 1645

_____
KATHLEEN M. SMITH
Appellate Defense Counsel
Oklahoma Bar Assoc. No. 17935

ATTORNEYS FOR APPELLANT

**CERTIFICATE OF SERVICE**

This is to certify that on this 15th day of December, 2005, a true and correct copy of the Brief of Appellant was served upon the Attorney General by leaving a copy with the Clerk of the Court of Criminal Appeals.

_____
JANET CHESLEY