**DEATH PENALTY CASE**

**DEATH PENALTY**

Case No. D-2005-310

# IN THE COURT OF CRIMINAL APPEALS OF THE STATE OF OKLAHOMA

**RICHARD EUGENE GLOSSIP**

Appellant,

vs.

**THE STATE OF OKLAHOMA**

Appellee.

Appeal from the
District Court of Oklahoma County

**FILED**
IN COURT OF CRIMINAL APPEALS
STATE OF OKLAHOMA

MAY   4 2006

MICHAEL S. RICHIE
CLERK



RECEIVED
CAPITOL OFFICE
MAY 5 2006
#6
ATTORNEY GENERAL

## REPLY BRIEF OF APPELLANT

JANET CHESLEY
Appellate Defense Counsel
Oklahoma Bar Assoc. No. 1645

KATHLEEN M. SMITH
Appellate Defense Counsel
Oklahoma Bar Assoc. No. 17935

Capital Trial Divisions
Oklahoma Indigent Defense System
P.O. Box 926
Norman, Oklahoma 73070
(405) 801-2666

ATTORNEYS FOR APPELLANT

May 4, 2006



**EXHIBIT**

C

Case No. D-2005-310

## IN THE COURT OF CRIMINAL APPEALS OF THE STATE OF OKLAHOMA

**RICHARD EUGENE GLOSSIP**

**Appellant,**

**vs.**

**THE STATE OF OKLAHOMA**

**Appellee.**

Appeal from the
District Court of Oklahoma County

## REPLY BRIEF OF APPELLANT

JANET CHESLEY
Appellate Defense Counsel
Oklahoma Bar Assoc. No. 1645

KATHLEEN M. SMITH
Appellate Defense Counsel
Oklahoma Bar Assoc. No. 17935

Capital Trial Divisions
Oklahoma Indigent Defense System
P.O. Box 926
Norman, Oklahoma 73070
(405) 801-2666

ATTORNEYS FOR APPELLANT

May 4, 2006

## TABLE OF CONTENTS

PAGE

REPLY TO PROPOSITION I ..................................................... 1

REPLY TO PROPOSITION II .................................................. 6

REPLY TO PROPOSITION III .................................................. 7

REPLY TO PROPOSITION IV .................................................. 10

REPLY TO PROPOSITION V .................................................. 13

REPLY TO PROPOSITION IX .................................................. 15

REPLY TO PROPOSITION X .................................................. 16

CONCLUSION ............................................................. 17

CERTIFICATE OF SERVICE .................................................. 18

## TABLE OF AUTHORITIES

### CASES

Browning v. State,
      2006 OK CR 8 ¶27 ......................................................... 5

Compton v. State,
      122 P.2d 819 (Okl.Cr. 1942) ................................................. 6

Cummings v. State,
      968 P.2d 821 (Okl.Cr. 1998) ................................................. 1

Ex parte Bullock,
      770 So. 2d 1062 (Ala. 2000) ................................................. 3

Frederick v. State,
      37 P.3d 908 (Okl.Cr. 2001) ................................................. 15

Kimmelman v. Morrison,
      477 U.S. 365, 106 S.Ct. 2574 (1986) ......................................... 14

Marbury v. Madison,
      5 U.S. (1 Cranch) 137, 2 L. Ed. 60 (1803) ................................... 17

Nelson v. Estelle,
      642 F.2d 903 (5th Cir. 1981) ................................................. 14

i

Nero v. Blackburn,
    597 F.2d 991 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Paxton v. Ward,
    199 F.3d 1197 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Pink v. State,
    104 P.3d 584 (Okl.Cr. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Sadler v. State,
    846 P.2d 377 (Okl.Cr. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

State v. Doerr,
    969 P.2d 1168 (Ariz. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

State v. Miller,
    396 N.W.2d 903 (Minn.App. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Washington v. Watkins,
    655 F.2d 1346 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Williamson v. Reynolds,
    904 F. Supp. 1529 (E.D.Okla. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Williamson v. Ward,
    110 F.3d 1508 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Witherspoon v. Illinois,
    391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) . . . . . . . . . . . . . . . . . . . . . 16

## STATUTORY AUTHORITY

12 O.S. 2001, § 2401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

12 O.S. 2001, § 2403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

12 O.S. Supp. 2002 § 2611 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

21 O.S. 2001, § 173 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

22 O.S. 2001, § 742 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Rule 3.5 (A) (4) *Rules of the Oklahoma Court of Criminal Appeals,*
    Title 22, Ch. 18, App. (2006 Supp.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Rule 3.11 (A) *Rules of the Oklahoma Court of Criminal Appeals,*
    Title 22, Ch. 18, App. (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Rule 3.11 (B) (3) *Rules of the Oklahoma Court of Criminal Appeals,*
    Title 22, Ch. 18, App. (2006 Supp.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## REPLY BRIEF OF APPELLANT

This brief is submitted on behalf of Richard Eugene Glossip in reply to the Brief of Appellee filed by the State of Oklahoma on April 14, 2006. Mr. Glossip reaffirms and reasserts all arguments advanced in his Brief of Appellant filed December 15, 2005; however, Mr. Glossip replies to certain of the Appellee's arguments as follows.

### REPLY TO PROPOSITION I
### (Insufficiency of the Evidence)

In Proposition I, Mr. Glossip argues the State presented insufficient evidence to support a guilty verdict for first degree malice murder based, in part, on the assertion the State failed to corroborate the testimony of its star witness, Justin Sneed. As this Court has held many times, the "testimony of an accomplice 'must be corroborated with evidence, that *standing alone*, tends to link the defendant to the commission of the crime charged.'" *Cummings v. State*, 968 P.2d 821, 830 (Okl.Cr. 1998) (quoting *Sadler v. State*, 846 P.2d 377, 383 (Okl.Cr. 1993) (emphasis added)). *See also Pink v. State*, 104 P.3d 584, 590 (Okl.Cr. 2004). The reason for this straightforward rule is amply illustrated by, among other things, one particular statement made by Justin Sneed that is heavily relied on by the State.

Beginning in its Statement of Facts, and continuing throughout its brief, the State refers to the "fact" that Mr. Glossip "promised" to pay Sneed $10,000 to kill Barry Van Treese. (Appellee's Brief at 6, 15, 52, 63, 70, 71, 72, 80) It is important to remember that in Mr. Glossip's first trial Sneed testified he was offered $7,000, not $10,000, to commit the murder. Sneed's explanation for this substantive change in his testimony was that the amount "just kept climbing every time we started talking about it." (Tr. XII 166-67) It is one thing for the amount proffered in a murder for hire scheme to increase *before* the murder is committed. It is quite another for that amount to go up between Mr. Glossip's first trial in 1998 and his second trial in 2004. Sneed's nonsensical explanation of the never before heard $10,000 promise of payment

epitomizes the reason accomplice testimony is inherently suspect and must be corroborated by *independent* evidence. As shown in Mr. Glossip's opening brief and this reply, the State failed to provide that corroboration.

In its brief, the State admits, as it must, that Sneed actually committed the murder for which Mr. Glossip was convicted and sentenced to death and, thus, Sneed must be considered an accomplice under 22 O.S. 2001, § 742. The State also admits, as it must, that all of the evidence it asserts as corroborative of Sneed's testimony is circumstantial. (Appellee's Brief at 14-16) While circumstantial evidence may be used to corroborate an accomplices's testimony, it nevertheless must at least tend to connect the defendant to the crime charged. Here, the evidence detailed by the State fails to provide independent evidence of Mr. Glossip's connection to the commission of malice aforethought murder.

The State contends five factors provide the needed corroboration of Sneed's testimony: (1) Glossip concealed the victim's body while others were searching for him; (2) Glossip possessed money after the murder that may have been proceeds from the money Sneed recovered from the victim's car; (3) Glossip had motive and opportunity to cause the victim's death; (4) Glossip had control over the actions of Sneed; and (5) Glossip began selling his possessions and supposedly stated his intention to leave the state after he became a suspect in the crime. (Appellee's Brief at 16) As will be shown below, Appellee has overstated the evidence presented at trial to support these contentions. More importantly, at best this evidence simply showed that Mr. Glossip was connected to the victim and to the admitted killer and that *after the fact* he had knowledge of the crime.

The State argues Glossip's "actions and statements the day of the murder are the primary evidence connecting him with the murder." (Appellee's Brief at 17) Of course the statements of a defendant can corroborate an accomplice's testimony *provided those statements link the defendant to the commission of the crime.* For

2

example, in *Ex parte Bullock*, 770 So.2d 1062 (Ala. 2000), cited by the State (Appellee's Brief at 17), the defendant was accused of an arson for hire. The Alabama court held that "the defendant's statement [to a friend a few weeks before the fire] that he wished his house would go up in smoke so he could start over, interpreted by reference to the other circumstantial evidence, was sufficient for the jury to infer that the defendant arranged for his house to be burned." *Bullock*, 770 So.2d at 1067. Significantly, the defendant's statement directly referred to a potential arson and was made shortly *before* the actual arson was committed. Moreover, the "other circumstantial evidence" referred to indicated the defendant was in dire financial straits, had tried to increase the amount of insurance on his house just before the fire, and had moved furniture, collectible items, family keepsakes and most of his clothing out of the house just before the fire. *Id.* at 1066. Without doubt, this evidence offered substantial corroboration of the accomplices's testimony. The same cannot be said in Mr. Glossip's case.

The State also relies on *State v. Miller*, 396 N.W.2d 903, 905 (Minn.App. 1986), for the proposition that "evidence [the] defendant initially lied to police corroborated [the] accomplice's testimony." (Appellee's Brief at 22) However, in *Miller*, the defendant had lied about even knowing the accomplice, then later admitted that he did. Moreover, the defendant was found "in the area" shortly after a pop machine in one store and a cash register in another had been broken into and he had in his pocket "86 nickels, 36 dimes, 22 quarters, and 5 pennies." *Miller*, 396 N.W. 2d at 904. Again, there is no question this evidence corroborated the testimony of the accomplice.

In contrast, here the State relies on statements made by Glossip that show only that he concealed his friend's crime after the fact. Nothing in those statements even implies he was involved in the crime itself. The State attempts to get around this flaw in its theory by arguing that Glossip did not lie to protect Sneed but, rather, to protect himself. This is an illusory distinction. As the State itself acknowledges, Glossip "said he initially lied to detectives because when Sneed told him about the murder, he felt

like he 'was involved in it, *I should have done something right then*[.]'" (Appellee's Brief at 23, emphasis added) Once Glossip made the fateful decision not to call police immediately after Sneed confessed to the murder, the only way for him to protect himself was to aid Sneed in avoiding or escaping "arrest, trial, conviction or punishment." 21 O.S. 2001, § 173. Considering Glossip's full statement to police in context, the State's argument at trial and on appeal that he was not trying to protect Sneed by concealing the crime is merely an exercise in semantics.

The State's second piece of alleged corroboration is its own speculation that Glossip possessed proceeds from the murder at the time of his arrest. The State argues Sneed recovered approximately $4,000 from the victim's vehicle after committing the murder and then split this amount with Mr. Glossip. Glossip had $1,757 on his person when he was arrested on January 9, 1997. (State's Ex. 2; Tr. XII 10-12) By the State's accounting, Glossip had $60 left from his paycheck and $500 from selling personal items the day before his arrest. Since Detective Bemo testified Glossip and his girlfriend, D-Anna Wood, had no apparent savings and the pair were living paycheck to paycheck (Tr. XIV 44), Appellee argues Glossip "had approximately $1,200.00 cash [$1,760 – 560] at book-in with no legitimate source" and, therefore, this must have been proceeds from the robbery. (Appellee's Brief at 24) However, if Glossip indeed had $2,000 from the robbery, $60 left from his paycheck, and $500 from his sale of personal property, he should have had around $2,560 at booking, not $1,760.

What is unexplained under the State's theory is not how Glossip came into $1,200, but how he lost approximately $800 if he actually received half the proceeds from the robbery. Interestingly, while the State offers no explanation for how Glossip spent approximately $800 in one day, it is apparently quite willing to assume Justin Sneed, an admitted marijuana and methamphetamine user, spent very little of his *confessed* proceeds of the robbery in the seven days he was on the lam. (Tr. XIV 13-18; 64-66; XV 92) The State's argument literally does not add up.

4

D-Anna Wood testified she did not know if she and Glossip had any savings because she was "not in charge of the money." (Tr. V 75-76) By stipulation, Glossip testified he often took cash advances against his paycheck specifically to hide money from D-Anna. That way she could "blow" the smaller paycheck he received and he could save money. (Tr. XV 16-18) After taxes, Glossip took home approximately $1,300 per month and had no expenses other than food, clothing, and incidentals like fishfood. (Tr. IV 84-85; V 75-76) Considering D-Anna's expectations, it is not unlikely that, over time, Mr. Glossip had hidden $1,200 from her, especially if he was trying to save enough money to buy her the Camaro or the "boob job" she told Billye Hooper he had promised. (Tr. VII 20) The State may believe there was "no legitimate source" for the money Mr. Glossip possessed on January 9, 1997, but the evidence shows otherwise.

Mr. Glossip has addressed the motive issue exhaustively in his Brief of Appellant and will not repeat those arguments here. (*See* Appellant's Brief at 12-21) Suffice it to say that while the evidence cited by the State at pages 25-27 of its brief may show that Donna and Barry Van Treese or Billye Hooper or Cliff Everhart or Kenneth Van Treese had concerns about Glossip's management of the motel, there is no evidence that this concern was ever communicated to Mr. Glossip and certainly no evidence that Mr. Van Treese actually confronted him about these problems on January 6, 1997. *See, e.g., Browning v. State*, 2006 OK CR 8 ¶27 (relevant question not what witness would *actually* have inherited as a result of victims' death, but what she *thought* she would inherit.)

Mr. Glossip has also thoroughly addressed the issue of his purported "control" over Justin Sneed. (Appellant's Brief at 21-24) Rather than repeat those arguments, Mr. Glossip would simply remind the Court that the State's evidence in this regard is largely speculation and innuendo provided by the case detective and/or individuals like Kayla Pursley, a woman Sneed testified he barely knew. (Tr. XII 70-71)

5

Finally, the State argues that Glossip had sold his possessions and "stated [an] intention to leave Oklahoma" and that these actions represented evidence of flight demonstrating a "consciousness of guilt." (Appellee's Brief at 30-31) In the first place, this Court has long held that evidence that a defendant merely departed from the scene of a crime is insufficient to raise an inference of guilt. *See, e.g., Compton v. State*, 122 P.2d 819, 821 (Okl.Cr. 1942). Moreover, whatever the detectives and/or Cliff Everhart *suspected* about Mr. Glossip's intentions after the murder, it was simply that – suspicion. The *evidence* shows that after being questioned by police into the early morning hours of January 8, 1997, and correctly surmising he was the prime suspect in the murder of Barry Van Treese (State's Ex. 1), Mr. Glossip spent the rest of that day selling his belongings and gathering together as much cash as he could (Tr. XV 16-18). Then, rather than absconding that night or the following day, Glossip took the money he had scraped together and *went to see a lawyer* to try to extricate himself from the terrible mess he had created by covering up for Justin Sneed.   (State's Ex. 2) Detectives may have *thought* Glossip was about to flee the state, but the evidence does not bear out their suspicions. The only person who fled this scene and, thus, demonstrated a "consciousness of guilt" was the actual murderer, Justin Sneed, who has managed to stay off of death row by putting Richard Glossip there in his stead.

The State's case against Richard Glossip was based on speculation, innuendo and the uncorroborated testimony of the actual killer. Taken as a whole, and viewed in the light most favorable to the State, no rational trier of fact have found the elements of malice aforethought murder beyond a reasonable doubt.

### REPLY TO PROPOSITION II
#### (Improper Admission of Irrelevant Evidence)

Mr. Glossip relies on his previous argument with respect to this proposition. However, two matters require brief discussion. Appellee asserts Glossip failed to cite to the record regarding Kayla Pursley's testimony. (Appellee's Brief at 41) In fact,

appellate counsel discussed Ms. Pursley's testimony in detail, including references to the record, in Proposition I and rather than repeat that testimony in Proposition II simply referred the Court to that prior argument. (Appellant's Brief at 22-23, 38) Moreover, Mr. Glossip's contention that Pursley exaggerated her testimony regarding her relationship to Sneed is not mere speculation as argued by the State. (Appellee's Brief at 41) Rather, it is based on Sneed's own testimony. (Tr. XII 70-71)

Finally, Mr. Glossip admits that defense counsel failed to object to the testimony discussed in Proposition II. (Appellee's Brief at 37) Indeed, he asserts in Proposition V that trial counsel was ineffective for this very reason. (Appellant's Brief at 38, n.18; 40, n.19; 68-70) The gravamen of his argument in Proposition II is that this improper evidence was so unfairly prejudicial and injurious to any semblance of a fair trial "as to make [Mr. Glossip's] resulting conviction a denial of due process under the state and federal Constitutions." (Appellant's Brief at 41) In other words, it was *plain error* to admit this evidence.

### REPLY TO PROPOSITION III
#### (Improper Use of Demonstrative Aids)

The State misinterprets Mr. Glossip's argument in this proposition, asserting he "waived all but plain error review for the vast majority of his claims" because he did not object each and every time the prosecution made one of its poster sized summaries of selected witness testimony. (Appellee's Brief at 44) The basis of the objection was not that the prosecutor made demonstrative exhibits while various witnesses were testifying, though the needless repetition of witness testimony while the posters were being created was indeed a problem. In fact, if the prosecutor had simply written down and displayed certain portions of testimony "while witnesses testified" (Appellee's Brief at 46), there would likely have been no objection. Rather, it was the manner in which these summaries were exhibited throughout the trial that counsel

objected to when it first became clear the prosecutor intended to leave up the posters even after each witness had concluded testifying. (Tr. V 195-96)

The trial judge overruled counsel's objection and made clear that she would allow the posters to be displayed as the prosecutor wished. *Id.* Thus, it was not necessary to object as each poster was being created. Moreover, even if this Court agrees trial counsel should have objected in each separate instance, Mr. Glossip submits this is but another example of counsel's ineffective representation at trial and hereby incorporates the failure to lodge proper objections to these demonstrative aids, which counsel clearly recognized were improper, into his arguments in Proposition V.

Appellee argues the posters were merely "pedagogical aids" prepared "to assist the jury in understanding and keeping track" of Mr. Glossip's "many different conflicting statements at the time of the murder designed to deflect attention from the victim's body in Room 102," and, thus, admissible pursuant to 12 O.S. Supp. 2002 § 2611. (Appellee's Brief at 45) But, this was not a far reaching drug conspiracy in which the jury might have had trouble keeping track of confusing connections between witnesses and perpetrators. Nor was it an esoteric securities fraud that the jury might need assistance to understand. The witnesses simply said Richard Glossip lied the day after the murder—a fact he never contested.

Moreover, many of the posters had nothing to do with "conflicting statements" made by Glossip. *Id.* For example, the first poster summarized Donna Van Treese's testimony about the operations of the motel and appears to have recounted such testimony as "bookkeeping . . . not up to par," "lifestyle decision not to fire Glossip during . . . family turmoil," and "year-end totals and losses demand change." (Tr. V 19-23) Billye Hooper's poster stating Glossip "ask[ed] her to go by and pay cable bill in the morning because he wanted to get it turned back on before Barry found out that it was off" (Tr. VII 60) had nothing to do with lies told by Mr. Glossip. Nor was there any reason the jury needed to be reminded every single day of the trial that William

8

Bender, the manager of the Tulsa motel, testified Glossip told him he had been questioned about the murder all night by the police and that Mr. Van Treese was "deader than a doornail," "cold as ice," and "beat to a bloody pulp." (Tr. ~~VII~~ 89) Instead, these were just favorite bits of testimony the prosecutor wanted to make sure the jury saw every day of the trial.

The State's argument the posters depicted "accurate" testimony also misses the point. (Appellee's Brief at 45, 47) Mr. Glossip's jury heard fourteen days of testimony and argument in this case, but only so much of that evidence as the prosecutor alone decided to write down onto fourteen pieces of poster paper was displayed to them every day. To demonstrate that the selective use of even accurate testimony can nevertheless be argumentative, especially to lay jurors uninitiated in the ways of the courtroom, the Court need look no further than the respective statements of fact in the parties' briefs. Each side has set forth "accurate" statements of fact, with appropriate citations. However, because the writer chooses among the many accurate facts those that are most favorable to the positions he or she intends to argue, the reader inevitably comes away with very different perceptions of events when comparing the two. The prosecutor's use of carefully chosen bits of testimony written on poster paper and taped up around the courtroom so that the jury could view and review them every day of the trial was advocacy — pure and simple.

Precisely how many demonstrative exhibits were made by defense counsel and whether he should have taken the opportunity to "utilize[] the same process as the prosecutor" on more occasions or abused that process by leaving the posters up after the witness had finished testifying is immaterial. (Appellee's Brief at 46) This Court simply cannot allow criminal trials to degenerate into a contest in which the parties

plaster the courtroom with dueling posters setting out snippets of each side's favorite testimony.[1] The peculiar circumstances of this case require relief.

### REPLY TO PROPOSITION IV
### (Prosecutorial Misconduct)

For the most part, Mr. Glossip stands on the arguments presented in his Brief of Appellant at pp. 49-61. However, several matters must be addressed. First, Mr. Glossip agrees defense counsel failed to object to much of the improper evidence and argument complained of in this proposition. Counsel's inadequate representation in this regard is addressed in Proposition V. (Appellant's Brief at 71) Mr. Glossip's argument here, in Proposition IV, is that the prosecutor's actions deprived him of his fundamental right to a constitutionally fair trial and, thus, the prosecutor's conduct constituted plain error in those instances in which trial counsel failed to object. (Appellant's Brief at 61)

As to the substance of the claim, Appellee characterizes as "curious" Mr. Glossip's contention the prosecutor's argument that "if he is innocent, why aren't [his fingerprints] there?" was unfairly prejudicial. (Appellee's Brief at 51) Of course, Mr. Glossip agrees parties have wide latitude to argue reasonable inferences from the evidence presented at trial. *Id.* And if the police had checked the common everyday surfaces in Rm. 102 for fingerprints, and found none, the prosecutor's argument would have been a reasonable inference from that evidence. However, the State's expert detailed every fingerprint she was asked to examine, even those that were smudges or "non-AFIS quality," and not one of them was submitted from the common surfaces in the room like the lightbulbs or mirrors or TV referred to in the State's closing argument. (Tr. X 184-213) In fact, toward the end of her testimony, the expert was

---

[1] Appellee states the posters "still exist and are located in the District Attorney's trial file." (Appellee's Brief at 49, n.2) Counsel respectfully requests this Court to direct supplementation of the record to include the actual posters used at trial pursuant to Rule 3.11(A) *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2001).

specifically asked by the prosecutor if her testimony had encompassed every fingerprint she was asked to examine and she answered, "Yes, sir." (Tr. X 202)

It is the fact the State made its "no fingerprints at the scene means he is guilty" argument with full knowledge those surfaces had never been checked that constituted misconduct. What is "curious" is that Appellee apparently has no qualms about asserting on the one hand that the prosecutor's argument was a reasonable inference from the evidence, and on the other hand that if the lightbulbs and mirrors *had* been checked for fingerprints, and Glossip's fingerprints *had* been found there, it would be "fatal to his claim in Proposition I that insufficient evidence was presented to corroborate the State's accomplice testimony[.]" (Appellee's Brief at 51) One must wonder how Mr. Glossip could possibly win such an argument.

Regarding Sneed's motive to kill, the State submits the prosecutor's argument that "Justin Sneed would never have killed Barry Van Treese for money alone" can be fairly restated as "Sneed would not have committed the murder but for [Glossip's] promise of $10,000," then concludes by stating "Sneed's testimony shows that Van Treese's murder was motivated by financial gain." (Appellee's Brief at 52) In other words, Sneed was not motivated by money alone but instead by financial gain. The State apparently sees no flaw in this logic, either at trial or on appeal.

Appellee's response regarding William Bender's misleading testimony that he did not know of any "shortages" at the Tulsa motel and did not believe he was about to be fired is equally unavailing. Mr. Glossip acknowledges that it is possible Barry Van Treese had decided to fire Glossip and move Bender to the Oklahoma City motel temporarily with the intention of firing Bender after finding new employees for both motels. (Appellee's Brief at 55-56; Tr. V 178) It is also possible Bender had never been informed about the "shortages" at the Tulsa motel and had no idea he was about to be fired. After all, Mr. Glossip told detectives that no one had ever informed him of such matters, either. (State's Ex. 2) The point is that whatever Bender thought, the

11

prosecutor *certainly* knew Bender's testimony was, at the very least, highly misleading because (1) the prosecutor successfully prevented the defense from presenting to the jury Def. Ex. 71A, the 1996 year-end summary for both motels that demonstrated Bender's motel had recorded even greater "shortages" than Oklahoma City and, (2) just six days after arguing that Bender was also about to be fired in January, 1997, the prosecutor *solicited* testimony to show Bender was not "under the impression that [he was] going to be fired." (Tr. IV 177-78, VIII 83)

The Tenth Circuit Court of Appeals addressed a similar circumstance in *Paxton v. Ward*, 199 F.3d 1197 (10th Cir. 1999). In *Paxton*, years before the murder for which he was on trial, charges against the defendant relating to the death of his wife in 1979 were dismissed when he passed a polygraph examination. In the second stage of Paxton's trial, the prosecutor put on evidence regarding the 1979 charge to support the continuing threat aggravator. Although the State stipulated that the charges had been dismissed in 1979, the prosecutor prevented Paxton from putting on any evidence regarding the polygraph examination or the reason the charges against him were dismissed. The prosecutor then argued Paxton had failed to counter the State's evidence regarding the 1979 murder and no one knew why the charges had been dismissed. On appeal, the State argued the comments were proper because, in fact, no evidence had been presented regarding the basis for dismissal. *Paxton*, 199 F.3d at 1216-17. The Tenth Circuit held:

> We begin by rejecting summarily the state's invitation to parse the prosecutor's argument word by word in a vacuum and justify it on the ground that there was in fact no evidence in the record as to why the charge had been dismissed. The argument was clearly meant to be understood as inviting the jury to infer that Mr. Paxton had no evidence to rebut the state's assertion that he killed his wife and to speculate at Mr. Paxton's expense on the reasons for dismissal. While it may be true that Mr. Macy could not have commented on facts not in the record, *rather than saying nothing he chose to misrepresent the reason for the absence of those facts.*

*Paxton*, 199 F.3d at 1217(emphasis added).

Here, the prosecutor was well aware of the information contained in Def. Ex. 71A, and had prevented Mr. Glossip from presenting that information to his jury. Nevertheless, the prosecutor purposely led the jury to believe there were no shortages in Tulsa and specifically solicited testimony with the express purpose of misleading the jury to believe Bender was not about to be fired. It is the fact the prosecutor, not Bender, was aware of the true facts and allowed those facts to be misrepresented to the jury that gives rise to this claim. (Appellant's Brief 13-14, 56-57)

### REPLY TO PROPOSITION V
#### (Ineffective Assistance of Counsel)

Mr. Glossip has thoroughly addressed the issue of defense counsel's ineffective representation at trial in both Proposition V and his Application for Evidentiary Hearing Pursuant to Rule 3.11(B) and those arguments will not be repeated here. However, one matter raised in the State's response requires discussion. Mr. Glossip has never contended that his counsel is incompetent as asserted by the State. (Appellee's Brief at 61) Rather, his argument is that his counsel was ineffective — and there is a difference. A simple analogy makes this point clear.

An individual driving a car may ineffectively negotiate a left turn and cause an accident. The mere fact that a person causes an accident does not mean that he or she should lose all driving privileges or is not competent to drive a car or is even a bad driver in general. It simply means that, in that instance, the individual made a mistake. What matters is how much damage, *i.e.*, prejudice, the individual caused by that negligence.

Mr. Glossip was represented by experienced counsel. However, the question before this Court is not whether counsel was generally competent, but whether counsel was Constitutionally effective in representing Mr. Glossip. Otherwise competent counsel may nevertheless render ineffective assistance if he makes critical errors that prejudice his client. *Williamson v. Reynolds*, 904 F. Supp. 1529, 1552, n.9

13

(E.D.Okla. 1995), aff'd in part, rev'd in part *Williamson v. Ward*, 110 F.3d 1508 (10th Cir. 1997) (on other grounds). Even if counsel provided effective assistance at trial in some areas, Mr. Glossip is entitled to relief if counsel rendered ineffective assistance in his performance in other portions of the trial. *Washington v. Watkins*, 655 F.2d 1346, 1355, rehearing denied with opinion, 662 F.2d 1116 (5th Cir. 1981). *See also Kimmelman v. Morrison*, 477 U.S. 365, 106 S.Ct. 2574 (1986) Indeed, a single error by counsel may be sufficient to warrant relief. *Nelson v. Estelle*, 642 F.2d 903, 906 (5th Cir. 1981) (counsel may be held to be ineffective due to a single error where the basis of the error is of Constitutional dimension); *Nero v. Blackburn*, 597 F.2d 991, 994 (5th Cir. 1979) ("sometimes a single error is so substantial that it alone causes the attorney's assistance to fall below the Sixth Amendment standard").

There is no doubt that, for the most part, defense counsel ably represented Mr. Glossip at trial. They cross-examined the State's witnesses, presented testimony and evidence of their own, and made some objections and argument. Nevertheless, there were inexplicable lapses of judgment during the trial as detailed in Mr. Glossip's opening brief and his 3.11 Application. In particular, trial counsels' failure to play the Sneed videotaped interview for the jury was extremely damaging, especially after the State had told the jury that if Sneed's testimony was that different from what he told detectives on January 14, 1997, the defense surely would have played the tape for them. (Tr. XIII 66-67) Indeed, after the prosecutor's challenge, there could be no possible strategy to support *not* playing the videotaped statement for the jury.

As set out in Mr. Glossip's Brief and 3.11 Application, there were substantial material discrepancies in Sneed's testimony, but the failure to play the tape left the jury with the impression there were not. In addition, only by viewing the tape could the jury accurately assess how clearly the detectives telegraphed that the only way to save himself was to implicate Glossip. Moreover, viewing the videotape would have shown that Sneed was not a pathetic, childlike individual who would kill to protect

14

Glossip as portrayed by the State. Indeed, once Sneed had been shown the way by detectives, the videotape shows he was more than happy to accuse Glossip of masterminding the murder to save his own skin. It was imperative that Mr. Glossip's jury view the Sneed videotape and counsels' failure to show it to them was ineffective.

### REPLY TO PROPOSITION IX
### (Improper Voir Dire)

In his ninth proposition of error, Mr. Glossip argues, *inter alia*, that the trial court applied an improper legal standard during voir dire that resulted in the erroneous exclusion of jurors for cause. (Appellant's Brief at 86-90) Specifically, the trial court instructed the jury that the law required that all three sentencing options be given "equal" consideration. This is not the law. *See Frederick v. State*, 37 P.3d 908, 926-927 (Okl.Cr. 2001). In its response, Appellee argues that the judge's "beet analogy" sufficiently informed the jury, in layman's terms, of the proper legal standard – *i.e.*, meaningful consideration. (Appellee's Brief at 82-83) While this analogy may be helpful in explaining what the jurors must do, the value of any such colloquial explanation was impermissibly undermined by the court's repeated exhortations to the prospective jurors that they be able to consider each punishment "equally." The result was exclusion of jurors with only conscientious reservations about the death penalty in violation of Mr. Glossip's right to a fair trial.

This point is demonstrated by the State's argument regarding Prospective Juror Sharon Moore. (Appellee's Brief at 85-86) Ms. Moore specifically told the trial court she thought she could give the death penalty "if they did something really gruesome," but still expressed some reservations about doing so. (Tr. II 15-16) Only after the trial court told Ms. Moore more than once that she had to consider each sentencing option "equally" did Ms. Moore finally state that her "concerns about the death penalty are such that regardless of the law and the evidence, [she] would not be able to give *equal* consideration to all three of the sentencing options[.]" (Tr. II 15-16, 36) *See*

*Witherspoon v. Illinois,* 391 U.S. 510, 519, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) ("[a] man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State and can thus obey the oath he takes as a juror.") This is, and always has been, Mr. Glossip's complaint. Appellee has offered nothing to refute this argument and, therefore, Mr. Glossip is entitled to relief.

### REPLY TO PROPOSITION X
### (Amended Section 2403 is Unconstitutional)

In his tenth proposition of error, Mr. Glossip claims that amended Section 2403 of the Oklahoma Evidence Code, mandating admission of a live victim photograph in both stages of trial without reference to the photograph's relevance to any material issue in dispute or whether any minimal probative value is substantially outweighed by the great danger of prejudice to the accused, is unconstitutional on its face, and that the admission of such a photograph of Barry Van Treese deprived Mr. Glossip of a fundamentally fair trial and reliable sentencing hearing. (Appellant's Brief at 93-99) For the most part, Mr. Glossip stands by the argument raised in his Brief of Appellant, but certain assertions by Appellee require a more direct response.

Contrary to Appellee's assertion, Mr. Glossip's claim is not simply that amended Section 2403 is unconstitutional because it is contrary to this Court's previous holdings prohibiting such photographs except in rare circumstances. (Appellee's Brief at 92) Nor has Mr. Glossip claimed that the statute at issue is unconstitutional simply because it "is not about criminal justice, but about politics." (Appellee's Brief at 90, 96) Instead, Mr. Glossip's claim is that this is not merely a case of the legislature disagreeing with the Court's assessment that live victim photographs are generally irrelevant to any first stage issue, as the State seems to suggest, Appellee's Brief at 92, but, rather, that the legislature has not determined that such evidence is *relevant,* only that it "shall be admissible." *See* 12 O.S. 2001, § 2403 . Moreover, the legislature has amended Section 2403 not because of any rational basis for believing that such

evidence is necessary to the administration of criminal proceedings, but rather because it was responding to a specific constituency.[2]  Finally, the State's argument that "in-life" photographs are relevant in the guilt stage of a homicide trial in the sense that they 'personalize the victim and help to complete the story for the jurors,'" (Appellee's Brief at 93) (quoting *State v. Doerr*, 969 P.2d 1168, 1176 (Ariz. 1998)),[3] fails ultimately to explain how "personalizing the victim" has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." 12 O.S. 2001, § 2401.

Plainly put, when, as here, a legislative enactment runs afoul of fundamental constitutional rights, such as the right to a fair trial, that enactment must fall. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 180, 2 L.Ed. 60 (1803) ("a law repugnant to the constitution is void").  Mr. Glossip's complaint thus appeals to this Court to exercise its role as a constitutional check on legislative excess and declare amended Section 2403 unconstitutional.

## CONCLUSION

Based on the errors, discussion of facts, arguments and citations of legal authority, the entire record before this Court and any prejudicial errors that this Court may note *sua sponte*, Mr. Glossip respectfully asks the Court to vacate the death sentence imposed against him because of the many errors depriving him of

---

[2] Counsel for Appellee takes issue with Mr. Glossip's citation to newspaper articles in support of his contentions regarding the legislative intent behind the Kristie LeGrange Bill, which amended Section 2403, citing Rules 3.5(A)(4) and 3.11(B)(3) of the *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2006 Supp.).  (Appellee's Brief at 96-97) However, neither Rule 3.5(A)(4), regarding the statement of facts of the case, nor Rule 3.11(B)(3), defining what constitutes the record on appeal and providing for supplementation of that record, prohibits reference to journals, newspaper articles, or other secondary sources for *non-adjudicative* facts bearing on the resolution of legal questions important to the decision of the case.

[3] The same court that Appellee quotes for this argument conversely recognized the "obvious danger ... that such photos can also be used to generate sympathy for the victim and his or her family, thereby undermining the defendant's right to an objective determination of guilt or innocence." *Doerr*, 969 P.2d at 1176.

his constitutional right to a reliable and individualized capital sentencing proceeding.

Respectfully submitted,

RICHARD EUGENE GLOSSIP

By: _____

JANET CHESLEY
Capital Defense Counsel
Oklahoma Bar Association No. 1645

KATHLEEN M. SMITH
Capital Defense Counsel
Oklahoma Bar Association No. 17935

Oklahoma Indigent Defense System
P.O. Box 926
Norman, Oklahoma 73070
(405) 801-2666

ATTORNEYS FOR APPELLANT

CERTIFICATE OF SERVICE

I certify that on the    day of May, 2006, a true and correct copy of the above and foregoing Brief of Appellant was delivered to the Clerk of this Court with instructions to deliver said copy to the Office of the Attorney General of the State of Oklahoma.

Janet Chesley

18