RECEIVED File

APR 17 2006

Attorney General

**DEATH PENALTY**

No. D-2005-310

---

# IN THE COURT OF CRIMINAL APPEALS OF THE STATE OF OKLAHOMA

---

**RICHARD EUGENE GLOSSIP,**

Appellant,

-vs-

**THE STATE OF OKLAHOMA,**

Appellee.

**F I L E D**
IN COURT OF CRIMINAL APPEALS
STATE OF OKLAHOMA

APR 14 2006

MICHAEL S. RICHIE
CLERK

---

**BRIEF OF APPELLEE**
**FROM OKLAHOMA COUNTY DISTRICT COURT**
**CASE NO. CF-97-244**
**Before the Honorable Twyla Mason Gray, District Judge**

---

**W.A. DREW EDMONDSON**
**ATTORNEY GENERAL OF OKLAHOMA**

**SETH S. BRANHAM, OBA # 18019**
**ASSISTANT ATTORNEY GENERAL**

**2300 N. Lincoln Blvd.**
**112 State Capitol Building**
**Oklahoma City, Oklahoma 73105**
**(405) 521-3921**
**(405) 521-6246 (FAX)**

**ATTORNEYS FOR APPELLEE**

---

**APRIL 14, 2006**

EXHIBIT
D

## TABLE OF CONTENTS

PAGE

STATEMENT OF THE CASE ................................. 1

STATEMENT OF THE FACTS ............................... 2

ARGUMENT AND AUTHORITY ............................. 13

**PROPOSITION I**

SUFFICIENT EVIDENCE WAS PRESENTED TO
SUPPORT DEFENDANT'S CONVICTION. .............. 13

**PROPOSITION II**

DEFENDANT IS NOT ENTITLED TO RELIEF BASED
ON THE ADMISSION OF ALLEGED IRRELEVANT
EVIDENCE ...................................... 37

**PROPOSITION III**

THE PROSECUTION'S USE OF DEMONSTRATIVE
AIDS DURING TRIAL WAS NOT ERROR .............. 44

**PROPOSITION IV**

DEFENDANT IS NOT ENTITLED TO RELIEF BASED
ON ALLEGED PROSECUTORIAL MISCONDUCT. ........ 50

**PROPOSITION V**

DEFENDANT RECEIVED CONSTITUTIONALLY
EFFECTIVE ASSISTANCE OF TRIAL COUNSEL. ........ 59

**PROPOSITION VI**

SUFFICIENT EVIDENCE WAS PRESENTED TO
SUPPORT THE JURY'S FINDING OF THE MURDER
FOR REMUNERATION AGGRAVATOR. ............... 67

**PROPOSITION VII**

> **DEFENDANT'S JURY WAS PROPERLY INSTRUCTED WITH THE UNIFORM WEIGHING AND MITIGATION INSTRUCTIONS.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

**PROPOSITION VIII**

> **DEFENDANT IS NOT ENTITLED TO RELIEF BASED ON EITHER THE FORM OR SUBSTANCE OF VICTIM IMPACT TESTIMONY PRESENTED IN HIS CASE.** . . . . . . . . . 77

**PROPOSITION IX**

> **DEFENDANT IS NOT ENTITLED TO RELIEF BASED ON THE TRIAL COURT'S REMOVAL FOR CAUSE OF PROSPECTIVE JURORS.** . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

**PROPOSITION X**

> **ADMISSION OF AN IN-LIFE PHOTOGRAPH OF THE VICTIM DURING GUILT STAGE DOES NOT WARRANT RELIEF.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

**PROPOSITION XI**

> **DEFENDANT IS NOT ENTITLED TO RELIEF BASED ON CUMULATIVE ERROR ANALYSIS.** . . . . . . . . . . . . . . . . 100

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

**CERTIFICATE OF MAILING** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

**TABLE OF AUTHORITIES**

**CASES CITED**

<u>Abshier v. State,</u>
  2001 OK CR 13, 28 P.3d 579 ......................................................... 68

<u>Allen v. State,</u>
  1994 OK CR 13, 871 P.2d 79 ......................................................... 66

<u>Banks v. State,</u>
  2002 OK CR 9, 43 P.3d 390 ................................................... 58, 59

<u>Black v. State,</u>
  2001 OK CR 5, 21 P.3d 1047 ........................................... 51, 52, 53

<u>Bland v. State,</u>
  2000 OK CR 11, 4 P.3d 702 ....................................................... 100

<u>Bowie v. State,</u>
  1991 OK CR 78, 816 P.2d 1143 .................................................... 34

<u>Boyd v. Ward,</u>
  179 F.3d 904 (10th Cir. 1999) ...................................................... 14

<u>Boyde v. California,</u>
  494 U.S. 370 (1990) ..................................................................... 76

<u>Brown v. State,</u>
  2003 OK CR 7, 67 P.3d 917 ......................................................... 74

<u>Bryson v. State,</u>
  1994 OK CR 32, 876 P.2d 240 ..................................................... 71

<u>Ex parte Bullock,</u>
  770 So. 2d 1062 (Ala. 2000) ........................................................ 17

<u>Byrne v. State,</u>
  1971 OK CR 100, 482 P.2d 620 ................................................... 49

<u>Cantelon v. State,</u>
  85 S.W.3d 457 (Tex. App. Austin 2002) ........................................ 32

**Cargle v. State,**
      1995 OK CR 77, 909 P.2d 806 ...................................................... 95

**Carter v. State,**
      1994 OK CR 49  879 P.2d 1234 .................................................. 15

**Chapman v. California,**
      386 U.S. 18 (1967) ......................................................... 97

**Colvette v. State,**
      568 So. 2d 319 (Ala. Crim. App. 1990) ......................................... 17

**Com. v. Degro,**
      733 N.E.2d 1024 (Mass. 2000) ..................................................... 94

**Com. v. Santiago,**
      681 N.E.2d 1205 (Mass. 1997) ..................................................... 94

**Cooks v. Ward,**
      165 F.3d 1283 (10th Cir.1998) ..................................................... 60

**Cummings v. State,**
      1998 OK CR 45, 968 P.2d 821 .............................................. 35, 75

**Davis v. State,**
      2004 OK CR 36, 103 P.3d 70 ....................................................... 37

**DeRosa v. State,**
      2004 OK CR 19, 89 P.3d 1124 ..................................................... 95

**Edwards v. State,**
      427 S.W.2d 629 (Tex. Crim. App. 1968) ......................................... 34

**Edwards v. State,**
      1977 OK CR 166, 571 P.2d 129 .................................................. 32

**Fleming v. State,**
      1988 OK CR 163, 760 P.2d 208 .................................................. 14

**Foster v. Ward,**
      182 F.3d 1177 (10th Cir. 1999) ..................................................... 14

**Frederick v. State,**
    2001 OK CR 34, 37 P.3d 908 ..................................... 31, 32, 68, 81

**Ganesan v. State,**
    45 S.W.2d 197 (Tex. App. Austin 2001) ........................................ 27

**Gill v. State,**
    873 S.W.2d 45 (Tex. Crim. App. 1994) .................................... 32, 34

**Glaze v. State,**
    1977 OK CR 206, 565 P.2d 710 .................................................. 46

**Glidewell v. State,**
    1983 OK CR 54, 663 P.2d 738 .................................................. 73

**Glossip v. State,**
    2001 OK CR 21, 29 P.3d 597 ..................................................... 1

**Grant v. State,**
    2002 OK CR 36, 58 P.3d 783 ............................................... 78, 79

**Hanson v. State,**
    2003 OK CR 12, 72 P.3d 40 ................................................ 51, 53

**Harris v. State,**
    2004 OK CR 1, 84 P.3d 731 ....................................................... 74

**Hernandez v. State,**
    939 S.W.2d 173 (Tex. Crim. App. 1997) ........................................ 30

**Hooks v. State,**
    2001 OK CR 1, 19 P.3d 294 ...................................................... 78

**Jackson v. Virginia,**
    443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) ............ 31, 68

**Johnson v. State,**
    911 P.2d 918 (Okl.Cr.1995) ........................................................ 71

**Knox v. State,**
    934 S.W.2d 678 (Tex. Crim. App. 1996) ........................................ 32

**Le v. State,**
  1997 OK CR 55, 947 P.2d 535 ..................................................... 99

**Ledbetter v. State,**
  1997 OK CR 5, 933 P.2d 880 ...................................................... 78

**Leitner v. State,**
  672 So. 2d 1371 (Ala. Crim. App. 1995) ....................................... 32

**Leppke v. State,**
  1977 OK CR 21, 559 P.2d 459 ..................................................... 32

**Littlejohn v. State,**
  2004 OK CR 6, 85 P.3d 287 .................................................. 37, 44

**Lockett v. State,**
  2002 OK CR 30, 53 P.3d 418 ....................................................... 68

**Marshall v. State,**
  1998 OK CR 30, 963 P.2d 1 ........................................................ 48

**Matthews v. State,**
  2002 OK CR 16, 45 P.3d 907 ....................................................... 51

**McElmurry v. State,**
  2002 OK CR 40, 60 P.3d 4 .......................................................... 22

**Minor v. State,**
  299 S.W. 422 (Tex. Crim. App. 1927) ........................................... 34

**Patton v. State,**
  1998 OK CR  66, 973 P.2d 270 ............................................... 86, 87

**Payne v. Tennessee,**
  501 U.S. 808 (1991) .................................................................. 95

**Pennington v. State,**
  1995 OK CR 79, 913 P.2d 1356 ................................................... 58

**Pickens v. State,**
  2003 OK CR 16, 74 P.3d 601 ....................................................... 74

Pink v. State,
       2004 OK CR 37, 104 P.3d 584 ..................................... 14

Plantz v. State,
       1994 OK CR 33, 876 P.2d 268 ............................... 69, 71

Powell v. State,
       1995 OK CR 37, 906 P.2d 765 ..................................... 72

Powell v. State,
       2000 OK CR 5, 995 P.2d 510 ................................ 83, 86

Prewitt v. State,
       460 So. 2d 296 (Ala. Crim. App. 1984) ......................... 17

Primeaux v. State,
       2004 OK CR 16, 88 P.3d 893 ............................... *passim*

Reed v. State,
       744 S.W.2d 112 (Tex. Crim. App. 1988) ......................... 27

Ring v. Arizona,
       536 U.S. 584 (2002) ..................................... 73

Roldan v. State,
       1988 OK CR 219, 762 P.2d 285 ................................. 31

Welch v. State,
       2000 OK CR 8, 2 P.3d 356 .......................................... 66

Simpson v. State,
       1992 OK CR 13, 827 P.2d 171 ..................................... 89

Spuehler v. State,
       1985 OK CR 132, 709 P.2d 202 ................................. 31

Stafford v. State,
       731 P.2d 1372 (Okl.Cr.1987) ........................................ 76

State v. Adams,
       295 N.W.2d 527 (Minn. 1980) ..................................... 32

State v. Broberg,
    677 A.2d 602 (Md. 1996) ............................................. 94

State v. Bugely,
    562 N.W.2d 173 (Iowa 1997) ....................................... 32

State v. Canada,
    481 P.2d 859 (Ariz. 1971) ........................................... 32

State v. Carney,
    649 N.W.2d 455 (Minn. 2002) ..................................... 94

State v. Doerr,
    969 P.2d 1168 (Ariz. 1998) ......................................... 93

State v. Duggan,
    333 P.2d 907 (Ore. 1958) ..................................... 32, 33

State v. Fey,
    7 P.3d 358 (Mont. 2000) ....................................... 32, 33

State v. Her,
    668 N.W.2d 924 (Minn. App. 2003) ......................... 22, 30

State v. Kaczmarek,
    795 P.2d 439 (Mont. 1990) ......................................... 33

State v. Marshall,
    531 N.W.2d 284 (N.D. 1995) ....................................... 34

State v. Miller,
    396 N.W.2d 903 (Minn. App. 1986) ............................. 22

State v. Thomason,
    2001 OK CR 27, 33 P.3d 930 ................................. 92, 97

State v. Williams,
    828 P.2d 1006 (Or. 1992) ...................................... 94, 95

State v. Willman,
    244 N.W.2d 314 (Iowa 1976) ..................................... 32

**Stouffer v. State,**
    1987 OK CR 92, 738 P.2d 1349 .................................... 58

**Strickland v. Washington,**
    466 U.S. 668 (1984) ...................................... 60

**Tibbs v. State,**
    1991 OK CR 115, 819 P.2d 1372 ................................ 88

**Torres v. State,**
    2002 OK CR 35, 58 P.3d 214 ................................ 74

**Turnage v. State,**
    708 N.W.2d 535 (Minn. 2006) ........................................ 32

**United States v. Buck,**
    324 F.3d 786 (5th Cir. 2003) ......................................... 45

**Valdez v. State,**
    1995 OK CR 18, 900 P.2d 363 ................................. 91, 92

**Villanueva v. State,**
    1985 OK CR 8, 695 P.2d 858 ......................................... 49

**Wackerly v. State,**
    2000 OK CR 15, 12 P.3d 1 ..................................... 49, 72

**Wainwright v. Witt,**
    469 U.S. 412 (1985) ...................................... 89

**Washington v. State,**
    1999 OK CR 22, 989 P.2d 960 .................................... 66

**Williams v. State,**
    2001 OK CR 9, 22 P.3d 702 ............................... 75, 76, 84

**Williams v. Taylor,**
    529 U.S. 362 (2000) ...................................... 93

## STATUTES CITED

12 O.S.2001, § 2615 ...................................................................... 48, 66

12 O.S.2001, § 2702 ........................................................................ 66

12 O.S.2001, § 2704 ........................................................................ 66

12 O.S.Supp.2002, § 2611 ............................................................ 45, 46

12 O.S.Supp.2002, § 2701 ................................................................ 65

12 O.S.Supp.2003, § 2403 ............................................... 90, 91, 92, 93

21 O.S.2001, § 173 ...................................................................... 23, 73

21 O.S.2001, § 791 ........................................................................ 73

22 O.S.2001, § 701.12 .................................................................... 70

22 O.S.2001, § 742 ............................................................ 13, 70, 78, 81

22 O.S.2001, § 984 .................................................................... 78, 81

## RULES CITED

Fed. R. Evid. 611 .......................................................................... 45

Fed. R. Evid. 1006 ........................................................................ 45

Rule 3.5(A)(4) & (5), *Rules of the Oklahoma Court of Criminal Appeals,*
    Title 22, Ch. 18, App. (2006) ........................................................ 41

Rule 3.5(A)(4), *Rules of the Oklahoma Court of Criminal Appeals,*
    Title 22, Ch. 18, App. (2006) .................................................... 96, 98

**IN THE COURT OF CRIMINAL APPEALS OF THE STATE OF OKLAHOMA**

RICHARD EUGENE GLOSSIP,          )
                                 )
          Appellant,             )
                                 )
v.                               )          **Case No. D-2005-310**
                                 )
THE STATE OF OKLAHOMA,           )
                                 )
          Appellee.              )

**BRIEF OF APPELLEE**

**STATEMENT OF THE CASE**

Richard Eugene Glossip, hereinafter "Defendant", was convicted by jury for the crime of First Degree Malice Murder in Case No. CF-97-244, in the District Court of Oklahoma County before the Honorable Twyla Mason Gray, District Judge. The jury found the existence of one (1) aggravating circumstance, namely, that Defendant committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration. The jury recommended a sentence of death. The trial court imposed the jury's recommendation. From this Judgment and Sentence, Defendant has perfected his appeal to this Court. It should be noted that this is the second conviction and death sentence imposed on Defendant for the murder of Barry Van Treese. This Court reversed Defendant's original conviction and death sentence based on alleged ineffective assistance of trial counsel. *Glossip v. State*, 2001 OK CR 21, 29 P.3d 597.

## STATEMENT OF FACTS

Barry Van Treese owned the Best Budget Inn, located at 301 South Council Road in Oklahoma City (Tr. IV 32-33; Tr. XIII 107). Van Treese hired Defendant in 1996 as on-site manager of the motel. Defendant and his girlfriend, D-Anna Wood, lived at the motel in an apartment behind the front office. Van Treese paid Defendant a salary plus free rent and utilities on the apartment (Tr. IV 38, 42-43, 50). Van Treese resided in the Lawton area but visited the motel every couple of weeks to pick-up daily receipts, check balance sheets and inspect the motel property. However, Defendant was responsible for the daily operations of the motel (Tr. IV 31-32, 41-42, 51-55).

In the second half of 1996, Van Treese's visits to the Oklahoma City motel decreased dramatically due to illness and deaths in his family. Van Treese made overnight visits to the motel only four (4) times during the last half of 1996 (Tr. IV 36-40, 42, 58-59). However, Van Treese and his wife maintained telephone contact with Defendant during this time period regarding, *inter alia,* daily collections and daily volume (Tr. IV 39, 41, 85, 120-21). During 1996, Van Treese and his wife, Donna, noticed shortages on the books for the Oklahoma City motel. By the end of December 1996, the Van Treeses discovered that approximately $6,101.92 was missing from accounts receivables for the entire year (Tr. IV 62-66). Defendant provided unsatisfactory explanations for these shortages when questioned at various points during the year (Tr. IV 72-78). Donna testified that

2

she and Barry "were very upset" about this shortage (Tr. IV 66).  Defendant, as manager of the motel, was responsible for maintaining the ledger and doing the accounting to make sure that the revenue turned over to the Van Treeses matched the volume of actual business at the motel.  Defendant was personally in possession of the daily motel receipts because Van Treese did not use a local Oklahoma City bank for motel deposits.  Defendant simply kept the cash in an envelope in his kitchen until Van Treese arrived to collect it (Tr. IV 53-55).

Because of the shortage, Barry Van Treese told his wife that he intended to audit the motel and perform a room-to-room inspection to determine what repairs and renovations needed to be done at the motel.  Van Treese intended to confront Defendant with the shortages and get an explanation during his visit to the motel on January 6, 1997 (Tr. IV 70-72).  Indeed, in December 1996, Defendant told Billye Hooper, a desk clerk at the motel, that he "knew things had to be taken care" regarding Defendant's management of the motel and that he would take care of those things after he returned from Christmas vacation (Tr. VII 37-40; Tr. VIII 32-34).  The Van Treeses had previously tolerated the shortages on the motel books because of the distraction of their many family problems in the second half of 1996 (Tr. V 20-21).  Cliff Everhart, a one percent owner of the motel, had audited the motel records on several occasions and felt Defendant "was probably pocketing a couple hundred a week extra" from the motel cash receipts during the last two or three months of 1996 (Tr. XI 172-73).  Everhart told Van Treese his

3

concerns. Based on that information, Van Treese arranged with Everhart to confront Defendant the night of January 6th about the shortages at the motel (Tr. XI 169-70, 172-77, 201).[1]

On January 6, 1997, around 6:00 p.m., Van Treese arrived at the Oklahoma City motel to make payroll for his employees and collect daily sheets and revenues that had accumulated since his last visit (Tr. IV 79-80; Tr. VII 53, 55). Van Treese picked up approximately $3,500.00 to $4,000.00 in receipts that evening (Tr. VII 77; Tr. XIV 28-30; State's Exhibit 2; Court's Exhibit 4 at 4-5). Shortly before 8:00 p.m., Van Treese left for a motel he owned in Tulsa (Tr. VIII 109-11; Tr. XIV 5-7; State's Exhibit 1; Court's Exhibit 3 at 9). Van Treese arrived at the Tulsa motel sometime before midnight (Tr. VIII 62, 109). William Bender, manager of the Tulsa motel, observed that Van Treese "was all puffed up. He was upset. He was mad...He was all red in the face" (Tr. VIII 63). Bender had never seen Van Treese that angry (Tr. VIII 64). Van Treese stayed at the Tulsa motel for approximately thirty (30) to forty-five (45) minutes (Tr. VIII 64). During that visit, Van Treese made Bender produce the current daily sheet and daily report for the motel. Van Treese made Bender inspect with him several of the motel rooms to ensure no one was staying in rooms that were, according to the daily report, not rented out (Tr. VIII 80). During this inspection, Van Treese told Bender that there were a number

---

[1]  However, Everhart did not have the opportunity to confront Defendant that night. Everhart arrived at the motel well before Van Treese arrived. Because Van Treese was not there, Everhart went home and made no further attempt to contact Van Treese. Everhart testified that he did not speak with Van Treese that night (Tr. XI 174-77).

of registration cards missing at the Oklahoma City motel in addition to weekend receipt money missing and people staying in rooms that were not registered (Tr. VIII 81). Van Treese was angry about what was going on at the Oklahoma City motel and was inspecting Bender's rooms because he assumed the same thing was happening at the Tulsa motel (Tr. VIII 81-82). Van Treese told Bender he gave Defendant until he returned to Oklahoma City "to come up with the weekend's receipts that were missing and if he came up with that, he was going to give him another week to come up with the registration cards and get all the year-end receipts together" (Tr. VIII 82). Otherwise, Van Treese was going to call the police (Tr. VIII 82).

After inspecting the rooms and obtaining from Bender financial records he needed for year-end reports, Van Treese returned to Oklahoma City (Tr. VIII 83). Pikepass records show that Van Treese arrived at the Oklahoma City Turner Turnpike gate at 1:36 a.m. on January 7th (Tr. VIII 109). He therefore arrived at the motel sometime around 2:00 a.m. (Tr. XIII 115-17). About 3:00 a.m., Defendant banged on the door to Room 117 and awoke Justin Sneed (Tr. XII 94; State's Exhibit 77). Sneed had lived at the motel for several months and became Defendant's close friend. Sneed, an eighteen (18) year-old high school dropout, worked for Defendant as a maintenance man at the motel. Sneed received a free room in exchange for this work but no salary. Sneed depended largely on Defendant for food (Tr. VII 28; Tr. XII 44-47, 71-73). Defendant asked Sneed five

5

(5) to ten (10) times previously to kill Barry Van Treese (Tr. XII 75-90). Defendant had told Sneed that with Van Treese out of the way, Defendant could control both the Oklahoma City and Tulsa motels owned by Van Treese. Defendant claimed that he could talk Van Treese's wife into letting him control both motels if Van Treese was killed. Defendant promised Sneed money if he killed Van Treese (Tr. XII 89-90).

Once inside Room 117, Defendant told Sneed that Van Treese had just returned to the motel. Defendant appeared "real nervous, real jittery" and wanted Sneed to murder Van Treese "right now" (Tr. XII 95). Defendant said that if Van Treese walked around the motel in the morning and "seen a couple of the rooms that were already supposed to be remodeled that weren't that [Defendant] was going to be fired" (Tr. XII 95). Defendant was supposed to have completely remodeled one of the handicapped rooms at the motel and make minor repairs in other rooms (Tr. XII 96-97). Defendant threatened that Sneed too would be evicted from the motel if Defendant were fired (Tr. XII 95-96). Defendant told Sneed that Van Treese was asleep in Room 102 (Tr. XII 98). As he walked out of Room 117, Defendant picked up a baseball bat laying in Sneed's room and said "why don't [you] just grab that bat and go over there and do it right now" (Tr. XII 96). Defendant urged Sneed to murder Van Treese three or four times during this conversation. Defendant promised $10,000.00 to Sneed if Van Treese was killed

6

immediately. Defendant also promised that he would put Sneed in charge of one of the motels once Van Treese was dead (Tr. XII 98-99).

Sneed agreed to kill Van Treese and Defendant left (Tr. XII 99-100). After walking to a nearby Sinclair station where he bought a soda, Sneed returned to his room, grabbed the baseball bat and his master room key, and walked to Room 102 (Tr. XII 100-01). When Sneed opened the door to the darkened room, Van Treese got out of bed and started walking towards him. Sneed described what happened next:

> At that point I took one swing with the baseball bat. [Van Treese] pushed me back into a chair and when I tripped and fell in the chair the end of the baseball bat hit the window shattering the outside window, and he tried to make it to the door and I got up out of the chair and grabbed him by the back of his shirt, because I think he was sleeping in a nightshirt and pulled him sideways so he tripped over my feet and his own feet and put him on the ground.
>
> And then at one point...I took my knife out of my pocket and tried to force it through his chest but it didn't go, and then that caused him to roll over onto his stomach to where his back was facing the ceiling and then I hit him quite a few more times with the baseball bat.

(Tr. XII 101-02). John Beavers, a motel resident who was walking through the parking lot around 4:30 a.m., heard the breaking glass from Room 102's window. Beavers heard agitated voices engaged in "clipped speech" going back and forth prior to the window breaking. Based on what he heard, Beavers believed "there was a fight going on" (Tr. VI 20-26, 30). Sneed testified that he was in Room 102

7

for fifteen (15) or twenty (20) minutes and that he hit Van Treese a maximum of ten times with the baseball bat (Tr. XII 112-13, 223).  Sneed left the murder weapon in Room 102 (Tr. XII 119).

Once Sneed believed Van Treese was dead, he returned to Room 117 and changed out of his bloody clothes.  Sneed stuffed the bloody clothes into a metal popcorn container.  Sneed then went to the motel office and made contact with Defendant (Tr. XII 117-19).  Sneed told Defendant that Van Treese was dead and that the window to Room 102 was broken (Tr. XII 120-22).  Defendant told Sneed to clean up the glass from the sidewalk in front of Room 102, to retrieve the bat from Room 102 and then to return to his motel room (Tr. XII 121-22).  Sneed complied and Defendant eventually appeared at Sneed's room (Tr. XII 123, 168; State's Exhibit 15).  Defendant "was nervous" and made Sneed go with him to Room 102 to make sure that Van Treese was dead (Tr. XII 123).  Once inside Room 102, Defendant removed a one hundred dollar bill from Van Treese's wallet and pocketed it (Tr. XII 123-24).  Defendant then told Sneed to drive Van Treese's car to an adjacent parking lot at a nearby credit union, that Sneed would find the money he was promised under the front seat of Van Treese's car (Tr. XII 124). Sneed retrieved Van Treese's car keys from a pair of jeans laid over the back of a loveseat and complied with Defendant's orders.  Sneed found an envelope with approximately $4,000.00 cash in the place described by Defendant (Tr. XII 125-27, 129).

8

Defendant met Sneed in Room 117 where they divided up the money. Defendant took half of the cash (Tr. XII 128-29). Defendant and Sneed returned to Room 102 and duct taped a shower curtain over the inside part of the room's window (Tr. XII 130, 132). Sneed also placed a sheet over Van Treese's body "out of respect" (Tr. XII 131). Defendant had Sneed turn up the air conditioner "full blast" so that Van Treese's body would not start to smell (Tr. XII 130, 132). As they walked out of the room around dawn, Defendant asked Sneed to break a key off in the lock. Sneed complied and the lock's tumbler fell out (Tr. XII 130, 137). Defendant told Sneed to tell anyone who asked about the broken window in Room 102 "that two drunks had rented the room and they had ended up breaking the window and then early in the morning we ran them off the premises (Tr. XII 136). To keep the motel maids away from the body, Defendant told Sneed that they would perform housekeeping on the downstairs rooms at the motel, which included Room102 (Tr. IX 49-51; Tr. XII 138-39). Defendant told Sneed to go to the hardware store and buy a sheet of plexiglass that would fit over the outside of the broken window. Defendant also told Sneed to buy some trash bags, a hacksaw and muriatic acid. Defendant explained that the muriatic acid and hacksaw could be used to dissolve and cut up Van Treese's body and that the remains could be disposed of in the trash bags (Tr. XII 142-46). Sneed returned later that morning with a sheet of plexiglass, trash bags and a hacksaw–he was unable to find any muriatic acid (Tr. XII 147). Defendant and Sneed installed the

9

sheet of plexiglass over the outside of the broken window (Tr. XII 149, 167; State's Exhibit 30).

Around 2:30 p.m. or 3:00 p.m., Billye Hooper received a call from Weokie Credit Union telling her that Van Treese's unlocked car had been found in the credit union parking lot adjacent to the motel (Tr. VII 70). The search for Barry Van Treese ensued (Tr IX 193). Cliff Everhart arrived at the motel around 4:00 p.m. and told Defendant to have Sneed search all the rooms in the motel for Van Treese. Defendant made it appear as though he complied with that request. He also assisted Everhart search the area around the motel (Tr. XI 185-87; Tr. XII 156-59). Defendant provided multiple and conflicting statements throughout the day in order to deflect attention from Room 102. Around 8:30 a.m. that morning, Defendant told Billye Hooper that Van Treese had "got up early that morning and had gone to get breakfast and was going to get some materials. They were going to start working on the motel" (Tr. VII 62). Defendant told a motel resident that morning who asked about the broken window in Room 102 that two drunks got into a fight, threw a footstool through the window and that he and Sneed threw them out of the motel (Tr. IX 45-47). When that same resident observed blood on the outside of the window to Room 102, Defendant told her that someone got cut cleaning up the glass (Tr. IX 53-56). After Van Treese's vehicle was located, Defendant told Sgt. Tim Brown of the Oklahoma City Police Department (OCPD) that he last saw Van Treese walking through the motel parking lot at 7:00 a.m.

10

that morning (Tr. IX 193-95). During a second conversation that night, Defendant told Sgt. Brown that Sneed said "that a couple of drunks had got in a fight and broke the window and that he had to take them off the property." Defendant stated that he saw Van Treese after the broken window incident (Tr. IX 206). Defendant later told Sgt. Brown that "everything started getting confused" and "[r]eally, the last time I remember seeing [Van Treese] is 8:00 the night before when he was picking up the payroll money" right before Van Treese left for Tulsa (Tr. IX 209). Defendant stated that he saw someone walking through the motel parking lot the morning of January 7th but he was not sure it was Van Treese (Tr. IX 215-19). When Sgt. Brown mentioned to Defendant his original statement about seeing Van Treese at 7:00 a.m., Defendant denied making that statement (Tr. IX 219).

Around 9:30 p.m., Sgt. Brown and Everhart discussed Defendant's conflicting statements and decided to enter Room 102 (Tr. IX 220-21; Tr. XI 191). They made entry using a pair of hemostats to open the door. Once inside, the pair discovered the body and Sgt. Brown secured the room (Tr. IX 222-24; XI 193-97). Sgt. Brown took Defendant into investigative detention. Once in the backseat of the patrol car, Defendant made the spontaneous statement that "[w]ell, I guess I better tell you now" that he heard the glass breaking earlier that morning followed by Sneed banging on the side wall of his apartment. Defendant stated that he believed the entire time that Sneed had something to do with Van Treese's

11

disappearance but did not want to say anything until he knew for sure. Defendant also stated that Sneed "had said something to him in the past about setting up a fake robbery" (Tr. IX 233-34). Defendant was interviewed by homicide detectives in the early morning hours of January 8th. During that interview, Defendant denied any involvement in, or prior knowledge of, the murder. However, Defendant told homicide detectives in a second interview on January 9th that Sneed appeared at his apartment early in the morning on January 7th and confessed to the murder. Defendant admitted his involvement in cleaning up the glass in front of Room 102 and sealing up the broken window with plexiglass. He also admitted that he did not share any of this information with investigators, or anyone else for that matter, during the search for Van Treese. However, Defendant denied either going inside Room 102 room or seeing Van Treese's body (Tr. XIV 5-7, 29; State's Exhibits 1 & 2; Court's Exhibits 3 & 4). Sneed was arrested on January 14th and, after initially denying participation in the homicide, implicated both himself and Defendant as described in Sneed's trial testimony (Tr. IV 4-6; Tr. XIV 74-75).

Additional facts will be presented below as they become relevant.

## ARGUMENT AND AUTHORITY

### I.

### SUFFICIENT EVIDENCE WAS PRESENTED TO SUPPORT DEFENDANT'S CONVICTION.

Defendant argues in his first proposition of error that insufficient corroboration was presented to support Justin Sneed's accomplice testimony. Defendant reasons that without Sneed's testimony, insufficient evidence was presented to support his first degree malice murder conviction. Defendant argues that, at best, he could be found guilty only as an accessory after the fact to Barry Van Treese's murder. Opening Br. at 10-33.

Oklahoma law provides that:

> A conviction cannot be had upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely show the commission of the offense or the circumstances thereof.

22 O.S.2001, § 742. This Court recently reaffirmed its jurisprudence interpreting Section 742:

> In *Cummings v. State*, we recognized the "general rule" that testimony of an accomplice "must be corroborated with evidence, that standing alone, tends to link the defendant with the commission of the crime charged." We have likewise described as "well settled" the interpretation of § 742 as requiring that "corroborative evidence must of itself, without the aid of the testimony of an accomplice, tend to some degree to connect the defendant with the commission of [the] offense,"and noted that "independent evidence merely consistent with

13

> the main story is not sufficient to corroborate it if it requires any part of the accomplice's testimony to make it tend to connect the defendant with the crime."
>
> The State correctly notes that we have not required that the *quantity* of the independent evidence connecting the defendant to the crime be great, though we have insisted that the evidence raise more than mere suspicion. In *Cummings*, we recognized that an accomplice's testimony need not be corroborated in all material respects and that the amount of corroboration required is simply "at least one material fact of independent evidence that tends to connect the defendant with the commission of the crime." We also recognized that circumstantial evidence can be adequate to corroborate an accomplice's testimony.

*Pink v. State*, 2004 OK CR 37, ¶¶15-16, 104 P.3d 584, 590 (citing *Cummings*, 1998 OK CR 45, 968 P.2d 821) (footnotes omitted). "The purpose behind the requirement of corroboration is to protect an accused from being falsely implicated by another criminal in the hope of clemency, a desire for revenge, or for any other reason." *Fleming v. State*, 1988 OK CR 163, ¶8, 760 P.2d 208, 209-10. It should be noted, however, that there is no federal constitutional requirement that accomplice testimony be corroborated. *Foster v. Ward*, 182 F.3d 1177, 1193 (10th Cir. 1999); *Boyd v. Ward*, 179 F.3d 904, 921-22 (10th Cir. 1999). Thus, Defendant's challenge to the accomplice testimony in this case rests on pure state law grounds.

**Analysis.** It is undisputed that Justin Sneed must be considered an accomplice under Section 742. Sneed pled guilty to the first degree murder of Barry Van Treese and testified that he personally went inside Room 102 and beat

Van Treese to death with a baseball bat.  However, Sneed testified that the only reason he murdered Van Treese was because Defendant had repeatedly asked him to do it and that on the night of the murder, Defendant offered Sneed, *inter alia*, $10,000.00 to commit the murder.  Sneed testified that Defendant feared being fired by Van Treese if he lived to see the condition of various rooms at the motel that were supposed to have been renovated or repaired by Defendant but were not.  Defendant also threatened that Sneed would be evicted from the motel by Van Treese if Defendant was fired.  Sneed received a plea deal of life without possibility of parole in exchange for his truthful testimony at Defendant's trial (Tr. XII 57-58, 75-101, 174, 178, 184; State's Exhibit 43).  Thus, Sneed is an accomplice for Section 742 purposes.  *Carter v. State*, 1994 OK CR 49 ¶29, 879 P.2d 1234, 1246 (definition of accomplice under Section 742).

Consistent with Section 742's mandate, Defendant's jury was provided OUJI-CR(2d) 9-27, 9-28, 9-30 & 9-32, Oklahoma's uniform instructions stating the requirement that accomplice testimony must be corroborated if used to convict a defendant (O.R. 1273-75).  Discussing Justin Sneed's testimony during closing argument, the prosecutor told the jury that "[t]he instructions say that the testimony of Justin Sneed must be corroborated...The instructions say that no person may be convicted on the testimony of an accomplice unless the testimony of that witness is corroborated by other evidence.  And there's no getting around that" (Tr. XV 89).  The prosecutor then discussed the balance of instructions and

15

detailed the evidence he believed provided sufficient corroboration for Sneed's accomplice testimony (Tr. XV 89-98). Defendant's jury was therefore correctly instructed on the law of accomplice corroboration. Further, Defendant's jury was instructed on the lesser-related offense of accessory to first degree murder (O.R. 1289-91). The jury found Sneed's testimony corroborated and credible and convicted Defendant of first degree malice murder (O.R. 1313-14).

Review of the record shows why. Sufficient evidence was presented by the prosecution at trial to corroborate Sneed's testimony. The prosecution presented circumstantial evidence that Defendant: (1) actively concealed, and deflected attention from, the victim's body in Room 102 over a nearly seventeen hour period while civilians and law enforcement searched for the victim at and around the motel; (2) possessed proceeds from the $4,000.00 Sneed recovered from the victim's car after the murder; (3) had strong motive and opportunity to cause the victim's death; (4) had control over the actions of Justin Sneed, an immature, uneducated 18 year old; and (5) began selling his possessions and stated his intention to leave the state. The totality of this circumstantial evidence tends to connect Defendant as an aider and abettor to the first degree malice murder of Barry Van Treese and therefore corroborates Sneed's testimony.

From the outset, this Court must consider the unique circumstances involved in analyzing the type of "murder for hire" or "crime for hire" scenario at issue here. As noted by the Alabama Supreme Court:

The nature of a "crime for hire" is that a physical connection between the defendant and the crime, or even the scene of the crime, may never exist. The defendant hires an accomplice for the purpose, among others, of avoiding a physical connection or presence. Thus, the corroboration of an accomplice's testimony may be accomplished by a number of pieces of circumstantial evidence, which, when considered collectively, support a reasonable inference by the jury that the defendant participated in the crime charged by hiring the accomplice to commit the physical acts necessary to perpetrate the crime. *See Colvette v. State*, 568 So.2d 319 (Ala. Crim. App. 1990) (arson for hire). Indeed, the corroboration of an accomplice's testimony in cases of "crimes for hire" may consist primarily of the defendant's statements which, interpreted by reference to the circumstances, tend to connect the defendant to the crime. *See Prewitt v. State*, 460 So.2d 296 (Ala. Crim. App. 1984) (murder for hire).

*Ex parte Bullock*, 770 So.2d 1062, 1068 (Ala. 2000). Defendant's actions and statements the day of the murder are the primary evidence connecting him with the murder. However, his actions and statements must be interpreted by reference to the other circumstantial evidence presented at trial. As shown below, Defendant actively concealed the fact of the murder for approximately seventeen hours from both law enforcement and civilians at the motel who were searching for the victim. Even after the body was found, Defendant lied to detectives during his first interview by claiming that he knew nothing about the murder. Defendant admitted during the second interview that he knew about the murder but actively concealed its existence during the search for Van Treese. Defendant's words, taken in conjunction with his clear motive to kill and his undisputed control over

17

Sneed, and evidence showing his possession of the victim's money after the murder, all establish a substantive connection between Defendant and the first degree malice murder of Van Treese that is inconsistent with either Defendant's innocence or Defendant's culpability as mere accessory after the fact.

**1. Actively Concealing the Murder for Seventeen Hours.** Evidence that Defendant lied to motel employees, guests and police the day of the murder in order to conceal the location and condition of the victim's body in Room 102 corroborates Sneed's testimony. Defendant admitted to Detective Bemo in the second interview on January 9th that he knew in the early morning hours of January 7th that Van Treese had been murdered and that the body was in Room 102. According to Defendant, Sneed told him that he committed the murder because he thought the victim would evict him from the motel. Defendant further admitted that he did nothing to disclose Sneed's confession to anyone during the extensive search at the motel that day. Indeed, Defendant admitted that he told Sneed to clean up the broken glass from Room 102's broken window. Defendant also admitted to helping Sneed install plexiglass over the broken window later that morning (Tr. XIV 28-30; State's Exhibit 2; Court's Exhibit 4 at 6-16, 22).

In addition, Defendant provided multiple conflicting versions of when he last saw the victim alive. Defendant provided no fewer than three (3) different stories to Sgt. Tim Brown when asked to tell the last time he saw Van Treese alive. Sgt. Brown was actively searching for Van Treese throughout the afternoon of January

18

7th. Defendant initially told Sgt. Brown that he last saw Van Treese at 7:00 a.m. on January 7th walking across the motel parking lot (Tr. IX 193-95). Later, Defendant told Sgt. Brown that he had seen Van Treese shortly after 4:30 a.m. on January 7th. Defendant claimed that Sneed told him that the window in Room 102 was broken out by a couple of drunks who got into a fight. Defendant said he observed Van Treese in the motel parking lot after the window was broken. Defendant claimed that Sneed told him that he had taken the drunks who broke the window off the property (Tr. IX 206). Later in the evening, Defendant told Sgt. Brown that "everything started getting confused" and "[r]eally, the last time I remember seeing [Van Treese] is 8:00 the night before when he was picking up the payroll money" before leaving for Tulsa (Tr. IX 209). When Sgt. Brown mentioned to Defendant his original statement about seeing Van Treese at 7:00 a.m., Defendant denied making the statement (Tr. IX 219).

Defendant also concealed the fact of the murder from employees and residents of the motel that day. Defendant told Billye Hooper around 8:00 a.m. that Van Treese had "got up early that morning and had gone to get breakfast and was going to get some materials. They were going to start working on the motel" (Tr. VII 62). Defendant told Hooper that Van Treese was staying in Room 108 (Tr. VII 66). Defendant also told Hooper not to put Room 102 on the housekeeping list because he and Sneed were going to clean up that room (Tr. VII 64). Defendant explained that Van Treese had rented that room to "a couple of drunks and they

19

had busted out a window" and that Defendant had run the drunks off the motel property (Tr. VII 64-66). Hooper said Defendant did not normally clean rooms (Tr. VII 65). Around the same time, Defendant told Kalya Pursley, a resident of the motel who had asked about Room 102's broken window, that two drunks got into a fight inside the room, threw a footstool through the window and that he and Sneed threw them off the motel property. Defendant suggested a man Pursley observed at the Sinclair station earlier that morning was one of the drunks who broke the motel room's window (Tr. IX 45-48). Defendant told Jackie Williams, a maid at the motel, not to clean any downstairs rooms, which would include Room 102 (Tr. VIII 122). During a telephone conversation, Defendant told the victim's wife sometime after 3:00 p.m. that the last time he saw the victim was between 7:00 and 7:30 a.m. on January 7th. Defendant said at that time the victim told him "he was going to buy supplies for the motel and he would be back later" (Tr. IV 99). Defendant said the victim looked and sounded fine (Tr. IV 100). Defendant told her that he would search all rooms at the motel for the victim (Tr. IV 101-02).

Defendant originally told Cliff Everhart during the search for Van Treese that the victim had arrived back at the motel from Tulsa around 2:30 or 3:00 a.m. on January 7th and had gone to bed. Defendant also told Everhart that he had rented Room 102 to a couple of drunk cowboys who eventually broke the window out (Tr. XI 188-90). Later in the evening, Defendant told Everhart that he last saw

20

the victim at 7 a.m. that day when the victim left the motel (Tr. XI 183-84).   In Everhart's presence, Defendant made it appear as though he had Sneed search the motel rooms for the victim (Tr. XI 185-86).   Defendant also actively searched the motel grounds with Everhart that day to make it appear as though he did not know the location or condition of the victim (Tr. XI 187).   Defendant even provided false leads to those searching for the victim.   At some point during the search, Defendant told Everhart and Sgt. Brown that he believed some people in an upstairs motel room may have been responsible for Van Treese's disappearance because they left their property in their room and had disappeared without checking out.   Based on that information, Everhart and Sgt. Brown needlessly searched the motel room described by Defendant (Tr. XI 191-92).

Defendant did not stop lying, however, when the victim's body was found. Defendant attempted to exculpate himself by shifting blame for the murder to Sneed.     When Sgt. Brown placed Defendant into investigative detention immediately after discovering the body, Defendant said he always suspected Sneed had something to do with the murder but he "didn't want to say anything until he knew for sure" and that Sneed said something to Defendant in the past about "setting up a fake robbery" (Tr. IX 233).   Defendant also lied to homicide detectives during his first interview on January 8th around 3:00 a.m., claiming that he knew nothing about the murder or the body being in Room 102 (Tr. XIV 5-7, 85; State's Exhibit 1; Court's Exhibit 3).   As noted by this Court:

> A statement that is believed to be completely false may be admitted by a party opponent merely because it shows that the defendant has lied about his involvement in the crime. **Such a lie, designed to conceal guilt, may on occasion be more convincing evidence of guilt than truthful admissions...A statement by a defendant intending to deny guilt may incidentally prove his guilt of the crime, or an element of the crime, or his identity, or his presence at the scene of the crime.**

*McElmurry v. State*, 2002 OK CR 40, ¶42, 60 P.3d 4, 19 (citing 12 O.S.1991, § 2801(4)(b)(1)) (emphasis added). *See also State v. Her*, 668 N.W.2d 924, 927 (Minn. App. 2003) ("Admissions and inadequacies in a defendant's testimony may corroborate an accomplice's testimony"); *State v. Miller*, 396 N.W.2d 903, 905 (Minn. App. 1986) (recognizing that evidence that defendant initially lied to police corroborated accomplice's testimony).   In the instant case, the prosecution presented extensive evidence showing that Defendant provided multiple conflicting and false statements for nearly seventeen hours at the motel on January 7th in order to deflect attention from the victim's body in Room 102. These statements, combined with the other circumstantial evidence presented to corroborate Sneed's testimony, tend to connect Defendant to the first degree malice murder of Barry Van Treese.   Simply put, Defendant's active attempts to conceal the victim's murder for most of the day on January 7th is totally inconsistent with either his innocence of the murder or his alleged culpability as an accessory after the fact. Defendant's own words during the second interview make that point clear.

22

It is significant that during the second interview, Defendant denied that he lied about the murder in order to protect Sneed. **Rather, Defendant said he initially lied to detectives because when Sneed told him about the murder, he felt like he "was involved in it, I should have done something right then" and that he did not want to lose his girlfriend over it** (State's Exhibit 2; Court's Exhibit 4 at 16-17). This statement is wholly inconsistent with either Defendant's innocence or his mere culpability as an accessory after the fact. Defendant's active concealment of the body in Room 102 on the day of the murder, and his many lies to detectives during the first interview, are consistent with Defendant as mere accessory only if one believes he is attempting to protect Sneed. Accessory after the fact, by definition, requires concealment of, or aid to, the offender with knowledge he has committed a felony and with intent that the offender may avoid or escape arrest, trial, conviction or punishment. 21 O.S.2001, § 173. Defendant's admission to police that he actively concealed the body not to protect Sneed but because he "felt like he was involved in it" is wholly inconsistent with Oklahoma's definition of accessory and, by extension, any theory of Defendant as mere accessory.

**2. Proceeds from Murder.** Recovery at book-in by police of approximately $1,757.00 from Defendant's person on January 9, 1997, also corroborates Sneed's testimony (Tr. XII 5-13). Sneed testified that he recovered approximately $4,000.00 from an envelope under the front seat of the victim's vehicle after

committing the murder. According to Sneed, Defendant told him where the money was located. Sneed testified that he split this amount with Defendant as proceeds for committing the murder (Tr. XII 124-30).

Defendant admitted to Detective Bemo in the second interview that he gave the victim approximately $4,000.00 to $4,500.00 in motel receipts, all in cash and traveler's checks, in the motel office the night before the murder (Tr. XIV 28-30; State's Exhibit 2; Court's Exhibit 4 at 4-5). Billye Hooper testified that motel records established that the victim picked up approximately $3,500.00 to $4,000.00 in motel receipts from Defendant the night before the murder (Tr. VII 77). Defendant had no legal source for approximately $1,200.00 of the cash recovered from his person at time of book-in. On January 6, 1997, Defendant received a paycheck from the victim for $429.33 (Tr. XIV 42; Tr. XV 17). Defendant spent all but approximately $60.00 of that paycheck on January 7th (Tr. XIV 42-43). Defendant received, at most, around $500.00 for furniture, vending machines and an aquarium he sold prior to his arrest (Tr. XV 16-17). Defendant had no apparent savings according to his girlfriend D-Anna Woods. She told police the pair were living paycheck to paycheck and "she didn't think [Defendant] could save any money" (Tr. XIV 44).

Thus, Defendant had approximately $1,200.00 cash at book-in with no legitimate source. The jury could infer that this money was proceeds from the cash he split with Sneed immediately after the murder. This evidence, taken

24

together with the evidence described below, corroborates Sneed's testimony as it tends to connect Defendant with the murder-for-hire plot concocted by Defendant.

**3. Motive.** The State presented evidence establishing that Barry Van Treese was going to confront Defendant on January 6th or 7th about shortages on the motel books that had persisted through the end of 1996. Cliff Everhart testified he was supposed to meet Van Treese at the Oklahoma City motel on the night of January 6th so they could confront Defendant about these shortages (Tr. XI 169-70, 172-77, 201). Everhart had previously told Van Treese he believed Defendant "was probably pocketing a couple hundred extra" a week from the motel cash receipts during the last two or three months of 1996 (Tr. XI 172-73). In December 1996, Billye Hooper, the front desk clerk, had also shared her concerns about Defendant's management of the motel with Van Treese, who told her he "knew things had to be taken care" of regarding Defendant's management of the motel. Van Treese promised her that he would take care of it after Christmas (Tr. VII 37-40; Tr. VIII 32-34). Van Treese's wife testified that by the end of December 1996, she and the victim discovered shortages from the motel accounts receivables totaling $6,101.92 and that the victim intended to confront Defendant about these shortages on January 6th. Van Treese told his wife that he would also audit the Oklahoma City motel and perform a room-to-room inspection of the motel at that time (Tr. IV 62-66, 70-72).

25

William Bender testified that Van Treese "was all puffed up. He was upset. He was mad...He was all red in the face" when Van Treese arrived at the Tulsa motel just before midnight on January 6th (Tr. VIII 63-64). During Van Treese's brief visit to the motel, he told Bender that there were a number of registration cards missing at the Oklahoma City motel, that weekend receipt money was missing and that Defendant was falsifying the motel daily reports by allowing people to stay in rooms that were not registered (Tr. VIII 80-82). Van Treese said that he gave Defendant until he returned to Oklahoma City "to come up with the weekend's receipts that were missing and if he came up with that, he was going to give him another week to come up with the registration cards and get all the year-end receipts together." Otherwise, Van Treese told Bender he was going to call the police (Tr. VIII 82).

Evidence was presented that the condition of the Oklahoma City motel on January 7th was deplorable. Kenneth Van Treese, the victim's brother, assumed control of the motel immediately after the murder. He discovered that only around 24 of the 54 rooms at the motel were in habitable condition. 12 rooms had no working heat. Other problems included keys that did not fit room doors, broken or dirty plumbing fixtures and broken telephone systems (Tr. XI 116-18). Kenneth testified that "the main thing that was wrong with the motel was it was filthy...absolutely filthy" (Tr. XI 119). The jury could infer that the victim was

unaware of these deteriorating conditions because he made only four overnight trips to the motel during the last half of 1996 (Tr. IV 36-40, 42, 58-59).

This evidence corroborates Sneed's testimony that Defendant feared being fired the morning of January 7th because of Defendant's mismanagement at the motel and provides strong motive for the murder. "While evidence of motive is insufficient in itself to corroborate an accomplice, it may be considered with other evidence to connect the accused with the crime." *Ganesan v. State*, 45 S.W.2d 197, 202 (Tex. App. Austin 2001) (citing *Reed v. State*, 744 S.W.2d 112, 127 (Tex. Crim. App. 1988)). Defendant's motive to murder Barry Van Treese explains why Defendant's active concealment of the body for seventeen hours is inconsistent with either Defendant's innocence or mere culpability as an accessory. The jury could infer that Defendant wanted the victim murdered so he would not lose his job and not be prosecuted for embezzlement.

**4. Control Over Accomplice.** Justin Sneed testified that the sole reason he murdered the victim was because of pressure from Defendant. The State presented evidence that Defendant largely controlled Sneed, an 18 year old, eighth-grade dropout who worked as a maintenance man for Defendant at the motel (Tr. XII 47-48) and that Sneed's mental capacity and personality made it unlikely he would plan to kill anyone, let alone Van Treese, whom he barely knew. One motel resident testified that, based on his limited observations, Sneed "didn't have a lot of mental presence" (Tr. VI 16). Bob Bemo, a retired homicide detective

27

who interviewed Sneed, testified that Sneed did not appear very mature and had below average intelligence. He also testified that Defendant appeared to be more aggressive and intelligent than Sneed. Bemo observed that Defendant was "a very intelligent individual...a very manipulative individual...what he does with everything that he does is he's manipulating, using people" (Tr. XIV 46-48). Kayla Pursley, another motel resident, described Sneed as being "very childlike" (Tr. IX 17). Sneed assisted caring for her children when Pursley broke her foot. Pursley testified that Sneed played with her children "[m]ore as a peer...that he kind of fit in with my boys, you know, he played and he was real simple. He had a skateboard and that was his life...he didn't make a lot of decisions. You had to tell him sometimes what to do" (Tr. IX 17). Pursley described how Sneed would not eat unless someone told him to eat (Tr. IX 18).

Defendant and Sneed were described as "very close" friends by people at the motel (Tr. VII 28). Sneed was largely dependent upon Defendant for food and money (Tr. VII 28; Tr. IX 21). Pursley testified that Sneed usually followed Defendant when they were together, that you normally did not see one without the other and that "[Defendant] would have to tell him what to do and how to do it" (Tr. IX 19-20, 23). Defendant had control over Sneed because Sneed had no other place to go and no family in the area (Tr. IX 21 & 24). Pursley observed that "[y]ou almost had to tell [Sneed] what to do in any circumstance, whether it was a working relationship or personal" (Tr. IX 23). Cliff Everhart testified that Sneed

28

was Defendant's "puppet", that Sneed "was not self-motivated. [Defendant] told him everything to do. [Defendant] would tell him to do this, he'd do it...If he needed something, he'd come to [Defendant]" (Tr. XI 185). Employees at the motel testified that Sneed did not know the victim very well (Tr. VII 34). This corroborated Sneed's testimony that he had only met the victim approximately three times prior to the murder during which time the pair had no real conversations (Tr. XII 76-77). Witnesses who knew both Defendant and Sneed testified that, based on Sneed's personality, they did not believe Sneed would commit a murder on his own (Tr. VII 34; Tr. IX 25).

This evidence shows that Defendant largely had control over Sneed's actions, that Sneed was dependent upon Defendant and that Sneed's personality and mental capacity made it unlikely that he would murder Barry Van Treese, practically a stranger, on his own volition. The evidence shows Sneed had the type of personality in January 1997 that allowed him to be easily influenced by Defendant into committing the murder. In the words of the trial judge during a bench conference, Sneed was "an illiterate guy who's just one notch above a street person" (Tr. XIII 61). Evidence of Sneed's personality and mental capacity and Defendant's control over him, combined with evidence that Defendant: (1) turned up with a large sum of cash shortly after the murder; (2) actively concealed the body in Room 102 for practically an entire day by misleading investigators and others who were searching for the victim at the motel; and (3) had strong motive

29

to kill the victim, tends to connect Defendant with the murder in this case. *See State v. Her*, 668 N.W.2d at 927 (opinion testimony of gang expert that defendant would have been in charge of accomplices he drove to robbery of motel, would have had authority to direct their activities and would have been aware of everything that was happening, sufficient to corroborate accomplice testimony that defendant ordered the robbery).

**5. Stated Intent to Flee.** After being interviewed by detectives, Defendant began the process of selling all of his possessions. He told Cliff Everhart that "he was going to be moving on" (Tr. XI 199-200). When homicide detectives got word of Defendant's stated intention to leave Oklahoma, they put police surveillance on Defendant (Tr. XIV 23). On January 9th, Defendant failed to appear for a previously scheduled meeting with homicide detectives at police headquarters. Defendant was eventually intercepted and taken to police headquarters to meet with homicide detectives where he eventually gave a second interview (Tr. XII 6-9). Evidence that Defendant sold off his possessions shortly after his initial contact with homicide detectives (but before he admitted in the second interview to actively concealing the victim's body in Room 102) represents evidence tending to connect Defendant with the murder of the victim. Evidence of flight can be a corroborating circumstance because it demonstrates consciousness of guilt. *Hernandez v. State*, 939 S.W.2d 173, 178 (Tex. Crim. App. 1997). In the instant case, evidence that Defendant was preparing to leave the state demonstrates a

consciousness of guilt which, combined with the additional circumstantial evidence discussed above, corroborates Sneed's testimony by tending to connect Defendant with the murder.

**Summary.** The circumstantial evidence discussed above was sufficient to corroborate Justin Sneed's accomplice testimony. This evidence tended to connect Defendant with the murder. That is all Oklahoma law requires. Defendant nonetheless devotes nearly twenty (20) pages of his opening brief to arguing inferences from the evidence presented at trial that he believes demonstrates his innocence. In short, Defendant recycles on appeal the same defense arguments previously rejected by his jury. Opening Br. at 12-31. Defendant ignores, however, the applicable standard of review. As noted by this Court in *Frederick v. State*, 2001 OK CR 34, 37 P.3d 908:

> Whenever the sufficiency of the evidence is challenged on appeal, this Court will apply the test set out in *Spuehler v. State*, 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203-204:
>
> "In *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979), the United States Supreme Court held that due process requires a reviewing court to determine 'whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt.' "
>
> Further, this Court will accept, on review, all reasonable inferences and credibility choices that tend to support the jury's verdict. *See e.g., Roldan v. State,* 1988 OK CR 219, ¶ 8, 762 P.2d 285, 287.

31

*Id.,* 2001 OK CR 34, ¶84, 37 P.3d at 933. Likewise, this Court must view evidence corroborating accomplice testimony in the light most favorable to the prosecution. *Leppke v. State,* 1977 OK CR 21, ¶33, 559 P.2d 459, 466 ("This Court will view the corroborating evidence in the strongest light"); *Edwards v. State,* 1977 OK CR 166, ¶23, 571 P.2d 129, 134 ("[t]his Court will take the strongest view of corroborating testimony such testimony will warrant"). *See also Turnage v. State,* 708 N.W.2d 535, 543 (Minn. 2006) (quoting *State v. Adams,* 295 N.W.2d 527, 533 (Minn. 1980)) ("[w]hen reviewing the sufficiency of evidence to corroborate accomplice testimony, 'we view the evidence in the light most favorable to the state and all conflicts in the evidence are resolved in favor of the verdict'"); *Cantelon v. State,* 85 S.W.3d 457, 461 (Tex. App. Austin 2002) (citing *Knox v. State,* 934 S.W.2d 678, 686-87 (Tex. Crim. App. 1996) & *Gill v. State,* 873 S.W.2d 45, 48 (Tex. Crim. App. 1994)) ("[w]e must view the corroborating evidence in the light most favorable to the verdict"); *State v. Fey,* 7 P.3d 358, 359 & 361 (Mont. 2000) (same); *State v. Bugely,* 562 N.W.2d 173, 176 (Iowa 1997) (same); *Leitner v. State,* 672 So.2d 1371, 1373-74 (Ala. Crim. App. 1995) (same); *State v. Canada,* 481 P.2d 859, 860 (Ariz. 1971) (same); *State v. Duggan,* 333 P.2d 907, 915 (Ore. 1958) (same).

While Defendant claims that the State's corroborative evidence in this case is equally consistent with innocence, "[c]orroborative evidence...need not be entirely inconsistent with innocence." *State v. Willman,* 244 N.W.2d 314, 315 (Iowa 1976). Simply put, "corroborating evidence is not insufficient merely

32

because it is circumstantial, disputed *or possibly consistent with innocent conduct;*

*it is the jury's duty to resolve such factual questions.*"   *Fey,* 7 P.3d at 361

(emphasis in original) (quoting *State v. Kaczmarek,* 795 P.2d 439, 442 (Mont.

1990)). *See also Duggan,* 333 P.2d at 915 (in reviewing sufficiency of accomplice-

corroboration testimony "[w]e are not concerned with the weight of the evidence

nor the conflict of the testimony"). Defendant's attempt to dispute the validity of

the State's corroboration evidence is therefore of no consequence for purposes of

the instant analysis. His jury was properly instructed on the use of accomplice

testimony. Sufficient evidence was presented to allow any rational trier of fact to

find that Sneed's testimony was corroborated as a matter of Oklahoma law. The

credibility determinations Defendant currently seeks are appropriately made by

a jury, not an appellate court.

Defendant's challenge to the circumstantial evidence in this case amounts

to his complaint that the prosecution presented no direct evidence corroborating

Sneed's testimony. As noted by the Texas Court of Criminal Appeals nearly forty

years ago in addressing the Texas accomplice-corroboration rule:

> The law forbidding a conviction upon the uncorroborated
> testimony of an accomplice does not demand that there
> be direct evidence pointing to the accused as the
> offender, but merely requires that there be 'other
> evidence tending to connect the defendant with the
> offense committed.' * * * Circumstances proved by
> credible witnesses may be as potent as direct testimony
> in tending to connect the accused with the commission
> of the offense.  The state is not called upon to point to
> some single or isolated fact which in itself, unrelated to

> other proven facts, will be sufficient corroboration. It is the combined and cumulative weight of the evidence furnished by non-accomplice witnesses which supply the test.

*Edwards v. State*, 427 S.W.2d 629, 632 (Tex. Crim. App. 1968) (quoting *Minor v. State*, 299 S.W. 422, 428-29 (Tex. Crim. App. 1927)). *See also State v. Marshall*, 531 N.W.2d 284, 288 (N.D. 1995) ("Evidence to corroborate an accomplice's testimony need not be incriminating in itself, or sufficient, standing alone, for a conviction"). The State noted at the outset of this discussion the unique circumstances attendant to corroborating accomplice testimony used in "crime for hire" and "murder for hire" cases like the instant case. The totality of the corroborating evidence presented in this case, however, goes well beyond mere suspicion that Defendant was involved in the murder.

Defendant's comparison of his case to others where this Court found insufficient corroboration of accomplice testimony does not warrant relief. Opening Br. at 32-33. "Judicial experience has shown that no precise rule can be formulated as to the amount of evidence that is required to corroborate the testimony of an accomplice witness. Each case must be judged on its own facts." *Gill*, 873 S.W.2d at 48. That the State did not present testimony that Defendant told other people he had solicited someone to murder the victim, as in *Bowie v. State*, 1991 OK CR 78, 816 P.2d 1143, is therefore not relevant. This Court did not state that such evidence was required as a matter of law.

34

Defendant's comparison of his case to *Cummings v. State*, 1998 OK CR 45, 968 P.2d 821, also lacks merit. Unlike *Cummings*, evidence was presented in the instant case that Defendant turned up with a large sum of cash immediately after the murder that the jury could infer were proceeds from the money Sneed took from the dead victim's car. Further, the defendant in *Cummings* admitted only to moving the body of his dead sister. Defendant, by contrast, actively concealed the body for nearly seventeen hours by lying to multiple police officers and civilians who were actively searching for the victim at the motel. Defendant lied about how the window in Room 102 was broken and presented multiple false statements regarding the last time he saw the victim alive, all in an attempt to deflect attention from evidence in Room 102 of the murder. Defendant admitted to homicide detectives that he lied because he "felt like he was involved in it, I should have done something right then" (State's Exhibit 2; Court's Exhibit 4 at 16-17). Defendant's active concealment of the body in Room 102, and the wild goose chase he led everyone on that day at the motel, goes well beyond merely moving a body as was the case in *Cummings*.

Evidence of Defendant's clear motive to murder the victim, along with his stated intent to leave the state and his near total control over Justin Sneed provides additional corroboration tending to connect Defendant with the murder. Simply put, the evidence showed that Sneed would not have committed such an

act alone.  The evidence also showed that Defendant had near total control over

Sneed.  All things considered, the instant case is distinguishable from *Cummings*.

Defendant has spilt much ink attempting to undermine the reliability of

Justin Sneed's testimony.  As shown above, Justin Sneed's testimony was

sufficiently corroborated.  It was also highly credible.  Proof of this fact may be

found in the words of the trial court during an in camera instructions conference:

> Well, you know, I find myself in a very unique position
> here because generally when cases are retried by the
> Court, so far I guess in my six years here, the cases that
> I've had for retrial, some of them were my own and some
> of them were tried by somebody else.  I've never had a
> situation where I've had to basically study the entire first
> trial and then try the case again.
>
> * * * * *  I've also had an opportunity to observe the
> witnesses and it is fascinating to me to see the difference
> that it makes to observe the witnesses on the stand.
> Some of the opinions that I had based on reading the
> first transcripts I, frankly, had very different opinions
> after listening to the testimony as it was presented and
> observing the witnesses.  **And I've got to tell you that
> one of those observations was about Justin Sneed.
> And I did find him to be a credible witness on the
> stand.**

(Tr. XV 44-45) (emphasis added).  This Court should reject Defendant's attempt

to keep from the jury Sneed's highly credible testimony.  There is no legal basis

for suppressing this testimony.  Defendant's jury was properly instructed on the

proper use of corroboration evidence and found that Sneed's testimony was not

only corroborated, but that it was credible and warranted a conviction of first

degree murder. Taken in the light most favorable to the State, as this Court must, the evidence in this case was sufficient to allow any rational trier of fact to find Sneed's testimony corroborated and to find sufficient evidence to support Defendant's conviction for the first degree malice murder of Barry Van Treese. That is especially so considering the exceptionally low standard of proof required to corroborate accomplice testimony. Relief is clearly unwarranted on this claim.

## II.

### DEFENDANT IS NOT ENTITLED TO RELIEF BASED ON THE ADMISSION OF ALLEGED IRRELEVANT EVIDENCE.

Defendant next launches multiple evidentiary challenges, based on relevancy and unfair prejudice grounds, to a litany of prosecution testimony. Opening Br at 34-43. It is well established that the scope of either party's examination of a witness and the admission of evidence "lie in the sound discretion of the trial court, whose rulings will not be disturbed unless that discretion is clearly abused, resulting in a manifest prejudice to the accused." *Davis v. State*, 2004 OK CR 36, ¶30, 103 P.3d 70, 79. Defendant failed to object to any of the testimony he now complains about on appeal. He has therefore waived all but plain error review. *Littlejohn v. State*, 2004 OK CR 6, ¶34, 85 P.3d 287, 299. "Plain error arises from those 'errors affecting substantial rights although they were not brought to the attention of the court.'" *Primeaux v. State*, 2004 OK CR 16, ¶72, 88 P.3d 893, 907 (quoting *Jones v. State*, 1989 OK CR 7, ¶8,

772 P.2d 922, 925)). Plain error has also "been defined as an error which goes to the foundation of the case, or which takes from a defendant a right essential to his defense." *Id.* (quoting *Simpson v. State*, 1994 OK CR 40, ¶23, 876 P.2d 690, 698). The State now turns to the individual evidentiary challenges launched by Defendant.

**Alleged Victim Sympathy Testimony.** Donna Van Treese's description of the victim's general physical condition was proper as part of the foundation for the in-life photograph introduced as State's Exhibit 79. Trial counsel specifically stated that he had no objection to the witness describing the photograph but that he believed the photograph was admissible only during penalty phase (Tr. IV 33-34). A description of the victim's physical condition was also relevant to corroborate that it was the victim in the crime scene photographs.

Defendant recognizes that testimony explaining why the Van Treeses were unable to devote their full attention to the Oklahoma City motel was proper. However, Defendant challenges Donna Van Treese's testimony at transcript pages 36 through 40 on this very topic as excessive and, therefore, unfairly prejudicial. Opening Br. at 35-36. Review of the testimony, however, reveals that it was relevant to describing the unique events that led to the victim's absence from routine visitation and hands-on operation of the motel. Donna Van Treese described how her husband was unable to devote his usual attention and frequent on-site visitation to the Oklahoma City motel because of the responsibilities

38

stemming from the various illnesses and deaths in his family during the latter half of 1996. Because of these events, the victim was able to stay overnight at the Oklahoma City motel only four (4) times during the second half of 1996 (Tr. IV 36-42, 58-59). This testimony was relevant to support the State's theory that Defendant had a unique opportunity to mismanage the Oklahoma City motel during this period, a fact which resulted in Defendant's ultimate plan to murder the victim. The testimony was more probative than prejudicial and was hardly "heart wrenching" as claimed by Defendant. Certainly no error, let alone plain error stems from this testimony.

Defendant's challenge to the testimony regarding the victim's personality and general demeanor also lacks merit. Opening Br. at 36-37. Testimony regarding the victim's generous and kind nature was no doubt overshadowed by testimony presented from largely the same witnesses that the victim had an explosive personality when angry, especially towards employees who did not do their job, and that he resorted to yelling, screaming and threats during such episodes (Tr. IV 61-62; Tr. XI 168-69). The challenged testimony merely provided a full description of the victim's range of personality. Moreover, it showed that his anger the night of the murder, as reported by William Bender, was unusual. It was therefore relevant, not unfairly prejudicial and not plain error.

Donna Van Treese's description of the damage she found to her husband's wedding band, which she discovered when she received it back from the funeral

home, was relevant for multiple purposes. It rebuts Defendant's claim that the victim's death occurred during commission of a robbery, illustrates the impact of the blows the victim suffered during the attack, and corroborates the medical examiner's observations regarding the body and the victim's multiple injuries to the hand (Tr. XI 35-36, 42-46; State's Exhibit 47-48, 75). It was therefore admissible.

Defendant's challenge to testimony regarding the speciality victim's ham radio operator license plates also lacks merit. Opening Br. at 37. This testimony was relevant to corroborate identification of the vehicle recovered from the credit union parking lot as belonging to the victim (Tr. IV 86-87; Tr. VIII 141; Tr. X 151). Any error stemming from the passing description of Defendant's personality by Kenneth Van Treese as it related to being a ham operator appears inadvertent. The prosecutor asked him to describe the victim's demeanor which, as described above, was relevant. Any excess in this challenged testimony was harmless, not plain error (Tr. X 218).

Donna Van Treese's description of the recent on-set of the victim's diabetes was relevant to show why she was so concerned when the victim turned up missing. This testimony also was probative on the issue of why employees and family members did not immediately suspect foul play when the victim turned up missing for seventeen (17) hours on January 7th (Tr. IV 98-100). This testimony was relevant, not unfairly prejudicial and certainly not plain error. Testimony

40

regarding the victim's t-shirt was relevant to corroborate identification of the victim's body based on the clothes he was wearing and to corroborate the medical examiner's observations of the body (Tr. IV 85-86; Tr. XI 36; State's Exhibit 48). No plain error stems from this testimony.

All things considered, Defendant's complaint that the above testimony was designed to inflame the jury's passion is patently frivolous and should be rejected by this Court.

**Alleged Justin Sneed Sympathy Testimony.** Defendant's challenge to evidence regarding Justin Sneed's background, personality and demeanor is equally meritless. This is not a difficult conclusion considering that Defendant's experienced and competent trial counsel did not object to any of it. Defendant waives any challenge to Kayla Pursley's testimony by failing to cite the record. Opening Br. at 38; Rule 3.5(A)(4) & (5), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2006). Pursley's testimony was relevant to illustrate Sneed's level of maturity, intelligence and sophistication, all factors relevant to the State's theory that Defendant had near total control over Sneed. Defendant's speculation that Pursley somehow exaggerated her testimony regarding Sneed is just that–speculation.

Sneed's testimony regarding his family, educational and employment background was relevant to describe how he ended up living by himself at a motel in Oklahoma City under the control of Defendant, even though he had two small

daughters and family in nearby Texas. It was also relevant to demonstrate his relative lack of sophistication and state of mind at the time of the murder, an important issue considering the prosecution theory that Defendant controlled Sneed. His testimony regarding drug use while staying at the Best Budget Inn and after being arrested was probative for the same reasons. Sneed's testimony regarding the educational achievements and personality changes he underwent while incarcerated for seven years after the murder was relevant to assessment of his current testimony because it provided a stark contrast to the immature eighteen (18) year old who committed this vicious murder in January 1997 (Tr. XII 38-49). Evidence of Sneed's sentence was relevant as part of the disclosure to his jury of the plea deal he entered with the State (Tr. XII 174, 184-86; State's Exhibit 43). This testimony was absolutely relevant, not unfairly prejudicial and not plain error. Defendant's challenge to this testimony is patently frivolous and should be rejected.

**Condition and Operation of Motel Testimony.** Kenneth Van Treese's testimony regarding the condition of the Oklahoma City motel on January 8, 1997, when he took control of it was obviously relevant. He described for the jury the purchases and repairs he made that were necessary to put the motel back into rentable condition (Tr. XII 22-26). Kenneth described the motel as "pretty much uninhabitable" because the rooms were dirty, had inoperable heating units, ragged bedding and linens, stopped-up sinks and toilets, mold on the bathroom

42

tile and wet carpet (Tr. XII 23). Only about one-fourth of the motel rooms were habitable (Tr. XII 25). The challenged testimony was therefore highly relevant regarding the deterioration Defendant allowed at the motel while the victim was absent from the property during the last half of 1996. No error, let alone plain error stems from this testimony and relief should be denied. Kenneth's description of the management system he put into place was relevant to demonstrate the shortcomings of the victim's management system. This testimony showed how it was possible Defendant, the on-site manager, could in fact steal from the motel (Tr. XI 112-15). Kenneth's testimony regarding complaints from other family members regarding how he was running the motel explained how he eventually left the motel after only two months and completes the story of his involvement in the motel (Tr. XI 121-22). It was therefore relevant, not unfairly prejudicial and certainly not plain error. Relief must be denied.

Defendant's complaint throughout this proposition of error is that the prosecution attempted to distract the jury with irrelevant, unfairly prejudicial testimony. As shown above, however, evidence may be relevant and admissible for many different reasons. The State did not attempt to unfairly prejudice or otherwise mislead Defendant's jury. The State did nothing more with the challenge testimony than meet its burden of proof with admissible evidence and attempt to answer questions the jury might reasonably have under the circumstances of this case. This was wholly proper and relief is unwarranted.

43

## III.

## THE PROSECUTION'S USE OF DEMONSTRATIVE AIDS DURING TRIAL WAS NOT ERROR.

In his third proposition of error, Defendant challenges the prosecutor's use of demonstrative aids that memorialized certain testimony of prosecution witnesses. Specifically, Defendant challenges fourteen (14) instances where the prosecutor wrote down a witnesses' testimony on easel paper as that witness testified. Defendant argues that, even though these demonstrative aids were not sent to the jury room for deliberations, reversible error occurred. Defendant argues that allowing the State to display certain portions of testimony on the easel paper in the courtroom improperly overemphasized that testimony, constituted a continuous closing argument and violated the rule of sequestration. Defendant also complains that the trial court erred in not allowing these particular demonstrative exhibits to be included as part of the trial record for purposes of appeal. Opening Br. at 42-49.

Defendant's allegations of error based on the prosecutor's use of these demonstrative aids lack merit. First, Defendant registered only one contemporaneous objection to the prosecutor's challenges actions (Tr. IX 121) and did not request a continuing objection to the balance of alleged improper actions of the prosecutor (Tr. V 195-96). Defendant has thus waived all but plain error review for the vast majority of his claims. *Littlejohn v. State*, 2004 OK CR 6, ¶34,

44

85 P.3d 287, 299. Second, Defendant does not dispute the accuracy of the testimony written on the easel board paper by the prosecutor. Nor does he dispute that these statements were written on the easel board paper as a witnesses testified to those facts and statements. Further, it is not disputed that these particular demonstrative exhibits were not admitted into evidence and were not sent back to the jury room during deliberations.

The prosecutor's use of easel board paper to memorialize certain testimony was merely resort to a pedagogical aid, permissible under 12 O.S.Supp.2002, § 2611. This is because the easel board paper "summarized evidence that had already been presented." *United States v. Buck*, 324 F.3d 786, 790 (5th Cir. 2003) (comparing use of chart for pedagogical purposes under FED. R. EVID. 611 and use of summary charts admitted under FED. R. EVID. 1006). Use of the easel board paper to memorialize Defendant's many incriminating statements to prosecution witnesses on the day of the murder, or shortly thereafter, was wholly proper to assist the jury in understanding, and keeping track of the testimony. This was especially appropriate considering that: (1) the jury heard testimony from nearly twenty-six witnesses during guilt stage alone; and (2) Defendant provided so many different conflicting statements at the time of the murder designed to deflect attention from the victim's body in Room 102--statements he later admitted to homicide detectives were false (Tr. IV 99-101; Tr. V 19-24, 97-105; Tr. VII 59-60; Tr. VIII 88-90, 116-17; Tr. IX 46-48, 56, 121, 206-07, 212-19, 233-36; Tr. XI 183-

84; State's Exhibit 2; Court's Exhibit 4).  The trial court did not abuse its

discretion in allowing the prosecutor to write down and display certain portions

of testimony while witnesses testified.  12 O.S.Supp.2002, § 2611(A)(2) ("the court

shall exercise control over the manner and order of interrogating witnesses and

presenting evidence so as to...[m]ake the interrogation and presentation effective

for the ascertainment of the truth"); *Glaze v. State*, 1977 OK CR 206, ¶21, 565

P.2d 710, 714 (reviewing for abuse of discretion trial court's refusal to re-read

testimony for jury during deliberations).  This is especially so considering that

Defendant had the same opportunity to use such demonstrative exhibits and in

fact, utilized the same process as the prosecutor on several occasions during

witness testimony.  As noted by the prosecutor:

> using the same size paper, the same marker, the Defense
> has made five demonstrative aids of their own of similar
> ilk, that had been displayed various lengths of time to
> the jury.  One in particular which is the one where
> Justin Sneed denies killing Barry Van Treese was
> displayed to this jury throughout, you know, Justin
> Sneed and others' testimony.

(Tr. XV 35).  Defendant's attempt on appeal to dispute this statement is belied by

the fact that *trial counsel* did not dispute the prosecutor's statement of fact

regarding Defendant's use of demonstrative aids.  Opening Br. at 48.  Defendant

clearly fails to demonstrate error, let alone plain error, stemming from the parties'

use of these demonstrative aids.

Defendant's complaint that the demonstrative aids should not have been left in the courtroom for the duration of the trial because they unfairly "emphasized certain testimony to the exclusion of other evidence received throughout the trial" lacks merit. Opening Br. at 46. Defendant's jury was instructed to consider all of the evidence in reaching a verdict, not just the testimony reproduced by the prosecutor on the easel board paper (O.R. 1263) ("[t]he defendant, is presumed innocent of this crime, and the presumption continues, unless, after consideration of all the evidence you are convinced of his guilt beyond a reasonable doubt...Evidence is the testimony received from witnesses under oath, stipulations made by the attorneys, and the exhibits admitted into evidence during the trial"). Defendant fails to demonstrate that displaying the demonstrative aids throughout the trial represents error going to the foundation of the case or otherwise takes from him a right essential to his defense *Primeaux v. State*, 2004 OK CR 16, ¶72, 88 P.3d 893, 907 (defining plain error). The same is true with Defendant's complaint that the prosecutor was able to make a "continuous closing argument" by displaying the demonstrative aids. Opening Br. at 46-47. Again, these demonstrative aids were based on accurate testimony and the jury was properly instructed to consider all the evidence presented at the trial. Defendant fails to demonstrate plain error here.

Defendant's complaint that the prosecutor violated the rule of sequestration by displaying the demonstrative aids is particularly weak. The rule of

sequestration, also known as the "rule of exclusion of witnesses", *Marshall v. State*, 1998 OK CR 30, ¶21, 963 P.2d 1, 8, is set forth in the Oklahoma Evidence Code. It provides in pertinent part that "[a]t the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses." 12 O.S.2001, § 2615. The witnesses in Defendant's case did not violate the rule of sequestration because they were not in the courtroom to hear other witnesses testify. Further, it is hard to imagine that a witness would tailor his or her testimony to handwritten phrases on easel paper displayed for the jury as demonstrative aids in the courtroom. The various pieces of testimony would only make sense to those like the trial court, parties and jury, who had been present in the courtroom for the duration of testimony. Any given witness would not have sufficient time during testimony to review, let alone adopt, the handwritten statements listed on the demonstrative exhibits. The State submits that a witness is more concerned with hearing and answering the continuous questions of the examiner while testifying than with searching for answers on the walls of the courtroom. This fact alone demonstrates the frivolous nature of this claim.

Further, the majority (if not all) of the witnesses who testified at Defendant's second trial had presented prior testimony and/or statements to police. In this sense, Defendant could expose any possible modification of testimony, for whatever reason, through impeachment by prior inconsistent statements. All

things considered, Defendant fails to demonstrate either prejudice or plain error stemming from the prosecutor's alleged violation of the rule of sequestration. *Villanueva v. State*, 1985 OK CR 8, ¶¶2-5, 695 P.2d 858, 860 (trial court has discretion to provided exceptions to rule of sequestration).   Relief is clearly unwarranted.

Finally, Defendant's complaint that he was prevented from making a proper record because the trial court would not allow him to make the prosecutor's demonstrative exhibits part of the trial record also lacks merit.  The trial court correctly noted that the contents of the demonstrative aids were reflected in the record during the prosecutor's questioning.  Defendant wholly fails to show prejudice based on the absence of the actual demonstrative aids from the trial record before this Court.[2] The extensive challenges Defendant has made to these demonstrative aids in the instant proposition show clearly that Defendant's appellate rights were not prejudiced.  *Wackerly v. State*, 2000 OK CR 15, ¶6, 12 P.3d 1, 7 (failure to transcribe prosecutor's exercise of peremptory challenges does not warrant reversal where omitted record does not affect ability to review for *Witherspoon* error; challenges for cause were recorded); *Byrne v. State*, 1971 OK CR 100, ¶6, 482 P.2d 620, 622 (no error where trial court failed to preserve chalkboard illustration used during state's case in chief; defendant failed to show

---

[2]  Undersigned counsel would further note that he has been advised by one of the prosecutors who handled this case below that the demonstrative aids used by the State still exist and are located in the District Attorney's trial file.

prejudice or that he was otherwise denied access to said illustration). All things considered, relief is unwarranted.

## IV.

## DEFENDANT IS NOT ENTITLED TO RELIEF BASED ON ALLEGED PROSECUTORIAL MISCONDUCT.

In his fourth proposition of error, Defendant alleges a litany of meritless prosecutorial misconduct claims based on closing argument and witness examination. In summary, Defendant alleges that the prosecution knowingly presented false and misleading evidence and argument to the jury during both stages of trial. Opening Br. at 49-61.

**Lack of Forensic Evidence.** Defendant first complains that the prosecutor's argument at transcript pages 83 through 86 regarding absence of his fingerprints in the motel room was false and misleading. In the challenged passage, the prosecutor argued that absence of Defendant's fingerprints from Room 102 was not unusual, even though he was manager of the motel and would be expected to have legitimate reasons to be inside that room. The prosecutor reasoned that even though one would expect Defendant's prints to be inside the room from "changing a lightbulb or cleaning the mirror, anything", Defendant "made certain by action or omission that his fingerprints would not be found there" by either wearing gloves or wiping down any fingerprints he may have left (Tr. XV 85-86). Defendant seems to reason that the prosecutor mislead the jury

with this argument because "the police limited their initial collection of forensic evidence to areas obviously related to the murder *and the prosecutor knew or should have known it.*" Opening Br. at 51 (emphasis in original). These comments were so outrageous that defense counsel did not object, thus waiving all but plain error. *Matthews v. State*, 2002 OK CR 16, ¶38, 45 P.3d 907, 920.

Defendant's argument is curious. It is undisputed that no physical evidence–including fingerprints–connected Defendant with Room 102. The prosecutor did nothing more in the challenged passage than make reasonable comment on the evidence presented. "Parties have wide latitude, in closing argument, to discuss the evidence and reasonable inferences from evidence, and relief is required only where grossly improper and unwarranted argument affects a defendant's rights." *Hanson v. State*, 2003 OK CR 12, ¶13, 72 P.3d 40, 49. Moreover, "each side is permitted to present the evidence and the inferences thereof from its own point of view." *Black v. State*, 2001 OK CR 5, ¶96, 21 P.3d 1047, 1078. Unless Defendant is arguing on appeal that Defendant's fingerprints were located somewhere in Room 102–an assertion seemingly fatal to his claim in Proposition I that insufficient evidence was presented to corroborate the State's accomplice testimony–there can be no possible error, let alone plain error, here. The same is true of the argument at transcript pages 167 and 168. Absence of Defendant's fingerprints from the plexiglass over the broken window, which he admitted helping Sneed install, allows the reasonable inference that Defendant's

prints should have been found on the plexiglass and that a possible explanation for their absence is that Defendant wiped them off the glass. Again, no objection was registered to these remarks and no plain error stems from the prosecutor's reasonable comment on the evidence.

**Sneed's Motive to Kill.** Defendant next complains that the prosecutor at transcript pages 68 and 69 argued that "Justin Sneed would never have killed Barry Van Treese for money alone". Defendant claims this argument was inconsistent with the prosecutor's allegation during penalty phase that the murder was committed for remuneration. Opening Br. at 51-52. No objection was made to this argument, thus waiving all but plain error. The prosecutor did nothing more in the challenged passages than argue that Sneed would not have committed the murder but for Defendant's promise of $10,000.00. This argument was based on Sneed's testimony (Tr. XII 178) and was therefore proper. *Black*, 2001 OK CR 5, ¶96, 21 P.3d at 1078. As discussed below in Proposition VI, this particular argument is not inconsistent with the State's theory that the murder was committed for remuneration. Sneed's testimony shows that Van Treese's murder was motivated by financial gain. Defendant wholly fails to show error, let alone plain error, with this nonsensical claim.

**Alleged Denigration of Defense Counsel.** Defendant complains that the prosecutor "materially misrepresented the facts, misled the jury, and denigrated counsel" with the argument that "[t]he State of Oklahoma did not charge

[Defendant] of lesser related offenses because he committed the big boy offense of Murder in the First Degree" (Tr. XV 175). Defendant argues this was false and misleading because he was originally charged as an accessory after the fact until the State on January 23, 1997, re-filed on Defendant with a first degree malice murder charge. Opening Br. at 52-53. Defendant's allegation of error on this point lacks merit. Regardless of the crime Defendant was originally charged with, the fact remains he was accused by the State of Oklahoma in a felony Information of first degree malice murder at time of trial. The trial court noted that Defendant was originally charged before the Van Treese murder investigation was complete and that additional information was developed that warranted the refiling. Defendant does nothing to rebut the trial court's statement. Indeed, trial counsel accepted the trial court's discussion of the history of the case as it related to the filing of the first degree murder charge (Tr. XV 176-77). That Defendant was originally charged as an accessory and two weeks later was charged with first degree murder is not significant (Tr. XIII 103-04; O.R. 5-6). What is significant, however, is that Defendant sat charged with malice murder at the time of the prosecutor's argument. The prosecutor's argument represents nothing more than reasonable comment on the evidence from the prosecutor's perspective that Defendant was guilty of malice murder as an aider and abettor and not accessory after the fact. No error stems from the challenged comment. *Hanson*, 2003 OK CR 12, ¶13, 72 P.3d at 49; *Black*, 2001 OK CR 5, ¶96, 21 P.3d at 1078.

Defendant's complaint that the prosecutor misled the jury by arguing that the lesser related offense instruction of accessory after the fact "was a defense trick" does not warrant relief. Opening Br. at 53-54. The challenged argument arises as part of the prosecutor's discussion of the evidence, from the State's perspective, that Defendant was guilty of first degree malice murder, not accessory after the fact (Tr. XV 172-75, 177). The prosecutor did not tell the jury it was inappropriate to consider the lesser related offense instruction or otherwise describe this instruction as a defense "trick". On the contrary, the prosecutor specifically told the jury that they should consider this instruction if they had doubts as to Defendant's guilt for first degree malice murder (Tr. XV 174-75). The prosecutor did not cast aspersions on defense counsel in the challenged closing argument. Rather, she only challenged defense counsel's claim that a conviction for accessory after the fact was appropriate under the law and facts. No error stems from this claim.

**Alleged Sympathy for Victim and His Family.** Defendant complains that the prosecutor "presented argument intended to evoke sympathy for the victim and his family." Defendant cites his argument in Proposition II regarding testimony of Donna Van Treese and Kenneth Van Treese that he claims "can only fairly be characterized as victim impact evidence." Opening Br. at 55-56. However, Defendant's claims here are just as meritless as they were in Proposition II. As shown above, the prosecution had legitimate reasons for presentation of

54

this testimony.  This fact is abundantly clear when one considers that trial counsel did not object to any of these alleged outrageous statements.  Defendant fails to show error, let alone plain error, based on these statements.  *Primeaux v. State*, 2004 OK CR 16, ¶72, 88 P.3d 893, 907.

**Alleged False and Misleading Evidence.**  Defendant contends that the prosecutor presented false and misleading evidence to the jury.  William Bender, on-site manager of the victim's Tulsa motel, testified that the victim told him several hours before the murder that he wanted Bender to take over management of the Oklahoma City motel.  Bender further testified that he was not under the impression that he was going to be fired when the victim left the Tulsa motel the night of the murder (Tr. VIII 83).  Defendant argues the prosecutor knew Bender's testimony was false because she stated during a bench conference that Donna Van Treese would testify that Bender was mismanaging the Tulsa motel and it was the Van Treese's intention to fire him as well, but that "they were going to take care of [Defendant] of the Oklahoma City motel first" (Tr. IV 178).  The prosecutor further noted that Bender had been fired two months after the murder, that Bender and Defendant "were both taking advantage of this family at the time of their loss" (Tr. IV 178).

Defendant wholly fails to prove that the prosecutor knowingly presented false testimony.  As noted by the prosecutor, the Van Treeses intended to fire Defendant first because of his mismanagement of the Oklahoma City motel.  That

would not necessarily preclude temporarily moving Bender to the Oklahoma City motel while the Van Treeses found new employees to run both motels. The victim could then assess the condition of the Tulsa motel without any on-site interference from Bender or his wife. Testimony from Bender that the victim was angrily checking rooms at the Tulsa motel because he believed Bender was cheating him in the same manner as Defendant suggests that the victim did not trust Bender but that Bender might be a "quick fix" at the Oklahoma City motel with Defendant's firing (Tr. VIII 81-82). Defendant fails to prove the prosecution knowingly used false evidence and fails to show error, let alone plain error. His failure to object to the challenged testimony at trial only confirms that fact (Tr. VIII 83). Relief is unwarranted.

**Allegedly Implying Additional Evidence Exists.** Defendant next complains that a portion of the prosecutor's re-direct examination of Kayla Pursley was formulated "for the express purpose of implying there was more this witness could tell the jury that would be damaging to [Defendant] if only she could remember what it was." Opening Br. at 58-59. No objection was made to this alleged improper exchange.

Defendant's allegation of error on this point is patently frivolous and should be denied. In the challenged passage, the prosecutor attempted to rebut defense counsel's suggestion throughout cross-examination that Pursley's testimony was unreliable because she first recalled some events from January 7, 1997, well after

being interviewed by police (Tr. IX 64, 70-73, 78-83, 96-97). The prosecutor attempted to bolster Pursley's credibility by showing that her trial testimony was based on her recollection of events while on the stand, not mere regurgitation of a police report (Tr. IX 98-101). That Pursley could not remember in 2004 some of the details she provided to the police when interviewed in 1997 was therefore wholly appropriate rehabilitation. It was not, as alleged by Defendant, an attempt to subliminally inform the jury to convict based on possible evidence not presented at trial. In this light, the prosecutor had no need to either impeach or attempt to refresh Pursley's recollection with her prior statements to police. Defendant therefore fails to show error, let alone plain error, stemming from the challenged comments. Relief should be denied.

**Alleged Penalty Phase Misconduct.** Finally, Defendant contends prosecutorial misconduct infected the penalty phase of his trial. Defendant argues that the prosecutor "misstated the law, denigrated [Defendant's] mitigating circumstances, and injected personal beliefs into the proceeding." Opening Br. at 59. Defendant fails to allege facts from the record, however, to support these claims. The vast majority of prosecutorial misconduct claims alleged by Defendant amount to reasonable comment on the evidence from the State's perspective of the case. Prior to the challenged comments the prosecutor told Defendant's jury that their opinion of punishment was the only one that mattered and that it was their responsibility to impose punishment (Tr. XVII 93). The

57

prosecutor then proceeded to respond to Defendant's closing arguments against the death penalty (Tr. XVII 93-108). Review of the totality of the record, including the exceptionally weak allegations of prosecutorial misconduct now made by Defendant for which defense counsel did not object, show the prosecutor made appropriate argument based on the law and evidence before the jury. The evidence supports the prosecutor's characterization of Defendant as a cold-blooded murderer, a relevant consideration for both the continuing threat aggravator alleged by the State and the jury's discretionary decision whether to impose death once they found existence of aggravating circumstances outweighed mitigating circumstances. *Pennington v. State*, 1995 OK CR 79, ¶70, 913 P.2d 1356, 1371. Moreover, the evidence fully supported the prosecutor's reference to Defendant's nature as a cold-blooded killer. *Stouffer v. State*, 1987 OK CR 92, ¶37, 738 P.2d 1349, 1357. The prosecutor's argument in this regard was not error, let alone plain error. The same is true with respect to the balance of Defendant's challenges to argument for which no objection was lodged. This argument amounts to fair comment on the evidence and the prosecutor did not tell the jury to ignore mitigating circumstances. Rather, the prosecutor questioned whether certain evidence presented by Defendant actually constituted mitigating circumstances. This was proper. *Banks v. State*, 2002 OK CR 9, ¶41, 43 P.3d 390, 401 ("both parties may freely discuss, during argument, reasonable inferences from the evidence"). No plain error stems from this argument.

Defendant's challenge to the prosecutor throwing unspecified photographs on defense counsel's table during closing does not warrant relief. Assuming *arguendo* this amounted to error, it was not outcome determinative. The jury sentenced Defendant to death based on the strong evidence that he hired Justin Sneed to murder the victim and the brutal nature of the murder, not alleged prosecutorial misconduct. Relief is clearly unwarranted here as Defendant was not deprived of a fundamentally fair trial in violation of due process or any other state or federal constitutional right. This is simply not a case where prosecutorial misconduct, either real or imagined, affected Defendant's rights. *Id.*, 2002 OK CR 9, ¶41, 43 P.3d at 401.

## V.

## DEFENDANT RECEIVED CONSTITUTIONALLY EFFECTIVE ASSISTANCE OF TRIAL COUNSEL.

In his fifth proposition of error, Defendant complains that trial counsel was constitutionally ineffective for failing to: (1) utilize Justin Sneed's videotaped interview with homicide detectives for impeachment purposes; (2) utilize Defense Exhibit 71 to demonstrate shortages at the victim's Tulsa motel; (3) object to alleged character testimony from Kayla Pursley and Billye Hooper; (4) object to the alleged improper testimony from Donna Van Treese and Justin Sneed detailed in Proposition II; and (5) object to the alleged prosecutorial misconduct set forth in Proposition IV. Opening Br. at 39-42.

To establish ineffective assistance of trial counsel, Petitioner must prove that counsel's performance was constitutionally deficient and that counsel's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prove deficient performance, Petitioner must overcome the strong presumption that counsel's conduct was constitutionally effective. Specifically, he "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (quotation omitted). To establish prejudice, Petitioner must show that, but for counsel's errors, there is a reasonable probability that the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694. If the alleged ineffective assistance occurred during the guilt-innocence stage, this Court determines whether there is a reasonable probability the jury would have had reasonable doubt regarding guilt. *Id.*, 466 U.S. at 695. In assessing prejudice, this Court looks at the totality of the evidence, not just the evidence helpful to Petitioner. *See Cooks v. Ward*, 165 F.3d 1283, 1293 (10th Cir. 1998).

If the alleged ineffectiveness occurred during the sentencing phase, this Court considers whether there is a "reasonable probability that, absent the errors, the sentencer...would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695; *see also Cooks*, 165 F.3d at 1296.

**Justin Sneed's Videotaped Interview**. Defendant first complains that trial counsel was ineffective for failing to use Justin Sneed's videotaped interview for impeachment of Sneed and Detective Bob Bemo. Defendant concedes, however, that "trial counsel cross-examined both Justin Sneed and Det. Bemo in the 2004 retrial regarding the circumstances of the interrogation and some of the discrepancies between the videotape and the trial testimony, and counsel attempted to elicit admissions regarding the same."   Opening Br. at 63. Defendant contends, however, that trial counsel was incompetent for not playing the videotaped interview for the jury. Defendant argues playing the tape for the jury would have: (1) shown that Det. Bemo manipulated Sneed to implicate Defendant; (2) impeached Sneed's testimony that he did not believe Det. Bemo told him at the outset of the interview that Defendant had been arrested; and (3) shown several alleged discrepancies between Sneed's trial testimony and statements he made to homicide detectives during his interview. Opening Br. at 63-66.

Defendant fails to show that counsel's performance was constitutionally deficient. First, Detective Bemo admitted on cross-examination that he told Sneed at the beginning of the interview that Defendant was under arrest and that Defendant "was the one who was laying it on him the heaviest as far as pointing the finger at Justin Sneed" (Tr. XIV 70-71). Defense counsel also elicited from Bemo that these statements were "suggestive in nature" and that Bemo did not

know whether Sneed could have been influenced based on those suggestive statements (Tr. XIV 71). Trial counsel clearly brought out for the jury events from the beginning of Sneed's interview favorable to Defendant's theory that Bemo influenced Sneed to implicate Defendant in the murder. Trial counsel elicited from Sneed on cross-examination that he was not initially truthful with detectives, that he initially denied any involvement in the homicide, that it took him "a little while" before he opened up and gave his statement, that he understood the police were focusing on him as a suspect and that he understood other people "were pointing the finger toward [him]" (Tr. XII 204-05; Tr. XIII 12-14). Sneed admitted on cross-examination that he implicated Defendant only after telling detectives he knew other people "were pointing the finger at [him]" (Tr. XIII 14). Trial counsel's performance was clearly not deficient in this regard.

Second, Bemo testified that he told Sneed during the interview that Defendant was under arrest (Tr. XIV 70). This impeached Sneed's earlier testimony that he did not believe the detectives told him that Defendant had been arrested (Tr. XIII 13). Trial counsel therefore successfully impeached Sneed on this point with Bemo's testimony. Trial counsel was not required to pursue this further because the point was made.

Third, Sneed was impeached by the prosecutor with alleged inconsistencies and omissions between his trial testimony and statement to homicide detectives. The prosecutor impeached Sneed with his 1998 trial testimony regarding the

amount he says Defendant offered him to kill the victim. The prosecutor elicited from Sneed that he told detectives that Defendant offered him $7,000.00 to kill the victim, not $10,000.00 as Sneed testified (Tr. XII 166-67). Defense counsel then impeached Sneed with the fact that he previously testified that he told detectives that Defendant offered $7,000.00 in exchange for the homicide (Tr. XIII 28-31). Sneed's alleged inconsistencies on this point were clearly presented to Defendant's jury and trial counsel was not deficient for failing to pursue it further.

Fourth, trial counsel elicited from Sneed that he had never previously mentioned, until his 2004 trial testimony, that he attempted to stab the victim in the chest with the pocket knife (Tr. XIII 6-7). The prosecutor's re-direct examination confirmed that Sneed did not tell detectives about stabbing the victim with the pocket knife (Tr. XIII 75-76). Fifth, Sneed admitted on cross that he did not tell detectives during the interview about Defendant urging him to kill the victim with a hammer in the boiler room (Tr. XIII 27). On re-direct, however, he explained that the detectives did not ask him about the boiler room incident (Tr. XIII 78-79). Bemo confirmed during cross that Sneed never told detectives about the boiler room incident (Tr. XIV 78-79). Sixth, Sneed admitted on cross that he did not tell detectives during the interview that Defendant took a one hundred dollar bill from the victim's billfold (Tr. XIII 44). Bemo confirmed this fact (Tr. XIV 77). Seventh, while Sneed initially testified on cross that he did not remember whether he told detectives about the hacksaw, trash bags and muriatic acid

during his interview, defense counsel eventually elicited from Sneed that "I don't think I did, no" regarding this list of items (Tr. XIII 47-50). On re-direct, Sneed explained that he was not asked by detectives about anything else he bought at the hardware store besides the plexiglass, that he was only asked about the acid, trash bags and hacksaw during his original testimony (Tr. XIII 81-82).

All things considered, Defendant fails to show either deficient performance or prejudice under *Strickland* based on failure to play the videotape of Sneed's interview with detectives. Unlike Defendant's 1998 trial, trial counsel actively impeached Sneed with the inconsistencies and omissions from his statement to detectives–the very inconsistencies and omissions Defendant now claims were not presented to his jury. Indeed, that was a major component of Sneed's cross-examination. Trial counsel was not required to attempt to present cumulative evidence in the form of the videotape to a jury that had been listening to testimony in open court for nearly two weeks. Relief is clearly unwarranted for this patently frivolous allegation of ineffective assistance of counsel.

**Financial Records.** Defendant next contends that trial counsel was ineffective for failing to utilize financial records disclosed by Donna Van Treese after the murder that showed an alleged $5,226.78 shortage at the victim's Tulsa motel managed by William Bender. Trial counsel attempted to introduce these very financial records during the trial as Defendant's Exhibit 71-A for largely the same reasons advanced on appeal. However, the trial court sustained the

prosecution's relevancy objection (Tr. IV 177-80; Tr. V 53-55). Even after review of William Bender's testimony, the trial court's assessment remains correct. Information regarding alleged shortages at the Tulsa motel are simply not relevant to the issue of Defendant's mismanagement of the Oklahoma City motel. Defendant does not seriously dispute the shortage reported by Donna Van Treese, reflected on Defendant's Exhibit 71-A, for the Oklahoma City motel. And as noted above in response to Proposition IV, Bender's testimony that the victim told him the night of the murder that he wanted Bender to manage the Oklahoma City motel is not necessarily inconsistent with Bender being fired two months later over on-going shortages at the Tulsa motel. Defendant fails to show either deficient performance or prejudice under *Strickland* based on trial counsel's failure to present financial information for the Tulsa motel. Relief must be denied.

**Failure to Object to "Character Evidence".** Defendant next contends that trial counsel was ineffective for failing to object to "character evidence" he says was introduced by the prosecution during testimony from Kayla Pursley and Billye Hooper (Tr. VII 28-29; Tr. IX 24-26). This challenged testimony, however, is not character evidence at all but rather, admissible lay opinion testimony under 12 O.S.Supp.2002, § 2701. Pursley's testimony that she did not believe Sneed was capable of killing the victim and that Sneed looked up to Defendant and would probably have done anything for him was based on her knowledge and experience of Defendant and Sneed's relationship and was properly admissible under Section

2701. Pursley's opinion was based upon her perceptions of Defendant and Sneed, was helpful to the jury on important issues arising in the case–i.e., Defendant's control over Sneed, Sneed's ability to commit murder and whether Sneed would commit the homicide on his own–and was not based on scientific, technical or other specialized knowledge within the scope of 12 O.S.2001, § 2702 (Tr. IX 16-26). The same is true of Hooper's challenged testimony to which trial counsel registered numerous objections on grounds of speculation and leading (Tr. VII 26-34).

Because their testimony did not tell the jury what result to reach, and was otherwise admissible under Section 2701, trial counsel was not ineffective for failing to object to this testimony. 12 O.S.2001, § 2704; *Allen v. State*, 1994 OK CR 13, ¶¶44-46, 871 P.2d 79, 95 (testimony that defendant was the "man" in her lesbian relationship with victim admissible lay opinion testimony where witness's opinion was based on observations of the two and it helped the jury understand why each party acted the way they did during events leading up to murder and murder itself). *See also Welch v. State*, 2000 OK CR 8, ¶¶16-18, 2 P.3d 356, 367-68; *Washington v. State*, 1999 OK CR 22, ¶23, 989 P.2d 960, 970-71 (general discussion of admissibility of lay opinion testimony). Thus, Defendant fails to show a reasonable probability that trial counsel's failure to object to this particular testimony was either outcome determinative or deficient performance.

**Failure to Register Meritless Objections to Testimony.** Trial counsel was also not ineffective for failing to object to the litany of meritless challenges Defendant launched against the testimony of Donna Van Treese and Justin Sneed in Proposition II. As shown above in response to Proposition II, the challenged testimony was relevant and properly admitted. Defendant fails to demonstrate prejudice or deficient performance under *Strickland* based on trial counsel's failure to make meritless objection.

**Failure to Register Meritless Objections to Alleged Prosecutorial Misconduct.** Defendant's complaint that trial counsel was ineffective for failing to object to the multiple instances of prosecutorial misconduct he alleges in Proposition IV also lacks merit. As shown above in response to Proposition IV, the challenged passage reflects only reasonable comment on the evidence, not actual prosecutorial misconduct. Trial counsel was not ineffective under *Strickland*.

## VI.

## SUFFICIENT EVIDENCE WAS PRESENTED TO SUPPORT THE JURY'S FINDING OF THE MURDER FOR REMUNERATION AGGRAVATOR.

In his sixth proposition of error, Defendant challenges the sufficiency of the evidence supporting the murder for remuneration aggravating circumstance. First, Defendant claims that the only evidence supporting this aggravator is Justin Sneed's testimony. Defendant reasons that Sneed's testimony is too unreliable and inconsistent to be believed by any rational juror. Second, Defendant argues

that Sneed's testimony "at most indicates a plan to murder Van Treese in order to rob him of the money in the car." Defendant argues that the murder for remuneration aggravator does not apply to murders committed solely to facilitate a robbery. Opening Br. at 71-76.

The trial court appropriately rejected this very challenge, finding no evidence that the murder was motivated to facilitate a robbery (Tr. XVI 46-50). "When the sufficiency of the evidence of an aggravating circumstance is challenged on appeal, this Court reviews the evidence in the light most favorable to the State to determine if any rational trier of fact could have found the aggravating circumstance beyond a reasonable doubt." *Lockett v. State*, 2002 OK CR 30, ¶39, 53 P.3d 418, 430 (quoting *Washington v. State*, 1999 OK CR 22, ¶44, 989 P.2d 960, 974). This standard incorporates the sufficiency of the evidence standard adopted by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307 (1979). *See, e.g., Frederick v. State*, 2001 OK CR 34, 37 P.3d 908, 933 (citing *Spuehler v. State*, 1985 OK CR 132, 709 P.2d 202, 203-04); *Abshier v. State*, 2001 OK CR 13, 28 P.3d 579, 610. The *Jackson* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.

That Defendant believes Justin Sneed's testimony is not sufficiently credible to support a finding of the murder for remuneration aggravator is no part of this

Court's evidentiary sufficiency review.  Rather, the question for this Court is simply whether there is any evidence in the record from Sneed or any other witness sufficient to establish that the murder of Van Treese was made in exchange for promise of remuneration. "This Court had repeatedly held that it is within the exclusive province of the jury to determine the weight and credibility to be given to the testimony of a witness, reconcile the testimony concerning the motives of the witnesses, weigh the evidence, and resolve conflicts in that evidence." *Plantz v. State*, 1994 OK CR 33, ¶43, 876 P.2d 268, 281.

Taken in the light most favorable to the State, sufficient evidence was presented to support the jury's finding of the murder for remuneration aggravator. Justin Sneed testified that around 3:00 a.m. on January 7th, Defendant banged on Sneed's room door and demanded entry (Tr. XII 94).  Defendant had asked Sneed five (5) to ten (10) times previously to kill Barry Van Treese (Tr. XII 75-90). Defendant told Sneed that with Van Treese out of the way, Defendant could control both the Oklahoma City and Tulsa motels.  Defendant claimed that he could talk Van Treese's wife into letting him control both motels if Van Treese was killed.  Defendant promised Sneed money if he killed Van Treese (Tr. XII 89-90).

Once inside Sneed's room, Defendant told Sneed that Van Treese had just returned to the motel. Defendant appeared "real nervous, real jittery" and wanted Sneed to murder Van Treese "right now" (Tr. XII 95).  Defendant said that if Van Treese walked around the motel in the morning and "seen a couple of the rooms

that were already supposed to be remodeled that weren't that [Defendant] was going to be fired" (Tr. XII 95). Defendant was supposed to have completely remodeled one of the handicapped rooms at the motel and make minor repairs in other rooms (Tr. XII 96-97). Defendant threatened that Sneed too would be evicted from the motel if Defendant were fired (Tr. XII 95-96). Defendant told Sneed that Van Treese was asleep in Room 102 (Tr. XII 98). Defendant picked up a baseball bat laying in Sneed's room and said "why don't [you] just grab that bat and go over there and do it right now" (Tr. XII 96). Defendant urged Sneed to murder Van Treese three (3) or four (4) times during this conversation. Defendant told Sneed during this conversation that Sneed would get paid $10,000.00 if he killed Van Treese immediately. Defendant also promised that he would put Sneed in charge of one of the motels once Van Treese was dead (Tr. XII 98-99).

Sneed agreed to kill Van Treese and Defendant left the room (Tr. XII 99-100). Sneed then committed the murder (Tr. XII 100-02, 112-13, 223). Sneed testified that he was in Room 102 for fifteen (15) to twenty (20) minutes and that he hit Van Treese a maximum of ten (10) times with a baseball bat (Tr. XII 112-13, 223).

Under Oklahoma law, the murder for remuneration aggravator applies where "the person committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration." 22 O.S.2001, § 701.12(3). "The traditional application

for this aggravating circumstance has been where a defendant has been hired or has hired another person to perform an act of murder." *Plantz*, 1994 OK CR 33, 876 P.2d at 281. "However, murder for remuneration has also been applied to killings motivated primarily to obtain proceeds from an insurance policy." *Id.* (citing *Johnson v. State*, 1982 OK CR 37, 665 P.2d 815, 824; *O'Bryan v. State*, 591 S.W.2d 464, 480 (Tex.Cr.1979)). *See also Bryson v. State*, 1994 OK CR 32, 876 P.2d 240, 258).

Justin Sneed's testimony, taken in the light most favorable to the State, would allow any rational trier of fact to find existence of the murder for remuneration aggravating circumstance beyond a reasonable doubt. Simply put, Defendant promised Sneed remuneration in the form of, *inter alia*, $10,000.00, if he would murder the victim. "This was not a crime of passion, nor was the murder committed as an afterthought while [Defendant] was in the course of committing another felony offense, such as robbery or burglary." *Johnson v. State*, 911 P.2d 918, 929 (Okl.Cr.1995). Rather, the evidence shows Van Treese's murder was motivated by financial gain. Defendant's contention that Van Treese's murder was committed to facilitate robbery of the victim represents a complete distortion of the record. Sneed testified that the reason he murdered Van Treese was because Defendant said he would pay him to do it (Tr. XII 178). That Sneed never collected the entire amount promised is an insufficient challenge to the sufficiency of the evidence supporting this aggravator. *See Plantz*, 876 P.2d at 281

("The fact that Appellant was apprehended before she could actually collect the money does not obviate this aggravating circumstance"). It is also not significant that Defendant split the $4,000.00 Sneed recovered after the murder from the victim's car. Sneed originally testified that he did not know where the $10,000.00 Defendant promised him would come from (Tr. XII 99). Any conflict in Sneed's testimony was for the jury to resolve, not this Court on appeal.

Moreover, Sneed only recovered the victim's car keys after: (1) leaving Room 102 and returning to his room after spending fifteen to twenty minutes with the body; (2) changing his clothes; (3) going to the motel office and meeting with Defendant; (4) returning to Room 102 to clean up glass from the broken window; (5) returning again to his motel room; (6) then returning to Room 102 with Defendant where Sneed recovered the victim's car keys per Defendant's instructions. This extreme time delay in recovering the victim's car keys that led to the money demonstrates that Defendant and Sneed were not interested in perpetrating a robbery but rather, committing a homicide. *Compare Wackerly v. State*, 2000 OK CR 15, ¶¶2, 25 & 27, 12 P.3d 1, 6 & 11 (evidence that defendant shot and killed victim and then immediately took fishing equipment from victim's immediate presence in order to pawn items for money sufficient to support conviction for robbery with firearms); *Powell v. State*, 1995 OK CR 37, ¶¶26-27, 906 P.2d 765, 774 (sufficient evidence for first degree felony murder conviction where evidence established a clear plan to beat and rob victim of his truck;

robbery was not mere afterthought to homicide because defendant and accomplices talked about beating and robbing victim of his truck on way to crime scene and once they in fact beat victim to death, they returned to victim's pickup then took his wallet and truck); *Glidewell v. State*, 1983 OK CR 54, ¶¶8-10, 22, 663 P.2d 738, 740 & 744 (murder for remuneration aggravator improper where defendant and his accomplices planned to rob convenience store and kill any witnesses to avoid arrest or prosecution); 21 O.S.2001, § 791 ("[r]obbery is a wrongful taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear").

The evidence shows that Sneed's motive for the murder was remuneration, not robbery. That is all Oklahoma law requires for a finding of this aggravator. Relief is clearly unwarranted here.

## VII.

## DEFENDANT'S JURY WAS PROPERLY INSTRUCTED WITH THE UNIFORM WEIGHING AND MITIGATION INSTRUCTIONS.

Relying primarily upon *Ring v. Arizona*, 536 U.S. 584 (2002), Defendant next argues that Instructions No. 7 and No. 8 (O.R. 1301-02) were constitutionally infirm because the uniform Oklahoma weighing instruction did not require the jury to find that aggravating circumstances must outweigh mitigating circumstances beyond a reasonable doubt before the death penalty could be

imposed. Opening Br. at 77-80. Defendant concedes that this Court has previously rejected this claim. This Court has consistently held that no specific burden of proof is necessary for the weighing of aggravating and mitigating circumstances performed by capital juries. *Harris v. State*, 2004 OK CR 1, ¶66, 84 P.3d 731, 754-55; *Pickens v. State*, 2003 OK CR 16, ¶4, 74 P.3d 601, 602; *Brown v. State*, 2003 OK CR 7, ¶14, 67 P.3d 917, 920; *Torres v. State*, 2002 OK CR 35, ¶7, 58 P.3d 214, 216. As summarized by this Court in *Harris*:

> We recently addressed the same claim in *Torres v. State*, 2002 OK CR 35, ¶ 7, 58 P.3d 214, 216, and held that the fact which increases the maximum possible punishment for first degree murder to a sentence of death is the finding of at least one aggravating circumstance: "It is that finding, not the weighing of aggravating and mitigating circumstances, that authorizes jurors to consider imposing a sentence of death." *Id.* The requirement set forth in *Ring* is satisfied by Oklahoma law which requires the jury to unanimously find any aggravating circumstance beyond a reasonable doubt. We decline to revisit our holding in *Torres*.

*Harris*, 2004 OK CR 1, ¶66, 84 P.3d at 754-55. Defendant provides no good reason to depart from this holding. Defendant's argument ignores that an Oklahoma murder defendant becomes eligible for the death penalty when the State proves beyond a reasonable doubt the existence of one or more aggravating circumstances. Relief is therefore unwarranted on this claim.

Defendant next claims that the uniform Oklahoma instruction provided to his jury that defined mitigating circumstances is unconstitutional because it

allowed his jury to ignore mitigating evidence. Defendant objects to the definition of mitigating circumstances set forth in Instruction No. 10 (O.R. 1304) that was taken from OUJI-CR (2d) 4-78. Specifically, Defendant claims this instruction "impermissibly narrows the characterization of mitigation to exclude evidence about the defendant that may warrant a sentence less than death simply because such evidence does not lessen his moral culpability or blame for the crime of which he's been convicted." Opening Br. at 80.

This Court has consistently rejected constitutional claims that OUJI-CR (2d) 4-78 prevent the jury from considering relevant mitigating circumstances. *See, e.g., Williams v. State*, 2001 OK CR 9, ¶109, 22 P.3d 702, 727-28; *Cummings v. State*, 1998 OK CR 45, ¶58, 968 P.2d 821, 838. Defendant provides no basis to depart from these previous holdings, especially considering the additional instructions given to Defendant's jury. Instruction No. 10 told the jury that "[t]he determination of what circumstances are mitigating is for you to resolve under the facts and circumstances of this case" (O.R. 1304). Instruction No. 11 provided a list of "CIRCUMSTANCES WHICH MAY BE MITIGATING" (O.R. 1305). Instruction No. 11 listed twelve (12) separate mitigating circumstances which the instruction said evidence had been presented to support (O.R. 1305-06). The concluding sentence instructed the jury that "[i]n addition, you may decide that other mitigating circumstances exist, and if so, you should consider those circumstances as well" (O.R. 1306). Reviewing the totality of the instructions as

this Court must, *see Boyde v. California*, 494 U.S. 370, 378 (1990) ("a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge"), there is no reasonable likelihood that the jury applied these instructions in a way that allowed them to ignore mitigating circumstances. *Id.*, 494 U.S. at 380.

This Court rejected a claim similar to Defendant's in *Williams*:

> The language of [OUJI-CR (2d) 4-78] has been upheld as in accordance with state law and federal constitutional requirements. *See Stafford v. State,* 731 P.2d 1372, 1375 (Okl.Cr.1987). Appellant's argument that his excluded language prevented the jury from considering all relevant mitigating evidence is not persuasive given the other instructions provided to the jury. Initially, Instruction No. 18 also tells the jury that what is to be considered mitigating is for them to decide. This statement broadens any limitations placed on the mitigating evidence through the first sentence. Further, the jury was given an instruction containing approximately ten (10) specifically listed mitigating circumstances. This instruction was approved by Appellant. Here, Appellant has failed to specifically set forth any relevant mitigating evidence which the jury was precluded from considering. Having reviewed Instruction No. 18 in its entirety and in context of the other instructions provided to the jury, we find there is not a reasonable likelihood that the jury would have applied Instruction No. 18 in a way that prevented them from considering any relevant mitigating evidence. *See Boyde v. California,* 494 U.S. at 380. Accordingly this assignment of error is denied.

*Williams*, 2001 OK CR 9, ¶109, 22 P.3d at 727-28.

In light of the actual instructions given, Defendant's jury was not allowed to ignore mitigating circumstances. Indeed, Defendant fails to establish what mitigating evidence his jury allegedly ignored because of the instructions. Relief is clearly unwarranted on this claim.

## VIII.

### DEFENDANT IS NOT ENTITLED TO RELIEF BASED ON EITHER THE FORM OR SUBSTANCE OF VICTIM IMPACT TESTIMONY PRESENTED IN HIS CASE.

In his eighth proposition of error, Defendant contends that he is entitled to relief based on victim impact testimony presented by Barrie Hall and Donna Van Treese. Defendant complains that: (1) both witnesses were improperly allowed to read victim impact statements from Barry Van Treese's other children, in violation of Defendant's right to confrontation; and (2) Donna Van Treese's own victim impact statement "was more akin to a statement given as a family representative, rather than simply her own" and therefore, "no other person should have been permitted to offer a victim impact statement." Opening Br. at 82-86.

Defendant's allegations of error on this point are meritless and should be denied. Defendant made no objection to the manner in which the victim impact statements were presented at trial. This is particularly important because Defendant specifically stated he had no objection at a bench conference to Barrie Hall and Donna Van Treese reading the victim impact testimony of Barry Van Treese's other children (Tr. XVI 36-37). Defendant has therefore waived all but

plain error. *Grant v. State*, 2002 OK CR 36, ¶56, 58 P.3d 783, 796.   More

importantly, any possible error was invited by Defendant's failure to object. He

should not be allowed to profit on appeal from his blatant inaction. *Ledbetter v.*

*State*, 1997 OK CR 5, ¶57, 933 P.2d 880, 897.

Further, this Court held in *Hooks v. State*, 2001 OK CR 1, ¶37, 19 P.3d 294,

313, that a family member who fits within the definition of "immediate family" in

22 O.S.2001, § 984(2), may lawfully present victim impact statements from other

"immediate family" members who choose not to testify:

> We have held the rules of evidence, including the
> prohibition against hearsay, apply to victim impact
> testimony.   However the statute clearly allows one
> person to speak for an entire family and describe the
> effect of a victim's death on individual family members.
> We reconcile this apparent conflict by finding no error
> where a family member or representative gives victim
> impact testimony on behalf of several immediate family
> members, as long as that testimony is otherwise
> admissible.

*Id.* However, in *Grant v. State*, 2002 OK CR 36, ¶56, 58 P.3d at 796, this Court

found error where victim impact statements from "immediate family" members

were read by two designated readers (the dead victim's sister and friend) because

there was no evidence the readers had personal knowledge of the facts in the

statements and there was no evidence the family members whose statements were

read were in attendance at the sentencing hearing. This Court refused to grant

relief because: (1) Grant failed to object at trial to the manner in which the victim

impact statements were presented, even though an in camera hearing was held and Grant was fully aware that statements for the absent victims would be read to the jury; (2) Grant's failure to object reflected an obvious strategy to avoid presenting the victim impact testimony in a more prejudicial manner; (3) Grant did not object to the content of the victim impact statements; (4) Grant's jury was provided the proper uniform victim impact instruction; (5) Grant failed to claim that he would have cross-examined the absent family members in any manner; (6) Grant did not challenge the sincerity or truthfulness of the victim impact statements of the absent family members; and (7) the aggravating circumstances were overwhelming and clearly outweighed the mitigating evidence presented. *Id.*, 2002 OK CR 36, ¶¶60-68, 58 P.3d at 796-97.

These same factors warrant a finding of no plain error in the instant case. As shown above, Defendant chose not to object at trial, despite existence of a bench conference at which this very issue was discussed. Defendant invited any possible error he now claims. Moreover, Defendant does not challenge the sincerity or truthfulness of the statements read for the children of Barry Van Treese who did not actually take the stand. Moreover, he did not cross-examine either victim impact witness that actually testified (Tr. XVI 76, 88). Defendant's failure to object was clearly a strategy to avoid having the jury confronted with six live victim impact witnesses; he had absolutely nothing with which to confront these witnesses. It is also significant that Defendant does not truly challenge the

79

content of the victim impact statements as read. At best, Defendant provides an oft-invoked reference to the victim impact statements being "emotionally charged", Opening Br. at 85, but does little to develop that particular allegation. That is because the victim impact testimony was carefully edited by the trial court at an in camera hearing to ensure it met the statutory requirements for admissibility. It is significant that most of this testimony was not objected to by Defendant during the in camera hearing (Tr. XVI 15-37). Defendant's jury was also properly instructed with the Oklahoma uniform instruction for victim impact testimony, thus reducing any possible misuse of the evidence presented (O.R. 1307-08).

That Defendant's jury rejected the continuing threat aggravator flatly undermines his suggestion that the death sentence was a result of passion, prejudice or some other emotion (O.R. 1315). Defendant's death sentence stems from: (1) the compelling testimony of Justin Sneed, who testified that Defendant agreed to pay him $10,000.00 to murder the victim; and (2) the horrible facts of this case which, as shown throughout this brief, involved the victim being beaten to death with a baseball bat. The victim impact evidence in this case was overshadowed by the horrible facts of Defendant's crime. Defendant's oft-repeated contention that Sneed's testimony lacks credibility is flatly undermined by the observations of the trial court at the in camera instructions conference discussed above in Proposition I (Tr. XV 45).

80

Defendant's claim that Donna Van Treese served as a "family representative" and therefore, no other victim impact witnesses should have been allowed to testify lacks merit. All of the victim impact witnesses and statements presented to the jury fell within the definition of "immediate family" as set forth in Section 984(2). Defendant ignores that all of these witnesses had the "absolute right" to testify under Oklahoma law. 22 O.S.2001, § 984.1(A). Further, the trial court required exclusion to oblique references in the victim impact statement to those people--"nieces, nephews, aunts, uncles and cousins"--that were outside Section 984(2)'s definition of "immediate family". For the reasons set forth above, Defendant is not entitled to relief. The strong evidence supporting the murder for remuneration aggravator is the reason Defendant was sentenced to death, not the manner in which otherwise admissible victim impact testimony was read to his jury. Relief must be denied.

## IX.

## DEFENDANT IS NOT ENTITLED TO RELIEF BASED ON THE TRIAL COURT'S REMOVAL FOR CAUSE OF PROSPECTIVE JURORS.

Defendant complains in his ninth proposition of error that the trial court improperly questioned jurors about their ability to impose the death penalty. He argues that the trial court removed prospective jurors Sharon Moore and Mary Lawton for cause "based on their inability to consider all three punishments 'equally'", in violation of *Frederick v. State,* 2001 OK CR 34, 37 P.2d 908.

Defendant also contends that "fifteen other prospective jurors were removed due to their reservations about the death penalty after the court explained that the three sentencing option [sic] must be 'equal.'" This, Defendant contends, resulted in exclusion of prospective jurors under an erroneous standard who had "only conscientious objections to the death penalty but who might otherwise follow the law." Defendant also contends that the trial court improperly removed Prospective Juror Sharita Miles based solely on the fact that Miles was serving a deferred sentence at time of Defendant's trial. Opening Br. at 86-93.

Defendant's allegations of error stemming from the voir dire employed in his case lacks merit. While the trial court did ask at the beginning of the voir dire process whether prospective jurors could "give true, heartfelt consideration to all three of the sentencing options and impose the sentence that's warranted by the law and evidence in this case?" (Tr. I 112), Defendant ignores the trial court's explanation of "heartfelt" to the venire panel:

> THE COURT: * * * * If the jury finds beyond a reasonable doubt that the Defendant is guilty of Murder in the First Degree, then the jury has the duty of assessing punishment. And the punishment for Murder in the First Degree is death, imprisonment for life without parole, or imprisonment for life.
>
> If you find the Defendant guilty of Murder in the First Degree, can you fairly consider all three of the legal punishments and impose the sentence that is warranted by law and evidence in this case?

And I'm going to give you another example here. We're not talking about some kind of theoretical discussion over a cup of coffee. We're talking about this man that sits in this courtroom. Okay? And I need to know whether you can give true, heartfelt consideration to all of the sentencing options.

And I'll give you this example. I've got a wonderful Italian mother who loves beets. It is her life's passion that her children love beets. I hate beets. My mother fixes beets a million different ways. She's always trying to, you know, serve me some kind of beet surprise. "Will you try this?"

**"Oh, you bet, mom." I am never going to try the beets. I'm never going to like them. I'm always going to say, "Yes, mom." I'm not going to do it. I am never going to give true, heartfelt consideration to her beet of the day program.**

If you are a juror in this case, I need to know whether you can give true, heartfelt consideration to all three of the sentencing options and impose the sentence that's warranted by the law and evidence in this case.

(Tr. I 111-112) (emphasis added). The trial court thus told the prospective jurors at the beginning of voir dire that "heartfelt consideration" meant *meaningful* or *any* consideration, a totally proper consideration in death qualification. *Powell v. State*, 2000 OK CR 5, ¶¶25-27, 995 P.2d 510, 520 ("Trial court did not abuse its discretion in excusing prospective jurors...Each juror stated, quite emphatically, that he or she could not give **meaningful** consideration to the death penalty as a possible punishment in this case") (emphasis added).

83

This fact is clear when one examines the record of voir dire for prospective jurors who were excused for cause immediately after the trial court gave the above explanation. Prospective jurors Floyd, Evans, Andrews, and Manning were dismissed for cause because they unequivocally stated that they could not consider imposing the death penalty, not because they stated they could not *equally* consider it as a punishment option (Tr. I 112, 113, 114, 116, 122-23). When Floyd, Evans, Andrews and Manning expressed their inability to impose the death penalty, the trial court asked each one of them a question similar to the following:

> THE COURT: So if you found beyond a reasonable doubt that the Defendant was guilty of Murder in the First Degree, your reservations about the penalty of death are so strong that regardless of the law or the facts and the circumstances, you would not impose the death penalty?

(Tr. I 113) (Floyd). *See also* (Tr. I 114-16) (Evans, Andrew & Manning). These prospective jurors were properly removed for cause because they indicated that they could not follow their law and instructions. Simply put, they stated they could never impose the death penalty, regardless of the facts and law applicable to the case. *Williams v. State*, 2001 OK CR 9, ¶ 10, 22 P.3d 702, 709 ("The proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"). The same is true concerning

Prospective Jurors Lawton and the other prospective jurors Defendant contends were improperly influenced by the trial court's use of the terms "heartfelt" and "equal" consideration during voir dire (Tr. I 124, 126, 196, 203; Tr. II 8-9, 13-15, 17-18, 23, 36; Tr. III 17, 110 & 112) (Stuart, Mueller, Pitt, Umstead, McClollum, Lawton, Turner, Holt, Bruner, James, Meier, Moore, Werito, McAdams & Hensley). The voir dire record shows that these prospective jurors were unable to impose the death penalty under any circumstances, not that they were merely unable to consider all three penalty options equally. Relief is wholly unwarranted based on these prospective jurors.

Nor is relief warranted based on Prospective Juror Sharon Moore's voir dire examination. Moore provided vacillating responses on the second day of voir dire regarding her ability to impose the death penalty. Moore asked to be heard by the trial court and the following exchange occurred:

> PROSPECTIVE JUROR MOORE:  I have thought a day and I am really against death and things like that and I just don't know I mean, I think I thought if it was really gruesome or something, I probably could do it. When I really think about it I'm really confused about if I could do it, convict somebody to death. I just, you know, have a little problem with would I do it, you know.
>
> So I'm still confused about the issue if I would actually convict them. I think I could do it if they did something really gruesome, which is murder, but I'm just really confused a little bit about if I should tell you that I couldn't do it. **So I guess I probably should say I couldn't do it, I couldn't convict someone to death.**

> THE COURT: * * * * You have to consider each one equally and impose the sentence that's warranted by the law and the evidence. So if you're not sure, I need you to think about it...**if you're telling me that your concerns are such that you would not consider imposing the death penalty no matter what the law and the evidence are, then you need to tell me that.** And if it's that you're uncertain about it, then I need you to keep thinking about it.

(Tr. II 15-16) (emphasis added). Moore then asked whether she could think about this issue "a little bit longer" and the trial court moved on to other prospective jurors (Tr. II 17). Shortly thereafter, during questioning by the prosecutor, Moore became emotional, started crying and stated that "I want to do my civic duty, but I think I do have a problem with the death penalty" (Tr. II 34). The trial court then asked Moore whether she believed her "concerns about the death penalty are such that regardless of the law and the evidence, you would not be able to give equal consideration to all three of the sentencing options?" to which Moore responded "I do" (Tr. II 36). Moore was then excused for cause without objection from Defendant (Tr. I 37).

Review of the totality of voir dire in this case makes clear that Prospective Juror Moore was unable to consider the death penalty as a sentencing option. The trial court's use of the terms "equal" and "heartfelt" consideration does nothing to undermine this point. *Powell*, 2000 OK CR 5, ¶27, 995 P.2d at 520. This Court looks to the entirety of the juror's *voir dire* examination to determine if the trial court properly excused the juror for cause. *Patton v. State,* 1998 OK CR

66, ¶16, 973 P.2d 270, 281. As shown above, the trial court made clear throughout voir dire that the issue was whether the jurors could give *meaningful*, or *any*, consideration to all three penalty options. The trial court's credibility determination concerning Moore does not amount to an abuse its discretion. *Id.* ("[a]s the trial court personally observes the jurors and their responses, this Court will not disturb its decision absent an abuse of discretion").

Defendant's challenge to the trial court's removal of Prospective Sharita Miles also lacks merit. Miles approached the bench during initial voir dire, in response to the trial court's question whether any venireman had been arrested or accused of a crime (Tr. I 56-57). Miles stated that she was once arrested when a passenger in her car was discovered by police to have "drugs on him." Miles stated that "the case is over. It happened like two years ago. And they put a misdemeanor on my record and said I can get it expunged off." The trial court responded that Miles actually pled guilty to a misdemeanor charge of possession of a controlled dangerous substance, marijuana. Apparently unaware the trial court had knowledge of Miles's prior record, Miles explained to the court that the marijuana conviction was her "first time". The trial court then informed Miles that she had a 1994 bogus check charge that had been dismissed and a 1997 bogus check charge for which Miles served a three year deferred sentence (Tr. I 61). Miles acknowledged that she was serving a two year deferred. She further indicated, in response to the court's questioning, that she was concerned about

her ability to be fair and impartial while currently serving a deferred sentence prosecuted by the State but then stated "what can I do about it?" Miles then stated, in response to questioning from the court, that she felt better suited to a case in which the State was not a party since she had been previously prosecuted by the State (Tr. I 62).

This Court has recognized that when the record demonstrates that a juror could not be fair and impartial, it is not an abuse of discretion for the trial court to dismiss the juror for cause. In *Tibbs v. State*, 1991 OK CR 115, ¶18, 819 P.2d 1372, 1378, this Court held that any "doubt as to a juror's impartiality should be resolved in favor of the defendant by excusing the juror for cause." Under questioning from the trial court, Miles expressed an internal conflict concerning whether she could be fair and impartial because of her deferred sentencing status. The trial court correctly noted that a juror in Miles's position would be prone to "holding it in the back of their mind that if they do something the State of Oklahoma doesn't like, even though we know that would never happen" that the State could retaliate against them because " [t]hey've got a lot at stake and they've got to feel that they're being watched carefully" (Tr. I 63). This on-going concern was only confirmed by Miles's initial hesitation to share the full extent of her criminal history in the presence of a state prosecutor.

Miles's responses, combined with the trial court's observations, make clear that Miles's removal for cause was proper and in fact protected Defendant's right

to a fair and impartial jury. The trial court observed Miles's demeanor during

questioning. In *Simpson v. State*, 1992 OK CR 13, ¶23, 827 P.2d 171, 175, this

court recognized that:

> In *Wainwright v. Witt*, 469 U.S. 412 (1985), the United
> States Supreme Court addressed the excusal for cause
> of prospective jurors in a capital case because of views
> on capital punishment.   The Court stated that the
> determination of a juror's bias cannot be reduced to a
> question and answer session. **Despite the lack of
> clarity in the written record, the Court realized that
> there will be situations where the trial judge is left
> with the definite impression that a prospective juror
> would be unable to faithfully and impartially apply
> the law.** Therefore, deference must be paid to the trial
> judge who sees and hears the jurors.

*Id.* (emphasis added).  In the instant case, the trial court saw and heard Miles's

responses. The court clearly received a definite impression that Miles was unable

to be fair and impartial based on the questioning. The trial court's finding goes

well beyond the categorical exclusion alleged by Defendant in his opening brief.

Further, the trial court's impression is supported by the record.

Defendant's complaint that the trial court's removal of Miles for cause was

inconsistent with the totality of voir dire because "a number of other prospective

jurors, including two who eventually sat on the jury, revealed prior involvement

with the criminal justice system" lacks merit.  Opening Br. at 92 & n. 33.

Defendant ignores that none of the prospective and actual jurors to whom he

refers was serving a deferred sentence at the time of Defendant's trial (Tr. I 64-68,

71 & 73). It was Miles's unique situation in serving a then-current deferred sentence that was the focus of the trial court's inquiry. Defendant's suggestion that the trial court verbally pressured Miles into acquiescing to removal, Opening Br. at 92 n. 32, ignores the totality of the voir dire record, particularly Miles's reticence to share her criminal history with the trial court in presence of the prosecutor and Miles's individual responses. Miles was not pressured into giving any particular answer. All things considered, relief is unwarranted because the trial court did not abuse its discretion in removing Miles for cause.

## X.

### ADMISSION OF AN IN-LIFE PHOTOGRAPH OF THE VICTIM DURING GUILT STAGE DOES NOT WARRANT RELIEF.

In his tenth proposition of error, Defendant challenges the trial court's admission of State's Exhibit 79, an in-life photograph of the victim, during guilt stage. Defendant contends that 12 O.S.Supp.2003, § 2403, violates the state and federal constitutions because it allows admission of such photographs at any stage of a capital murder trial. Defendant argues that an in-life photograph of the victim is irrelevant evidence designed solely to prejudice capital murder defendants. Defendant further contends that the amendments to Section 2403 allowing admission of appropriate in-life photographs "is not about criminal justice, but about politics" and that the prosecutor's use of the in-life photograph

in the instant case was a mere "stunt" aimed at unfairly prejudicing Defendant. Opening Br. at 93-99.

Defendant's allegation of error on this point lacks merit. The prosecutor in the instant case introduced a single "in life" photograph of Barry Van Treese after establishing through Donna Van Treese that the photograph accurately depicted how the victim appeared at the time of the murders. Van Treese's brief testimony about the photograph was limited to laying a foundation for its admission (Tr. IV 33-36).

In the past, this Court has held that "photographs of [homicide] victims [taken while alive] are inadmissible unless they are relevant to some material issue and their relevancy outweighs the danger of prejudice to the defendant." *Valdez v. State*, 1995 OK CR 18, ¶64, 900 P.2d 363, 384 (internal citation omitted). Further, this Court has stated that "where there is no purpose in introducing such pictures into evidence, such admission invokes the sympathy of the jury and constitutes error." *Id.* (internal citation omitted).

In 2003, the Oklahoma Legislature amended Section 2403 of the Oklahoma Evidence Code. Defendant contends that the Oklahoma Legislature exceeded its authority in enacting the 2003 amendment to 12 O.S.Supp.2003, § 2403. That amendment provides:

> However, in a prosecution for any criminal homicide, an appropriate photograph of the victim while alive shall be admissible evidence when offered by the district attorney

> to show the general appearance and condition of the
> victim while alive.

12 O.S.Supp.2003, § 2403. This, Defendant contends, is clearly unconstitutional

because it makes "in life" photographs of criminal homicide victims *per se*

admissible, contrary to this Court's previous holdings that "in life" photographs

are only admissible when "relevant" and not "unfairly prejudicial." *See, e.g.,*

*Valdez*, 1995 OK CR 18, ¶64, 900 P.2d at 384. Simply because the Oklahoma

Legislature passed a law to make "in life" photographs relevant in homicide

prosecutions, the Defendant argues, does not make them so.

Conversely, however, just because this Court previously has prohibited the

admission of such photographs except in rare circumstances, does not render the

Legislature's enactment unconstitutional. "It is a well established rule of law that

a legislative act is presumed to be constitutional and that the party attacking the

constitutionality has the burden of proof." *State v. Thomason*, 2001 OK CR 27,

¶7, 33 P.3d 930, 932. Further, "[w]henever reasonably possible[,] statutes should

be construed so as to uphold their constitutionality." *Id.* Therefore, this Court

must construe Section 2403's amendment so as to uphold its constitutionality

unless it is unreasonable to so do.

Section 2403 is constitutional as written. The intent of the legislation is to

make "in life" photographs generally admissible in criminal homicide prosecutions.

However, the statute does not prevent a court from prohibiting the admission of

a photograph which will unfairly prejudice the defendant. By its own language,

the statute authorizes admission of only "appropriate" photographs–i.e.,

photographs that are not unfairly prejudicial.   12 O.S.Supp.2003, § 2403.

Therefore, the statute does not make all pre-mortem photographs of homicide

victims relevant *per se* nor does it unconstitutionally prevent a court from

safeguarding an accused's right to fair trial. Although the term "appropriate' is

undefined, it is derived from the term "proper" which "is a common term in the

legal world and, accordingly...judges are familiar with its meaning." *Williams v.*

*Taylor*, 529 U.S. 362, 401 (2000) (O'Connor, J., concurring) (discussing term

"reasonable" as it relates to federal habeas amendments).   *See* Black's Law

Dictionary (6th ed. 1990) at 1216 (defining 'proper' as "[t]hat which is fit, suitable,

appropriate, adapted, correct. Reasonably sufficient"). Thus, Section 2403 on its

face prohibits the nonsensical, inappropriate scenarios involving "in-life" victim

photographs envisioned by Defendant by providing reasonable guidance for its

application.  Opening Br. at 97-98.

Similarly, appropriate photographs of victims while alive are relevant in the

guilt stage of a homicide prosecution as evidence of the specific harm done, that

is, that an individual human being's life was taken away, by a defendant.  In this

sense, "in life" photographs "personalize the victim and help to complete the story

for the jurors." *State v. Doerr*, 969 P.2d 1168, 1176 (Ariz. 1998) (en banc) (citing

*State v. Scales*, 518 N.W.2d 587, 593 (Minn. 1994)) (finding that "in life"

photograph of victim failed to provide "much, if any, assistance to the jury in

deciding the case", refusing to adopt *per se* prohibition of "in life" photographs and recognizing that "[i]t can, of course, be argued that 'in life' photos personalize the victim and help to complete the story for the jurors"). *See also Com. v. Degro*, 733 N.E.2d 1024, 1032 (Mass. 2000) (citing *Com. v. Santiago*, 681 N.E.2d 1205 (Mass. 1997)) (introduction of "in life" photo of murder victim upheld because "[t]he Commonwealth may 'tell the jury something of the person whose life [has] been lost in order to humanize the proceedings'...and a photograph may be admitted for this purpose"); *State v. Carney*, 649 N.W.2d 455, 463 (Minn. 2002) (upholding admission of "in life" photograph in homicide case depicting victim with his family; "[t]he photograph fell within the prosecutor's latitude in showing [the victim] as a human being and was not unduly prejudicial as [victim's] wife testified that he was married with three kids").

It has been noted that a majority of jurisdictions "that have considered the admissibility of 'in life' photographs have also upheld their admission." *State v. Broberg*, 677 A.2d 602, 607 (Md. 1996) (and cases cited therein). Moreover, in *State v. Williams*, 828 P.2d 1006, 1012-13 (Or. 1992), the Oregon Supreme Court upheld the admission of pre-mortem photographs of a victim pursuant to a state statute nearly identical to the one enacted by the Oklahoma Legislature. Oregon Revised Statute 41.415 provides: "In a prosecution for any criminal homicide, a photograph of the victim while alive shall be admissible evidence when offered by the district attorney to show the general appearance and condition of the victim

while alive." *Williams*, 828 P.2d at 1012. The *Williams* court specifically rejected a constitutional attack on the Oregon statute. *Id.*

Defendant's contention that "in-life" victim photographs are inadmissible on constitutional grounds even during the penalty phase of a capital murder trial is exceptionally weak. Opening Br. at 96. Appropriate victim impact evidence includes evidence that provides a "quick glimpse" of the life of the victim extinguished by a defendant. *DeRosa v. State*, 2004 OK CR 19, ¶77, 89 P.3d 1124, 1151. An "in-life" victim photograph ensures that a capital murder defendant is not allowed to "turn[ ] the victim into a 'faceless stranger at the penalty phase of a capital trial,'" and therefore "deprive[ ] the State of the full moral force of its evidence". *Payne v. Tennessee*, 501 U.S. 808, 825 (1991). Any risk of sympathy for the victim generated by an appropriate "in-life" photograph is minimized by the limiting instructions for victim impact evidence provided to Oklahoma juries, *Cargle v. State*, 1995 OK CR 77, ¶ 909 P.2d 806, 828-29, including the jury that sentenced Defendant to death (O.R. 1307-08). In the words of that instruction, an "in-life" victim photo during penalty phase "is intended to remind [the jury] as the sentencer that just as the defendant should be considered as an individual, so too the victim is an individual whose death may represent a unique loss to society and the family" (O.R. 1307). No possible constitutional infirmity stems from admission of an "in-life" photograph of the victim during penalty phase.

Defendant's suggestion that Section 2403 is unconstitutional because it is "one-sided in its application" lacks merit. Opening Br. at 95. While it is true that Section 2403 does state that an appropriate "in-life" photograph of the victim shall be admissible "when offered by the district attorney" in a homicide prosecution, this provision of the statute merely recognizes the obvious–i.e., that a defense attorney will never introduce such evidence for the purposes described above. Thus, the Oklahoma Legislature's use of this particular language is not surprising and does not raise constitutional concerns. Further, nothing in this provision prohibits the introduction of "in-life" photographs of the victim by a homicide defendant in order to present a defense. No one, let alone the Oklahoma Legislature, questions that a defendant has a federal constitutional right to present relevant evidence essential to his defense. *Primeaux v. State*, 2004 OK CR 16, ¶¶49-50, 88 P.3d 893, 903 (cases cited therein).

Defendant's contention that Section 2403 is unconstitutional because it "is not about criminal justice, but about politics" lacks merit. Opening Br. at 95. Under Defendant's logic, every statute must be presumed unconstitutional because every statute is enacted by elected politicians. As noted above, this is not the standard of review applied by this, or any other, Court when assessing the constitutionality of a statutory provision. Defendant's citation to newspaper articles in support of this claim is totally inappropriate. None of these articles are part of the record. Rule 3.5(A)(4) & Rule 3.11(B)(3), *Rules of the Oklahoma Court*

*of Criminal Appeals*, Title 22, Ch. 18, App. (2006).   Moreover, Defendant's improper extra-record evidence fails to prove much of anything.  It is no surprise that victims' rights advocates would view the amendments to Section 2403 as a triumphant response to what they viewed as incorrect decisions from this Court prohibiting admission of "in-life photographs. This does not, however, resolve the constitutional issue before the Court and is not even particularly informative.

As note above, legislative enactments are presumed constitutional and must be construed by this Court, if at all possible, such that their constitutionality is upheld.  *Thomason*, 2001 OK CR 27, ¶7, 33 P.3d 930, 932.  Because, as shown above, Section 2403 is constitutional as written and as applied in this case, this Court must uphold the statute against Defendant's constitutional challenge.  As discussed above, the "in life" photograph introduced in this case was relevant and admissible.  But even if this Court finds admission of the "in life" photograph in this case improper, any error was harmless beyond a reasonable doubt.  *Chapman v. California*, 386 U.S. 18, 24 (1967).  State's Exhibit 79 did little more than humanize a victim who was already described through testimony.  Further, it was the strong evidence of Defendant's guilt and the aggravating circumstance presented at trial (*see* Propositions I & VI)--not State's Exhibit 79--that resulted in Defendant's conviction and death sentence.  Any possible error was therefore harmless.

Defendant's contention that the prosecutor in this case used admission of the "in-life" victim photograph as a "stunt" to inject unfairly prejudicial sympathy for the victim into the guilt-stage proceedings requires separate discussion. Opening Br. at 98. First, Defendant's comparison of this case to an alleged instance of prosecutorial misconduct in another Oklahoma County capital murder case is improper as it relies upon extra-record evidence. Rule 3.5(A)(4) & Rule 3.11(B)(3), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2006). Second, Defendant's use of the term "stunt" to describe an alleged error by the prosecutor in this case is totally unnecessary and improper. This is particularly troubling considering the open hostility shown by Defendant towards the Oklahoma Legislature and victims' rights advocates in the instant proposition of error and Defendant's apparent commitment to disregarding this Court's restrictions on extra-record evidence. Opening Br. at 95-96.

Third, Defendant's allegation of prosecutorial misconduct based on the prosecutor's examination of Donna Van Treese at transcript Volume IV, page 33, lacks merit. The prosecutor did nothing more in the challenged passage than lay a foundation for the "in-life" photograph. And the challenged claim was such an outrageous "stunt" that trial counsel made no objection. Indeed, defense counsel stated during a bench conference immediately after the challenged passage that, while he objected to admission of the photograph, he had no problem with Donna Van Treese describing the photograph to the jury. Defense counsel registered no

objection to her particular testimony (Tr. IV 34). No error, let alone plain error, stems from this passage. The same is true of Defendant's challenge to the prosecutor's guilt-stage closing argument at transcript Volume XV, page 58. Again, this comment was so outrageous that Defendant did not object (Tr. XV 58-59). Further, the prosecutor's challenged argument represents reasonable comment on the evidence presented as it relates to elements of first degree malice murder instruction. This is wholly proper. "Both parties have wide latitude in closing arguments to discuss the evidence and reasonable inferences, and this Court will grant relief only where grossly improper and unwarranted argument affects the defendant's rights." *Le v. State*, 1997 OK CR 55, ¶50, 947 P.2d 535, 554. Defendant is clearly not entitled to relief based on alleged prosecutorial misconduct surrounding State's Exhibit 79.

The same is true regarding Defendant's challenge to identification by Barrie Hall of State's Exhibit 79 during her victim impact testimony (Tr. XVI 71). No objection was lodged at trial and no plain error stems from this alleged improper conduct by the prosecutor. It was entirely appropriate for the victim's daughter to identify the man in the photograph as her father, the very person whom she was there to testify about. This action was not unfairly prejudicial. The prosecutor's passing reference to State's Exhibit 79 during penalty-phase closing argument also does not warrant relief. In the challenged passage, which did not draw an objection, the prosecutor said only "I suggest that...[Defendant] deserves

the death penalty for what he did to Barry Van Treese. **You recall him from State's Exhibit No. 79**" (Tr. XVII 65) (emphasis added). This was appropriate comment on the evidence, not plain error. Relief should be denied.

## XI.

## DEFENDANT IS NOT ENTITLED TO RELIEF BASED ON CUMULATIVE ERROR ANALYSIS.

Defendant next alleges cumulative error. The above analysis demonstrates that cumulative error did not deprive Defendant of a reliable and fair trial. As shown above, none of Defendant's claims of error warranted relief. Defendant's conviction and death sentence in this case stems from the State's strong evidentiary presentation during both stages. This is simply not a case where numerous irregularities during Defendant's trial somehow prejudiced his rights. *Bland v. State*, 2000 OK CR 11, ¶132, 4 P.3d 702, 734. Relief is unwarranted.

## CONCLUSION

Defendant's contentions have been answered by both argument and citations of authority. No error occurred which would require reversal, a new trial or modification of the death sentence imposed. The sentence of death was not imposed under the influence of passion, prejudice or any other arbitrary factor and the evidence overwhelmingly supported the aggravating circumstance found by the jury. Therefore, the State of Oklahoma respectfully requests that Defendant's conviction and sentence of death be affirmed.

Respectfully submitted,

**W.A. DREW EDMONDSON**
**ATTORNEY GENERAL OF OKLAHOMA**

*[signature]*

**SETH S. BRANHAM, OBA #18019**
**ASSISTANT ATTORNEY GENERAL**

112 State Capitol Building
Oklahoma City, OK  73105
(405) 521-3921 (Voice)
(405) 521-6246 (Fax)

**ATTORNEYS FOR APPELLEE**

## CERTIFICATE OF MAILING

I certify that on this 14th day of April, 2006, a true and correct copy of the foregoing was mailed via United States mail, with full-first class postage pre-paid, to:

Janet Chesley
Kathleen M. Smith
Oklahoma Indigent Defense System
Capital Direct Appeals Division
P.O. Box 926
Norman, Oklahoma 73070

*[signature]*

**SETH S. BRANHAM**

101