# IN THE UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| RICHARD GLOSSIP, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | CIV-08-326-HE |
| | ) | |
| MARTY SIRMONS, WARDEN, | ) | |
| Oklahoma State Penitentiary, | ) | |
| | ) | |
| Respondent. | ) | |

_____

## MOTION FOR EVIDENTIARY HEARING

_____

December 31, 2008

_____

**MARK HENRICKSEN, OBA # 4102**
**LANITA HENRICKSEN, OBA# 15016**
HENRICKSEN & HENRICKSEN
LAWYERS, INC.
600 North Walker, Suite 220
Oklahoma City, Oklahoma 73102-3035
        (405) 609-1970
        (405) 609-1973 (Facsimile)
mark.henricksen@coxinet.net
henricksen.lanita@coxinet.net

# TABLE OF CONTENTS

**Statement of the Case** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**Requests in State Court  for Evidentiary Hearing on Ineffective Assistance  of Counsel Claims**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**Petitioner's Request For Evidentiary Hearing** . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**1.   Trial Counsel's Failure to Utilize Justin Sneed's Videotaped Interview** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      Manipulation of Mr. Sneed to Implicate Petitioner  . . . . . . . . . . . . . . . . . . 13

      Discrepancies Between Mr. Sneed's Videotape and his Trial Testimony . . 15

**2.   Failure to Utilize Readily Available Evidence to Cross-Examine Witnesses** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**3.   Failure to properly cross-examine Justin Sneed by use of a Psychiatric Evaluation For the Determination of Competency to Stand Trial** . . . . 20

**4.   Failure to Object to Conduct of The Trial Judge** . . . . . . . . . . . . . . . . . . 23

**5.   The Trial Court erred in permitting the State to display selective portions of certain witnesses' testimony through out the trial** . . . . . . . 24

**Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

# TABLE OF AUTHORITIES

FEDERAL CASES

*Bryan v. Mullin*, 335 F.3d 1207 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . 26

*California v. Brown*, 479 U.S. 538 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Cannon v. Mullin*, 383 F.3d 1152, 1175 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . 26

*Chambers v. Mississippi*, 410 U.S. 284 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Evitts v. Lucey*, 469 U.S. 387(1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Glossip v. Oklahoma*, 128 S.Ct. 1124 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Mayes v. Gibson*, 210 F.3d 1284 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . 30

*Medina v. Barnes*, 71 F.3d 363 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Romano v. Gibson*, 239 F.3d 1156 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . 29

*Rompilla v. Beard*, 545 U.S. 374 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Skipper v. South Carolina*, 476 U.S. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Strickland v. Washington*, 466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . 27-29

*Washington v. Texas*, 388 U.S. 14 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Wiggins v. Smith*, 539 U.S. 510  (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Woodson v. North Carolina*, 428 U.S. 280 (1976) . . . . . . . . . . . . . . . . . . . . . . . . 29

STATE CASES

*Glossip v. State,* 29 P.3d 597 (Okl. Cr. App. 2001) . . . . . . . . . . . . . . . . . . 3, 7, 15

*Glossip v. State*, 157 P.3d 143 (Okla. Cr. App. 2007) . . . . . . . . . . . . . . . . . . . . 3, 5

STATE STATUTES

Rules of the Court of Criminal Appeals, Okla. Stat. tit. 22, Ch. 18 . . . . . . . . . . 4, 7

21 O.S. §701.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## IN THE DISTRICT COURT FOR THE

## WESTERN DISTRICT OF OKLAHOMA

RICHARD GLOSSIP,                          )
                                          )
                    Petitioner,           )
                                          )
     vs.                                  )          No. CIV-08-326-HE
                                          )
MARTY SIRMONS,        Warden,             )
Oklahoma State Penitentiary,              )
                                          )
                    Respondent.           )

## MOTION FOR EVIDENTIARY HEARING
_____

Petitioner Richard Glossip  filed his Petition For a Writ of Habeas Corpus in

this Court  on November 3, 2008.    Pursuant to the scheduling Order in this case,

Petitioner files this Motion For an Evidentiary Hearing on his claims of ineffective

assistance of counsel, and on Ground III of his Petition setting forth his claim  that

the trial court erred in permitting the state to display selective portions of certain

witnesses'  testimony  throughout  the trial.   Simultaneous  with  the filing of his

Petition  For a Writ of Habeas Corpus, Petitioner filed his Appendix to Petition For

a Writ of Habeas  Corpus.   Attachment  7  to  the  Appendix  consisted  of  a

Determination of Competency to Stand Trial, Psychiatric Evaluation and, therefore,

Petitioner filed a Redacted Appendix to Petition for a Writ of Habeas Corpus excluding Attachment 7, and filed under seal the Unredacted Appendix which included Attachment 7. Said Appendix contains materials which were not part of the record in Petitioner's case but which were included as non-record material in support of his requests for evidentiary hearings in State Court proceedings. The non-record materials are supportive to claims of ineffective assistance of counsel set out in Petitioner's Petition For a Writ of Habeas Corpus as well as this Motion For Evidentiary Hearing and reference in this motion shall be to said sealed Appendix.

## STATEMENT OF THE CASE

This habeas corpus case involves the retrial of Petitioner. Initially, on January 14, 1997, only Justin Blayne Sneed had been charged by Information in Oklahoma County District Court Case No. CF-97-244, with Murder in the First Degree of Barry Van Treese in violation of 21 O.S. 701.7(A) (2001). (O.R. 1-4) On January 23, 1997, a second Information was filed adding Richard Glossip as a co-defendant in the case. Petitioner was originally charged with one count of Accessory to First Degree Murder in Oklahoma County District Court, Case Number CF-1997-256. However, that case was dismissed on January 27, 1997, after Petitioner was charged as a principal in Case Number CF-1997-244. (O.R.5-9) Petitioner was tried separately by a jury, convicted of one count of Murder in the First Degree, and sentenced to death in June

1998.  The conviction and sentence were appealed to the Oklahoma Court of Criminal

Appeals[1] and on July 17, 2001, the OCCA  reversed and remanded the case for a new

trial.  *See Glossip v. State,*  29 P.3d 597 (Okl. Cr. App.  2001).

**The Retrial of Petitioner**

On June 1, 2004, Petitioner was again convicted by a jury before the Honorable

Twyla Mason Gray, District Judge, of Murder in the First Degree in violation of 21

O.S. §701.7.  On June 3, 2004, having found the murder for remuneration aggravator,

the jury assessed punishment at death.  Judgment and Sentence was imposed by the

trial court on August 27, 2004.

The conviction and sentence were affirmed on direct appeal on April 13, 2007.

*Glossip v. State*, 157 P.3d 143 (Okla. Cr. App. 2007).  *See* Attachment  2 to Appendix.

Post-Conviction relief was denied on December 6, 2007 in an unpublished opinion in

Case Number PCD-2004-978.  *See* Attachment  1 to Appendix.  Certiorari was denied

on January 22, 2008, in   *Glossip  v.  Oklahoma*, 128 S.Ct.  1124 (2008).   *See*

Attachment 3 to Appendix.

**Requests in State Court  for Evidentiary Hearing on Ineffective Assistance of
Counsel Claims.**

---

[1]Hereinafter "OCCA"

3

In direct appeal proceedings an Application For Evidentiary Hearing on Sixth Amendment Claims was filed simultaneously with Petitioner's direct appeal brief, in accordance with Rule 3.11(B)(3)(b) of the *Rules of the Court of Criminal Appeals,* Okla. Stat. tit. 22, Ch. 18, App. (2004). Petitioner requested a hearing on the following issues which have been included in Ground V of Petitioner's Petition For A Writ of Habeas Corpus which is incorporated herein:

**Trial Counsel's Failure to Utilize Justin Sneed's Videotaped Interview**;

**Trial Counsel's Failure to Use Financial Records to Cross-Examine State's Witnesses.**

In support of his request for an evidentiary hearing in State Court, Petitioner attached the following non-record materials:

Exhibit 1: Affidavit of Jolene Perham with attached videotaped interview of Justin Sneed conducted on January 14, 1997;

Exhibit 1A: Videotaped interview of Justin Sneed conducted by Oklahoma City Police Detectives Bob Bemo and Bill Cook on January 14, 1997;

Exhibit 2: Affidavit of Jolene Perham with attached transcript of January 14, 1997 Sneed interview;

Exhibit 3: Affidavit of Jolene Perham with attached financial records of Best Budget Inns.

The above described documents are included in Petitioner's Appendix to Petition For A Writ of Habeas Corpus as Attachments 16, 17 and 18; the actual

4

videotape was conventionally filed in this case.  (Attachment 17 to Appendix)

The OCCA denied Petitioner's request for an evidentiary hearing on these claims.  *Glossip v. State*, 157 P.3d 143, n. 10 (Okla. Cr. App. 2007).

Petitioner also requested an evidentiary hearing on Sixth Amendment Claims during state post-conviction proceedings on the following issues which have been included in Ground XI and Ground XII of Petitioner's Petition For a Writ of Habeas Corpus which are incorporated herein:

**Failure to properly cross-examine Justin Sneed by use of a Psychiatric Evaluation For the Determination of Competency to Stand Trial;**

**Failure to Object to Conduct of The Trial Judge.**

In support of his request for an evidentiary hearing in the  State Court post-conviction proceeding  the Petitioner  included the following non-record materials in the  Appendix  to his Application For Post Conviction Relief:

Appendix 4: Letter from Edith King, Ph.D., with attached Psychiatric Evaluation For the Determination of Competency to Stand Trial;

Appendix 5: Affidavit of Christopher Evangelista, a member of Petitioner's jury;

Appendix 6: Affidavit of Steve Leedy, Oklahoma Indigent Defense System Investigator;

Appendix 7: Affidavit of Sherry Britton, a member of Petitioner's jury;

Appendix 8: Affidavit of Anna Rose Wilson, a member of Petitioner's

5

jury;

Appendix 9: Affidavit of Sara Bonnell, attorney with the Oklahoma Indigent Defense System;

Appendix 10: Affidavit of Krystal Willis, Oklahoma Indigent Defense System Investigator;

Appendix 11: Affidavit of Donald Stamman, a member of Petitioner's jury;

Petitioner has included the above non-record material as the following  Attachments

to his  Appendix To Petition For A Writ of Habeas Corpus:

Attachment 7:  Letter from Edith King, Ph.D., with attached Psychiatric Evaluation For the Determination of Competency to Stand Trial;

Attachment 8:  Affidavit of Christopher Evangelista, a member of Petitioner's jury;

Attachment 9:  Affidavit of Steve Leedy, Oklahoma Indigent Defense System Investigator;

Attachment 10:  Affidavit of Sherry Britton, a member of Petitioner's jury;

Attachment 11:   Affidavit of Anna Rose Wilson, a member of Petitioner's jury;

Attachment 12: Affidavit of Sara Bonnell, attorney with the Oklahoma Indigent Defense System;

Attachment 13: Affidavit of Krystal Willis, Oklahoma Indigent Defense System Investigator;

Attachment 14: Affidavit of Donald Stamman, a member of Petitioner's

jury;

Petitioner's request for a hearing in the post-conviction proceeding was denied. *See* unpublished opinion in Appendix at Attachment 1, p. 9.

### Petitioner's Request For Evidentiary Hearing

Petitioner requests that this Court grant an evidentiary hearing on the following claims of ineffective assistance of counsel. Petitioner incorporates Grounds V, XI and XII of his Petition For a Writ of Habeas Corpus to support his request for an evidentiary hearing.

### 1.    Trial Counsel's Failure to Utilize Justin Sneed's Videotaped Interview

Shortly after Mr. Sneed was apprehended he was interviewed by Police Detectives Bob Bemo and Bill Cook, with the interview being preserved on a videotape. (See Attachments 17 and 18 to Petitioner's Appendix)  Petitioner's 1998 conviction was reversed due to the ineffective assistance of counsel. *Glossip,* 29 P.3d at 599.  That reversal was premised, in large part, on trial counsel's failure to use Justin Sneed's videotaped interview to cross-examine both Mr. Sneed and Detective Bemo.  Specifically, the Court held "[t]rial counsel's failure to utilize important impeachment evidence against Justin Sneed stands out as the most glaring deficiency in counsel's performance." *Id.* at 601.    However, trial counsel at Petitioner's 2004 trial again failed to use this critical piece of evidence to cross-examine Justin Sneed

and Detective Bemo.   The value of the. Sneed video to the defense at trial was twofold:  (1) it vividly illustrates the manner in which the detectives manipulated Mr. Sneed into implicating Petitioner in this crime, and   (2)  it points to   the many discrepancies between Mr. Sneed's   January 14, 1997, interview, his 1998 trial testimony and, most  recently, his 2004 trial testimony.    The discrepancies between the videotape and Mr. Sneed's testimony at Petitioner's first trial were egregious to the point that Petitioner was granted a new trial based in part on counsel's failure to introduce the videotape.   However, even additional discrepancies were added  in Mr. Sneed's testimony in Petitioner retrial held in 2004.

At trial, Detective Bemo denied making any suggestive statements to Justin Sneed during the interview.  (Tr. XIV 71)   The videotape of the interview, however, shows otherwise.   After reading Mr. Sneed his *Miranda* rights, Detective Bemo immediately began to suggest that Mr. Sneed should implicate Petitioner:

> BEMO: Okay.  The thing about it is, Justin, we think – *we know that this involves more than just you*, okay?  We've got witnesses and we've got other people and we most likely have physical evidence.  You know what I am saying on this thing.   And right now the best thing you can do is to just be straightforward with us about this thing and talk to us about it and tell us what happened and who all was involved, *because I personally don't think you're the only one.*  Everybody that we talked to they're putting it on you, okay?  They're putting the whole thing on you and they're going to leave you holding the bag.   In other words, if you just said you don't want to talk to us and you want to talk to an attorney we would march you down to the jail and we would book you

in for this charge and you would be facing this thing on your own.   *And I don't think it's just you.   I think there are more people involved and you can straighten out a lot of things.  And I just don't think you should take the whole thing*.

(Attachment 17 to Appendix;  Attachment 18  at p. 5-6).

> BEMO:   Well, do you want to – let's get down to – to business here. Do you want to tell us that happened out there, how this all got started and run it down to us?

> SNEED:   Huh-uh

> BEMO:   You don't want to tell us about it?

> SNEED:   I don't really know what to say about it.

> BEMO:   Well, let me tell you, there's – there's a lot of people, you know, when something like this happens everybody tried to save themselves.

> SNEED:   Uh-huh

> BEMO:   And everybody wants  to make themselves look as good as they can, you know, to the  — to the police.  Because then all of a sudden, you know, the cat's out of the bag and everybody knows what's going on.  Well, they've made you the scapegoat in this.   You know, everybody is saying you're the one that did this and you did it by yourself *and I don't believe that.  You know that Rich is under arrest, don't  you*?

> SNEED:   No.  I didn't know that.

> BEMO:   Yeah.  He's under arrest, too.

> SNEED:   Okay.

> BEMO:   *So he's the one – he's putting it on you the worst.  Now I think that there's more to this than just you being by yourself and I would like for you to tell me what – how this got started and what happened and –*

(Attachment 17 to Appendix; Attachment 18 to Appendix, at 16-17.)

For the next eight minutes, the detectives relentlessly  suggest that Petitioner was involved in the murder:

> COOK:   Well, basically what he's saying, Justin, is that Rich told us that you're the one that came to him with that idea.

> BEMO:   He's putting it off on you, Justin.  That's what he told us.

> SNEED:  No.  I don't understand that.

> BEMO:   *And now Rich is trying to save himself by saying that you're in this by yourself, that it was all your doing and you're the one that – did the homicide it was you, that you came to him and told him about it, is that  true*?

(Attachment 17 to Appendix; Attachment 18 at 19)

> BEMO:   Okay.  Are you saying that you didn't kill him?

> SNEED:   Yes, sir.

> BEMO:    Well, that ain't going to get it.  They're putting it all  on you.  That's what I'm trying to tell you.

> COOK:   You know, Justin, I suppose I'm not so sure if I wasn't in your shoes I wouldn't say the same thing you're saying.   But we've gone through a lot of trouble, we've gone to a lot of work, investigation.  And what you're saying there doesn't add up with everything else that we have discovered, not only with our technical investigation but also you told some folks some things.  Okay?

SNEED:   What do you mean?

COOK:   *Well, what I mean is according to Rich, you told him*

BEMO:   *That you killed the man, the owner of the motel.*

COOK:   And what we want you to do is try to do the manly thing here and get this thing straightened out.  We want to hear your side of it.  If it's just – if it went bad or you didn't mean to do it you need to tell us that and that's what we'll tell the District Attorney's office.  But you need to get straight with us and tell us what's going on here.

(Attachment 17 to Appendix; Attachment 18 at 20-22)

COOK:   I can appreciate the bad situation you're in even to the point of where you're feeling desperate.  I think maybe I would feel desperate in that situation, but I need you to get straight with us now and tell us what's going on, because we've been doing this for a lot of years.   And on this particular situation we have worked on it ever since it's happened *and I think we know what happened*.  Some stuff I know we know, some stuff we think we know, and we would like for you to straighten us out for sure.   *And anything you tell us we're going to go tell the District Attorney.   I mean, if it's a situation where you didn't mean to do this, got carried away, and you're sincere and you're telling the truth, we'll go tell the man that*.

BEMO:   But we want to know whose – whose idea it was.

COOK:   Is it all your idea, the whole thing?

SNEED:   No, sir.

COOK:   Well, okay, tell me.

BEMO:   You need to tell us about it.

SNEED:   Okay.  Rich told me that he would split what money we could

11

get out of Barry.  I think that's – his name was Barry.

(Attachment 17 to Appendix; Attachment 18 at 24-25.

The failure to impeach Detective Bemo with the detectives' own words and the failure to impeach Justin Sneed  has no strategic basis and was clearly prejudicial to Petitioner.

Other discrepancies include the following:

The incident with the hammer in the boiler room in November or December, 1998 (Tr. XII 80-81) was not mentioned on the tape or in the 1998 trial testimony.

The allegation that Petitioner looked through the victim's wallet and stole a $100 bill (Tr. XII 123) was not mentioned on the tape or in the 1998 trial testimony.

Testimony that Justin Sneed tried to "push" a pocketknife with a broken tip into the victim's chest during the attack (Tr. XII 102) was not mentioned on the tape or in the 1998 testimony.

Testimony that Petitioner asked Justin Sneed to kill the victim five or six times (Tr. XII 79) was not mentioned on the tape.

Testimony that Petitioner gave Justin Sneed a list of items to pick up: trash bags, hack saw, muriatic acid (Tr. XII 144) was not mentioned on the tape)

Trial counsel's failure to introduce the videotape of Justin Sneed's statement also led to the following exchange on redirect examination:

Justin Sneed's testimony was the only evidence presented by the State to tie Petitioner directly to the murder.  Trial counsel was ineffective for failing to impeach this witness with his prior inconsistent statement.

12

Trial counsel did  cross-examined Justin Sneed and Detective  Bemo in the 2004 retrial regarding the circumstances of the interrogation and some of the discrepancies between the videotape and the trial testimony, and counsel attempted to elicit admissions regarding the same, *(See, e.g.,* Tr. XIII 25-31; XIV 70-71), but Petitioner's  previous counsel had tried to cross-examine these witnesses also.  (O.R. 603)  Moreover, whenever the witness denied the differences in the testimony or was unsure about what was said in the initial interview on January 14, 1997, counsel simply let it go.  If the jury had been allowed to view the videotape of Mr. Sneed's interview, there would have been no question what Mr. Sneed and the detectives said and why.

The  substance  of  Petitioner's   claim  is  that  trial  counsel  failed  to  utilize available   compelling  and  powerful  evidence  to  impeach  the  State's  primary witnesses.   Justin Sneed was the State's star witness.  Mr. Sneed, who admitted that he killed the victim, testified against Petitioner in exchange for a sentence of Life Imprisonment Without the Possibility of Parole.

### Manipulation of Mr. Sneed to Implicate Petitioner.

On  the  videotape,  the  detectives  skillfully  manipulate  Mr.  Sneed  into inculpating Petitioner in the murder of Barry Van Treese.

BEMO:  Well, they've made you the scapegoat in this.  You know,

everybody is saying you're the one that did this and you did it by yourself and I don't believe that. You know Rich is under arrest, don't you?

SNEED:  No.  I didn't know that.

BEMO:  Yeah.  He's under arrest, too.

SNEED:  Okay.

BEMO:  So he's the one -- he's putting it on you the worst.  Now, I think that there's more to this than just you being by yourself and I would like for you to tell me what - - how this got started and what happened[.]

(*See* p. 17 to Attachment 18 to Appendix, and Attachment 17)  However, at the 2004 trial, when Mr. Sneed was asked about whether he knew Petitioner had been arrested when he talked to detectives he responded, "I think it was my understanding that he had been questioned, but I don't think it was any understanding that he had been arrested." (Tr. XIII 13)  Trial counsel failed to follow up on this important point, and failed to ask the witness about how the detectives told him over and over that they believed Petitioner was involved before Mr. Sneed finally implicated him. (*See*  pp. 16-25 to Attachment 18 to Appendix, and Attachment 17)  Indeed, it is unclear through counsel's cross-examination whether it was Mr. Sneed or the detectives who thought "people were pointing the finger" at him. (Tr. XIII 14)

Counsel's cross-examination of Detective  Bemo did not fare any better with respect to informing the jury of the circumstances surrounding Mr. Sneed's

14

interrogation.  While certainly counsel went through some of the detective's questions that led Mr. Sneed to implicate Petitioner,  Detective  Bemo naturally denied any intent to do so. (Tr. XIV 70-71) Only the video could have conveyed to the jury how clearly and unambiguously the detectives telegraphed to Mr. Sneed that they wanted him to inculpate Petitioner. (*see* Attachment 17 to Appendix)   There can be no genuine strategic justification for failing to impeach these crucial state witnesses with evidence so clearly probative of their credibility.

### Discrepancies Between Mr. Sneed's Videotape and his Trial Testimony.

As the Court noted in Petitioner's first appeal, there were "at least seven material inconsistencies and . . . at least five things in Sneed's [1998] trial testimony that he had completely omitted from his videotaped statement." *Glossip,* 29 P.3d  at 601. Again, trial counsel attempted to get the inconsistencies across to the jury through cross-examination.  However, counsel's failure to introduce the actual tape led to the following exchange on redirect examination of Justin Sneed:

A: [Variations regarding times things occurred] are just approximations.

Q:  And you know from reading and watching the videotape interview because they videotaped it, right, with the police?  Yes, they did.

Q: *And if it was entirely different from what you told us today, we'd have played that, right?*

A:  Yes.

Q: *Well, they would have played it, right?*

A: Yes.
(Tr. XIII 66-67) (emphasis added).

In fact, the videotape *was* entirely different, and counsel's failure to play it for the jury left the impression it was not.   Several material inconsistencies - extremely prejudicial testimony that was *not* told to detectives on January 14, 1997, and was *not* testified to in 1998 bear repeating here:  Mr. Sneed testified in 2004 that Petitioner offered him $10,000 to kill Barry Van Treese.  (Tr. XII 166-67)  In his interview with detectives and at his 1998 trial, the amount mentioned by Mr. Sneed, whether it was what the victim was "sitting on" as in the videotape, or what Mr. Sneed says Petitioner promised him, was consistently $7,000.  Mr. Sneed never even mentioned the figure of $10,000.  But, rather than *impeach* Mr. Sneed with his prior testimony, counsel offered  him the prior transcripts to "refresh his recollection" and,  thus, allows him to "explain" how he got to the $10,000 figure even though it had *never* been mentioned or even hinted at before he testified at the 2004 trial.[2]

This is but one example of discrepancies that appeared for the first time at Petitioner's 2004 trial. Others include the fact Mr. Sneed described for the first time

---

[2]While Mr. Sneed's explanation that the offer "just kept climbing every time we started talking about it" might make sense if the price was escalating *before* the murder, an increase in the amount to be paid that occurs between the 1998 trial and the 2004 trial is disingenuous. (Tr. XII 167)

another incident   in which Petitioner wanted him to kill Mr. Van Treese with a

hammer in the boiler room of the motel in November  or December, 1996.  (Tr. XII

80-81); alleged for the first time that Petitioner had  taken the victim's wallet out of

his pants pocket and removed a $100 bill; (Tr. XII 123), and said for the first time he

had tried to "push" a knife with a broken tip into Mr. Van Treese's chest during the

attack, (Tr. XII 102).

The failure of trial counsel to cross-examine and meaningfully test the primary

evidentiary bases of the State's case against Petitioner clearly runs afoul of the

*Strickland* standard. Trial counsel's failure to use Justin Sneed's videotaped statement

simply cannot be explained and Petitioner was prejudiced as a result.

The value of the Mr. Sneed video to the defense at trial was twofold:  (1)  it

vividly illustrates the manner in which the detectives manipulated Mr. Sneed into

implicating Petitioner in this crime, and  (2)  it points up the many discrepancies

between Mr. Sneed's January 14, 1997, interview, his 1998 trial testimony,  and his

2004 trial testimony.

**2.      Failure to Utilize Readily Available Evidence to Cross-Examine Witnesses.**

Donna Van Treese testified extensively regarding alleged "shortages" of over

$6,000 for the year 1996 which were of great concern to her and to Mr. Van Treese

as well.  (Tr. IV 63-71)  Trial counsel had in his possession a number of financial

17

records for both the Oklahoma City and Tulsa Best Budget Inns that would have made clear to the jury that this "shortage" was not peculiar to the Oklahoma City motel. *(See* Attachment 16 to Appendix)

Counsel first attempted to introduce Def. Ex. 71, a summary of the 1996 year-end deposit versus volume report, during his cross-examination of Mrs. Van Treese. The State objected to the document because it included figures for the Tulsa motel which the prosecutor considered irrelevant. Without further discussion, the trial court asked defense counsel to redact the Tulsa figures from the report.[3] (Tr. 133-34) Later in the day, counsel asked the court to revisit the issue of Def. Ex. 71, arguing that the Tulsa figures were relevant to show that Tulsa had suffered similar losses. In response, the State made an offer of proof that DonnaVan Treese would say that William Bender, the manager of the Tulsa Best Budget, was also mismanaging that motel and the Van Treeses intended to fire him as well after they had dealt with Petitioner. (Tr. IV 177-78) Rather than being an argument against admissibility of Def. Ex. 71, this was one of the primary reasons the Tulsa records were crucial to presentation of Petitioner's defense. Although the trial court reserved ruling on defense counsel's request, counsel never even attempted to use the document to cross-

---

[3]In redacted form, Def. Ex. 71 simply reinforced Mrs. Van Treese's testimony that a $6,100 "shortage" existed with respect to the Oklahoma City motel.

examine either Mrs. Van Treese or William Bender.  (Tr. IV 179)

The unredacted Def. Ex. 71 showed the shortage at the Tulsa Best Budget Inn was $5,226.78, representing 3% of its total sales volume, while the $6,100 shortage at the Oklahoma City motel was only 2%.  (*See* Attachment 16 to Appendix)

The State's case against Petitioner, other than Justin Sneed's uncorroborated testimony, centered on his alleged motive to kill Barry Van Treese, and the $6,100 shortage was the linchpin of that allegation.  *(See, e.g.,* Tr. III 210, 214; IV 63-71, XV 152, 162, 164)  Evidence showing the Tulsa motel had suffered an even greater loss was critical to Petitioner's defense.

If counsel had cross-examined Donna Van Treese using this document, as he told the trial court he intended to do, she presumably would have provided the testimony the State had put forward in its offer of proof, *i.e.,* that the Van Treeses intended to fire Mr. Bender as well as Petitioner.  (Tr. IV 177-78)  As a result of his failure to do so, the jury only heard Bender instead testify that he was never even talked to about the shortages at the Tulsa motel, much less that anyone threatened to fire him over such a shortage.  (Tr. VIII 94)  Bender's testimony offered the perfect opportunity to again attempt to use the unredacted Def. Ex. 71 for purposes of impeachment.  Mrs. Van Treese had already identified the document as one she had created.  If Bender could explain the $5,200 "shortage" in Tulsa, it would likely have

19

offered an explanation for the shortage in Oklahoma City as well. If he could not, his credibility would have been severely damaged.  There simply was no downside.  As things stood, because counsel did not introduce the unredacted exhibit through either Mrs. Van Treese or  Mr. Bender,  Bender's testimony that Barry Van Treese was so pleased with his management of the Tulsa motel that he wanted him to take Petitioner's job in Oklahoma City went unchallenged. (Tr. VIII 83-84)

Similarly, trial counsel had within his possession documents that would have undermined completely Billye Hooper's damaging testimony that Petitioner was somehow manipulating the room rentals so that there were always 19-21 rooms rented per night. (Tr. VII 45-46) These documents show that the number of room rentals per night  varied widely for every single month of 1996.  (*See* Attachment 16 to Appendix)  The documents collected in Attachment 16 to the Appendix were powerful weapons to defend against a case built on the kind of speculation and innuendo Ms. Hooper's testimony represents.  Counsel had an obligation to be knowledgeable about the documents in his files and to use them in defense of Petitioner.

**3.    Failure to properly cross-examine Justin Sneed by use of a Psychiatric Evaluation For the Determination of Competency to Stand Trial;**

Relevant to Petitioner's request for an evidentiary hearing on this claim is

20

Ground XI of Petitioner's Petition For a Writ of Habeas Corpus which is incorporated herein.

Even prior to trial, it was obvious the State's case relied almost solely on the testimony of Justin Sneed, Petitioner's co-defendant in Oklahoma County Case CF-1997-244.  As such, a reasonable attorney would have prepared, through investigation and interviews, to cross examine Mr. Sneed.  This would include a review of the documents filed in Case CF-1997-244, discussed below.  *Rompilla v. Beard*, 545 U.S. 374 (2005).

Throughout the trial the State presented Justin Sneed as a scared, poor, pitiful soul with a hard life who had easily been manipulated by Petitioner into killing Barry Van Treese.  (Tr. III 203-204, 208-209, 215-216, 223-224; Tr. XII 38-41, 100-101, 127-128, 130-131, 159, 188, 191-192; Tr. XV 67-73, 92, 94, 151, 157, 181) However, had trial counsel conducted additional investigation regarding evidence that was available in the court file in Oklahoma County Case CF-1997-244, and filed on July 17, 1997,  and then presented this information during the cross examination of Mr. Sneed, the picture painted by the state would have been revealed as  fraudulent.  There is a reasonable  probability  that  Petitioner  would  not  have  been  found  a principal to the murder, but instead convicted of a lesser or related offense.   (*See* Attachment 7 to Appendix , a copy of a Letter from Oklahoma County Crisis

Intervention Center dated July 1, 1997, and a psychiatric evaluation to determine competency to stand trial   performed on Justin Sneed, and filed with the Oklahoma County Court Clerk in on July 17, 1997.  The psychiatric evaluation for determination of competency  has been included as Attachment 7 to unredacted Appendix filed under seal in this habeas proceeding.   The letter also indicates that a copy of the document was forwarded to Petitioner's attorney prior to his first trial, indicating that this material not only was available in the court file, but was also in the possession of trial counsel.

The State repeatedly presented testimony and argument that Mr. Sneed was merely a "puppy" under the control of Petitioner the "dog trainer" and that Mr. Sneed would have never committed the murder, but for Petitioner.  The testimony and evidence presented by the State on this issue was the basis, in part, for the conviction and sentence.  The decision of the OCCA regarding the claim of insufficiency of evidence in Ground I  refers to Petitioner's control over Mr. Sneed.   However, the readily available evidence in the court file showed that  Mr. Sneed was not a "puppy". In fact, he was an untrained vicious dog long before ever meeting Petitioner.

The real Mr. Sneed was an individual that could think for himself and commit crimes without Petitioner's guidance.   These included fighting, burglary and making a bomb threat.  (*See* Sealed Attachment 7 to Appendix )  Had trial counsel thoroughly

22

investigated and cross examined Mr. Sneed, the picture painted by the state would have been different and the weight of Mr. Sneed's testimony significantly reduced. (Attachment 8 to Appendix , Affidavit of Christopher Evangelista)

Appellate counsel was ineffective for failing to argue that  trial counsel failed to adequately developed and present this issue.  There is a reasonable probability that the results of Petitioner's trial would have been different.  *Evitts v. Lucey*, 469 U.S. 387(1985)

## 4.     Failure to Object to Conduct of The Trial Judge.

Ground XII of Petitioner's Petition For a Writ of Habeas Corpus is the basis of Petitioner's request for an evidentiary hearing on this issue, and Petitioner incorporates Ground XII herein.

At one or more times during the trial, Judge Gray expressed emotion, by crying or tearing up.  Her emotions could have influenced the jury by indicating her opinion as to the merits of the evidence or the credibility of a witness.

The first suggestion of the court's bias is found after the state made its first stage opening argument at the end of the day on May 13, 2004.  (Tr. III 201-225)  On May 14, 2004, at the very beginning of the day, just before the defense was about to give their first stage opening argument, the Court made the following statement at the bench:

23

THE COURT:          Thanks for your patience with me this morning.  I explained to the jury my situation because I didn't want them to think that it was a comment on the evidence.   I told them I'd like to proceed this morning and if I find I just can't concentrate on the evidence or that I'm just sitting up here unable to control my emotions, then I'll just be honest with you guys and tell you I've got to go home.  Okay?

(Tr. IV 5).[4]

In addition to the abovementioned ex parte communication with the jury regarding her emotions, at times during the trial, several jurors, as well as an investigator for Petitioner, saw the judge either crying or with tears in her eyes.  (See Attachment  9 to Appendix,  Affidavit of Steve Leedy;  Attachment 10 to Appendix , Affidavit of Sherry Britton; Attachment 11 to Appendix, Affidavit of Anna Rose Wilson; Attachment 12 to Appendix, Affidavit of Sara Bonnell;   and Attachment 13 to Appendix, Affidavit of Krystal Willis)

**5.     The Trial Court erred in permitting the State to display selective portions of certain witnesses' testimony through out the trial.**

Petitioner requests an evidentiary hearing on his claim set forth in Ground III of his Petition For a Writ of Habeas Corpus, incorporated herein,  wherein he claims

---

[4]As indicated, this conversation between the judge and jury took place outside the presence of defense counsel, Petitioner, and the state. (See also, Attachment 12 to Appendix, Affidavit of Sara Bonnell and Attachment 13 to Appendix, Affidavit of Krystal Willis) Upon notice of this conversation, defense counsel did not object or make any other requests. (Tr. IV 5)

24

that the trial court erred in permitting the State to display selective portions of certain witnesses' testimony through out the trial.  The display of large posters containing portions of evidence which the Prosecutor carefully selected, and documented in the Prosecutor's handwriting, for continual consideration of the jurors throughout the trial, and which were seen by subsequent witnesses as they testified, violated Petitioner's constitutional right to due process.

Petitioner requests a hearing on this claim in order that a sufficient review of his claim may be made by this Court.  Included as Attachment 15 to his Appendix to Petition For a Writ of Habeas Corpus is the Affidavit of Juror Latricia Deselle, who stated that the posters were helpful and that the Prosecutor referred to the posters during cross examination of defense witnesses.   Attachment 11 to the Appendix consists of an Affidavit of Juror Anna Rose Wilson who found the posters "very helpful to me."   Even though Petitioner did not request an evidentiary hearing in State Court on this claim he still is entitled to an evidentiary hearing in this Court pursuant to 28 U.S.C. § 2254(e)(2)(A)(ii) which provides:

> "(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –
>
>   (A) the claim relies on –
>      . . . .
>      (ii) a factual predicate that could not have been previously

25

discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."

Petitioner has been prohibited from providing the State Court as well as this Court with sufficient facts surrounding the posters due to the interference of the trial court and  the prosecutor.   Petitioner has also filed a motion for discovery of the posters in this habeas proceeding but the Respondent has objected to the production of the posters.

## An evidentiary hearing is warranted in this Court due to the State Court's denial of such a hearing.

When a habeas petitioner did not fail to develop his claim in State court, the federal district  court must analyze whether a hearing is required under the pre-AEDPA standard.  *Bryan v. Mullin*, 335 F.3d 1207, 1214 (10th Cir. 2003).   Thus, Petitioner must first make allegations which, if proved, would entitle him to relief. *Medina v. Barnes*, 71 F.3d 363, 366 (10th Cir. 1995).   "If the petitioner does that the court must then determine whether petitioner is entitled to an evidentiary hearing to resolve any disputed fact underlying his claims." *Id.*   *See also   Cannon v. Mullin*,

383 F.3d 1152, 1175 (10th Cir. 2004) (under pre-AEDPA standard a petitioner is entitled to an evidentiary hearing if he diligently tried to develop the factual record in state court, and if his allegations, if true and not contravened by the existing factual record, would entitle him to relief.)

Petitioner has set forth facts in his Petition For a Writ of Habeas Corpus which support his claims of ineffective assistance of counsel. He provided extra record materials which show that there are facts outside the record which support his claims and his allegations are not contravened by the existing factual record. Petitioner requests, at a minimum, that this Court grant an evidentiary on his claims of ineffective assistance of counsel

**Ineffective assistance of trial counsel**

The Sixth Amendment to the United States Constitution, applied to the states through the Fourteenth Amendment, guarantees every criminal defendant the right to effective counsel, the deprivation of which constitutes a constitutional violation. Standards for effective assistance of counsel claims are set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). The Supreme Court held in *Strickland* that to demonstrate an ineffective assistance of counsel claim to warrant reversal of a conviction or a sentence a defendant must meet a two-prong test by showing that counsel's representation fell below an objective standard of reasonableness, and that

there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 688 & 694.   Petitioner is not required to show proof of prejudice beyond a reasonable doubt or by clear and convincing evidence, or even by a preponderance of the evidence, as these tests are too stringent. *Id.* at 695.  The "reasonable probability" test requires only that an error may reasonably have made a difference.   When confidence in the outcome is undermined, prejudice is shown. *Id.* at 694.   The evidence which Petitioner's trial counsel failed to present constituted both mitigating evidence as well as evidence that controverted the State's allegation that Petitioner was responsible for the murder of Barry Van Treese.

An accused has a Sixth Amendment right to present relevant evidence favorable to his defense through defense witnesses or cross-examination of prosecution witnesses. *Washington v. Texas*, 388 U.S. 14 (1967). When assessing relevancy, trial courts as well as appellate courts must keep in mind that the validity of a defense theory is for the jury to decide. Petitioner's right to due process and a fair trial was violated when he was denied "the right to a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973).

A trial counsel's function "is to make the adversarial testing  process work in the particular case." *Strickland v. Washington*, 466 U.S. 668 (1984). *See Wiggins v.*

28

*Smith*, 539 U.S. 510  (2003).

To determine whether a defendant has been prejudiced by his trial counsel's deficient performance, an appellate court must consider the totality of the evidence before the factfinder and whether "the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S., at 695. "[D]espite the strong presumption of reliability," there can be no question but that "the result of [this] particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Strickland*, 466 U.S., at 696.

The test announced in *Strickland* applies to second stage as well as first stage of trial.  <u>Id.</u> at 696.  The Supreme Court has consistently held that "the sentencer may not refuse to consider or be precluded from considering 'any relevant mitigating evidence.'" *Skipper v. South Carolina,* 476 U.S. 1 (1186).  Accordingly, "the sentence imposed at the penalty stage should reflect a reasoned *moral* response to the defendant's background, character, and crime."  *California v. Brown,* 479 U.S. 538, 545 (1987) (emphasis in original) (O'Connor, J., concurring).  "Consideration of such evidence is a 'constitutionally indispensable part of the process of inflicting the penalty of death.'" *California v. Brown,* 479 U.S. at 541 (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (plurality)).   "Mitigating evidence plays an overwhelmingly important role in the just imposition of the death penalty." *Romano*

*v. Gibson*, 239 F.3d 1156, 1180 (10th Cir. 2001) (quoting *Mayes v. Gibson*, 210 F.3d 1284, 1288 (10th Cir. 2000).  Use of the Psychiatric Evaluation performed on Justin Sneed constitutes not only a defense to the crime, but certainly would have affected second stage.  Even though the evaluation deals with Justin Sneed and not Petitioner, the jury would have  a less harsh opinion of Petitioner rather than viewing him as a ruthless man who took advantage of the alleged young and manipulated Justin Sneed.

There is a reasonable probability that the outcome of the second stage of Petitioner's trial would have been different but for the ineffectiveness of his trial counsel.

The jury was unaware of  critical information.   Petitioner's trial counsel's representation fell below an objective standard of reasonableness, and that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

## Conclusion

Petitioner diligently sought to develop his claims in state court and has made allegations which, if proved, would entitle him to relief.  Petitioner requests that this Court grant an evidentiary hearing on the issues set forth herein.

Respectfully submitted,


s/Mark Henricksen_____
MARK HENRICKSEN, OBA #4102




## CERTIFICATE OF SERVICE

I hereby certify that on December 31, 2008, I electronically transmitted the attached document to the Clerk of this Court using the ECF System for filing.  Based on the records currently on file, the Clerk of the Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Seth Branham
Assistant Attorney General
313 NE 21st St.
Oklahoma City, OK 73105
fhc.docket@oag.state.ok.us
seth_branham@oag.state.ok.us


s/Mark Henricksen_____
MARK HENRICKSEN


HENRICKSEN & HENRICKSEN
LAWYERS, INC.
600 North Walker, Suite 220
Oklahoma City, Oklahoma  73102-3035
(405) 609-1970     (405) 609-1973 fax
mark.henricksen@coxinet.net

31