No. CIV-08-326-HE

_____

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA
_____

### RICHARD GLOSSIP,

Petitioner,

-vs-

### RANDALL WORKMAN, Warden,
Oklahoma State Penitentiary

Respondent.

_____

## RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS
_____

### W.A. DREW EDMONDSON
### ATTORNEY GENERAL OF OKLAHOMA

### SETH S. BRANHAM, OBA #18019
### ASSISTANT ATTORNEY GENERAL

### 313 NE 21st Street
### Oklahoma City, OK  73105
### (405) 521-3921; (405) 522-4534 (FAX)
### fhc.docket@oag.state.ok.us
### ATTORNEYS FOR RESPONDENT

_____

**JANUARY 20, 2009**

# <u>TABLE OF CONTENTS</u>

**Page**

RULE 5 STATEMENT AND HISTORY OF THE CASE............................................. 1

STANDARD OF REVIEW. ........................................................................... 3

STATEMENT OF FACTS............................................................................. 7

ARGUMENT AND AUTHORITY. .................................................................. 12

### I.

SUFFICIENT EVIDENCE WAS PRESENTED TO SUPPORT PETITIONER'S CONVICTION FOR THE FIRST DEGREE MALICE MURDER OF BARRY VAN TREESE............................................................................. 12

   A.    Exhaustion. ................................................................ 12

   B.    Merits. ...................................................................... 14

### II.

NO FEDERAL CONSTITUTIONAL VIOLATION STEMS FROM THE LITANY OF STATE LAW EVIDENTIARY RULINGS CHALLENGED BY PETITIONER. .................................. 22

   A.    Exhaustion. ................................................................ 23

   B.    Merits. ...................................................................... 24

### III.

PETITIONER'S FEDERAL CONSTITUTIONAL CHALLENGE TO THE PROSECUTOR'S USE OF DEMONSTRATIVE EXHIBITS AT TRIAL IS UNEXHAUSTED AND PROCEDURALLY BARRED FROM REVIEW. ...................................................................... 33

A.      Exhaustion. ........................................................................... 33

B.      Alternative Merits Analysis. ................................................. 37

## IV.

### PETITIONER IS NOT ENTITLED TO RELIEF BASED ON ALLEGED PROSECUTORIAL MISCONDUCT. ........................ 46

A.      Exhaustion. ........................................................................... 46

B.      Merits. .................................................................................. 46

## V.

### PETITIONER IS NOT ENTITLED TO RELIEF BASED ON ALLEGED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL. ................................................................................. 61

A.      Exhaustion. ........................................................................... 62

B.      Merits. .................................................................................. 62

## VI.

### SUFFICIENT EVIDENCE WAS PRESENTED TO SUPPORT THE MURDER FOR REMUNERATION AGGRAVATING CIRCUMSTANCE. .................................. 76

A.      Exhaustion. ........................................................................... 76

B.      Merits. .................................................................................. 76

## VII.

### PETITIONER'S CONSTITUTIONAL CHALLENGE TO OKLAHOMA'S WEIGHING INSTRUCTION DOES NOT WARRANT HABEAS RELIEF. ............................................. 83

A.      Exhaustion. ........................................................................... 83

**B.**     **Merits.** ................................................................................. **84**

## VIII.

**THE VICTIM IMPACT TESTIMONY DID NOT DENY
PETITIONER A FUNDAMENTALLY FAIR TRIAL IN
VIOLATION OF DUE PROCESS** ........................................... **91**

**A.**     **Exhaustion.** ......................................................................... **92**

**B.**     **Merits.** ................................................................................. **93**

## IX.

**PETITIONER IS NOT ENTITLED TO HABEAS RELIEF
BASED ON THE TRIAL COURT'S REMOVAL FOR
CAUSE OF SEVERAL PROSPECTIVE JURORS.** .............. **97**

**A.**     **Exhaustion.** ......................................................................... **98**

**B.**     **Merits.** ................................................................................. **98**

## X.

**ADMISSION OF AN IN-LIFE PHOTOGRAPH DURING
GUILT-STAGE DID NOT DEPRIVE PETITIONER OF A
FAIR TRIAL.** ........................................................................ **111**

**A.**     **Exhaustion.** ....................................................................... **111**

**B.**     **Merits.** ............................................................................... **112**

## XI.

**TRIAL COUNSEL WERE NOT INEFFECTIVE FOR
FAILING TO IMPEACH JUSTIN SNEED'S TESTIMONY
WITH INFORMATION FROM SNEED'S 1997 COURT-
ORDERED COMPETENCY REPORT AND APPELLATE
COUNSEL WERE NOT INEFFECTIVE FOR FAILING
TO RAISE THIS ISSUE.** ...................................................... **122**

**A.**     **Exhaustion.** ................................................................................. **122**

**B.**     **Merits.** ......................................................................................... **123**

### XII.

**TRIAL COUNSEL WERE NOT INEFFECTIVE FOR FAILING TO ALLEGE JUDICIAL BIAS AND APPELLATE COUNSEL WERE NOT INEFFECTIVE FOR FAILING TO RAISE THIS ISSUE** ............................................ **129**

**A.**     **Exhaustion.** ................................................................................. **129**

**B.**     **Merits.** ......................................................................................... **129**

### XIII.

**PETITIONER'S UNDEVELOPED, MERITLESS CUMULATIVE ERROR CLAIM.** ........................................................ **134**

**A.**     **Exhaustion.** ................................................................................. **134**

**B.**     **Merits.** ......................................................................................... **134**

**MOTION FOR EVIDENTIARY HEARING.** ............................................. **136**

**CONCLUSION.** .............................................................................................. **142**

**CERTIFICATE OF SERVICE.** .................................................................... **143**

# TABLE OF AUTHORITIES

## FEDERAL CASES CITED

**Anderson v. Harless,**
459 U.S. 4 (1982)................................................................. 13

**Apprendi v. New Jersey,**
530 U.S. 466 (2000)............................................................. 83

**Aycox v.  Lytle,**
196 F.3d 1174 (10th Cir. 1999)........................................... 123

**Barclay v. Florida,**
463 U.S. 939 (1983)............................................................. 88

**Bell v. Cone,**
535 U.S. 685 (2002).............................................................. 6

**Bland v. Sirmons,**
459 F.3d 999 (10th Cir. 2006)...................................... *passim*

**Boltz v. Mullin,**
415 F.3d 1215 (10th Cir. 2005)............................................ 79

**Booth v. Maryland,**
482 U.S. 496 (1987)............................................................. 91

**Bracy v. Gramley,**
520 U.S. 899 (1997)........................................................... 132

**Brecheen v. Reynolds,**
41 F.3d 1343 (10th Cir. 1994)....................................... 35, 36

**Brecht v. Abrahamson,**
507 U.S. 619 (1993)............................................. 45, 114, 115

**Brown v. Collins,**
937 F.2d 175 (5th Cir. 1991)............................................... 21

v

**Brown v. Payton,**
    544 U.S. 133 (2005). ........................................................................ 78

**Brown v. Sirmons,**
    515 F.3d 1072 (10th Cir. 2008). ...................................................... 44

**Bullock v. Carver,**
    297 F.3d 1036 (10th Cir. 2002). .................................................... 121

**Burton v. Johnson,**
    948 F.2d 1150 (10th Cir. 1991). .................................................... 109

**Calderon v. Thompson,**
    523 U.S. 538 (1998). ........................................................................ 37

**Cannon v. Gibson,**
    259 F.3d 1253 (10th Cir. 2001). ................................................ 34, 35

**Cannon v. Mullin,**
    383 F.3d 1152 (10th Cir. 2004). .................................................... 141

**Chapman v. California,**
    386 U.S. 18 (1967) .................................................................. 44, 136

**Chapman v. LeMaster,**
    302 F.3d 1189 (10th Cir. 2002). ...................................................... 94

**City of Chicago v. Morales,**
    527 U.S. 41 (1999) ........................................................................ 114

**Coleman v. Thompson,**
    501 U.S. 722 (1991). ................................................................ 34, 35

**Cook v. McKune,**
    323 F.3d 825 (10th Cir. 2003). .................................................. 78, 84

**Cooks v. Ward,**
    165 F.3d 1283 (10th Cir.1998). ...................................................... 63

**Crawley v. Dinwiddie,**
    533 F.3d 1226 (10th Cir. 2008)................................................ 38, 39, 40, 89, 112

**Cummings v. Sirmons,**
    506 F.3d 1211 (10th Cir. 2007)................................................ 34, 35, 37

**Cunningham v. California,**
    549 U.S. 270 (2007)................................................................ 88

**Darden v. Wainwright,**
    447 U.S. 168 (1986)............................................. 23, 48, 103, 107

**Darks v. Mullin,**
    327 F.3d 1001 (10th Cir. 2003)........................................... 135

**Demarest v. Price,**
    130 F.3d 922 (10th Cir. 1997)............................................. 35

**Doctor John's, Inc. v. City of Roy,**
    465 F.3d 1150 (10th Cir. 2006)........................................... 114

**Donnelly v. DeChristoforo,**
    416 U.S. 637 (1974).............................................................. 47

**Dowling v. United States,**
    493 U.S. 342 (1990)....................................................... 45, 119

**Duckett v. Mullin,**
    306 F.3d 982 (10th Cir. 2002)....................................... 44, 54

**Early v. Packer,**
    537 U.S. 3 (2002).................................................................. 78

**English v. Cody,**
    146 F.3d 1257 (10th Cir. 1999)............................................. 34

**Estelle v. McGuire,**
    502 U.S. 62 (1991)......................................................... 45, 112, 121

**Fero v. Kerby,**
    39 F.3d 1462 (10th Cir. 1994). ............................................................... 46, 132, 133

**Fields v. Gibson,**
    277 F.3d 1203 (10th Cir. 2002). .................................................................... 79

**Foster v. Ward,**
    182 F.3d 1177 (10th Cir. 1999). ................................................................. 21, 22

**Fry v. Pliler,**
    551 U.S. 112, 127 S. Ct. 2321 (2007). ......................................... 44, 114, 121, 136

**Gilson v. State,**
    520 F.3d 1196 (10th Cir. 2008). .................................................................... 94

**Glossip v. Oklahoma,    U.S.   ,**
    128 S. Ct. 1124 (2008). ............................................................................... 2

**Hale v. Gibson,**
    227 F.3d 1298 (10th Cir. 2000). .................................................................... 34

**Harrington v. Nix,**
    983 F.2d 872 (8th Cir. 1993). ....................................................................... 21

**Harris v. Poppell,**
    411 F.3d 1189 (10th Cir. 2005). .................................................................... 48

**Hawkins v. Mullin,**
    291 F.3d 658 (10th Cir. 2002). ...................................................................... 85

**Henderson v. Norris,**
    118 F.3d 1283 (8th Cir. 1997). .................................................................... 135

**Hicks v. Oklahoma,**
    447 U.S. 343 (1980). ............................................................... 13, 23, 83, 84, 91

**House v. Hatch,**
    527 F.3d 1010 (10th Cir. 2008). ........................................................... *passim*

**Illinois v. Krull,**
    480 U.S. 340 (1987). ........................................................................... 119

**Jackson v. Shanks,**
    143 F.3d 1313 (10th Cir. 1998). ....................................................... 115

**Jackson v. Virginia,**
    443 U.S. 307 (1979). .............................................................. 12, 14, 79

**Jones v. Barnes,**
    463 U.S. 745 (1983). ........................................................................ 123

**Jones v. United States,**
    526 U.S. 227 (1999). .......................................................................... 83

**Kansas v. Marsh,**
    548 U.S. 163 (2006). ................................................................... 88, 89

**Klein v. Neal,**
    45 F.3d 1395 (10th Cir. 1995). .................................................... 35, 36

**Lawrence v. Texas,**
    539 U.S. 558 (2003). ........................................................................ 113

**Le v. Mullin,**
    311 F.3d 1002 (10th Cir. 2002). ....................................................... 78

**Lewis v. Jeffers,**
    497 U.S. 764 (1990). .......................................................................... 78

**Lindh v. Murphy,**
    521 U.S. 320 (1997). ............................................................................ 3

**Lorraine v. Coyler,**
    291 F.3d 416 (6th Cir.  2002). ........................................................ 134

**Malicoat v. Mullin,**
    426 F.3d 1241 (10th Cir. 2005). ................................................. 47, 59

**Matthews v. Price,**
    83 F.3d 328 (10th Cir. 1996). .............................................................. 24

**Mayes v. Gibson,**
    210 F.3d 1284 (10th Cir. 2000). .......................................................... 137

**Medlock v. Ward,**
    200 F.3d 1314 (10th Cir. 2000). ..................................................... 34, 35

**Miller v. Mullin,**
    354 F.3d 1288 (10th Cir. 2004). .......................................................... 40

**Mollett v. Mullin,**
    348 F.3d 902 (10th Cir. 2003). ............................................................ 59

**Montana v. Egelhoff,**
    518 U.S. 37 (1996). ........................................................................... 119

**Moore v. Reynolds,**
    153 F.3d 1086 (10th Cir. 1998). .......................................................... 35

**Morgan v. Illinois,**
    504 U.S. 719 (1992). ......................................................................... 107

**Mu'Min v. Virginia,**
    500 U.S. 415 (1991). ......................................................................... 103

**Murray v. Carrier,**
    477 U.S. 478 (1986). ..................................................................... 35, 36

**Neill v. Gibson,**
    278 F.3d 1044 (10th Cir. 2001). ................................................... 34, 135

**Parker v. Scott,**
    394 F.3d 1302 (10th Cir. 2005). ................................................... 85, 94

**Patterson v. New York,**
    432 U.S. 197 (1977). ......................................................................... 119

**Paxton v. Ward,**
    199 F.3d 1197 (10th Cir. 1999)................................................................ 47

**Payne v. Tennessee,**
    501 U.S. 808 (1991)................................................................. 91, 96, 115

**Payne v. Tennessee,**
    501 U.S. 808 (1991)........................................................................... 115

**Ring v. Arizona,**
    536 U.S. 584 (2002)............................................................ 83, 84, 87, 90

**Ristaino v. Ross,**
    424 U.S. 589 (1976)........................................................................... 107

**Romano v. Gibson,**
    239 F.3d 1156 (10th Cir. 2001)........................................................ 21, 24

**Romano v. Gibson,**
    278 F.3d 1145 (10th Cir. 2002).................................................... 138, 141

**Sallahdin v. Mullin,**
    275 F.3d 1211 (10th Cir. 2002)............................... 59, 102, 103, 109, 111

**Sandoval v. Ulibarri,**
    548 F.3d 902 (10th Cir. 2008)..................................... 63, 123, 129

**Schlup v. Delo,**
    513 U.S. 298 (1995)............................................................................. 36

**Schriro v. Landrigan,**
    550 U.S. 465, 127 S. Ct. 1933 (2007). .............................................. 137

**Scott v. Jones,**
    915 F.2d 1188 (8th Cir. 1990)........................................................... 135

**Scrivener v. Tansy,**
    68 F.3d 1234 (10th Cir. 1995)............................................................ 21

**Smith v. Robbins,**
        528 U.S. 259 (2000). ................................................................... 123, 128

**Spears v. Mullin,**
        343 F.3d 1215 (10th Cir. 2003). ............................................... 14, 34

**Strickland v. Washington,**
        466 U.S. 668 (1984). ...................................................... 62, 63, 75, 128

**Thomas v. Gibson,**
        218 F.3d 1213 (10th Cir. 2000). ........................................................ 35

**Thornburg v. Mullin,**
        422 F.3d 1113 (10th Cir. 2005). ........................................... 47, 59, 78

**Tillman v. Cook,**
        215 F.3d 1116 (10th Cir. 2000). ...................................................... 48

**Torres v. Lytle,**
        461 F.3d 1303 (10th Cir. 2006). ...................................................... 15

**Trice v. Ward,**
        196 F.3d 1151 (10th Cir. 1999). ...................................................... 48

**Troxel v. Granville,**
        530 U.S. 57 (2000) ........................................................................ 113

**Tuilaepa v. California,**
        512 U.S. 967 (1994). ............................................................... 87, 88

**Tumey v. Ohio,**
        273 U.S. 510 (1927). .................................................................... 132

**Turner v. Quarterman,**
        481 F.3d 292 (5th Cir. 2007). ......................................................... 88

**United States v. Barrett,**
        496 F.3d 1079 (10th Cir. 2007). ........................................... 85, 86, 94

**United States v. Booker,**
     **543 U.S. 220 (2005).** .............................................................................. **88**

**United States v. Castillo,**
     **140 F.3d 874 (10th Cir. 1999).** ........................................... **114, 117, 120**

**United States v. Fields,**
     **483 F.3d 313 (5th Cir. 2007).** ........................................................... **85**

**United States v. Grandison,**
     **780 F.2d 425 (4th Cir. 1985).** ......................................................... **118**

**United States v. Joe,**
     **8 F.3d 1488 (10th Cir. 1993).** ................................................... **118, 120**

**United States v. Mendes,**
     **912 F.2d 434 (10th Cir. 1990).** ........................................................ **120**

**United States v. Pettigrew,**
     **468 F.3d 626 (10th Cir. 2006).** ................................................. **118, 120**

**United States v. Purkey,**
     **428 F.3d 738 (8th Cir. 2005).** ........................................................... **85**

**United States  v. Rivera,**
     **900 F.2d 1462 (10th Cir. 1990).** ................................................. **44, 115**

**United States v. Russell,**
     **411 U.S. 423 (1973).** ....................................................................... **115**

**United States v. Salerno,**
     **481 U.S. 739 (1987).** ............................................................. **113, 114**

**United States v. Sampson,**
     **486 F.3d 13 (1st Cir. 2007)** .............................................................. **85**

**Uttecht v. Brown,**
     **551 U.S. 1, 127 S. Ct. 2218 (2007).** ..................................... **99, 100, 109**

**Valdez v. Ward,**
    219 F.3d 1222 (10th Cir. 2000)............................................................ 14

**Wainwright v. Witt,**
    469 U.S. 412 (1985)............................................................................ 98

**Walton v. Arizona,**
    497 U.S. 639 (1990)............................................................................ 89

**Washington v. Glucksburg,**
    521 U.S. 702 (1997).......................................................................... 113

**Weeks v. Angelone,**
    528 U.S. 225 (2000).......................................................................... 120

**Welch v. Sirmons,**
    451 F.3d 675 (10th Cir. 2006)................................................... *passim*

**Williams v. Taylor,**
    529 U.S. 362 (2000)................................................................... *passim*

**Wilson v. Sirmons,**
    536 F.3d 1064 (10th Cir. 2008)................................... 94, 95, 102

**Wilson v. Sirmons,**
    549 F.3d 1267 (10th Cir. 2008)............................................... 65

**Woodson v. North Carolina,**
    428 U.S. 280 (1976)............................................................................ 23

**Young v. Sirmons,**
    486 F.3d 655 (10th Cir.  2007)..................................................... 14, 15

## STATE CASES CITED

**Black v. State,**
    2001 OK CR 5, 21 P.3d  1047........................................................... 49

**Boyd v. State,**
    663 S.E.2d 218 (Ga. 2008).............................................................. 118

**Byrne v. State,**
    1971 OK CR 100, 482 P.2d 620.................................................................. 44

**Coddington v. State,**
    2006 OK CR 34, 142 P.3d 437........................................................... 15, 116

**Com. v. Degro,**
    733 N.E.2d 1024 (Mass. 2000). ............................................................ 117

**Com. v. Roney,**
    866 A.2d 351 (Pa. 2005). ...................................................................... 86

**Com. v. Santiago,**
    681 N.E.2d 1205 (Mass. 1997). ............................................................ 117

**Frederick v. State,**
    2001 OK CR 34, 37 P.2d 908................................................................. 97

**Glossip v. State,,**
    2001 OK CR 21, 29 P.3d at 599............................................................ 22

**Glossip v. State,**
    2007 OK CR 12, 157 P.3d 143.................................................... *passim*

**Glossip v. State,**
    Case No. PCD-2004-978 (Okla. Crim. App. Dec. 6, 2007)................................. 3

**Glossip v. State,**
    No. PCD-2004-978 (Okla. Crim. App. Dec. 6, 2007)............... 122, 129, 134, 138

**Graham v. State,**
    2001 OK CR 18, 27 P.3d 1026................................................................ 53

**Grandison v. State,**
    889 A.2d 366 (Md. 2005)....................................................................... 86

**Grant v. State,**
    2003 OK CR 2, 58 P.3d 783.................................................................... 91

**Hogan v. State,**
     2006 OK CR 19, 139 P.3d 907 ............................................................. 116

**Johnson v. State,**
     1995 OK CR 62, 911 P.2d 918 ............................................................... 81

**Lott v. State,**
     2004 OK CR 27, 98 P.3d 318 ................................................................. 92

**Marshall v. State,**
     1998 OK CR 30, 963 P.2d 1 ................................................................... 42

**Matthews v. Sirmons,**
     2007 WL 2286239 (W.D. Okla. Aug. 6, 2007) .................................... 85

**Ortiz v. State,**
     869 A.2d 285 (Del. 2005) ...................................................................... 86

**People v. Harris,**
     866 N.E.2d 162 (Ill. 2007) ..................................................................... 85

**People v. Manriquez,**
     123 P.3d 614 (Cal. 2005) ....................................................................... 86

**Plantz v. State,**
     1994 OK CR 33, 876 P.2d 268 ......................................................... 81, 82

**Ross v. Parker,**
     No. CIV-08-33-C, 2008 WL 2951071 (W.D. Okla. Jul 28, 2008). ................. 133

**State v. Barker,**
     826 N.E.2d 648 (Ind. 2005) ................................................................... 86

**State v. Broberg,**
     677 A.2d 602 (Md. 1996) ..................................................................... 118

**State v. Carney,**
     649 N.W.2d 455 (Minn. 2002) ............................................................ 117

**State v. Doerr,**
  969 P.2d 1168 (Ariz. 1998)........................................................ 117

**State v. Ellison,**
  140 P.3d 899 (Ariz. 2006)........................................................ 116

**State v. Fry,**
  126 P.3d 516 (N.M. 2005)........................................................... 86

**State v. Gales,**
  694 N.W.2d 124 (Neb. 2005)....................................................... 86

**State v. Longo,**
  148 P.3d 892 (Or. 2006). ............................................................ 86

**State v. Thomason,**
  2001 OK CR 27, 33 P.3d 930...................................................... 119

**State v. Waldron,**
  624 S.E.2d 887 (W. Va. 2005)..................................................... 118

**State v. Williams,**
  828 P.2d 1006 (Or. 1992). .......................................................... 118

**Torres v. State,**
  2002 OK CR 35, 58 P.3d 214............................................. 85, 87, 88

**Wackerly v. State,**
  2000 OK CR 15, 12 P.3d 1............................................................ 44

**Young v. Sirmons, ___ F.3d ___,**
  2008 WL 5220520 (10th Cir. 2008).................................. 135, 136, 137

## FEDERAL STATUTES CITED

18 U.S.C. §§ 3591-98. ...................................................................... 86

21 U.S.C. § 848................................................................................. 86

28 U.S.C. § 2254...................................................................... *passim*

## FEDERAL RULES CITED

Fed. R. Civ. P. 25. ........................................................................................ 1

Fed. R. Evid. 403. ...................................................................................... 117

Fed. R. Evid. 414. ...................................................................................... 117

Fed. R. Evid. 606. ...................................................................................... 124

Fed. R. Evid. 801-02. .......................................................................... 119, 131

## STATE STATUTES CITED

Okla. Stat. tit. 12, §§ 2401-03. ................................................................. 23

Okla. Stat. tit. 12, § 2403. ....................................................................... 111

12 O.S.Supp.2002, § 2606. ....................................................................... 124

Okla. Stat. tit. 12, § 2611. ......................................................................... 40

Okla. Stat. tit. 12, § 2615. ......................................................................... 42

Okla. Stat. tit. 12, § 2403. ....................................................................... 116

Okla. Stat. tit. 21, § 701.7. ........................................................................ 15

Okla. Stat. tit. 21, §§ 701.11. ............................................................... 85, 87

21 O.S.2001, § 701.12. ............................................................................... 77

Okla. Stat. tit. 21, § 701.12. ............................................................. 2, 81, 85

Okla. Stat. tit. 22, § 1086. ......................................................................... 34

Okla. Stat. tit. 22, § 1089. ......................................................................... 34

## **<u>OTHER</u>**

**Okla. Const. art. 15, §§ 1-2**.......................................................................................... **119**

## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **RICHARD GLOSSIP,** | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | )   Case No.  CIV-08-326-HE |
| | ) |
| **RANDALL WORKMAN, Warden,** | ) |
| **Oklahoma State Penitentiary,**[1] | ) |
| | ) |
| Respondent. | ) |

## RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS

COMES NOW the Attorney General of Oklahoma, W.A. Drew Edmondson, by and through Seth S. Branham, Assistant Attorney General, appearing on behalf of the Respondent, Randall Workman, Warden, Oklahoma State Penitentiary, and submits this response to the *Petition for Writ of Habeas Corpus* filed on behalf of Petitioner in this case. Doc. 25.

## RULE 5 STATEMENT AND HISTORY OF THE CASE

1.      Petitioner, Richard Glossip, an inmate in state custody at the Oklahoma State Penitentiary, McAlester, Oklahoma, was tried by jury in May and June 2004 for the murder of Barry Van Treese in Case No. CF-97-244, in the District Court of Oklahoma County before the Honorable Twyla Mason Gray, District Judge.  The jury found Petitioner guilty

---

[1]  Randall Workman replaced Marty Sirmons as Warden of Oklahoma State Penitentiary on December 15, 2008.  Fed. R. Civ. P. 25(d).

of first degree malice murder as charged in the Information. *Glossip v. State*, 2007 OK CR 12, ¶ 1, 157 P.3d 143, 147.

2.      During a separate penalty phase, the jury found the existence of one aggravating circumstance, namely, that Petitioner committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration. Okla. Stat. tit. 21, § 701.12(3). Petitioner was sentenced to death by the jury.  The trial court sentenced Petitioner in accordance with the jury's recommendations. *Glossip*, 2007 OK CR 12, ¶ 2, 157 P.3d at 147.

3.      The 2004 guilty verdict and death sentence against Petitioner constituted the second time Petitioner was convicted and sentenced to death for the Van Treese murder. Petitioner's murder conviction and death sentence from his first trial, held in 1998, were reversed by the Oklahoma Court of Criminal Appeals (OCCA) on direct appeal based on ineffective assistance of trial counsel. *Id.*, 2007 OK CR 12, ¶ 2, 157 P.3d at 147 n.1 (citing *Glossip v. State*, 2001 OK CR 21, 29 P.3d 597).

4.      On April 13, 2007, Petitioner's conviction and death sentence were affirmed on direct appeal in Case No. D-2005-310 by the OCCA in a published decision. *Id.*, 2007 OK CR 12, ¶ 134, 157 P.3d at 164.  Rehearing was denied on June 1, 2007.  The United States Supreme Court denied certiorari review on January 22, 2008. *Glossip v. Oklahoma*, __U.S.__, 128 S. Ct. 1124 (2008).

5.     The OCCA denied Petitioner's original application for state post-conviction relief in an unpublished decision. *Glossip v. State*, Case No. PCD-2004-978 (Okla. Crim. App. Dec. 6, 2007).  *See* Doc. 26, Att. 1.

6.     The claims presented in this petition are exhausted, except as noted below.

7.     Respondent is filing simultaneously with this response a motion with the OCCA to cause the state court record, including trial transcripts, to be transmitted to this Court.  Doc. 37.  Respondent is unaware of any proceedings that have been recorded but not transcribed.

## STANDARD OF REVIEW

Petitioner's petition for federal habeas corpus relief was filed with this Court on November 3, 2008, and is therefore governed by the amended provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which includes the standard of review provisions of 28 U.S.C. § 2254(d).  *Lindh v. Murphy*, 521 U.S. 320, 336 (1997).  Under amended 28 U.S.C. § 2254(d), an application for a writ of habeas corpus shall not be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication of the claim:

> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;  or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1) & (2).   Moreover, state court determinations of fact "shall be presumed correct" unless the defendant rebuts that presumption by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

The Supreme Court has construed the review standard set forth in subsection (d)(1). *See Williams v. Taylor*, 529 U.S. 362 (2000).  When applying subsection (d)(1), the Court stated the threshold question is whether the petitioner seeks to apply a rule of law that was "clearly established" by the Supreme Court at the time the conviction became final.[2]  *See id.* at 390 (Stevens, J., writing for the Court).  *See also House v. Hatch*, 527 F.3d 1010, 1015 (10th Cir. 2008) (reiterating that "[w]hether the law is clearly established is *the* threshold question under § 2254(d)(1)").  This threshold inquiry is analytically dispositive of the § 2254(d) analysis.  *Id.* at 1017.  "That is, without clearly established federal law, a federal habeas court need not assess whether a state courts decision was 'contrary to' or involved an 'unreasonable application' of such law."  *Id.*  Recent decisions from the Supreme Court establish "that Supreme Court holdings–the exclusive touchstone for clearly established federal law–must be construed narrowly and consist only of something akin to on-point holdings."  *House*, 527 F.3d at 1015.  As explained by the Tenth Circuit, "clearly established law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case sub judice.  Although the legal rule at issue need not have had its

---

[2]     This clause "refers to the holdings, as opposed to the dicta, of th[e Supreme] Court's decisions as of the time of the relevant state-court decision."  *See Williams*, 529 U.S. at 412 (O'Connor, J., writing for the Court).

genesis in the closely-related or similar factual context, the Supreme Court must have expressly extended the legal rule to that context." *Id.* at 1016.

If clearly established Supreme Court precedent governs the claim at issue, the reviewing court must then proceed to a bifurcated inquiry. *Williams,* 529 U.S. at 404-05 (O'Connor, J., writing for the Court) (subsection (d)(1) "defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court"). The reviewing court must first determine whether the state court's decision was contrary to clearly established Federal law. The "contrary to" clause of subsection (d)(1) is fulfilled where the state court applied a rule that was "diametrically different [from], opposite in character or nature, or mutually opposed" to a maxim of law as stated by the Supreme Court. *Id.* at 404-06. The "contrary to" clause is also satisfied where the state court is confronted with a set of facts which are "materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Id.*

The reviewing court must next ask whether the state court's determination involved an unreasonable application of clearly established Federal law. *See id.* at 406-07. The "unreasonable application" clause of subsection (d)(1) applies in two scenarios: first, where the "state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case,"; second, where the "state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle

to a new context where it should apply," *Id.* at 407.  In either scenario the reviewing habeas court must determine whether the state court's application of Supreme Court precedent to the case at bar was "reasonable."  *See id.* at 409-10.

The Supreme Court refrained from defining the term "reasonable" as it is used in AEDPA, other than to note that while it is "difficult to define," it is "a common term in the legal world and, accordingly, federal judges are familiar with its meaning." *Id.* at 410.  The Court did instruct that the reasonableness determination is an objective inquiry, not a subjective one.  *See id.* at 409-10.  Thus, the fact that one court or even a few courts have applied the precedent in the same manner to close facts does not make the state court decision "reasonable."   Further, the Supreme Court "stressed in *Williams* that an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 694 (2002).  Therefore, a federal habeas court may not issue a writ under the unreasonable application clause "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly".  *Id*.  According to the Tenth Circuit, "the AEDPA's conception of objective reasonableness lies 'somewhere between clearly erroneous and unreasonable to all reasonable jurists." *House*, 527 F.3d at 1019 (quoting *Maynard v. Boone*, 468 F.3d 665, 670 (10th Cir. 2006)).  Thus, "only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254." *Id.* (quoting *Maynard*, 468 F.3d at 671).

## STATEMENT OF FACTS

The facts relevant to Petitioner's convictions are referenced in the OCCA's published decision on direct appeal. *Glossip*, 2007 OK CR 12, ¶¶ 3-24, 157 P.3d at -147-50.  The State incorporates that discussion here, cognizant that the OCCA's factual determinations are presumed correct under the AEDPA (*See* 28 U.S.C. 2254(e)(1)):

> ¶ 3 In January of 1997, Richard Glossip worked as the manager of the Best Budget Inn in Oklahoma City, and he lived on the premises with his girlfriend D-Anna Wood. Justin Sneed, who admitted killing Barry Van Treese, was hired by Glossip to do maintenance work at the motel.

> ¶ 4 Barry Van Treese, the murder victim, owned this Best Budget Inn and one in Tulsa. He periodically drove from his home in Lawton, Oklahoma to both motels. The Van Treese family had a series of tragedies during the last six months of 1996, so Mr. Van Treese was only able to make overnight visits to the motel four times in that time span. His usual habit was to visit the motel every two weeks to pickup the receipts, inspect the motel, and make payroll.

> ¶ 5 The State presented testimony about the physical condition, financial condition, and the day to day operations of the motel. At the beginning of 1997, Mr. Van Treese decided to do an audit of both motels after it was determined that there were shortfalls. Before Mr. Van Treese left for Oklahoma City, Donna Van Treese, Barry's wife, calculated Glossip's net pay at $429.33 for the period ending January 5[th], 1997, because Glossip had $211.15 in draws.[1] On January 6, 1997, she and Mr. Van Treese reviewed the books and discovered $6,101.92 in shortages for the Oklahoma City motel in 1996. Mrs. Van Treese testified her husband intended to ask Glossip about the shortages.  [fn.1 Glossip's salary was $1,500.00 per month, which was divided twice monthly.   The net amount was after other usual deductions.]

7

¶ 6 Sometime in December, Mr. Van Treese told Billye Hooper, the day desk manager, that he knew things needed to be taken care of, and he would take care of them the first of January. Hooper believed Van Treese was referring to Glossip's management of the motel.

¶ 7 Justin Sneed, by all accounts, had placed himself in a position where he was totally dependent on Glossip. Sneed started living at the motel when he came to Oklahoma City with a roofing crew from Texas. Sneed quit the roofing crew and became a maintenance worker at the motel. He made no money for his services, but Glossip provided him with a room and food. Sneed admitted killing Mr. Van Treese because Glossip offered him money to do it. The events leading up to the killing began with Van Treese's arrival at the motel on January 6.

¶ 8 Van Treese arrived at the Best Budget Inn in Oklahoma City on January 6, 1997, around 5:30 p.m. Around 8:00 or 9:00 p.m., Van Treese left Oklahoma City to go to the Tulsa Best Budget Inn to make payroll and collect deposits and receipts. Hooper testified Van Treese was not upset with Glossip and did not say anything to her about shortages before he left for Tulsa. Van Treese did tell Hooper he planned to stay for a week to help remodel rooms.

¶ 9 William Bender, the manager of the Tulsa motel, testified that Mr. Van Treese was very upset. He had never seen him that angry. Van Treese inspected the daily report for the motel, and he checked to see if the daily report matched rooms actually occupied. He told Bender that there were missing registration cards, missing receipts and unregistered occupants at the Oklahoma City motel.

¶ 10 He told Bender that he told Glossip that he had until Van Treese arrived back at Oklahoma City to come up with the missing receipts. Then he was going to give Glossip another week to come up with the missing registration cards and to get the receipts in order. He also told Bender that if Glossip were

fired Bender would manage the Oklahoma City motel. Van Treese left the Tulsa motel and arrived back at the Oklahoma City motel at about 2:00 a.m. on January 7.

¶ 11 Sneed, also known as Justin Taylor, testified that in exchange for maintenance work, Glossip let him stay in one of the motel rooms. Sneed said he only met Van Treese a few times, and he saw him at the motel with Glossip on the evening of January 6, 1997. Sneed testified that around 3:00 a.m. on January 7, 1997, Glossip came to his room. Glossip was nervous and jittery. Glossip wanted Sneed to kill Van Treese and he promised him $10,000.00 for killing Van Treese. Sneed testified that Glossip had asked him to kill Van Treese several times in the past and the amount of money kept getting bigger and bigger.

¶ 12 Glossip suggested that Sneed take a baseball bat, go into Van Treese's room (room number 102), and beat him to death while he slept. Glossip said that if Van Treese inspected the rooms in the morning, as he intended to do, he would find that none of the work had been done. Glossip told Sneed that both of them would be out of a job.

¶ 13 Sneed went over to the Sinclair Station next door and bought a soda and possibly a snack. He then went back to his room and retrieved the baseball bat. Sneed said he went to Van Treese's room and entered using a master key that Glossip had given him. Van Treese woke up and Sneed hit him with the bat. Van Treese pushed Sneed, and Sneed fell into the chair and the bat hit and broke the window. When Van Treese tried to get away, Sneed threw him to the floor and hit him ten or fifteen times. Sneed also said that he pulled out a knife and tried to stab Van Treese a couple of times, but the knife would not penetrate Van Treese. Sneed received a black eye in the fight with Van Treese. He later told others that he fell in the shower and hit his eye.

¶ 14 A long time resident of the motel, John Beavers, was walking outside when heard strange noises coming from room 102. He then heard the glass breaking. Beavers believed there was a fight going on in room 102.

¶ 15 After Sneed killed Van Treese he went to the office and told Glossip he had killed Van Treese. He also told him about the broken window. Sneed said that he and Glossip went to room 102 to make sure Van Treese was dead. Glossip took a $100 bill from Van Treese's wallet.

¶ 16 Glossip told Sneed to drive Van Treese's car to a nearby parking lot, and the money he was looking for would be in an envelope under the seat. Glossip also told him to pick up the glass that had fallen on the sidewalk.

¶ 17 Sneed retrieved the car keys from Van Treese's pants and drove Van Treese's car to the credit union parking lot. He found an envelope with about $4000.00 cash under the seat. He came back and swept up the glass. He put the broken glass in room 102, just inside the door. He said that Glossip took the envelope from him and divided the money with him. He also testified that Glossip helped him put a shower curtain over the window, and he helped him cover Van Treese's body. According to Sneed, Glossip told him, that if anyone asked, two drunks got into a fight, broke the glass, and we ran them off. Sneed testified that Glossip told him to go buy a piece of Plexiglas for the window, and some Muriatic acid, a hacksaw, and some trash bags in order to dispose of Van Treese's body.

¶ 18 D-Anna Wood testified that she and Glossip were awakened at around 4:00 a.m. by Sneed. She testified that Glossip got out of bed and went to the front door. When he returned, Glossip told her that it was Sneed reporting that two drunks got into a fight and broke a window. She testified that Glossip then returned to bed.

¶ 19 Glossip told police during a second interview, that Sneed told him that he killed Van Treese. He denied ever going into room 102, except for assisting with repairing the window. He said he never saw Van Treese's body in the room.

¶ 20 The next morning, Billye Hooper arrived at work and was surprised to see that Glossip was awake. She also noticed that Mr. Van Treese's car was gone. She asked Glossip about the car, and Glossip told her that Mr. Van Treese had left to get supplies for remodeling rooms. A housekeeper testified that Glossip told her to clean the upstairs rooms, and he and Sneed would take care of the downstairs, where room 102 was located.

¶ 21 Later that afternoon, employees found Mr. Van Treese's car in a credit union parking lot near the motel, and a search for Van Treese began. Glossip and D-Anna Wood were at Wal-Mart shopping. They returned to the motel, because Hooper paged them and told them to come back. The police were contacted sometime after Mr. Van Treese's car was found.

¶ 22 Cliff Everhart, who worked security for Mr. Van Treese in exchange for a 1% ownership, was already at the motel. He told Sneed to check all of the rooms. Sneed indicated that he did so. Everhart, Glossip and Wood drove around looking for Van Treese in nearby dumpsters and fields.

¶ 23 Everhart and Oklahoma City Police Sgt. Tim Brown began discussing Glossip's conflicting statements, so they decided to check room 102 on their own. At about 10:00 p.m. they discovered Van Treese's body in his room. Sneed had already left the motel that afternoon, and he was not apprehended until a week later. Glossip was taken into custody that night, questioned and released. The next day, Glossip began selling his possessions. He told people he was leaving town. However, before he could leave town, he was taken into custody again for further questioning.

¶ 24 Subsequent searches revealed that Sneed possessed approximately $1,700.00 in cash, and that Glossip possessed

approximately $1,200.00. Glossip claimed this money came from his paycheck and proceeds from the sale of vending machines and his furniture.

*Id.*

Additional facts will be presented below as necessary.

## ARGUMENT AND AUTHORITY

### I.

### SUFFICIENT EVIDENCE WAS PRESENTED TO SUPPORT PETITIONER'S CONVICTION FOR THE FIRST DEGREE MALICE MURDER OF BARRY VAN TREESE.

In his first ground for relief, Petitioner challenges the sufficiency of the evidence supporting his conviction for the first degree malice murder of Barry Van Treese. The thrust of Petitioner's argument is that the prosecution did not satisfy Oklahoma's accomplice-corroboration rule, thus, insufficient evidence was presented to support this claim. Doc. 25 at 21-65.

### A.    *Exhaustion.*

Petitioner challenged the sufficiency of the evidence supporting his first degree murder conviction in Proposition I of his direct appeal brief. Petitioner based that claim on *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) and Oklahoma law requiring accomplice testimony to be corroborated. The OCCA rejected Petitioner's sufficiency of the evidence claim, *see* 2007 OK CR 12, ¶¶ 37-53, 157 P.3d at 151-54, and it is therefore exhausted for purposes of federal habeas review.

12

To the extent Petitioner relies upon *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980) for the proposition that a criminal defendant has a federal constitutional right to statutorily-conferred rights and that "denial of those rights constitutes a violation of due process", Opening Br. at 22, this aspect of his evidentiary sufficiency challenge is unexhausted. Petitioner did not cite *Hicks*, let alone advance this particular argument, in support of his evidentiary sufficiency challenge in state court.  Rather, he relied upon *Jackson,* a state accomplice-corroboration statute and OCCA decisions interpreting that statute.  12/15/05 *Brief of Appellant* (D-2005-310) at 10-33 (Okla. Crim. App.).  In order to exhaust a federal claim, a habeas petitioner must do more than merely present "all the facts necessary to support the federal claim" to the state court or articulate a "somewhat similar state-law claim." *Bland v. Sirmons*, 459 F.3d 999, 1011 (10th Cir. 2006) (quoting *Anderson v. Harless*, 459 U.S. 4, 6 (1982)).  A claim has been exhausted when it has been "fairly presented" to the state court. *Id.* (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)).  "Fair presentation" means that the petitioner has raised the "substance" of the federal claim in state court.  *Id.* (quoting *Picard*, 404 U.S. at 278).  While a habeas petitioner is not required to cite "'book and verse on the federal constitution,'" the petitioner "cannot assert entirely different arguments from those raised before the state court." *Id.*  This aspect of the instant ground for relief is therefore unexhausted.

If Petitioner returned to state court to exhaust this claim, it would unquestionably be deemed procedurally barred on independent and adequate state law grounds because it could have been, but was not, raised in his original post-conviction application.  *Id.* at 1012

(discussing consequences for failure to exhaust under Oklahoma's post-conviction act); *Spears v. Mullin*, 343 F.3d 1215, 1253-55 (10th Cir. 2003) (adequacy discussion). Without belaboring the issue, Petitioner makes no attempt to meet the "cause and prejudice" or "miscarriage of justice" exceptions to overcome this default. As such, this aspect of his ineffectiveness claim should be deemed unexhausted and procedurally barred from review, especially considering the records-based nature of the claim. *Bland*, 459 F.3d at 1012.

The State now turns to the merits of that portion of the instant ground for relief that was actually exhausted in state court.

### B.    Merits.

Under federal law, "the relevant question [when the sufficiency of the evidence has been challenged] is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). An even more limited review is required by AEDPA where, as here, a habeas petitioner's sufficiency of the evidence challenge has already been decided on the merits in state court. *Valdez v. Ward*, 219 F.3d 1222, 1237 (10th Cir. 2000). Federal habeas relief is available only if the OCCA's adjudication of Petitioner's evidentiary sufficiency challenge resulted in a decision that was either contrary to, or an unreasonable application of, *Jackson v. Virginia* to the facts of Petitioner's case. *Spears*, 343 F.3d at 1237-38 (citing 28 U.S.C. § 2254(d)). The analysis of what a reasonable jurist could have decided about a rational juror has been described as "deference squared" by the Tenth Circuit. *Young v. Sirmons*, 486 F.3d 655, 666 n.3 (10th Cir.

2007); *Torres v. Lytle*, 461 F.3d 1303, 1313 (10th Cir. 2006).  The question before this Court is simply whether the OCCA's application of the *Jackson* standard was objectively reasonable.  *Young*, 486 F.3d at 666.

Justin Sneed's testimony, standing alone, was sufficient to support Petitioner's conviction as a principal for the first degree malice murder of Barry Van Treese.  *See Glossip*, 2007 OK CR 12, ¶ 39, 157 P.3d at 151 (discussing Oklahoma's aiding and abetting principles); Okla. Stat. tit. 21, § 701.7(A) (defining first degree malice murder under Oklahoma law); *Coddington v. State*, 2006 OK CR 34, ¶ 70, 142 P.3d 437, 456 (same). While much of the OCCA's analysis of this claim addressed whether the prosecution presented sufficient corroborating evidence to support Sneed's accomplice testimony, the Court ultimately applied the *Jackson* standard in finding that sufficient evidence was presented to support Petitioner's conviction for first degree malice murder. *Id.*, 2007 OK CR 12, ¶ 38, 157 P.3d at 151.

As noted by the OCCA, "[d]irect evidence supporting Glossip's commission of the crime came from admitted accomplice Justin Sneed."  *Glossip*, 2007 OK CR 12, ¶ 39, 157 P.3d at 151.  *See also id.*, 2007 OK CR 12, ¶¶ 37-53, 157 P.3d at 151-54 (detailing evidence supporting conviction).  Sneed testified that Petitioner promised him large sums of cash if he would kill Barry Van Treese, that on the evening before the murder, Petitioner offered him $10,000.00 if he would kill Van Treese when he returned to the motel from Tulsa.  *Id.*, 2007 OK CR 12, ¶ 43, 157 P.3d at 152.  Sneed testified that around 3:00 a.m. on January 7, 1997, Petitioner banged on the door to Room 117 and awoke him (Tr. XII 94; State's Exhibit

77).  Sneed had lived at the motel for several months and became Petitioner's close friend.

Sneed, an eighteen (18) year-old high school dropout, worked for Petitioner as a maintenance

man at the motel.  Sneed received a free room in exchange for this work but no salary.  Sneed

depended largely on Petitioner for food (Tr. VII 28; Tr. XII 44-48, 71-73).  Petitioner asked

Sneed approximately five to six (but less than ten) times previously to kill Barry Van Treese

(Tr. XII 90).  Petitioner had told Sneed that with Van Treese out of the way, Petitioner could

control both the Oklahoma City and Tulsa motels owned by Van Treese.  Petitioner claimed

that he could talk Van Treese's wife into letting him control both motels if Van Treese was

killed.  Petitioner promised Sneed money if he killed Van Treese (Tr. XII 89-90).

Once inside Room 117, Petitioner told Sneed that Van Treese had just returned to the

motel.  Petitioner appeared "real nervous, real jittery" and wanted Sneed to murder Van

Treese "right now" (Tr. XII 95).  Petitioner said that if Van Treese walked around the motel

in the morning and "seen a couple of the rooms that were already supposed to be remodeled

that weren't that [Petitioner] was going to get fired" (Tr. XII 95).  Petitioner was supposed

to have completely remodeled one of the handicapped rooms at the motel and make minor

repairs in other rooms (Tr. XII 96-97).  Petitioner threatened that Sneed too would be evicted

from the motel if Petitioner were fired (Tr. XII 95-96).  Petitioner told Sneed that Van Treese

was asleep in Room 102 (Tr. XII 98).  As he walked out of Room 117, Petitioner looked at

a baseball bat laying in Sneed's room and said "why don't [you] just grab that bat and go

over there and do it right now" (Tr. XII 96).  Petitioner urged Sneed to murder Van Treese

three or four times during this conversation (Tr. XII 98).  Petitioner promised $10,000.00 to

16

Sneed if Van Treese was killed immediately (Tr. XII 98, 167).  Petitioner also promised that

he would put Sneed in charge of one of the motels once Van Treese was dead (Tr. XII 99).

Sneed agreed to kill Van Treese and Petitioner left (Tr. XII 99-100).  After walking

to a nearby Sinclair station where he bought a soda, Sneed returned to his room, grabbed the

baseball bat and his master room key, and walked to Room 102 (Tr. XII 100-01).  When

Sneed opened the door to the darkened room, Van Treese got out of bed and started walking

towards him.  Sneed described what happened next:

> At that point I took one swing with the baseball bat. [Van
> Treese] pushed me back into a chair and when I tripped and fell
> in the chair the end of the baseball bat hit the window shattering
> the outside window, and he tried to make it to the door and I got
> up out of the chair and grabbed him by the back of his shirt,
> because I think he was sleeping in a nightshirt and pulled him
> sideways so he tripped over my feet and his own feet and put
> him on the ground.
>
> And then at one point...I took my knife out of my pocket and
> tried to force it through his chest but it didn't go, and then that
> caused him to roll over onto his stomach to where his back was
> facing the ceiling and then I hit him quite a few more times with
> the baseball bat.

(Tr. XII 101-02).  John Beavers, a motel resident who was walking through the parking lot

around 4:30 a.m., heard the breaking glass from Room 102's window.  Beavers also heard

agitated voices engaged in "clipped speech" going back and forth in the room.  Based on

what he heard, Beavers believed "there was a fight going on" (Tr. VI 20-26, 30).  Sneed

testified that he was in Room 102 for fifteen (15) or twenty (20) minutes and that he hit Van

Treese a maximum of ten times with the baseball bat (Tr. XII 112-13, 223). Sneed left the murder weapon in Room 102 (Tr. XII 119).

Once Sneed believed Van Treese was dead, he returned to Room 117 and changed out of his bloody clothes. Sneed stuffed the bloody clothes into a metal popcorn container. Sneed then went to the motel office and made contact with Petitioner (Tr. XII 117-19). Sneed told Petitioner that Van Treese was dead and that the window to Room 102 was broken (Tr. XII 120-22). Petitioner told Sneed to clean up the glass from the sidewalk in front of Room 102, to retrieve the bat from Room 102 and then to return to his motel room (Tr. XII 121-22). Sneed complied and Petitioner eventually appeared at Sneed's room (Tr. XII 123). Petitioner "was nervous" and made Sneed go with him to Room 102 to make sure that Van Treese was dead (Tr. XII 123). Once inside Room 102, Petitioner removed a one hundred dollar bill from Van Treese's wallet and pocketed it (Tr. XII 123-24). Petitioner then told Sneed to drive Van Treese's car to an adjacent parking lot at a nearby credit union, that Sneed would find the money he was promised under the front seat of Van Treese's car (Tr. XII 124). Sneed retrieved Van Treese's car keys from a pair of jeans laid over the back of a loveseat and complied with Petitioner's orders (Tr. XII 124). Sneed found an envelope with approximately $4,000.00 cash in the place described by Petitioner (Tr. XII 125-27, 129).

Petitioner met Sneed in Room 117 where they divided up the money. Petitioner took half of the cash (Tr. XII 128-29). Petitioner and Sneed returned to Room 102 and duct taped a shower curtain over the inside part of the room's window (Tr. XII 130, 132). Sneed also placed a sheet over Van Treese's body "out of respect" (Tr. XII 131). Petitioner had Sneed

turn up the air conditioner "full blast" so that Van Treese's body would not start to smell (Tr. XII 130, 132).  As they walked out of the room around dawn, Petitioner asked Sneed to break a key off in the lock.  Sneed complied and the lock's tumbler fell out (Tr. XII 130, 137). Petitioner told Sneed to tell anyone who asked about the broken window in Room 102 "that two drunks had rented the room and they had ended up breaking the window and then early in the morning we ran them off the premises (Tr. XII 136).  To keep the motel maids away from the body, Petitioner told Sneed that they would perform housekeeping on the downstairs rooms at the motel, which included Room 102 (Tr. IX 49-51; Tr. XII 138-39). Petitioner told Sneed to go to the hardware store and buy a sheet of plexiglass that would fit over the outside of the broken window.  Petitioner also told Sneed to buy some trash bags, a hacksaw and muriatic acid.  Petitioner explained that the muriatic acid and hacksaw could be used to dissolve and cut up Van Treese's body and that the remains could be disposed of in the trash bags (Tr. XII 142-46).  Sneed returned later that morning with a sheet of plexiglass, trash bags and a hacksaw–he was unable to find any muriatic acid (Tr. XII 147). Petitioner and Sneed installed the sheet of plexiglass over the outside of the broken window (Tr. XII 149, 167; State's Exhibit 30).  Petitioner spent the rest of the day lying to police and employees of the motel, providing conflicting statements  in order to steer everyone away from the crime scene and conceal the victim's body.  *Id.*, 2007 OK CR 12, ¶¶ 48-50, 157 P.3d at 153.

Once the victim's body was discovered 17 hours after the murder, Petitioner attempted to exculpate himself by shifting blame for the murder to Sneed.  When Sgt. Brown

placed Petitioner into investigative detention immediately after discovering the body, Petitioner said he always suspected Sneed had something to do with the murder but he "didn't want to say anything until he knew for sure" and that Sneed said something to Petitioner in the past about "setting up a fake robbery" (Tr. IX 233).  Petitioner also lied to homicide detectives during his first interview on January 8th around 3:00 a.m., claiming that he knew nothing about the murder or the body being in Room 102 (Tr. XIV 5-7, 85; State's Exhibit 1; Court's Exhibit 3).

The next day, Petitioner started selling his belongings, before he eventually admitted in a second interview with police to actively concealing the murder.  Petitioner told Cliff Everhart that "he was going to be moving on", then failed to show up for an appointment with homicide detectives.  He was promptly arrested and interviewed a second time during which Petitioner admitted to actively concealing the body.  *Id.*, 2007 OK CR 12, ¶ 51, 157 P.3d at 153.  Petitioner said that he lied to detectives about Sneed telling him about the killing not to protect Sneed, but because he felt like he "was involved in it."  *Id.*; (State's Exhibit 2; Court's Exhibit 4 at 16-17).

The above evidence, taken in the light most favorable to the prosecution, was sufficient to allow any rational trier of fact to find beyond a reasonable doubt that Petitioner was a principal to the murder of Barry Van Treese.  To the extent Petitioner complains on habeas, as he did on state direct review, that the prosecution failed to present adequate corroboration to satisfy Oklahoma's accomplice-corroboration rule, he is not entitled to relief.  In the context of an unpublished habeas case governed by AEDPA, the Tenth Circuit

held that "[f]ederal law does not require independent corroboration of accomplice testimony: 'a jury may convict based on the uncorroborated testimony of a co-conspirator.' The OCCA's application of the more demanding Oklahoma standard requiring independent corroboration is not contrary to the less rigorous federal standard." *Watson v. Howard*, 123 Fed. Appx. 910, 917-18 (10th Cir. 2005). Even in the pre-AEDPA context, it was well recognized that state laws requiring corroboration of accomplice testimony do not implicate federal constitutional concerns that may be addressed on habeas review. *See, e.g., Foster v. Ward*, 182 F.3d 1177, 1193-94 (10th Cir. 1999); *Scrivener v. Tansy*, 68 F.3d 1234, 1239 (10th Cir. 1995); *Harrington v. Nix*, 983 F.2d 872, 874 (8th Cir. 1993); *Brown v. Collins*, 937 F.2d 175, 182 n.12 (5th Cir. 1991).

Here, Petitioner presents no clearly-established Supreme Court precedent imposing a federal constitutional requirement that accomplice testimony must be corroborated to support a conviction. In light of Sneed's testimony, that is the end of the analysis. *See Hatch v. House*, 527 F.3d 1010, 1017 (10th Cir. 2008). The OCCA's adjudication of this claim is only to be compared to clearly-established Supreme Court precedent, *Williams v. Taylor*, 529 U.S. 362, 412 (2000), not state-law standards of review. *Romano v. Gibson*, 239 F.3d 1156, 1164-65 (10th Cir. 2001) (applying *Jackson* standard instead of "reasonable hypothesis" standard applied by OCCA). Simply put, "[t]he Constitution does not prohibit convictions based primarily on accomplice testimony." *Foster*, 182 F.3d at 1193. Petitioner's extensive

challenges to the evidence corroborating Sneed's testimony are therefore of no consequence and must play no part in this Court's analysis.[3]

All things considered, the OCCA's rejection of this claim was neither contrary to, nor an unreasonable application of, the *Jackson* standard to the facts of this case. Nor was it in any way based on an unreasonable determination of the facts. Relief must therefore be denied. 28 U.S.C. § 2254(d).

## II.

### NO FEDERAL CONSTITUTIONAL VIOLATION STEMS FROM THE LITANY OF STATE LAW EVIDENTIARY RULINGS CHALLENGED BY PETITIONER.

Petitioner next launches multiple evidentiary challenges, based on relevancy and unfair prejudice grounds, to a litany of prosecution testimony. He claims that the prosecution

---

[3] This is not to say, of course, that Sneed's testimony was uncorroborated. As noted by the OCCA, it was corroborated in multiple ways and Oklahoma's accomplice corroboration rule was fully satisfied, *Glossip*, 2007 OK CR 12, ¶¶ 40-53, 157 P.3d at 151-54, a point on which the dissent even agreed. *Id.*, 2007 OK CR 12, ¶¶ 25-33, 157 P.3d at 172-75 (Chapel, J., dissenting). Sneed's testimony was subject to cross-examination and defense counsel had an opportunity to attack it before the jury (Tr. XII 193-230; Tr. XIII 5-64). That two separate juries have now sentenced Petitioner to death based on Sneed's testimony should refute any suggestion that corroboration was lacking or that Sneed's testimony was not worthy of belief. *See Glossip*, 2001 OK CR 21, ¶ 5, 29 P.3d at 599 (acknowledging Sneed's testimony in Petitioner's first trial). Indeed, the trial judge during an in camera instructions conference stated her observation that Sneed was a credible witness on the stand (Tr. XV 45). However, the validity of the accomplice corroboration evidence in this case is simply no part of this Court's evidentiary sufficiency analysis on federal habeas. The same is true of Petitioner's belated challenge to the accomplice instruction used in his case. Doc. 25 at 27-31; *House*, 527 F.3d at 1017; *Foster*, 182 F.3d at 1193-94; *Glossip*, 2007 OK CR 12, ¶ 42 n.5, 157 P.3d at 152 n.5 (noting Petitioner raised no challenge to accomplice instruction but discussing issue in light of recent state decision).

improperly attempted to elicit sympathy during guilt-stage for the victim and Justin Sneed.

Petitioner cites Oklahoma evidence rules as well as the federal due process clause to support

this claim.  Doc. 25 at 65-81.

### A.        Exhaustion.

Petitioner presented these same evidentiary challenges in Proposition II of his direct

appeal brief.  Petitioner relied upon Okla. Stat. tit. 12, §§ 2401-03--Oklahoma's evidentiary

provisions addressing relevance and unfairly prejudicial evidence--for the state law aspect of

this claim.  He cited *Darden v. Wainwright*, 447 U.S. 168 (1986) and *Woodson v. North*

*Carolina*, 428 U.S. 280 (1976) for the federal constitutional basis of this claim, arguing that

the alleged improperly admitted evidence denied him a fundamentally fair trial in violation

of due process.  The OCCA rejected on the merits the various evidentiary challenges raised

in this ground for relief, *Glossip,* 2007 OK CR 12, ¶¶ 54-64, 157 P.3d at 154-55.

To the extent Petitioner relies upon *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980) for

the proposition that a criminal defendant has a federal constitutional right to statutorily-

conferred rights and that denial of those rights constitutes a violation of due process, Doc. 25

at 67, this aspect of his evidentiary challenges is unexhausted.  Petitioner did not cite *Hicks*,

let alone advance this particular argument, in support of his evidentiary challenges in state

court.  12/15/05 *Brief of Appellant* (D-2005-310) at 34-42 (Okla. Crim. App.).  This aspect

of the instant claim is therefore unexhausted and procedurally barred on independent and

adequate state law grounds from review.  Respondent incorporates here by reference the

discussion in response to Ground I above to support this argument.

The State now turns to the merits of those portions of the instant ground for relief that were actually exhausted in state court.

**B.      Merits.**

"[S]tate evidentiary determinations ordinarily do not present federal constitutional issues." *Romano v. Gibson*, 239 F.3d 1156, 1166 (10th Cir. 2001).  Hence, in the typical case, this Court's review on habeas of state-law evidentiary rulings is limited to the issue of fundamental fairness under the Fourteenth Amendment's due process clause.  *Welch v. Sirmons*, 451 F.3d 675, 687-88 (10th Cir. 2006); *Matthews v. Price*, 83 F.3d 328, 331 (10th Cir. 1996).  Because the OCCA rejected the instant claims on the merits, this Court's review is further constrained by AEDPA's deference provisions.  *Welch*, 451 F.3d at 687-88 (citing *Early v. Packer*, 537 U.S. 3, 8 (2003)).  The precise question before this Court then is whether the Oklahoma courts' evidentiary rulings were either contrary to, or based on an unreasonable application of, clearly established Supreme Court precedent to the facts of this case or were otherwise based on an unreasonable determination of the facts.  28 U.S.C. § 2254(d).

**1.      Alleged Victim Sympathy Testimony.**  The OCCA correctly recognized that "trial counsel failed to object to any of the testimony [Petitioner] now claims was improper." *Glossip*, 2007 OK CR 12, ¶ 54, 157 P.3d at 154.  The OCCA rejected Petitioner's specific claims of error relating to alleged victim-sympathy evidence:

> ¶ 55 Glossip first argues that the testimony of Donna Van Treese, the victim's spouse was irrelevant to the first stage of trial. He ties this testimony with the introduction of the "in-life" photograph, which was met with an objection.

¶ 56 Donna Van Treese, during first stage, described the victim as a fifty-four year old man, who had quit smoking six years prior, had gained weight, was balding, and had gray hair. He grew a full white beard and when he shaved it off; his daughter cried and begged him to grow it back. The "in-life" photograph shows Mr. Van Treese without the beard.

¶ 57 Mrs. Van Treese was allowed to testify that the months prior to his death, a series of tragedies had occurred which included the death of her mother. After this death the family took a long trip in a motor home to several States. During this trip Mr. Van Treese felt an urgent need to get home. When they arrived home, they learned that Mr. Van Treese's mother was scheduled for heart by-pass surgery that very morning. She did not survive the surgery.

¶ 58 The purpose of this testimony was to show why Mr. Van Treese was not involved in the day to day operations of the motel in the months preceding his death. It was meant to show how the motel could slip into physical and financial disrepair without his knowledge.

¶ 59 During the first stage, several witnesses described Mr. Van Treese as a loving, kind, and generous person who on many occasions allowed people to stay at the motel when they were down on their luck. This testimony was coupled with evidence that Mr. Van Treese had a temper and would explode with anger towards employees. Although this testimony may have been irrelevant to the first stage, it did not rise to the level of plain error. This evidence did not deprive Glossip of a fair trial.

¶ 60 Evidence that Mr. Van Treese was a ham radio operator was relevant to the identification of his vehicle, as the vehicle was found at the credit union parking lot with an amateur radio operators personalized license plate. The evidence about his diabetes was relevant to show why Mrs. Van Treese called people to initiate a search as soon as she heard about him being missing, and to explain why the discovery of his car was troublesome.

25

*Glossip*, 2007 OK CR 12, ¶¶ 55-60, 157 P.3d at 154.

Review of the record shows that the OCCA's rejection of these claims was wholly reasonable.  Donna Van Treese's description of the victim's general physical condition was proper as part of the foundation for the in-life photograph introduced as State's Exhibit 79. Trial counsel specifically stated that he had no objection to the witness describing the photograph but that he believed the photograph was admissible only during penalty phase (Tr. IV 33-34).  In fact, admission of the photograph during guilt-stage was authorized under Oklahoma law.  *Id.*, 2007 OK CR 12, ¶¶ 76-80, 157 P.3d at 156-57.  A description of the victim's physical condition was also relevant to corroborate that it was the victim in the crime scene photographs.

Petitioner recognized on direct appeal that testimony explaining why the Van Treeses were unable to devote their full attention to the Oklahoma City motel was appropriate. However, Petitioner challenged Donna Van Treese's testimony at transcript pages 36 through 40 on this very topic as excessive and, therefore, unfairly prejudicial.  12/15/05 *Brief of Appellant*, No. D-2005-310, at 35-36.  Review of the testimony, however, reveals that it was relevant to describing the unique events that led to the victim's absence from routine visitation and hands-on operation of the motel.  Donna Van Treese described how her husband was unable to devote his usual attention and frequent on-site visitation to the Oklahoma City motel because of the responsibilities stemming from the various illnesses and deaths in his family during the latter half of 1996.  Because of these events, the victim was able to stay overnight at the Oklahoma City motel only four (4) times during the second half of 1996 (Tr. IV 36-42,

58-59). This testimony was relevant to support the State's theory that Petitioner had a unique opportunity to mismanage the Oklahoma City motel during this period, a fact which resulted in Petitioner's ultimate plan to murder the victim. The testimony was more probative than prejudicial and was not "heart wrenching" as claimed by Petitioner. No error stems from this testimony.

Petitioner's challenge to the testimony regarding the victim's personality and general demeanor also lacks merit. Testimony regarding the victim's generous and kind nature was no doubt overshadowed by testimony presented from largely the same witnesses that the victim had an explosive personality when angry, especially towards employees who did not do their job, and that he resorted to yelling, screaming and threats during such episodes (Tr. IV 61-62; Tr. XI 168-69). The challenged testimony merely provided a full description of the victim's range of personality. Moreover, it suggested that the intensity of his anger the night of the murder, as reported by William Bender, was unusual (Tr. VIII 63-64, 81). It was therefore relevant and not unfairly prejudicial and certainly did not deny Petitioner a fundamentally fair trial.

Donna Van Treese's description of the damage she found to her husband's wedding band, which she discovered when she received it back from the funeral home, was relevant for multiple purposes. It rebuts Petitioner's claim that the victim's death occurred during commission of a robbery, illustrates the impact of the blows the victim suffered during the attack, and corroborates the medical examiner's observations regarding the body and the victim's multiple injuries to the hand (Tr. IV 21; Tr. XI 35-36, 42-46; Tr. XV 116, 137-39;

State's Exhibit 47-48, 75).  It was therefore admissible.       Petitioner's challenge to testimony regarding the speciality victim's ham radio operator license plates also lacks merit. This testimony was relevant to corroborate identification of the vehicle recovered from the credit union parking lot as belonging to the victim (Tr. IV 86-87; Tr. VIII 141; Tr. X 151). Any error stemming from the passing description of Petitioner's personality by Kenneth Van Treese as it related to being a ham operator appears inadvertent.  The prosecutor asked him to describe the victim's demeanor which, as described above, was relevant.  Any excess in this challenged testimony did not deprive Petitioner of a fundamentally fair trial (Tr. X 218).

Donna Van Treese's description of the recent on-set of the victim's diabetes was relevant to show why she was so concerned when the victim turned up missing and when his car was discovered at a parking lot near the motel.  This testimony also was probative on the issue of why employees and family members did not immediately suspect foul play when the victim turned up missing for seventeen (17) hours on January 7th (Tr. IV 98-100).  This testimony was relevant, not unfairly prejudicial and did not deprive Petitioner of a fair trial. Testimony regarding the victim's t-shirt was relevant to corroborate identification of the victim's body based on the clothes he was wearing and to corroborate the medical examiner's observations of the body (Tr. IV 85-86; Tr. XI 36; State's Exhibit 48).  No error stems from this testimony and Petitioner was not deprived of a fundamentally fair trial in violation of due process.

All things considered, Petitioner's complaint that the above testimony was designed to inflame the jury's passion is meritless and did not deprive Petitioner of a fundamentally fair trial.  The OCCA's rejection of these challenges was wholly reasonable.

    **2.**    **Alleged Justin Sneed Sympathy Testimony.**  Petitioner's challenge to evidence regarding Justin Sneed's background, personality and demeanor is equally meritless. Petitioner's experienced and competent trial counsel did not object to any of it.  *Glossip*, 2007 OK CR 12, ¶ 54, 157 P.3d at 154.  The OCCA rejected this claim on the merits:

> ¶ 61 In this proposition, Glossip also claims that the State introduced irrelevant evidence he claims was intended to evoke sympathy for Justin Sneed. The defense theory was that Sneed killed Mr. Van Treese without any influence from Glossip. They presented this theory in opening statement by first describing Sneed as a remorseless, confessed killer, and then, throughout the opening, presented a story showing how Sneed acted alone.

> ¶ 62 The State portrayed Sneed as a person with low intellectual ability, and a child like demeanor. They presented testimony about his background, and his growing up in a single parent home, having a child early in life, dropping out of school after the eighth grade, coming to Oklahoma City with a roofing crew, and quitting that to work at the motel in exchange for rent. This was all meant to show how he placed himself in a position to be dependent on Glossip. Although there was some lay opinion evidence regarding whether Sneed had the personality that would allow him to kill Mr. Van Treese on his own, this testimony comprised only a small portion of the State's case. This testimony did not rise to the level of plain error.

*Id.*, 2007 OK CR 12, ¶¶ 61-62, 157 P.3d at 154-55.

    The OCCA's adjudication of this claim was wholly reasonable.  Pursley's testimony was relevant to illustrate Sneed's level of maturity, intelligence and sophistication, all factors

relevant to the State's theory that Petitioner had near total control over Sneed.  Petitioner's speculation that Pursley somehow confused her testimony regarding Sneed is just that–speculation.

Sneed's testimony regarding his family, educational and employment background was relevant to describe how he ended up living by himself at a motel in Oklahoma City under the control of Petitioner, even though he had two small daughters and family in nearby Texas. It was also relevant to demonstrate his relative lack of sophistication and state of mind at the time of the murder, an important issue considering the prosecution theory that Petitioner controlled Sneed.  His testimony regarding drug use while staying at the Best Budget Inn and after being arrested was probative for the same reasons.  Sneed's testimony regarding the educational achievements and personality changes he underwent while incarcerated for seven years after the murder was relevant to assessment of his current testimony because it provided a stark contrast to the immature eighteen (18) year old who committed this vicious murder in January 1997 (Tr. XII 38-49).  Evidence of Sneed's sentence was relevant as part of the disclosure to his jury of the plea deal he entered with the State (Tr. XII 174, 184-86; State's Exhibit 43).  Defense counsel even referenced the plea deal during opening arguments as a basis for challenging Sneed's credibility, further undermining any claim of prejudice (Tr. IV 23).  This testimony was absolutely relevant, not unfairly prejudicial and did not deprive Petitioner of a fair trial.  The above evidence rebutted the defense theory, introduced during opening statement, that Sneed was a remorseless, confessed killer who acted alone (Tr. IV 9-18).  The OCCA's adjudication of this claim was wholly reasonable.

**3.     Testimony Regarding Condition and Operation of Motel.**   The OCCA
appropriately rejected Petitioner's challenge to the admission of testimony regarding the
condition and operation of the motel:

> ¶ 63 Next, in this proposition, Glossip claims that the State
> introduced irrelevant evidence regarding the remedial measures
> taken after Mr. Van Treese's death to show the condition of the
> motel. Glossip argues that this evidence was an indictment on the
> way Mr. Van Treese ran the motel, rather than relevant to show
> that Glossip had a reason to kill Mr. Van Treese.
>
> ¶ 64 The evidence included testimony that Mr. Van Treese's
> brother Kenneth Van Treese bought new towels and linens for
> the motel, replaced forty mattresses, and disposed of broken
> furniture. It was brought out during this testimony that Glossip
> never had the authority to buy new linens and towels. There was
> plenty of evidence that the motel was not in good repair when
> Mr. Van Treese died. Glossip could have believed that he would
> be fired because of the condition of the motel, whether he was
> responsible for the condition or not. The evidence was
> admissible and the jury could give it whatever weight they
> thought appropriate. There is no error here.

*Glossip*, 2007 OK CR 12, ¶¶ 63-64, 157 P.3d at 155.

The OCCA's decision was wholly reasonable.  Testimony regarding the condition of
the Oklahoma City motel on January 8, 1997, when Kenneth Van Treese took control of it,
was obviously relevant.  John Sunday, whom Kenneth brought in to manage the motel,
described for the jury the purchases and repairs he made that were necessary to put the motel
back into rentable condition (Tr. XII 19-20, 22-26).  Sunday described the motel as "pretty
much uninhabitable" because the rooms were dirty, had inoperable heating units, ragged
bedding and linens, stopped-up sinks and toilets, mold on the bathroom tile and wet carpet (Tr.

31

XII 23). Only about one-fourth of the motel rooms were habitable (Tr. XII 25). The challenged testimony was therefore highly relevant regarding the deterioration Petitioner allowed at the motel while the victim was absent from the property during the last half of 1996. No error stems from this relevant and admissible testimony and Petitioner was not deprived of a fundamentally fair trial with its admission.

Kenneth's description of the management system he put into place was relevant to demonstrate the shortcomings of the victim's management system. This testimony showed how it was possible Petitioner, the on-site manager, could in fact steal from the motel (Tr. XI 112-15). Kenneth's testimony regarding complaints from other family members regarding how he was running the motel explained how he eventually left the motel after only two months and completes the story of his involvement in the motel (Tr. XI 121-22). It was therefore relevant, not unfairly prejudicial and was proper for the jury to consider. Again, Petitioner was not deprived of a fair trial with its admission.

**4.     Summary.** Petitioner's complaint throughout this ground for relief is that the prosecution attempted to distract the jury with irrelevant, unfairly prejudicial testimony. As shown above, however, evidence may be relevant and admissible for many different reasons. The State did not attempt to unfairly prejudice or otherwise mislead Petitioner's jury. The State did nothing more with the challenged testimony than meet its burden of proof with admissible evidence and attempt to answer questions the jury might reasonably have under the circumstances of this case. This was wholly proper. The OCCA's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly-established Supreme Court

precedent to the facts of this case. Nor was it based on an unreasonable determination of the facts. Habeas relief must be denied. 28 U.S.C. § 2254(d).

## III.

### PETITIONER'S FEDERAL CONSTITUTIONAL CHALLENGE TO THE PROSECUTOR'S USE OF DEMONSTRATIVE EXHIBITS AT TRIAL IS UNEXHAUSTED AND PROCEDURALLY BARRED FROM REVIEW.

In Ground III, Petitioner challenges on federal due process grounds the State's use at trial of demonstrative exhibits consisting of poster-sized sheets of paper on which the prosecution wrote portions of testimony in response to witness statements from the stand. Doc. 25 at 82-96.

### A.    Exhaustion.

As shown in the State's November 26, 2008, response to Petitioner's discovery motion, the federal aspect of this particular claim is unexhausted and procedurally barred from habeas review on independent and adequate state-law grounds. While Petitioner presented a similar state-law claim to the OCCA, no federal basis for his challenge to the prosecutor's use of demonstrative exhibits was exhausted in state court. Respondent incorporates here by reference his previous discussion and analysis of this issue. Doc. 32 at 1-9.

This Court may not grant relief on an unexhausted claim. *See* 28 U.S.C. § 2254(b)(1)(A). (However, an unexhausted claim may be denied on the merits. 28 U.S.C. § 2254(b)(2)). However, if the court to which a habeas petitioner must present his claims in order to meet the federal exhaustion requirements would now find those claims procedurally

barred, there is a procedural default for purposes of habeas review. *Bland v. Sirmons*, 459 F.3d 999, 1012 (10th Cir. 2006). Were Petitioner to return to state court and attempt to exhaust the federal aspect of this claim in a second application for post-conviction relief, the OCCA would unquestionably find it procedurally barred from review. *See Cummings v. Sirmons*, 506 F.3d 1211, 1223 (10th Cir. 2007); *Bland*, 459 F.3d at 1012. Oklahoma deems waived on post-conviction review claims that were not, but could have been, raised on direct appeal. Okla. Stat. tit. 22, § 1086; *Cannon v. Gibson*, 259 F.3d 1253, 1267-69 (10th Cir. 2001); *Hale v. Gibson*, 227 F.3d 1298, 1330 (10th Cir. 2000). In addition, "Oklahoma deems waived claims that were not, but could have been, raised in an initial application for post-conviction relief in a death penalty case." *Medlock v. Ward*, 200 F.3d 1314, 1323 (10th Cir. 2000) (citing Okla. Stat. tit. 22, §§ 1086, 1089(D)(2)). *See also* Okla. Stat. tit. 22, § 1089(D)(8).

This Court may not consider issues raised in a habeas petition "that have been defaulted in state court on an independent and adequate procedural ground[ ] unless the petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice." *English v. Cody*, 146 F.3d 1257, 1259 (10th Cir. 1999) (citing *Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991)). The Tenth Circuit has consistently concluded that Oklahoma's bar to claims raised on post-conviction review that could have been raised on direct appeal is both independent and adequate. *Neill v. Gibson*, 278 F.3d 1044, 1057 (10th Cir. 2001); *Cannon*, 259 F.3d at 1266-69; *Hale*, 227 F.3d at 1330 n.15. The Tenth Circuit has also repeatedly held that Oklahoma's procedural bar to claims not raised on initial post-conviction review is independent and adequate. *See Spears v. Mullin*, 343 F.3d 1215, 1253-55 (10th Cir. 2003);

*Cannon*, 259 F.3d at 1265-66; *Thomas v. Gibson*, 218 F.3d 1213, 1221 (10th Cir. 2000) (citing

*Medlock*, 200 F.3d at 1323; *Moore v. Reynolds*, 153 F.3d 1086, 1097 (10th Cir. 1998)).

A federal court may proceed to the merits of a procedurally defaulted habeas claim or

aspect of a claim if the petitioner establishes either cause for the default and actual prejudice

or a fundamental miscarriage of justice if the merits of the claim are not reached. *Demarest*

*v. Price*, 130 F.3d 922, 941 (10th Cir. 1997); *Klein v. Neal*, 45 F.3d 1395, 1400 (10th Cir.

1995); *Brecheen v. Reynolds*, 41 F.3d 1343, 1353 (10th Cir. 1994). The determination of cause

and prejudice and of fundamental miscarriage of justice are both matters of federal law. *See*

*Murray v. Carrier*, 477 U.S. 478, 489 (1986); *Klein*, 45 F.3d at 1400.

"Cause" for a procedural default generally involves "some objective factor external to

the defense [that] impeded counsel's efforts to comply with the State's procedural rule."

*Murray*, 477 U.S. at 488. Cause may be established by showing that "the factual or legal basis

for a claim was not reasonably available to counsel" or that there was " 'some interference by

officials that made compliance impracticable." *Id.* (quoting *Brown v. Allen*, 344 U.S. 443, 486

(1953)). However, ineffective assistance of counsel in the post-conviction proceedings does

not constitute cause under federal law. *See Coleman v. Thompson*, 501 U.S. 722, 757 (1991)

("Because [petitioner] had no [federal constitutional] right to counsel to pursue his appeal in

state habeas, any attorney error that led to the default of [his] claims in state court cannot

constitute cause to excuse the default in federal habeas."); *Cummings*, 506 F.3d at 1223. Also,

any basis for "cause" must itself be exhausted in state court as an independent federal

constitutional claim. *Murray*, 477 U.S. at 488-89. If cause is established, the habeas

petitioner must then show that he suffered actual prejudice as a result of the alleged violation of federal law. *See Klein*, 45 F.3d at 1400; *Brecheen*, 41 F.3d at 1353.

Alternatively, a federal court may proceed to the merits of a procedurally defaulted claim if the petitioner establishes that failure to consider the claim would result in a fundamental miscarriage of justice. *See Klein*, 45 F.3d at 1400; *Brecheen*, 41 F.3d at 1353. To come within this "very narrow exception," *Klein*, 45 F.3d at 1400, the petitioner must supplement his habeas claim with a colorable showing of actual innocence. *See id.* Such a showing does not in itself entitle the petitioner to relief but instead serves as a " 'gateway' " that then entitles the petitioner to consideration of the merits of his claims. *Brecheen*, 41 F.3d at 1357 (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)).

In this context, actual innocence means that "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *see also Murray*, 477 U.S. at 496 ("[W]e think that in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default."). Actual innocence requires a stronger showing than that necessary to establish prejudice. *Schlup*, 513 U.S. at 327. "[T]he habeas court must make its determination concerning the petitioner's innocence 'in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial.' " *Id.* at 328.

36

The Supreme Court has often emphasized "the narrow scope" of the exception. *Calderon v. Thompson*, 523 U.S. 538, 559 (1998). "'To be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." *Id.* (quoting *Schlup*, 513 U.S. at 324). Given the rarity of such evidence, "in virtually every case, the allegation of actual innocence has been summarily rejected." *Id.* In order to satisfy this exception to the procedural default rule, a habeas petitioner must do more than simply attack the evidence presented at his trial and claim that, barring its admission, insufficient evidence was presented to support his conviction. *Cummings*, 506 F.3d at 1224. Rather, the habeas petitioner "must come forward with new evidence, the admission of which would have made it more likely than not that he would have been acquitted." *Id.*

Petitioner in the instant case has made no attempt to meet either the "cause and prejudice" or "miscarriage of justice" standards or to challenge the adequacy of the state procedural default rules applicable to this claim. No valid basis for meeting either exception is apparent. Accordingly, Petitioner has failed to exhaust the federal basis of the instant claim and he is now procedurally barred from raising that claim to this Court. *Bland*, 459 F.3d at 1012.

### B.   *Alternative Merits Analysis.*

Assuming *arguendo* Petitioner did exhaust a federal basis for the instant claim in state court, he would still not be entitled to relief. *See id.* at 1012-13 (conducting alternative merits analysis on unexhausted claim). AEDPA deference would be applicable because the OCCA

rejected this claim on the merits.  *Id.*; *Crawley v. Dinwiddie*, 533 F.3d 1226, 1230 (10th Cir.

2008); *see Glossip v. State*, 2007 OK CR 12, ¶¶ 65-75, 157 P.3d 143, 155-56.[4]

The OCCA's rejection of this claim was wholly reasonable.  After discussing the

relevant trial proceedings, the record and the dearth of precedent on this issue, the OCCA

held:

> ¶ 75 In viewing the entire record, we cannot say that the posters
> affected the outcome of this trial. Both sides utilized the poster
> tactic during trial, although, the State seemed to utilize more
> posters than the defense. There is no argument that the posters
> did not contain factual information, and they were utilized to
> assist the jury in understanding the testimony, considering the
> trial court's instructions against note-taking. Any error in the
> utilization of these posters was harmless.

*Id.*, 2007 OK CR 12, ¶ 75, 157 P.3d at 156.

---

[4]  Petitioner's passing contention that AEDPA deference does not apply to this claim lacks
merits.  Doc. 25 at 90, 92-93.  To the extent he claims the OCCA did not consider his sub-
claim"regarding failure to sequester the jury", Doc. 25 at 90, no such claim was raised in
state court.  If, however, Petitioner means the rule-of-sequestration aspect of this claim, he
is mistaken.  The OCCA recognized this aspect of the claim, referred to Petitioner's claim
that the posters stayed up throughout the trial "in full view of the jury and all subsequent
witnesses throughout the trial", then found any error in utilization of the posters harmless.
*Glossip*, 2007 OK CR 12, ¶¶ 65, 72 & 75, 157 P.3d at 155, 156.  This Court owes deference
to the state court's result, even if its reasoning is not expressly stated.  *Crawley*, 533 F.3d at
1230 n.5.  To the extent Petitioner claims AEDPA does not apply because the state court did
not order disclosure of the posters so they could also be considered, Doc. 25 at 92-93, he
fails to persuade.  The posters were not necessary for resolution of this claim under the
circumstances.  As discussed below, these posters merely reflected bits of accurate witness
testimony from the witness stand.  Both parties used the posters.  All of the words written on
the posters were contained in the transcript.  Petitioner's extensive citation to the transcript
to support this claim makes that point abundantly clear.  AEDPA would therefore apply
assuming the Court found Petitioner exhausted the federal basis of this claim.

Petitioner identifies no authority where the Supreme Court has considered a factual scenario analogous or similar to that presented here.  *Cf. Crawley*, 533 F.3d at 1230.  Indeed, the OCCA specifically commented on the "dearth of precedent" from other jurisdictions governing the use of demonstrative exhibits at trial in the manner identified here.  The OCCA specifically noted Petitioner's sole reliance on a 1964 Kentucky case, which itself noted the "dearth of precedent" on this point.  *Glossip*, 2007 OK CR 12, ¶ 73, 157 P.3d at 156. Petitioner invokes state procedural concepts like the rule of witness sequestration, undue emphasis of trial testimony, and the trial court's abuse of discretion to support this claim and relies upon state case law to support this claim beyond his general due process challenge.  It is clear then that Petitioner's request for federal habeas relief in Ground III is driven largely by state trial management considerations.  Doc. 25 at 85-90, 94.  Not surprisingly, this is not a case where the Supreme Court has expressly extended the legal rule (alleged due process violation based on denial of fundamentally fair trial) championed by Petitioner to this context–i.e., the use of demonstrative exhibits in open court.  *Crawle*y, 533 F.3d at 1230.  As found by the Tenth Circuit:

> [C]learly established [federal] law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case *sub judice*.  Although the legal rule at issue need not have had its genesis in the closely-related or similar factual context, the Supreme Court must have expressly extended the legal rule to that context.

*Id.* (quoting *House v. Hatch,* 527 F.3d 1010, 1016 (10th Cir. 2008)).  Because there is no clearly established federal law, as articulated by the Supreme Court, relevant to Petitioner's

claim this Court's analysis "ends where it begins." *Id.* at 1231. "Absent controlling Supreme Court precedent, it follows ineluctably that the [state court's] decision...cannot be either 'contrary to, or an unreasonable application of, clearly established Federal law.'" *Id.* (quoting *House*, 527 F.3d at 1021). Petitioner's failure to present relevant Supreme Court law to support this ground for relief is therefore fatal to his quest for habeas relief. 28 U.S.C. § 2254(d).

Even if AEDPA did not apply, Petitioner would still not be entitled to relief. Petitioner does not dispute the accuracy of the testimony written on the easel board paper by the prosecutor. Nor does he dispute that these statements were written on the easel board paper as a witness testified to those facts and statements. Further, it is undisputed that these particular demonstrative exhibits were not admitted into evidence and were not sent back to the jury room during deliberations.

The prosecutor's use of easel board paper to memorialize certain testimony was merely resort to a pedagogical or visual aid, permissible under Okla. Stat. tit. 12, § 2611. Use of these demonstrative exhibits was within the sound discretion of the trial judge. *Miller v. Mullin*, 354 F.3d 1288, 1295 (10th Cir. 2004). More significantly, "the ability of an appellate court to overturn discretionary rulings on direct review is severely constrained. It is even more attenuated on habeas review." *Id.* at 1296. Use of the easel board paper to memorialize Petitioner's many incriminating statements to prosecution witnesses on the day of the murder, or shortly thereafter, was wholly proper to assist the jury in understanding, and keeping track of the testimony. This was especially appropriate considering that: (1) the jury heard

testimony from nearly twenty-six witnesses during guilt stage alone; and (2) Petitioner provided so many different conflicting statements at the time of the murder designed to deflect attention from the victim's body in Room 102--statements he later admitted to homicide detectives were false. (Tr. IV 99-101; Tr. V 19-24, 97-105; Tr. VII 59-60; Tr. VIII 88-90, 116-17; Tr. IX 46-48, 56, 121, 206-07, 212-19, 233-36; Tr. XI 183-84; State's Exhibit 2; Court's Exhibit 4). The trial court did not abuse its discretion in allowing the prosecutor to write down and display certain portions of testimony while witnesses testified. This is especially so considering that Petitioner had the same opportunity to use such demonstrative exhibits and in fact, utilized the same process as the prosecutor on several occasions during witness testimony. *Glossip*, 2007 OK CR 12, ¶ 75, 157 P.3d at 156. As noted by the prosecutor:

> using the same size paper, the same marker, the Defense has made five demonstrative aids of their own of similar ilk, that had been displayed various lengths of time to the jury. One in particular which is the one where Justin Sneed denies killing Barry Van Treese was displayed to this jury throughout, you know, Justin Sneed and others' testimony.

(Tr. XV 35). Petitioner's attempt to dispute this statement is belied by the fact that *trial counsel* did not dispute the prosecutor's statement of fact regarding Defendant's use of demonstrative aids. Doc. 25 at 91.

Petitioner's complaint that the demonstrative aids should not have been left in the courtroom for the duration of the trial because they unfairly emphasized certain testimony to the exclusion of other evidence received throughout the trial does not warrant relief. Doc. 25

41

at 85-88.  Petitioner's jury was instructed to consider all of the evidence in reaching a verdict,

not just the testimony reproduced by the prosecutor on the easel board paper (O.R. 1263)

("[t]he defendant, is presumed innocent of this crime, and the presumption continues, unless,

after consideration of all the evidence you are convinced of his guilt beyond a reasonable

doubt...Evidence is the testimony received from witnesses under oath, stipulations made by

the attorneys, and the exhibits admitted into evidence during the trial").  And again, both

parties resorted to this tactic so the defense could counter-balance the State's posters if the

need arose.

Petitioner's complaint that the prosecutor was able to make a "continuous closing

argument" by displaying the demonstrative aids, does not warrant relief.  Doc. 25 at 88.

Again, these demonstrative aids were based on accurate testimony and the jury was properly

instructed to consider all the evidence presented at the trial.  Petitioner's complaint that the

prosecutor violated the rule of sequestration by displaying the demonstrative aids is

particularly weak.  Doc. 25 at 88-90.  The rule of sequestration, also known as the "rule of

exclusion of witnesses", *Marshall v. State*, 1998 OK CR 30, ¶ 21, 963 P.2d 1, 8, is set forth

in the Oklahoma Evidence Code.  It provides in pertinent part that "[a]t the request of a party

the court shall order witnesses excluded so that they cannot hear the testimony of other

witnesses."  Okla. Stat. tit. 12, § 2615.

The witnesses in Petitioner's case did not violate the rule of sequestration because they

were not in the courtroom to hear other witnesses testify.  Further, it is hard to imagine that

a witness would tailor his or her testimony to handwritten phrases on easel paper displayed

for the jury as demonstrative aids in the courtroom. The various pieces of testimony would only make sense to those like the trial court, parties and jury, who had been present in the courtroom for the duration of testimony. Any given witness would not have sufficient time during testimony to review, let alone adopt, the handwritten statements listed on the demonstrative exhibits. The State submits that a witness is more concerned with hearing and answering the continuous questions of the examiner while testifying than with searching for answers on the walls of the courtroom.     Further, the majority (if not all) of the witnesses who testified at Petitioner's second trial had presented prior testimony and/or statements to police. In this sense, Petitioner could expose any possible modification of testimony, for whatever reason, through impeachment by prior inconsistent statements. This would satisfy the primary purpose of the rule, described by Petitioner as discouraging and exposing fabrication, inaccuracy and collusion in testimony. Doc. 25 at 89.

Finally, Petitioner's complaint that he was prevented from making a proper record because the trial court would not allow him to make the prosecutor's demonstrative exhibits part of the trial record also lacks merit. The demonstrative aids were reflected in the record during the prosecutor's questioning. Petitioner wholly fails to show prejudice based on the absence of the actual demonstrative aids from the trial record before this Court. Petitioner's citation to numerous passages from the trial transcript evidencing the prosecutor's resort to memorializing bits of testimony on the writing pads undermines his claim of an inadequate record. *See*, *e.g.*, Doc. 25 at 83, 84; 12/15/05 *Brief of Appellant* (D-2005-310) at 42-43. There is nothing on the posters not already contained in the printed trial transcript as the

demonstrative aids only reflect bits of witness testimony.  The extensive challenges Petitioner has made to these demonstrative aids on direct review and in his § 2254 petition show clearly that his appellate rights were not prejudiced.  *See Wackerly v. State*, 2000 OK CR 15, ¶ 6, 12 P.3d 1, 7 (failure to transcribe prosecutor's exercise of peremptory challenges does not warrant reversal where omitted record does not affect ability to review for *Witherspoon* error; challenges for cause were recorded); *Byrne v. State*, 1971 OK CR 100, ¶ 6, 482 P.2d 620, 622 (no error where trial court failed to preserve chalkboard illustration used during state's case in chief; defendant failed to show prejudice or that he was otherwise denied access to said illustration).

Based on the foregoing, any possible error in the use of the demonstrative aids by the prosecutor was harmless as they did not substantially and injuriously effect or influence the jury's verdict in this case.  *See Fry v. Pliler*, 551 U.S. 112, 127 S. Ct. 2321, 2327, 2328 (2007); *Brown v. Sirmons*, 515 F.3d 1072, 1084 (10th Cir. 2008).[5]  The vague federal basis of Petitioner's claim–a due process violation premised on the denial of a fair trial, *see*, *e.g.*, Doc. 25 at 82-83, 96--standing alone suggests that relief is unwarranted.  "'[B]ecause a fundamental-fairness analysis is not subject to clearly definable legal elements,' when engaged in such an endeavor a federal court must 'tread gingerly' and exercise 'considerable self-restraint.'"  *Duckett v. Mullin*, 306 F.3d 982, 999 (10th Cir. 2002) (quoting *United States*

---

[5]  Petitioner incorrectly urges that the *Chapman v. California*, 386 U.S. 18 (1967) harmless error standard applies.  Doc. 25 at 93, 94.  To the extent he urges elsewhere in his brief without citation of authority that prejudice should be presumed, Doc. 25 at 92, again, he simply states the wrong standard.

*v. Rivera*, 900 F.2d 1462, 1477 (10th Cir. 1990)).  The Supreme Court has cautioned federal courts to "bear in mind our previous admonition that we "have defined the category of infractions that violate 'fundamental fairness' very narrowly." *Estelle v. McGuire*, 502 U.S. 62, 72-73 (1991) (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)).  "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation." *Id.*

Petitioner invokes state procedural concepts like the rule of witness sequestration, undue emphasis of trial testimony, and the trial court's abuse of discretion to support this claim.  It is clear then that Petitioner's request for federal habeas relief in Ground III is driven by state trial management considerations.  Doc. 25 at 85-90, 94.  This approach should be rejected.  As noted by the Supreme Court:

> The principle that collateral review is different from direct review resounds throughout our habeas jurisprudence.  Direct review is the principal avenue for challenging a conviction. "When the process of direct review–which, if a federal question is involved, includes the right to petition this Court for a writ of certiorari–comes to an end, a presumption of finality and legality attaches to the conviction and sentence.  The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials."

*Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993) (internal citations omitted).

Here, Petitioner fails to show that he was denied a fundamentally fair trial in violation of due process based on the prosecutor's use of, or the trial judge's rulings regarding, the demonstrative aids.  Any possible error was harmless.  Thus, even under a de novo standard

of review, Petitioner would not be entitled to habeas relief on this claim.   Relief must

therefore be denied.[6]

## IV.

### PETITIONER IS NOT ENTITLED TO RELIEF BASED ON ALLEGED PROSECUTORIAL MISCONDUCT.

In Ground IV, Petitioner advances the laundry list of prosecutorial misconduct claims

he raised on direct appeal.  Doc. 25 at 97-115.[7]

### A.    Exhaustion.

The prosecutorial misconduct claims raised in Ground IV of Petitioner's § 2254

petition were presented to the OCCA in Proposition IV of his direct appeal brief.  *See Glossip*

*v. State*, 2007 OK CR 12, ¶¶ 81-99, 157 P.3d 143, 157-59.  This ground for relief is therefore

exhausted.

### B.    Merits.

Consistent with previous decisions, the OCCA adjudicated Petitioner's prosecutorial

misconduct claims based on the following  standard: "no trial will be reversed on the

allegations of prosecutorial misconduct unless the cumulative effect was such to deprive the

---

[6]  To the extent Petitioner mentions in passing that the trial court's preparation of an abstract of testimony at the conclusion of trial constitutes evidence of judicial bias, Doc. 25 at 94 n.30, this claim was not presented in state court and should be deemed unexhausted and procedurally barred for the reasons set forth in section A above.   Even if this claim were proper for this Court's consideration, Petitioner hardly shows that the trial judge harbored actual bias against him in light of this action.  *See Welch v. Sirmons*, 451 F.3d 675, 699 (10th Cir. 2006) (discussing requirements for showing actual judicial bias on habeas); *Fero v. Kerby*, 39 F.3d 1462, 1479 (10th Cir. 1994) (same).

[7]  Petitioner's related claim that his trial counsel were constitutionally ineffective for failing to object to the majority of instances of prosecutorial misconduct set forth in Ground IV, Doc. 25 at 98, 129, is addressed below in the State's response to Ground V.

defendant of a fair trial." *Glossip*, 2007 OK CR 12, ¶ 81, 157 P.3d at 157.  This standard is the same as that required by federal law and its application by the OCCA in denying Petitioner's claims triggers AEDPA deference.  *Bland v. Sirmons*, 459 F.3d 999, 1024 (10th Cir. 2006).  Likewise, the OCCA's review of the majority of claims for plain error (because no contemporaneous objection was made by trial counsel) is also entitled to AEDPA deference.  *Thornburg v. Mullin*, 422 F.3d 1113, 1124-25 (10th Cir. 2005).

Thus, the sole issue for this Court is whether the OCCA's adjudication was either contrary to, or an unreasonable application of, clearly established Supreme Court precedent to the facts of Petitioner's case.  28 U.S.C. § 2254(d).  *See, e.g., Bland*, 459 F.3d at 1018-19 (applying AEDPA deference to prosecutorial misconduct claim reviewed under Oklahoma plain error rule); *Malicoat v. Mullin*, 426 F.3d 1241, 1256 (10th Cir. 2005) (same).

Generally, a prosecutor's improper remarks require reversal of a state conviction only if the remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 & 645 (1974).  Alternatively, if the alleged prosecutorial misconduct denied the petitioner a specific constitutional right, a valid habeas corpus claim may be established without proof that the entire trial was rendered fundamentally unfair.  *See Paxton v. Ward*, 199 F.3d 1197, 1217 (10th Cir. 1999) (citing *Donnelly*, 416 U.S. at 643).

Inquiry into fundamental fairness requires examination of the entire proceedings, including the strength of the evidence against the petitioner, both as to guilt at that stage of the trial and as to moral culpability at the sentencing phase.  Any cautionary steps such as

47

instructions to the jury, offered by the court to counteract improper remarks, may also be considered. *Harris v. Poppell*, 411 F.3d 1189, 1197 (10th Cir. 2005). Counsel's failure to object to the comments, while not dispositive, is also relevant to a fundamental fairness assessment. *Trice v. Ward*, 196 F.3d 1151, 1167 (10th Cir. 1999). "[I]t is not enough that the prosecutor's remarks were undesirable or even universally condemned." *Darden*, 477 U.S. at 181 (quotation marks omitted). Ultimately, this court considers the jury's ability to judge the evidence fairly in light of the prosecutor's conduct. *Tillman v. Cook*, 215 F.3d 1116, 1129 (10th Cir. 2000).

1.    **Absence of Petitioner's Fingerprints in Room 102.** Petitioner first complains that the prosecutor's argument at transcript pages 83 through 86 regarding absence of his fingerprints in the motel room was false and misleading. Doc. 25 at 98-101. The OCCA rejected this claim:

> ¶ 82 Glossip's first series of claims attack the prosecution's argument as a misrepresentation of facts and misleading the jury. He first claims that the prosecutor committed misconduct when arguing that the absence of Glossip's fingerprints in room 102 amounted to evidence of guilt. There was no objection to these comments, thus we review for plain error only.

> ¶ 83 Here the prosecutor was merely arguing that, as manager of the motel and as a person who was responsible for repairs in every room, it was very suspicious that none of his fingerprints were found in the room. This was a fair inference from the evidence. The prosecutor was not arguing that Glossip selectively removed fingerprints after the crime, but was arguing that the absence of his fingerprints in the room, even ones that might have been left there under innocent circumstances was unusual. There is no plain error here.

*Glossip*, 2007 OK CR 12, ¶¶ 82-83, 157 P.3d at 157.  The OCCA's adjudication of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent.  Nor was it based on an unreasonable determination of the facts.

In the challenged passage, the prosecutor argued that absence of Petitioner's fingerprints from Room 102 was unusual, even though he was manager of the motel and would be expected to have legitimate reasons to be inside that room.  The prosecutor reasoned that even though one would expect Petitioner's prints to be inside the room from "changing a lightbulb or cleaning the mirror, anything", Petitioner "made certain by action or omission that his fingerprints would not be found there" by either wearing gloves or wiping down any fingerprints he may have left (Tr. XV 85-86).  Petitioner reasons that the prosecutor misled the jury with this argument because "the police limited their initial collection of forensic evidence to areas obviously related to the murder *and the prosecutor knew or should have known it."*  Doc. 25 at 100 (emphasis in original).  These comments were so outrageous that defense counsel did not object.

Petitioner's argument is curious.  It was undisputed at trial that no physical evidence–including fingerprints–connected Petitioner with Room 102.  The prosecutor did nothing more in the challenged passage than make reasonable comment on the evidence presented.  "A prosecutor may comment on and draw reasonable inferences from evidence presented at trial." *Bland*, 459 F.3d at 1028 (quoting *Thornburg v. Mullin*, 422 F.3d 1113, 1131 (10ᵗʰ Cir. 2005)).  Moreover, "each side is permitted to present the evidence and the inferences thereof from its own point of view." *Black v. State*, 2001 OK CR 5, ¶ 96, 21 P.3d

1047, 1078. Unless Petitioner is arguing on appeal that his fingerprints actually were located somewhere in Room 102–an argument seemingly fatal to his unpersuasive challenges to the sufficiency of the evidence, Doc. 25 at 54--there can be no possible error from these comments. The same is true of the argument at transcript pages 167 and 168. Absence of Petitioner's fingerprints from the plexiglass over the broken window, which he admitted helping Sneed install, allows the reasonable inference that Petitioner's prints should have been found on the plexiglass and that a possible explanation for their absence is that Petitioner wiped them off the glass or wore gloves so that his prints would not appear. Again, no objection was registered to these remarks which represent reasonable comment on the evidence by the prosecutor.

"The ultimate question is whether the jury was able to fairly judge the evidence in light of the prosecutors' conduct." *Bland*, 459 F.3d. at 1024. Petitioner wholly fails to show that the challenged comments, *which drew no objection*, in any way prevented the jury from fairly judging either party's evidence. The OCCA's adjudication was therefore wholly reasonable under and relief must be denied. 28 U.S.C. § 2254(d).

2.    **Sneed's Motive to Kill.**    Petitioner next complains that the prosecutor at transcript pages 68 and 69 argued that "Justin Sneed would never have killed Barry Van Treese for money alone".   Defendant claims this argument was inconsistent with the prosecutor's allegation during penalty phase that the murder was committed for remuneration. Doc. 25 at 102.  No objection was made to this argument.  The OCCA rejected this claim on the merits, correctly noting that "[t]he State was merely arguing that Sneed had no reason to

kill Mr. Van Treese other than the offer of money from [Petitioner].  Again, this is a fair inference from the evidence.  There is no plain error here."  *Glossip*, 2007 OK CR 12, ¶ 84, 157 P.3d at 157.

The record supports the OCCA's decision.  The prosecutor did nothing more in the challenged passages than argue that Sneed would not have committed the murder but for Petitioner's promise of $10,000.00.  This argument was based on Sneed's testimony (Tr. XII 178) and was therefore proper.  As shown below in response to Ground VI, this particular argument is not inconsistent with the State's theory that the murder was committed for remuneration.  Sneed's testimony standing alone shows that Van Treese's murder was motivated by financial gain.  Other evidence presented at Petitioner's trial supported this conclusion.  *See id.*, 2007 OK CR 12, ¶¶ 43, 62 & 116, 157 P.3d at 152, 154 & 161. Petitioner wholly fails to show error, let alone the denial of a fair trial, based on the challenged argument.

**3.     Alleged Denigration of Defense Counsel.**  Petitioner contends that the prosecutor misrepresented the facts, misled the jury, and denigrated counsel with the argument that "[t]he State of Oklahoma did not charge [Petitioner] of lesser related offenses because he committed the big boy offense of Murder in the First Degree" (Tr. XV 175).  Petitioner argues this was false and misleading because he was originally charged as an accessory after the fact until the State on January 23, 1997, re-filed on Petitioner with a first degree malice murder charge.  Doc. 25 at 102-04.

The OCCA rejected this claim on the merits:

> ¶ 85 Next, Glossip argues that the prosecutor mislead the jury when arguing that the defense of ''accessory after the fact''was baseless, because the State did not charge him with accessory after the fact to murder. In fact, the State did, initially charge Glossip with accessory to murder and Sneed with murder in separate Informations.  The State then dismissed the accessory Information and added Glossip as a co-defendant with Sneed on the murder Information.

> ¶ 86 The State argued that it did not charge Glossip with accessory to murder, because he was guilty of the ''big boy offense of Murder in the First Degree.'' Actually, the State did not pursue prosecution of Glossip for accessory, because they alleged he was guilty of first degree murder. The method of prosecution and the filing of charges is discretionary with the prosecution. Here the prosecutor is merely arguing that Glossip is guilty of murder, regardless of his defense that he only acted after the fact in attempting to cover up the crime. The argument, again, is properly based on the evidence adduced at trial.

*Glossip*, 2007 OK CR 12, ¶¶ 85-86, 157 P.3d at 157-58.

The record shows that the OCCA's adjudication of this claim was wholly reasonable. Regardless of the crime Petitioner was originally charged with, the fact remains he was accused by the State of Oklahoma in a felony Information of first degree malice murder at time of trial.  The trial court noted that Petitioner was originally charged before the Van Treese murder investigation was complete and that additional information was developed that warranted dismissal of the accessory charge and  refiling against Petitioner for first degree murder.  Petitioner does nothing to rebut the trial court's statement.  Indeed, trial counsel accepted the trial court's discussion of the history of the case as it related to the filing of the first degree murder charge (Tr. XV 176-77).  That Petitioner was originally charged as an

accessory and two weeks later was charged with first degree murder is not significant (Tr. XIII

103-04; O.R. 5-6).   What is significant, however, is that Petitioner sat charged with first

degree malice murder at the time of the prosecutor's argument.   The challenged comments

represent reasonable argument from the State's perspective that Petitioner was guilty of malice

murder as an aider and abettor and not accessory after the fact.   There is nothing misleading

or unfair about it.   No error, let alone the denial of a fair trial, stems from the challenged

comments.

     **4.**    **Lesser-Related Offense Instruction as "Defense Trick".**   Petitioner complains

that the prosecutor misled the jury by arguing that the lesser related offense instruction of

accessory after the fact "was a defense trick".   Doc. 25 at 104-06.

> ¶ 87 The prosecutor argued that the lesser related offense
> instruction relating to accessory to murder was only given
> because defense counsel requested it.  Glossip objected to this
> argument and the trial court admonished the prosecutor. Juries
> are to consider lesser related offenses, only if they have a
> reasonable doubt that a defendant has committed the greater
> offense. OUJI–CR 2d 10–27 (1996); *Graham v. State,* 2001 OK
> CR 18, ¶ 6, 27 P.3d 1026, 1027.   The jury was properly
> instructed on the method of reviewing greater and lesser
> offenses.   These instructions properly channeled the jury's
> decision making process and cured any error.

*Id.*, 2007 OK CR 12, ¶ 87, 157 P.3d at 158.

    The OCCA's decision is wholly reasonable in light of the record.   The challenged

argument arises as part of the prosecutor's discussion of the evidence, from the State's

perspective, that Petitioner was guilty of first degree malice murder, not accessory after the

fact (Tr. XV 172-75, 177).   The prosecutor did not tell the jury it was inappropriate to

consider the lesser related offense instruction or otherwise describe this instruction as a defense "trick". On the contrary, the prosecutor, after being admonished, specifically told the jury that they should consider this instruction if they had doubts as to Petitioner's guilt for first degree malice murder (Tr. XV 174-75). The written instructions provided proper instruction on the method of reviewing greater and lesser instructions (O.R. 1288-90). The prosecutor did not cast aspersions on defense counsel in the challenged closing argument. Rather, she only challenged defense counsel's claim that a conviction for accessory after the fact was appropriate under the law and facts. Moreover, the jury is presumed to follow its instructions. *See Duckett v. Mullin*, 306 F.3d 982, 991 (10th Cir. 2002).

All things considered, the OCCA's adjudication of this claim was neither contrary to, nor an unreasonable application of, clearly-established Supreme Court law to the facts of this case. Nor was it based on an unreasonable determination of the facts.

**5.     Alleged Victim Sympathy.** Petitioner next complains that the prosecutor "presented argument intended to evoke sympathy for the victim and his family in first stage." Petitioner cites his argument from Ground II regarding testimony of Donna Van Treese and Kenneth Van Treese that he describes as "victim impact testimony." Doc. 25 at 107-08. However, Petitioner's claims here are just as meritless as they were in Ground II. As shown above, the prosecution had legitimate reasons for presentation of this testimony, something made clear by the absence of any defense objection to it. Petitioner fails to show error, let alone that he was denied a fair trial, based on these statements.

The OCCA rejected this claim, finding that its resolution of Petitioner's substantive challenge to this testimony also resolved the related claim of prosecutorial misconduct. *Glossip*, 2007 OK CR 12, ¶ 88, 157 P.3d at 158.  The OCCA's rejection of this claim was wholly reasonable.

**6.    Allegedly Implying Additional Evidence Exists.**  Petitioner next complains that a portion of the prosecutor's re-direct examination of Kayla Pursley was formulated "for the express purpose of implying there was more this witness could tell the jury that would be damaging to [Petitioner] if only she could remember what it was."  Doc. 25 at 108-10.  No objection was made to this alleged improper exchange.  The OCCA rejected Petitioner's claim on the merits:

> ¶ 91 Next, Glossip claims that the prosecutor implied that additional evidence existed. During the re-direct examination of witness Kayla Pursley, Glossip claims that the prosecutor inferred that this jury would not hear everything she said to the police because she could not remember what she told police. The prosecutor did not allow Pursley to refresh her memory with the police report and tell the jury what she told police. No objection was made to this questioning at trial.

> ¶ 92 As indicated by the State, this questioning was to rebut the defense's cross-examination where counsel brought up the fact that she testified to things not in the police report because she remembered these things after talking to the police. The prosecutor was merely attempting to show that Pursley was testifying from her memory and not from the police report. The fact that the jury was deprived of this evidence due to a lack of memory was not indicative of more evidence damaging to Glossip. This claim does not rise to the level of plain error.

*Id.*, 2007 OK CR 12, ¶ 91, 157 P.3d at 158.

The OCCA's adjudication of this claim was wholly reasonable.  In the challenged passage, the prosecutor attempted to rebut defense counsel's suggestion throughout cross-examination that Pursley's testimony was unreliable because she first recalled some events from January 7, 1997, well after being interviewed by police (Tr. IX 64, 70-73, 78-83, 96-97). The prosecutor attempted to bolster Pursley's credibility by showing that her trial testimony was based on her recollection of events while on the stand, not mere regurgitation of a police report (Tr. IX 98-101).  That Pursley could not remember in 2004 some of the details she provided to the police when interviewed in 1997 was therefore wholly appropriate rehabilitation.  It was not, as alleged by Petitioner, an attempt to subliminally inform the jury to convict based on possible evidence not presented at trial.  In this light, the prosecutor had no need to either impeach or attempt to refresh Pursley's recollection with her prior statements to police.  Petitioner therefore fails to show error, let alone the denial of a fair trial, stemming from the challenged comments.

> **7.    Alleged Penalty Phase Misconduct.**  Finally, Petitioner contends prosecutorial

misconduct infected the penalty phase of his trial.  He argues that the prosecutor "misstated the law, denigrated [Petitioner's] mitigating circumstances, and injected personal beliefs into the proceeding."  Doc. 25 at 111.  The OCCA rejected this claim on the merits:

> ¶ 93 Glossip also claims misconduct occurred during the penalty phase of trial. He first claims that the prosecutor misstated the law regarding the appropriate punishment by arguing that death is appropriate because society, the Van Treese family, the Glossip family, and the justice system is "worse off" because of Richard Glossip. The State also argued that Glossip was a "cold-blooded murderer" and "cold-blooded murders in the State of

Oklahoma we punish with death." The prosecutor went on to argue that "He chose the option of murder in the face of other options and that makes death the appropriate option." There were no objections to these arguments.

¶ 94 Glossip also cites to the prosecutor's argument inferring that no one would be here, except for the actions of Richard Glossip, including the statement, "you [the jury] wouldn't be here making this tough decision." Again there was no objection.

¶ 95 Glossip claims that the prosecutor unfairly denigrated Glossip's mitigating evidence by pointing out that while he is awaiting trial he gets his niece to come visit him so he can bring her to trial so she can testify. The prosecutor also pointed out the fact that other mitigation evidence was from a 23-year-old detention officer. The prosecutor pointed out the fact that Sneed was about that age and he buddies up to this young kid so he can have a witness to say he is not violent. There was no objection to this argument.

¶ 96 Defense counsel did object during the next citation of alleged misconduct. The prosecutor used the victim's photographs as props, placed them on defense table, and said "I don't have a problem with taking this blood and putting it right over here. Because this is where it goes." Counsel's objection was aimed at the prosecutor "throwing things on our table." Defense counsel said the prosecutor should give them to the jury. The objection was overruled. The objection was not based on the argument but on where the prosecutor was placing the photographs. Because he raises a different argument here, we can review for plain error only.

¶ 97 All of the alleged misconduct came during the State's second closing, after defense counsel stated that the State wants "Richard Glossip's blood to flow" (to which a State's objection was sustained). Defense counsel also told the jury that this was a decision that they would have to live with; the State would put this case away and forget about it. Defense counsel also argued that the State sees Richard Glossip as a person with no social redeeming value-ignoring the fact that he had a normal life, was a hard worker and supported his family.

¶ 98 It must be noted, that the State alleged two aggravating circumstances: continuing threat; and murder for remuneration. Most of the argument, from both sides, was in an attempt to show whether Glossip was a continuing threat to society. The continuing threat aggravating circumstance requires a jury to determine whether it is probable that a defendant will commit future criminal acts of violence that would constitute a continuing threat to society.

¶ 99 All of the prosecutor's arguments were proper comments on the evidence in order to show that, based on the circumstances of this crime, Glossip was a continuing threat to society. Obviously, the jury did not accept the prosecutor's argument, because they did not find that Glossip was a continuing threat.

*Glossip*, 2007 OK CR 12, ¶¶ 93-99, 157 P.3d at 158-59.

The OCCA's rejection of this claim was wholly reasonable. The vast majority of prosecutorial misconduct claims alleged by Petitioner amount to reasonable comment on the evidence by the State and response to defense closing argument. The challenged arguments came after defense counsel argued during closing that the State wanted "Richard Glossip's blood to flow. That's what they're after", told the jury they would have to live with their decision and that the State would put this case away and forget about it (Tr. XVII 81-82, 90). Defense counsel also attacked Sneed's veracity, the State's portrayal of Sneed and urged that the evidence showed Petitioner was not a future danger to society (Tr. XVII 82-88, 90). Prior to the comments Petitioner now challenges, the prosecutor told Petitioner's jury that their opinion of punishment was the only one that mattered and that it was their responsibility to impose punishment (Tr. XVII 93). The prosecutor then proceeded to respond to Petitioner's closing arguments against the death penalty (Tr. XVII 93-108).

58

Review of the totality of the record shows the prosecutor made appropriate argument based on the law and evidence before the jury. *Thornburg*, 422 F.3d at 1131 ("A prosecutor may comment on and draw reasonable inferences from evidence presented at trial"). Much of the challenged argument stems from the prosecutor's attempt to show that Petitioner was a continuing threat to society as alleged in the bill of particulars. The evidence supported the prosecutor's characterization of Petitioner as a cold-blooded murderer, a relevant consideration for both the continuing threat aggravator alleged by the State, *see Sallahdin v. Mullin*, 275 F.3d 1211, 1231-32 (10th Cir. 2002) (Oklahoma's continuing threat aggravator may be based solely on calloused nature of killing), and the jury's discretionary decision whether to impose death once they found existence of aggravating circumstances outweighed mitigating circumstances. *Mollett v. Mullin*, 348 F.3d 902, 918 (10th Cir. 2003) (Oklahoma juries may decline to impose death penalty even if they find aggravating circumstances outweigh mitigating circumstances).

The same is true concerning the balance of Petitioner's challenges to argument for which no objection was lodged. This argument amounts to fair comment on the evidence as it applied to the aggravating circumstances alleged. Further, the prosecutor did not tell the jury to ignore mitigating circumstances. Rather, the prosecutor questioned whether certain evidence presented by Petitioner actually constituted mitigating circumstances. This was proper. *Malicoat*, 426 F.3d at 1257 ("A prosecutor may present an argument to the jury regarding the appropriate weight to afford the mitigating factors offered by the defendant").

Petitioner's challenge to the prosecutor throwing unspecified photographs on defense counsel's table during closing argument does not warrant relief. Assuming *arguendo* this amounted to error, it did not deprive Petitioner of a fair trial. The jury's rejection of the continuing threat aggravator, standing alone, shows the jury was not unfairly swayed by this prosecutorial argument. Moreover, the jury sentenced Petitioner to death based on the strong evidence that he hired Justin Sneed to murder the victim and the brutal nature of the murder, discussed in sections I and VI, not alleged prosecutorial misconduct. Relief is unwarranted here as Petitioner was not deprived of a fundamentally fair trial in violation of due process or any other federal constitutional right. The OCCA's rejection of these prosecutorial claims was wholly reasonable.

**8.  Summary.**  None of the individual claims of prosecutorial misconduct discussed above, either individually or cumulatively, warrant habeas relief. *Bland*, 459 F.3d at 1029 (reviewing instances of prosecutorial misconduct cumulatively for the denial of a fundamentally fair trial). The evidence supporting Petitioner's first degree murder conviction was strong, being based on the corroborated testimony of his accomplice, Justin Sneed. As discussed in Section VI below, this same testimony supported the aggravating circumstance found by the jury, namely, that the murder was committed for remuneration or promise of remuneration. *See also Glossip*, 2007 OK CR 12, ¶¶ 43, 115-17, 157 P.3d at 152 & 161. Ultimately, none of the alleged prosecutorial misconduct considered cumulatively prevented the jury from fairly judging the evidence, *Bland*, 459 F.3d at 1024, or otherwise denied

Petitioner a fundamentally fair trial in violation of due process.  Again, that the jury rejected the continuing threat aggravator makes this point clear.

The OCCA analyzed Petitioner's prosecutorial misconduct claims in terms of cumulative error analysis.  *See Glossip*, 2007 OK CR 12, ¶¶ 81 & 93-99, 157 P.3d at 157 & 158-59.  The OCCA's adjudication was neither contrary to, nor an unreasonable application of, clearly-established Supreme Court precedent to the facts of this case.  Nor was it based on an unreasonable determination of the facts.  Relief must therefore be denied. 28 U.S.C. § 2254(d).

## V.

### PETITIONER IS NOT ENTITLED TO RELIEF BASED ON ALLEGED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL.

In Ground V, Petitioner alleges he is entitled to federal habeas relief based on several instances of ineffective assistance of trial counsel.  Specifically, Petitioner complains that his trial counsel were constitutionally ineffective for failing to: (1) utilize Justin Sneed's videotaped interview with homicide detectives for impeachment purposes; (2) utilize Defense Exhibit 71 to demonstrate shortages at the victim's Tulsa motel; (3) object to alleged character testimony from Kayla Pursley and Billye Hooper; (4) object to the alleged improper testimony from Donna Van Treese and Justin Sneed detailed in Ground II; and (5) object to the alleged prosecutorial misconduct set forth in Ground IV.  Doc. 25 at 115-30.

### A.   Exhaustion.

These claims were presented to the OCCA in Proposition V of Petitioner's direct appeal brief. *See Glossip v. State*, 2007 OK CR 12, ¶¶ 100-13, 157 P.3d 143, 159-61. The claims in this ground for relief are therefore exhausted.

### B.   Merits.

To establish ineffective assistance of trial counsel, Petitioner must prove that counsel's performance was constitutionally deficient and that counsel's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prove deficient performance, Petitioner must overcome the strong presumption that counsel's conduct was constitutionally effective. Specifically, he "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689. It is not enough that counsel's decisions were wrong in hindsight; they must fall below "an objective standard of reasonableness," evaluated from counsel's perspective at the time the decision was made. *Id.* at 688. Further, "[j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* at 689. A reviewing court must take every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*

Thus, a reviewing court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690.

To establish prejudice, Petitioner must show that, but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. If the alleged ineffective assistance occurred during the guilt-innocence stage, this Court determines whether there is a reasonable probability the jury would have had reasonable doubt respecting guilt. *Id.,* 466 U.S. at 695. In assessing prejudice, this Court looks at the totality of the evidence, not just the evidence helpful to Petitioner. *See Cooks v. Ward*, 165 F.3d 1283, 1293 (10th Cir.1998). If the alleged ineffectiveness occurred during the sentencing phase, this Court considers whether there is a "reasonable probability that, absent the errors, the sentencer...would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695; *see also Cooks*, 165 F.3d at 1296.

Where, as here, the state court denied the ineffective assistance claims on the merits (with one exception noted below), the issue under AEDPA's deferential provisions is whether the state court's decision was either contrary to, or an unreasonable application of, *Strickland*. 28 U.S.C. § 2254(d)(1); *Sandoval v. Ulibarri*, 548 F.3d 902, 911 (10th Cir. 2008); *Welch v. Sirmons*, 451 F.3d 675, 704 (10th Cir. 2006).

1.      **Justin Sneed's Videotaped Interview.** Petitioner first complains that his trial counsel were ineffective for failing to use Justin Sneed's videotaped interview for impeachment of Sneed and Detective Bob Bemo. Petitioner concedes that "trial counsel

cross-examined both Justin Sneed and Det. Bemo in the 2004 retrial regarding the circumstances of the interrogation and some of the discrepancies between the videotape and the trial testimony, and counsel attempted to elicit admissions regarding the same..." Doc. 25 at 119. Petitioner contends, however, that trial counsel were incompetent for not playing the videotaped interview for the jury. Petitioner argues playing the tape for the jury would have: (1) shown that Bemo manipulated Sneed to implicate Petitioner; (2) impeached Sneed's testimony that he did not believe Bemo told him at the outset of the interview that Petitioner had been arrested; and (3) shown several alleged discrepancies between Sneed's trial testimony and statements he made to homicide detectives during his interview. Doc. 25 at 118-24.

Applying *Strickland*, the OCCA rejected this claim. Despite the fact that Sneed's videotaped interview was not part of the record because it was not introduced at trial, the OCCA nonetheless considered the contents of the videotape and rejected the claim on the merits. *Glossip*, 2007 OK CR 12, ¶¶ 100-06, 157 P.3d at 159-60. The OCCA noted that previous counsel's failure to impeach Sneed by playing the videotape at the first trial was one of many reasons the OCCA reversed Petitioner's original conviction and death sentence. *Id.*, 2007 OK CR 12, ¶¶ 103-04, 157 P.3d at 160. Recognizing that Petitioner's counsel at the second trial knew previous counsel was found ineffective for failing to introduce the Sneed videotape, the OCCA articulated three possibilities explaining counsel's failure to introduce the videotape at the second trial, namely, that counsel at the second trial were: (1) "banking on [their] ineffectiveness garnering [their] client another trial"; (2) "[they] made a strategic

decision not to introduce the tape and only question witnesses about the statements on the tape"; or (3) failure to utilize the videotape was not the sole reason counsel was deemed ineffective at the first trial. *Id.*, 2007 OK CR 12, ¶ 104, 157 P.3d at 160.

The OCCA expressly found the first reason invalid. *Id.*  It also pointed out that the absolute failure to utilize the videotape during the first trial was one of many reasons (including counsel's total failure to prepare for trial, formulate any reasonable defense theory and failure to object to inadmissible evidence) why Petitioner's original trial attorney was deemed constitutionally ineffective. *Id.,* 2007 OK CR 12, ¶ 104 n.12 & n.13, 157 P.3d at 160. The OCCA observed that counsel during the second trial actually used the contents of the videotape to cross-examine both Sneed and Bemo regarding the circumstances of the police interview, statements made during the interview and discrepancies between current testimony and statements on the tape.  The OCCA found this to be "a valid strategy." *Id.*, 2007 OK CR 12, ¶¶ 104 & 106, 157 P.3d at 160.

Petitioner concedes that the OCCA "applied *Strickland*, the correct standard" in rejecting this particular claim on the merits and that AEDPA applies to this claim.  Doc. 25 at 124.  In light of the above discussion, the issue before this Court under 28 U.S.C. § 2254(d) is simply whether the OCCA's adjudication of this claim resulted in a decision that was either contrary to, or an unreasonable application of, *Strickland*.[8]

---

[8]  A discussion of whether AEDPA deference applies when the OCCA denies an ineffective assistance  claim based on extra-record evidence under Rule 3.11(B)(3)(b), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2006), is unnecessary. *See Wilson v. Sirmons*, 549 F.3d 1267 (10th Cir. 2008) (order setting en banc review).  The OCCA did not apply the Rule 3.11 standard in the text of its analysis rejecting the

The OCCA's rejection of this claim was wholly reasonable. Petitioner fails to show that counsel's performance was constitutionally deficient or that he was prejudiced.

First, Detective Bemo admitted on cross-examination that he told Sneed at the beginning of the interview that Petitioner was under arrest and that Petitioner "was the one who was laying it on him the heaviest as far as pointing the finger at Justin Sneed" (Tr. XIV 70-71). Bemo testified that he told Sneed that he did not believe Sneed was the only one involved in the homicide, that Bemo knew the crime was committed by others besides Sneed (Tr. XIV 70). Defense counsel also elicited from Bemo that these statements were "suggestive in nature" and that Bemo did not know whether Sneed could have been influenced based on those suggestive statements (Tr. XIV 71). Trial counsel clearly brought out for the jury events from the beginning of Sneed's interview favorable to Petitioner's theory that Bemo influenced Sneed to implicate Petitioner in the murder. Trial counsel elicited from Sneed on cross-examination that he was not initially truthful with detectives, that he initially denied any involvement in the homicide, that it took him "a little while" before he opened up and gave his statement, that he understood the police were focusing on him as a suspect and that he understood other people "were pointing the finger toward [him]" (Tr. XII 204-05; Tr.

---

substantive ineffective assistance claim raised by Petitioner. The OCCA only applied the Rule 3.11 standard in footnote 10 denying Petitioner's request for an evidentiary hearing on his ineffectiveness claims. Footnote 10 was inserted immediately after the introduction of the claim at the beginning of the ineffective assistance of counsel merits analysis. *Glossip*, 2007 OK CR 12, ¶ 100 n.10, 157 P.3d. at 159. The Court's substantive analysis in the text of the opinion after footnote 10 specifically articulates and applies the *Strickland* standard, *id.*, 2007 OK CR 12, ¶¶ 100-02, 157 P.3d at 159-60, to Petitioner's records-based and extra-record ineffectiveness claims.

XIII 12-14). Sneed admitted on cross-examination that he implicated Petitioner only after telling detectives he knew other people "were pointing the finger at [him]" (Tr. XIII 14). Trial counsel's performance was clearly not deficient in this regard.

Second, Bemo testified that he told Sneed during the interview that Petitioner was under arrest (Tr. XIV 70). This impeached Sneed's earlier testimony that he did not believe the detectives told him that Petitioner had been arrested (Tr. XIII 13). Trial counsel therefore successfully impeached Sneed on this point with Bemo's testimony. Trial counsel was not required to pursue this further because the point was made.

Third, Sneed was impeached by the prosecutor with alleged inconsistencies and omissions between his trial testimony and the statement to homicide detectives. On direct examination, Sneed acknowledged that he told detectives that Petitioner offered him $7,000.00 to kill the victim (Tr. XII 166-67). Defense counsel then impeached Sneed with the fact that he previously testified that Petitioner offered $7,000.00 in exchange for the homicide, different from his testimony at the 2004 trial that it was supposed to be $10,000.00 (Tr. XIII 28-31). Sneed's alleged inconsistencies on this point were thus presented to Petitioner's jury and trial counsel was not deficient for failing to pursue it further.

Fourth, trial counsel elicited from Sneed that he had never previously mentioned, until his 2004 trial testimony, that he attempted to stab the victim in the chest with the pocket knife. He admitted during this exchange that he did not mention this fact to the detectives (Tr. XIII 6-7). The prosecutor's re-direct examination confirmed that Sneed did not tell detectives

67

about stabbing the victim with the pocket knife even though the detectives specifically asked whether he did (Tr. XIII 75-76).

Fifth, Sneed admitted on cross that he did not tell detectives during the interview about Petitioner urging him to kill the victim with a hammer in the boiler room (Tr. XIII 27).  On re-direct, however, he explained that the detectives did not ask him about the boiler room incident (Tr. XIII 78-79).  Bemo confirmed during cross that Sneed never told detectives about the boiler room incident (Tr. XIV 78-79).

Sixth, Sneed admitted on cross that he did not tell detectives during the interview that Petitioner took a one hundred dollar bill from the victim's billfold (Tr. XIII 44).  Bemo confirmed this fact (Tr. XIV 77).

Seventh, while Sneed initially testified on cross that he did not remember whether he told detectives about the hacksaw, trash bags and muriatic acid during his interview, defense counsel eventually elicited from Sneed that "I don't think I did, no" regarding this list of items (Tr. XIII 47-50).  On re-direct, Sneed explained that he was not asked by detectives about anything else he bought at the hardware store besides the plexiglass, that he was only asked about the acid, trash bags and hacksaw during his original testimony (Tr. XIII 81-82).

All things considered, Petitioner fails to show either deficient performance or prejudice under *Strickland* based on failure to play the videotape of Sneed's interview with detectives.  Unlike Petitioner's 1998 trial, trial counsel actively impeached Sneed with the inconsistencies and omissions from his statement to detectives–the very inconsistencies and omissions Petitioner now claims were not presented to his jury.  *See Glossip*, 2007 OK CR 12, ¶ 104

68

n.13, 157 P.3d at 160 ("In this case, trial counsel questioned both Bemo and Sneed about inconsistencies between prior statements and current testimony").  Indeed, this was a major component of counsel's cross-examination of Sneed.  Trial counsel was not required to attempt to present cumulative evidence in the form of the videotape to a jury that had been listening to testimony in open court for nearly two weeks.  The OCCA's adjudication of this claim was wholly reasonable.  Relief must be denied.

   2.    **Tulsa Motel Financial Records.**  Petitioner complains that trial counsel was ineffective for failing to utilize financial records disclosed by Donna Van Treese after the murder that showed an alleged $5,226.78 shortage at the victim's Tulsa motel which was managed by William Bender.  Trial counsel attempted to introduce these very financial records during the trial as Defendant's Exhibit 71-A for largely the same reasons advanced on appeal.  However, the trial court sustained the prosecution's relevancy objection (Tr. IV 177-78; Tr. V 53-55).  Even after review of William Bender's testimony, the trial court's assessment remains correct.  Information regarding alleged shortages at the Tulsa motel are simply not relevant to the issue of Petitioner's mismanagement of the Oklahoma City motel.  Petitioner does not seriously dispute the shortage reported by Donna Van Treese, reflected on Defendant's Exhibit 71-A, for the Oklahoma City motel.

   Further, Bender's testimony that the victim told him the night of the murder that he wanted Bender to manage the Oklahoma City motel is not necessarily inconsistent with Bender being fired two months later over on-going shortages at the Tulsa motel (Tr. VIII 83).  During a bench conference over the financial records, the prosecutor stated that Donna Van

69

Treese would testify in rebuttal that Bender was mismanaging the Tulsa motel and it was the Van Treeses' intention to fire him as well, but that "they were going to take care of [Petitioner] of the Oklahoma City motel first" (Tr. IV 178).  The prosecutor further noted that Bender had been fired two months after the murder, that Bender and Petitioner "were both taking advantage of this family at the time of their loss" (Tr. IV 178).

As noted by the OCCA, that intent would not necessarily preclude temporarily moving Bender to the Oklahoma City motel while the Van Treeses found new employees to run both motels.  *Id.*, 2007 OK CR 12, ¶ 90, 157 P.3d at 158.  The victim could then assess the condition of the Tulsa motel without any on-site interference from Bender or his wife. Testimony from Bender that the victim was angrily checking rooms at the Tulsa motel because he believed Bender was cheating him in the same manner as Petitioner suggests that the victim did not trust Bender but that Bender might be a "quick fix" at the Oklahoma City motel upon Petitioner's firing (Tr. VIII 81-82).

The OCCA rejected this claim on the merits:

> ¶ 107 Glossip next argues that trial counsel failed to utilize readily available evidence (other than the video tape mentioned above) to cross-examine witnesses. Glossip clams that counsel was ineffective for failing to utilize financial records concerning the victim's Tulsa motel to show that the "over $6,000.00 shortage" at the Oklahoma City motel was not unusual. Counsel did attempt to introduce this evidence, but the trial court ruled it inadmissible. Counsel did not try to impeach witnesses with the documents.

> ¶ 108 Part of the State's theory was that Glossip wanted Van Treese killed so he could take over the management of both motels: Oklahoma City and Tulsa. The State also presented

evidence that Glossip was going to be confronted about the $6,000.00 shortage. Furthermore, evidence was presented that Glossip did not want Van Treese to discover the condition of the motel.

¶ 109 The shortages at the Tulsa motel, while relevant to show that the $6000.00 shortage was not unusual, was not relevant to show that Glossip intended to have Van Treese killed because he feared termination. His fear was based on the condition of the motel, the missing registration cards, and missing money at the Oklahoma City motel.

*Glossip*, 2007 OK CR 12, ¶¶ 107-09, 157 P.3d at 160-61.  The OCCA's adjudication was

wholly reasonable.[9]  Petitioner fails to show either deficient performance or prejudice under

*Strickland* based on trial counsel's failure to present the irrelevant financial information from

the Tulsa motel.  Relief must be denied.

**3.**     **Oklahoma City Motel Records.**  Petitioner contends that trial counsel were

ineffective for failing to impeach Billye Hooper's testimony that motel room rentals at the

Oklahoma City motel remained consistently at 19 to 21 rooms.  Petitioner claims that financial

records from the Oklahoma City motel, in trial counsel's possession, show that the number

---

[7]   To the extent Petitioner complains that the OCCA did not review this particular ineffectiveness claim, he is mistaken. Doc. 25 at 125.  As shown above, the Court analyzed Petitioner's claim and found that the Tulsa motel records were simply irrelevant.  Thus, trial counsel was not ineffective for failing to present it.  Although the OCCA did not expressly recite in the above passage that this particular ineffectiveness claim was denied, the effect of its words lead to that inescapable conclusion, as does the Court's conclusion at the end of the opinion that "[w]e find no error warranting reversal of Glossip's conviction or sentence of death for first-degree murder, therefore the Judgment and Sentence of the trial court is, hereby, AFFIRMED." *Glossip*, 2007 OK CR 12, ¶ 134, 157 P.3d at 164.  The same is true of the Court's recitation of the *Strickland* standard at the beginning of the ineffective assistance section of the opinion, *id.*, 2007 OK CR 12, ¶¶ 100-02, 157 P.3d at 159-60, and its application of *Strickland* to the ineffectiveness claims raised by Petitioner.

of room rental "varied widely for every single month of 1996." Petitioner argues "[t]his information would cast doubt on the State's theory that Petitioner had a motive to murder Mr. Van Treese" and therefore he was prejudiced from trial counsel's failure to use the information from these records. Doc. 25 at 127-28.

The OCCA did not review this particular ineffectiveness claim, thus, AEDPA deference does not apply. Assuming *arguendo* the truth of Petitioner's factual allegations, he would still not be entitled to relief. The State presented extensive evidence, beyond the cited passage from Billye Hooper's testimony, establishing Petitioner's motive for murdering the victim. This included testimony from Justin Sneed, William Bender, Donna Van Treese, Cliff Everhart and the people who took over the motel after the murder. Their testimony established that Petitioner was about to be fired at the Oklahoma City motel because of its deplorable conditions and the shortages on the books Petitioner had created. *See id.*, 2007 OK CR 12, ¶¶ 5, 8-12, 45-46, 64, 89 & 109, 157 P.3d at 148-49, 152-53, 155, 158, 161.

Indeed, the State presented evidence establishing that Barry Van Treese was going to confront Petitioner on January 6th or 7th about shortages on the motel books that had persisted through the end of 1996. Cliff Everhart testified he was supposed to meet Van Treese at the Oklahoma City motel on the night of January 6th so they could confront Petitioner about these shortages (Tr. XI 172-77, 201). Everhart had previously told Van Treese he believed Petitioner "was probably pocketing a couple hundred extra" a week from the motel cash receipts during the last two or three months of 1996. Everhart reached this conclusion by independently comparing at different times the rooms actually rented against the registration

sheet in the motel office.  Everhart discovered discrepancies during the two or three months before the murder (Tr. XI 172-73).

In December 1996, Billye Hooper shared her concerns about Petitioner's management of the motel with Van Treese, who told her he "knew things had to be taken care" of regarding Petitioner's management of the motel.  Van Treese promised her that he would take care of it after Christmas (Tr. VII 37-40; Tr. VIII 32-34).  Van Treese's wife testified that by the end of December 1996, she and the victim discovered shortages from the motel accounts receivables totaling $6,101.92 and that the victim intended to confront Petitioner about these shortages on January 6th.  Van Treese told his wife that he would also audit the Oklahoma City motel and perform a room-to-room inspection of the motel at that time (Tr. IV 62-66, 68-72).

William Bender testified that Van Treese "was all puffed up.  He was upset.  He was mad...He was all red in the face" when Van Treese arrived at the Tulsa motel just before midnight on January 6th (Tr. VIII 63-64).  During Van Treese's brief visit to the motel, he told Bender that there were a number of registration cards missing at the Oklahoma City motel, that weekend receipt money was missing and that Petitioner was falsifying the motel daily reports by allowing people to stay in rooms that were not registered (Tr. VIII 80-82).  Van Treese said that he gave Petitioner until he returned to Oklahoma City "to come up with the weekend's receipts that were missing and if he came up with that, he was going to give him another week to come up with the registration cards and get all the year-end receipts together." Otherwise, Van Treese told Bender he was going to call the police (Tr. VIII 82).

Evidence was presented that the condition of the Oklahoma City motel on January 7th was deplorable.  Kenneth Van Treese, the victim's brother, assumed control of the motel immediately after the murder.  He discovered that only around 24 of the 54 rooms at the motel were in habitable condition.  12 rooms had no working heat.  Other problems included keys that did not fit room doors, broken or dirty plumbing fixtures and broken telephone systems (Tr. XI 116-18).  Kenneth testified that "the main thing that was wrong with the motel was it was filthy.  It was absolutely filthy" (Tr. XI 119).  The jury could infer that the victim was unaware of these deteriorating conditions because he made only four overnight trips to the motel during the last half of 1996 (Tr. IV 41-42, 58-59).

This evidence corroborated Justin Sneed's testimony that Petitioner feared being fired the morning of January 7th because of Petitioner's mismanagement at the motel, in particular his failure to remodel several rooms (Tr. XII 95-97).  In total, it provides strong motive for the murder.  It is also not dependant on the cited passage from Hooper's testimony regarding the number of motel rooms rented after her return to the Oklahoma City motel in October 1996 (Tr. VII 41, 45-47, 94).  Further, Hooper admitted on re-direct that she would not know if the books did not balance at the motel (Tr. VIII 31).

All things considered, Petitioner fails to show a reasonable probability of a not-guilty verdict had trial counsel introduced the Oklahoma City motel records for the purposes identified.  The State's evidence of motive was overwhelming and was not dependant upon the cited passage from Billye Hooper's testimony.  Petitioner therefore fails to meet

*Strickland's* prejudice prong and fails to show ineffective assistance of counsel. *Strickland,* 466 U.S. at 695. Relief must be denied.

**4. Failure to Object to Evidence Discussed in Ground II.** Petitioner next complains that trial counsel were ineffective for failing to object to the litany of meritless challenges against the testimony of Donna Van Treese and Justin Sneed set forth in Ground II. Doc. 25 at 128. As shown above in response to Ground II, however, the challenged testimony was relevant and properly admitted. Petitioner fails to demonstrate prejudice or deficient performance under *Strickland* based on trial counsel's failure to make meritless objections.

The OCCA rejected this claim on the merits. *Glossip*, 2007 OK CR 12, ¶ 112 , 157 P.3d at 161. In his habeas petition, Petitioner correctly applies the AEDPA standard of review to this merits adjudication but reaches the wrong result. Doc. 25 at 128. The OCCA's adjudication of this claim, like its adjudication of the evidentiary challenges discussed in Ground II, was wholly reasonable in light of the meritless nature of the individual claims. Relief must therefore be denied.

**5. Failure to Object to Alleged Instances of Prosecutorial Misconduct.** Petitioner complains that trial counsel were ineffective for failing to object to the multiple instances of prosecutorial misconduct he alleges in Ground IV also lacks merit. Doc. 25 at 129. As shown above in response to Ground IV, the challenged passages reflect reasonable comment on the evidence and law, not prosecutorial misconduct. Trial counsel was not ineffective under *Strickland*. Again, Petitioner correctly applies the AEDPA standard of

review in his analysis of this claim but simply reaches the wrong result.  Doc. 25 at 129.  The

OCCA's rejection of this ineffectiveness claim, *id.*, 2007 OK CR 12, ¶ 113, 157 P.3d. at 161,

was wholly reasonable considering the meritless nature of the prosecutorial misconduct

claims.

## VI.

### SUFFICIENT EVIDENCE WAS PRESENTED TO SUPPORT THE MURDER FOR REMUNERATION AGGRAVATING CIRCUMSTANCE.

In Ground VI, Petitioner challenges the sufficiency of the evidence supporting the

murder for remuneration aggravating circumstance found by his jury.  First, Petitioner claims

that the only evidence supporting this aggravator is Justin Sneed's testimony.  Petitioner

reasons that Sneed's testimony is too unreliable and inconsistent to be believed by any rational

juror.  Second, Petitioner argues that Sneed's testimony "at most indicates a plan to murder

Mr. Van Treese in order to rob him of the money in his car."  Petitioner argues that the murder

for remuneration aggravator does not apply to murders committed solely to facilitate a

robbery.  Doc. 25 at 130-37.

### A.  Exhaustion.

Petitioner presented this claim to the OCCA in Proposition VI of his direct appeal brief.

It is therefore exhausted for purposes of federal habeas review.

### B.  Merits.

The OCCA rejected this claim on the merits, finding that sufficient evidence was

presented to support this claim:

¶ 114  In proposition six, Glossip claims there was insufficient evidence to support the sole aggravating circumstance of murder for remuneration. Murder for remuneration, in this case, requires only that Glossip employed Sneed to commit the murder for payment or the promise of payment.  21 O.S.2001, § 701.12.

¶ 115  Here, Glossip claims that Sneed's self-serving testimony was insufficient to support this aggravating circumstance. Glossip claims that the murder was only a method to steal the money from Van Treese's car.

¶ 116  The flaw in Glossip's argument is that no murder needed to occur for Sneed and Glossip to retrieve the money from Van Treese's car. Because Glossip knew there would be money under the seat, a simple burglary of the automobile would have resulted in the fruits of their supposed desire. The fact is that Glossip was not after money, he wanted Van Treese dead and he was willing to pay Sneed to do the dirty work. He knew that Sneed would do it for the mere promise of a large payoff. There was no evidence that Sneed had any independent knowledge of this money.

¶ 117 There is sufficient evidence that Glossip promised to pay Sneed for killing Van Treese.

*Glossip v. State*, 2007 OK CR 12, ¶¶ 114-17, 157 P.3d 143, 161.

Petitioner contends that AEDPA deference does not apply here because the OCCA "did not apply any standard" in adjudicating his evidentiary sufficiency claim.  Doc. 25 at 130. Petitioner ignores, however, that the state court is not required to expressly apply any particular standard in order to receive deference.  A federal habeas court must look not at the authorities, if any, relied upon by the state court, but to the court's reasoning and result.  As recently reiterated by the Supreme Court:

A state-court decision is contrary to this Court's clearly established precedents if it applies a rule that contradicts the governing law set forth in our cases, or if it confronts a set of facts that is materially indistinguishable from a decision of this

77

> Court but reaches a different result.  A state-court decision
> involves an unreasonable application of this Court's clearly
> established precedents if the state court applies this Court's
> precedents to the facts in an objectively unreasonable manner.

*Brown v. Payton*, 544 U.S. 133, 141 (2005) (internal citations omitted).  "Avoiding these pitfalls does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [those] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  *Thornburg v. Mullin*, 422 F.3d 1113, 1124 (10th Cir. 2005) (quoting *Early v. Packer*, 537 U.S. 3, 8 (2002)).  Here, the OCCA resolved Petitioner's constitutional claim on the merits and not on some procedural grounds.  That is sufficient to trigger AEDPA deference.  *See Cook v. McKune,* 323 F.3d 825, 831 (10th Cir. 2003) (state court's failure to discuss or even be aware of federal precedent does not in itself render the state court's decision contrary to federal law; resolution of a constitutional claim based on state law, and without reference to federal cases, warranted AEDPA deference); *Le v. Mullin*, 311 F.3d 1002, 1011 n.2 (10th Cir. 2002) ("If, in the context of a *summary disposition*, a state court gives any indication that it addressed all of a petitioner's federal constitutional [claims]–even if the state court says nothing about the specifics of the petitioner's arguments, fails to reference federal case law supporting the decision, and remains silent as to the reasoning forming the basis of its resolution–this court applies AEPDA's deferential standard of review").

The Supreme Court held in *Lewis v. Jeffers*, 497 U.S. 764 (1990) that, with regard to the sufficiency of the evidence for aggravating circumstances, the standard of review set forth

in *Jackson v. Virginia*, 443 U.S. 307 (1979)—whether any rational trier of fact, viewing the evidence in the light most favorable to the State, could have found the essential element of the crime beyond a reasonable doubt—is applicable. *Jeffers*, 497 U.S. at 781-82. Although aggravating circumstances are not "elements" of any offense, the standard of review for determining whether evidence is sufficient to convict is equally applicable to protecting a defendant's Eighth Amendment right to be free from the arbitrary and capricious imposition of the death penalty. *Id.* at 782. Like factual findings, state court findings of aggravating circumstances often require a sentencer to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id. See also Boltz v. Mullin,* 415 F.3d 1215, 1230 & 1232 (10th Cir. 2005); *Fields v. Gibson,* 277 F.3d 1203, 1220 (10th Cir. 2002).

Petitioner fails to show that the OCCA's adjudication of this claim was either contrary to, or an unreasonable application of, *Jackson* or that it was based on an unreasonable determination of the facts. Taken in the light most favorable to the State, sufficient evidence was presented to support the jury's finding of the murder for remuneration aggravator. Justin Sneed testified that around 3:00 a.m. on January 7th, Petitioner banged on Sneed's motel room door and demanded entry (Tr. XII 94). Petitioner had asked Sneed five but less than ten times previously to kill Barry Van Treese (Tr. XII 75-90). Petitioner told Sneed that with Van Treese out of the way, Petitioner could control both the Oklahoma City and Tulsa motels. Petitioner claimed that he could talk Van Treese's wife into letting him control both motels

if Van Treese was killed.  Petitioner promised Sneed money if he killed Van Treese (Tr. XII 89-90).

Once inside Sneed's room, Petitioner told Sneed that Van Treese had just returned to the motel.  Petitioner appeared "real nervous, real jittery" and wanted Sneed to murder Van Treese "right now" (Tr. XII 95).  Petitioner said that if Van Treese walked around the motel in the morning and "seen a couple of the rooms that were already supposed to be remodeled that weren't that [Petitioner] was going to get fired" (Tr. XII 95).  Petitioner was supposed to have completely remodeled one of the handicapped rooms at the motel and make minor repairs in other rooms (Tr. XII 96-97).  Petitioner threatened that Sneed too would be evicted from the motel if Petitioner were fired (Tr. XII 95-96).  Petitioner told Sneed that Van Treese was asleep in Room 102 (Tr. XII 98).  On his way out the door, Petitioner looked at a baseball bat laying in Sneed's room and said "why don't [you] just grab that bat and go over there and do it right now" (Tr. XII 96).  Petitioner urged Sneed three or for time during this conversation to murder Van Treese (Tr. XII 98).  Petitioner told Sneed during this conversation that he would pay Sneed $10,000.00 if he killed Van Treese immediately.  Petitioner also promised that he would put Sneed in charge of one of the motels once Van Treese was dead (Tr. XII 98-99).

Sneed agreed to kill Van Treese and Petitioner left the room (Tr. XII 99-100).  Sneed then committed the murder (Tr. XII 100-02, 112-13, 223).  Sneed testified that he was in Room 102 for fifteen (15) to twenty (20) minutes and that he hit Van Treese a maximum of ten (10) times with the baseball bat (Tr. XII 112-13, 223).

Under Oklahoma law, the murder for remuneration aggravator applies where "the person committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration." Okla. Stat. tit. 21, § 701.12(3).  Under Oklahoma law, "[t]he traditional application for this aggravating circumstance has been where a defendant has been hired or has hired another person to perform an act of murder."  *Plantz v. State*, 1994 OK CR 33, ¶ 42, 876 P.2d 268, 281. "However, murder for remuneration has also been applied to killings motivated primarily to obtain proceeds from an insurance policy."  *Id.* (citing *Johnson v. State*, 1982 OK CR 37, 665 P.2d 815, 824; *O'Bryan v. State*, 591 S.W.2d 464, 480 (Tex.Cr.1979)).

Justin Sneed's testimony, taken in the light most favorable to the prosecution, would allow any rational trier of fact to find existence of the murder for remuneration aggravating circumstance beyond a reasonable doubt.   Simply put, Petitioner promised Sneed remuneration in the form of, *inter alia*, $10,000.00, if he would murder the victim.  "This was not a crime of passion, nor was the murder committed as an afterthought while [Petitioner] was in the course of committing another felony offense, such as robbery or burglary." *Johnson v. State*, 1995 OK CR 62, ¶ 53, 911 P.2d 918, 929.  Rather, the evidence shows Van Treese's murder was motivated by financial gain.  Petitioner's contention that Van Treese's murder was committed to facilitate robbery of the victim ignores the record.  Sneed testified that the reason he murdered Van Treese was because Petitioner said he would pay him to do it (Tr. XII 178).  That Sneed never collected the entire amount promised is an insufficient challenge legally and factually to the sufficiency of the evidence supporting this aggravator.

*See Plantz*, 1994 OK CR 33, ¶ 42, 876 P.2d at 281 ("The fact that Appellant was apprehended before she could actually collect the money does not obviate this aggravating circumstance"). It is also not significant that Petitioner split the $4,000.00 Sneed recovered after the murder from the victim's car.  Sneed originally testified that he did not know where the $10,000.00 Petitioner promised him would come from (Tr. XII 98-99).  Any conflict in Sneed's testimony was for the jury to resolve, not this Court on collateral review.

Moreover, Sneed only recovered the victim's car keys after: (1) leaving Room 102 and returning to his room after spending fifteen to twenty minutes with the body (Tr. XII 112-13, 117-18); (2) changing his bloodied clothes (Tr. XII 117-119); (3) going to the motel office and meeting with Petitioner (Tr. XII 119-22); (4) returning to Room 102 to clean up glass from the broken window and to dispose of the murder weapon (Tr. XII 122); (5) returning again to his motel room (Tr. XII 122); (6) then returning to Room 102 with Petitioner where Sneed recovered the victim's car keys per Petitioner's instructions (Tr. XII 123-24).  This extreme time delay in recovering the victim's car keys that led to the money demonstrates that Petitioner and Sneed were not interested in perpetrating a robbery but rather, committing a homicide.

The evidence clearly shows that Sneed's motive for the murder was remuneration, not robbery.  That is all Oklahoma law requires for a finding of this aggravator.  The OCCA's adjudication of this claim was therefore wholly reasonable.  Relief must be denied.

# VII.

# PETITIONER'S CONSTITUTIONAL CHALLENGE TO OKLAHOMA'S WEIGHING INSTRUCTION DOES NOT WARRANT HABEAS RELIEF.

In Ground VII, Petitioner challenges the constitutionality of Oklahoma's capital sentencing scheme based on *Jones v. United States*, 526 U.S. 227 (1999), *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Ring v. Arizona*, 536 U.S. 584 (2002). Because his jury was not required to find that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt, Petitioner claims he is entitled to a new capital sentencing hearing under *Jones, Apprendi* and *Ring*. Petitioner also argues that the Oklahoma statutes require giving such an instruction and that the OCCA's failure to extend to him that state-law right violates due process under *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980). Doc. 25 at 137-44.

## A.    *Exhaustion.*

Petitioner argued in Proposition VII, sub-part A, of his direct appeal brief that the uniform weighing instruction provided to his jury resulted in an unconstitutional and unreliable death sentence in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments. Petitioner reasoned that under *Jones*, *Apprendi* and *Ring*, he had a federal constitutional right to an instruction requiring the jury find that aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt before the death penalty could be imposed. Petitioner also argued that Oklahoma law required such an instruction. Hence, these aspects of Petitioner's claim are exhausted for purposes of federal habeas review.

83

However, Petitioner's claim based on *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980) that a criminal defendant has a federal constitutional right to statutorily-conferred rights and that the denial of those state-law rights constitutes a violation of due process is unexhausted and procedurally barred.  Doc. 25 at 141  Petitioner did not cite *Hicks*, let alone advance this particular argument, in support of his challenge to Oklahoma's uniform weighing instruction.  Rather, he relied exclusively upon *Jones, Ring and Apprendi*, Oklahoma statutes and OCCA decisions.  Hence, this claim was not presented at any point in state court and is unexhausted and procedurally barred from review on independent and adequate state law grounds.  The State incorporates here by reference the discussion above from Ground I regarding exhaustion and procedural bar.  *See generally Bland v. Sirmons*, 459 F.3d 999, 1011-12 (10th Cir. 2006).

The State now turns to the merits of Petitioner's properly exhausted claims.

### B.      Merits.

The OCCA rejected this claim on the merits.  *Glossip v. State*, 2007 OK CR 12, ¶ 118, 157 P.3d 143, 161.  Thus, AEDPA deference applies.  Petitioner's passing mention that the OCCA did not review this claim, and therefore AEDPA deference does not apply, lacks merit.  Doc. 25 at 138-39.  The OCCA recognized the federal nature of the claim, going so far as to cite *Ring*.  The state court then relied upon its previous rejection of this claim in denying relief.  *Id.*  Thus, there is no question that the OCCA denied this claim on the merits.  *Cf. Cook v. McKune*, 323 F.3d 825, 830-31 (10th Cir. 2003).

To the extent Petitioner challenges the uniform weighing instruction provided to his jury on state law grounds, he is not entitled to relief.  It is well settled that the fact that the

instruction was allegedly incorrect under state law is not a basis for habeas relief.  *Parker v. Scott*, 394 F.3d 1302, 1319 (10th Cir. 2005).  Further, a state court's interpretation of a state statute is a matter of state law binding on this court.  *Id.*  Consistent with its prior decisions, the OCCA rejected Petitioner's challenge, including his state law challenge to the weighing instruction.  *Glossip*, 2007 OK CR 12, ¶ 118, 157 P.3d at 161 (citing *Mitchell v. State*, 2006 OK CR 20, ¶ 81, 136 P.3d 671, 704).  *See also Torres v. State*, 2002 OK CR 35, ¶¶ 3-7, 58 P.3d 214, 215-16.  Thus, this Court must accept the OCCA's interpretation of Oklahoma law.  *House v. Hatch*, 527 F.3d 1010, 1028 (10th Cir. 2008).

Petitioner's exhausted federal claim likewise fails.  This precise challenge has been rejected in this district by Judge Russell.  *Matthews v. Sirmons*, 2007 WL 2286239, at **33-35 (W.D. Okla. Aug. 6, 2007) (No. CIV-03-417-R) (unpublished).  The Tenth Circuit recently rejected a similar challenge to a federal death penalty statute.  *United States v. Barrett*, 496 F.3d 1079, 1107-08 (10th Cir. 2007).  And in the context of rejecting a challenge, based on *Apprendi,* to the use of unadjudicated act evidence to prove Oklahoma's continuing threat aggravator, the Tenth Circuit held that: "Oklahoma's capital sentencing procedure [  ] requires the State to charge and prove to a jury beyond a reasonable doubt the existence of at least one aggravating factor. Okla. Stat. tit. 21, §§ 701.11, 701.12.  Those requirements satisfy *Apprendi.*"  *Hawkins v. Mullin*, 291 F.3d 658, 678 (10th Cir. 2002).[10]

---

[10]  The rejection of Petitioner's claim by other state and federal courts further highlights the correctness of the OCCA's rejection of this claim.  *See United States v. Sampson*, 486 F.3d 13, 31-32 (1st Cir. 2007); *United States v. Fields*, 483 F.3d 313, 345-46 (5th Cir. 2007); *United States v. Purkey*, 428 F.3d 738, 749-50 (8th Cir. 2005); *Brownfield v. State*, 2007 WL 1229388, at **28-30 (Ala. Crim. App. Apr. 27. 2007); *People v. Harris*, 866 N.E.2d 162,

The federal statutory scheme at issue in the Tenth Circuit's analysis in *Barrett* differs little from the Oklahoma capital sentencing scheme under which Petitioner was sentenced to death.  At the time the defendant in *Barrett* was tried in federal court, "there were two separate, though substantially similar, federal schemes in place for imposition of the death penalty." *Barrett*, 496 F.3d at 1106.  The first of those schemes was identified by this Court as the Federal Death Penalty Act, 18 U.S.C. §§ 3591-98 (FDPA).  However, because the defendant in *Barrett* was not sentenced to death under the FDPA, but rather, the death penalty provisions set forth in 21 U.S.C. § 848, a provision that was repealed by Congress *after* Barrett was sentenced, this Court analyzed the constitutionality of § 848, not the FDPA. *Barrett*, *supra*.  Title 21, U.S.C. § 848(k) provides in pertinent part that "the jury, or if there is no jury, the court, shall [    ] consider whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death."  Additionally, 848(k) expressly provided that "[t]he jury or the court, regardless of its findings with respect to aggravating and mitigating factors, is never required to impose a death sentence and the jury shall be so instructed."

---

190-91 (Ill. 2007); *State v. Longo*, 148 P.3d 892, 906 (Or. 2006); *State v. Fry*, 126 P.3d 516, 531-36 (N.M. 2005); *Grandison v. State*, 889 A.2d 366, 381-84 (Md. 2005); *People v. Manriquez*, 123 P.3d 614, 644 (Cal. 2005); *State v. Barker*, 826 N.E.2d 648, 649-50 (Ind. 2005); *State v. Gales*, 694 N.W.2d 124, 144-45 (Neb. 2005); *Ortiz v. State*, 869 A.2d 285, 304-06 (Del. 2005); *Com. v. Roney*, 866 A.2d 351, 358-61 (Pa. 2005).

Petitioner's jury was instructed with Oklahoma's pattern weighing instruction (O.R. 1302), consistent with Oklahoma's capital sentencing scheme. Okla. Stat. tit. 21, § 701.11 ("Unless at least one of the statutory aggravating circumstances...is so found or if it is found that any such aggravating circumstance is outweighed by the finding of one or more mitigating circumstances, the death penalty shall not be imposed"). As the OCCA has repeatedly recognized, a defendant becomes eligible for the death penalty under Oklahoma law when the jury convicts a defendant of first degree murder and finds the existence of one or more aggravating circumstances beyond a reasonable doubt during penalty phase. *See, e.g., Torres*, 2002 OK CR 35, ¶¶ 3-7, 58 P.3d 214, 215-16. That is all *Ring* requires. As recognized by the OCCA:

> *Ring* describes a substantive element of a capital offense which makes an increase in authorized punishment contingent on a finding of fact. Using this description, the substantive element of capital murder in Oklahoma is the jury's finding of the aggravating circumstance necessary to support a capital sentence. It is that finding, not the weighing of aggravating and mitigating circumstances, that authorizes jurors to consider imposing a sentence of death.

*Id.*, 2002 OK CR 35, ¶ 6, 58 P.3d at 216 (citing *Ring*, 536 U.S. at 600-02) (internal footnotes omitted).

The Supreme Court has held that "[a] capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision." *Tuilaepa v. California*, 512 U.S. 967, 979 (1994). In this regard, the Court explained:

> "Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death

87

> penalty,...the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment." *Ramos*, 463 U.S. at 1008.  Indeed, the sentencer may be given "unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty." *Zant*, [426 U.S. 862, 875 (1983)]; *see also Barclay v. Florida*, 463 U.S. 939, 948-51 (1983) (plurality opinion).

*Id.* at 979-80.  More recently, the Supreme Court reiterated that "when a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant." *Cunningham v. California*, 549 U.S. 270, 285 (2007) (quoting *United States v. Booker*, 543 U.S. 220 (2005)).

Under Oklahoma law, the increase in punishment range from life without possibility of parole to death is contingent on the finding of an aggravating circumstance beyond a reasonable doubt.  *Torres*, 58 P.3d at 216.  After that finding, an Oklahoma jury merely exercises its broad discretion in imposing sentence within a statutory range without resort to additional fact finding.  Under the above federal constitutional principles, no burden of proof was required for the weighing decision, which amounts to nothing more than the selection (as opposed to the eligibility) decision in Oklahoma's capital sentencing process.  *See Tuilaepa*, 512 U.S. at 971-73 (distinguishing "eligibility" and "selection" decisions in the capital sentencing process); *Turner v. Quarterman*, 481 F.3d 292, 300 (5th Cir. 2007) ("*Ring* is inapposite to any discussion of the constitutional requirements of the selection phase").

In *Kansas v. Marsh*, 548 U.S. 163 (2006), the Supreme Court reaffirmed that so long as a state capital sentencing system satisfied the requirements of (1) rationally narrowing the

class of death-eligible defendants; and (2) permitting a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of the crime (essentially relevant mitigating circumstances), "a State enjoys a range of discretion in imposing the death penalty, including the manner in which aggravating and mitigating circumstances are to be weighed." *Id.* at 174. In *Marsh*, the Supreme Court applied *Walton v. Arizona*, 497 U.S. 639 (1990) to uphold the Kansas death penalty statute on Eighth Amendment grounds. The Court noted that the Arizona capital sentencing scheme in *Walton* had been construed to mean that the death penalty would be imposed upon a finding that aggravating circumstances are not outweighed by mitigating circumstances. *Id.* at 172. Arizona's sentencing scheme assigned no burden of proof to the weighing process as in Kansas, which required the State to prove beyond a reasonable doubt that mitigating circumstances did not outweigh aggravating circumstances. *Id.* at 173. The Supreme Court had no difficulty upholding the Kansas death penalty statute based on *Walton*, which it expressly found controlling. *Id.*

The above discussion shows that the OCCA's rejection of Petitioner's *Ring* claim was wholly reasonable. More fundamentally, however, the above discussion shows that the Supreme Court's jurisprudence in this area is anything but "clearly-established" respecting Petitioner's requested extension of *Ring* to the selection phase of Oklahoma's capital sentencing process. Indeed, Petitioner cites no decision from the Supreme Court extending *Ring* to the context of the selection phase of a capital sentencing trial. Under AEDPA, that should be the end of the analysis. *Crawley v. Dinwiddie*, 533 F.3d 1226, 1230-31 (10th Cir.

2008); *House v. Hatch*, 527 F.3d 1010, 1015-17 (10th Cir. 2008).  There is simply no clearly-established Federal law, articulated in Supreme Court caselaw, that the OCCA could unreasonably apply.

*Ring* itself supports this conclusion.  The sole issue in *Ring* was whether a trial judge could, consistent with the Sixth Amendment, find the existence of an aggravating circumstance beyond a reasonable doubt in a formal weighing system similar to Oklahoma's capital sentencing scheme.  *Ring*, 536 U.S. at 597.  The Supreme Court emphasized that the *Ring* petitioner's constitutional challenge was "tightly delineated: He contends only that the Sixth Amendment required jury findings on the aggravating circumstances asserted against him."  *Id.* at 597 n.4.  The petitioner in *Ring* did not make a Sixth Amendment claim with respect to mitigating circumstances, argue that the Sixth Amendment required the jury to make the ultimate determination whether to impose the death penalty or even challenge the Arizona Supreme Court's reweighing in his case.  *Id.* at 597-98 n.4.

The precise holding in *Ring* was simply that "a sentencing judge, sitting without a jury, [may not] find an aggravating circumstance necessary for imposition of the death penalty." *Id.* at 609.  Rather, "the Sixth Amendment requires that [those circumstances] be found by a jury." *Id.*  Justice Scalia's concurring opinion in *Ring*, responding to Justice Breyer's separate opinion concurring in the judgment, made explicit that:

> today's judgment had nothing to do with jury sentencing.  What today's decision says is that the jury must find the existence of the *fact* that an aggravating factor exists.  Those States that leave the ultimate life-or-death decision to the judge may continue to do so---by requiring a prior jury finding of aggravating factor in

> the sentencing phase or, more simply, by placing the aggravating-factor determination (where it logically belongs anyway) in the guilt phase.

*Id.* at 612-13 (emphasis in original).

All things considered, habeas relief is unwarranted as Petitioner fails to marshal clearly-established Supreme Court law governing this claim.   And the OCCA's merits decision was reasonable in any event.   Relief should therefore be denied.

## VIII.

## THE VICTIM IMPACT TESTIMONY DID NOT DENY PETITIONER A FUNDAMENTALLY FAIR TRIAL IN VIOLATION OF DUE PROCESS.

In Ground VIII, Petitioner challenges the victim impact testimony introduced during penalty phase.   Doc. 25 at 144-51.   Petitioner presents these argument in a disjointed, scattershot manner.   The individual arguments presented are as follows:

1.   "[T]he victim impact evidence presented in the second stage of [Petitioner's] trial went beyond what is allowed under Oklahoma law", amounting to a due process violation under *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980). Doc. 25 at 145.

2.   The victim-impact testimony deprived him of his confrontation rights and his right to a fair sentencing proceeding.   Doc. 25 at 146.

3.   Under *Payne v. Tennessee*, 501 U.S. 808 (1991) and *Booth v. Maryland*, 482 U.S. 496 (1987), a victim may not give an opinion as to the appropriateness of the death penalty or a recommended punishment.   Doc. 25 at 147.

4.   Under *Grant v. State*, 2003 OK CR 2, 58 P.3d 783, 797, the victim impact witnesses should not have been

permitted to read the statements of the decedent's children, thus resulting in a confrontation violation. Doc. 25 at 148-49.

5.  Under *Lott v. State*, 2004 OK CR 27, 98 P.3d 318, 347, Donna Van Treese's victim impact statement improperly discussed the impact of the murder on other family members. Doc. 25 at 149-50.

6.  The above-described errors in the victim impact testimony resulted in "a jury verdict of death based on emotion rather than reason in violation of [Petitioner's] rights under the Fourteenth Amendment". Doc. 25 at 150-51.

7.  "[T]he OCCA's decision involved an unreasonable application of clearly established law as determined by the Supreme Court." Doc. 25 at 151.

8.  "Justice demands that the Court vacate [Petitioner's] sentence of death." Doc. 25 at 151.

## A.   *Exhaustion.*

With three exceptions, these arguments were presented to OCCA in Proposition VIII of Petitioner's opening brief on direct appeal and are therefore exhausted for purposes of federal habeas review.

Regarding Argument 1, Petitioner did not rely on *Hicks v. Oklahoma* in state court. While Petitioner claimed that the victim impact testimony introduced at his trial violated Oklahoma law, he did not cite *Hicks* or otherwise attempt to manufacture a Fourteenth Amendment liberty-interest-without-due-process violation based on the trial court's application of state law. As was the case in Grounds I, II and VII, this aspect of his victim-impact claim is unexhausted and procedurally barred from review on independent and

adequate state law grounds.  Without belaboring the subject, the State incorporates here by reference its earlier discussions of this issue in Grounds I, II and VII for support.

Argument 3 was not presented in state court.  This is no surprise considering that the victim impact witnesses did not make a recommendation as to sentence (Tr. XVI 70-88).  This particular argument is therefore unexhausted and procedurally barred from review on independent and adequate state law grounds, just like Petitioner's *Hicks*-based arguments.

While Petitioner did not expressly present Argument 7 in state court, that failure is of no consequence.  Argument 7 obviously represents Petitioner's concession that the AEDPA standard of review applies to the OCCA's adjudication of this claim and amounts to a federal law discussion more thoroughly addressed below in response to the merits of Petitioner's claim.  28 U.S.C. § 2254(d).

The State now turns to the merits of Petitioner's properly exhausted claims.

**B.      Merits.**

**1.  Standard of Review.**  The OCCA rejected Petitioner's challenges to the victim impact statements on the merits.  *Glossip v. State,* 2007 OK CR 12, ¶¶ 121-31, 157 P.3d 162-63.  While much of this discussion involved interpretation of Oklahoma's victim impact statute, the OCCA recognized the federal dimension of Petitioner's claim and discussed the federal constitutional standard from *Payne v. Tennessee* for analyzing victim-impact testimony.  *Id.*, 2007 OK CR 12, ¶ 124, 157 P.3d at 162.  Thus, AEDPA deference applies.

**2.   State Law Challenges.**   To the extent Petitioner challenges the victim impact evidence introduced at his trial on state law grounds, he is not entitled to habeas relief.   On habeas review, a state court's interpretation of a state statute is a matter of state law binding on a federal court.   *See*, *e.g.*, *Chapman v. LeMaster*, 302 F.3d 1189, 1196 (10th Cir. 2002). Thus, to the extent Petitioner takes issue with the OCCA's interpretation of Oklahoma's victim impact statute as it relates to the admissibility of the victim impact evidence under state law, this Court is bound by the OCCA's decision.   *See, e.g., Gilson v. State*, 520 F.3d 1196, 1232 n.10 (10th Cir. 2008) (citing *Parker v. Scott*, 394 F.3d 1302, 1319 (10th Cir. 2005)). Thus, his state-law arguments (Arguments 1, 2, 4, 5) challenging the reading by Barrie Hall and Donna Van Treese of victim impact statements from non-testifying family members is not a basis for habeas relief.

**3.   Confrontation Challenges.**   To the extent Petitioner claims that his Sixth Amendment confrontation rights were violated based on the admission of the victim impact testimony, he is not entitled to relief.   As noted by the Tenth Circuit, "it is 'far from clear' whether the Confrontation Clause even applies at capital sentencing proceedings."   *Wilson v. Sirmons*, 536 F.3d 1064, 1111 (10th Cir. 2008) (quoting *United States v. Barrett*, 496 F.3d 1079, 1099 (10th Cir. 2007)).   Considering that this is habeas review, this Court may reverse only based on clearly established law as articulated by the Supreme Court.   *Id.* at 1112.   Thus, Petitioner is not entitled to relief on Sixth Amendment grounds.

**4.   Fourteenth Amendment Analysis.**   All that remains is Petitioner's general challenge under *Payne v. Tennessee* to the victim impact testimony on federal due process

grounds.  Petitioner urges that he was denied a fair trial, in violation of due process, because the two victim impact witnesses, Barrie Hall and Donna Van Treese, read their own victim impact statements and the statements of other immediate family members.  *Id.*, 2007 OK CR 12, ¶ 124, 157 P.3d at 162 (reciting standard).  "Intermingled in this proposition are comments that Mrs. Van Treese's statement was more akin to a statement made by a family representative, rather than a personal statement addressing the impact of the death on her personally. [Petitioner] argues that either her statement should have been admitted as a representative, or the State should have presented the personal testimony of immediate family members, not both."  *Id.*, 2007 OK CR 12, ¶ 125, 157 P.3d at 163.

Resolution of this challenge is simplified by Petitioner's failure to object at trial to the method used to present the victim impact statements.  As noted by the OCCA, "counsel specifically stated that he had no objection to the two witnesses reading the statements of the remaining 'immediate family members.'"  *Id.*, 2007 OK CR 12, ¶ 130, 157 P.3d at 163.  The OCCA appropriately reviewed this aspect of Petitioner's claim for plain error.  *Wilson*, 536 F.3d at 1113.  Petitioner's "assertions of prejudice are undermined by his counsel's delay in challenging [the victim impact] statement[s]."  *Id.* (quoting *Short v. Sirmons*, 472 F.3d 1177, 1193 (10th Cir. 2006)).  The Tenth Circuit has stressed that "[t]he requirement of a timely objection applies with particular force in this context, when the defendant knows the content of the testimony in advance and could prevent any error from taking place; even an objection to the oral testimony would, if well taken, elicit a curative instruction."  *Id.*

In the instant case, Petitioner objected to the victim impact evidence during a pre-trial motion hearing. During penalty phase, however, defense counsel made objections at an in camera hearing to some of the language in some of the victim impact statements and the trial judge redacted the statements. *Glossip*, 2007 OK CR 12, ¶ 130, 157 P.3d at 163; (Tr. XVI 15-36). However, counsel specifically stated he had no objection to the two victim impact witnesses reading statements from the immediate family members. *Id.*; (Tr. XVI 36-37). Petitioner was therefore not denied a fundamentally fair trial in violation of due process based on the method by which these victim impact statements were presented in open court. *See Payne*, 501 U.S. at 825 (reciting constitutional standard).

Moreover, Petitioner does not challenge the sincerity or truthfulness of the statements read for the children of Barry Van Treese who did not actually take the stand. Moreover, he did not cross-examine either victim impact witness that actually testified (Tr. XVI 76, 88). Petitioner's failure to object was clearly a strategy to avoid having the jury confronted with six live victim impact witnesses; he had absolutely nothing with which to confront these witnesses. It is also significant that Petitioner does not truly challenge the content of the victim impact statements as read. At best, Petitioner suggests the victim impact statements were emotionally charged but does little to develop that particular idea. That is because the victim impact testimony was carefully edited by the trial court during an in camera hearing to ensure it met the statutory requirements for admissibility. It is significant that much of this testimony was not objected to by Petitioner during the in camera hearing (Tr. XVI 15-37). Petitioner's jury was also properly instructed with the Oklahoma uniform instruction for

victim impact testimony, thus reducing any possible misuse of the evidence presented (O.R. 1307-08).

That Petitioner's jury rejected the continuing threat aggravator further undermines his suggestion that the death sentence was a result of passion, prejudice or some other emotion (O.R. 1315).  Petitioner's death sentence stems from: (1) the compelling testimony of Justin Sneed, who testified that Petitioner agreed to pay him $10,000.00 to murder the victim; and (2) the horrible facts of this case which, as shown throughout this brief, involved the victim being brutally beaten to death with a baseball bat.  The victim impact evidence in this case was overshadowed by the horrible facts of Petitioner's crime.

All things considered, the OCCA's rejection of this claim was neither contrary to, nor an unreasonable application of, *Payne*.  Relief must be denied.  28 U.S.C. § 2254(d).

## IX.

### PETITIONER IS NOT ENTITLED TO HABEAS RELIEF BASED ON THE TRIAL COURT'S REMOVAL FOR CAUSE OF SEVERAL PROSPECTIVE JURORS.

In Ground IX, Petitioner complains that he was denied a fair and impartial trial, in violation of the federal constitution, because the trial judge excused for cause Prospective Jurors Lawton and Moore.  Petitioner argues that the trial court removed prospective jurors Sharon Moore and Mary Lawton for cause "based on their inability to consider all three punishments 'equally'", in violation of *Frederick v. State*, 2001 OK CR 34, 37 P.2d 908. Petitioner also contends that "fifteen other prospective jurors were removed due to their reservations about the death penalty after the court explained that the three sentencing option

[sic] must be 'equal.'"  This, Petitioner claims, resulted in exclusion of prospective jurors under an erroneous standard who had "only conscientious objections to the death penalty but who might otherwise follow the law."  Doc. 25 at 151-56.

Petitioner also contends that the trial court improperly removed prospective juror Sharita Miles based solely on the fact that Miles was serving a deferred sentence at time of the trial.  Doc. 25 at 156-61.

**A.     Exhaustion.**

These issues were raised in Proposition IX of Petitioner's opening brief on direct appeal.  They are therefore exhausted for purposes of federal habeas review.

**B.     Merits.**

**1.  Standard of Review.**  Petitioner appropriately recognizes in his analysis that AEDPA deference applies to these claims.  Doc. 25 at 156, 161.  The OCCA rejected these issues on the merits.  *Glossip v. State*, 2007 OK CR 12, ¶¶ 25-36, 157 P.3d 143, 150-51.  Applying the rule in *Wainwright v. Witt*, 469 U.S. 412, 424 (1985), the OCCA recognized that "[t]he proper standard for determining when prospective jurors may be excluded for cause because of their views on capital punishment is whether their views would prevent, or substantially impair, the performance of their duties as jurors in accordance with the instructions and their oath."  *Id.*, 2007 OK CR 12, ¶ 32, 157 P.3d at 150.  However, the Court recognized that "[t]his standard does not require that a prospective juror's incompetence to serve be established on the record with 'unmistakable clarity.'"  *Id.*, 2007 OK CR 12, ¶ 33, 157 P.3d. at 150-51 (quoting *Witt*, 469 U.S. at 424-25).  The OCCA also recognized that "we must

98

give great deference to trial judges in matters regarding jury selection", *id.*, and applied an abuse of discretion standard to each juror challenge. *Id.*, 2007 OK CR 12, ¶¶ 33-34, 36, 157 P.3d at 151. The OCCA therefore applied the correct standard and AEDPA deference applies. *Uttecht v. Brown*, 551 U.S. 1, 127 S. Ct. 2218, 2228 (2007).

**2. Prospective Jurors Lawton and Moore.** Petitioner registered no objection to either prospective jurors Lawton or Moore being excused for cause, a factor this Court must consider in determining whether the OCCA's adjudication was reasonable. *Id.*, 127 S. Ct. at 2229-30. With respect to the excusal of prospective jurors Lawton and Moore, the OCCA found as follows:

> ¶ 34 In the present case, because there was no objection to the removal of these two jurors, any error must rise to the level of plain error. Here there is no such error. [Prospective juror Lawton] was unequivocal in her statement that she could not impose the death penalty. [Prospective juror Moore] expressed concerns about her ability to impose the death penalty at a very early stage in the voir dire process stating that she couldn't impose death. This juror asked for more time to consider whether she would consider the death penalty if the law and facts warranted such a penalty. She vacillated back and forth and finally stated that she could not consider the death penalty equally. We find that based on the entire voir dire, the trial court did not abuse its discretion in removing these two jurors.

*Glossip*, 2007 OK CR 12, ¶ 34, 157 P.3d at 151.

The record of Prospective juror Lawton's voir dire responses confirms the OCCA's analysis:

> PROSPECTIVE JUROR LAWTON: Your Honor, I would not be able to give the death penalty equal consideration as a sentencing option.

99

> THE COURT: So your reservations about the death penalty are such that regardless of the law or the facts or the evidence, you would not consider imposing a penalty of death?

> PROSPECTIVE JUROR LAWTON: That's correct.

(Tr. II 13-14). Lawton was then excused for cause sua sponte by the trial judge (Tr. II 14). Petitioner registered no objection to Lawton being stricken for cause. Nor did he object to the questions being asked by the trial court. *Id.*, 2007 OK CR 12, ¶¶ 27-28, 157 P.3d at 150. Lawton's responses, combined with defense counsel's failure to object or even to complain about the questions being asked, show that the trial court and the interested parties in the courtroom felt that removing prospective juror Lawton was appropriate under *Witt*. *See Uttecht*, 127 S. Ct. at 2229. Her responses show she would not impose the death penalty under any circumstances. "Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." *Id.* at 2224. The trial court did not abuse its discretion in striking Lawton from the venire panel for cause. The OCCA's rejection of Petitioner's challenge to the excusal of Lawton for cause was therefore wholly reasonable and relief is unwarranted.

The same is true for the removal of prospective juror Moore. Moore provided vacillating responses on the second day of voir dire regarding her ability to impose the death penalty. Moore asked to be heard by the trial court and the following exchange occurred:

> PROSPECTIVE JUROR MOORE: I just wanted to say I have thought a day and I am really against death and things like that and I just don't know. I mean, I think I thought if it was really

gruesome or something, I probably could do it.  When I really think about it I'm really confused about if I could do it, convict somebody to death.  I just, you know, have a little problem with would I do it, you know.

So I'm still confused about the issue if I would actually convict them.  I think I could do it if they did something really gruesome, which is murder, but I'm just really confused a little bit about if I should tell you that I couldn't do it.  **So I guess I probably should say I couldn't do it, I couldn't convict someone to death.**

THE COURT: Well, I want to clear up something.  You're not convicting somebody to death.  What happens is that the first stage of this trial will be whether or not the State proves this Defendant is guilty of Murder in the First Degree.  If the jury finds him guilty of that, then the jury has the job of assessing punishment and there are three potential punishments.

You have to consider each one equally and impose the sentence that's warranted by the law and the evidence.  So if you're not sure, I need you to think about it...**if you're telling me that your concerns are such that you would not consider imposing the death penalty no matter what the law and the evidence are, then you need to tell me that.**  And if it's that you're uncertain about it, then I need you to keep thinking about it.

(Tr. II 15-17) (emphasis added).  Moore then asked whether she could think about it "a little bit longer" and the trial court moved on to other prospective jurors (Tr. II 17).  Shortly thereafter, during questioning by the prosecutor, Moore became emotional, started crying and stated that "I want to do my civic duty, but I think I do have a problem with the death penalty" (Tr. II 34).  The trial court then asked Moore whether she believed her "concerns about the death penalty are such that regardless of the law and the evidence, you would not be able to give equal consideration to all three of the sentencing options?" to which Moore responded

"I do" (Tr. II 36). Moore was then excused for cause without objection from Petitioner (Tr. I 37). *See Glossip*, 2007 OK CR 12, ¶¶ 29 & 34, 157 P.3d at 150 & 151.

Review of the totality of voir dire in this case makes clear that Moore too was unable to consider the death penalty as a sentencing option and was therefore substantially impaired as a juror. The trial court, which is in a "superior position" to evaluate Moore's credibility, demeanor and qualifications, *id.* at 2231, did not abuse its discretion in finding Moore substantially impaired. The totality of Moore's voir dire responses, along with Petitioner's failure to object either to Moore's removal or the questions leading to Moore's removal, establish that the trial court did not abuse its discretion here. The record shows that the interested parties believed that removal of Moore from the panel was appropriate under the *Witt* standard. *Id.* at 2229. All things considered, the OCCA's adjudication of this claim was neither contrary to, nor an unreasonable application of, clearly-established Supreme Court precedent.

**3. Manner and Method of Voir Dire.** Petitioner complains that the trial court asked the wrong questions during voir dire regarding the venire's ability to consider all three penalty options--i.e., asking whether jurors could give "equal" or "heartfelt" consideration to all three penalty options as opposed to simply "meaningful" consideration). "A defendant's right to an impartial jury includes the right to an adequate voir dire to identify unqualified jurors." *Sallahdin v. Gibson*, 275 F.3d 1211, 1222 (10th Cir. 2002). However, the manner and method of voir dire is within the discretion of the trial judge who retains "great flexibility" in conducting voir dire. *Wilson v. Sirmons*, 536 F.3d 1064, 1097 (10th Cir. 2008); *Sallahdin*, 275

F.3d at 1223.  "In a petition for habeas, our inquiry into the conduct of voir dire is limited to whether the trial court's restriction on voir dire rendered the trial fundamentally unfair."  *Id.* at 1222 (quoting *Mayes v. Gibson*, 210 F.3d 1284, 1292 (10th Cir. 2000)).  *See Mu'Min v. Virginia*, 500 U.S. 415, 425-26 (1991).

The inquiry under *Witt* "does not end with a mechanical recitation of a single question and answer."  *Darden v. Wainwright*, 477 U.S. 168, 176 (1986).  Rather, the context surrounding the challenged jurors' exclusion must be examined to determine whether the trial court's decision that their beliefs would substantially impair the performance of their duties as jurors was fairly supported by the record.  *Id.*  Thus, even where the precise wording of a trial court's question, and the answer given by a prospective juror, do not by themselves compel a conclusion that the juror could not under any circumstances impose the death penalty, the trial court could appropriately take into account the fact that the totality of questioning "made the purpose and meaning of the *Witt* inquiry absolutely clear."  *Id.* at 178.

While the trial court in the instant case did ask at the beginning of the voir dire process whether prospective jurors could "give true, heartfelt consideration to all three of the sentencing options and impose the sentence that's warranted by the law and evidence in this case" (Tr. I 112), Petitioner ignores the trial court's explanation of "heartfelt" to the venire panel:

> THE COURT: * * * *  If the jury finds beyond a reasonable doubt that the Defendant is guilty of Murder in the First Degree, then the jury has the duty of assessing punishment.  And the

punishment for Murder in the First Degree is death, imprisonment for life without parole, or imprisonment for life.

If you find the Defendant guilty of Murder in the First Degree, can you fairly consider all three of the legal punishments and impose the sentence that is warranted by law and evidence in this case?

And I'm going to give you another example here. We're not talking about some kind of theoretical discussion over a cup of coffee. We're talking about this man that sits in this courtroom. Okay? And I need to know whether you can give true, heartfelt consideration to all of the sentencing options.

And I'll give you this example. I've got a wonderful Italian mother who loves beets. It is her life's passion that her children love beets. I hate beets. My mother fixes beets a million different ways. She's always trying to, you know, serve me some kind of beet surprise. "Will you try this?"

**"Oh, you bet, mom." I am never going to try the beets. I'm never going to like them. I'm always going to say, "Yes, mom." I'm not going to do it. I am never going to give true, heartfelt consideration to her beet of the day program.**

If you are a juror in this case, I need to know whether you can give true, heartfelt consideration to all three of the sentencing options and impose the sentence that's warranted by the law and evidence in this case.

(Tr. I 111-112) (emphasis added). The trial court thus told the prospective jurors at the beginning of voir dire that "heartfelt consideration" meant *meaningful* or *any* consideration, a totally proper consideration in death qualification.

This is clear when one examines the record of voir dire for prospective jurors who were excused for cause immediately after the trial court gave the above explanation. Prospective jurors Floyd, Evans, Andrew, and Manning were dismissed for cause because they

unequivocally stated that they could not consider imposing the death penalty regardless of the law and facts--not because they stated they could not *equally* consider it as a punishment option (Tr. I 112, 113, 114, 116, 122-23).   When Floyd, Evans, Andrews and Manning expressed their inability to impose the death penalty, the trial court asked each one of them a question similar to the following:

> THE COURT:  So if you found beyond a reasonable doubt that the Defendant was guilty of Murder in the First Degree, your reservations about the penalty of death are so strong that regardless of the law or the facts and the circumstances, you would not impose the death penalty?

(Tr. I 113) (Floyd).  *See also* (Tr. I 114-16) (Evans, Andrew & Manning).   Trial counsel had no objection to these prospective jurors being removed under the *Witt* standard (Tr. I 119-20). These prospective jurors were properly removed for cause because they indicated that they could not follow the law and instructions.   Simply put, they stated they could never impose the death penalty, regardless of the facts and law in the case.

The same is true concerning the other prospective jurors Petitioner suggests were improperly influenced by the trial court's use of the terms "heartfelt" and "equal" consideration during voir dire (Tr. I 124-126, 149-51, 196-97, 202, 203; Tr. II 5-6, 8-9, 13-15, 17-18, 23; Tr. III 17, 110-11 & 112) (Stuart, Albright, Mueller, Pitt, Umstead, McCollum, Cornforth, Turner, Holt, Bruner, James, Meier, Werito, McAdams & Hensley).   The voir dire record shows that these prospective jurors were unable to impose the death penalty under any circumstances--not that they were unable to consider all three penalty options equally or that they merely had conscientious scruples against capital punishment.

The prosecutor's voir dire made that point abundantly clear.  Her questions probed whether the prospective jurors could consider all three sentencing options in case of a conviction and whether the death penalty was something the prospective jurors could actually impose if it was the most appropriate under the law and circumstances (Tr. II 182, 192-93, 195-96, 198-99).  The prosecutor emphasized that the law required the jury to impose the most appropriate sentence, whether it was life, life without parole or death (Tr. II 198).  The prospective jurors were not confused regarding their duties if selected as jurors based on the prosecutor's questioning.  The prosecutor's questions were consistent with the questioning and explanations previously offered by the trial judge.

Defense counsel expressed his understanding of the trial court's questions on voir dire when he told the prospective jurors: "I know that you've heard the question under the law, facts and circumstances can you consider all three [penalty options].  And you still wouldn't be sitting here if we all didn't answer yes, initially" (Tr. II 260).  Counsel then focused voir dire questions for the prospective jurors regarding whether they were leaning towards one or more of the punishment options from the outset or whether the prospective jurors viewed all three punishments as equal possibilities (Tr. II 261) ("Now, when we say 'consider,' that's not the same question as are you leaning for one more than the other or are do you see them all three as equal possibilities?").  Several of the jurors thereafter stated their understanding that, if selected, they would "have to consider all three" punishment options during a penalty phase proceeding (Tr. II 262, 265; Tr. III 78, 87).  There was not some great expression of confusion by the prospective jurors during this exchange.

The Supreme Court has held that "[v]oir dire is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion." *Ristaino v. Ross*, 424 U.S. 589, 594 (1976). "The Constitution, after all, does not dictate a catechism for voir dire, but only that the defendant be afforded an impartial jury." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). *Witt* itself recognized this fact. *See Darden*, 477 U.S. at 178 ("*Witt* recognized that 'determination of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism'"). Here, Petitioner was afforded a fair and impartial jury through an adequate voir dire process that allowed him to: (1) intelligently explore the biases of prospective jurors; (2) excuse those veniremen whose biases prevented them from following the law; and (3) intelligently exercise peremptory challenges. That is all the law requires. Petitioner's failure to object to the trial court's questioning only confirms this fact. All things considered, relief should be denied on this claim. The OCCA's decision was neither contrary to, nor an unreasonable application of, clearly-established Supreme Court law.

**4. Prospective Juror Miles.** Petitioner's challenge to the trial court's removal of prospective juror Sharita Miles also lacks merit. Miles approached the bench during voir dire, in response to the trial court's question whether any venire members had been charged with or accused of a crime (Tr. I 56-57). Miles stated that she was once arrested when a passenger in her car was discovered by police to have "drugs on him." Miles stated that "the case is over. It happened like two years ago. And they put a misdemeanor on my record and said I can get it expunged off." The trial court responded that Miles actually pled guilty to a

misdemeanor charge of possession of a controlled dangerous substance, marijuana. Apparently unaware the trial court had knowledge of Miles's prior record, Miles explained to the court that the marijuana conviction was her "first time". The trial court then informed Miles that she had a 1993 bogus check charge that had been dismissed and a 1997 bogus check charge for which Miles served a three year deferred sentence (Tr. I 61). Miles acknowledged that she was serving a two year deferred. She further indicated, in response to the court's questioning, that she was concerned about her ability to be fair and impartial while currently serving a deferred sentence prosecuted by the State but then stated "what can I do about it?" Miles then stated, in response to questioning from the court, that she felt better suited to a case in which the State was not a party since she had been previously prosecuted by the State (Tr. I 62-63).

The OCCA rejected Petitioner's challenge to the trial court's actions in removing Miles for cause:

> ¶ 35 In this proposition, Glossip also claims that a person serving a deferred sentence was improperly removed for cause. This juror raised her hand and later approached the bench when the trial court inquired whether anyone had "ever been charged with or accused of a crime." She was not completely honest with the trial court, until the trial court indicated that it knew about this juror's history of two different deferred sentences, one of which she was currently serving. The trial court expressed concern about the juror's ability to be fair and impartial in a criminal case when she, herself, had been prosecuted by the State. This juror agreed that it bothered her, and asked "what can I do about it?"
>
> ¶ 36 This juror agreed that she would be better suited for a non-criminal case. Before excusing her for cause, the trial court allowed defense counsel to object. The trial court stated that it

> had "a real problem with people who are on a deferred sentence
> sitting as jurors. They've got a lot at stake...." Although the trial
> court made a blanket statement about all persons currently
> serving a deferred sentence, the trial court believed this juror
> would be biased because she was currently serving a deferred
> sentence. The trial court, did not abuse its discretion in finding
> that this juror could not be fair and impartial and removing her
> for cause.

*Glossip*, 2007 OK CR 12, ¶¶ 35-36, 157 P.3d at 151.

The OCCA's adjudication was wholly reasonable.  The record shows Miles was dishonest in her responses to the trial judge.  "This dishonesty, of itself, is evidence of bias." *Burton v. Johnson*, 948 F.2d 1150, 1159 (10th Cir. 1991).  The trial judge's finding that Miles could not be fair and impartial constitutes a finding of fact that is supported by the record and is entitled to deference on appeal.  *Uttecht,* 127 S. Ct. at 2224.  Again, juror bias need not be established with unmistakable clarity and the trial judge, being in the superior position to observe witnesses demeanor and determine credibility, may resolve any ambiguity in favor of the State.  *Sallahdin*, 275 F.3d at 1225 (citing *Witt*, 469 U.S. at 424).

Under questioning from the trial court, Miles expressed an internal conflict concerning whether she could be fair and impartial because of her deferred sentencing status.  The trial court correctly noted that a juror in Miles's position would be prone to "holding it in the back of their mind that if they do something the State of Oklahoma doesn't like, even though we know that would never happen" that the State could retaliate against them because "[t]hey've got a lot at stake and they've got to feel that they're being watched carefully" (Tr. I 63).  This

on-going concern was only confirmed by Miles's initial hesitation to share the full extent of her criminal history in the presence of a state prosecutor.

Miles's responses, combined with the trial court's observations, make clear that Miles's removal for cause was proper and in fact protected Petitioner's right to a fair and impartial jury. In the instant case, the trial court saw and heard Miles's responses. The trial judge clearly received a definite impression that Miles was unable to be fair and impartial based on the questioning. The trial court's finding goes well beyond the categorical exclusion alleged by Petitioner in his § 2254 petition. The trial court's impression is supported by the record.

Petitioner's complaint that the trial court's removal of Miles for cause was inconsistent with the totality of voir dire because "a number of other prospective jurors, including two who eventually sat on the jury, revealed prior involvement with the criminal justice system" lacks merit. Doc. 25 at 159. He ignores that none of the prospective and actual jurors referenced were serving a deferred sentence at the time of trial (Tr. I 64-68, 71 & 73). It was Miles's unique situation in serving a then-current deferred sentence that was the focus of the trial court's inquiry. Petitioner's suggestion that the trial court verbally pressured Miles into acquiescing to removal, Doc. 25 at 159 n.41, ignores the totality of the voir dire record, particularly Miles's reticence to share her criminal history with the trial court in presence of the prosecutor and Miles's individual responses. Miles was not pressured into giving any particular answer. All things considered, relief is unwarranted because the trial court did not abuse its discretion in removing Miles for cause. Given the deference that must be accorded under AEDPA to the OCCA's rejection of this claim, it was clearly reasonable for the state

court to remove Miles for cause.  *See Sallahdin*, 275 F.3d at 1225 (applying AEDPA to juror bias claim).

## X.

### ADMISSION OF AN IN-LIFE PHOTOGRAPH DURING GUILT-STAGE DID NOT DEPRIVE PETITIONER OF A FAIR TRIAL.

In Ground X, Petitioner challenges the trial court's admission of State's Exhibit 79, an in-life photograph of the victim, during guilt stage.  Its admission was authorized under Okla. Stat. tit. 12, § 2403.  Petitioner recycles his arguments from direct appeal, often verbatim.  He contends that § 2403 violates the state and federal constitutions because it allows admission of in-life photographs at any stage of a capital murder trial.  Petitioner argues that an in-life photograph of the victim is irrelevant evidence designed solely to prejudice capital murder defendants.  Petitioner further contends that the amendments to Section 2403 allowing admission of appropriate in-life photographs "is not about criminal justice, but about politics" and that the prosecutor's use of the in-life photograph in this case unfairly prejudiced the defense.  Doc. 25 at 161-69.

### A.    *Exhaustion.*

This claim was raised in Proposition X of Petitioner's opening brief on direct appeal and was rejected on the merits by the OCCA.  *Glossip v. State*, 2007 OK CR 12, ¶¶ 76-80, 157 P.3d 143, 156-57.  It is therefore exhausted for purposes of federal habeas review.

### B.      Merits.

To the extent Petitioner challenges admission of the in-life photograph on state law grounds, he is not entitled to federal habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("Federal habeas corpus relief does not lie for errors of state law").  Petitioner also presents both facial and as-applied federal constitutional challenges to § 2403.  The OCCA rejected both challenges on the merits. *Glossip*, 2007 OK CR 12, ¶¶ 76-80, 157 P.3d at 156-57.  Thus, AEDPA deference applies.

Additionally, it is clear that one of the assumptions behind Petitioner's claim is that the admission of irrelevant evidence automatically rises to a federal due process violation. However, the Supreme Court has left open that very issue. *Estelle*, 502 U.S. at 70 ("Concluding, as we do, that the prior injury evidence was relevant to an issue in the case, we need not explore further the apparent assumption of the Court of Appeals that it is a violation of the due process guaranteed by the Fourteenth Amendment for evidence that is not relevant to be received in a criminal trial").  Thus, to the extent Petitioner relies upon this premise to support his claim, he is not entitled to habeas relief under AEDPA.  He fails to identify clearly-established Federal law, as articulated by the Supreme Court, to support this premise. *Crawley v. Dinwiddie*, 533 F.3d 1226, 1230-31 (10th Cir. 2008); *House v. Hatch*, 527 F.3d 1010, 1015-17 (10th Cir. 2008).

Nor does he identify clearly-established Supreme Court precedent either addressing an evidence rule similar to § 2403 or otherwise entertaining on federal habeas review a facial challenge, on due process grounds, to a state evidentiary rule.  Again, the lack of clearly

established Supreme Court precedent relied upon by Petitioner to support this claim is, standing alone, fatal to his constitutional challenges in Ground X. *Crawley*, *supra*; *House*, *supra*.

The State nonetheless turns to the individual specifics of Petitioner's facial and as-applied federal challenges.

1.    **Facial Challenge.**  The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law."  To be sure, the Supreme Court has long recognized that the Amendment's Due Process Clause, like the Fifth Amendment, "guarantees more than fair process." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (quoting *Washington v. Glucksburg*, 521 U.S. 702, 719 (1997)).  "The Clause also includes a substantive component that 'provides heightened protection against government interference with certain fundamental rights and liberty interests.'" *Id.* (quoting *Glucksburg*, *supra*).  Here, Petitioner cites no such specific fundamental right or liberty interest and he does not propose extending the constitutional concept of "liberty" to some hitherto unprotected aspect of personal well-being. *See*, *e.g.*, *Lawrence v. Texas*, 539 U.S. 558, 564-79 (2003) (invalidating Texas criminal sodomy statute on grounds that petitioners were free as adults to engage in private sexual conduct in the exercise of their fundamental liberty under Fourteenth Amendment's due process clause); *Glucksburg*, 521 U.S. at 720 (describing fundamental liberty interests protected under substantive due process analysis).

Thus, Petitioner's facial challenge is appropriately reviewed in terms of procedural due process. *See United States v. Salerno*, 481 U.S. 739, 746 (1987) (distinguishing substantive

and procedural due process protections of Due Process Clause).  "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."  *Id.* at 745.  That § 2403's provision "might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since [the Court has] not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment."  *Id.*[11]

---

[11]  The Tenth Circuit has recognized that the Supreme Court has been "less than clear" as to what a party must show in order to succeed on a facial vagueness challenge.  *Doctor John's, Inc. v. City of Roy*, 465 F.3d 1150, 1157 n.5 (10th Cir. 2006) (citing *Salerno*, *supra*, and *City of Chicago v. Morales*, 527 U.S. 41, 55 (1999)).  Any uncertainty as to the standard to be applied to a facial challenge of a state evidentiary rule, however, *see United States v. Castillo*, 140 F.3d 874, 879 n.3 (10th Cir. 1999) (noting, in context of facial challenge on direct appeal to federal rule of evidence, uncertainty as to continued vitality of *Salerno* standard), undercuts a habeas petitioner's request for relief where, as here, AEDPA deference applies.  Again, relief may only be granted if the state court's decision is contrary to, or unreasonably applies, clearly-established Federal law as articulated by the Supreme Court.  If Petitioner cannot show certainty in the standard of review to be applied to a facial challenge of this type, he cannot show that the OCCA's rejection of his facial challenge was contrary to, or an unreasonable application of, clearly-established Federal law as articulated by the Supreme Court.  28 U.S.C. § 2254(d); *House*, *supra*; *Crawley*, *supra*.  Further, the State submits that the *Salerno* standard should apply on habeas review of facial challenge to a state evidentiary rule, assuming of course that such a review is even proper here under AEDPA.  Once the Supreme Court has had an opportunity on certiorari from a state court's decision on direct review to review the facial validity of a state statute, the concepts of finality, comity and federalism driving the Supreme Court's habeas jurisprudence would dictate the most stringent standard of review for such challenges.  *See Fry v. Pliler*, 551 U.S. 112, 127 S. Ct. 2321, 2325 (2007) (discussing reasons articulated by Supreme Court in *Brecht v. Abrahamson*, 507 U.S. 619 (1993) for adopting a less onerous standard of harmless error analysis on habeas review).  This is consistent with the Supreme Court's recognition that AEDPA "limited rather than expanded the availability of habeas relief".  *Id.* at 2327.

When government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner. This is the essence of procedural due process analysis. *Id.* at 746. "Under our constitutional system, the primary responsibility for defining crimes against state law, fixing punishments for the commission of these crimes, and establishing procedures for criminal trials rests with the States." *Payne v. Tennessee*, 501 U.S. 808, 823 (1991). It is well settled that the admissibility of photographic evidence at a criminal trial remains within the sound discretion of the trial judge. Its admission will not support habeas relief "absent fundamental unfairness so as to constitute a denial of due process of law." *Jackson v. Shanks*, 143 F.3d 1313, 1322 (10th Cir. 1998). As noted by the Tenth Circuit, "[t]he Due Process Clause...protects against denials of fundamental fairness that are "'shocking to the universal sense of justice'" *United States v. Rivera*, 900 F.2d 1462, 1477 (10th Cir. 1990) (quoting *United States v. Russell*, 411 U.S. 423, 432 (1973)). While "[t]he States remain free, in capital cases, as well as others, to devise new procedures and new remedies to meet felt needs...In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Payne,* 501 U.S. at 823.

Petitioner fails to show that there are no set of circumstances under which an in-life photograph admitted under § 2403 would be constitutional. Section 2403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, needless presentation of cumulative evidence, or unfair and harmful surprise. However, in a prosecution for any

115

> criminal homicide, an appropriate photograph of the victim while alive shall be admissible evidence when offered by the district attorney to show the general appearance and condition of the victim while alive.

Okla. Stat. tit. 12, § 2403. The OCCA has interpreted this provision to allow admission of only those "in-life" photographs meeting § 2403's balancing test for relevant evidence. *See Glossip*, 2007 OK CR 12, ¶ 79, 157 P.3d at 157 ("[c]ontrary to Glossip's claim, § 2403 only allows the admission of one 'appropriate' photograph. We held, in *Hogan*, that photographs which violate the balancing test of § 2403 would be inadmissible"). *See also Hogan v. State*, 2006 OK CR 19, ¶ 64, 139 P.3d 907, 931; *Coddington v. State*, 2006 OK CR 34, ¶ 56, 142 P.3d 437, 452-53.

The admission of an "appropriate" in-life photograph during the penalty phase of a capital murder trial would be consistent with *Payne's* authorization of victim impact testimony. In-life photos admitted under § 2403 during penalty phase would be no more prejudicial than any other victim impact evidence authorized by *Payne*. *Id.*, 2006 OK CR 34, ¶ 58, 142 P.3d at 453; *State v. Ellison*, 140 P.3d 899, 923-24 (Ariz. 2006) (en banc). Admission under § 2403 of an in-life photograph of a homicide victim during the guilt-innocence portion of a state murder trial is equally constitutional when the OCCA's interpretation is faithfully applied. The statute, as interpreted by the OCCA, does not make all pre-mortem photographs of homicide victims relevant *per se* nor does it unconstitutionally prevent a court from safeguarding an accused's right to fair trial. Thus, § 2403 prohibits the inappropriate hypothetical scenarios involving "in-life" victim photographs Petitioner

116

envisions by providing reasonable guidance for its application.  This eliminates the due process concerns expressed by Petitioner.  *See United States v. Castillo*, 140 F.3d 874, 882-83 (10th Cir. 1998) (finding "most significant factor" in rejecting facial challenge to Fed. R. Evid. 414 was that evidence allowed under this rule could still be excluded under Fed. R. Evid. 403 if prejudicial effect substantially outweighs its probative value).

Moreover, appropriate photographs of victims while alive are relevant in the guilt stage of a homicide prosecution as evidence of the specific harm done, that is, that an individual human being's life was taken away, by a defendant.  In this sense, "in life" photographs "personalize the victim and help to complete the story for the jurors."  *State v. Doerr*, 969 P.2d 1168, 1176 (Ariz. 1998) (en banc) (citing *State v. Scales*, 518 N.W.2d 587, 593 (Minn. 1994)) (finding that "in life" photograph of victim failed to provide "much, if any, assistance to the jury in deciding the case", refusing to adopt *per se* prohibition of "in life" photographs and recognizing that "[i]t can, of course, be argued that 'in life' photos personalize the victim and help to complete the story for the jurors").  *See also State v. Carney*, 649 N.W.2d 455, 463 (Minn. 2002) (upholding admission of "in life" photograph in homicide case depicting victim with his family; "[t]he photograph fell within the prosecutor's latitude in showing [the victim] as a human being and was not unduly prejudicial as [victim's] wife testified that he was married with three children"); *Com. v. Degro*, 733 N.E.2d 1024, 1032 (Mass. 2000) (citing *Com. v. Santiago*, 681 N.E.2d 1205 (Mass. 1997)) (introduction of "in life" photo of murder victim upheld because "[t]he Commonwealth may 'tell the jury something of the person whose life [has] been lost in order to humanize the proceedings'...and a photograph may be

admitted for this purpose”);.  Such photographs are also relevant to establish the victim's identity.  *United States v. Pettigrew*, 468 F.3d 626, 638 (10th Cir. 2006); *United States v. Joe*, 8 F.3d 1488, 1499 (10th Cir. 1993).  *See, e.g.*, *Boyd v. State*, 663 S.E.2d 218, 220 (Ga. 2008); *State v. Waldron*, 624 S.E.2d 887, 895 (W. Va. 2005); *United States v. Grandison*, 780 F.2d 425, 429-30 (4th Cir. 1985), *overruled on other grounds*, 479 U.S. 1076 (1987)).

It has been noted that a majority of jurisdictions “that have considered the admissibility of ‘in life’ photographs have also upheld their admission.”  *State v. Broberg*, 677 A.2d 602, 607 (Md. 1996) (and cases cited therein).  Moreover, in *State v. Williams*, 828 P.2d 1006, 1012-13 (Or. 1992), the Oregon Supreme Court upheld the admission of pre-mortem photographs of a victim pursuant to a state statute nearly identical to the one enacted by the Oklahoma Legislature.  Oregon Revised Statute 41.415 provides: “In a prosecution for any criminal homicide, a photograph of the victim while alive shall be admissible evidence when offered by the district attorney to show the general appearance and condition of the victim while alive.”  *Williams*, 828 P.2d at 1012.  The *Williams* court specifically rejected a constitutional attack on the Oregon statute.  *Id.*

In light of the foregoing, Petitioner fails to show that there is no set of circumstances for which admission of an in-life photograph of the victim during a state murder trial, pursuant to § 2403, would be constitutional.  Not every instance of admitting such photos during a state murder trial will result in the denial for a defendant of a fundamentally fair trial in violation

of due process.[12]  And there is nothing universally shocking to the sense of justice from this

rule.  The Due Process Clause will invalidate an evidentiary rule only if the rule violates those

fundamental conceptions of justice which lie at the base of our civil and political institutions

and which define the community's sense of fair play and decency.  *Dowling v. United States*,

493 U.S. 342, 353 (1990).  The Due Process Clause has limited operation beyond the specific

guarantees enumerated in the Bill of Rights.  *Id.* at 352.  The Supreme Court has "defined the

category of infractions that violate 'fundamental fairness' very narrowly."  *Id.* at 353.

Petitioner fails to meet his burden to show that the challenged portion of § 2403, as

construed by the OCCA, in any way violates due process or contemporary notions of

fundamental fairness in light of our history.  *See Montana v. Egelhoff*, 518 U.S. 37, 47 (1996)

(quoting *Patterson v. New York*, 432 U.S. 197, 202 (1977)) (noting that defendant, not the

---

[12]  Petitioner's contention that Section 2403 is unconstitutional because it "is not about criminal justice, but about politics" is of no significance.  Doc. 25 at 164.  Under Petitioner's logic, every statute must be presumed unconstitutional because every statute is enacted by elected politicians.  But, as shown above, that is not the standard applied to facial challenges to a state statute.  Moreover, like all state officers, members of the Oklahoma Legislature take an oath before assuming office to protect the Constitution of the United States.  Okla. Const. art. 15, §§ 1-2.  "Indeed, by according laws a presumption of constitutional validity, courts presume that legislatures act in a constitutional manner."  *Illinois v. Krull*, 480 U.S. 340, 351 (1987).  *See also State v. Thomason*, 2001 OK CR 27, ¶ 7, 33 P.3d 930, 932.  The Oklahoma Legislature's authorization of admission of in-life photographs during state murder trials is relevant to this Court's analysis of Petitioner's facial constitutional challenge to the extent that it is recognized that the Legislature's act is *presumed* constitutional. Petitioner's improper citation to newspaper articles, Fed. R. Evid. 801-02, therefore fails to prove much of anything.  It is no surprise that victims' rights advocates would view the amendments to Section 2403 as a triumphant response to what they viewed as incorrect decisions from the OCCA prohibiting admission of "in-life photographs.  This does not, however, resolve the constitutional issue before the Court under the applicable standards and is not even particularly informative.

State, "must show that the principle of procedure violated by the rule (and allegedly required by due process) is 'so rooted in the traditions and conscience of our people as to be ranked as fundamental'"); *Castillo*, 140 F.3d at 881 (assuming without deciding on direct review that common law ban on propensity evidence is a protection that the Due Process Clause guarantees "because of the ban's lineage and significance in our jurisprudence" but noting that history of evidence rules regarding defendant's sexual propensities is ambiguous at best). Thus, the OCCA's rejection of Petitioner's facial constitutional challenge to § 2403 was neither contrary to, nor an unreasonable application of, clearly-established Supreme Court law.

    **2. As-Applied Challenge.** Review of Petitioner's meritless as-applied challenge is independently fatal to his facial challenge. *See United States v. Mendes*, 912 F.2d 434, 439 (10th Cir. 1990) (and cases cited therein) (defendant cannot claim that a statute is unconstitutional in some of its reaches if the statute is constitutional as applied to him). Based on the principles discussed above, the "in life" photograph introduced in this case was relevant and admissible. *See*, *e.g.*, *Pettigrew*, 468 F.3d at 638; *Joe*, 8 F.3d at 1499. The trial judge instructed the jury that sympathy, sentiment or prejudice should not enter its guilt-stage deliberations but instead base its verdict on the evidence (O.R. 1292), a sentiment reinforced by the prosecutor's closing. *See*, *e.g.*, (Tr. XV 53-57). "A jury is presumed to follow its instructions." *Weeks v. Angelone*, 528 U.S. 225, 234 (2000). Admission was therefore not shocking to the universal sense of justice and Petitioner was not deprived of a fundamentally fair trial in violation if due process. *See Pettigrew*, 468 F.3d at 638. As noted by the OCCA:

Here, the State offered, in the first stage, an innocuous portrait of Van Treese, taken during the September preceding his death. The photograph was offered "to show the general appearance and condition of the victim while alive" in accordance with the statute. Other than the fact that Barry Van Treese had a beard at the time of his death, the photograph depicted his appearance just before his death. The photograph met the guidelines of the statute, and its probative value was not substantially outweighed by the danger of unfair prejudice.

*Glossip*, 2007 OK CR 12, ¶ 79, 157 P.3d at 157. The OCCA appropriately found that admission of State's Exhibit 79 did not constitute an abuse of discretion by the trial judge. *Id.*, 2007 OK CR 12, ¶ 80, 157 P.3d at 157. The OCCA's rejection of Petitioner's as-applied challenge to the in-life photograph introduced at this trial was therefore wholly reasonable. Habeas relief is unwarranted in light of the deference mandated by AEDPA as well as the traditional deference imposed by habeas courts when reviewing state evidentiary rulings. *Bullock v. Carver*, 297 F.3d 1036, 1055 (10th Cir. 2002) (quoting *Estelle*, 502 U.S. at 73 & *Estelle v. Williams*, 425 U.S. 501, 503 (1976)).

Assuming *arguendo* State's Exhibit 79's admission was constitutional error, any error would be harmless as it did not have a substantial and injurious influence or impact on the jury's guilt-stage verdict. *Fry v. Pliler*, 551 U.S. 112, 127 S. Ct. 2321, 2326-27 (2007) (applying *Brecht* harmless error standard on habeas to claims subject to AEDPA deference). State's Exhibit 79 did little more than humanize and visually identify a victim who was described through testimony. Further, it was the strong evidence of Petitioner's guilt and the aggravating circumstance presented at trial (*see*, *e.g.*, response above to Grounds I & VI and *Glossip*, 2007 OK CR 12, ¶¶ 43-53, 157 P.3d at 152-54)--not State's Exhibit 79--that resulted

in Petitioner's conviction and death sentence.   Any *possible* error was therefore harmless.

Relief must therefore be denied.

## XI.

### TRIAL COUNSEL WERE NOT INEFFECTIVE FOR FAILING TO IMPEACH JUSTIN SNEED'S TESTIMONY WITH INFORMATION FROM SNEED'S 1997 COURT-ORDERED COMPETENCY REPORT AND APPELLATE COUNSEL WERE NOT INEFFECTIVE FOR FAILING TO RAISE THIS ISSUE.

Citing a juror's post-verdict affidavit, Petitioner contends in Ground XI that had trial

counsel cross-examined Justin Sneed with information contained in a 1997 court-ordered

competency evaluation report in which Sneed told a court-appointed psychologist that he had

served one year's probation as a juvenile for burglary of a house and making a bomb threat,

there was a reasonable likelihood of a different guilt-stage verdict.   Petitioner also contends

that his appellate counsel were ineffective for failing to raise this claim on direct appeal.   Doc.

25 at 170-76.

### A.    *Exhaustion.*

These claims were raised in Proposition II of Petitioner's original state post-conviction

relief application.   The OCCA rejected these trial and appellate counsel ineffectiveness claims

on the merits.   *Glossip v. State*, No. PCD-2004-978, at 2-4, 5-6 (Okla. Crim. App. Dec. 6,

2007).   This claim is therefore exhausted for purposes of federal habeas review.

**B.      Merits.**

Respondent incorporates here by reference his discussion in response to Ground V above of the *Strickland* standard which governs ineffective assistance of trial counsel claims. In relation to appellate counsel ineffectiveness claims, the Supreme Court has flatly rejected the proposition that an appellate advocate must raise every non-frivolous issue in order to provide effective representation under the Sixth Amendment. *Jones v. Barnes*, 463 U.S. 745 (1983). *See also Smith v. Robbins*, 528 U.S. 259, 288 (2000) ("[i]n *Jones v. Barnes*...we held that appellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal"). Indeed, the Supreme Court has noted that "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Jones*, 463 U.S. at 751-52. Notwithstanding this admonition, "it is still possible to bring a *Strickland* claim...but it is difficult to demonstrate that counsel was incompetent." *Robbins*, 528 U.S. at 288.

Petitioner concedes that the OCCA adjudicated both his trial and appellate counsel ineffectiveness claims on the merits using *Strickland*. Doc. 25 at 176. AEDPA deference therefore applies to this claim and adds yet another layer of deference for this Court's analysis. The sole issue before this Court is whether the OCCA's rejection of Petitioner's ineffectiveness claims was either contrary to, or an unreasonable application of, *Strickland*. 28 U.S.C. § 2254; *Sandoval v. Ulibarri*, 548 F.3d 902, 911 (10th Cir. 2008) (quoting *Aycox v.*

*Lytle*, 196 F.3d 1174, 1178 (10th Cir. 1999)) ("Although the state court's conclusions were stated starkly, they are not impervious to analysis. "[W]e owe deference to the state court's *result*, even if its reasoning is not expressly stated").

First, Petitioner's citation to a juror affidavit to support his claim of a different verdict based on his proposed line of questioning is improper and must constitute no part of this Court's analysis. Fed. R. Evid. 606(b); 12 O.S.Supp.2002, § 2606(B); *Carter v. Gibson*, 27 Fed. Appx. 934, 946 (10th Cir. 2001) (unpublished) (refusing to consider juror affidavit designed to bolster death row inmate's claim that trial counsel was ineffective; citing § 2606(B) and Fed. R. Evid. 606(B)).

Second, the proffered evidence simply does not overcome the fact that "the State presented a compelling case which showed that Justin Sneed placed himself in a position where he was totally dependent on [Petitioner]." *Glossip v. State*, 2007 OK CR 12, ¶ 43, 157 P.3d 143, 152. The record shows that Justin Sneed testified that the sole reason he murdered the victim was because of pressure from Petitioner. The State presented evidence that Petitioner largely controlled Sneed, an 18 year old, eighth-grade dropout who worked as a maintenance man for Petitioner at the motel (Tr. XII 47-48) and that Sneed's mental capacity and personality made it unlikely he would plan to kill anyone, let alone Van Treese, whom he barely knew.

One motel resident testified that, based on his limited observations, Sneed "didn't have a lot of mental presence" (Tr. VI 16). Bob Bemo, the homicide detective who interviewed Sneed, testified that Sneed did not appear very mature and had below average intelligence (Tr.

124

XIV 46-47).  He also testified that Petitioner appeared to be more aggressive and intelligent than Sneed (Tr. XIV 47-48).   Bemo observed that Petitioner was "a very intelligent individual...a very manipulative individual...what he does with everything that he does is he's manipulating, using people" (Tr. XIV 46).   Kayla Pursley, another motel resident, described Sneed as being "very childlike" (Tr. IX 17).   Sneed assisted caring for her children when Pursley broke her foot.   Pursley testified that Sneed played with her children "[m]ore as a peer...that he kind of fit in with my boys, you know, he played and he was real simple.  He had a skateboard and that was his life...he didn't make a lot of decisions.  You had to tell him sometimes what to do" (Tr. IX 17).   Pursley described how Sneed would not eat unless someone told him to eat (Tr. IX 18).

Petitioner and Sneed were described as "very close" friends by people at the motel (Tr. VII 28).   The evidence suggested Sneed was largely dependent upon Petitioner for food and money (Tr. VII 28; Tr. IX 21).   Pursley testified that Sneed usually followed Petitioner when they were together, that you normally did not see one without the other and that  "[Petitioner] would have to tell him what to do and how to do it" (Tr. IX 19-20, 23).   Petitioner had control over Sneed because Sneed had no other place to go and no family in the area (Tr. IX 21, 24).   Pursley observed that "[y]ou had to almost tell [Sneed] what to do in any circumstance, whether it was a working relationship or personal" (Tr. IX 23).   Cliff Everhart testified that Sneed was Petitioner's "puppet", that Sneed "was not self-motivated.  [Petitioner] told him everything to do. [Petitioner] would tell him to do this, he'd do it...If he needed something, he'd come to [Petitioner]" (Tr. XI 185).   Billye Hooper testified that Sneed did not know the

victim very well (Tr. VII 34).  This corroborated Sneed's testimony that he had only met the victim approximately three times prior to the murder during which time the pair had no real conversations (Tr. XII 76-77).

This evidence shows that Petitioner largely had control over Sneed's actions, that Sneed was dependent upon Petitioner and that Sneed's personality and mental capacity made it unlikely he would murder Barry Van Treese, a practical stranger, on his own volition.  The evidence shows Sneed had the type of personality in January 1997 that allowed him to be easily influenced by Petitioner into committing the murder.  In the words of the trial judge during a bench conference, Sneed was "an illiterate guy who's just one notch above a street person" (Tr. XIII 61).

The OCCA recognized this evidence on direct review, correctly finding that:

> The State portrayed Sneed as a person with low intellectual ability, and a child like demeanor. They presented testimony about his background, and his growing up in a single parent home, having a child early in life, dropping out of school after the eighth grade, coming to Oklahoma City with a roofing crew, and quitting that to work at the motel in exchange for rent. This was all meant to show how he placed himself in a position to be dependent on Glossip.

*Id.*, 2007 OK CR 12, ¶ 62, 157 P.3d at 154.

In light of the above evidence, there is no reasonable probability of a different verdict had Petitioner elicited at trial that Sneed had been convicted as a juvenile of a house burglary and making a bomb threat.  Bare reference to these two purported incidences, as well as references to him fighting, without further factual development, does not contradict the

126

compelling evidence marshaled by the State at trial that Sneed was totally dependent upon, and under control of, Petitioner.  Neither a house burglary, nor a bomb threat, nor fighting, necessarily require much in the way of planning or criminal sophistication.

Petitioner's bare references to these crimes also fails to undermine the evidence presented to corroborate Sneed's testimony.  This included: (1) evidence that Petitioner had overwhelming motive to murder the victim, *id.*, 2007 OK CR 12, ¶¶ 44-47, 157 P.3d at 152-53; (2) Petitioner's active concealment of the victim's body from investigators for seventeen hours, his lies to multiple individuals about the broken window as well as his multiple inconsistent statements regarding the last known sighting of the victim--all in an attempt to deflect attention from Room 102, *id.*, 2007 OK CR 12, ¶¶ 48-50, 157 P.3d at 153; (3) Petitioner's statement during his initial interview with police that he knew nothing about the murder or the body being in Room 102, *id.*, 2007 OK CR 12, ¶ 51, 157 P.3d at 153 (Tr. XIV 5-7; State's Exhibit 1; Court's Exhibit 3); (4) Petitioner's sale of his belongings the day after the murder, but before his second interview with police in which he admitted to actively concealing the victim's body and lying about Sneed telling him about killing the victim "not to protect Sneed, but because he felt like he 'was involved in it.'" *id.*, 2007 OK CR 12, ¶ 51, 157 P.3d at 153; (5) Petitioner's statement to Cliff Everhart that "he was going to be moving on", *id.*; (6) Petitioner's failure to show up voluntarily at the second police interview; *id.;* and (7) Petitioner's unexplained possession of around $1,200.00 cash when he was arrested by authorities which the totality of circumstances establish came from the $4000 taken from the victim's car.  *Id.*, 2007 OK CR 12, ¶ 43, 157 P.3d at 152.  *See also id.*, 2007 OK CR 12, ¶¶

30-31 & n.54, 157 P.3d at 173-74 (Chapel, J., dissenting) (""[t]he evidence regarding [Petitioner's] paycheck, sales, and purchases, which could not explain where he obtained approximately $1200 of the cash in his possession at the time of his arrest, materially corroborated Sneed's testimony that [Petitioner] offered him money to kill Van Treese and then paid Sneed for accomplishing the murder...").

In light of the State's "strong circumstantial case against [Petitioner], which when combined with the testimony of Sneed directly implicating [Petitioner], was more than adequate to sustain his conviction for the first-degree murder of Barry Van Treese", *id.*, 2007 OK CR 12, ¶ 33, 157 P.3d at 175 (Chapel, J., dissenting), the relatively weak probative force of the proffered evidence Petitioner now claims trial counsel should have elicited does not establish a reasonable probability of a different outcome at trial, either during guilt or penalty stage.  Trial counsel were therefore not ineffective for failing to elicit this evidence on cross-examination of Sneed and direct appeal counsel were not ineffective for failing to advance this meritless claim on direct appeal.  *Robbins*, 528 U.S. at 285 (and cases cited therein); *Strickland*, 466 U.S. at 687.

The OCCA's adjudication of this claim was therefore neither contrary to, nor an unreasonable application of, *Strickland*.  Relief must be denied.

## XII.

## TRIAL COUNSEL WERE NOT INEFFECTIVE FOR FAILING TO ALLEGE JUDICIAL BIAS AND APPELLATE COUNSEL WERE NOT INEFFECTIVE FOR FAILING TO RAISE THIS ISSUE.

Again citing juror affidavits, Petitioner contends in Ground XII that trial and appellate counsel were constitutionally ineffective for failing to argue that purported judicial bias denied him a fundamentally fair trial in violation of due process. Petitioner claims that "[a]t one or more times during the trial, Judge Gray expressed emotion, by crying or tearing up. Her emotions could have influenced the jury by indicating her opinion as to the merits of the evidence or the credibility of a witness." Thus, Petitioner reasons, a new trial is warranted. Doc. 25 at 177-80.

### A.    Exhaustion.

These claims were presented in Proposition III of Petitioner's original state post-conviction relief application and the OCCA denied relief on the merits. *Glossip v. State*, No. PCD-2004-978, at 2-4, 6-7 (Okla. Crim. App. Dec. 6, 2007). This claim is therefore exhausted for purposes of federal habeas review.

### B.    Merits.

The OCCA denied on the merits the trial and appellate counsel ineffectiveness claims at issue here. *Cf. Sandoval v. Ulibarri*, 548 F.3d 902, 911 (10th Cir. 2008) (applying AEDPA deference where state court's order was "quite terse"; "although the state court's conclusions were stated starkly, they are not impervious to analysis"; deference is owed to the result if

reasoning is not expressly stated); *Welch v. Sirmons*, 451 F.3d 675, 699 (10th Cir. 2006) (finding AEDPA deference applies to state court's adjudication of substantive judicial bias claim where OCCA only cited state law in its analysis). Noticeably, Petitioner does not contend otherwise. Thus, the sole issue before this Court is whether the OCCA's adjudication was either contrary to, or an unreasonable application of, clearly-established Supreme Court precedent to the facts of this case or was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d).

Petitioner's substantive judicial bias claim is exceptionally weak. First, Petitioner never requested recusal, nor alleged any bias on the part of the trial judge, until he filed his state post-conviction relief application. Second, in an affidavit presented to the OCCA as part of the State's June 11, 2007, post-conviction response, the trial judge fully explains the passage at Transcript Volume IV, page 5, cited by Petitioner. Remarkably, Petitioner fails to mention Judge Gray's affidavit, let alone address it. The trial judge explains that shortly before resuming court the morning of May 12, 2004, she was informed that a close personal friend had died several hours earlier. At that moment, the jurors were in the jury room and counsel for both parties were sitting in the judge's outer office, all awaiting resumption of the trial.

After being told about the death of her friend, the trial judge did in fact cry in her office and for 15 to 20 minutes discussed the matter with the friend who delivered the tragic news. Once she composed herself, the trial judge stepped outside and talked to counsel for both parties about the matter. The trial judge declined the attorneys' offer to take the day off and

told them she was going to tell the jury what happened and why there had been a delay resuming the trial.  The attorneys agreed with this approach and had no objections.

The trial judge describes in her affidavit how she informed the jurors about the unexpected death of her friend, how she had just received the news and why resumption of the trial had been delayed.  The trial judge then stated specifically that any emotion she might show was not a commentary on the evidence or anything to do with Petitioner's trial.  She also advised that the attorneys had offered to take the day off, that she did not want to do that, but that if she found herself unable to concentrate, that she would have an obligation to inform the parties and recess for the day.  The door to the jury room was open at all times during this discussion between the trial judge and the jurors and the attorneys were present and could easily hear what was said while in the outer room of the judge's office.  After speaking with the jurors, the trial judge told the attorneys they would make a brief record in the courtroom. Once proceedings resumed around 9:45 a.m., the record found at Transcript Volume IV, page 5, was made.  Affidavit of Honorable Twyla Mason Gray at ¶¶ 1-3 (6/11/07 Response to P.C. Appl., Resp. Ex. 1).

Petitioner's reliance upon juror affidavits and an affidavits from OIDS investigators to support his judicial bias claim, also lacks merit.[13]  The most that can be said, based on direct

---

[13]  To the extent Petitioner relies upon affidavits of defense investigators relaying hearsay statements from jurors (Affidavit of Sara Bonnell, Affidavit of Krystal Willis), the State objects on grounds of hearsay.  Fed. R. Evid. 801-02.

testimonials in Petitioner's[14] and the State's[15] affidavits, is that the trial judge was either "teary eyed" or shed a single tear at some point during the trial.  Of course, none of the affidavits fix a precise time during which this happened, and Petitioner fails to cite any portion of the written record reflecting that the trial judge was crying.  In her affidavit, the trial judge states that she may have been teary-eyed a couple of times during testimony but that she did not cry. Affidavit of Honorable Twyla Mason Gray at ¶ 4 (6/11/07 Response to P.C. Appl., Resp. Ex. 1).

The Tenth Circuit recently discussed the law applicable to judicial bias claims subject to AEDPA deference:

> The Supreme Court has long held that it is a violation of due process for a criminal defendant to be tried by a judge who "has a direct, personal, substantial pecuniary interest in reaching a conclusion against [the defendant] in his case." *Tumey v. Ohio*, 273 U.S. 510, 523 (1927).  In other words, "the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor" regarding a trial judge's qualifications to hear a case, *Bracy v. Gramley*, 520 U.S. 899, 904 (1997), and requires that the trial judge have "no actual bias against the defendant or interest in the outcome of his particular case." *Id.* at 905.

*Welch*, 451 F.3d at 699.  With respect to claims based on the mere appearance of bias, *see*

*Fero v. Kerby*, 39 F.3d 1462, 1478 (10th Cir. 1994), "'Because the Supreme Court's case law

---

[14]  Petitioner's affidavits were originally attached as Exhibits 5 through 13 to Petitioner's October 10, 2006, state post-conviction relief application.

[15]  The State's affidavits were attached as Exhibits 2 through 6 to its June 11, 2007 response to Petitioner's state post-conviction relief application.  *See* 6/8/07 Affidavit of Michelle Dawn Raath at ¶ 5 (Resp. Ex. 2); 6/8/07 Affidavit of Joyce Carole Thornton at ¶ 5 (Resp. Ex. 3); 6/8/07 Affidavit of Donald Louis Stamman at ¶ 3 (Resp. Ex. 4); 6/8/07 Affidavit of Sherry Ann Britton at ¶ 3 (Resp. Ex. 5); 6/11/07 Affidavit of David Piscitello at ¶ 5 (Resp. Ex. 6).

has not held, not even in dicta, let alone 'clearly established,' that the mere appearance of bias on the part of a state trial judge, without more, violates the Due Process Clause', [a habeas petitioner] cannot establish his entitlement to federal habeas relief under the standards outlined in [AEDPA]" *Welch*, 451 F.3d at 701 (quoting *Johnson v. Carroll*, 369 F.3d. 253, 263 (3d Cir. 2004)) (internal citation omitted). *See also Ross v. Parker*, No. CIV-08-33-C, 2008 WL 2951071, at *6 (W.D. Okla. Jul 28, 2008) (unpublished) (citing *Welch*, *supra*) ("In the context of habeas corpus, a judge's 'appearance of bias' alone does not amount to a due process violation").

There is no evidence that the trial judge in the instant case harbored actual bias towards Petitioner. *Id.* at 700 (citing *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)) ( noting "that the probability of actual bias on the part of the judge is too high to be constitutionally tolerable" in cases where "the adjudicator has a pecuniary interest in the outcome and in which he has been the target of personal abuse or criticism from the party before him"); *Fero*, 39 F.3d at 1479. Petitioner therefore fails to overcome the "presumption of judicial integrity", *id.*, recognized by the OCCA in denying this claim. Moreover, Petitioner is unable in light of the applicable standard of review to obtain relief under an appearance-of-bias theory of judicial bias. *Welch*, 451 F.3d at 700-01. Because the substantive judicial bias claim itself is meritless, Petitioner's trial and appellate counsel were not constitutionally ineffective under *Strickland* for failing to raise this claim. *Id.* at 707 (where substantive judicial bias claim is deemed meritless, ineffective assistance claim premised on failure to raise that same judicial bias claim also lacks merit).

All things considered, the OCCA's rejection of this claim was wholly reasonable. Relief must therefore be denied.

## XIII.

## PETITIONER'S UNDEVELOPED, MERITLESS CUMULATIVE ERROR CLAIM.

In Ground XIII, Petitioner claims he is entitled to federal habeas relief based on cumulative error. Doc. 25 at 180-81.

### A.    Exhaustion.

Petitioner alledged cumulative error in Proposition XI of his opening brief on direct appeal and in Proposition V of his state post-conviction relief application. The instant cumulative error claims is exhausted for purposes of federal habeas review.

### B.    Merits.

The OCCA rejected Petitioner's cumulative error argument on the merits. *Glossip v. State*, No. PCD-2004-978, at 8 (Okla. Crim. App. Dec. 6, 2007). Thus, AEDPA applies. The issue before the Court is whether the OCCA's rejection of this claim was either contrary to, or an unreasonable application of, clearly-established Supreme Court precedent to the facts of this case or was otherwise based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d).

First, the State submits that no authority from the United States Supreme Court recognizes "cumulative error" as a separate violation of the federal constitution or as a separate ground for federal habeas relief. *Lorraine v. Coyler*, 291 F.3d 416, 447 (6th Cir.

2002) ("The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief").  *See also Henderson v. Norris*, 118 F.3d 1283, 1288 (8th Cir. 1997) (quoting *Scott v. Jones*, 915 F.2d 1188, 1191 (8th Cir. 1990) ("cumulative error does not call for habeas relief, as each habeas claim must stand or fall on its own").  The OCCA's rejection of Petitioner's cumulative error analysis can therefore not be contrary to, or an unreasonable application of, clearly established Federal law as set forth by the Supreme Court at the time of the state court's decision.  28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  *See Darks v. Mullin*, 327 F.3d 1001, 1017 (10th Cir. 2003) (declining to address whether cumulative error may represent a free-standing constitutional violation or is otherwise cognizable as a separate ground for relief).

Assuming *arguendo*, however, that cumulative error claims are cognizable on habeas review, Petitioner is still not entitled to relief.  Cumulative error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless.  *Young v. Sirmons*, __F.3d__, 2008 WL 5220520 at *27 (10th Cir. 2008), "Because there was no constitutional error, [Petitioner] has failed to establish any cumulative error warranting habeas relief." *Neill v. Gibson*, 278 F.3d 1044, 1063 (10th Cir. 2001).  Further, cumulative error analysis on habeas extends only to constitutional errors, *Young*, 2008 WL 5220520 at **27-28, not statutory or state-law rights as claimed by Petitioner.  Doc. 25 at 181.

Petitioner fails to demonstrate he was deprived of a fundamentally fair trial in violation of due process based upon alleged constitutional error.  His total failure to provide specifics

in connection with this claim only proves this point.  The OCCA's rejection of this claim was therefore wholly reasonable.  28 U.S.C. § 2254(d).[16]  All things considered, habeas relief on grounds of cumulative error is unwarranted.

## MOTION FOR EVIDENTIARY HEARING

In his separately filed *Motion for Evidentiary Hearing*, Petitioner contends that a federal evidentiary hearing is warranted on the following claims set forth in his § 2254 petition: (1) ineffective assistance of counsel for failure to utilize Justin Sneed's videotaped interview (Ground V); (2) ineffective assistance of counsel for failure to utilize motel records to impeach prosecution witnesses (Ground V); (3) ineffective assistance of counsel for failing to cross-examine Justin Sneed with information from his competency exam (Ground XI); (4) ineffective assistance for failure to alleged judicial bias (Ground XII); (5) use of demonstrative exhibits during trial (Ground III).  Doc. 42.

**1.    Ineffectiveness Claims Raised on Direct Appeal.**  Petitioner requested an evidentiary hearing in state court on direct appeal for the ineffectiveness claims set forth in Grounds V.  The OCCA denied this request.  *Glossip v. State*, 2007 OK CR 12, ¶ 100 n.10, 157 P.3d 143, 159 n.10.  Petitioner is entitled to a federal hearing on these claims if "his allegations, if true and not contravened by the existing factual record, would entitle him to habeas relief."  *Young v. Sirmons*, __F.3d__, 2008 WL 5220520, at *25 (10th Cir. 2008)

---

[16]  Petitioner claims that the *Chapman v. California*, 386 U.S. 18, 24 (1967) standard for harmless error applies to any federal constitutional errors found by this Court on habeas. Doc. 25 at 181.  This statement, however, contradicts Supreme Court authority.  *Fry v. Pliler*, 551 U.S. 112, 127 S. Ct. 2321, 2326-27 (2007) (applying *Brecht* harmless error standard on habeas even to claims subject to AEDPA deference).

(quoting *Bland v. Sirmons*, 459 F.3d 999, 1033 (10th Cir. 2006)).  But he is only entitled to habeas relief if his ineffectiveness claims, assuming them true, entitle Petitioner to relief. Thus, the pre-AEDPA standard for evidentiary hearing and *Strickland* "work in conjunction with each other."  *Id.*  Additionally, because these two ineffectiveness claims are subject to AEDPA deference, this Court must take into account that standard in determining whether an evidentiary hearing is appropriate. *Schriro v. Landrigan*, 550 U.S. 465, 127 S. Ct. 1933, 1940 (2007) (citing *Mayes v. Gibson*, 210 F.3d 1284, 1287 (10th Cir. 2000) ("Whether [an applicant's] allegations, if proven, would entitle him to habeas relief is a question governed by [AEDPA]").

As discussed above in response to Ground V, Petitioner's factual allegations, even assuming them to be true, are insufficient to demonstrate deficient performance or prejudice under *Strickland*.  Additionally, Petitioner wholly fails to show that additional factual development is necessary.  All things considered, an evidentiary hearing should be denied as to the ineffectiveness claims set forth in Ground V.

**2. Ineffectiveness Claims Raised on Post-Conviction.**  The ineffectiveness claims set forth in Ground XI and Ground XII were raised for the first time on post-conviction review.  At the conclusion of both of these claims in his post-conviction relief application, Petitioner urged the OCCA "to reverse and remand this case for a new trial and sentencing." 10/20/06 *Application for Post-Conviction Relief* (No. PCD-2004-978) at 39, 42 (Okla. Crim. App).  Petitioner did not specifically request an evidentiary hearing in his post-conviction

137

application with respect to these two claims, although he did specifically request an evidentiary hearing on an unrelated juror misconduct claim. *Id.* at 46.

In a separately filed motion for evidentiary hearing, Petitioner requested that the OCCA order an evidentiary hearing "to resolve all factual disputes raised in the Post Conviction Application or any subsequent court filings." 10/20/06 Motion for Evidentiary Hearing and Request to Conduct Discovery (No. PCD-2004-978) (Okla. Crim. App.). Petitioner did not specify in this motion which claims from his state post-conviction application warranted factual development. The OCCA, in a footnote, summarily denied Petitioner's motion for evidentiary hearing. *Glossip v. State*, No. PCD-2004-978, at 8 n.2 (Okla. Crim. App. Dec. 6, 2007).

Based on the foregoing, the State submits Petitioner failed to request an evidentiary hearing as to the ineffectiveness claims set forth in Grounds XI and XII. Petitioner did not specifically request an evidentiary hearing as to these two claims and never suggested to the OCCA that unresolved factual issues, or additional factual development, was required to prove these particular claims. His request for a federal hearing is therefore governed by the AEDPA standard of review. *See Romano v. Gibson*, 278 F.3d 1145, 1150 (10th Cir. 2002) (where habeas petitioner sought an evidentiary hearing in state court on unrelated ineffectiveness claims, but did not specifically request a hearing on claim presented on habeas, AEDPA standard for an evidentiary hearing applied). Simply put, he did not diligently attempt to develop the factual basis of these ineffectiveness claims in state court in the manner he now requests. *Id. See also Williams v. Taylor*, 529 U.S. 420, 435 (2000).

To satisfy the AEDPA standard for an evidentiary hearing, Petitioner must show either that the claim relies on: (1) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court that was previously unavailable, 28 U.S.C. § 2254(e)(2)(A)(i); or (2) a factual predicate that could not have been previously discovered through the exercise of due dilligence, 28 U.S.C. § 2254(e)(2)(A)(ii); and that the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense. 28 U.S.C. § 2254(e)(2)(B).

Petitioner cannot meet this standard. Petitioner's ineffectiveness claims do not rely upon a new rule of constitutional law made retroactive by the Supreme Court. Nor do his claims rely upon a factual predicate that could not have been previously discovered through due diligence. The information supporting Petitioner's ineffectiveness claims was presented on state appeal. Indeed, the nucleus of information and evidence upon which he relies was taken from trial counsel's file. An evidentiary hearing may be denied for this reason alone. *See Williams*, 529 U.S. at 435 (noting that lack of diligence will not bar evidentiary hearing under AEDPA standard if efforts to discover the facts would have been in vain and there is a convincing claim of innocence; § 2254(e)(2)(A)(ii)'s "reference to diligence pertains to cases in which the facts could not have been discovered, whether there was diligence or not").

Nor does Petitioner make any showing that the facts underlying these ineffectiveness claims would be sufficient to establish a convincing claim of innocence but for the alleged constitutional error. Neither claim relies upon exculpatory evidence or otherwise calls into

question the State's strong case for guilt and the death penalty, as discussed throughout this response brief.  The information from Justin Sneed's competency evaluation regarding other crimes is merely impeachment evidence and, as discussed in response to Ground XI, innocuous information at best.  Petitioner's claim of judicial bias, and the facts upon which it relies, also does nothing to call into question Petitioner's guilt for the murder.  Petitioner therefore fails to meet § 2254's requirement for an evidentiary hearing.[17]

**3. Challenge to Use of Demonstrative Exhibits.**  Petitioner acknowledges that he did not request an evidentiary hearing in state court to further develop the demonstrative exhibit claim set forth in Ground III.  Doc. 42 at 25.  Petitioner nonetheless claims he is entitled to a hearing under § 2254(e)(2)(A)(ii) because he "has been prohibited from providing the State Court as well as this Court with sufficient facts surrounding the posters due to the interference of the trial court and prosecutor."  Doc. 42 at 26.

First, Petitioner is not entitled to an evidentiary hearing on this claim regardless of applicability of § 2254(e)(2) because, as discussed more thoroughly elsewhere in this response brief, Petitioner's demonstrative exhibit claim is unexhausted and procedurally barred from review.  Petitioner offers nothing in his § 2254 petition, or in his subsequently filed motion for evidentiary hearing, to overcome this fact.  Petitioner merely notes that the State has previously objected to his motion for discovery.  Doc. 42 at 26.  What he fails to mention is

---

[17]  Assuming *arguendo* the pre-AEDPA standard applied to these two claims, Petitioner would still not be entitled to an evidentiary hearing.  As shown above in connection with the State's discussion of these individual claims, the OCCA's rejection of these claims was wholly reasonable.  Petitioner has no claim to relief under the governing standards of review.  These claims are meritless.

that the State objected to discovery for this particular claim for the same reason it opposes an

evidentiary hearing on this claim, namely, that the claim is unexhausted and procedurally

barred.  Doc. 32.  Petitioner is not entitled to an evidentiary hearing on an unexhausted and

procedurally barred claim.  *See Cannon v. Mullin*, 383 F.3d 1152, 1177 (10th Cir. 2004)

(noting if district court determines habeas petitioner was diligent in development of claim, he

is entitled to an evidentiary hearing on the merits if the claim is not procedurally barred).

Alternatively, also as shown above in response to Ground III, this claim is substantively

meritless.

Second, the State disputes that the factual basis of the demonstrative exhibits claim was

unavailable.  As discussed above in response to Ground III, the demonstrative aids were

reflected in the record during the prosecutor's questioning.  Petitioner wholly fails to show

prejudice based on the absence of the actual demonstrative aids from the trial record before

this Court.  Petitioner's citation to numerous passages from the trial transcript evidencing the

prosecutor's resort to memorializing bits of testimony on the writing pads undermines his

claim of an inadequate record as well as any notion that the facts underlying this claim could

not have been discovered through the exercise of due diligence.  28 U.S.C. §

2254(e)(2)(A)(ii).

Third, Petitioner makes no attempt to satisfy the second part of the AEDPA standard

for an evidentiary hearing, namely, that the facts underlying his claim present a convincing

claim of innocence.  28 U.S.C. § 2254(e)(2)(B).  That should be the end of the analysis.

*Romano*, 278 F.3d at 1150 (denying evidentiary hearing where habeas petitioner fails to assert

that his claim meets § 2254(e)(2)'s requirements).  Regardless, it is clear the facts supporting

Ground III fail to satisfy § 2254(e)(2)(B).  As noted by the OCCA, "there is no argument that

the posters did not contain factual information, and they were utilized to assist the jury in

understanding the testimony..." *Glossip*, 2007 OK CR 12, ¶ 75, 157 P.3d at 156.  The posters

were based on witness testimony presented in open court and therefore offer nothing new

regarding Petitioner's culpability for the murder.  Their use implicates state trial management

concerns, not Petitioner's culpability for the murder.  The AEDPA's requirements for an

evidentiary hearing are not satisfied based on the facts underlying Petitioner's demonstrative

exhibit claim.

**4.  Summary.**  Petitioner is not entitled to a federal evidentiary hearing for any of his

claims.  His request for evidentiary hearing should therefore be denied.

## CONCLUSION

Based on the foregoing, federal habeas corpus relief is unwarranted.  Petitioner's

petition for federal habeas corpus relief should be denied in its entirety.  Additionally, an

evidentiary hearing is unwarranted in this case.

Respectfully submitted,

**W.A. DREW EDMONDSON**
**ATTORNEY GENERAL OF OKLAHOMA**

**s/ SETH S. BRANHAM**
**SETH S. BRANHAM, OBA #18019**
**ASSISTANT ATTORNEY GENERAL**

313 N.E. 21st Street
Oklahoma City, OK  73105
(405) 521-3921 (Voice)
(405) 522-4534 (Fax)
Service email: fhc.docket@oag.state.ok.us
**ATTORNEYS FOR RESPONDENT**

## CERTIFICATE OF SERVICE

On this 20th day of January, 2009, I certify that a true and correct copy of the foregoing was electronically transmitted to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Mark Henricksen
Lanita Henricksen
Henricksen & Henricksen Lawyers, Inc.
600 N. Walker, Suite 220
Oklahoma City, OK 73102-3035
e-mail:        mark.henricksen@coxinet.net
               henricksen.lanita@coxinet.net

s/ SETH S. BRANHAM