## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

RICHARD GLOSSIP,                    )
                                    )
            Petitioner,             )
vs.                                 )        NO. CIV-08-0326-HE
                                    )
RANDALL WORKMAN,                    )
                                    )
            Respondent.             )

## ORDER

In 1998 petitioner Richard Glossip was convicted in Oklahoma state court of first degree murder.  Glossip was sentenced to death but his conviction was reversed by the Oklahoma Court of Criminal Appeals ("OCCA") based on ineffective assistance of trial counsel.[1]  He was retried and was again convicted of first degree murder and sentenced to death.[2]  Glossip filed a direct appeal and the OCCA, with two judges dissenting, affirmed his conviction and sentence.  After the OCCA denied his petition for rehearing and application for state post-conviction relief, Glossip filed this federal habeas action.  In addition to his petition for writ of habeas corpus, petitioner filed a motion requesting an evidentiary hearing.[3]

---

[1] *Glossip v. State*, 29 P.3d 597 (Okla. Crim. App. 2001) ( "*Glossip I*").

[2] *The state filed a bill of particulars charging that Glossip should be punished by death due to the existence of two aggravating circumstances: 1) the murder was committed for remuneration or the promise of remuneration and (2) the existence of a probability that the petitioner would commit criminal acts of violence that would constitute a continuing threat to society.  The jury found the murder for remuneration aggravator.*

[3] *With certain exceptions noted subsequently, the OCCA resolved on the merits each of the claims petitioner asserts in his habeas petition.  This court addressed respondent's assertion that Ground III was unexhausted in its May 26, 2010, Order.*

**Factual Background**[4]

Since May, 1995,  Glossip had managed the Best Budget Inn in Oklahoma City and lived with his girlfriend, D-Anna Wood, in an apartment connected to the motel office. Glossip allowed Justin Sneed, a nineteen year old, to stay at the motel rent-free in exchange for performing maintenance work on the property.  Barry Van Treese, who lived in Lawton, Oklahoma, owned the motel and another Best Budget Inn in Tulsa.  During the early morning hours of January 7, 1997, while Van Treese was sleeping in a room at the Oklahoma City motel, Sneed entered the room and severely beat him with a baseball bat, killing him.  Sneed admitted the crime, pleaded guilty, and testified against Glossip at trial.  Sneed claimed Glossip promised him money to kill Van Treese.  In exchange for his testimony, Sneed received a sentence of life without parole.  There is no physical evidence connecting Glossip to the crime scene.  The State based its case primarily on Sneed's testimony.  The State's theory was that Glossip had Van Treese killed because he was afraid Van Treese was going to fire him.

Glossip asserts thirteen grounds for relief in his habeas petition.  He requested and was granted discovery with respect to Ground III.[5]  Petitioner's motion for evidentiary hearing is directed at Ground III and also Grounds V, XI, and XII, which consist of various allegations of ineffective assistance of counsel.

---

[4]*The OCCA outlined the relevant underlying facts of the case in detail in* Glossip v. State, *157 P.3d 143 (Okla. Crim. App. 2007), cert. denied, 552 U.S. 1167 (2008) ("*Glossip II*"). They are briefly summarized here and will be discussed in more detail as appropriate.*

[5]*Order, May 26, 2010 [Doc. #53].*

2

**Standard of Review under AEDPA**

The court's review is governed by the provisions of the Antiterrorism and Effective

Death Penalty Act of 1996 ("AEDPA").[6]  Young v. Sirmons, 551 F.3d 942, 948 (10th Cir.

2008), *cert. denied*, ___ U.S. ___ (2009).  Under AEDPA the applicable standard of review

is determined by the state court's resolution of the claim.  Federal habeas relief may not be

granted on the basis of a claim that the state court addressed on the merits unless the state

court decision "was contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States," 28

U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of

the evidence presented in the State court proceeding." *Id*. § 2254(d)(2). "A state-court

decision is contrary to clearly established federal law if: (a) the state court applies a rule that

contradicts the governing law set forth in Supreme Court cases; or (b) the state court

confronts a set of facts that are materially indistinguishable from a decision of the Supreme

Court and nevertheless arrives at a result different from [that] precedent." Fairchild, 579

F.3d at 1139 (internal quotations omitted).  "A decision is an 'unreasonable application' of

clearly established federal law only if the state court identifies the correct governing legal

principle from the Supreme Court's decisions but unreasonably applies that principle to the

facts of the prisoner's case." *Id. (*quoting Young, 486 F.3d at 663).

When reviewing a state court's application of federal law, the court is precluded from

_____

[6]*Because petitioner filed his § 2254 petition after AEDPA's effective date, its provisions apply to his grounds for relief.  Hamilton v. Mullin, 436 F.3d 1181, 1186 (10th Cir. 2006).*

issuing the writ simply because it concludes in its "independent judgment that the state court applied the law erroneously or incorrectly." Young, 551 F.3d at 948 (internal quotation omitted). Instead, the court "must be convinced that the application was also objectively unreasonable." *Id.* While the standard does not required abject deference, it prohibits the court from substituting its judgment for that of the state court. *Id.* [7]

## **Ground I – Sufficiency of evidence – Guilt stage**

Glossip attacks the accuracy of the Court of Appeal's summary of the facts established at his trial. He claims several of the OCCA's factual statements or determinations were unreasonable in light of the evidence presented in the State court proceeding. He also claims the evidence was insufficient to support his conviction[8] and that the State failed to present corroborating evidence connecting him to the murder as required by state law, 22 Okla. Stat. § 742.

## OCCA's Factual determinations

Factual determinations by a state court are presumed to be correct and a petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. §2254(e)(1). "Unless the OCCA's factual determinations are shown to be clearly wrong and objectively unreasonable, [the court] may not overturn them on federal habeas review."

---

[7]*The Appendix to the Petition for Writ of Habeas Corpus includes non-record materials which both parties address in their briefs. Due to the absence of objection by the State to their review and, as they have been considered by the court, the record is expanded to include them. Rule 7(a) of the Rules Governing Section 2254 Cases.*

[8]*The OCCA based its resolution of petitioner's sufficiency of the evidence claim on the factual summary included in its opinion. See Glossip II, 157 P.3d at 147-50.*

4

Gilson v. Sirmons, 520 F.3d 1196, 1223 (10th Cir. 2008), *cert. denied,* ___ U.S. ___ (2010).

Petitioner challenges the OCCA's factual determinations that the evidence showed that "Justin Sneed placed himself in a position where he was totally dependent on Glossip ... and ... that there was motive."  Habeas petition, pp. 34-35.  He also claims that "[c]learly, there was no evidence in Petitioner's trial that supported a finding that the money [found in Glossip's possession] belonged to Mr. Van Treese."  *Id.* at 32.[9]

Petitioner contends the evidence underlying the OCCA's factual determination of motive for the murder – Glossip feared he would be fired because of the condition of the motel and shortages in the motel accounts –  was unreliable, speculative and, inconsistent.[10]  He asserts that Billye Hooper's testimony that something was amiss because the same number of rooms were rented each night was contradicted by financial records trial counsel possessed but did not use to cross-examine Ms. Hooper.[11]  He points to conflicting evidence

---

[9]*Petitioner does not attempt to discredit the evidence underlying the OCCA's findings that Glossip's conduct after the murder, including his attempted concealment of the crime, "point[ed] to his guilt."  Glossip II, 157 P.3d at 152. Rather, the crux of his argument is that "[h]owever misguided Mr. Glossip's actions were, they did not tend to connect him to the murder of Mr. Van Treese but, rather, to its cover up."  Habeas petition, p. 55.  To the extent petitioner does assert the OCCA unreasonably determined that Glossip intended to flee, the evidence he offers - the fact that he had not left town or hidden and had met with an attorney rather than keeping an appointment with law enforcement officials – is insufficient to rebut the presumption of accuracy accorded the state court's factual determination.  There was evidence that the day after the murder Glossip was selling his possessions and said "he was going to be moving on."  State Trial Transcript Volume XI, p. 199 (hereinafter Tr. Vol. __, p. __).*

[10]*Several of the exhibits petitioner relies upon to undermine the OCCA's findings were not introduced at trial.*

[11]*However, "the focus of a Jackson [sufficiency of the evidence] inquiry is not on what evidence is missing from the record, but whether the evidence in the record, viewed in the light most favorable to the prosecution, is sufficient for any rational trier of fact to find the defendant guilty*

regarding Van Treese's policy as to "comped rooms" and whether Van Treese knew Sneed was working in exchange for a free room. He argues that, while Donna Van Treese testified of her great concern for shortages in excess of $6,000 for 1996, the majority of them occurred during the first part of the year and he was not fired at that time, the shortages at the Tulsa motel represented a higher percentage of total sales volume than the shortages at the Oklahoma City location, yet that manager testified he had not been told his job was in jeopardy, and the victim's brother testified the shortages were insignificant. He claims that the victim's brother and the individuals who helped him run the motel after the murder were not qualified to testify regarding the motel's condition and that their assessment was contrary to that of witnesses who were there on a regular basis. He cites other discrepancies in the evidence pertaining to a motive for the murder[12] and points out that the Oklahoma City motel had made its target, based on the amount required to trigger a bonus for the manager, every month in 1996, except for December.

The court cannot, however, weigh conflicting evidence or consider the credibility of

_____

beyond a reasonable doubt." Matthews v. Workman, 577 F.3d 1175, 1185 (10th Cir. 2009), cert. denied, ___ U.S. ___ (2010) .

[12]Petitioner points out that, although Mrs. Van Treese testified that the receipts for the Oklahoma City motel were never deposited in a bank, Tr. Vol. IV, p. 53-54, William Bender testified that Van Treese was angry when he arrived in Tulsa the evening of January 6, 1997, because the weekend receipt money from Oklahoma City had not been deposited and was missing. That, however, was not the only reason Bender gave for Van Treese's anger. Tr. Vol. VIII, pp. 81-82. Petitioner also notes discrepancies in testimony as to the number of missing registration cards.

the witnesses.[13]  Messer v. Roberts, 74 F.3d 1009, 1013 (10th Cir. 1996).  While petitioner

claims the State did not present any evidence that Van Treese was concerned about the

condition of the property, it did elicit testimony that Glossip was worried that once Van

Treese walked around the motel and saw "a couple of the rooms that were already supposed

to be remodeled that weren't that he was going to get fired."  Tr. Vol. XII, p. 95.  The State

also introduced evidence that in January, 1997, the condition of the motel was "deplorable"

and that Van Treese was concerned about financial irregularities in January, 1997.  Tr. Vol.

IV, pp. 70-71, 74-75, 77-78.  Mrs. Van Treese testified that her husband intended to confront

Glossip on January 6, 1997, about the $6,000 shortage.  Id. at 70-71.  William Bender, the

manager of the Best Budget Inn in Tulsa, testified that Van Treese told him on January 6,

1996, that he (Van Treese) had told Glossip earlier that evening that he had until Van Treese

drove to Tulsa and back to "come up with the weekend's receipts that were missing and if

he came up with that, he was going to give him another week to come up with the registration

cards and get all the year-end receipts together" or [h]e was going to call the police."  Tr.

Vol. VIII, p.82.  Sneed testified that on two occasions Glossip had discussed with him the

possibility of his (Glossip) being fired, the second time being the morning of January 7.  Tr.

Vol. XIII, pp. 93-94.  Sneed stated that when Glossip came to his room at 3:00 a.m. on

---

[13]*The court notes that petitioner's recitation of the evidence is, in part, selective. For example, in his discussion of the physical condition of the motel petitioner claims Van Treese "constantly knew of [the motel's] condition." Habeas petition, p. 40. Yet the evidence was that during the last six months of 1996, Van Treese had made a limited number of overnight trips to the motels because of family issues. While his past practice had been to spend four to five nights a week at his two motels, between approximately July and December, 1996, he spent four nights away from home and just went to the motels every two weeks. Tr. Vol. IV, pp. 39-42.*

January 7, that Glossip "was really serious like he was going to get fired ...." Id. at p. 93.

While a rational juror might have discredited this evidence, petitioner has not shown that "a rational jury <u>could not</u> accept it," <u>Matthews v. Workman</u>, 577 F.3d 1175, 1185 (10th Cir. 2009), *cert. denied*, ___ U.S. ___ (2010), or that the OCCA's factual determination that Glossip had a motive to kill Van Treese was unreasonable.[14]   Petitioner has offered no persuasive evidence to undermine this factual finding and, therefore, has failed to satisfy his burden.[15]   ""[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." <u>Wood v. Allen</u>, 558 U.S. ___, ___ (2010).

Petitioner's attack on the OCCA's finding that Sneed was totally dependent on him, similarly constitutes a challenge to the weight and credibility of the evidence presented by the State at trial.  The State offered evidence that supported the OCCA's determination,

---

[14]*Petitioner focuses on the lack of evidence that Van Treese came to the motel on January 6, 1997, intending to fire him.  Habeas petition, pp. 45-46.  Regardless of Van Treese's intent, there was evidence from which a rational jury could find that Glossip was afraid he would be fired for one or more reasons – the condition of the hotel or financial discrepancies.  Petitioner acknowledges in his habeas petition that Van Treese "was, however, clearly angry when he arrived in Tulsa sometime between 11:00 p.m. and midnight."  Habeas petition, p. 46 n.14 (citing Tr. Vol. VIII, p. 63).  He claims, though, that "Mr. Bender either misunderstood the reasons Mr. Van Treese was angry, or simply exaggerated the reasons he was given for that anger."  Id.*

[15] *In Ground I petitioner also attacks the evidence offered by the State to support the murder for remuneration aggravator, habeas petition, pp. 53-54, claiming the State's assertion that Glossip offered Sneed money to kill Van Treese so he could take over the management of both the Tulsa and Oklahoma City motels was inconsistent with the State's assertion that Glossip was concerned about being fired.  The two are not necessarily inconsistent.  The jury could have concluded that Glossip had initially planned the murder so he could run both motels, but decided the evening of January 6, 1997, to commit the crime out of fear he would be fired.  The sufficiency of the evidence to support the aggravator was raised in Ground VI of the petition and will be discussed subsequently.*

including the testimony of Kayla Pursley that he "was very childlike," was dependent on Glossip for food and cigarette money, and "had no one else at all once his parents had [taken his brother back to Texas and] left him there." Tr. Vol. IX, pp. 17-21, 24. Cliff Everhart testified that "Justin was Richard's puppet," who did what Glossip told him to do and came to Glossip if he needed something. Tr. Vol. XI, p.185. Sneed testified that, after his brother returned to Texas in late October or November, 1996, he was without friends or family, was dependent on Glossip for food, had no income, and had quit his roofing job, which he had taken to support his daughters, because he "got entangled with a little bit of drugs and stuff like that when I come up here, so I just kind of lost sight of what my goal and my purpose was." Tr. Vol. XII, pp. 47, 65, 68-72. Sneed said he quit his roofing job, which paid about $500 a week, because his stepbrother told him "that he had a deal with Richard Glossip that we could work at the motel and still stay at the motel and, you know, it sounded like a good idea when he was first talking about it so we jumped on it, and I just kind of went along with the ride." *Id*. at pp. 46-47.[16]

As petitioner asserts, some of the testimony pertaining to Sneed's personality and dependency, such as the statements of John Beavers, Tr. Vol. VI, pp. 15-16, was speculative. There also was contrary evidence – evidence that Sneed had been previously employed, was

---

[16]*Sneed, along with his stepbrother, Wes Taylor, and a few other people from the small Texas town where he lived, were hired by a roofing contractor to work on a roofing crew in Oklahoma. The company paid for the crew members to stay at the Best Budget Inn. Sneed's brother quit work two or three weeks before Sneed did and, during that time, befriended Glossip. Less than a month after Wes quit, his father (Sneed's stepfather), came and took him back to Texas because of an outstanding warrant. The stepfather offered to take Sneed too, but he refused because he did not like the stepfather. Tr. Vol. XII, pp. 41-46.*

offered his old job back by his former boss sometime before Christmas of 1996, and, within twenty-four hours of leaving the Best Budget Inn, was working for the same roofing crew.[17] Tr. Vol. XII, p. 47, Vol. XIII, pp 8-10. [18]  However, as noted before, this court cannot weigh conflicting evidence or assess the witnesses' credibility.  Messer, 74 F.3d at 1013.  The court "may disregard testimony on review only if [it] find[s] that the witness is inherently incredible."  Tapia v. Tansy, 926 F.2d 1554, 1562 (10th Cir. 1991). *See* United States v. Cardinas Garcia, 596 F.3d 788, (10th Cir. 2010), *cert. denied,* ___ U.S. ___ (2010) ( "A fact-finder's credibility determinations are virtually unreviewable on appeal.") (internal quotations omitted)

Finally, petitioner asserts there was no basis for the OCCA's factual determination that the money found on Glossip when he was arrested had belonged to Van Treese. However, the record includes evidence that the money Glossip had with him at the time of his arrest included his half of the cash Sneed retrieved from Van Treese's car after the

---

[17]*Sneed testified that he left the motel January 7, 1996, at Glossip's direction. Tr. Vol. XII, p. 159 ("He ... was telling me that I needed to leave and that I needed to leave right now, that no matter what I just needed to get my stuff and leave.").  At that time, Van Treese's car had been found but his body was still in the motel room.  According to Sneed, his reemployment occurred as a matter of happenstance.  Id. at pp. 160-62.*

[18]*While he challenges the OCCA's finding that "the State presented a compelling case which showed that Justin Sneed placed himself in a position where he was totally dependent on Glossip," Glossip II, 157 P.3d at 152, petitioner asserts in his petition that "[a]t the time of the murder, [Sneed] had* no *income,* no *money saved, ate only when someone invited him to dinner and, in essence, depended on strangers to provide him drugs."  Habeas petition, p. 52.  Petitioner also asserts that he delayed taking action after Sneed told him of the murder because "Sneed was his friend and someone he had taken care of and fed for several months."  Habeas petition, p. 55 n.18.*

murder. Sneed testified that on January 7, 1997, Glossip gave him approximately $2000, half the money Sneed had retrieved at Glossip's direction, from under the front seat of the victim's car. Tr. Vol. XII, p. 125-29. That sum ($4000) corresponded to the amount Billye Hooper testified Van Treese had picked up the evening of January 6, 1997.[19] Tr. Vol. VII, p. 83.

Glossip asserts in his habeas petition that "[a]t the time of his arrest, he was carrying $1,757.00 in cash, a sum comprised of his paycheck, proceeds from the sale of vending machines to the Best Budget Inn and personal items to other individuals, and his savings." Habeas petition, p. 15. However, the bulk of the cash[20] was not accounted for by Glossip's explanation of it, as discussed by the dissent.[21] Van Treese gave Glossip a check for $429.33 the evening of January 6, 1997. Tr. Vol. IV, pp. 81-83. Glossip's girlfriend, D-Anna Wood, testified that on January 7, 1997, they cashed a check[22] and then went shopping. Petitioner stipulated that he spent approximately $285 that day on an engagement ring for Ms. Wood and eyeglasses for himself. Tr. Vol. XV, p. 17. The remaining $144, when combined with the money petitioner testified he obtained for selling his TV, futon ($190 combined), and

---

[19]*Based on the daily reports, which reflected the motel's receipts for each day, Ms. Hooper testified that Van Treese had picked up between $3,500 and $4,000 that evening .*

[20]*When arrested, Glossip had $1,757.00 in cash on his person. Tr. Vol. XII, p. 12.*

[21]*Glossip II, 157 P.3d at 174 n.52 (Chapel, J., dissenting); see Tr. Vol. XIV, pp. 39-43.*

[22]*Ms. Wood could not recall whether it was Glossip's paycheck, but it is evident from the Stipulation read into the record and from the habeas petition that it was the check petitioner had received the night before from Van Treese. Tr. Vol. XV, p. 17; Habeas petition, p. 15.*

11

aquarium ($100)and the proceeds from some vending machines he owned ($200), *id.*, amounted to approximately $634, far short of what Glossip was carrying when he was picked up by the police on January 9, 1997. Petitioner has not provided clear and convincing evidence sufficient to overcome the presumption of correctness afforded the OCCA's finding that the money in his possession belonged to the victim.

For the reasons discussed, the court concludes the OCCA's factual determinations as to motive, Sneed's dependency on Glossip and the origins of the bulk of the money found in Glossip's possession when arrested, are objectively reasonable "in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

Sufficiency of the evidence to support conviction

In addition to challenging specific factual determinations made by the OCCA, Glossip makes a two-pronged attack on the sufficiency of the evidence to support the conviction. He claims the State failed to present evidence corroborating Justin Sneed's testimony, that the jury was erroneously instructed in this regard, and that the State failed to present sufficient evidence of first degree murder. He argues that at most the evidence established he was an accessory after the fact.

OCCA's resolution of the issue

Glossip presented essentially the same arguments on direct appeal, claiming that "the only direct evidence connecting him to this crime was the testimony of Justin Sneed, the admitted killer" and that "[n]o physical evidence connected Mr. Glossip to the murder and no compelling evidence corroborated Sneed's testimony." Brief of Appellant, p.10. The

OCCA rejected Glossip's contentions, finding: "[h]ere, all of the evidence taken together amounts to sufficient evidence to, first, corroborate Sneed's story about Glossip's involvement in the murder, and second, the evidence sufficiently ties Glossip to the commission of the offense, so that the conviction is supported." Glossip v. State, 157 P.3d 143, 153-54 (Okla. Crim. App. 2007), *cert. denied*, 552 U.S. 1167 (2008) ("Glossip II).

A. Corroboration of accomplice's testimony

Under Oklahoma law "[a] conviction cannot be had upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely show the commission of the offense or the circumstances thereof." 22 Okla. Stat. §742.[23]   Insofar as petitioner relies on an asserted violation of Oklahoma law requiring independent corroboration of an accomplice's testimony, his claim fails. "The Constitution does not prohibit convictions based primarily on accomplice testimony." Scrivner v. Tansy,

---

[23]*However, "[i]f the accomplice's testimony is corroborated as to one material fact by independent evidence tending to connect the accused to the commission of the crime, the jury may infer that the accomplice speaks the truth as to all. Glossip II, 157 P.3d at 152, citing Fleming v. State, 760 P.2d 208, 210 (Okla.Crim.App. 1988). "Even entirely circumstantial evidence may be sufficient to corroborate an accomplice's testimony." Id.*

*The OCCA cited, as independent evidence connecting Glossip to the crime, "the discovery of the money in Glossip's possession," id., his motive, his active concealment of Van Treese's body, and his plans to "move on." The dissent criticizes the majority opinion's reliance on any evidence but the money, noting its failure to cite any Oklahoma authority for "its assumption that non-accomplice evidence suggesting that a defendants had a motive to commit a crime, assisted the perpetrator in concealing a crime, or planned to leave the area afterward can qualify as adequate corroborating evidence linking a defendant to the actual commission of the crime under 22 O.S. 2001, § 742." Glossip II, 157 P.3d at 172 (Chapel, J., dissenting).*

68 F.3d 1234, 1239 (10th Cir. 1995).[24]  *See* <u>Boyd v. Ward,</u> 179 F.3d 904, 921-22 (10th Cir.

1999); <u>Smith v. Gibson</u>, 2005 WL 1185815, at \*21 (W.D.Okla. 2005), *aff'd* 550 F.3d 1258

(10th Cir. 2008), *cert. denied*, ___ U.S. ___ (2009).[25]

  As for the claimed error in the jury instruction on accomplice testimony, it, like any

alleged instructional error, is "only grounds for habeas relief if in the context of the entire

trial, the failure to give the instruction rendered the trial fundamentally unfair." <u>Smith</u>, 2005

WL 1185815, at \*21;[26] <u>Nguyen v. Reynolds</u>, 131 F.3d 1340, 1357 (10th Cir. 1997) ("As a

general rule, errors in jury instructions in a state criminal trial are not reviewable in federal

habeas corpus proceedings, unless they are so fundamentally unfair as to deprive petitioner

of a fair trial and to due process of law.") (internal quotations omitted); *see* <u>Foster v. Ward</u>,

182 F.3d 1177, 1193 (10th Cir. 1999).  The question is "'whether the ailing instruction by

---

[24]While "an error of state law might rise to the level of a constitutional violation required *for habeas relief if it resulted in a fundamentally unfair trial,"* <u>Boyd v. Ward</u>, *179 F.3d 904, 921-22 (10th Cir. 1999), the court concludes no such error occurred here.  As is subsequently discussed, the court finds that, although a close question, the OCCA's determination that the evidence was sufficient to sustain the conviction was not an unreasonable application of the standard articulated by the Supreme Court in* <u>Jackson v. Virginia</u>, *443 U.S. 307 (1979).*

[25]*Respondent asserts that, with respect to the accomplice corroboration instruction, petitioner asserts a separate due process claim, based on* <u>Hicks v. Oklahoma</u>, *447 U.S. 343, 345-46 (1980), which was not exhausted.  Assuming petitioner did exhaust a claim based on the asserted denial of his statutorily conferred right to have independent evidence corroborate Sneed's testimony, he has not shown a due process violation.  See generally* <u>Hooker v. Mullin</u>, *293 F.3d 1232, 1237 n.3 (2002) ("Mr. Hooker's petition hints the admission of such hearsay may have violated the Confrontation Clause because the statement 'could not be subject to the scrutiny of cross-examination.'  The argument is conclusory, and we need not address it.").*

[26]*Although petitioner's counsel failed to object to the instruction at trial, Tr. Vol. 15, pp. 37-53, and had not raised any issue regarding the giving of the uniform jury instruction, which the OCCA subsequently amended in* <u>Pink v. State</u>, *104 P.3d 584, 593 (Okla. Crim. App. 2004), the OCCA nonetheless considered its impact on the trial.*

itself so infected the entire trial that the resulting conviction violates due process.'" <u>Nguyen</u>, 131 F.3d at 1357 (quoting <u>Henderson v. Kibbe</u>, 431 U.S. 145, 154 (1977)).  The OCCA's determination that "the giving of the pre-<u>Pink</u> instruction did not affect the outcome of this trial," <u>Glossip II</u>, 157 P.3d at 152 n.5, is entitled to deference under AEDPA.

The instructional error involved here is that the trial court failed to inform the jury that it had to determine whether independent corroborating evidence, standing alone, i.e. in the absence of the testimony of Sneed (the alleged accomplice), connected Glossip to the commission of the crime.  The jury was instructed that "you may eliminate this [the accomplice's] testimony entirely," in determining whether the testimony of the accomplice had been corroborated, rather than you "<u>must</u>" eliminate the accomplice's testimony.[27] However, as noted previously, there is no constitutional requirement that the testimony of an accomplice be corroborated by independent evidence.  The OCCA also concluded that there was independent corroboration of Sneed's testimony – the money found in Glossip's possession when arrested.[28]  *See generally* <u>Pink v. State</u>, 104 P.3d 584, 590-91 (Okla.Crim.App. 2004) (circumstantial evidence can be adequate to corroborate an

---

[27]*The amended instruction informs the jury that it must set aside the testimony of an accomplice when determining whether there was separate evidence "tending to show the commission of the offense charged and tending to connect the defendant with the offense."*  <u>Pink</u>, *104 P.3d at 593.*

[28]*While petitioner argued that "[t]here was insufficient evidence to show that the money found in Mr. Glossip's possession was part of the money which Justin Sneed took from Mr. Van Treese's car," habeas petition, p. 32, he did not specifically contend that the money, if shown to have belonged to Van Treese, could not constitute independent evidence of the offense.  The court has rejected petitioner's challenge to the OCCA's factual finding that the money Glossip had with him at the time of his arrest belonged to Van Treese.*

accomplice's testimony and the "amount of corroboration required is simply at least one material fact of independent evidence that tends to connect the defendant with the commission of the crime") (internal quotations omitted); Glaze v. State, 565 P.2d 710, 712-13 (Okla.Crim.App. 1977) (evidence corroborating testimony of accomplice, while "not great ... was sufficient for the trial court to submit the issue to the jury for their determination").

"Even were there a state law violation, no fundamental unfairness resulted." Boyd, 179 F.3d at 922. "Defense counsel was able to challenge [Sneed's] testimony in a number of ways," id., and as is subsequently discussed, Sneed's testimony, combined with other evidence presented by the prosecution, was sufficient to support Glossip's conviction. The OCCA's rejection of Glossip's claim of instructional error was not contrary to or an unreasonable application of federal constitutional law. Habeas relief is not warranted on the basis of the claimed lack of corroboration or the jury instruction on accomplice testimony.

B. Sufficiency of evidence -- first degree murder

Petitioner was convicted of first degree murder. In the context of § 2254 habeas review, state law provides the substantive elements of the crime applicable to the sufficiency of the evidence standard. Torres v. Mullin, 317 F.3d 1145, 1152 (10th Cir. 2003). Under Oklahoma law:

> A person commits murder in the first degree when that person unlawfully and with malice aforethought causes the death of another human being. Malice is that deliberate intention unlawfully to take away the life of a human being, which is manifested by external circumstances capable of proof.

21 Okla. Stat. 701.7(A). To convict an aider and abetter as a principal in a first degree

16

murder prosecution, the prosecution must prove "that the accused procured the crime to be done, or aided, assisted, abetted, advised or encouraged the commission of the crime." Banks v. State, 43 P.3d 390, 397 (Okla.Crim.App. 2002) (internal quotation omitted).[29]

The "clearly established federal law" applicable to a sufficiency of the evidence claim is supplied by Jackson v. Virginia, 443 U.S. 307 (1979). There the Supreme Court held that, in evaluating the constitutional sufficiency of evidence supporting a criminal conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319.[30] The court's "review under this standard is sharply limited, and a court faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Turrentine v. Mullin, 390 F.3d 1181, 1197 (10th Cir. 2004) (internal quotations omitted).

Although the OCCA did not cite Jackson, the court applied the Jackson standard when considering Glossip's sufficiency of the evidence claim. Glossip II, 157 P.3d at 151 ("When

_____

[29]Oklahoma law provides that "[a]ll persons concerned in the commission of crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, are principals." 21 Okla. Stat. § 172

[30]The sufficiency of the evidence determination "is a mixed question of law and fact. We ask whether the facts are correct and whether the law was properly applied to the facts, which is why we apply both 28 U.S.C. § 2254(d)(1) and (d)(2) when reviewing sufficiency of the evidence on habeas." Maynard v. Boone, 468 F.3d 665, 673 (10th Cir. 2006). Having rejected Glossip's challenges to the OCCA's factual findings, the court has determined that "the facts are correct." Id.

the sufficiency of evidence is challenged on appeal, this Court will determine, whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt."). Therefore, the court reviews the OCCA's decision with AEDPA deference.[31] Torres, 317 F.3d at 1152 n.3. AEDPA limits the court's inquiry to whether the OCCA's application of Jackson was objectively unreasonable. Matthews, 577 F.3d at 1183.

The State's case hinged on whether Sneed's testimony that he committed the murder at Glossip's direction was credible – whether the jury believed Sneed's statement that he would not have attacked Van Treese if Glossip had not told him to do so.[32] Tr. Vol. XII, p. 127. Petitioner's counsel had adequate opportunity to, and did, cross-examine Sneed.[33] He asked Sneed about inconsistencies between Sneed's testimony at trial and his prior testimony and statements to the police, including earlier testimony that Glossip had offered him a smaller sum ($7,000) to commit the murder. Sneed was questioned about his failure to tell the police that a hacksaw and muriatic acid were among the items Glossip had instructed him

---

[31] "That the OCCA did not cite Jackson is of no moment; state courts need not refer to, or even be aware of, controlling Supreme Court cases, 'so long as neither the reasoning nor the result of the state-court decision contradicts them.'" Matthews, 577 F.3d at 1183 n.2 (quoting Early v. Packer, 537 U.S. 3, 8 (2002)).

[32] As noted before, Glossip did not challenge the OCCA's factual findings regarding his extensive involvement in the attempt to cover up the crime. He told "people that Van Treese had left early that morning (January 7, 1996), to get supplies," "intentionally steered everyone away from room 102," and "told a number of people that two drunken cowboys broke the window." Glossip II, 157 P.3d at 153.

[33] Whether petitioner's counsel failed to use all available evidence is another issue addressed elsewhere.

to pick up to conceal the murder. He also was asked about his plea agreement and the fact that he implicated Glossip after he learned that "people were pointing the finger toward [him]." Tr. Vol. XIII, p. 14.  During cross-examination, Sneed admitted that he had not told the police that sometime around November Glossip had tried to get him to hit Van Treese with a hammer when Van Treese was in the boiler room of the motel and that, while he stated he had "no options," he was working the day after the murder for his former employer.  *Id.* at p. 38.[34]  "The jury was entitled to discredit or believe [Sneed's] testimony." <u>Foster</u>, 182 F.3d at 1194.  *See* <u>Tapia</u>, 926 F.2d at 1562.  The court "must accept the jury's resolution of the evidence as long as it is within the bounds of reason." <u>Messer</u>, 74 F.3d at 1013 (internal quotation omitted).[35]  Its "task is limited by AEDPA to inquiring whether the OCCA's application of <u>Jackson</u> was unreasonable." <u>Matthews</u>, 577 F.3d at 1183.

On the basis of the record before it, the court "cannot say that the OCCA's sufficiency of the evidence analysis falls afoul of AEDPA's standards of review."[36]  *Id.* at 1186.  *See*

---

[34]*Glossip offers several facts that he claims are inconsistent with his guilt, including his having checked a guest into the room adjacent to room 102, which he knew Van Treese would occupy, and his having suggested to Officer Brown that he talk to Kayla Pursley as she might have information about the case, when Glossip knew she was aware of the broken window in room 102. The court concludes this and other evidence relied on by petitioner, see habeas petition, p. 61, does not render the evidence in the case insufficient for the jury to find petitioner guilty.*

[35]*The jury also heard Detective Bemo testify that: "One of the statements that [Glossip] made when he was discussing or talking to me was that he indicated that he didn't mean for Barry to get hurt. And that was a surprise to me that he would make a statement like that." Tr. Vol. XIV, p. 95. The detective explained that he was surprised because Glossip had "always tried to distance himself from this homicide ... He implicated himself." Id. (Glossip's actual statement was that he "never intended for Barry to ever get hurt ...." Court's Exhibit 4, p. 29).*

[36]*In reaching this conclusion, the court has considered petitioner's argument pertaining to the lack of forensic evidence connecting him to the crime. See habeas petition, p. 54. See* <u>Matthews</u>,

Torres, 317 F.3d at 1152-55 (10th Cir. 2003) (finding a rational juror could conclude petitioner had requisite intent to kill, "[n]otwithstanding the lack of evidence on an announced intent" to kill and despite the fact that evidence was susceptible to multiple interpretations); *see generally* Foster, 182 F.3d at 1193-94; Boyd, 179 F.3d at 921-22. Therefore, Glossip is not entitled to habeas relief on this ground of his petition.

## Ground II – Evidentiary Errors

In Ground II petitioner claims his due process rights were violated by various evidentiary errors committed by the state trial judge.   He contends the state was allowed to present evidence which was not only irrelevant and highly prejudicial, but also misleading and confusing.

The OCCA rejected this proposition on direct appeal, finding it did not rise to the level of plain error.[37]   The court concluded that the testimony of Donna Treese detailing a series of family tragedies that occurred in the months preceding the murder, which Glossip asserted was introduced merely to elicit sympathy for the victim and his family, was relevant to demonstrate why Mr. Van Treese had not been involved in the day to day operations of the motel and how the motel could "slip into physical and financial disrepair without his knowledge."  Glossip II, 157 P.3d at 154.  The OCCA also found that evidence that Van

---

*577 F.3d at 1185 (Jackson does not require blood, DNA, or fingerprint evidence or eyewitness testimony to sustain a criminal conviction).*

[37]*Due to defense counsel's failure to object to any of the evidence challenged in Ground II, the OCCA applied a plain error standard of review.  Glossip II, 157 P.3d at 154 ("Plain error is that error which goes to the foundation of the case or takes away a right which is essential to a defendant's case.").*

Treese was a ham radio operator and a diabetic was relevant, as was testimony pertaining to Sneed's intellect and personality which the State offered to show how Sneed put himself in a position to be dependent on Glossip.[38]  While the OCCA did determine that some of the first stage testimony regarding the victim, as well as some lay opinion evidence as to Sneed's ability to kill Van Treese on his own, may have been improper, it concluded that such evidence did not deprive Glossip of a fair trial.  Finally, the state appellate court rejected petitioner's argument that evidence of steps taken by Van Treece's brother to refurbish the motel after the murder was erroneously admitted.[39]

Oklahoma's plain-error test is rooted in due process.  Thornburg v. Mullin, 422 F.3d 1113, 1124 (10th Cir. 2005).  Therefore, because the OCCA applied the same test this court applies to determine whether there has been a due-process violation, the court must defer to the OCCA's ruling  unless it unreasonably applied that test.  Id. at 1124.

A state court's evidentiary ruling will not be disturbed on habeas review unless petitioner "demonstrates that the court's error was 'so grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process.'"

---

[38]Although petitioner contends the State offered testimony from Sneed whose only purpose was to "lessen his moral culpability for the murder," habeas petition, p. 77, the State's theory was that Sneed committed the murder at Glossip's behest.  The defense argued that Sneed acted alone. Tr. Vol. IV, pp 11-25.

[39]The OCCA noted that it was brought out during the trial that Glossip lacked the authority to make the linen and towel purchases Kenneth Van Treese made when he took control of the motel after his brother died. To the extent evidence of the extensive changes made by Kenneth Van Treese was irrelevant, it was not so unduly prejudicial as to deny petitioner the fundamental fairness that is the essence of due process.

Fox v. Ward, 200 F.3d 1286, 1296 (10th Cir. 2000) (quoting Williamson v. Ward, 110 F.3d 1508, 1522 (10th Cir. 1997). Most of the challenged evidence was relevant and neither it nor the evidence which may have lacked probative value[40] was so unduly prejudicial as to render the proceedings against petitioner fundamentally unfair. Petitioner has not shown that the OCCA's decision on this claim was an unreasonable determination of the facts nor an unreasonable application of Supreme Court law. The asserted evidentiary errors did not violate petitioner's due process rights.[41] The court declines to grant habeas corpus relief to Glossip on this Ground.[42]

## Ground III – Trial error – Posters

---

[40] *This would include the testimony of Donna Van Treese and other witnesses, including William Bender, Cliff Everhart, and Kenneth Van Treese, regarding the victim's personality. However, the court rejects petitioner's argument that Mrs. Van Treese's physical description of the victim during the first stage of the trial lacked probative value. See United States v. Pettigrew, 468 F.3d 626, (10th Cir. 2006) (" A photograph of a victim while living is admissible to prove the identity of the victim."); Thornburg, 422 F.2d at 1129 ("Even if [the petitioner] did not dispute the manner of death, the state still bore the burden to convince the jury that its witnesses, both eyewitnesses and experts, provided an accurate account of events. The photographs [of the charred remains of the victims' bodies] corroborated their accounts."). The State's introduction of a photograph of the victim, which was published to the jury during Mrs. Van Treese's testimony, is the subject of Ground X of the petition.*

[41] *The OCCA did not specifically address in its opinion petitioner's challenges to Donna Van Treese's testimony regarding her wedding band and her description of the t-shirt the victim was wearing when killed, which were raised in Glossip's brief before the OCCA on direct appeal. The court cannot, therefore, afford any deference to the state court's disposition of those matters. See Duckett v. Mullin, 306 F.3d 982, 990 (10th Cir. 2002). Applying a de novo standard of review, the court finds the contested testimony was relevant and not unduly prejudicial.*

[42] *To the extent petitioner attempts to assert a new claim based on Hicks, 447 U.S. at 343, the court agrees with the State that it is unexhausted and procedurally barred. Petitioner did not assert cause and prejudice excusing the default or suggest that a fundamental miscarriage of justice will occur if the merits of the claim are not reviewed. See Bland v. Sirmons, 459 F.3d 999, 1012 (10th Cir. 2006). Even if exhausted, a Hicks claim would not warrant habeas relief on Ground II.*

In Ground III petitioner claims his constitutional right to due process was violated when the trial court allowed the state "to display selective portions of certain witnesses' testimony throughout the entire trial because it overemphasized that testimony, constituted a continuous closing argument, and violated the rule of sequestration of witnesses." Habeas petition, p. 82.[43] The state trial court refused to permit defense counsel to preserve the demonstrative exhibits for appellate review either by making them part of the original record or allowing defense counsel to photograph them. Petitioner filed a discovery motion here pursuant to Rule 6 of the Rules Governing Section 2254 Cases seeking production of the posters, which the prosecution had retained.[44] This court granted the requested discovery and later allowed petitioner to supplement the record with copies of the posters[45] and supplement his petition/brief. Respondent also was allowed to supplement his brief and the record was expanded to permit both parties to submit affidavits pertaining to the location and use of the posters.[46]

---

[43]*The OCCA court stated that "[t]he record is not clear whether these pads stayed up during the entire trial" and that Glossip's assertion that the posters were "'taped up to various places in the courtroom and remained in full view of the jury and all subsequent witnesses throughout the trial,'" was not supported by his citations to the record.* Glossip II*, 157 P.3d at 156. However, respondent does not assert that the posters were removed before both stages of the case were concluded and did not contest petitioner's assertion in his supplemental brief that the posters were displayed during the entire trial.*

[44]*The court previously concluded that petitioner had exhausted this claim. May 26, 2010, Order [Doc. #53].*

[45]*Although the defense also used posters during the trial, they were not preserved. See* Glossip II*, 157 P.3d at 170 n.27.*

[46]*Because the parties disagree as to whether the posters could be seen by the testifying witness, the court has assumed they were visible. Petitioner did not challenge the assertion by Ms.*

The OCCA focused on the trial court's failure to allow the posters to become part of the record, rather than the merits of the ground for relief.  In discussing the effect of the trial court's decision, the OCCA mentioned two cases,  Lanning v. Brown, 377 S.W.2d 590, 594 (Ky.1964), a Kentucky civil decision, and Miller v. Mullin, 354 F.3d 1288 (10th Cir. 2004) a habeas case in which the Tenth Circuit addressed the consequences of a prosecutor's unannounced use of an illustrative device, a transparency, during closing argument.  The OCCA stated:

> the [Miller] Court noted a risk of using transparencies during closing argument. The court noted that "[a]n inherent risk in the use of pedagogical devices is that they may unfairly emphasize part of the proponent's proof or create the impression that disputed facts have been conclusively established or that inferences have been directly proved."

Glossip II, 157 P.3d at 156 (quoting Miller, 354 F.3d at 1295).

The OCCA then proceeded to hold:

> In viewing the entire record, we cannot say that the posters affected the outcome of this trial. Both sides utilized the poster tactic during trial, although, the State seemed to utilize more posters than the defense. There is no argument that the posters did not contain factual information, and they were utilized to assist the jury in understanding the testimony, considering the trial court's instructions against note-taking. Any error in the utilization of these posters was harmless.

Id.

The initial question is whether petitioner's evidentiary claim was "adjudicated on the

_Smothermon, one of the State's prosecutors, in her affidavit that two of the posters were used as demonstrative exhibits only during opening and closing arguments.  See petitioner's supplemental brief on Ground III, p. 2 n.1.  Her explanation for Kenneth Van Treese's remark about the posters also was not refuted.  The court has considered those two  portions of Ms. Smothermon's affidavit, but ignored the remainder because of the parties' disagreement as to the posters visibility.  See petitioner's objection, Exhibits 1, 2 [Doc. #62]._

merits" within the meaning of § 2254(d), when the OCCA did not review the posters themselves,[47] but was generally, if not specifically, aware of their contents.  The OCCA stated that "[a]ccording to the record cited, the prosecutor made notes of significant testimony on a large flip chart sized easel pad.  This pad was left up for the jury to view during trial ....."  Glossip II, 157 P.3d at 156.  The court remarked that "the only way to determine what was on the posters, in toto, is to search the record and note where it appears that the prosecutor was writing on the note pad."  Id.  On direct appeal petitioner cited some, but not all, of the pages in the trial transcript which disclosed the statements or the essence of the statements written on the posters.[48]

If the state court "decided the 'substance' of the claim," Wilson v. Workman, 577 F.3d 1284, 1293 (10th Cir. 2009), this court reviews the determination that the prosecution's use of the posters was harmless error by applying the standard articulated by the Supreme Court in Brecht v. Abrahamson, 507 U.S. 619 (1993).  "Under Brecht, habeas relief is proper only if the error had a 'substantial and injurious effect or influence in determining the jury's

---

[47]*The OCCA concluded that, while Glossip had requested an evidentiary hearing so the record could be supplemented with the posters, "the inclusion of the demonstrative exhibits would not affect [the court's] decision in this case."  Glossip II, 157 P.3d at 155 n.8.*

[48]*The trial transcript occasionally reflects that statements were written down that are not reflected on the posters that were produced and made part of the record.  E.g., Tr. Vol. V, pp. 21, 23, 97.  The court assumes the writing/posters reflecting those statements were not preserved after the conclusion of the witness' testimony.  That accords with the reason given by the prosecutor for the posters that were on continual display – "[t]his demonstrative exhibit is a running, continuing tally of the various spins that this Defendant has put on, you know, his version of the facts."  Id. at p. 196; Tr. Vol. VIII, pp. 51-52.  For the most part the posters submitted to this court reflect the conflicting statements Glossip made on January 7, 1997, to conceal the murder. Id.*

verdict.'" <u>Bland v. Sirmons</u>, 459 F.3d 999, 1009 (10th Cir. 2006) (quoting <u>Brecht</u>, 507 U.S. at 623). "[A] substantial and injurious effect exists when the court finds itself in grave doubt about the effect of the error in the jury's verdict. Grave doubt exists where the issue of harmlessness is so evenly balanced that [the court] feels [itself] in virtual equipoise as to the harmlessness of the error." <u>Bland</u>, 459 F.3d at 1009-10 (internal quotations and citation omitted).

If, however, the OCCA did not adjudicate the federal claim because it did not review the posters themselves, *see* <u>Wilson</u>, 577 F.3d at 1292-93, its decision is not entitled to deference under AEDPA. This court then reviews the claim *de novo* and, after having examined the posters and considered the parties' supplemental briefs, must determine whether "the prejudicial impact of constitutional error in [the] state-court criminal trial rises to the substantial and injurious effect standard set forth in <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), and <u>O'Neal v. McAninch</u>, 513 U.S. 432, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995)." <u>Welch v. Workman</u>, 607 F.3d 674, 685 (10th Cir. 2010) (internal quotations omitted). As the court concludes petitioner is not entitled to habeas relief even if the claim is reviewed *de novo*, it is unnecessary to determine whether the state court adjudicated the claim on the merits.[49] *See* <u>Webber v. Scott</u>, 390 F.3d 1169, 1174-77 (10th

---

[49]*While the OCCA found error, it is unclear whether it found error under state or federal law. Habeas relief cannot be granted unless the petitioner first establishes a constitutional violation. Arguably the prosecution's use of the posters did not rise to the level of a due process violation. However, the court need not address that issue as it concludes that the trial court's error was harmless under* <u>Brecht</u>. *See generally* <u>Wright v. Van Patten</u>*, 552 U.S. 120, 125-26 (2008) (discussion of clearly established federal law for purposes of § 2254);* <u>Crawley v. Dinwiddie</u>*, 584 F.3d 916, 920-22 (10th Cir. 2009), cert. denied, ___ U.S. ___ (2010). The court has assumed, for*

26

Cir. 2004) (court assumed the OCCA did not address the merits of petitioner's federal claim, including whether it was harmless, assumed a due process error had occurred, and applied Brecht harmless error standard).

Petitioner asserts the trial court's error of allowing the State, over defense objection, "to post summaries of witness testimony throughout the courtroom and to leave [those] demonstrative exhibits visible to jurors and later witnesses, from the time they were first crafted until the conclusion of the first stage of Glossip's trial," Glossip II, 157 P.3d at 165 (Chapel, J., dissenting), was not harmless.[50]  He contends the error resulted in a violation of the rule of sequestration of witnesses, permitted the prosecutors to unduly emphasize what they viewed as key testimony, and allowed the State to make a perpetual closing argument,

The posters consist of handwritten bits of witnesses' testimony on sheets of butcher block paper, approximately 27 by 36 inches in size.  They apparently were taped to the edge of the State's counsel table and elsewhere in the courtroom.  The writing on the posters is large enough that they would have been legible if within a juror or witness' line of vision. The court has assumed that, once created, a poster could be seen throughout the remainder of the trial by both the jury and the witnesses.[51]  The posters were not admitted into evidence

---

*purposes of considering petitioner's claim, that there was constitutional error.*

[50]*The claimed error is trial error rather than structural error. See* Brecht, *507 U.S. at 629 ("Trial error occur[s] during the presentation of the case to the jury, and is amenable to harmless-error analysis because it may ... be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial]." ) (internal quotations omitted).*

[51]*See supra note 46.*

and were not sent with the jury to the jury room.

Most of the writing on the posters consists of statements Glossip made on January 7, 1997, to various people in an attempt to cover up the crime,[52] including when he had last seen the victim, the cause of the broken window, the room in which the victim had spent the night, and who was to clean the downstairs motel rooms.[53]  Two posters include references to statements Glossip made to Office Tim Brown at different times during the day on January 7, 2010, and then after Van Treese's body was found. They demonstrate inconsistencies in Glossip's statements to the police, reflecting that Glossip told Brown at 4:30 p.m. on January 7, 1997, that he had seen Van Treese walking through the parking lot that morning at 7:00 a.m, sometime after 7 p.m. told him that he was  not sure when he had last seen Van Treese, and, around 9 p.m., said that everything was getting turned around and he did not say he say he had seen the victim at 7:00 a.m.  The writings on these posters also show that petitioner did not mention anything to Officer Brown about Justin Sneed's involvement in Van Treese's

---

[52]*One exception is the poster documenting petitioner's statements to William Bender – that petitioner did not commit the crime but knew who did it, that he did not tell the police because he was in fear for his life and that he'd have left if the police had not told him to stick around.  The court does not, though, find that the State's use of this poster, alone or in combination with the others, warrants habeas relief under* <u>*Brecht*</u>*.*

[53]*Two posters were used by the prosecution only during opening and closing arguments. Their use for that purpose was  not addressed or challenged by petitioner and they have not, therefore, been considered pertinent to petitioner's claim.  See supra note 46.*
*Two other posters were submitted to the court and made part of the record.  (They were not mentioned by the prosecutor in her descriptions of the various posters in her affidavit.)  On one is written (1) the date the body was found and its location, (2) that Justin Sneed denied killing Van Treese on January 14, 1997,  (3) that an interview (apparently with Glossip) was conducted with Bemo and Cook on January 8, 1997, and (4) after the first Bemo-Cook interview furniture (presumably Glossip's) was sold.  The other poster contains background information on Billye Hooper.  Neither of these posters impact petitioner's claim.*

disappearance until after the body was discovered.  The statements on these posters did not

directly link Glossip to the murder.

The only poster that included statements directly connecting Glossip to the murder

was that on which the prosecutor summarized Sneed's testimony ("Sneed poster").  A rough

recreation of that poster follows:

<br>

Richard Glossip's Statements

to

Justin Sneed

<br>

| More than | Kill Barry |
| 1x | Van Treese |
| < 10 | for $$ |
| (6 or 7) | |
| | |
| | Goal to run |
| 2x | (control) |
| | both motels |
| | Could convince Barry's |
| | wife into letting him do that |
| | |
| Actual plan | in broiler rm -- |
| Nov/Dec | with little hammer |

Neither party has cited, nor has the court found, cases concluding due process

violations resulted from a use of demonstrative exhibits similar to that which occurred during

Glossip's trial.[54]   Petitioner relies on cases in which trial courts have refused to allow

---

[54]*Because the jury found the murder for remuneration aggravator, the Sneed poster was pertinent to both stages of the trial.  Therefore, the court must consider its impact during the sentencing stage as well as the guilt stage.*

testimony to be reread to the jury during deliberations.[55]   The courts' concern in those decisions was that "testimony taken out of context could give too much stress to a particular point."   Glaze v. State, 565 P.2d 710, 714 (Okla.Crim.App. 1977).   While that concern is present here, those cases are distinguishable in that the issue arose during jury deliberations. While the posters could be viewed by the jury during the trial, the jurors' attention was not specifically focused on them, as it would be if their contents were read to them after they had retired to deliberate or if the posters had been sent to the jury room.

A demonstrative aid somewhat similar to the State's posters was the subject of United States v. Downen, 496 F.2d 314 (10th Cir. 1974), which addressed the issue on direct appeal. The trial court had allowed a blackboard chart the government prepared "summarizing its theory of the case to remain before the jury throughout the trial and to be sent to the jury room during jury deliberations."   Id. at 319.   The defendants argued on appeal that the exhibit had not been admitted into evidence, was not admissible and its use was extremely prejudicial to them.   The chart "contained in summary form the Government's 'case' as to each count in the indictment, including a brief description of each vehicle involved [and] the vehicle VINS, with dates noted when the respective vehicles were stolen and later recovered."   Id.   It had been presented to the court and opposing counsel prior to trial.   At that time defense counsel had objected to its use until the government had introduced

---

[55]Courts  have long had the discretion to allow a jury to reread certain testimony, so long as it was read in its entirety.  See e.g., United States v. Keys, 899 F.2d 983, 988 (10th Cir. 1990).

evidence supporting each notation on the chart.  The defendants also "objected to the prejudicial effect of permitting the Government to 'select' certain evidence for special treatment in that it would be continually 'in front' of the jury. They further argued that, assuming that all of the evidence on the backboard chart had been presented by the Government and admitted, then and only then could the Government employ it, and then only in closing arguments."  *Id.*   The government contended that, because of the complicated factual transactions,  the blackboard chart was needed to avoid jury confusion.

In determining that the trial court properly allowed the blackboard chart to be used as a demonstrative exhibit, the Tenth Circuit noted that the jury had been instructed that it was not evidence and merely an aid to assist them in keeping track of the various vehicles involved in the charged offenses, both during trial and when, at the specific request of the jury foreman and over the defendants' objection, the chart was taken into the jury room.  The court stated that "the touchstone" for its determination was whether the record evidenced prejudice to the defendants "by reason of the jury's view of the blackboard chart."  *Id.* at 320. It concluded that "nothing contained on the blackboard chart could have prejudicially influenced the jurors' verdicts, in light of the careful and detailed cautionary instructions given by the Trial Court that it was not evidence and contained information relating only, in part, to the Government's theory of the case which must be proved beyond a reasonable doubt in order to have evidentiary value."  *Id*.  While the judge, during Glossip's trial, included in its jury instructions a general definition of "evidence," no specific limiting instructions regarding the posters was given.  However, unlike the blackboard, the posters were not

31

before the jury when it was deliberating.

In Miller, 354 F.3d at 1293, cited by the OCCA in Glossip II, the Tenth Circuit was confronted in a habeas case with a prosecutorial misconduct claim based on the prosecutor's use of an illustrative device. During the final closing argument the prosecutor "presented a transparency marked with the letters 'JAy' and posited that these letters matched blood smears on the double doors and floor of the murder scene."[56] Id. The prosecutor told the jury that "they could see the victim 'went into his own blood ... and wrote his killer's name.'" Id. at 1294 (quoting Tr. trans. vol. X, at 251). Miller argued that he was "unduly prejudiced because the prosecutor knew before trial that he intended to suggest that [the victim] was identifying his killer in the blood smear during final closing" and precluded him from rebutting or cross-examining the State's "undisclosed bombshell" theory. Id.

The Tenth Circuit court found  "[t]he use of a transparency, which is a pedagogical device, [to be] more akin to argument than evidence." Id. at 1295 (internal quotation omitted). It noted that "[a]n inherent risk in the use of pedagogical devices is that they may unfairly emphasize part of the proponent's proof or create the impression that disputed facts have been conclusively established or that inferences have been directly proved." Id. (internal quotation omitted). Therefore, "[t]he unsupervised use of pedagogical aids during closing arguments greatly heightens the risk of reversible error." Id.

Reviewing Miller's claim under AEDPA, the Tenth Circuit concluded that "[a]lthough

---

[56]The victim in Miller knew the petitioner as "Jay Elkins."  Miller, 354 F.3d at 1291.

the transparencies may have unfairly emphasized or even exaggerated the significance of the

blood spatters, and may have potentially injected a new theory into the case, [it could not]

say that the Oklahoma Court of Criminal Appeals unreasonably applied federal law when it

determined that the trial court's allowing this use was not plain error.[57] *Id.* at 1296. The Tenth

Circuit pointed out that the transparency had "directly and dramatically countered a defense

argument." *Id*. Nonetheless, the court expressed its concern about the "dramatic

presentation during final closing and the potentially inflammatory nature of the prosecutor's

comments," "[g]iven the lack of notice of the use of the transparencies." *Id*. It cited the

Eighth Circuit's warning that:

> [I]n a criminal case, the prosecution runs a tangible risk of creating reversible
> error when it seeks to augment the impact of its oral argument with pedagogic
> devices. .... <u>Because the very purpose of a visual aid of this type is to heighten
> the persuasive impact of oral argument, we will necessarily be more inclined
> to reverse in a close case if the testimony has been unfairly summarized or the
> summary comes wrapped in improper argument.</u>

*Id*. (quoting <u>United States v. Crockett</u>, 49 F.3d 1357, 1362 (8th Cir.1995)).[58]

The State's introduction of two reenactment videos formed the basis for the

petitioner's due process claim in <u>Harris v. Poppell</u>, 411 F.3d 1189 (10th Cir. 2005). The

petitioner claimed the videotapes, which "supported the state's theory and undermined Mr.

Harris's theory of self-defense," *id.* at 1190, violated his right to a fundamentally fair trial.

On direct appeal, after applying a three part test, the OCCA had concluded that the

_____

[57]*The OCCA reviewed the trial court's decision to allow the argument and use of the transparency for plain error because defense counsel waited over an hour to object.*

[58]<u>*Crockett*</u> *was before the appellate court on direct rather than collateral review.*

prosecutor had properly used the videos to illustrate the testimony of Mr. Bevel, the State's expert witness.

On habeas review, the Tenth Circuit's task was to determine whether the state court's evidentiary ruling "rendered the trial so fundamentally unfair that a denial of constitutional rights result[ed]." *Id.* at 1197. The court "acknowledge[d] the concerns of the magistrate judge and the OCCA's dissent that the videos went beyond their use as demonstrative aids to illustrate Mr. Bevel's testimony. When a video represents one party's staged recreation of facts in controversy, 'not only is the danger that the jury may confuse art with reality particularly great, but the impressions generated by the evidence may prove particularly difficult to limit.'" *Id.* (quoting Robinson v. Missouri Pacific R.R. Co., 16 F.3d 1083, 1088 (10th Cir. 1994)). It also did not "lightly dismiss the magistrate judge's concern that the videos affected the jury's verdict because (1) there were no eyewitnesses, (2) the crime scene was not preserved, and (3) the crux of the issue before the jury was whether Petitioner acted in self-defense." *Id.* at 1197-98 (internal quotation omitted). Nonetheless, the appellate court concluded the OCCA had not unreasonably applied controlling Supreme Court precedent. As the two videos were relevant, had evidentiary support for their introduction and the petitioner "had adequate trial opportunity to challenge the evidentiary underpinnings and possible inferences drawn from the videos," *id*. at 1198, the court could not "conclude that the alleged error in the OCCA's evidentiary ruling was so grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process." *Id.* (internal quotation omitted.) The Tenth Circuit reached this conclusion even "[t]hough the

jury was not given the 'model' instruction that the OCCA preferr[ed] and the videos likely made Mr. Harris's theory of self-defense less plausible." *Id*. Mr. Harris was not, the court stated, "absolutely <u>barred</u> from asserting self-defense with regard to the murder; indeed, he presented evidence and called his own expert witness in support of his theory." *Id*.

The court has considered the State's use of the posters against the backdrop of these cases, remembering that the decision to allow the parties to use visual aids "rests squarely with the trial court" and that "the ability of an appellate court to overturn discretionary rulings on direct review is severely constrained [and] ... is even more attenuated on habeas review." <u>Miller</u>, 354 F.3d at 1295,1296. The issue for the court to decide is not whether the posters use violated some state evidentiary rule, but whether their impact on the trial was harmless error under <u>Brecht</u>.

Petitioner's argument that the posters allowed a witness to tailor his or her testimony to that of a prior witness is not persuasive.[59] Because most of the witnesses had previously testified (during the first trial and/or preliminary hearing) or given statements, petitioner's trial counsel had the opportunity to challenge any changes in their testimony that might have been due to their reading the statements of preceding witnesses. Moreover, as is discussed subsequently, the bulk of the testimony recorded on the posters was not disputed. Also, as respondent asserts, it would have been difficult for a witness to read what was on the posters

---

[59]*The one example petitioner gave of a witness expressly referring to prior testimony was the comment of Kenneth Van Treese, the victim's brother. See Tr. Vol. XI, p. 127. However, as a family member, Mr. Van Treese was permitted to be in the courtroom for the entirety of the trial. Tr. Vol. IV, pp. 26-27; respondent's supplemental brief regarding Ground III, Exhibit 1, Doc. #59. See supra note 46.*

at the same time he or she was being asked questions.

The more difficult question is the impact of the posters on the jurors' deliberations – did they allow or cause certain testimony to be overemphasized to such an extent that the error "'resulted in actual prejudice?'" Welch, 607 F.3d at 685 (quoting Brecht, 507 U.S. at 637).[60]  As petitioner notes, the jurors not only heard the witness make the statements and then see them recorded, the prosecutor occasionally reread a statement to verify its accuracy. However, petitioner does not contend that the prosecutors inaccurately recorded the witness' testimony.[61]   More importantly, he does not dispute the accuracy of most of the statements attributed to him on the posters.  As stated by petitioner's counsel during his closing argument, "Mr. Glossip sits here charged with murder for inconsistent statements." Tr. Vol. XV, p. 123.  The thrust of petitioner's defense was that, while he made false statements and may have committed a crime, it was committed after Sneed murdered Van Treese, not before. Id. at pp.104-05, 148 ("The only thing that has been clearly established is the wrong – misjudgment by Mr. Glossip.  And it may have a risen to the level of accessory after the fact, the lesser related offense."); see Tr. Vol. IV, p. 17 (defense counsel stated during his opening: "What evidence is there, I want you to ask yourselves throughout the course of this trial that shows the involvement of Richard Glossip in this homicide before the homicide was

---

[60]While petitioner criticizes the State's creation of the posters, see Habeas petition, p. 86, the gist of his claim is that the prosecution improperly failed to remove the posters after the witnesses finished testifying.  See Tr. Vol. VIII, p. 50.

[61]The OCCA noted that "[t]here is no argument that the posters did not contain factual information ...." Glossip II, 157 P.3d at 156.

committed.  That really is the focus of this trial, I submit to you.").   Glossip admitted that he had lied to the detectives and that he had covered up the murder.  State's Exhibit 2, Court's Exhibit 4, pp. 16, 20 ("I didn't have nothing to do with Barry's death, Justin did it. I mean, I guess I did, I covered it up.").

With the exception of the Sneed poster, by allowing the posters to remain visible throughout the proceedings the trial court essentially permitted the State to present cumulative, though undisputed, testimony about Glossip's statements on January 7 and 8, 1997.  The court does not discount the impact of these posters.  As described by the respondent, the prosecutor used the "easel board paper to memorialize Petitioner's many incriminating statements to prosecution witnesses on the day of the murder, or shortly thereafter  ... designed to deflect attention from the victim's body in Room 102 ...."  State's response, pp. 40-41.  The jury could have considered Glossip's various statements as evidence not merely of his attempt to conceal the discovery of the crime, but as proof that he was involved in the murder itself.  However, the court concludes that the continual display of these posters was not harmful under the deferential standard of <u>Brecht</u>.  Petitioner's defense was that, while he might have been involved in an attempt to hide the murder, he was not involved in its commission.  Glossip's counsel stated during his closing argument that none of the witnesses (with the exception of Sneed), "placed Mr. Glossip killing Mr. Van Treese or have personal knowledge of that or have knowledge of a contract or an agreement between him and Justin Sneed.  None of them."  Tr. Vol. XV, p. 115.  Their recorded statements on the posters did not make that link.  They also neither undercut Glossip's

defense nor directly bolstered the State's murder charge.[62]   Under these circumstances, the court concludes that the presence of the posters reflecting the testimony of witnesses other than Sneed did not have a substantial and injurious effect on the jury's verdict.  *See* Campaneria v. Reid, 891 F.2d 1014, 1022 (2nd Cir. 1989) (improperly admitted subsequent recorded confession to crime was "entirely cumulative" and its admission was harmless error, where the prosecution properly admitted an untainted oral confession).

The Sneed poster reflected the crux of the State's case against Glossip.  Its contents, a synopsis of Sneed's testimony implicating Glossip in the murder, addressed facts which were highly disputed. The poster was created on May 26, 2004, late in the trial.[63]

Although a close question, the court concludes that the trial court's decision to allow the continued display of the Sneed poster, whether considered alone or in combination with the other posters was, while erroneous, harmless under Brecht.  Key considerations include the fact that the information on the poster accurately reflected  Sneed's testimony, that the poster was not sent to the jury deliberation room, and that the information on the poster was limited and simple.[64]  As Sneed was the state's principal witness, it is doubtful the jury would have needed any reminder as to the central points of his testimony which were recorded on

---

[62]*None of these posters included statements relating to a possible motive for Glossip to murder Van Treese.*

[63]*Voir dire began on May 11, 2004.  Sneed testified on May 26 and 27.  The trial continued on May 28 and the first stage of the proceeding concluded, with a verdict being returned,  on June 1, 2004.  The second stage of the trial lasted two days.  The Sneed poster was present in the courtroom for the last three to four days of stage one and the entirety of stage two.*

[64]*The same factors apply to the other posters as well.*

the posters – that Glossip offered him money to kill Barry Trees so he could run both motels.[65]  Although not determinative, the court notes that the defense also created and displayed posters during Glossip's trial.[66]

The trial judge did not give any specific limiting instructions with respect to the posters.  However, she instructed the jurors both at the beginning of the trial and before they began deliberating that "[t]he State has the burden of providing the evidence that establishes guilt beyond a reasonable doubt ...." and  then defined evidence as testimony received from witnesses under oath, stipulations and exhibits admitted into evidence during the trial.  Tr. Vol. III, p. 192; Original Record Vol. VII, p. 1263.  The jury was also advised  that evidence "is not what the attorneys say, it is not what I say" and that "[t]he exhibits go back with you into deliberation."  Tr. Vol. III, p. 192.  "'[A] jury is presumed to follow its instructions.'" Crawley v. Dinwiddie, 584 F.3d 916, 918 n.2 (10th Cir. 2009), *cert. denied*, ___ U.S. ___ (2010) (quoting Weeks v. Angelone, 528 U.S. 225, 234 (2000)).

The trial court clearly erred in allowing the posters to remain on display in the courtroom throughout the trial.  However, "'an error that may justify reversal on direct

---

[65]*The Sneed poster also referenced Sneed's testimony about the plan to murder Van Treese in the broiler room with a hammer.*

[66]*See Tr. Vol XV, p. 35 (In opposing the request of petitioner's counsel to make the posters part of the record, the prosecutor asserted that the defense had also made aids, including one, "which is the one where Justin Sneed denies killing Barry Van Treese was displayed to this jury throughout, you know, Justin Sneed and others' testimony."); Tr. Vol XIII, p. 85 ([W]e've had it written up on a board now for almost an entire day that at first you [Sneed] denied killing Barry Van Treese, right?").  Glossip's trial counsel may have felt compelled to use posters to counteract the effects of those created by  the prosecution.*

appeal will not necessarily support a collateral attack on a final judgment.'" Welch, 607 F.3d at 685 (quoting Brecht, 507 U.S. at 634). Habeas relief may not be granted "merely because there is a reasonable possibility that trial error contributed to the verdict." Brecht, 507 U.S. at 637. While not endorsing the practice permitted here, the court concludes, applying Brecht and in light of Downen, Miller and Harris, that the error did not have a "substantial and injurious effect or influence in determining the jury's verdict." Id. (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). The petitioner is not entitled to habeas relief on this claim.[67]

## Ground IV – Prosecutorial Misconduct

In Ground IV petitioner contends he was deprived of a fair trial and sentencing hearing by prosecutorial misconduct. He asserts the claimed errors collectively, if not individually, deprived him of due process.

The OCCA noted that relief would not be granted for prosecutorial misconduct unless the cumulative effect of the alleged misconduct was "such to deprive the defendant of a fair trial." Glossip II, 157 P.3d at 157. It then rejected petitioner's objections to the prosecution's arguments and actions, finding no error, no plain error,[68] or that any error which did occur had been cured. The court affords § 2254(d) deference to the OCCA's

---

[67]The State is directed to retain and preserve the posters for purposes of appeal.

[68]The OCCA reviewed much of the challenged remarks, arguments and conduct that occurred during the guilt stage of the trial for plain error due to counsel's failure to object at trial. It reviewed all of petitioner's challenges to the prosecutor's alleged improper comments during the sentencing phase of the trial for plain error due to lack of objections.

ultimate conclusion that a new trial was not warranted on the basis of prosecutorial misconduct, as it considered the claim under a standard identical to the federal standard. *See* Thornburg v. Mullin, 422 F.3d 1113, 1125 (10th Cir. 2005) ("We see no practical distinction between the formulations of plain error in Thornburg and Cleary and the federal due-process test, which requires reversal when error so infused the trial with unfairness as to deny due process of law. Because the OCCA applied the same test we apply to determine whether there has been a due-process violation, we must defer to its ruling unless it unreasonably appli[ed] that test.") (internal citations and quotations omitted); Bland, 459 F.3d. at 1024 (standard applied by OCCA – reversal of conviction not warranted due to allegations of prosecutorial misconduct unless the cumulative effect deprived the defendant of a fair trial – was "the same as that under federal law").

As petitioner does not argue that the prosecutor's remarks prejudiced a specific right, such as the privilege against compulsory self-incrimination, the question is whether they "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Matthews, 577 F.3d at 1186 (10th Cir. 2009) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). "[T]he appropriate standard for review of such a claim on writ of habeas corpus is the narrow one of due process, and not the broad exercise of supervisory power." *Id.* (internal quotations omitted). Because the court's interest is in whether petitioner obtained a fair trial, "'inappropriate prosecutorial comments, standing alone, [do] not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding.'" *Id*. (quoting United States v. Young, 470 U.S. 1, 11 (1985)).

41

"To determine whether a trial is rendered fundamentally unfair, [the court] examine[s] the entire proceeding, including the strength of the evidence against the petitioner, both as to guilt at that stage of the trial and as to moral culpability at the sentencing phase as well as [a]ny cautionary steps-such as instructions to the jury-offered by the court to counteract improper remarks." Bland, 459 F.3d at 1024 (internal quotations omitted). "'Ultimately, [the court] must consider the probable effect the prosecutor's [statements] would have on the jury's ability to judge the evidence fairly.'" Duckett v. Mullin, 306 F.3d 982, 989 (10th Cir. 2002) (quoting Fero v. Kerby, 39 F.3d 1462, 1474 (10th Cir.1994)).

With respect to misconduct that occurs during the sentencing phase of a capital case, "[t]he standard governing appellate review of closing arguments ... is whether the comments might have affected the sentencing decision." Id. at 992 (internal quotations omitted). "The Eighth Amendment requires that sentencing procedures in a capital case be evaluated under a heightened standard of reliability." Id.

**First Stage Comments**

First, Glossip claims the prosecution misled the jury by arguing that the absence of his fingerprints in Room 102 implicated him in the murder. The prosecutor knew, or should have known, Glossip argues, that the police "limited their initial collection of forensic evidence to areas obviously related to the murder." Habeas petition, p. 100.[69] He asserts that

---

[69]*Defense counsel argued in his closing that "when you look at the fingerprint locations, they were collecting the blood. They collected the obvious prints. They didn't go collect and look on the counter tops in the bathroom, whether or not there was work done on the toilet, the shower curtain. They're looking for obvious signs." Tr. Vol. XV, p. 127.*

"[i]t is hard to imagine how Mr. Glossip could have selectively wiped off all of his own fingerprints, but left everyone of Justin Sneed's prints in place." *Id.*[70]  Glossip claims the prosecutor improperly remarked during his first-stage closing argument:

> Does the absence of his fingerprints, even though we know that in all likelihood he'd been in that room repeatedly and had legitimate business there, and even though he, himself, admits confirming John Prittie's description that he helped put the plexiglass on that broken window, not one single Richard Glossip fingerprint can be found.  Can you think of some reasonable explanations for that looking for a reasonable inference as justified by your common sense.
>
> ....
>
> And, understand, I'm not talking about fingerprints in the blood of Barry Van Treese. We've seen some of those.  I'm talking about any fingerprint at all.  He had legitimate business in room 102 at times and there would by many circumstances under which an innocent Richard Glossip could put his fingerprint in that room.  Okay?  I'm talking about no fingerprints of any kind at all.
>
> ....
>
> Why isn't [sic] his fingerprints there?  If he is innocent, why aren't they there. He helped put up that plexiglass.  He touched it.  His fingerprints should be there. Why aren't they. Because somebody wiped them off.  Innocent people don't do that.

Tr. Vol. XV, pp. 84-86, 167-68.

The OCCA concluded the prosecutor "was merely arguing that, as manager of the motel and as a person who was responsible for repairs in every room, it was very suspicious

---

[70]*However, in his opening statement petitioner's counsel asserted that the technical investigation would demonstrate that Justin Sneed acted alone.  He stated that numerous fingerprints were taken from objects in room 102 (including the light switch, door knob, and mattress), and "[i]t was Justin Sneed's prints that were in this room. Tr. Vol. IV, pp. 13-14.*

that none of his fingerprints were found in the room," and the argument "was a fair inference from the evidence." Glossip II, 157 P.3d at 157.  The prosecutor was not, the court found, "arguing that Glossip selectively removed fingerprints after the crime,  but was arguing that the absence of his fingerprints in the room, even ones that might have been left there under innocent circumstances was unusual." *Id.*

The OCCA's determination was not unreasonable. *See* Thornburg, 422 F.3d at 1131 ("A prosecutor may comment on and draw reasonable inferences from evidence presented at trial."); *see generally* Donnelly, 416 U.S. at 646-47 ("Such arguments, like all closing arguments of counsel, are seldom carefully constructed in toto before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear. ... [A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.").  The prosecutor could reasonably infer, from the absence of Glossip's fingerprints on the plexiglass, which petitioner admitted helping Sneed install, Court's Exhibit 4, p. 17, that Glossip wiped his fingerprints off the glass or wore gloves so no prints would appear.  Petitioner has not shown that the prosecutor's comments prevented the jury from being "able to fairly judge the evidence." Bland, 459 F.3d at 1024.

Glossip next contends the prosecutors improperly argued that he was the only person who had a motive to kill Van Treese.  The OCCA dismissed petitioner's contention, finding that the prosecution's statement that Sneed had no reason to kill Van Treese other than the

44

offer of money from Glossip was a reasonable inference from the evidence. <u>Glossip II</u>, 157 P.3d at 157. Petitioner has misconstrued the prosecutor's remarks. *See* Tr. Vol. XV, pp. 68-69. The State was not asserting, as petitioner claims, that Sneed lacked a motive to kill Van Treese, but rather that money was his only motive. Sneed provided the evidentiary basis for this argument when he testified that he murdered Van Treese "[b]ecause Mr. Glossip said that he would pay me to do it." Tr. Vol. XII, p. 178. The OCCA could reasonably have determined that the prosecutor's statement was a fair comment on the evidence.[71]

Petitioner contends the prosecutor also misled the jury by giving it "the impression that the State had always believed Mr. Glossip was a principal to the murder," habeas petition, p. 104, when in fact Glossip had originally been charged as an accessory after the fact. In response to this argument, the OCCA noted that "[t]he method of prosecution and the filing of charges is discretionary with the prosecution," and found that the prosecutor was "merely arguing that Glossip [was] guilty of murder, regardless of his defense that he only acted after the fact in attempting to cover up the crime." <u>Glossip II</u>, 157 P.3d at 158.[72] The court concludes the OCCA's ruling on this issue was not unreasonable.

More troubling are certain comments the prosecutor made, which petitioner contends denigrated defense counsel by implying that the lesser related offense instruction was a

---

[71]*Petitioner also claims the State misled the jury by making the inconsistent arguments that the death penalty was appropriate based on the murder for remuneration aggravator and that Sneed would not have committed the murder just for the money. This assertion fails as it is based on a misconstruction of the State's argument.*

[72]*The trial court explained that petitioner was originally charged before the murder investigation was completed. Tr. Vol. XV, pp. 176-77.*

defense trick.  The prosecutor remarked during her closing.

> I want to talk to you about this lesser related offense.  I want to point out to
> you why you got it.  You see, because it says lesser.  That's why you got it.
> Because they wanted you to have a lesser option.  I want to tell you something.
> We don't get to choose here, see, you all don't.  The State of Oklahoma chose,
> right or wrong, we chose Murder in the First Degree.[73]

Tr. Vol. XV, p. 171-72.

> Let me tell you something about lesser related offenses.  Let me tell you why
> we just charge with one offense.  Because that's what he did.  Because that's
> what the evidence is.  You know, somebody, they drive drunk, they commit
> DUI and they slam into somebody, they run a stop sign, they slam into
> somebody and they kill them, you know what we charge them with?
> Manslaughter.  Because that's what driving drunk and killing somebody is.
> And at trial if they get up and they go, "You've got me, okay, find me guilty
> of, well, running the stop sign."  We don't accept that offer.  And that's what
> this is.  It's an offer to plead to running the stop sign.  But he did more than
> that. And the State of Oklahoma respectfully declines his offer of a lesser
> related offense.  Doesn't even really fit --

Tr. Vol. XV, pp. 172-73.

Defense counsel objected at the bench to the prosecutor's remarks.  *Id.* at p.173.  He

argued that the prosecutor improperly implied that the lesser included instruction was merely

something petitioner had suggested, rather than something the court had determined was

appropriate for the jury's consideration.   The court told the prosecutor that she was

concerned by her "statement let me tell you why you got this instruction," and would allow

her to fix it.  *Id.* at p. 174.  The prosecutor then told the jury:

---

[73]*Petitioner omitted some of the prosecutor's statements, in which she explained that if the jury had a reasonable doubt as to murder, then it should consider the lesser included offense of accessory after the fact.  Tr. Vol. XV, p. 172.*

Ladies and gentlemen, when we talk about lesser related offenses they are running the red stop sign and that's it. Now, they're in your packet and they're for your consideration. I mean, they're not here because they're not for your consideration. They are for your consideration. But they are properly for your consideration at the proper – at the proper time. If you have reasonable doubt of murder, then you will consider. And that is the proper time.[74]

*Id.* at pp. 174-75.[75]

The OCCA found that the prosecutor's argument that petitioner was "guilty of murder, regardless of his defense that he only acted after the fact in attempting to cover up the crime … [was] properly based on the evidence adduced at trial." Glossip II, 157 P.3d at 158. With respect to the prosecutor's comment that the lesser related instruction was given only because of defense counsel's request, the OCCA noted that the trial court admonished the prosecutor, the jury was properly instructed regarding greater and lesser offenses and the instructions "properly channeled the jury's decision making process and cured any error." *Id.* The OCCA also noted that under Oklahoma law juries "are to consider lesser related offenses, only if they have a reasonable doubt that a defendant has committed the greater offense." *Id.*

While the prosecutor's comments had the potential to mislead, the court concludes the prosecutor's closing remarks, when considered in their entirety and in conjunction with the jury instructions, did not alter the fundamental fairness of Glossip's trial. The prosecution essentially "reminded the jury that it should refer to the written instructions during

---

[74]*Glossip, in his petition, notably omitted the last two sentences of the prosecutor's remarks.*

[75]*The prosecutor subsequently told the jury to "[t]alk about Murder in the First Degree, then if you can't – if you have reasonable doubt of that, then talk about accessory." Tr. Vol. XV, p. 180.*

deliberations. The jury is presumed to follow its instructions, even when there has been misleading argument." <u>Bland</u>, 459 F.3d at 1015 (internal citation omitted); *see* <u>Duckett</u>, 306 F.3d at 991 ("We disagree with Duckett's characterization of the effect of the prosecution's remarks and further note that we ordinarily assume that jurors have followed a judge's instructions."). The state court's adjudication of this alleged instance of prosecutorial misconduct was not contrary to or an unreasonable application of clearly established federal law.

Petitioner's next claim of prosecutorial misconduct is based on the prosecutor's alleged introduction of extensive victim impact evidence during the first stage of the trial. The evidence petitioner relies on was also the basis for his claim of trial court evidentiary error in Ground II of the habeas petition. The OCCA rejected the argument on the basis of its prior resolution of the issue. This court concluded that determination did not amount to reversible error under AEDPA's deferential standard and reaches the same decision here.

As his final claim of prosecutorial misconduct that occurred during the first stage of the trial, petitioner claims the State implied, during its redirect examination of Ms. Pursley, that there was additional evidence implicating petitioner which the witness could not remember.[76] The OCCA noted that defense counsel had established during his cross-examination of Ms. Pursley that she had testified to things not included in the police report which she claimed to have remembered after she was interviewed. The court concluded

---

[76] *Petitioner cites only state cases in support of his claim that the prosecutor's questioning of the witness was improper.*

"[t]he prosecutor was merely attempting to [rebut the cross-examination and] show that Pursley was testifying from her memory and not from the police report. The fact that the jury was deprived of this evidence due to a lack of memory was not indicative of more evidence damaging to Glossip." Glossip II, 157 P.3d at 158. The OCCA found the prosecutor's questions did not "rise to the level of plain error." *Id.* The state court's characterization of the disputed questioning – that the prosecutor was attempting to rebut defense counsel's suggestion that Ms. Pursley's testimony was not credible – was reasonable. *See* Tr. Vol. IX, pp. 78-83, 96-100. Petitioner has not pointed to any Supreme Court precedent that would have required a contrary ruling by the OCCA.

**Second Stage Comments**.

Petitioner asserts the prosecutors, during their second stage closing argument, misstated the law, injected their personal beliefs into the proceeding, and denigrated his mitigating circumstances. He first claims the prosecutor misstated the law when she argued in her closing that "death was the only appropriate penalty because we're not better off because of Mr. Glossip," habeas petition, p. 111, and that "cold-blooded murderers in the state of Oklahoma we punish with death." Tr. Vol. XVII, pp. 93-94, 98, 107. He contends the prosecutor also asserted other improper criteria to support the death penalty, including "her belief [that] '[Glossip] chose the option of murder in the face of other options.'" Habeas petition, p. 111 (quoting Tr. Vol. XVII, p. 94). He claims the prosecutor improperly argued that:

Richard Glossip killed for this, a piece of property, and he killed for this,

49

money.  It's a lot.  It's a lot of hundreds and fifties and twenties.  Right here, according to Richard Glossip, is the price of a life and because of that mentality that's why we punish with death.  That's why it is correct to take a life for the life that was taken.

Tr. Vol. XVII, p. 94.

Other remarks during the prosecution's closing are challenged as being overly theatrical or as an expression of the prosecutor's personal opinion that petitioner should "pay with his life."  Habeas petition, p.112.  Petitioner also asserts prejudice from the prosecutor's "demonstration in which she threw 'things,' presumably photographs of the victim's injuries, onto the defense table,"[77] *id.*, while commenting that:

> Because but for the actions of Richard Glossip, Justin Sneed would not have killed Barry Van Treese and but for the actions of Richard Glossip, I wouldn't be here and but for the actions of Richard Glossip, their family wouldn't [be] here, and but for the actions of Richard Glossip, the Van Treese's would not be here and but for the actions of Richard Glossip, you wouldn't be here making this tough decision.
> So I don't have a problem with taking this blood and putting it right over here.  Because this is where it goes.

Tr. Vol. XVII, p. 102,

Petitioner's remaining objection to the prosecutions' closing argument is based on the following remarks :

> What's his motive while he's awaiting trial?  It's to get his niece to come visit him six times after this trial is set so he can bring her in here and make her testify.

---

[77] *It is unclear whether the prosecution placed or tossed some photographs onto the defense table and what the pictures depicted – whether they were of the victim or, as petitioner asserts, of the victim's injuries.  See* <u>Glossip II</u>, *157 P.3d at 159.*

His motive is to be a good boy and to buddy up to a 23-year-old detention officer – interesting the age he chooses, I think, the age of Justin Sneed. He chooses this young kid to buddy up with so he can be free and roam the pod while everybody else is in a cell 23 hours and 45 minutes a day. And then he doesn't cause any problems because he knows we've listed as an aggravator the probability that he will be violent. He's not stupid. That does not tell you, though, that he's not going to be violent in the future.[78]

Tr. Vol. XVII, p. 97. Glossip claims the prosecutor intended by these remarks to inform the jurors that they could ignore petitioner's "mitigating circumstances because, in the prosecutor's opinion, no one could really care for Mr. Glossip unless he had manipulated them into doing so." Habeas petition, p. 113.

The OCCA noted that all of the alleged misconduct that occurred during the sentencing phase came after defense counsel remarked "that the State wants 'Richard Glossip's blood to flow,'" Glossip II, 157 P.3d at 159 (quoting Tr. Vol. 17, p. 81),[79] and that both the prosecution and defense counsel focused most of their arguments on whether Glossip was a continuing threat to society. It concluded that "[a]ll of the prosecutor's arguments were proper comments on the evidence in order to show that, based on the circumstances of this crime, Glossip was a continuing threat to society," and that the jury obviously did not accept the prosecutor's argument as it did not find the continuing threat aggravator. Id. With one exception, relating to the prosecutor's comments about the appropriateness of the death penalty, the court finds the OCCA did not unreasonably apply

---

[78]Petitioner omitted the last sentence in the cited argument from his brief.

[79]The State objected to the remark and the judge advised defense counsel at the bench that she did not believe the comment was appropriate and not to repeat it.

51

federal law.

The prosecutor did not, in her quoted remarks, mislead the jury about sentencing alternatives. *See* Thornburg, 422 F.3d at 1136 (prosecutor's statement that the defendant "could be released from jail at some point if not sentenced to death" could "mislead the jury about possible punishment alternatives);   Hooks v. Workman, 606 F.3d 715, 742 (10th Cir. 2010) ("The prosecutors, Miller and Macy, then immediately proceeded to mislead the jury as to its role in sentencing by informing jurors (1) the jury's work would be wasted if it failed to reach a unanimous verdict, (2) defense counsel's argument that it took the vote of only one juror to prevent imposition of the death penalty constituted a request for 'jury nullification,' and (3) failure to deliberate in a manner leading to a unanimous verdict would amount to operating outside the law."). Her comments and alleged theatrics could, though, be construed as expressing her personal views, specifically her statement: "So I don't have a problem with taking this blood and putting it right over here.  Because this is where it goes."  Tr. Vol. XVII, p. 102.

While "a prosecutor is entitled to argue that under the facts and law, capital punishment is appropriate," it is "improper for a prosecutor to inject his personal opinion on the propriety of the death sentence."[80]  Thornburg, 422 F.3d at 1135.  The court assumes the statements pertaining to the appropriateness of the death penalty "crossed the line," *id.* at

---

[80]*The prosecutor did, though, tell the jury that "it's your vote that counts."  Tr. Vol. XVII, p. 93.  However, she said that right after telling the jury that "I'm going to tell you that me [sic], Connie Smothermon, death is the appropriate option for Richard Glossip."  Id.*

1136,[81] but does not find they rendered the trial fundamentally unfair.  *See* Malicoat v. Mullin, 426 F.3d 1241, 1256 (10th Cir. 2005) (prosecutor's theatrics – conducting a substantial portion of his rebuttal argument in the guilt phase as if he were the 13 month old victim– were not sufficiently prejudicial to deprive petitioner of a fair trial, as statements of abusive conduct and extent of victim's injuries were supported by evidence in the record and the prosecution's case was compelling).

As for the prosecutor's remarks regarding petitioner's mitigating evidence, they were an attempt to persuade the jury not to be swayed by it.  "As long as the jury is properly instructed on the use of mitigating evidence, the prosecution is free to comment on the weight the jury should accord to it."  Bland, 459 F.3d at 1026.  "The comments did not contradict the court's instructions and did not preclude the jury from considering" petitioner's mitigating evidence.  Fox, 200 F.3d at 1299.  Here, as in Fox and Bland, the trial court instructed the jury that "[t]he determination of what circumstances are mitigating is for you to resolve under the facts and circumstances of this case."  Original Record Vol. VII, p. 1304.  "The prosecutor[], while critical of [Glossip's] mitigating evidence, never told the jury it could not consider [Glossip's] mitigating evidence. The challenged prosecutorial argument was consistent with the jury instructions and bore only on the weight of the evidence."  Bland, 459 F.3d at 1026.

---

[81]*The challenged remarks fell far short of those condemned in* Malicoat v. Mullin, *426 F.3d 1241, 1256 (10th Cir. 2005) as an attempt by the prosecutor to "inflame the passions and prejudices of the jury."*

Assessing the OCCA's decisions on petitioner's various claims of prosecutorial misconduct "through AEDPA's forgiving lens," the court cannot say the state court's analysis was "contrary to or an unreasonable application of Supreme Court precedent, or based on an unreasonable determination of the facts." Matthews, 577 F.3d at 1186.

The court now must address whether any of the errors, considered cumulatively, deprived petitioner of a fair trial at either the guilt or sentencing stage. Bland, 459 F.3d at 1029. "[T]he OCCA's opinion does not clearly indicate that it considered, in the aggregate, the prejudicial effect of the individual errors." Malicoat, 426 F.3d at 1263. Accordingly, the court reviews petitioner's cumulative error claim *de novo*. *Id*

"'A cumulative error analysis aggregates all the errors that individually might be harmless, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless.'" *Id*. (quoting Thornburg, 422 F.3d at 1137). In a death penalty case, the court reviews "whether the 'improper comments as a whole so infected the trial with unfairness as to make the resulting conviction a denial of due process, or rendered the sentencing fundamentally unfair in light of the heightened degree of reliability demanded in a capital case.'" *Id.*

The only errors that could have affected the verdict of guilty stemmed from the prosecutor's introduction of victim impact testimony[82] and her argument related to the giving

---

[82]*This issue was addressed in conjunction with Ground II.*

of the lesser related offense instruction.[83]   The only errors that could have impacted the sentence are the prosecutor's expressions of her personal view that the death penalty was the only appropriate sentence.[84]

The prosecution's case, dependent as it was on the testimony of an accomplice, is not as strong as in many cases involving the imposition of the death penalty.   However, having considered the evidence of guilt,  the court's instructions to the jury and defense counsel's failure to object to much of the argument petitioner now challenges,[85] the court concludes the cumulative effect of the misconduct did not deprive petitioner of a fair trial.  Petitioner is not entitled to habeas corpus relief on the basis of his assertions of prosecutorial misconduct.

## Ground V – Ineffective Assistance of Counsel

In  Ground  V  petitioner  points  to  multiple  instances  of  counsel's  alleged ineffectiveness during both the guilt and sentencing phases of the trial.  He claims counsel failed to impeach Sneed by using Sneed's videotaped interview with the police, failed to impeach Donna Van Treese and William Bender with documents reflecting shortages at the Tulsa Best Budget Inn,  failed to impeach Billye Hooper with certain documents pertaining to room occupancy rates, failed to object to prejudicial testimony and failed to object to

---

[83]*The court has treated this as error due only to the OCCA's comment that "any error" was cured by the jury instructions.  Glossip II, 157 P.3d at 158.*

[84]*"In assessing cumulative error, only first stage errors are relevant to the conviction, but all errors are relevant to the ultimate sentence."  Hamilton, 436 F.3d at 1197.*

[85]*"Counsel's failure to object to the [prosecutor's] comments, while not dispositive, is also relevant to a fundamental fairness assessment."  Le v. Mullin, 311 F.3d 1002, 1013 (10th Cir. 2002).*

improper prosecutorial comments and conduct.[86]

The OCCA rejected Glossip's claims on direct appeal. In its decision the court discussed the <u>Strickland</u> standard[87] and then proceeded to consider petitioner's various allegations of deficient performance. <u>Glossip II</u>, 157 P.3d at 159-61. The court noted that Glossip had filed a motion requesting an evidentiary hearing with respect to this claim so that he might supplement the record with "the video taped interview of Justin Sneed, a transcript of the interview, the financial records of the Best Budget Inns (Tulsa and Oklahoma City), and accompanying affidavits." <u>Id.</u> at 159 n.10. Without specifically ruling on Glossip's motion, the OCCA concluded: "This evidence does not contain sufficient information to show by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize this evidence. See Rule 3.11(B)(3)(b), Rules of the Court of Criminal Appeals, Title 22, Ch. 18, App. (2006)." <u>Id.</u>[88]

As the OCCA considered the non-record evidence, it arguably adjudicated the merits of the claim. <u>See</u> <u>Welch v. Sirmons</u>, 451 F.3d 675, 709 (2006) (AEDPA deferential standard of review applied to OCCA's decision rejecting ineffective assistance claim in which OCCA concluded an evidentiary hearing was "not warranted because the application and

---

[86]*Most of the claimed ineffective assistance of counsel occurred during the guilt phase of the proceedings, although petitioner does asserts that his counsel were deficient in failing to object to second-stage prosecutorial misconduct.*

[87]<u>*Strickland v. Washington,*</u> *466 U.S. 668 (1984).*

[88]*Later in its opinion the OCCA again noted that the videotaped interview was not a part of the record as it was not introduced into evidence during the trial, but that Glossip had sought an evidentiary hearing to supplement the record.* <u>*Glossip II,*</u> *157 P.3d at 160.*

supplemental materials [did] not contain sufficient information to show [the] Court by clear and convincing evidence there [was] a strong possibility trial counsel was deficient for failing to utilize the complained-of evidence in second stage"), *abrogated on other grounds* in Wackerly v. Workman, 580 F.3d 1171 (10th Cir. 2009).  However,  the standard of review applied, at least with respect to the additional evidence, was that found in Oklahoma Appellate Rule 3.11(B)(3)(b), rather than Strickland.  "Rule 3.11's standard poses a lower substantive standard (the defendant need show only a 'strong possibility' of ineffectiveness) but a higher evidentiary standard (the evidence must be 'clear and convincing' rather than simply a 'preponderance')." Wilson, 577 F.3d at 1297.  Because the "interplay of these two standards-one more demanding, one less demanding than the federal-is not clear," *id*., the court has conducted a *de novo* review of petitioner's claims of counsel error that are dependent, at least in part, on extra-record evidence. *See* Wackerly v. Workman, 580 F.3d 1171, 1175 (10th Cir. 2009) ("Until recently, an intra-circuit split of authority existed on what standard governs our review of habeas petitions presenting ineffective assistance of counsel claims, like Mr. Wackerly's, when the OCCA declines to supplement the original trial record with outside evidence proffered by the petitioner....[T]he *en banc* court [has] concluded that we should review [such a] petition *de novo*."), *cert. denied*, ___ U.S. ___ (2010); Wilson, 577 F.3d at 1292  (decisions in which "the  OCCA first analyzes the proffered non-record evidence against the Strickland standard, concludes that even if admitted the evidence would not entitle the petitioner to habeas relief, and then denies the motion for an evidentiary hearing .... are treated as decisions on the merits for purposes of

AEDPA deference").  As for petitioner's ineffective assistance claims based on the trial record alone, he cannot obtain federal habeas relief under AEDPA's deferential standard of review, unless he establishes that the OCCA's decision was contrary to or an unreasonable application of Strickland.

To succeed on his effective assistance of counsel claim petitioner must establish that "counsel's (1) 'representation fell below an objective standard of reasonableness,' and (2) there is 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Welch, 607 F.3d at 702  (quoting Strickland, 466 U.S. at 688, 694).  "Deficient performance entails an error so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Malicoat, 426 F.3d at 1248.  Counsel's decisions "must fall below 'an objective standard of reasonableness,' evaluated from counsel's perspective at the time the decision was made." Bland, 459 F.3d at 1030 (quoting Strickland, 466 U.S. at 689).  "It is not enough that counsel's decisions were wrong in hindsight."  Id.  The Supreme Court requires that every effort be made "'to eliminate the distorting effects of hindsight' by indulging in a strong presumption counsel acted reasonably."  Welch, 607 F.3d at 703 (quoting Strickland, 466 U.S. at 689).

The court "need not consider whether counsel's performance was deficient, however, if the petitioner was not prejudiced by the alleged deficiency."  Bland, 459 F.3d 1030. A petitioner establishes prejudice by demonstrating "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Id.

(quoting Strickland, 466 U.S. at 694). "For challenges to counsel's conduct during the sentencing phase, a petitioner must show 'a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'"  Id. (quoting Strickland, 466 U.S. at 695).

Failure to introduce Sneed's videotaped interview

Petitioner claims his attorneys were derelict in failing to impeach both Sneed and Detective Bemo with the videotape of Sneed's interview with Detectives Bemo and Cook. He points out that the OCCA reversed his first conviction in large part because his trial counsel did not use the video.  The state appellate court found after petitioner's first trial that his attorney's failure to use "important impeachment evidence against Justin Sneed [stood] out as the most glaring deficiency in counsel's performance."  Glossip v. State, 29 P.3d 597, 601 (Okla.Crim.App. 2001) ("Glossip I").[89]  However, contrary to petitioner's assertion, his attorneys in his 2004 trial did not "again fail[] to use this critical piece of evidence to cross-examine Justin Sneed and Det. Bemo."  Habeas petition, p. 118.  While they did not seek to introduce the tape itself into evidence, unlike petitioner's counsel in his 1998 trial they did confront Sneed with various discrepancies and inconsistencies between his 1997 videotaped interview and subsequent testimony.  Bemo also was asked on cross about his interview techniques and whether his questions to Sneed were suggestive.

---

[89]*The OCCA notes in Glossip II, though, that "the failure to utilize the tape during the first trial was one of many reasons why this Court found there was ineffective assistance of trial counsel during the first trial."  Glossip II, 157 P.3d at 160.  During the first trial, while "trial counsel indicated he would use the tape to impeach Justin Sneed ...when the time came, 'counsel failed to utilize the video tape at all.'"  Glossip II, 157 P.3d at 160 n.13 (quoting Glossip I, 29 P.3d at 601).*

Petitioner concedes his trial counsel cross-examined both Sneed and Bemo in the 2004 retrial about the circumstances of the interrogation and discrepancies between the videotaped statements and Sneed's later trial testimony.[90] He argues, though, that "whenever the witness denied the differences in the testimony or was unsure about what was said in the initial interview on January 14, 1997, counsel simply let it go. If the jury had been allowed to view the videotape of Mr. Sneed's interview, there would have been no question what Mr. Sneed and the detectives said and why." Habeas petition, p. 119. Petitioner asserts Sneed's testimony on "the videotape was entirely different" from what he stated on the stand and that "counsel's failure to play [the tape] for the jury left the impression it was not." *Id.* at p. 122.[91]

---

[90]*After this concession, petitioner then states, citing O.R. 603, "but Mr. Glossip's previous counsel had tried to cross-examine these witnesses also." Habeas petition, p. 119. Petitioner references a page from the trial court's findings following an evidentiary hearing held on remand from the OCCA after his first trial to address claims of juror misconduct and ineffective assistance of counsel. What the court found, however, was that prior counsel's attempt to cross-examine Bemo was so bungled that it was "impossible to know if his testimony was inconsistent" and he "never confronted Sneed with the discrepancies between his testimony during trial and his videotaped confession." O.R. 603. The parallel petitioner attempts to draw between his first and second trial does not exist.*

[91]*Petitioner claims that "counsel's failure to introduce the actual tape led to the following exchange," during Sneed's redirect examination. Habeas petition, p. 122. The cited questioning pertained to discrepancies in Sneed's testimony with respect to when different events occurred. He stated that the times given were just estimations and was then asked:*
> *Q. And you know from reading and watching the videotape interview – because they videotaped it, right, with the police?*
> *A. Yes, they did.*
> *Q. And if it was entirely different from what you told us today, we'd have played that, right?*
> *A. Yes.*
> *Q. Well, they would have played it, right?*
> *A. Yes.*

Petitioner asks the court to engage in what the Supreme Court has specifically warned against – using hindsight to second guess his attorney's tactical decisions.  Simply because defense counsel's impeachment may have fallen short of perfection does not mean it "'fell below an objective standard of reasonableness.'"  <u>Welch</u>, 607 F.3d at 702 (quoting <u>Strickland</u>, 466 U.S. at 688).  Defense counsel questioned Sneed about the many inconsistencies between his 2004 trial testimony and prior statements.  Sneed admitted (1) he did not tell (or think he had told)  Detectives Bemo and Cook about the hammer/boiler room incident, Tr. Vol. 13, p. 27; (2) that he had previously stated that the amount he was to be paid for the murder was $7,000, *id*. at pp. 28-31; (3) that he did not tell the detectives during the interview that Glossip had removed a $100 bill from the victim/Van Treese's wallet, *id*. at p.44; (4) that he could not remember if he had told them about the acid, the trash bags or the hacksaw, *id.* at pp. 48-49; and (5) that he had denied stabbing Van Treese, *id*. at p. 15.  Many of the discrepancies between Sneed's statements to the police and his in-court testimony were confirmed by Bemo during his cross-examination, including that Sneed did not tell the police that Glossip had removed a $100 bill from the victim's wallet or mention the boiler room incident.  Bemo could not recall if Sneed had informed them about the hacksaw or muriatic acid.  Tr. Vol. XIV, pp. 76-79.

As petitioner asserts, playing the tape might have clarified what Sneed did and did not tell the officers during the initial interview.  However, defense counsel clearly made the point

---

*Tr. Vol. XIII, pp. 66-67.*

that Sneed's story had changed and in ways that made Glossip more culpable. Having reviewed the videotape of Sneed's initial interview with the police, the interview transcript and the trial transcript, the court concludes defense counsel was not constitutionally ineffective for failing to impeach Sneed by playing the videotape at trial.

Petitioner also contends, though, that the videotape would have "convey[ed] to the jury how clearly and unambiguously the detectives telegraphed to Mr. Sneed that they wanted him to inculpate Mr. Glossip." Habeas petition, p.121. As mentioned before, the court does not "determine counsel's effectiveness through a rear view mirror." Welch, 607 F.3d at 703. "The Supreme Court requires [the court] to make 'every effort ... to eliminate the distorting effects of hindsight' by indulging in a strong presumption counsel acted reasonably." *Id.* (quoting Strickland, 466 U.S. at 689).

Defense counsel's decision not to introduce the video was reasonable trial strategy.[92] Playing the tape would have shown that Bemo told Sneed several times that he knew he did not commit the murder by himself and that others, particularly Glossip, were saying he acted alone.[93] However, it also would have allowed the jury to hear Sneed explain, once again, how Glossip masterminded the murder. Contrary to petitioner's characterization of the interview, the officers' questioning was not sufficiently manipulative to make it evident from

---

[92]*The OCCA reached the same conclusion but did not explain counsel's strategy.* *Glossip II, 157 P.3d at 160 ("Counsel's use of the contents of the tape to cross-examine witnesses, without introducing the tape, was a valid strategy.").*

[93]*During the interview the police officers told Sneed at three different times that they "[knew] that this involves more than just you," and that "[e]verybody that we talked to they're putting it on you."* Habeas petition, appendix, Attachment 18, pp. 5, 17, 21.

viewing the videotape that, but for their suggestions, Sneed would not have implicated Glossip in the murder of Barry Van Treese.[94]   Through his cross examinations of Bemo and Sneed, defense counsel was, though, able to elicit testimony that supported Glossip's theory that Bemo influenced Sneed to identify Glossip as his accomplice.  Bemo admitted that at the beginning of his interview with Sneed  he specifically told him that he "knew that this crime was committed by more than just himself," that he "personally did not think that he was the only one involved in this homicide," and that "Glossip was the one who was laying it on him the heaviest as far as pointing the finger at [him ] ...." Tr. Vol. XIV, p. 70.  Having viewed the videotape and examined the trial transcript, the court concludes petitioner has not shown that defense counsel's handling of the tape and his cross-examinations of Sneed and Bemo "'fell below an objective standard of reasonableness.'" Welch, 607 F.3d at 702 (quoting Strickland, 466 U.S. at 688).

Failure to impeach witnesses based on shortages at the Tulsa Best Budget Inn

Petitioner complains that his trial attorney was derelict in failing to inform the jury that both Best Budget Inns had shortages, not just the Oklahoma City motel.  Defense counsel attempted to introduce a document reflecting losses at the Tulsa motel, defendant's Exhibit 71, but the trial court sustained the prosecutor's relevancy objection. Petitioner's attorney later sought reconsideration of the court's ruling. He argued that, while the State

---

[94]*If the videotape did reflect, as petitioner argues, that the officers were able to manipulate Sneed, playing it would have arguably supported the State's theory that Sneed was an easily influenced, dependent individual whom Glossip controlled.  Under those circumstances, it would have been a reasonable trial strategy for defense counsel to cross-examine Sneed and Bemo about what Sneed said during the interview, but not play the video.*

asserted the murder was motivated in part by the fact Glossip was going to be fired because of losses at the Oklahoma City motel, the records would show the Tulsa motel had similar shortages. Tr. Vol. IV, p. 178.  The prosecutor responded:

> If asked those questions as an Offer of Proof, [Mrs. Van Treese] will say that William Bender was also mismanaging the motel, that it was their intention to fire him as well, that they were going to take care of Richard Glossip of the Oklahoma City motel first.  And, in fact, William Bender was fired two months after, like in March.  They were both taking advantage of their family at the time of their loss.

*Id.*

The trial judge reserved her ruling, but counsel never attempted to either introduce the documents or use them to cross-examine Mrs. Van Treese or William Bender.[95]  The OCCA did not specifically rule on this instance of alleged deficient performance, stating that "[t]he shortages at the Tulsa motel, while relevant to show that the $6,000.00 shortage was not unusual, was not relevant to show that Glossip intended to have Van Treese killed because he feared termination." Glossip II, 157 P.3d at 161.  While the OCCA obviously rejected this claim of deficient performance by counsel, as there was no explicit ruling and it entailed non-record evidence, the court has reviewed it *de novo*.

Petitioner claims that because counsel failed to cross-examine Mrs. Van Treese or Bender about the losses at the Tulsa motel, the jury was deprived of evidence that would have impeached Bender's testimony (1) that no one had ever talked to him about shortages,

---

[95]*In support of this argument petitioner cites Attachment 16 to the Appendix. Although the document is not completely self-explanatory, it does reflect that an undesignated motel, which the court assumes is the Tulsa Best Budget Inn, sustained a loss in the amount of $5,226.78 for 1996.*

much less threatened to fire him and (2) that Van Treese wanted him to replace Glossip and manage the Oklahoma City Best Budget Inn.[96]  Petitioner also asserts that, if questioned about the Tulsa shortage, Bender might have offered an explanation for both it and the Oklahoma shortage or, "[i]f he could not, his credibility would have been severely damaged." Habeas petition, p. 127.

In light of the State's proffer, defense counsel had to weigh the effect of evidence of shortages at the Tulsa motel on Bender's credibility against the impact of  Mrs. Van Treese's testimony that she and her husband, in addition to firing Glossip, planned  to (and did in fact) fire Bender.  Her testimony would have substantiated the State's evidence of motive – that Glossip  feared  he was going to be terminated.  Glossip's counsel could have made a considered decision not to use the Tulsa records to cross-examine or impeach Mrs. Van Treese or William Bender.  Under the circumstances, petitioner has not shown that counsel's strategic determination to keep the information from the jury was professionally deficient.

Failure to impeach Billye Hooper's testimony regarding motel room rentals

Petitioner claims his trial counsel possessed documents that would have "undermined completely  Billye  Hooper's  damaging  testimony  that  Mr.  Glossip  was  somehow manipulating the room rentals so that there were always 19-21 rooms rented per night." Habeas petition, p.127.  Those documents would have shown, he contends, that the number

---

[96]*The OCCA concluded that "[t]he fact that the Van Treeses discussed firing both managers was not in conflict with the fact that they were going to fire Glossip first, [and ] move Bender to the Oklahoma City motel to take Glossip's place while managers were sought for both motels."  Glossip II, 157 P.3d at 158.*

of room rentals per night varied widely each month of 1996.[97]   As the OCCA did not consider this claim, the court's review is *de novo*.

The referenced documents reflect that room rentals varied widely from month to month.  Ms. Hooper's testimony to the contrary was incorrect.  However, Ms. Hooper's testimony about the room rental rates was but a small part of the State's evidence demonstrating that Glossip had a motive to commit the murder.  Ms. Hooper testified that she noticed, after she returned from medical leave in October, that the number of rooms rented did not seem to fluctuate. She stated: "So in my opinion, I felt like that there was probably rooms that were not being written down," but then continued, "but I wasn't there, so I couldn't say that's what happened."  Tr. Vol. VII, pp. 46-47.  In light of the other evidence before the jury demonstrating Glossip's motive to commit the murder, including the testimony of Mrs. Van Treese, Cliff Everhart and Justin Sneed, the court concludes counsel's failure to impeach Ms. Hooper with the records reflecting the actual room rentals did not materially prejudice petitioner.

<u>Failure to object to irrelevant, prejudicial evidence</u>

In Ground II of his petition, Glossip challenged the trial court's admission of evidence he claimed was irrelevant and prejudicial.  Petitioner now contends that his counsel were ineffective for failing to object to this evidence.   The OCCA noted that it had previously found that the evidence did not "rise to the level of plain error" and "further [found] that the

---

[97]*The documents were submitted with the habeas petition.  Habeas petition, appendix, Attachment 16.*

failure to object did not amount to ineffective assistance, as this evidence did not affect the outcome of the case." Glossip II, 157 P.3d at 161.  Having determined the OCCA properly concluded, when considering the issues raised in Ground II of the habeas petition, that the alleged evidentiary errors did not violate petitioner's due process rights, the court concludes the OCCA's decision that petitioner's counsel was not ineffective for failing to object to the admission of that evidence was a reasonable application of Strickland.

Failure to object to prosecutorial misconduct

Petitioner claims counsel was ineffective for failing to object to the various instances of prosecutorial misconduct detailed in Ground IV of his habeas petition. The OCCA rejected his argument, finding that "[a]ny misconduct that might have occurred did not affect the outcome of this case, so there can be no ineffective assistance of counsel." Glossip II, 157 P.3d at 161.  Having determined the OCCA properly concluded, when considering the issues raised in Ground IV of the habeas petition, that the alleged prosecutorial misconduct did not deprive petitioner of a fair trial, the court finds the OCCA reasonably applied the Strickland standard in determining that trial counsel was not ineffective for failing to object to the claimed misconduct.

The court has rejected petitioner's ineffective assistance counsel claims which were reviewed *de novo* and has determined, as to the rest of petitioner's ineffective assistance claims, that the OCCA reasonably applied federal law as determined by the Supreme Court. Therefore, petitioner's request for habeas relief on the basis of Ground V is denied.

**Ground VI – Sufficiency of evidence – Penalty stage**

In Ground VI petitioner claims the evidence was insufficient to support the jury's finding that the murder was committed for remuneration. To establish the murder for remuneration aggravator under Oklahoma law, the prosecutor must prove "[t]he person committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration." 21 Okla. Stat. §701.12(3). Glossip asserts that "[t]he only evidence to support this theory was the bartered testimony of confessed killer Justin Sneed, who saved his own life by implicating Mr. Glossip." Habeas petition, p. 132. Sneed's testimony about a plan to kill Van Treese for money is "highly suspect," petitioner argues, due to its "numerous variations and inconsistencies." *Id*. Petitioner contends that Sneed's testimony at most indicates a murder/robbery and not murder for remuneration. The murder, he alleges, "merely facilitated the robbery." Habeas petition, p. 136.

The OCCA held there was "sufficient evidence that Glossip promised to pay Sneed for killing Van Treese." Glossip II, 157 P.3d at 161. The state court found petitioner's argument that the murder "was only a method to steal the money" to be flawed because "no murder needed to occur for Sneed and Glossip to retrieve the money from Van Treese's car." *Id*. Since Glossip knew there would be money under the car seat, the court concluded that "a simple burglary of the automobile would have resulted in the fruits of their supposed desire." *Id.* Although the OCCA did not mention the standard of review it was applying, it "presumably applied the rational fact finder standard," which "'required the [court] to view the evidence in the light most favorable to the prosecution and determine whether any

68

rational finder of fact could have found the aggravator beyond a reasonable doubt.'" Hooker, 293 F.3d at 1240 (quoting McCracken v. Gibson, 268 F.3d 970, 981 (10th Cir.2001)). Therefore, contrary to petitioner's assertion, the OCCA's decision is entitled to AEDPA deference.

The State's case at both stages of the trial depended on Sneed's testimony. The critical question for the jury at the penalty phase was whether the jury believed that he murdered Van Treese because Glossip promised to pay him. This court's rationale for concluding that the OCCA's application of Jackson was not unreasonable, when considering the sufficiency of the evidence to support petitioner's conviction, applies here as well. A rational trier of fact could have found that Sneed was telling the truth and that Glossip employed him to commit the murder for payment or the promise of payment. That "is all that is necessary under Jackson ...." Boltz v. Mullin, 415 F.3d 1215, 1233 (10th Cir. 2005). *See generally* Chanthadara, 230 F.3d at1267 ("It was for the jury to weigh the credibility" of a witness who testified in support of especially heinous aggravator that respondent confessed he was the person who "'pulled the trigger,'" even though she barely knew respondent and had had an intimate relationship with accomplice.).

Accordingly, the OCCA's decision was neither contrary to nor an unreasonable application of federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented. Habeas relief is denied on this ground.

**Ground VII – Erroneous Jury Instructions – Second Stage**

Petitioner claims the second stage jury instructions did not comply with state law[98] and violated the Constitution because they did not require the State to prove beyond a reasonable doubt that any aggravator the jury found to exist outweighed the mitigating circumstances.  The challenged instruction stated that:

> If you unanimously find that one or more of the aggravating circumstances existed beyond a reasonable doubt, the death penalty shall not be imposed unless you also unanimously find that any such aggravating circumstance or circumstances outweigh the finding of one or more mitigating circumstances. Even if you find that the aggravating circumstances outweighs the mitigating circumstances, you may impose a sentence of imprisonment for life with the possibility of parole or imprisonment for life without the possibility of parole.

Original Record Vol. VII, p. 1302.[99]  As it had consistently rejected the same argument and petitioner provided no basis for the court to reconsider its previous decisions, the OCCA rejected petitioner's claim.

Petitioner contends the OCCA's position is contrary to several Supreme Court

---

[98]*To the extent petitioner bases his challenge to the instruction on the trial judge's alleged noncompliance with state law, specifically 21 Okla. Stat. 701.11, his claim fails.  See habeas petition, p. 140.  "[T]he fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief.  Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).  To the extent petitioner attempts to assert a new claim based on Hicks, 447 U.S. at 343, the court agrees with the State that it is unexhausted and procedurally barred.   See supra note 42.   But even if considered on the merits, petitioner would not prevail on his Hicks claim.  The OCCA has implicitly determined that Oklahoma's weighing instruction, Oklahoma Uniform Jury Instruction CR 4-80 ("OUJI"), complies with Oklahoma's death penalty statute.  See Torres v. State, 58 P.3d 214, 216 (Okla. Crim. App. 2002). "On habeas review ... the [state] courts' interpretation of the state felony murder statute is a matter of state law binding on this court."  Chapman v. LeMaster, 302 F.3d 1189, 1196 (10th Cir. 2002).*

[99]*The instruction mirrored the language of OUJI-CR 4-80.  Defense counsel had requested that a modified version of that uniform jury instruction be given, which would have informed the jury that the aggravating circumstances must outweigh the mitigating circumstances beyond a reasonable doubt.*

decisions, including <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000) and <u>Ring v. Arizona</u>, 536 U.S. 584 (2002).[100] He relies on the Court's holding in <u>Ring</u> that "[c]apital defendants ... are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment," *id.* at 589, claiming that the jury's determination that the aggravating factors outweigh the mitigating factors is a "<u>factual</u> finding," habeas petition, p. 140, that increases the maximum penalty for the crime.

The State responds that there is no clearly established federal law requiring a jury to find beyond a reasonable doubt that aggravating factors outweigh mitigating factors before it imposes the death penalty.  It asserts the same argument has been rejected by Judge Russell in <u>Matthews v. Sirmons</u>, 2007 WL 2286239 at *33-35 (W.D.Okla. 2007), *aff'd* <u>Matthews v. Workman</u>, 577 F.3d 1175 (10th Cir. 2009)  and by the Tenth Circuit in <u>United States v. Barrett</u>, 496 F.3d 1079, 1107-08 (10th Cir. 2007), *cert. denied*, ___ U.S. ___ (2010), when considering a federal death penalty statute that was substantially similar to Oklahoma's capital sentencing scheme.

The court agrees that petitioner's reliance on <u>Ring</u> and its predecessors is misplaced. After respondent filed its brief the Tenth Circuit resolved the issue, concluding that the "<u>Apprendi</u> argument is certainly barred on the merits by dint of our decision in <u>United States</u>

---

[100]Petitioner also asserts that the OCCA did not review the claim on the merits.  Clearly it did.  The state court noted that the petitioner was relying on <u>Ring</u> and, in rejecting the argument, cited <u>Mitchell v. State</u>, 136 P.3d 671, 704 (Okla. 2006), which relied on the court's prior decision in <u>Torres,</u> 58 P.3d at 215-16.  In <u>Torres</u>, the OCCA concluded that "Oklahoma's provision that jurors make the factual finding of an aggravating circumstance beyond a reasonable doubt is all that <u>Ring</u> requires.").  Id. at 216.

v. Barrett, 496 F.3d 1079, 1107 (10th Cir. 2007). There, we explained that the jury's

determination that aggravating factors outweigh mitigating factors is not a finding of fact

subject to Apprendi but a 'highly subjective, largely moral judgment regarding the

punishment that a particular person deserves.'" Matthews, 577 F.3d at 1195 (quoting Barrett,

496 F.3d at 1107).[101]

     The OCCA's resolution of petitioner's claim was not contrary to or an unreasonable

application of clearly established federal law.  Glossip is not entitled to habeas relief on this

ground.

## Ground VIII – Victim Impact Testimony

     During the sentencing stage of the trial, the prosecution incorporated by reference all

of the first-stage evidence and presented victim impact statements.[102]   Barrie Hall, the

victim's oldest daughter, read her own statement and that of her younger sister and Donna

Van Treese read her own statement and those of three of her sons. Glossip contends in

---

[101]*As the Supreme Court explained in* Tuilaepa v. California, *512 U.S. 967 (1974):*
*A capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision. . . . Once the jury finds that the defendant falls within the legislatively defined category of person eligible for the death penalty, ... the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment. Indeed, the sentencer may be given "unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty."*
Id. at 979-80 *(internal quotations omitted).*

[102]*"[T]he Eighth Amendment erects no* per se *bar to victim impact evidence."* Turrentine, *390 F.3d at 1200.  "'[A] State may legitimately conclude,' as Oklahoma has, see Okla. Stat. tit. 21, §701.10(c)(1992), 'that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed.'"* Id. *(quoting* Payne v. Tennessee, *501 U.S. 808, 827 (1991)).*

Ground VIII that his right to confrontation was violated when the two witnesses were allowed to read the statements of other family members.  He also asserts that because Mrs. Van Treese's statement was, in actuality, that of a family representative rather than an individual, no one else should have been allowed to offer a statement.[103]  These errors resulted, he claims, in a "verdict of death based on emotion rather than reason in violation of Mr. Glossip's rights under the Fourteenth Amendment."  Habeas petition, p. 151.[104]

The OCCA noted that, although defense counsel had objected to victim impact evidence in a pretrial motion and hearing, he had "specifically stated that he had no objection to the two witnesses reading the statements of the remaining 'immediate family members.'" Glossip II, 157 P.3d at 163.  Concluding that "any claim regarding the method of victim impact evidence presentation is waived, except that error which is plain error," the OCCA found that "Glossip was not harmed by the State's utilization of two family members to read

---

[103]To the extent petitioner is relying on a violation of state law pertaining to the admission of victim impact evidence as a basis for habeas relief his claim fails.  "'[C]laims of state law violations are not cognizable in a federal habeas action.'"  Ellis v. Hargett, 302 F.3d 1182, 1189 (10th Cir. 2002) (quoting Montez v. McKinna, 208 F.3d 862, 865 (10th Cir.2000); 28 U.S.C. §2254(a)).

[104]Petitioner also recites other "bedrock principles," which he asserts were violated during the second stage of the trial.  See habeas petition, pp. 147-48.  He does not, though, explain how those principles apply in this case or cite portions of the transcript demonstrating the asserted constitutional errors.   For example, although petitioner contends the Tenth Circuit, relying on Payne, 501 U.S. at 830 n. 2, has held that "admission of the victims' statements regarding the appropriate punishment" for a defendant was improper, the victim impact witnesses in this case did not make sentence recommendations.  See Tr. Vol. XVI, pp. 70-88.  Therefore, the court deems such arguments waived and focuses instead on the errors specifically raised.  To the extent petitioner once again attempts to assert a claim based on Hicks the court finds it is unexhausted and procedurally barred.  See supra note 42.  Even if considered on the merits, petitioner's Hicks claim would fail.

the statements of five others." *Id.* Because the OCCA reviewed this claim on the merits, referring to the Fourteenth Amendment Due Process standard set out in <u>Payne</u>, <u>Glossip II</u>, 157 P.3d 162, this court's "review is limited to the question of whether its decision was contrary to or involved an unreasonable application of <u>Payne</u>." <u>Turrentine</u>, 390 F.3d at 1201.

Although petitioner identifies several Supreme Court decisions as providing the "clearly established federal law" applicable to this claim, none discuss whether it is unconstitutional for an immediate family member to "both testify on their own behalf and represent other members of the immediate family." <u>Glossip II</u>, 157 P.3d at 163.[105] Having reviewed the State's second stage evidence, the court concludes the victim impact evidence was not "'so unduly prejudicial that it render[ed] the trial fundamentally unfair....'" <u>Young</u>, 551 F.3d at 951 (quoting <u>Payne</u>, 501 U.S. at 825).

Petitioner has not shown that the OCCA's finding of no plain error was contrary to or an unreasonable application of federal law. He is not entitled to habeas relief on this ground.[106]

## Ground IX  – Voir Dire

---

[105]*If the issue is whether the State, by allegedly exceeding state statutory limits on the <u>amount</u> of victim impact evidence that could be introduced, violated petitioner's due process rights, the court finds no constitutional error. As noted by the State, the petitioner did not mount a serious challenge in his habeas petition to the content of the victim impact statements that were read.*

[106]*Petitioner cites no cases to support his assertion in Ground VIII that his confrontation rights were violated. The Tenth Circuit has stated that "'[i]t is far from clear that the Confrontation Clause applies to a capital sentencing proceeding.'" <u>United States v. Barrett</u>, 496 F.3d 1079, 1100 (10th Cir. 2007) (quoting <u>United States v. Higgs</u>, 353 F.3d 281, 324 (4th Cir. 2003)). As the court can grant habeas relief only on the basis of clearly established law as articulated by the Supreme Court, petitioner's confrontation clause challenge to the impact victim evidence fails.*

Ground IX is based on alleged errors committed by the trial judge during voir dire. Petitioner asserts that because the trial judge applied an erroneous standard when considering whether a prospective juror should be excused for cause based on his or her death penalty views, two jurors, Lawton and Moore, were improperly removed and the entire jury pool may have been affected. He alleges that "[t]he voir dire process in this case resulted in the exclusion, to [his] disadvantage, of otherwise qualified jurors without proper regard to whether they could be fair and impartial." Habeas petition, p. 151. Petitioner also claims the court improperly excused a third prospective juror, Miles, for cause because she was serving a deferred sentence for misdemeanor drug possession. The OCCA adjudicated petitioner's voir dire challenges on direct appeal. Therefore its decisions are entitled to AEDPA deference.

<u>Prospective Jurors Lawton and Moore</u>

During voir dire the trial judge informed the prospective jurors that Glossip was charged with first degree murder and, if the jury found him guilty, they would have the duty of assessing punishment. She explained that the possible punishments were death, imprisonment for life with no parole, or imprisonment for life and asked: "If you find the Defendant guilty of Murder in the First Degree, can you fairly consider all three of the legal punishments and impose the sentence that is warranted by law and evidence in this case?" Tr. Vol 1, p. 111. She then individually polled the prospective jurors, inquiring whether he or she could "give true, heartfelt consideration to all three of the sentencing options and impose the sentence that's warranted by the law and evidence in [the] case." *Id.* at p. 112.

75

As the voir dire continued the court repeatedly asked the prospective jurors if they could give "heartfelt" or "equal" consideration to all three penalty options,[107] rather than could they "consider all three of these legal punishments – death, imprisonment for life without parole or imprisonment for life ...[and] impose the punishment warranted by the law and evidence."  Oklahoma Uniform Jury Instruction CR 1-5 Alternate 2 (Death Penalty). She also referred to the jurors' ability to give "fair consideration of all three options."  Tr. Vol I, p. 118.[108]

Petitioner asserts that the requirement that jurors give equal consideration to all three sentencing options is contrary to the OCCA's ruling in Frederick v. State, 37 P.3d 908 (Okla. Crim. App. 2001).[109]  He claims the erroneous "equal consideration" standard had the effect of "excluding jurors with only conscientious objections to the death penalty but who might otherwise follow the law."  Habeas petition, p. 156.  He contends the trial judge improperly excluded Lawton and Moore, who had reservations about the death penalty, for cause "based

---

[107]E.g., Tr. Vo1. I, p. 150 ("[a]ll three [sentencing options] have to have equal, heartfelt consideration").

[108]E.g., Tr. Vol. II, pp. 5 ("fairly consider[] all the sentencing options"); 14 ("consider all three sentencing options");

[109]Petitioner relies on the Oklahoma Court of Criminal Appeal's statement in Frederick,37 P.3d at 926-27 that: "To withstand a challenge for cause concerning punishment issues, a venireperson need only be willing to consider all the penalties provided by law and not be irrevocably committed to any one punishment option before the trial has begun."  In other words, petitioner asserts, a prospective juror in a capital case does not have to consider all three punishments "equally."

on their inability to consider all punishments 'equally.'"[110]  Habeas petition, p. 153.[111]  He

also alleges that the entire pool may have been tainted "as fifteen other prospective jurors

were removed due to their reservations about the death penalty after the court explained that

the three sentencing options must be 'equal.'"  *Id.* at p. 155.

The OCCA initially examined the judge's discussions with both Lawton and Moore.

The court noted that after Lawton stated that she would "not be able to give the death penalty

equal consideration as a sentencing option," Glossip II, 157 P.3d at 150, Tr. Vol. II, p. 13,

the judge asked her, "'So your reservations about the death penalty are such that regardless

of the law or the facts or the evidence, you would not consider imposing a penalty of

death?'"  *Id.*  When Lawton "unequivocally answered, 'That's correct' ... [s]he was then

removed for cause without objection."  Glossip II, 157 P.3d at 150.

Moore had expressed some concern to the court about her ability to impose the death

penalty and at one point asked if she could "think about it a little bit longer."  Tr. Vol II, p.

17.  Later, when questioned by the prosecutor, she stated that she wanted to do her civic duty,

but thought she did "have a problem with the death penalty."  *Id.* at p. 34.  The trial court

then asked her, "do you believe that your concerns about the death penalty are such that

regardless of the law and the evidence, you would not be able to give equal consideration to

---

[110]*Defense counsel, during voir dire, used the very language petitioner now attacks.  He asked a potential juror: "You know, equal consideration for the three punishments depending on the facts and circumstances of the law, right?"  Tr. Vol. II, p. 266.*

[111]*Petitioner argues that because Lawton and Moore were "struggling with the idea of imposing the death penalty," habeas petition, p. 154, their feelings about it were "obviously not 'equal' to sentences of life or life without parole."  Id. at pp. 154-55.*

all three of the sentencing options." *Id.* at p. 36.  When she responded  "I do," the court

removed Moore for cause, again without objection from trial counsel.  Glossip II, 157 P.3d

at 150.

The OCCA rejected petitioner's reliance on Frederick, stating that it had subsequently

held in Jones v. State, 134 P.3d 150 (2006) that "'[a] major purpose of *voir dire* in a capital

case is to reveal whether jurors will consider all three punishment options equally.  A juror

who cannot should be excused for cause.'"  Glossip II, 157 P.3d at 150 (quoting Jones, 134

P.3d 155).  Citing Wainwright v. Witt, 469 U.S. 412, 424 (1985), the OCCA announced

that "[t]he proper standard for determining when prospective jurors may be excluded for

cause because of their views on capital punishment is whether their views would prevent, or

substantially impair, the performance of their duties as jurors in accordance with the

instructions and their oath." *Id.*  The standard does not require, the OCCA stated, "that a

prospective juror's incompetence to serve be established on the record with 'unmistakable

clarity.'" *Id*. at 150-51 (quoting Wainwright, 469 U.S. at 424-25).  The court then held:

> In the present case, because there was no objection to the removal of these two
> jurors, any error must rise to the level of plain error. Here there is no such
> error. The first juror was unequivocal in her statement that she could not
> impose the death penalty. The second juror expressed concerns about her
> ability to impose the death penalty at a very early stage in the voir dire process
> stating that she couldn't impose death. This juror asked for more time to
> consider whether she would consider the death penalty if the law and facts
> warranted such a penalty. She vacillated back and forth and finally stated that
> she could not consider the death penalty equally. We find that based on the
> entire voir dire, the trial court did not abuse its discretion in removing these
> two jurors.

*Id.* at 151.

"The seminal cases with respect to qualifying potential jurors for sentencing in death penalty cases are <u>Witherspoon v. Illinois</u>, 391 U.S. 510 (1968), and <u>Wainwright v. Witt</u>, 469 U.S. 412 (1985)."  <u>United States v. Fields</u>, 516 F.3d 923, 936 (10th Cir. 2008), *cert. denied*, ___ U.S. ___ (2009).  "The Supreme Court recently summarized the standards for assessing <u>Witherspoon</u>-<u>Witt</u> challenges in <u>Uttecht v. Brown</u>, 551 U.S. 1 (2007)."  *Id.*  "The dispositive question is whether a potential juror is 'substantially impaired in his or her ability to impose the death penalty under the [governing legal] framework.'"  *Id.* at 936-37 (quoting <u>Uttecht</u>, 551 U.S. at 9).  The trial court's ruling warrants deference as it is "'based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province.'"  *Id.* at 937 (quoting <u>Uttecht</u>, 551 U.S. at 7).  "And the district court is accorded broad discretion when 'there is lengthy questioning of a prospective juror and the trial court has supervised a diligent and thoughtful voir dire.'"  *Id.* (quoting <u>Uttecht</u>, 551 U.S. at 20).  If the prospective juror's statements are ambiguous, the trial court may resolve the issue in favor of the State.  *Id.*  Consequently, "the excusal of a potential juror 'may be upheld even in the absence of clear statements from the juror that he or she is impaired.'"  *Id.* (quoting <u>Uttecht</u>, 551 U.S. at 7).

Having examined the complete voir dire conducted by the state judge, the court concludes she did not deprive Glossip of a fair and impartial jury by her references to "equal" or "heartfelt" consideration or by her removal of Moore or Lawton for cause.  *Id.* at 937 ("The excusal of a prospective juror must be affirmed unless 'the record discloses no basis for a finding of substantial impairment.'") (quoting <u>Uttecht</u>, 551 U.S. at 20).  The trial judge

did not violate petitioner's constitutional right to an impartial jury "by excluding veniremen for cause simply because they expressed general objections to the death penalty or voiced conscientious or religious scruples against its inflictions." Chanthadara, 230 F.3d at 1270 (internal quotations omitted). "Given [the court's] restricted ability to review the trial court's actions, the OCCA's deferring to the judgment of the trial court judge [with respect to Moore and Lawton] was not an unreasonable and inconsistent application of federal law." Brown v. Sirmons, 515 F.3d 1072, 1081 (10th Cir. 2008), cert. denied, ___ U.S. ___ (2008).

Prospective Juror Miles

The trial judge removed Miles, a prospective juror serving a deferred sentence, for cause, expressing her concerns about the juror's ability to be fair and impartial. After a brief exchange the judge asked Miles if she thought she was "better suited to a case in which the State [was] not involved since [she'd] been prosecuted by the State on ... other cases." Tr. Vol 1, p. 63. Miles replied "yes" and was excused. The judge explained to counsel that she "just [had] a real problem with people who are on a deferred sentence sitting as jurors," because they had "a lot at stake and they've got to feel that they're being watched carefully." Id. Defense counsel objected to Miles's removal.

Petitioner claims the trial court failed to ask questions designed to determine bias, and instead conveyed her belief that Miles should not serve on a criminal jury "through suggestive inquires that encouraged Ms. Miles to adopt the same position." Habeas petition, p. 159. Noting that other jurors who had had prior involvement with the criminal justice system were not excused, petitioner asserts the judge "created a disqualification [for

80

individuals serving deferred sentences] not founded in law."[112]  *Id.* at p. 160.

Because of defense counsel's objection, the OCCA reviewed petitioner's claim that Miles was improperly removed for cause for an abuse of discretion.  The circumstances surrounding Miles's removal, as summarized by the OCCA, were:

> This juror raised her hand and later approached the bench when the trial court inquired whether anyone had "ever been charged with or accused of a crime." She was not completely honest with the trial court, until the trial court indicated that it knew about this juror's history of two different deferred sentences, one of which she was currently serving. The trial court expressed concern about the juror's ability to be fair and impartial in a criminal case when she, herself, had been prosecuted by the State. This juror agreed that it bothered her, and asked "what can I do about it?"
>
> This juror agreed that she would be better suited for a non-criminal case. Before excusing her for cause, the trial court allowed defense counsel to object. The trial court stated that it had "a real problem with people who are on a deferred sentence sitting as jurors. They've got a lot at stake...."

Glossip II, 157 P.3d at 151.

The OCCA concluded that "although the trial court made a blanket statement about all persons currently serving a deferred sentence, the trial court believed this juror would be biased because she was currently serving a deferred sentence. The trial court, did not abuse its discretion in finding that this juror could not be fair and impartial and removing her for cause."  *Id.*  The OCCA's rejection of petitioner's challenge to the removal of Miles was not an unreasonable application of federal law.  Petitioner has not shown an unconstitutional

---

[112]*However, as respondent points out, none of the prospective jurors petitioner references, habeas petition, p. 159 n.42,  was serving a deferred sentence at the time of trial.  Tr. Vol. I, pp. 64-73.*

"arbitrary exclusion of any ... well-defined class of citizens." Peters v. Kiff, 407 U.S. 493,

498 (1972).  He is not entitled to habeas relief on this ground.

## Ground X – Admission of Victim's photograph

Glossip argues that the state trial court erred in admitting a photograph of Van Treese

taken before the murder.[113]  He asserts that the statute under which the photograph was

admitted was unconstitutional and that the photograph's admission was a denial of due

process.[114]

The photograph, a head shot of the victim, State's Exhibit 79, was introduced into

evidence during the guilt phase through the testimony of Mrs. Van Treese.  Barrie Hall, one

of the victim's daughters, then identified it during the sentencing stage.  Tr. Vol. XVI, p. 71.

The prosecutor referred to the picture during his guilt phase closing argument when he stated:

"[I]n a nutshell, murder is the process by which one human being takes State's Exhibit 79,

a picture of Barry Van Treese in happier days, and deliberately hurts him with the idea to kill

him, and out of that man makes State's Exhibit No. 65."  Tr. Vol. XV, p. 58.  He also

referred to it during his second stage closing argument: "I suggest that to you, that he

deserves the death penalty for what he did to Barry Van Treese.  You recall him from State's

Exhibit No. 79."  Tr. Vol. XVII, p. 65.

────────────────────

[113]*As the prosecutor incorporated by reference all of the first stage evidence into the second stage proceedings, the photograph was part of the evidence before the jury when making its sentencing determination.*

[114]*The court does not agree with respondent that petitioner has asserted the argument that "the admission of irrelevant evidence automatically rises to a federal due process violation." State's response, p. 112.*

The photograph was admitted pursuant to 12 Okla. State. § 2403, which provides in part that "in a prosecution for any criminal homicide, an appropriate photograph of the victim while alive shall be admissible evidence when offered by the district attorney to show the general appearance and condition of the victim while alive."  Petitioner contends the statute is unconstitutional on its face as it allows evidence to be admitted regardless of its relevance and potential prejudice, permits only the prosecution to offer photographs into evidence, and provides no guidance for its application, such as limitations on the size of the photograph or for what purpose it may be considered by the jury.  He claims the photograph was both irrelevant and highly prejudicial, introduced to "incite an emotional response."  Habeas petition, p. 168.  Glossip argues that, as a result of its admission, his trial was rendered fundamentally unfair and he was deprived of due process.

The OCCA rejected petitioner's constitutional challenge to the statute, noting that it allowed only one "'appropriate'" photograph to be admitted if it satisfied § 2403's balancing test.[115]  It concluded that the photograph, "an innocuous portrait of Van Treese, taken during the September preceding his death," "met the guidelines of the statute, and its probative value was not substantially outweighed by the danger of unfair prejudice."  Glossip II, 157 P.3d

---

[115]*The complete statute provides:*

*Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, needless presentation of cumulative evidence, or unfair and harmful surprise. However, in a prosecution for any criminal homicide, an appropriate photograph of the victim while alive shall be admissible evidence when offered by the district attorney to show the general appearance and condition of the victim while alive.*

*12 Okla. Stat. § 2403.*

at 157.  Reviewing the trial court's evidentiary decision to admit the photograph under an abuse of discretion standard, the OCCA concluded the trial court did not err in admitting it. *Id*.

Although the State argues that AEDPA deference applies because the OCCA rejected petitioner's facial and as-applied federal constitutional challenges to § 2403 on the merits, the OCCA did not apply a federal standard of review.  Therefore, petitioner's claims are reviewed *de novo*.  The court finds it unnecessary to address petitioner's constitutional challenges to §2403, as it concludes the admission of the photograph did not violate petitioner's due process rights.

Glossip "can receive habeas relief only if the erroneous admission of evidence rendered his trial as a whole fundamentally unfair." Hooker v. Mullin, 293 F.3d 1232, 1238 (2002).  When considering state court evidentiary rulings on habeas review the court "'determine[s] whether  the error was so grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process.'" *Id.* (quoting Williamson v. Ward, 110 F.3d 1508, 1522 (10th Cir. 1997)).

Petitioner has not identified any Supreme Court or federal appellate decision holding that the admission of an in-life photograph during the guilt or penalty stage of a trial warrants habeas relief.  However, the court has found several cases rejecting a claim in circumstances similar to those present here.  In United State v. Pettigrew, 468 F.3d 626 (10th Cir. 2006), the defendant was convicted of involuntary manslaughter and three counts of assault, after his truck collided with a van occupied by a couple and their two daughters.  The wife died

in the accident and the other family members sustained moderate to serious injuries.  The defendant challenged the government's use of a photograph depicting all four family members, including the wife/mother while she was living.[116]  The government displayed the photo during its opening statement, used it to establish the wife's identity through the testimony of her husband, and displayed it again during its closing arguments.

Noting that "[a] photograph of a victim while living is admissible to prove the identity of the victim," the appellate court concluded the district court did not abuse its discretion in allowing the jury to see the photo "during the several phases of the trial."  *Id.* at 638.  The court was, though, "troubled by the Government's decision to display a photo of Carrie Beasley with the rest of her family and refer to it while saying that she did not make it home that night."  *Id.*  It admonished the government for offering a photograph of the deceased victim posed with her family, rather than a photo depicting only the decedent, stating that such a proffer by the government "'needlessly pushes the prosecutorial envelope, and could, if coupled with errors not present here, jeopardize a conviction.'"  *Id.* (quoting United States v. Jones, 24 Fed.Appx. 968, 975 (10th Cir. 2001) (unpublished opinion)).

The court previously noted that the state trial court may have erred in admitting some of the testimony regarding the victim during the guilt stage of the trial, but concluded that testimony was not sufficiently prejudicial to render the proceedings against petitioner

---

[116]*In Pettigrew, the government had sought to admit the photograph into evidence. Although the defendant had objected that the exhibit was not offered for any proper purpose and would be unduly prejudicial, the court stated the photo would be admitted for the purpose of identification of the victims.  Despite the ruling, the government did not move for the photo's admission.*

fundamentally unfair.  The state's introduction of, and references to, the photograph do not affect this conclusion.  The photo was a single picture of the victim by himself.  It was not unduly emphasized during the testimony of any witness at either stage of the proceeding. While the court is troubled by the prosecutor's somewhat inflammatory references to the photographic exhibit during his first stage and second stage closings, it is not persuaded that the challenge exhibit was sufficiently prejudicial "that it fatally infected the trial."  Hooker, 293 F.3d at 1238.    Due process claims have failed in cases involving evidence of more poignant character than what was introduced here.  *E.g.,* United States v. Chanthadara, 230 F.3d 1237, 1274 (10th Cir. 2000) (citing cases and concluding trial was not rendered fundamentally unfair despite tremendous emotional effects of evidence, which included victim's children ending their testimony in tears and amplification of husband's testimony with numerous colored photographs of the victim while she was alive).  *See also* Malicoat, 426 F.3d at 1259 (OCCA's conclusion that error resulting from trial court's admission of irrelevant single living photograph of murdered child during sentencing phase,[117] compounded by prosecution's reference to the photo in closing argument, did not contribute to death sentence, was "a plausible reading of the record.").  Petitioner is not entitled to habeas relief on this ground.

## Ground XI – Ineffective Assistance of Counsel – Failure to Investigate

In Ground XI petitioner alleges his trial counsel was ineffective because he failed to

---

[117]*The OCCA decided* Malicoat *before the legislature enacted 12 Okla. State. § 2403 in 2002.*

obtain and cross-examine Sneed with information contained in a 1997 court-ordered psychiatric evaluation. Habeas petition, appendix, Attachment 7. That evidence, petitioner argues, would have shown that "Sneed was an individual that could think for himself and commit crimes without Mr. Glossip's guidance."[118] Habeas petition, p. 171. Petitioner asserts that, but for counsel's error, there was a reasonable probability that the result of the trial would have been different. He contends his appellant counsel erred by not raising this claim on direct appeal.

Petitioner asserted this claim in his application for post-conviction relief. The OCCA concluded it was barred as it was "merely an attempt to expand on claims made on direct appeal." Glossip v. State, No. PCD-2004-978, slip op. at 6  (Dec. 6, 2007) (unpublished). The court then proceeded to consider the claim on the merits and rejected it, finding that "the introduction of this information at trial or on direct appeal would not have changed the outcome of this case." *Id.*

In support of its decision, the OCCA cited Rule 9.7(D), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2007), which governs supplementation of the capital post-conviction record. Because of its reference to Rule 9.7(D), the standard of review applied by the OCCA is unclear. Therefore, the court will review petitioner's claim of ineffective trial and appellate counsel *de novo* under the Strickland standard.

The examiner states in the psychiatric evaluation that Sneed said he had been kicked

---

[118]*Petitioner erroneously characterizes this evidence as "mitigating."*

out of school in the eighth grade for fighting and that he "had a year's probation as a juvenile for burglary of a house and a bomb threat." Habeas petition, appendix, Attachment 7. Petitioner argues, citing a juror's post-verdict affidavit, *id.,* Attachment 8, that this information would have demonstrated that Sneed was not the subservient person portrayed by the State.[119]

Considering the evidence of Sneed's immaturity and dependency on Glossip, which is detailed in the court's analysis of petitioner's sufficiency of the evidence claim, in conjunction with the minimal information in the psychiatric evaluation relied on by petitioner, the court concludes Glossip has failed to demonstrate a reasonable probability of a different outcome at either stage of the proceeding if trial counsel had presented evidence that, at some time in his youth, Sneed had made a bomb threat and burgled a house.[120] There

---

[119]The court "may not consider the juror's statement." Carter v. Gibson, 27 Fed.Appx. 934, 946 (10th Cir. 2001) (unpublished). See Fed.R.Evid. 606(b). In Carter the petitioner claimed his counsel was ineffective for advising him to testify and then failing to prepare him to testify. He offered in support of his claim a juror's statement to his attorney that "the jury would not have sentenced [him] to death except for his demeanor and attitude while testifying." Id. at 946. Citing 12 Okla. Stat. § 2606(b) and Fed.R.Evid. 606(b), the Tenth Circuit held the statement could not be considered but, even if it could, it was "not compelling or specific. And it may not impeach the jury's verdict." Id. The juror's statement submitted by Glossip is similarly unconvincing. The juror stated that he found Sneed to be one of the State's most persuasive witnesses. He also stated: "[Sneed] seemed to be timid and unable to think for himself, as he was presented by the state. However, had I known about his prior burglary and bomb threat, I would have seen that Mr. Sneed could think for himself." Habeas petition, appendix, Attachment 8.

[120]The court is hampered in its analysis because petitioner provides no information about Sneed's juvenile offenses other than that they occurred. Under these circumstances, it is questionable whether counsel's failure to find and use the evaluation was an "unprofessional error" under Strickland. See Welch, 607 F.3d at 703 ("Counsel's performance must be 'completely unreasonable' to be constitutionally ineffective, 'not merely wrong.'") (quoting Hoxsie v. Kerby, 108 F.3d 1239, 1246 (10th Cir.1997)).

is no indication whether Sneed committed those offenses by himself or whether he was influenced to participate by someone else.  Petitioner has failed to provide any information regarding the crimes except that they occurred at some unspecified time.

As Glossip has not shown the required prejudice resulting from his counsel's alleged failure to investigate he is not entitled to relief under <u>Strickland</u> based on the conduct of his trial counsel.  That conclusion precludes petitioner from succeeding on his claim of ineffective assistance of appellate counsel.

## Ground XII– Ineffective Assistance of Counsel – Judicial Bias

Petitioner asserts in Ground XII that his trial and appellate counsel were constitutionally deficient for failing to assert at trial and argue on appeal that his due process rights were violated as a result of  judicial bias.  He claims that because "[a]t one or more times during the trial, Judge Gray expressed emotion, by crying or tearing up," he was "tried in a court that through its expressed emotion was biased."  Habeas petition, p. 178.[121]

The OCCA rejected Glossip's claim in an unpublished decision denying his application for post-conviction relief.  OCCA Opinion Denying Post-Conviction Relief,

---

[121]As the "first suggestion of the court's bias," habeas petition, p. 178, petitioner cites the trial judge's statement on the record at the bench, just before the defense was to begin its first stage opening argument:

> Thanks for your patience with me this morning.  I explained to the jury my situation because I didn't want them to think that it was a comment on the evidence. I told them I'd like to proceed this morning and if I find I just can't concentrate on the evidence or that I'm just sitting up here unable to control my emotions, then I'll just be honest with you guys and tell you I've got to go home.  Okay?

Tr. Vol. IV, p. 5.

Glossip v. State, No. PCD-2004-978 (Dec. 6, 2007) (unpublished).  In its order, the corrt

discussed the Strickland standard and then proceeded to consider petitioner's various

allegations of ineffective assistance.  The OCCA found petitioner had failed to "show that

the trial court's emotional state affected [the] trial by indicating a bias for or against any

party."  OCCA Opinion, slip op. at 6.  It also concluded that "[t]he extra-record documents

do not show, by clear and convincing evidence there is a strong possibility that Glossip was

prejudiced by the trial court's action."  *Id.*

While the OCCA adjudicated the merits of petitioner's ineffective assistance/judicial

bias claim, as noted in conjunction with Ground V, the standard of review applied, at least

with respect to the non-record evidence, was that found in Oklahoma Appellate Rule

3.11(B)(3)(b), rather than Strickland.  Therefore, the court has conducted a *de novo* review

of petitioner's claim of counsel error.  Strickland requires that Glossip establish "[1] that

counsel's performance was constitutionally deficient and [2] that counsel's deficient

performance prejudiced the defense, depriving the petitioner of a fair trial with a reliable

result." Bland, 459 F.3d at 1030 (quoting Boyd, 179 F.3d at 913).

The trial judge's affidavit is among the documents submitted to the OCCA in

conjunction with petitioner's application for post-conviction relief.  In it the judge explains

that about five minutes before the trial was to commence she was told by a friend that his

sister, the judge's "dear friend," had died early that morning.[122]   State's response to

---

[122]*Petitioner did not refer to the trial judge's affidavit in his habeas petition.*

application for post-conviction relief, Exhibit 1.   She informed counsel of the situation and told them she was going to explain to the jury what happened and why the trial had been delayed, to which "[t]he attorneys agreed." *Id.* She then stepped into the jury room, which was adjacent to the room in which counsel were sitting, and told the jury that she had just learned of the unexpected death of a close friend and that "any emotion [she] might show was not a commentary on the evidence or anything to do with Mr. Glossip's trial."[123] *Id.* In her affidavit the judge also stated that "Other than that morning, I may have been tear-eyed a couple of times during the testimony.  Mr. Van Treese was beloved by his family.  It was hard knowing their loss and the violent way he died.  However, I did not cry at any time during the trial." *Id*.

Petitioner does not specify whether he is claiming actual bias or the appearance of bias.[124]   He also does not identify in his petition when during the trial the judge was emotional[125] or how her actions affected or were perceived by the jury.  His vague assertion

---

[123]*The judge stated that the attorneys could easily hear what she said to the jury.  State's response to application for post-conviction relief, Exhibit 1.  Petitioner's assertion that  trial counsel was ineffective for not objecting "[u]pon notice of this conversation," habeas petition, p. 179 n.44, lacks merit, as the record reflects that trial counsel agreed to the judge's conversation with the jury and was in a position to hear it.*

[124]*With respect to a claim of the appearance of bias, the Tenth Circuit has held that "because the Supreme Court's case law has not held, not even in dicta, let alone 'clearly established,' that the mere appearance of bias on the part of a state trial judge, without more, violates the Due Process Clause, [a petitioner] cannot establish his entitlement to federal habeas relief under the standards outlined in § 2244(d)(1)."* <u>Welch</u>*, 451 F.3d at 701 (internal quotation and citation omitted).*

[125]*An attorney with the Oklahoma Indigent Defense System ("OIDS") submitted an affidavit relating her conversations with several jurors.  One juror was reported as having stated that "[h]e observed the judge crying during the trial when they got into details.  It was not a big cry, maybe*

that "[h]er emotions could have influenced the jury by indicating her opinion as to the merits of the evidence or the credibility of a witness," habeas petition, p. 178, is inadequate to demonstrate that the judge had "'actual bias against the defendant or [an] interest in the outcome of his particular case.'" Welch, 451 F.3d at 699 (quoting Bracy v. Gramley, 520 U.S. 899, 905 (1997)).

Petitioner also appears to have mischaracterized his underlying claim. Rather than judicial bias, he essentially is asserting juror bias based on the trial court's purported comments on the evidence. See Chanthadara, 230 F.3d at 1247.   He has not, though, shown that the jury was exposed to the judge's assessment of any aspect of the case.   Regardless of how the issue is framed, petitioner's counsel was not ineffective for failing to raise the issue of bias, judicial or juror, at trial or on appeal.   Habeas relief is denied on this ground.

## Ground XIII– Cumulative Error

In Ground XIII, petitioner asserts that the "cumulative effect of errors denied Mr. Glossip substantial statutory and constitutional rights," habeas petition, p. 181, without specifying the claimed errors.   The State contends the OCCA rejected petitioner's cumulative error claim on the merits in Glossip's state postconviction proceeding and its application of federal law was reasonable under AEDPA.[126]   However, as the court has assumed the OCCA

---

just one tear."  Habeas petition, Appendix, Attachment 12.  Another juror stated, when interviewed by an investigator with OIDS that "[a]t least one time during the trial," during the second stage, he witnessed the judge crying and saw her blow her nose.  Id., Attachment 13.

[126]The State also argues that cumulative error claims are not cognizable on habeas review due to the lack of Supreme Court precedent.  However, the Tenth Circuit has repeatedly recognized the cumulative error doctrine. See e.g., Matthews, 577 F.3d at 1195 n.10.

did not adjudicate petitioner's claim based on the posters and has assumed that the trial court's evidentiary ruling resulted in constitutional error, the OCCA's cumulative error review is not accorded AEDPA deference.

If only constitutional errors are considered when conducting a cumulative error analysis, *see e.g.,* Matthews, 577 F.3d at 1195 n.10, there is nothing to aggregate as only one constitutional error was found (the trial court's decision pertaining to the posters). However, if individual trial errors that, alone, have not been found to amount to constitutional violations are aggregated with the constitutional error, *see e.g.*, Malicoat, 426 F.3d at 1261-62, petitioner still is not entitled to habeas relief.

Having considered the record as a whole, the court concludes that the cumulative effect of the prosecutor's various errors – her introduction of victim impact testimony, argument related to the giving of the lesser related offense instruction and remarks that the death penalty was the only appropriate sentence – when combined with the trial court's erroneous evidentiary ruling, is not such "that collectively [the errors] can no longer be determined to be harmless." Welch, 607 F.3d at 7087 (internal quotation omitted). Therefore, petitioner is not entitled to habeas relief on this ground.

Evidentiary Hearing

Petitioner requested an evidentiary hearing with respect to his claim predicated on the State's use of posters (Ground III) and allegations of ineffective assistance of counsel (Grounds V, XI, and XII). Because the claims could be resolved on the basis of the existing record, an evidentiary hearing was unnecessary. *See* Hooks, 606 F.3d at 731. Petitioner's

motion will therefore be denied.

Conclusion

Having rejected petitioner's grounds for relief, his petition for writ of habeas corpus

[Doc. # 25] is **DENIED**.  His motion for evidentiary hearing  [Doc. #42] is also **DENIED**.[127]

**IT IS SO ORDERED.**

Dated this 28th day of September, 2010.

_____
JOE HEATON
UNITED STATES DISTRICT JUDGE

---

[127]*By separate order, the court granted respondent's motion to expand the record [Doc. #60].*