FILED
United States Court of Appeals
Tenth Circuit

**July 25, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

# UNITED STATES COURT OF APPEALS

## TENT CIRCUIT

RICHARD GLOSSIP,

        Petitioner - Appellant,

v.

ANITA TRAMMELL, Warden,
Oklahoma State Penitentiary,

        Respondent - Appellee.

No. 10-6244
(D.C. No. 5:08-CV-00326-HE)
(W.D. Okla.)

## ORDER AND JUDGMENT[*]

Before **GORSUCH**, **MURPHY**, and **O'BRIEN**, Circuit Judges.

      An Oklahoma jury found Richard Glossip guilty of first degree murder and sentenced him to death. On direct appeal, the Oklahoma Court of Criminal Appeals ("OCCA") affirmed Glossip's conviction and death sentence. *Glossip v. State*, 157 P.3d 143 (Okla. Crim. App. 2007). After exhausting his state post-conviction remedies, Glossip filed the instant 28 U.S.C. § 2254 habeas corpus petition in federal district court. The district court denied habeas relief in an

---

[*]This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

extensive order.  Glossip appeals the district court's denial of habeas relief,

raising six overarching issues.  Exercising jurisdiction pursuant to 28 U.S.C.

§§ 1291 and 2253, this court **affirms** the district court's denial of Glossip's

habeas petition.

## FACTUAL BACKGROUND

The following general factual background is taken from the opinion of the

OCCA on direct appeal.  Any additional facts particularly relevant to Glossip's

individual habeas claims are set out more fully below in the discussion section of

this opinion:

> In January of 1997, Richard Glossip worked as the manager of
> the Best Budget Inn in Oklahoma City, and he lived on the premises
> with his girlfriend D-Anna Wood.  Justin Sneed, who admitted
> killing Barry Van Treese, was hired by Glossip to do maintenance
> work at the motel.

> Barry Van Treese, the murder victim, owned this Best Budget
> Inn and one in Tulsa.  He periodically drove from his home in
> Lawton, Oklahoma to both motels.  The Van Treese family had a
> series of tragedies during the last six months of 1996, so Mr. Van
> Treese was only able to make overnight visits to the motel four times
> in that time span.  His usual habit was to visit the motel every two
> weeks to pickup the receipts, inspect the motel, and make payroll.

> The State presented testimony about the physical condition,
> financial condition, and the day to day operations of the motel.  At
> the beginning of 1997, Mr. Van Treese decided to do an audit of both
> motels after it was determined that there were shortfalls.  Before Mr.
> Van Treese left for Oklahoma City, Donna Van Treese, Barry's wife,
> calculated Glossip's net pay at $429.33 for the period ending January
> 5th, 1997, because Glossip had $211.15 in draws.  [Footnote 2:
> Glossip's salary was $1500.00 per month, which was divided twice
> monthly.  The net amount was after other usual deductions.]  On

-2-

January 6, 1997, she and Mr. Van Treese reviewed the books and discovered $6,101.92 in shortages for the Oklahoma City motel in 1996. Mrs. Van Treese testified her husband intended to ask Glossip about the shortages.

Sometime in December, Mr. Van Treese told Billye Hooper, the day desk manager, that he knew things needed to be taken care of, and he would take care of them the first of January. Hooper believed Van Treese was referring to Glossip's management of the motel.

Justin Sneed, by all accounts, had placed himself in a position where he was totally dependent on Glossip. Sneed started living at the motel when he came to Oklahoma City with a roofing crew from Texas. Sneed quit the roofing crew and became a maintenance worker at the motel. He made no money for his services, but Glossip provided him with a room and food. Sneed admitted killing Mr. Van Treese because Glossip offered him money to do it. The events leading up to the killing began with Van Treese's arrival at the motel on January 6.

Van Treese arrived at the Best Budget Inn in Oklahoma City on January 6, 1997, around 5:30 p.m. Around 8:00 or 9:00 p.m., Van Treese left Oklahoma City to go to the Tulsa Best Budget Inn to make payroll and collect deposits and receipts. Hooper testified Van Treese was not upset with Glossip and did not say anything to her about shortages before he left for Tulsa. Van Treese did tell Hooper he planned to stay for a week to help remodel rooms.

William Bender, the manager of the Tulsa motel, testified that Mr. Van Treese was very upset. He had never seen him that angry. Van Treese inspected the daily report for the motel, and he checked to see if the daily report matched rooms actually occupied. He told Bender that there were missing registration cards, missing receipts and unregistered occupants at the Oklahoma City motel.

He told Bender that he told Glossip that he had until Van Treese arrived back at Oklahoma City to come up with the missing receipts. Then he was going to give Glossip another week to come up with the missing registration cards and to get the receipts in order. He also told Bender that if Glossip were fired Bender would manage

-3-

the Oklahoma City motel.  Van Treese left the Tulsa motel and
arrived back at the Oklahoma City motel at about 2:00 a.m. on
January 7.

Sneed, also known as Justin Taylor, testified that in exchange
for maintenance work, Glossip let him stay in one of the motel
rooms.  Sneed said he only met Van Treese a few times, and he saw
him at the motel with Glossip on the evening of January 6, 1997.
Sneed testified that around 3:00 a.m. on January 7, 1997, Glossip
came to his room.  Glossip was nervous and jittery.  Glossip wanted
Sneed to kill Van Treese and he promised him $10,000.00 for killing
Van Treese.  Sneed testified that Glossip had asked him to kill Van
Treese several times in the past and the amount of money kept
getting bigger and bigger.

Glossip suggested that Sneed take a baseball bat, go into Van
Treese's room (room number 102), and beat him to death while he
slept.  Glossip said that if Van Treese inspected the rooms in the
morning, as he intended to do, he would find that none of the work
had been done.  Glossip told Sneed that both of them would be out of
a job.

Sneed went over to the Sinclair Station next door and bought a
soda and possibly a snack.  He then went back to his room and
retrieved the baseball bat.  Sneed said he went to Van Treese's room
and entered using a master key that Glossip had given him.  Van
Treese woke up and Sneed hit him with the bat.  Van Treese pushed
Sneed, and Sneed fell into the chair and the bat hit and broke the
window.  When Van Treese tried to get away, Sneed threw him to the
floor and hit him ten or fifteen times.  Sneed also said that he pulled
out a knife and tried to stab Van Treese a couple of times, but the
knife would not penetrate Van Treese.  Sneed received a black eye in
the fight with Van Treese.  He later told others that he fell in the
shower and hit his eye.

A long time resident of the motel, John Beavers, was walking
outside when [he] heard strange noises coming from room 102.  He
then heard the glass breaking.  Beavers believed there was a fight
going on in room 102.

After Sneed killed Van Treese he went to the office and told Glossip he had killed Van Treese.  He also told him about the broken window.  Sneed said that he and Glossip went to room 102 to make sure Van Treese was dead.  Glossip took a $100 bill from Van Treese's wallet.

Glossip told Sneed to drive Van Treese's car to a nearby parking lot, and the money he was looking for would be in an envelope under the seat.  Glossip also told him to pick up the glass that had fallen on the sidewalk.

Sneed retrieved the car keys from Van Treese's pants and drove Van Treese's car to the credit union parking lot.  He found an envelope with about $4000.00 cash under the seat.  He came back and swept up the glass.  He put the broken glass in room 102, just inside the door.  He said that Glossip took the envelope from him and divided the money with him.  He also testified that Glossip helped him put a shower curtain over the window, and he helped him cover Van Treese's body.  According to Sneed, Glossip told him, that if anyone asked, two drunks got into a fight, broke the glass, and we ran them off.  Sneed testified that Glossip told him to go buy a piece of Plexiglas for the window, and some Muriatic acid, a hacksaw, and some trash bags in order to dispose of Van Treese's body.

D-Anna Wood testified that she and Glossip were awakened at around 4:00 a.m. by Sneed.  She testified that Glossip got out of bed and went to the front door.  When he returned, Glossip told her that it was Sneed reporting that two drunks got into a fight and broke a window.  She testified that Glossip then returned to bed.

Glossip told police during a second interview, that Sneed told him that he killed Van Treese.  He denied ever going into room 102, except for assisting with repairing the window.  He said he never saw Van Treese's body in the room.

The next morning, Billye Hooper arrived at work and was surprised to see that Glossip was awake.  She also noticed that Mr. Van Treese's car was gone.  She asked Glossip about the car, and Glossip told her that Mr. Van Treese had left to get supplies for remodeling rooms.  A housekeeper testified that Glossip told her to

clean the upstairs rooms, and he and Sneed would take care of the downstairs, where room 102 was located.

Later that afternoon, employees found Mr. Van Treese's car in a credit union parking lot near the motel, and a search for Van Treese began. Glossip and D-Anna Wood were at Wal–Mart shopping. They returned to the motel, because Hooper paged them and told them to come back. The police were contacted sometime after Mr. Van Treese's car was found.

Cliff Everhart, who worked security for Mr. Van Treese in exchange for a 1% ownership, was already at the motel. He told Sneed to check all of the rooms. Sneed indicated that he did so. Everhart, Glossip and Wood drove around looking for Van Treese in nearby dumpsters and fields.

Everhart and Oklahoma City Police Sgt. Tim Brown began discussing Glossip's conflicting statements, so they decided to check room 102 on their own. At about 10:00 p.m. they discovered Van Treese's body in his room. Sneed had already left the motel that afternoon, and he was not apprehended until a week later. Glossip was taken into custody that night, questioned and released. The next day, Glossip began selling his possessions. He told people he was leaving town. However, before he could leave town, he was taken into custody again for further questioning.

Subsequent searches revealed that Sneed possessed approximately $1,700.00 in cash, and that Glossip possessed approximately $1,200.00. Glossip claimed this money came from his paycheck and proceeds from the sale of vending machines and his furniture.

*Glossip*, 157 P.3d at 147-51.

## STANDARD OF REVIEW

A petitioner is entitled to federal habeas relief only if the state court's merits-based adjudication of his claims "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). This standard is "highly deferential" and "demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quotation omitted). Federal habeas courts must presume the state court's factual findings are correct unless the petitioner rebuts that presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

This court first determines "whether the principle of federal law on which the petitioner's claim is based was clearly established by the Supreme Court at the time of the state court judgment." *Bland v. Sirmons*, 459 F.3d 999, 1009 (10th Cir. 2006); *see also Hooks v. Workman*, 689 F.3d 1148, 1163 (10th Cir. 2012). To be clearly established for purposes of federal habeas review, the Supreme Court must have established the principle of law via a holding in a case where the facts are similar to the facts in the petitioner's case. *House v. Hatch*, 527 F.3d 1010, 1016 (10th Cir. 2008). "The absence of clearly established federal law is dispositive under § 2254(d)(1)." *Id.* at 1018. That is, only if this court answers "affirmatively the threshold question as to the existence of clearly established federal law, may we ask whether the state court decision is either contrary to or an unreasonable application of such law." *Id.*

-7-

If clearly established federal law exists, this court moves on to consider whether the state court decision was contrary to or an unreasonable application of that clearly established federal law. *Bland*, 459 F.3d at 1009. "A decision is 'contrary to' clearly established federal law . . . if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases or if the state court confronts a set of facts . . . materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from the result reached by the Supreme Court." *Id.* (quotations omitted) (alterations in original). "A state court decision involves an 'unreasonable application' of federal law if the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* (quotation omitted) (alteration in original). Thus, "[a]s a condition for obtaining federal habeas relief, . . . a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786–87 (2011).

This court employs a less deferential standard if the state court has not adjudicated the merits of a petitioner's claim. In such situations, this court exercises its "independent judgment in deciding the claim." *McCracken v. Gibson*, 268 F.3d 970, 975 (10th Cir. 2001). "In doing so, we review the federal

district court's conclusions of law de novo and its findings of fact, if any, for clear error." *Id.*  Nevertheless, "[a]ny state-court findings of fact that bear upon the claim are entitled to a presumption of correctness rebuttable only by clear and convincing evidence." *Hooks*, 689 F.3d at 1164 (quotation omitted).

## DISCUSSION

On appeal, Glossip asserts he is entitled to habeas relief based on each of the following six alleged constitutional errors: (1) he was denied due process by the prosecution's creation and display during trial of posters emphasizing the government's evidence; (2) prosecutorial misconduct deprived him of fair guilt and penalty proceedings; (3) he was denied effective assistance of trial counsel; (4) the sole aggravator underlying his death sentence is not supported by sufficient evidence; (5) the introduction of improper victim impact evidence denied him a reliable penalty proceeding; and (6) the cumulative effect of otherwise individually harmless errors rendered his trial fundamentally unfair.  As set out below, this court concludes Glossip is not entitled to habeas relief on any of his claims of error.

## I.  Display of Posters at Trial

### A.  Background

#### 1.  OCCA Decision

Glossip claims that the State used demonstrative aids to overly emphasize certain portions of witnesses' testimony.  He claims that the posters (1) placed undue influence on selected testimony, (2)

were the equivalent of continuous closing argument, and (3) violated the rule of sequestration. . . .

. . . Defense counsel requested that these poster sized note sheets be preserved . . . for appellate review, but the trial court refused the request. . . .  We are extremely troubled by the trial court's attitude toward defense counsel's attempt to preserve the demonstrative aides for appellate review.  [Footnote 8:  Glossip has asked for an evidentiary hearing so that the record may be supplemented with these demonstrative exhibits . . . ; however, we find that the inclusion of the demonstrative exhibits would not affect our decision in this case.]

. . . .

Here, the only way to determine what was on the posters, *in toto*, is to search the record and note where it appears that the prosecutor was writing on the note pad.  According to the record cited, the prosecutor made notes of significant testimony on a large flip chart sized easel pad.  This pad was left up for the jury to view during trial over trial counsel's objection which was made after the second day of testimony.

The record is not clear whether these pads stayed up during the entire trial.  Glossip asserts that they stayed on display from witness to witness from the first day of testimony to the last with no citation to the record.  Glossip cannot say what was written on the poster sized pad sheets . . . .

Glossip claims that the posters were "taped up to various places in the courtroom and remained in full view of the jury and all subsequent witnesses throughout the trial."  Glossip's citations to the record do not support this specific factual claim.

Glossip admits that he has found no cases on point in Oklahoma, and only cites to a Kentucky case that he cites as saying,

It is one thing to allow a party to make a chart or summary or other demonstrative aid for use while a witness is testifying.  It is quite another 'to allow a particular segment of testimony to be advertised,

-10-

bill-board fashion,' after that witness has completed his
or her testimony.

*Lanning v. Brown*, 377 S.W.2d 590, 594 (Ky. 1964).  The chart
displayed in *Lanning* was a poster sized chart noting the list of
special damages claimed by the party in a personal injury case.  The
Court held that the display of the chart was harmless, because the
damages were not in substantial dispute.  The Kentucky court noted a
dearth of precedent on this point.

In *Miller v. Mullin*, 354 F.3d 1288, 1295 (10th Cir. 2004), the
[Tenth Circuit] noted a risk of using transparencies during closing
argument.  The court noted that "[a]n inherent risk in the use of
pedagogical devices is that they may 'unfairly emphasize part of the
proponent's proof or create the impression that disputed facts have
been conclusively established or that inferences have been directly
proved.'" *Id.* (citing *United States v. Drougas*, 748 F.2d 8, 25 (1st
Cir. 1984)).

In viewing the entire record, we cannot say that the posters
affected the outcome of this trial.  Both sides utilized the poster
tactic during trial, although, the State seemed to utilize more posters
than the defense.  There is no argument that the posters did not
contain factual information, and they were utilized to assist the jury
in understanding the testimony, considering the trial court's
instructions against note-taking.  Any error in the utilization of these
posters was harmless.

*Glossip*, 157 P.3d at 155-56.

## 2. District Court Order

[P]etitioner claims his constitutional right to due process was
violated when the trial court allowed the state "to display selective
portions of certain witnesses' testimony throughout the entire trial
. . . . This court . . . allowed petitioner to supplement the record with
copies of the posters  . . . and the record was expanded to permit both
parties to submit affidavits pertaining to the location and use of the
posters.

. . . .

-11-

The initial question is whether petitioner's evidentiary claim was "adjudicated on the merits" within the meaning of § 2254(d), when the OCCA did not review the posters themselves, but was generally, if not specifically, aware of their contents. . . .

. . . .

. . . As the court concludes petitioner is not entitled to habeas relief even if the claim is reviewed *de novo*, it is unnecessary to determine whether the state court adjudicated the claim on the merits. . . .

. . . .

The posters consist of handwritten bits of witnesses' testimony on sheets of butcher block paper, approximately 27 by 36 inches in size. They apparently were taped to the edge of the State's counsel table and elsewhere in the courtroom. The writing on the posters is large enough that they would have been legible if within a juror or witness' line of vision. The court has assumed that, once created, a poster could be seen throughout the remainder of the trial by both the jury and the witnesses. The posters were not admitted into evidence and were not sent with the jury to the jury room.

Most of the writing on the posters consists of statements Glossip made on January 7, 1997, . . . in an attempt to cover up the crime, including when he had last seen the victim, the cause of the broken window, the room in which the victim had spent the night, and who was to clean the downstairs motel rooms. Two posters include references to statements Glossip made to Officer Tim Brown at different times during the day on January 7, 2010, and then after Van Treese's body was found. They demonstrate inconsistencies in Glossip's statements to the police, reflecting that Glossip told Brown at 4:30 p.m. on January 7, 1997, that he had seen Van Treese walking through the parking lot that morning at 7:00 a.m, sometime after 7 p.m. told him that he was not sure when he had last seen Van Treese, and, around 9 p.m., said that everything was getting turned around and he did not say he had seen the victim at 7:00 a.m. The writings on these posters also show that petitioner did not mention anything to Officer Brown about Justin Sneed's involvement in Van Treese's

0disappearance until after the body was discovered.  The statements on these posters did not directly link Glossip to the murder.

The only poster that included statements directly connecting Glossip to the murder was that on which the prosecutor summarized Sneed's testimony ("Sneed poster"). . . .

Neither party has cited, nor has the court found, cases concluding due process violations resulted from a use of demonstrative exhibits similar to that which occurred during Glossip's trial.  [Footnote 54: Because the jury found the murder for remuneration aggravator, the Sneed poster was pertinent to both stages of the trial.  Therefore, the court must consider its impact during the sentencing stage as well as the guilt stage.]  Petitioner relies on cases in which trial courts have refused to allow testimony to be reread to the jury during deliberations.  The courts' concern in those decisions was that "testimony taken out of context could give too much stress to a particular point."  *Glaze v. State*, 565 P.2d 710, 714 (Okla. Crim. App. 1977).  While that concern is present here, those cases are distinguishable in that the issue arose during jury deliberations.  While the posters could be viewed by the jury during the trial, the jurors' attention was not specifically focused on them, as it would be if their contents were read to them after they had retired to deliberate or if the posters had been sent to the jury room.

. . . .

The court has considered the State's use of the posters against the backdrop of [Tenth Circuit cases] . . . .  The issue for the court to decide is not whether the posters use violated some state evidentiary rule, but whether their impact on the trial was harmless error under *Brecht*.

Petitioner's argument that the posters allowed a witness to tailor his or her testimony to that of a prior witness is not persuasive. Because most of the witnesses had previously testified (during the first trial and/or preliminary hearing) or given statements, petitioner's trial counsel had the opportunity to challenge any changes in their testimony that might have been due to their reading the statements of preceding witnesses.  Moreover, . . . the bulk of the testimony recorded on the posters was not disputed.  Also . . . , it

would have been difficult for a witness to read what was on the posters at the same time he or she was being asked questions.

The more difficult question is the impact of the posters on the jurors' deliberations—did they allow or cause certain testimony to be overemphasized to such an extent that the error "'resulted in actual prejudice?'" [*Welch v. Workman*, 607 F.3d 675, 685 (10th Cir. 2010) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993))]. . . . [T]he jurors not only heard the witness make the statements and then see them recorded, the prosecutor occasionally reread a statement to verify its accuracy. However, petitioner does not contend that the prosecutors inaccurately recorded the witness' testimony. More importantly, he does not dispute the accuracy of most of the statements attributed to him on the posters. As stated by petitioner's counsel during his closing argument, "Mr. Glossip sits here charged with murder for inconsistent statements." The thrust of petitioner's defense was that, while he made false statements and may have committed a crime, it was committed after Sneed murdered Van Treese, not before. Glossip admitted that he had lied to the detectives and that he had covered up the murder.

With the exception of the Sneed poster, by allowing the posters to remain visible throughout the proceedings the trial court essentially permitted the State to present cumulative, though undisputed, testimony about Glossip's statements on January 7 and 8, 1997. . . . The jury could have considered Glossip's various statements as evidence not merely of his attempt to conceal the discovery of the crime, but as proof that he was involved in the murder itself. However, the court concludes that the continual display of these posters was not harmful under the deferential standard of *Brecht*. Petitioner's defense was that, while he might have been involved in an attempt to hide the murder, he was not involved in its commission. Glossip's counsel stated during his closing argument that none of the witnesses (with the exception of Sneed), "placed Mr. Glossip killing Mr. Van Treese or have personal knowledge of that or have knowledge of a contract or an agreement between him and Justin Sneed. None of them." Their recorded statements on the posters did not make that link. They also neither undercut Glossip's defense nor directly bolstered the State's murder charge. Under these circumstances, the court concludes that the presence of the posters reflecting the testimony of witnesses other

-14-

than Sneed did not have a substantial and injurious effect on the jury's verdict.

The Sneed poster reflected the crux of the State's case against Glossip. Its contents, a synopsis of Sneed's testimony implicating Glossip in the murder, addressed facts which were highly disputed. The poster was created on May 26, 2004, late in the trial.

Although a close question, the court concludes that the trial court's decision to allow the continued display of the Sneed poster, whether considered alone or in combination with the other posters was . . . harmless under *Brecht*. Key considerations include the fact that the information on the poster accurately reflected Sneed's testimony, that the poster was not sent to the jury deliberation room, and that the information on the poster was limited and simple. As Sneed was the state's principal witness, it is doubtful the jury would have needed any reminder as to the central points of his testimony which were recorded on the posters—that Glossip offered him money to kill [Van Treese] so he could run both motels. Although not determinative, the court notes that the defense also created and displayed posters during Glossip's trial.

The trial judge did not give any specific limiting instructions with respect to the posters. However, she instructed the jurors both at the beginning of the trial and before they began deliberating that "[t]he State has the burden of providing the evidence that establishes guilt beyond a reasonable doubt" and then defined evidence as testimony received from witnesses under oath, stipulations and exhibits admitted into evidence during the trial. The jury was also advised that evidence "is not what the attorneys say, it is not what I say" and that "[t]he exhibits go back with you into deliberation." "'[A] jury is presumed to follow its instructions.'" *Crawley v. Dinwiddie*, 584 F.3d 916, 918 n.2 (10th Cir. 2009).

The trial court clearly erred in allowing the posters to remain on display in the courtroom throughout the trial. However, "'an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment.'" *Welch*, 607 F.3d at 685 (quoting *Brecht*, 507 U.S. at 634). Habeas relief may not be granted "merely because there is a reasonable possibility that trial error contributed to the verdict." *Brecht*, 507 U.S. at 637. While not

-15-

> endorsing the practice permitted here, the court concludes, applying
> *Brecht* . . . that the error did not have a "substantial and injurious
> effect or influence in determining the jury's verdict." *Id.* The
> petitioner is not entitled to habeas relief on this claim.

District Ct. Order at 23-40 (footnotes, citations, and alteration omitted).

## B.  Analysis

This court notes at the outset that the record reveals two potential non-merits impediments to Glossip obtaining habeas relief on this claim.  Oklahoma argues convincingly that because Glossip did not properly exhaust his federal due process claim in state court, the claim is subject to an anticipatory procedural bar. *See Anderson v. Sirmons*, 476 F.3d 1131, 1139 n.7 (10th Cir. 2007) ("Anticipatory procedural bar occurs when the federal courts apply procedural bar to an unexhausted claim that would be procedurally barred under state law if the petitioner returned to state court to exhaust it." (quotations omitted)).[1]

---

[1]A habeas petitioner must show he has exhausted his state court remedies. 28 U.S.C. § 2254(b); *Picard v. Connor*, 404 U.S. 270, 275 (1971).  Federal claims must be "fairly presented to the state courts" to give them the "initial opportunity to pass upon and correct alleged violations" of a prisoner's federal rights.  *Picard*, 404 U.S. at 275  (quotations omitted).  It is not enough that all facts necessary to support a federal claim were before the state court or that a similar state-law claim was made.  *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam). Instead, a state court must "be alerted to the fact that [a prisoner is] asserting claims under the United States Constitution."  *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995) (per curiam).  The crucial inquiry is whether the substance of the claim has been presented to the state court in a manner sufficient to put it on notice of the federal constitutional claim.  *Picard*, 404 U.S. at 278.

On direct appeal, Glossip did not mention the federal Constitution in either
(continued...)

Alternatively, Oklahoma makes a strong argument that assuming Glossip properly

exhausted a federal due process claim, the OCCA's resolution of that claim is

entitled to AEDPA deference.[2]   We need not resolve these issues, however,

_____

[1](...continued)
the heading or text of his brief.  He cited no Supreme Court or federal case.  *Cf. Dye v. Hofbauer*, 546 U.S. 1, 7 (2005) (concluding issue was fairly presented when the text of the brief cited the Fifth and Fourteenth Amendments and federal cases concerning alleged violations of federal due process rights).  The district court nevertheless opined Glossip exhausted the issue because he twice utilized the term "due process" in his appellate brief.  *Baldwin v. Reese*, 541 U.S. 27 (2004), indicates this is not sufficient.  Baldwin asserted he preserved a Sixth Amendment claim by using the term "ineffective assistance of appellate counsel" in his state-court appellate brief.  *Id.* at 33.  The Court rejected this assertion, concluding there was nothing inherent in the term "ineffective assistance" indicating it was a federal, as opposed to a state-law, claim.  *Id.*  Likewise, there is no reason to assume Glossip's reference to "due process" in his state-court brief referred to a federal claim, as opposed to a claim arising under the Oklahoma Constitution.  *Cf.* Okla. Const. art. 2, § 7 ("No person shall be deprived of life, liberty, or property, without due process of law.").  "If a habeas petitioner wishes to claim that a[] . . . ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court."  *Duncan*, 513 U.S. at 366.  Oklahoma makes a strong argument that Glossip did not do so.

[2]Glossip asserts the OCCA's resolution is not a merits adjudication because the OCCA refused to expand the record to include the posters and, without the posters, it was impossible for the OCCA to evaluate the legal or factual basis of the claim.  The problem with this argument, however, is that his claim, both before the district court and before this court, never focused on the content of the posters, i.e., he never asserted any information set out in the posters was inaccurate.  *Glossip v. State*, 157 P.3d 143, 156 (Okla. Crim. App. 2007) ("There is no argument that the posters did not contain factual information . . . .");  District Ct. Order at 36 ("[P]etitioner does not contend that the prosecutors inaccurately recorded the witnesses' testimony.  More importantly, he does not dispute the accuracy of most of the statements attributed to him on the posters.").  Instead, he argued on direct appeal that the mere existence of the (admittedly accurate) posters allowed witnesses to tailor their testimony to that already adduced and

(continued...)

because the record makes clear Glossip is not entitled to habeas relief even if this court proceeds to the merits of the claim.  28 U.S.C. § 2254(b)(2) (providing a habeas petition "may be denied on the merits, notwithstanding the failure of an applicant to exhaust" state court remedies); *Webber v. Scott*, 390 F.3d 1169, 1175 (10th Cir. 2004) ("The question of whether the OCCA reached the merits need not be decided, however, because Webber's claim fails with or without according the state court's decision AEDPA deference.").

Because Glossip does not contend the prosecution's use of the posters impinged upon a specific constitutional right, he is entitled to habeas relief only if the use of the posters "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Matthews v. Workman*, 577 F.3d

---

[2](...continued)
allowed the prosecution to emphasize testimony it deemed important. Furthermore, as the district court observed, the OCCA "was generally, if not specifically, aware of [the posters'] contents."  District Ct. Order at 25.  This awareness was based on passages from the record that revealed where the prosecutor made notes of "significant testimony."  *Glossip*, 157 P.3d at 156. Given that the accuracy of the testimony memorialized on the posters has never been challenged and the OCCA's general familiarity with the content of the posters and the entire trial transcript, it appears difficult to conclude the OCCA acted unreasonably in proceeding on the record before it.  *See id.*  That being the case, Oklahoma argues convincingly that Glossip cannot prevail unless he can meet the standards set out in § 2254(d).  Since he has not identified any clearly established Supreme Court case law governing the display of demonstrative aids during trial, he cannot satisfy this standard.  *House v. Hatch*, 527 F.3d 1010, 1021 (10th Cir. 2008) ("Absent controlling Supreme Court precedent, it follows ineluctably that the [state court's] decision . . . cannot be either 'contrary to, or [ ] an unreasonable application of, clearly established Federal law.'").

1175, 1186 (10th Cir. 2009) (quotation omitted).  For all those reasons set out by

the district court[3] in denying Glossip habeas relief on this claim, we conclude the

answer to that question is an unequivocal "no."  Although there is no need to

recapitulate the district court's thorough analysis, a few points are worth

---

[3]Although this court adopts the district court's thorough analysis and
rejection of this claim of error, we depart from the district court as to one narrow
point.  In analyzing this claim, the district court assumed the existence of error
and assessed the harmfulness of the error using the "substantial and injurious
effect" standard set out in *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993).  As
this court made clear, however,

> A prosecutor's remarks to the jury can create constitutional error in
> one of two ways.  First, [those remarks] can prejudice "a specific
> right, such as the privilege against compulsory self-incrimination, as
> to amount to a denial of that right."  *Donnelly v. DeChristoforo*, 416
> U.S. 637, 643 (1974).  In such a case, we review the harmfulness of
> the error using *Brecht*'s "substantial and injurious effect" standard.
> Second, even if the prosecutor's improper remarks do not impact a
> specific constitutional right, they may still create reversible error if
> they "so infected the trial with unfairness as to make the resulting
> conviction a denial of due process."  *Donnelly*, 416 U.S. at 643.  The
> Supreme Court has instructed us that "the appropriate standard for
> review of such a claim on writ of habeas corpus is 'the narrow one of
> due process, and not the broad exercise of supervisory power.'"
> *Darden v. Wainwright*, 477 U.S. 168, 181 (quoting *Donnelly*, 416
> U.S. at 642).

*Matthews v. Workman*, 577 F.3d 1175, 1186 (10th Cir. 2009) (citations omitted);
*see also Miller v. Mullin*, 354 F.3d 1288, 1295 (10th Cir. 2004) (recognizing a
habeas argument based on the use of a visual aid at trial was analogous to an
assertion of improper argument).  Thus, rather than assuming error and applying
*Brecht*, the most appropriate course in this case is to determine whether the use of
the posters at trial resulted in a constitutional violation.  To answer that question,
this court focuses on whether the use of the posters rendered Glossip's trial
fundamentally unfair.

emphasizing.  As noted by the district court, the overwhelming majority of the

posters memorialized statements Glossip made to multiple individuals in the days

immediately following the murder.  Glossip never denied making these

statements.  In fact, his defense was that while he might have been involved in an

attempt to hide the murder, he was not involved in its commission.  Importantly,

as Glossip argued during his closing argument, none of those statement connected

him to Van Treese's murder.  Further, the posters were not admitted into evidence

and were not sent to the jury room during deliberations.  As this court made clear

in *Miller v. Mullin*, use of demonstrative exhibits is within the sound discretion of

the trial judge.  354 F.3d 1288, 1295 (10th Cir. 2004).  "[T]he ability of an

appellate court to overturn discretionary rulings on direct review is severely

constrained.  It is even more attenuated on habeas review."  *Id.* at 1296.  Given

the large number of witnesses (twenty-six witnesses testified during the guilt

phase), it was not fundamentally unfair for the trial court to allow the use of

posters to assist the jury in understanding, and keeping track of, the testimony.

This is especially so considering that Glossip had the same opportunity to use

such demonstrative exhibits and, in fact, utilized the same technique on several

occasions during witness testimony.  *Glossip*, 157 P.3d at 156.

The poster memorializing Sneed's testimony is a slightly closer question.

That poster was the only one which included statements directly connecting

Glossip to Van Treese's murder.  It reflected the crux of the prosecution's case

and represented a synopsis of Sneed's highly disputed testimony implicating Glossip in the murder.  Nevertheless, as is true of the other posters, Glossip has never challenged the accuracy of the poster and the poster was not submitted to the jury during deliberations.  Most importantly, Sneed was the prosecution's principle witness.  Like the district court, we think it is beyond doubtful that the jury would have needed any reminder as to the central points of Sneed's testimony.  Furthermore, Sneed testified very late in the trial, only a few days before the case was submitted to the jury.  Thus, the poster memorializing Sneed's testimony was not displayed in front of the jury for an extended time period.  Finally, although it did not provide a limiting instruction, the trial court specifically instructed the jury at the beginning of trial, and in the written charge, (1) that the prosecution had the burden of providing evidence that establishes guilt beyond a reasonable doubt; and (2) that evidence consists of testimony received from witnesses under oath, together with stipulations and exhibits admitted during the trial.  Given this trial context, we safely conclude the Sneed poster did not render Glossip's trial fundamentally unfair.

Because the use of the posters in this case, considered together and in the context of the entire proceeding, did not render Glossip's trial unfair, their use did not deprive Glossip of his Fourteenth Amendment right to due process.

## II.  Prosecutorial Misconduct

Glossip alleges various instances of prosecutorial misconduct during both the guilt and penalty phases of his trial.  The OCCA adjudicated Glossip's misconduct claims by analyzing whether "the cumulative effect was such to deprive the defendant of a fair trial."  *Glossip*, 157 P.3d at 157.  "Because this standard is the same as that under federal law, we apply the deferential AEDPA standard of review, and examine whether the OCCA's decision was an unreasonable application of the standard."  *Bland*, 459 F.3d at 1024 (citation omitted).  Generally, a prosecutor's improper remarks require federal habeas relief only if the remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process."[4]  *Donnelly*, 416 U.S. at 643, 645.  Alternatively, if prosecutorial misconduct denied Glossip a specific constitutional right, a valid habeas corpus claim may be established without proof the entire

---

[4]     To determine whether a trial is rendered fundamentally unfair, we examine the entire proceeding, including the strength of the evidence against the petitioner, both as to guilt at that stage of the trial and as to moral culpability at the sentencing phase as well as any cautionary steps—such as instructions to the jury—offered by the court to counteract improper remarks.  It is not enough that the prosecutors' remarks were undesirable or even universally condemned.  The ultimate question is whether the jury was able to fairly judge the evidence in light of the prosecutors' conduct.

*Bland v. Sirmons*, 459 F.3d 999, 1024 (10th Cir. 2006) (quotations, alterations, and citations omitted).

-22-

trial was rendered fundamentally unfair.  *Id.* at 643; *see also Paxton v. Ward*, 199

F.3d 1197, 1217 (10th Cir. 1999).

## A.  Guilt Phase

### 1.  Fingerprint Evidence

#### a.  OCCA Decision

Glossip . . . claims that the prosecutor committed misconduct
when arguing that the absence of Glossip's fingerprints in room 102
amounted to evidence of guilt.  There was no objection to these
comments, thus we review for plain error only.

Here the prosecutor was merely arguing that, as manager of the
motel and as a person who was responsible for repairs in every room,
it was very suspicious that none of his fingerprints were found in the
room.  This was a fair inference from the evidence.  The prosecutor
was not arguing that Glossip selectively removed fingerprints after
the crime, but was arguing that the absence of his fingerprints in the
room, even ones that might have been left there under innocent
circumstances was unusual.  There is no plain error here.

*Glossip*, 157 P.3d at 157.

#### b.  District Court Decision

The prosecutor knew, or should have known, Glossip argues, that the
police "limited their initial collection of forensic evidence to areas
obviously related to the murder."  He asserts that "[i]t is hard to
imagine how Mr. Glossip could have selectively wiped off all of his
own fingerprints, but left [every one] of Justin Sneed's prints in
place."  Glossip claims the prosecutor improperly remarked during
his first-stage closing argument:

Does the absence of his fingerprints, even though we
know that in all likelihood he'd been in that room
repeatedly and had legitimate business there, and even
though he, himself, admits confirming John Prittie's
description that he helped put the plexiglass on that

broken window, not one single Richard Glossip
fingerprint can be found.  Can you think of some
reasonable explanations for that looking for a reasonable
inference as justified by your common sense.

. . . .

And, understand, I'm not talking about fingerprints in
the blood of Barry Van Treese.  We've seen some of
those.  I'm talking about any fingerprint at all.  He had
legitimate business in room 102 at times and there
would be many circumstances under which an innocent
Richard Glossip could put his fingerprint in that room.
Okay?  I'm talking about no fingerprints of any kind at
all.

. . . .

Why isn't [sic] his fingerprints there?  If he is innocent,
why aren't they there.  He helped put up that plexiglass.
He touched it.  His fingerprints should be there.  Why
aren't they?  Because somebody wiped them off.
Innocent people don't do that.

The OCCA concluded the prosecutor "was merely arguing that,
as manager of the motel and as a person who was responsible for
repairs in every room, it was very suspicious that none of his
fingerprints were found in the room," and the argument "was a fair
inference from the evidence."  *Glossip*, 157 P.3d at 157.  The
prosecutor was not, the court found, "arguing that Glossip selectively
removed fingerprints after the crime, but was arguing that the
absence of his fingerprints in the room, even ones that might have
been left there under innocent circumstances was unusual."  *Id.*

The OCCA's determination was not unreasonable.  *See*
[*Thornburg v. Mullin*, 422 F.3d 1113, 1131 (10th Cir. 2005)] ("A
prosecutor may comment on and draw reasonable inferences from
evidence presented at trial.");  *see generally Donnelly*, 416 U.S. at
646-47 ("Such arguments, like all closing arguments of counsel, are
seldom carefully constructed in toto before the event;  improvisation
frequently results in syntax left imperfect and meaning less than

-24-

crystal clear. . . .   [A] court should not lightly infer that a prosecutor
intends an ambiguous remark to have its most damaging meaning or
that a jury, sitting through lengthy exhortation, will draw that
meaning from the plethora of less damaging interpretations.").   The
prosecutor could reasonably infer, from the absence of Glossip's
fingerprints on the plexiglass, which petitioner admitted helping
Sneed install, that Glossip wiped his fingerprints off the glass or
wore gloves so no prints would appear.   Petitioner has not shown that
the prosecutor's comments prevented the jury from being able to
fairly judge the evidence.

District Ct. Order at 42-44 (footnote and citation omitted).

### c.  Analysis

This court does not quite know what to make of the OCCA's determination

that "[t]he prosecutor was not arguing that Glossip selectively removed

fingerprints after the crime, but was arguing that the absence of his fingerprints in

the room, even ones that might have been left there under innocent circumstances

was unusual."  *Glossip*, 157 P.3d at 157.  As noted by the district court, the

prosecutor specifically argued to the jury as follows: "Why isn't [sic] his

fingerprints there?  If he is innocent, why aren't they there.  He helped put up that

plexiglass.  He touched it.  His fingerprints should be there.  Why aren't they?

Because somebody wiped them off.  Innocent people don't do that."  District Ct.

Order at 43.  Nevertheless, the OCCA's ultimate conclusion, that the prosecutor's

statements amounted to proper commentary on the evidence, is not unreasonable.

Although Glossip admitted he participated in the placing of the plexiglass

in the room in which Van Treese was murdered, his fingerprints were not present

in that area of the room.  Nor were his fingerprints found elsewhere.  It is

legitimate for the prosecutor to ask the jury to draw a negative inference from this

strange absence of fingerprints.  This is especially true given that during an

interview with Detective Bemo on January 9, 1997, Glossip repeatedly

emphasized the special care he took, in the aftermath of the murder, to make sure

his prints did not appear in the room.  The prosecutor's statements regarding the

absence of Glossip's fingerprints in the motel room where the murder occurred

did not amount to misconduct and, most certainly, did not prevent the jury from

fairly judging the evidence at Glossip's trial.

### 2.  Lesser-Included Offense

#### a.  OCCA Decision

Glossip argues that the prosecutor mislead the jury when arguing that
the defense of "accessory after the fact" was baseless, because the
State did not charge him with accessory after the fact to murder.  In
fact, the State did[] initially charge Glossip with accessory to murder
and Sneed with murder in separate Informations.  The State then
dismissed the accessory Information and added Glossip as a
co-defendant with Sneed on the murder Information.

The State argued that it did not charge Glossip with accessory
to murder, because he was guilty of the "big boy offense of Murder
in the First Degree."  Actually, the State did not pursue prosecution
of Glossip for accessory, because they alleged he was guilty of first
degree murder.  The method of prosecution and the filing of charges
is discretionary with the prosecution.  Here the prosecutor is merely
arguing that Glossip is guilty of murder, regardless of his defense
that he only acted after the fact in attempting to cover up the crime.
The argument, again, is properly based on the evidence adduced at
trial.

The prosecutor argued that the lesser related offense instruction relating to accessory to murder was only given because defense counsel requested it.  Glossip objected to this argument and the trial court admonished the prosecutor.  Juries are to consider lesser related offenses, only if they have a reasonable doubt that a defendant has committed the greater offense.  The jury was properly instructed on the method of reviewing greater and lesser offenses.  These instructions properly channeled the jury's decision making process and cured any error.

*Glossip*, 157 P.3d at 157-58 (citations omitted).

## b.  District Court Decision

Petitioner contends the prosecutor misled the jury by giving it "the impression that the State had always believed Mr. Glossip was a principal to the murder," when in fact Glossip had originally been charged as an accessory after the fact.  In response to this argument, the OCCA noted that "[t]he method of prosecution and the filing of charges is discretionary with the prosecution," and found that the prosecutor was "merely arguing that Glossip [was] guilty of murder, regardless of his defense that he only acted after the fact in attempting to cover up the crime."  *Glossip*, 157 P.3d at 158.  The court concludes the OCCA's ruling on this issue was not unreasonable.

More troubling are certain comments the prosecutor made, which petitioner contends denigrated defense counsel by implying that the lesser related offense instruction was a defense trick.  The prosecutor remarked during her closing:

> I want to talk to you about this lesser related offense.  I want to point out to you why you got it.  You see, because it says lesser.  That's why you got it.  Because they wanted you to have a lesser option.  I want to tell you something.  We don't get to choose here, see, you all don't.  The State of Oklahoma chose, right or wrong, we chose Murder in the First Degree.
>
> Let me tell you something about lesser related offenses.  Let me tell you why we just charge with one offense.

> Because that's what he did.  Because that's what the
> evidence is.  You know, somebody, they drive drunk,
> they commit DUI and they slam into somebody, they run
> a stop sign, they slam into somebody and they kill them,
> you know what we charge them with?  Manslaughter.
> Because that's what driving drunk and killing somebody
> is.  And at trial if they get up and they go, "You've got
> me, okay, find me guilty of, well, running the stop sign."
> We don't accept that offer.  And that's what this is.  It's
> an offer to plead to running the stop sign.  But he did
> more than that.  And the State of Oklahoma respectfully
> declines his offer of a lesser related offense.  Doesn't
> even really fit --

Defense counsel objected at the bench to the prosecutor's
remarks.  He argued that the prosecutor improperly implied that the
lesser included instruction was merely something petitioner had
suggested, rather than something the court had determined was
appropriate for the jury's consideration.  The court told the
prosecutor that she was concerned by her "statement let me tell you
why you got this instruction," and would allow her to fix it.  The
prosecutor then told the jury:

> Ladies and gentlemen, when we talk about lesser related
> offenses they are running the red stop sign and that's it.
> Now, they're in your packet and they're for your
> consideration.  I mean, they're not here because they're
> not for your consideration.  They are for your
> consideration.  But they are properly for your
> consideration at the proper time.  If you have reasonable
> doubt of murder, then you will consider.  And that is the
> proper time.

The OCCA found that the prosecutor's argument that petitioner
was "guilty of murder, regardless of his defense that he only acted
after the fact in attempting to cover up the crime . . .  [was] properly
based on the evidence adduced at trial." *Glossip*, 157 P.3d at 158.
With respect to the prosecutor's comment that the lesser related
instruction was given only because of defense counsel's request, the
OCCA noted that the trial court admonished the prosecutor, the jury
was properly instructed regarding greater and lesser offenses and the

-28-

instructions "properly channeled the jury's decision making process and cured any error." *Id.*  The OCCA also noted that under Oklahoma law juries "are to consider lesser related offenses, only if they have a reasonable doubt that a defendant has committed the greater offense." *Id.*

While the prosecutor's comments had the potential to mislead, the court concludes the prosecutor's closing remarks, when considered in their entirety and in conjunction with the jury instructions, did not alter the fundamental fairness of Glossip's trial. The prosecution essentially "reminded the jury that it should refer to the written instructions during deliberations.  The jury is presumed to follow its instructions, even when there has been misleading argument." *Bland*, 459 F.3d at 1015.  The state court's adjudication of this alleged instance of prosecutorial misconduct was not contrary to or an unreasonable application of clearly established federal law.

District Ct. Order at 45-48 (citations and footnotes omitted).

### c.  Analysis

Glossip's arguments with regard to his claim of prosecutorial misconduct are two-fold.  He first argues the prosecution misrepresented the facts, and thereby misled the jury, when it gave the impression the State always believed he was a principal to the murder when, in fact, he was originally charged as an accessory after the fact.  Like the district court, we think this assertion hardly merits discussion.  Glossip has not cited a single case indicating the original indictment in this case remained either legally or factually relevant.  That being the case, the original indictment did not bind the prosecution.  Furthermore, contrary to Glossip's assertion, the original indictment does not necessarily mean the prosecution ever thought Glossip was a simple accessory.  Instead, it likely

indicates that early in the investigation Oklahoma was not sure of Glossip's role, but was sure he was involved at least as an accessory.  Eventually, Oklahoma became convinced Glossip was a murderer and it could prove that fact.  That being the case, the comments identified by Glossip were consistent with the factual history of the case.  Furthermore, the OCCA reasonably concluded the prosecutor's remarks were simply an argument to the jury that the evidence showed Glossip was guilty of the greater offense.  *Glossip*, 157 P.3d at 158 (holding prosecutor's argument Glossip was "guilty of murder, regardless of his defense that he only acted after the fact in attempting to cover up the crime . . . [was] properly based on the evidence adduced at trial").

As to the prosecutor's alleged denigration of the lesser-included offense, the OCCA's determination of harmlessness is reasonable.  After Glossip objected, the trial judge admonished the prosecutor to clarify to the jury that it was obligated to comply with the court's instructions and consider the accessory charge if it could not reach a unanimous verdict on the murder charge.  The jury instructions correctly set out the jury role.[5]  *See Bland*, 459 F.3d at 1015 ("The

_____

[5]Instruction number 27 directed the jury, in part, as follows:

If you have a reasonable doubt of the defendant's guilt of the charge of Murder In The First Degree, you must then consider the charge of Accessory To Murder In The First Degree.

You are not required to determine unanimously that the

(continued...)

jury is presumed to follow its instructions, even when there has been misleading argument." (citation omitted)).  Thus, the OCCA's determination of harmlessness is reasonable.

### 3.  Victim Impact Evidence

#### a.  Background

##### i.  OCCA Decision

The OCCA concluded on the merits that the overwhelming bulk of the evidence introduced during the guilt phase which Glossip described as improper "victim impact evidence" was relevant and properly admitted:

> Glossip claims that the State presented irrelevant and highly prejudicial evidence during the first stage of trial.  He claims that the State attempted to elicit sympathy for the victim . . . .  However, trial counsel failed to object to any of the testimony Glossip now claims was improper.  Therefore, he has waived all but a review for plain error. . . .
>
> Glossip first argues that the testimony of Donna Van Treese, the victim's spouse was irrelevant to the first stage of trial. . . .
>
> Donna Van Treese . . . described the victim as a fifty-four year old man, who had quit smoking six years prior, had gained weight, was balding, and had gray hair.  He grew a full white beard and when

---

[5](...continued)
defendant is not guilty of the crime charged before you consider a lesser related offense.  If you have a reasonable doubt as to which offense the defendant may be guilty of, you may find him guilty only of the lesser related offense.  If you have a reasonable doubt as to the guilt of the defendant on all such offenses, you must find him not guilty of any crime.

he shaved it off; his daughter cried and begged him to grow it back. . . .

Mrs. Van Treese was allowed to testify that the months prior to his death, a series of tragedies had occurred which included the death of her mother.  After this death the family took a long trip in a motor home to several States.  During this trip Mr. Van Treese felt an urgent need to get home.  When they arrived home, they learned that Mr. Van Treese's mother was scheduled for heart by-pass surgery that very morning.  She did not survive the surgery.

The purpose of this testimony was to show why Mr. Van Treese was not involved in the day to day operations of the motel in the months preceding his death.  It was meant to show how the motel could slip into physical and financial disrepair without his knowledge.

. . . .

Evidence that Mr. Van Treese was a ham radio operator was relevant to the identification of his vehicle, as the vehicle was found at the credit union parking lot with an amateur radio operators [sic] personalized license plate.  The evidence about his diabetes was relevant to show why Mrs. Van Treese called people to initiate a search as soon as she heard about him being missing, and to explain why the discovery of his car was troublesome.

*Glossip*, 157 P.3d at 154.  The OCCA concluded any small amount of such

evidence that was not properly admitted did not amount to plain error:

During the first stage, several witnesses described Mr. Van Treese as a loving, kind, and generous person who on many occasions allowed people to stay at the motel when they were down on their luck.  This testimony was coupled with evidence that Mr. Van Treese had a temper and would explode with anger towards employees.  Although this testimony may have been irrelevant to the first stage, it did not rise to the level of plain error.  This evidence did not deprive Glossip of a fair trial.

*Id.*

-32-

### ii. District Court Decision

The heart of the district court's brief analysis is as follows:

> Most of the challenged evidence was relevant and neither it nor the
> evidence which may have lacked probative value was so unduly
> prejudicial as to render the proceedings against petitioner
> fundamentally unfair.  Petitioner has not shown that the OCCA's
> decision on this claim was an unreasonable determination of the facts
> nor an unreasonable application of Supreme Court law.  The asserted
> evidentiary errors did not violate petitioner's due process rights. . . .

District Ct. Order at 22 (footnote omitted).

### b. Analysis

The OCCA reasonably concluded the overwhelming bulk of Donna Van

Treese's testimony was relevant and properly admitted.[6]  Thus, as noted by the

district court, this aspect of Glossip's misconduct claim necessarily fails.

Furthermore, those portions of Donna Van Treese's trial testimony about Van

---

[6]Glossip's evidentiary claim regarding the admissibility of Donna Van
Treese's testimony was sufficiently insubstantial that he was not granted a COA
to raise the issue on appeal.  This dooms a large measure of this particular claim
of prosecutorial misconduct.  In response, Glossip asserts that because the OCCA
did not individually set out and address in its opinion on direct appeal every one
of the allegedly improper statements elicited by prosecutors from Donna Van
Treese, this court can review those particular statements de novo.  In so arguing,
he focuses on testimony relating to Van Treese's wedding ring and a t-shirt Van
Treese wore depicting Jesus Christ.  Glossip cites no precedent in support of this
assertion.  *But see Harrington v. Richter*, 131 S. Ct. 770, 784 (2011) (holding that
a federal habeas court must defer to summary state court decisions, even those
entirely devoid of reasoning).  In any event, even assuming Donna Van Treese's
testimony regarding Van Treese's wedding ring and "Jesus t-shirt" was so
irrelevant that its elicitation amounted to misconduct, this court is firmly
convinced that limited testimony, considered in the context of the entire
proceeding, did not render Glossip's trial fundamentally unfair.

Treese that were not relevant did not so dominate the guilt phase of the trial so as to render it fundamentally unfair.  In any event, the OCCA's conclusions in this regard are certainly not so wrong as to be unreasonable.  The district court properly denied habeas relief on this claim of misconduct.

### 4.  Implying Existence of Additional Facts

#### a.  Background

##### i.  OCCA Decision

Glossip claims that the prosecutor implied that additional evidence existed.  During the re-direct examination of witness Kayla Pursley, Glossip claims that the prosecutor inferred that this jury would not hear everything she said to the police because she could not remember what she told police.  The prosecutor did not allow Pursley to refresh her memory with the police report and tell the jury what she told police.  No objection was made to this questioning at trial.

> As indicated by the State, this questioning was to rebut the defense's cross-examination where counsel brought up the fact that she testified to things not in the police report because she remembered these things after talking to the police.  The prosecutor was merely attempting to show that Pursley was testifying from her memory and not from the police report.  The fact that the jury was deprived of this evidence due to a lack of memory was not indicative of more evidence damaging to Glossip.  This claim does not rise to the level of plain error.

*Glossip*, 157 P.3d at 158.

##### ii.  District Court Decision

The district court concluded the OCCA had reasonably found the prosecutor was properly "attempting to rebut defense counsel's suggestion that Ms. Pursley's testimony was not credible."  District Ct. Order at 48-49.

-34-

### b.  Analysis

On redirect examination of Kayla Pursley, the prosecutor asked the

following series of questions:

> Q.  And, in fact, in the police report are some things that you
> don't remember right now.  Right?
>
> A.  Right.
>
> Q.  Okay.  Some things of other statements that Richard
> Glossip made.  Right?
>
> A.  Right.
>
> Q.  And when you told the police that on January 7th, you
> were telling them the truth?
>
> A.  Yes.
>
> Q.  It's just that it's not before this jury right now because you
> don't remember it today?
>
> A.  Right.
>
> Q.  So those additional statements that we might be able to
> write up here we've just lost those because it took us seven years to
> get this to trial.  Right?
>
> A.  Right.

Glossip argues the clear import of this line of questioning was the

prosecution had additional evidence of guilt that would not be presented to the

jury.  *Cf. Berger v. United States*, 295 U.S. 78, 84 (1935) (condemning, among a

long litany of acts of prosecutorial misconduct, a prosecutor's "suggesting by his

questions that statements had been made to him personally out of court, in respect

of which no proof was offered").  Glossip's arguments notwithstanding, it was reasonable for the OCCA to conclude the prosecutor was not attempting to imply to the jury there was additional, unmentioned evidence of Glossip's guilt, but was instead attempting to convey to the jury that the police report was irrelevant because Pursley was testifying solely from memory.  After all, during his cross-examination of Pursley, defense counsel had implied Pursley's testimony was not to be believed because it deviated from the police report.  It was also reasonable for the OCCA to conclude the jury most likely understood the prosecutor's line of questioning consistent with the prosecutor's wholly proper intent.  That being the case, Glossip's claim of misconduct fails.

**B. Penalty Phase Misconduct**

**1. Background**

**a. OCCA Decision**

As to Glossip's claim of prosecutorial misconduct during the penalty phase, the OCCA concluded as follows:

> Glossip also claims misconduct occurred during the penalty phase of trial.  He first claims that the prosecutor misstated the law regarding the appropriate punishment by arguing that death is appropriate because society, the Van Treese family, the Glossip family, and the justice system is "worse off" because of Richard Glossip.  The State also argued that Glossip was a "cold-blooded murderer" and "cold-blooded murders in the State of Oklahoma we punish with death."  The prosecutor went on to argue that "He chose the option of murder in the face of other options and that makes death the appropriate option."  There were no objections to these arguments.

-36-

Glossip also cites to the prosecutor's argument inferring that no one would be here, except for the actions of Richard Glossip, including the statement, "you [the jury] wouldn't be here making this tough decision."  Again there was no objection.

Glossip claims that the prosecutor unfairly denigrated Glossip's mitigating evidence by pointing out that while he is awaiting trial he gets his niece to come visit him so he can bring her to trial so she can testify.  The prosecutor also pointed out the fact that other mitigation evidence was from a 23–year–old detention officer.  The prosecutor pointed out the fact that Sneed was about that age and he buddies up to this young kid so he can have a witness to say he is not violent.  There was no objection to this argument.

Defense counsel did object during the next citation of alleged misconduct.  The prosecutor used the victim's photographs as props, placed them on defense table, and said "I don't have a problem with taking this blood and putting it right over here.  Because this is where it goes."  Counsel's objection was aimed at the prosecutor "throwing things on our table."  Defense counsel said the prosecutor should give them to the jury.  The objection was overruled.  The objection was not based on the argument but on where the prosecutor was placing the photographs.  Because he raises a different argument here, we can review for plain error only.

All of the alleged misconduct came during the State's second closing, after defense counsel stated that the State wants "Richard Glossip's blood to flow" (to which a State's objection was sustained).  Defense counsel also told the jury that this was a decision that they would have to live with; the State would put this case away and forget about it.  Defense counsel also argued that the State sees Richard Glossip as a person with no social redeeming value—ignoring the fact that he had a normal life, was a hard worker and supported his family.

It must be noted, that the State alleged two aggravating circumstances: continuing threat; and murder for remuneration.  Most of the argument, from both sides, was in an attempt to show whether Glossip was a continuing threat to society.  The continuing threat aggravating circumstance requires a jury to determine whether it is

-37-

probable that a defendant will commit future criminal acts of
violence that would constitute a continuing threat to society.

All of the prosecutor's arguments were proper comments on
the evidence in order to show that, based on the circumstances of this
crime, Glossip was a continuing threat to society.  Obviously, the
jury did not accept the prosecutor's argument, because they did not
find that Glossip was a continuing threat.

*Glossip*, 157 P.3d at 158-59.

## b.  District Court Decision

Petitioner asserts the prosecutors, during their second stage
closing argument, misstated the law, injected their personal beliefs
into the proceeding, and denigrated his mitigating circumstances.  He
first claims the prosecutor misstated the law when she argued in her
closing that "death was the only appropriate penalty because we're
not better off because of Mr. Glossip," and that "cold-blooded
murderers in the state of Oklahoma we punish with death."  He
contends the prosecutor also asserted other improper criteria to
support the death penalty, including "her belief [that] '[Glossip]
chose the option of murder in the face of other options.'"  He claims
the prosecutor improperly argued that:

Richard Glossip killed for this, a piece of property, and
he killed for this, money.  It's a lot.  It's a lot of
hundreds and fifties and twenties.  Right here, according
to Richard Glossip, is the price of a life and because of
that mentality that's why we punish with death.  That's
why it is correct to take a life for the life that was taken.

Other remarks during the prosecution's closing are challenged
as being overly theatrical or as an expression of the prosecutor's
personal opinion that petitioner should "pay with his life."  Petitioner
also asserts prejudice from the prosecutor's "demonstration in which
she threw 'things,' presumably photographs of the victim's injuries,
onto the defense table," while commenting that:

Because but for the actions of Richard Glossip,
Justin Sneed would not have killed Barry Van Treese

-38-

and but for the actions of Richard Glossip, I wouldn't be
here and but for the actions of Richard Glossip, their
family wouldn't [be] here, and but for the actions of
Richard Glossip, the [Van Treeses] would not be here
and but for the actions of Richard Glossip, you wouldn't
be here making this tough decision.

So I don't have a problem with taking this blood
and putting it right over here.  Because this is where it
goes.

Petitioner's remaining objection to the prosecutions' closing
argument is based on the following remarks:

What's his motive while he's awaiting trial?  It's to get
his niece to come visit him six times after this trial is set
so he can bring her in here and make her testify.

His motive is to be a good boy and to buddy up to a
23-year-old detention officer—interesting the age he
chooses, I think, the age of Justin Sneed.  He chooses
this young kid to buddy up with so he can be free and
roam the pod while everybody else is in a cell 23 hours
and 45 minutes a day.  And then he doesn't cause any
problems because he knows we've listed as an
aggravator the probability that he will be violent.  He's
not stupid.  That does not tell you, though, that he's not
going to be violent in the future.

Glossip claims the prosecutor intended by these remarks to
inform the jurors that they could ignore petitioner's "mitigating
circumstances because, in the prosecutor's opinion, no one could
really care for Mr. Glossip unless he had manipulated them into
doing so."

. . . With one exception, relating to the prosecutor's
comments about the appropriateness of the death penalty, the court
finds the OCCA did not unreasonably apply federal law.

The prosecutor did not, in her quoted remarks, mislead the jury
about sentencing alternatives.  *See Thornburg*, 422 F.3d at 1136

(prosecutor's statement that the defendant "could be released from jail at some point if not sentenced to death" could "mislead the jury about possible punishment alternatives); *Hooks v. Workman*, 606 F.3d 715, 742 (10th Cir. 2010) ("The prosecutors, Miller and Macy, then immediately proceeded to mislead the jury as to its role in sentencing by informing jurors (1) the jury's work would be wasted if it failed to reach a unanimous verdict, (2) defense counsel's argument that it took the vote of only one juror to prevent imposition of the death penalty constituted a request for 'jury nullification,' and (3) failure to deliberate in a manner leading to a unanimous verdict would amount to operating outside the law."). Her comments and alleged theatrics could, though, be construed as expressing her personal views, specifically her statement: "So I don't have a problem with taking this blood and putting it right over here. Because this is where it goes."

While "a prosecutor is entitled to argue that under the facts and law, capital punishment is appropriate," it is "improper for a prosecutor to inject his personal opinion on the propriety of the death sentence." *Thornburg*, 422 F.3d at 1135. The court assumes the statements pertaining to the appropriateness of the death penalty "crossed the line," *id.* at 1136, but does not find they rendered the trial fundamentally unfair. *See Malicoat v. Mullin*, 426 F.3d 1241, 1256 (10th Cir. 2005) (prosecutor's theatrics—conducting a substantial portion of his rebuttal argument in the guilt phase as if he were the 13 month old victim—were not sufficiently prejudicial to deprive petitioner of a fair trial, as statements of abusive conduct and extent of victim's injuries were supported by evidence in the record and the prosecution's case was compelling).

As for the prosecutor's remarks regarding petitioner's mitigating evidence, they were an attempt to persuade the jury not to be swayed by it. "As long as the jury is properly instructed on the use of mitigating evidence, the prosecution is free to comment on the weight the jury should accord to it." *Bland*, 459 F.3d at 1026. "The comments did not contradict the court's instructions and did not preclude the jury from considering" petitioner's mitigating evidence. [*Fox v. Ward*, 200 F.3d 1286, 1299 (10th Cir. 2000).] Here, as in *Fox* and *Bland*, the trial court instructed the jury that "[t]he determination of what circumstances are mitigating is for you to resolve under the facts and circumstances of this case." "The

-40-

prosecutor[], while critical of [Glossip's] mitigating evidence, never told the jury it could not consider [Glossip's] mitigating evidence. The challenged prosecutorial argument was consistent with the jury instructions and bore only on the weight of the evidence." *Bland*, 459 F.3d at 1026.

Assessing the OCCA's decisions on petitioner's various claims of prosecutorial misconduct "through AEDPA's forgiving lens," the court cannot say the state court's analysis was "contrary to or an unreasonable application of Supreme Court precedent, or based on an unreasonable determination of the facts." *Matthews*, 577 F.3d at 1186.

District Ct. Order at 49-55 (citations and footnote omitted).

## 2. Analysis

According to Glossip, none of the instances of misconduct identified in his petition constitute fair commentary on the evidence on the part of the prosecution. The OCCA's contrary conclusion, he asserts, is so wrong to be unreasonable. Furthermore, Glossip contends the prosecutor's misconduct rendered the penalty phase of his trial fundamentally unfair, given that he presented a strong case in mitigation and the jury found the existence of only a single aggravating factor.

Glossip is not entitled to habeas relief on this claim of error. The OCCA reasonably concluded the vast majority of the prosecutor's remarks were proper commentary on the evidence or argument the jury should not be swayed by Glossip's evidence in mitigation. Glossip's arguments to the contrary do nothing more than ask this court to substitute its judgment for the judgment of the OCCA. This court is required, however, to assess the OCCA's resolution of Glossip's

prosecutorial misconduct claims "through AEDPA's forgiving lens." *Matthews*,

577 F.3d at 1186.  An examination of the trial transcript reveals a heavily

contested penalty phase with the parties' evidentiary submissions centering

almost exclusively around the question whether Glossip was a continuing threat to

society.  As noted by the OCCA, when viewed through this lens, the prosecutor's

comments reasonably relate to Glossip's arguments regarding the existence of that

aggravating factor. *Glossip*, 157 P.3d at 159.  Furthermore, the jury's rejection of

the continuing threat aggravator makes it difficult to argue the prosecutor's

arguments led the jury to decide the case on the basis of anything other than the

evidence presented.

That leaves only one potential error: the prosecutor's statements indicting

her view that death was the appropriate punishment.  Those comments, however,

were not the major focus of the prosecutor's second closing and were not overly

dramatic.  Furthermore, one of the comments was specifically followed by a

statement that no matter the prosecutor's views, it was the jury's view that really

mattered.  This error did not render that phase fundamentally unfair.

## III.  Ineffective Assistance of Counsel

Glossip was granted a COA on three claims of ineffective assistance of

counsel: (1) failure to use effectively at trial a videotaped statement Sneed made

to police in 1997; (2) failure to object to acts of prosecutorial misconduct; and (3) failure to use at trial Sneed's competency report.[7]

## A. Sneed's Videotaped Statement

### 1. Background

#### a. OCCA Decision

[Glossip] . . . claims that counsel was ineffective for failing to utilize Justin Sneed's videotaped interview to impeach Sneed and Detective Bemo. Glossip points out that this Court, in our Opinion reversing Glossip's original conviction, stated that "[t]rial counsel's failure to utilize important impeachment evidence against Justin Sneed stands out as the most glaring deficiency in counsel's performance." *Glossip*, 29 P.3d at 601.

---

[7]In his habeas petition, Glossip raised seven discrete claims of ineffective assistance. He received a COA to raise on appeal only the three claims identified above. In an order issued by this court well before Glossip filed his opening brief, Glossip was informed that any request to further expand the COA must be filed within ten days. Glossip never filed a request to expand the COA. Nevertheless, Glossip renews in his appellate brief "his request for a COA on his entire claim of ineffective assistance." Appellant's Br. at 72. He does not, however, offer this court any reason to grant that request. Instead, he merely asserts as follows: "[G]iven the scope of the existing COA, Mr. Glossip will address only those portions of the ineffective assistance of counsel claims [upon which he obtained a COA]." *Id.* Because Glossip failed to timely move for an expanded COA and failed to offer any reason this court could conclude these additional claims satisfy the statutory standard set out in 28 U.S.C. § 2253(c)(2), Glossip's request for an expanded COA is **denied**. *See Romano v. Gibson*, 278 F.3d 1145, 1155 (10th Cir. 2002).

Alternatively, Glossip asserts that even if we deny his request for an expanded COA, the remaining claims should "be part of the court's analysis when addressing the cumulative error claim for which there is a COA." *Id.* This court has already rejected such an approach to conducting cumulative error review in the context of habeas appeals. *Young v. Sirmons*, 551 F.3d 942, 972-73 (10th Cir. 2008).

One would believe that if this Court stated an attorney was ineffective (to the point of requiring reversal) for failing to utilize one piece of evidence to impeach witnesses, the new attorneys on retrial would utilize the evidence.  That is, unless counsel at the second trial is either banking on his ineffectiveness garnering his client another trial or he made a strategic decision not to introduce the tape and only question witnesses about the statements on the tape.  The third possibility is that the failure to utilize this one piece of evidence is not the sole reason counsel was found to be ineffective during the first trial.  This Court trusts that the first reason is invalid.  Counsel's use of the contents of the tape to cross-examine witnesses, without introducing the tape, was a valid strategy.  Furthermore, the failure to utilize the tape during the first trial was one of many reasons why this Court found there was ineffective assistance of trial counsel during the first trial.  Even though these two trials encompass the same subject, similar strategic decisions occurring during both trials, might not result in the same conclusion by this Court.  [Footnote 13: During the first trial, trial counsel indicated he would use the tape to impeach Justin Sneed, but when the time came, "counsel failed to utilize the video tape at all."  *Glossip*, 29 P.3d at 601.  In this case, trial counsel questioned both Bemo and Sneed about inconsistencies between prior statements and current testimony.]

The videotaped interview was not introduced into evidence during this trial, thus it is not a part of the record.  Glossip has filed a motion for an evidentiary hearing pursuant to Rule 3.11, Rules of the Court of Criminal Appeals, Title 22, Ch. 18, App. (2006), in order to supplement the record.

Glossip admits that trial counsel cross-examined both Sneed and Bemo regarding the circumstances of the interview, statements made during the interview and discrepancies between current testimony and statements on the tape.  Counsel was not ineffective for utilizing this strategy.

*Glossip*, 157 P.3d at 159-60 (footnote omitted).

### b. District Court Decision

The district court began its analysis of this aspect of Glossip's claim of ineffective assistance by engaging in an extended discussion of the appropriate standard of review.  Noting the OCCA possibly resolved this claim by reference to Oklahoma Appellate Rule 3.11, Rules of the Court of Criminal Appeals, Title 22, Ch. 18, App. (2006), the district court concluded it must review the claim de novo.  *See Wilson v. Workman*, 577 F.3d 1284, 1290-93, 1299-1300 (10th Cir. 2009) (en banc) (holding that an OCCA resolution of a claim of ineffective assistance based on Rule 3.11 did not amount to an "adjudication on the merits" entitled to AEDPA deference).  It then moved on to deny habeas relief on the merits:

> Petitioner claims his attorneys were derelict in failing to impeach both Sneed and Detective Bemo with the videotape of Sneed's interview with Detectives Bemo and Cook.  He points out that the OCCA reversed his first conviction in large part because his trial counsel did not use the video.  The state appellate court found after petitioner's first trial that his attorney's failure to use "important impeachment evidence against Justin Sneed [stood] out as the most glaring deficiency in counsel's performance." *Glossip v. State*, 29 P.3d 597, 601 (Okla. Crim. App. 2001).  However, contrary to petitioner's assertion, his attorneys in his 2004 trial did not "again fail[] to use this critical piece of evidence to cross-examine Justin Sneed and Det. Bemo."  While they did not seek to introduce the tape itself into evidence, unlike petitioner's counsel in his 1998 trial they did confront Sneed with various discrepancies and inconsistencies between his 1997 videotaped interview and subsequent testimony.  Bemo also was asked on cross about his interview techniques and whether his questions to Sneed were suggestive.

-45-

Petitioner concedes his trial counsel cross-examined both Sneed and Bemo in the 2004 retrial about the circumstances of the interrogation and discrepancies between the videotaped statements and Sneed's later trial testimony.  He argues, though, that "whenever the witness denied the differences in the testimony or was unsure about what was said in the initial interview on January 14, 1997, counsel simply let it go.  If the jury had been allowed to view the videotape of Mr. Sneed's interview, there would have been no question what Mr. Sneed and the detectives said and why." Petitioner asserts Sneed's testimony on "the videotape *was* entirely different" from what he stated on the stand and that "counsel's failure to play [the tape] for the jury left the impression it was not."

Petitioner asks the court to engage in what the Supreme Court has specifically warned against—using hindsight to second guess his attorney's tactical decisions.  Simply because defense counsel's impeachment may have fallen short of perfection does not mean it "'fell below an objective standard of reasonableness.'"  *Welch*, 607 F.3d at 702 (quoting *Strickland*, 466 U.S. at 688).  Defense counsel questioned Sneed about the many inconsistencies between his 2004 trial testimony and prior statements.  Sneed admitted (1) he did not tell (or think he had told) Detectives Bemo and Cook about the hammer/boiler room incident; (2) that he had previously stated that the amount he was to be paid for the murder was $7,000; (3) that he did not tell the detectives during the interview that Glossip had removed a $100 bill from the victim/Van Treese's wallet; (4) that he could not remember if he had told them about the acid, the trash bags or the hacksaw; and (5) that he had denied stabbing Van Treese. Many of the discrepancies between Sneed's statements to the police and his in-court testimony were confirmed by Bemo during his cross-examination, including that Sneed did not tell the police that Glossip had removed a $100 bill from the victim's wallet or mention the boiler room incident. Bemo could not recall if Sneed had informed them about the hacksaw or muriatic acid.

As petitioner asserts, playing the tape might have clarified what Sneed did and did not tell the officers during the initial interview.  However, defense counsel clearly made the point that Sneed's story had changed and in ways that made Glossip more culpable.  Having reviewed the videotape of Sneed's initial interview with the police, the interview transcript and the trial transcript, the

court concludes defense counsel was not constitutionally ineffective for failing to impeach Sneed by playing the videotape at trial.

Petitioner also contends, though, that the videotape would have "convey[ed] to the jury how clearly and unambiguously the detectives telegraphed to Mr. Sneed that they wanted him to inculpate Mr. Glossip." As mentioned before, the court does not "determine counsel's effectiveness through a rear view mirror." *Welch*, 607 F.3d at 703. "The Supreme Court requires [the court] to make 'every effort . . . to eliminate the distorting effects of hindsight' by indulging in a strong presumption counsel acted reasonably." *Id.* (quoting *Strickland*, 466 U.S. at 689).

Defense counsel's decision not to introduce the video was reasonable trial strategy. Playing the tape would have shown that Bemo told Sneed several times that he knew he did not commit the murder by himself and that others, particularly Glossip, were saying he acted alone. However, it also would have allowed the jury to hear Sneed explain, once again, how Glossip masterminded the murder. Contrary to petitioner's characterization of the interview, the officers' questioning was not sufficiently manipulative to make it evident from viewing the videotape that, but for their suggestions, Sneed would not have implicated Glossip in the murder of Barry Van Treese. Through his cross examinations of Bemo and Sneed, defense counsel was, though, able to elicit testimony that supported Glossip's theory that Bemo influenced Sneed to identify Glossip as his accomplice. Bemo admitted that at the beginning of his interview with Sneed he specifically told him that he "knew that this crime was committed by more than just himself," that he "personally did not think that he was the only one involved in this homicide," and that "Glossip was the one who was laying it on him the heaviest as far as pointing the finger at [him ]." Having viewed the videotape and examined the trial transcript, the court concludes petitioner has not shown that defense counsel's handling of the tape and his cross-examinations of Sneed and Bemo "'fell below an objective standard of reasonableness.'" *Welch*, 607 F.3d at 702 (quoting *Strickland*, 466 U.S. at 688).

District Ct. Order at 59-63 (footnotes and citations omitted).

## 2. Analysis

### a. Standard of Review

Although the parties expend a considerable number of pages briefing the

appropriate standard of review for this issue, this court's recent decision in *Lott v.*

*Trammell* resolves the question.  705 F.3d 1167, 1211-13 (10th Cir. 2013).  *Lott*

began by noting that this court, sitting en banc, held in 2009 that "a federal court

does not owe deference to the OCCA's rejection of an ineffectiveness claim under

the OCCA Rule 3.11 standards."  *Id.* at 1211 (quotation and alterations omitted)

(discussing *Wilson*, 577 F.3d at 1300).  *Lott* concluded, however, that *Wilson* was

no longer good law given the OCCA's subsequent decision in *Simpson v. State*,

230 P.3d 888 (Okla. Crim. App. 2010).  705 F.3d at 1212.  According to *Lott*,

> In *Simpson*, the OCCA made clear that Rule 3.11 obligates it to
> "thoroughly review and consider [a defendant's Rule 3.11]
> application and affidavits along with other attached non-record
> evidence."  230 P.3d at 905.  Thus, even in cases, such as *Wilson*,
> where the OCCA summarily disposes of a defendant's Rule 3.11
> application without discussing the non-record evidence, we can be
> sure that the OCCA in fact considered the non-record evidence in
> reaching its decision.  Such a conclusion, we note, is entirely
> consistent with the Supreme Court's repeated admonitions that
> AEDPA's deferential standards of review "do[] not require that there
> be an opinion from the state court explaining the state court's
> reasoning."  *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011).  The
> OCCA's decision in *Simpson* also clarifies that the interplay of Rule
> 3.11's "clear and convincing" evidentiary standard and its "strong
> possibility of ineffectiveness" substantive standard is "intended to be
> less demanding than the test imposed by *Strickland*."  230 P.3d at
> 906.  In other words, the OCCA in *Simpson* has now assured us that
> "when [it] review[s] and den[ies] a request for an evidentiary hearing
> on a claim of ineffective assistance under the standard set forth in

> Rule 3.11, [it] necessarily make[s] the adjudication that Appellant
> has not shown defense counsel to be ineffective under the more
> rigorous federal standard set forth in *Strickland*." *Id.*  Consequently,
> it is plain to us, as a matter of federal law, that any denial of a
> request for an evidentiary hearing on the issue of ineffective
> assistance of counsel filed pursuant to OCCA Rule 3.11 . . . operates
> as an adjudication on the merits of the *Strickland* claim and is
> therefore entitled to deference under § 2254(d)(1).

705 F.3d at 1213.  *Lott* makes clear, then, that even assuming the OCCA resolved

Glossip's claim of ineffective assistance pursuant to Rule 3.11, that resolution is

nonetheless an "adjudicat[ion] on the merits" subject to the heightened AEDPA

standards set out in 28 U.S.C. § 2254(d)(1).

### b.  Analysis

This court's review of counsel's performance is "highly deferential."

*Hooks*, 606 F.3d at 723.  "[C]ounsel is strongly presumed to have rendered

adequate assistance and made all significant decisions in the exercise of

reasonable professional judgment."  *Byrd v. Workman*, 645 F.3d 1159, 1168 (10th

Cir. 2011) (quotation omitted).  Glossip bears a heavy burden in that he must

overcome the presumption his counsel's actions were sound trial strategy.  *Id.*

Furthermore, because this is a § 2254 proceeding, Glossip faces an even greater

challenge.  *Id.* ("[W]hen assessing a state prisoner's ineffective-assistance-of-

counsel claims on habeas review, we defer to the state court's determination that

counsel's performance was not deficient and, further, defer to the attorney's

decision in how to best represent a client." (quotation and alteration omitted)).

Because *Strickland* sets out a general standard, "a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).  For that reason, our review of Glossip's habeas claim of ineffective assistance is "doubly deferential."  *Id.* Glossip does not come close to satisfying this exacting standard.  For those reasons set out by the district court in concluding, under a de novo standard, that counsel's performance was not deficient, the OCCA's decision denying Glossip relief is not unreasonable.

In arguing to the contrary, Glossip contends the video of the interview would have revealed the detectives manipulated Sneed into implicating him in the murder.  Like the district court, however, this court's review of the trial record reveals counsel was able to effectively cross-examine Detective Bemo by eliciting testimony supporting the theory Bemo influenced Sneed to identify Glossip as his accomplice.  Trial counsel asked Bemo on cross-examination about his interview techniques[8] and whether his questions to Sneed were suggestive.  Bemo admitted

------

[8]In that regard, trial counsel began by eliciting from Detective Bemo testimony that he could be perceived as intimidating:

> Q.  . . .  You are a pretty good-sized fellow and have kind of a deep voice.  You can kind of intimidate some people.  Would you agree?

> A.  I've been told that, yes.

(continued...)

he told Sneed (1) at the beginning of the interview that Glossip was pointing the

finger at Sneed and (2) he did not believe Sneed was the only one involved in the

homicide.[9]  Defense counsel also effectively cross-examined Detective Bemo as

---

[8](...continued)
Counsel then proceeded to question Detective Bemo about a technique he used
when he thought more than one person might be involved in a homicide:

> Q.  The technique—that is a technique, is it not, to—if you
> think it's more than one person that's involved, that you tell
> somebody you're interviewing that basically you better speak now
> because if he tells us something, he's liable to get the deal and
> you're not going to get the deal; isn't that true?

> A.  Yes, it is.

> Q.  And it is an opportunity that many people take to get the
> deal, and the better deal, if you will, in a case?

> A.  In some cases, yes.

[9]Counsel elicited the following testimony from Detective Bemo:

> Q.  At the beginning of the interview with Justin Sneed, did
> you tell him that you had some things that you wanted him to listen
> to before you said anything to him?

> A.  Yes.

> Q.  And didn't you tell him specifically that you knew that this
> crime was committed by more than just himself?

> A.  Yes.

> Q.  And you told him that you personally did not think that he
> was the only one involved in this homicide?

> A.  That's correct.

(continued...)

to whether these statements were "suggestive in nature" and whether Sneed could

have been influenced by them.[10]   Glossip nevertheless asserts the video is such

---

[9](...continued)
    Q.  In this interview before—or at least at some point in time
before then end of the interview, you told him that Mr. Glossip was
under arrest?

    A.  Yes, I did.

    Q.  And you also told him that Mr. Glossip was the one who
was laying it on him the heaviest as far as pointing the finger at
Justin Sneed who committed the homicide?

    A.  Yes, I did.

[10]Counsel elicited the following testimony from Detective Bemo:

    Q.  We talked at the very beginning of our questions this
afternoon about interrogating, interrogators' techniques and how an
interrogator can lead a witness to a—in a particular direction.  Was
that the intent in your interview of Mr. Sneed in making these
comments to him at that time?

    A.  Was it my intent to lead him?

    Q.  Yes, sir.

    A.  No.

    Q.  Do you agree with me that they are suggestive statements?

    A.  I don't think they are.  They were factual statements.

    Q.  Factual statements can still be suggestive in nature, can
they not?

    A.  Sure.

                                                        (continued...)

powerful evidence of police manipulation of Sneed that the failure to show the

video to the jury is indefensible.  Having reviewed the video, we conclude, as did

the district court, that "the officers' questioning was not sufficiently manipulative

to make it evident from viewing the videotape that, but for their suggestions,

Sneed would not have implicated Glossip in the murder of Barry Van Treese."

District Ct. Order at 62-63.  That being the case, trial counsel could have

reasonably concluded his cross-examination of Bemo gave the defense all the

benefits it would have received with the admission of the video without any of the

risks associated with its actual production.

Nor is Glossip correct in asserting it was necessary to admit the video to

effectively cross-examine Sneed as to the numerous inconsistencies in his

statements regarding the circumstances surrounding the murder.  The transcript

reveals trial counsel's cross-examination of Sneed effectively conveyed to the

jury that Sneed's testimony had conveniently evolved from the time of his first

statement to police to Glossip's second trial, seven years later.  *See id.* at 61

(cataloging Sneed's admissions as to inconsistencies in his testimony).  Trial

---

[10](...continued)
        Q.  And Justin Sneed, having heard your comments, suggesting
as they were, do you think he would not have been influenced in his
responses to the actual questions you were ask[ing] about the
homicide?

        A.  I don't know.  I don't know if he could have been
influenced or not.

counsel was able to adduce evidence as to the inconsistencies in Sneed's testimony without adducing a video in which Sneed explained how Glossip masterminded Van Treese's murder.

Given all this, the OCCA's determination that counsel did not perform deficiently by referencing the video in the cross-examination of Sneed and Bemo without adducing the video itself is not wrong, let alone unreasonable. *Harrington*, 131 S. Ct. at 786-87 (holding that as a condition for obtaining federal habeas relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement"). Accordingly, Glossip is not entitled to habeas relief on this claim of ineffective assistance.

### B.  Failure to Object to Misconduct

#### 1.  Background

##### a.  OCCA Decision

On direct appeal, Glossip argued his trial counsel was ineffective in failing to object to several instances of prosecutorial misconduct, specifically including those instances of alleged misconduct analyzed above. In resolving this claim, the OCCA simply stated that because Glossip's misconduct claims failed on the merits, this claim of ineffective assistance likewise lacked merit. *Glossip*, 157

P.3d at 154, 158, 161 ("Any misconduct that might have occurred did not affect

the outcome of this case, so there can be no ineffective assistance of counsel.").

### b.  District Court Decision

The district court's resolution of this issue was appropriately terse:

> Having determined the OCCA properly concluded . . . that the alleged prosecutorial misconduct did not deprive petitioner of a fair trial, the court finds the OCCA reasonably applied the *Strickland* standard in determining that trial counsel was not ineffective for failing to object to the claimed misconduct.

District Ct. Order at 67.

### 2.  Analysis

Glossip asserts that because the OCCA unreasonably denied him relief on

his claims of prosecutorial misconduct, it likewise unreasonably concluded he

was not prejudiced by trial counsel's failure to object to those same instances of

misconduct.  Given that this court has concluded Glossip is not entitled to habeas

relief on his claims of misconduct, it follows he is likewise not entitled to relief

on this claim of ineffective assistance of trial counsel.

### C.  Sneed Competency Evaluation

### 1.  Background

### a.  OCCA Decision

For the first time in his state court petition for post-conviction relief,

Glossip argued that his trial counsel was ineffective in failing to obtain, and

cross-examine Sneed with, a 1997 court-ordered psychiatric evaluation.  Glossip

argued the evaluation would have shown, in contrast to the prosecution's arguments at trial, that "Sneed was an individual that could think for himself and commit crimes without [] Glossip's guidance."  District Ct. Order at 87 (quotation omitted).  The OCCA denied relief in an unpublished summary opinion, concluding the claim was "merely an attempt to expand on claims made on direct appeal; therefore the claim is barred."  Nevertheless, the OCCA went on to hold that the claim also failed on the merits because "the introduction of the information would not have changed the outcome of this case."

### b.  District Court Order

[It is unclear whether the OCCA reviewed the competency evaluation in resolving this claim.]  Therefore, the court will review petitioner's claim . . . *de novo* under the *Strickland* standard.

The examiner states in the psychiatric evaluation that Sneed said he had been kicked out of school in the eighth grade for fighting and that he "had a year's probation as a juvenile for burglary of a house and a bomb threat."  Petitioner argues . . . this information would have demonstrated that Sneed was not the subservient person portrayed by the State.

Considering the evidence of Sneed's immaturity and dependency on Glossip . . . in conjunction with the minimal information in the psychiatric evaluation relied on by petitioner, the court concludes Glossip has failed to demonstrate a reasonable probability of a different outcome at either stage of the proceeding if trial counsel had presented evidence that, at some time in his youth, Sneed had made a bomb threat and burgled a house.  There is no indication whether Sneed committed those offenses by himself or whether he was influenced to participate by someone else.  Petitioner has failed to provide any information regarding the crimes except that they occurred at some unspecified time.

-56-

> As Glossip has not shown the required prejudice resulting from his counsel's alleged failure to investigate he is not entitled to relief under *Strickland* . . . .

District Ct. Order at 87-89 (citation and footnotes omitted).

## 2. Analysis

Glossip asserts the district court erred in concluding he was not prejudiced by counsel's failure to utilize Sneed's competency evaluation at trial. In so arguing, Glossip claims the evaluation would have gone far in discrediting the prosecution's trial theory (i.e., that Sneed was easily manipulated by Glossip into murdering Van Treese). Sneed's arguments in this regard are unconvincing.[11] The evidence adduced by the prosecution "presented a compelling case" that Sneed "was totally dependent on Glossip." *Glossip*, 157 P.3d at 152.[12] The

---

[11]Although the OCCA's adjudication of this claim is almost certainly entitled to AEDPA deference, this court need not address the question because Glossip cannot prevail even if we review de novo the question whether Glossip has satisfied *Strickland*'s prejudice prong. *Webber v. Scott*, 390 F.3d 1169, 1175 (10th Cir. 2004) ("The question of whether the OCCA reached the merits need not be decided, however, because Webber's claim fails with or without according the state court's decision AEDPA deference.").

[12]This court's independent review confirms the OCCA's characterization of the trial record. The district court summarized the evidence regarding Sneed's immaturity and dependency on Glossip in resolving Glossip's challenge to the evidence supporting his murder conviction:

> Kayla Pursley [testified] that [Sneed] "was very childlike," was dependent on Glossip for food and cigarette money, and "had no one else at all once his parents had [taken his brother back to Texas and] left him there." Cliff Everhart testified that "Justin was Richard's puppet," who did what Glossip told him to do and came to Glossip if

(continued...)

competency examination does precious little to counter that evidence.  Although

the examination indicates Sneed had a troubled childhood involving serious

criminal conduct, there is simply nothing in the report casting doubt on his

immaturity or suggestibility.

The competency report is so devoid of factual background that it is

impossible to even guess at the circumstances surrounding Sneed's youthful

criminal conduct.  That being the case, it is just as likely (A) the criminal conduct

alluded to in the report is consistent with the overwhelming trial evidence of

Sneed's suggestibility, as it is (B) the criminal conduct alluded to in the report is

indicative of some heretofore unreported streak of initiative on the part of Sneed.

*See* District Ct. Order at 88-89 ("There is no indication whether Sneed committed

those offenses by himself or whether he was influenced to participate by someone

_____

[12](...continued)
he needed something.  Sneed testified that, after his brother returned
to Texas in late October or November, 1996, he was without friends
or family, was dependent on Glossip for food, had no income, and
had quit his roofing job, which he had taken to support his daughters,
because he "got entangled with a little bit of drugs and stuff like that
when I come up here, so I just kind of lost sight of what my goal and
my purpose was."  Sneed said he quit his roofing job, which paid
about $500 a week, because his stepbrother told him "that he had a
deal with Richard Glossip that we could work at the motel and still
stay at the motel and, you know, it sounded like a good idea when he
was first talking about it so we jumped on it, and I just kind of went
along with the ride."

District Ct. Order at 9 (citations omitted).

else."). Given the strength of the prosecution's evidence of Sneed's dependence on Glossip, there is no probability, let alone a "reasonable probability," that admission of the relatively benign competency report would have altered the outcome of either stage of Glossip's trial. *Strickland*, 466 U.S. at 694 (holding that to demonstrate a deprivation of the Sixth Amendment right to counsel, a petitioner must show, inter alia, "a reasonable probability that, but for counsel's unprofessional errors, the result of the case would have been different"). Because Glossip cannot show "sufficient prejudice," his ineffective assistance claim "necessarily fails." *Hooks*, 606 F.3d at 724 (quotation omitted).

## IV. Murder-For-Remuneration Aggravator

### A. Background

At the conclusion of the penalty phase, the jury found Glossip employed Sneed to murder Van Treese "for remuneration or the promise of remuneration." *Glossip*, 157 P.3d at 147; *see also* Okla. Stat. tit. 21, § 701.12(3) (setting out parameters of Oklahoma's murder-for-remuneration aggravating circumstance).[13]

---

[13]To establish the murder-for-remuneration aggravator under Oklahoma law, the prosecution must prove "[t]he person committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration." Okla. Stat. tit. 21, § 701.12(3). This aggravating circumstance applies "where a defendant has been hired or has hired another person to perform an act of murder." *Plantz v. State*, 876 P.2d 268, 284 (Okla. Crim. App. 1994). It does not apply where the murder is committed to facilitate a robbery, even when the murder is planned in advance. *See Boutwell v. State*, 659 P.2d 322, 328 (Okla. Crim. App. 1983).

The jury's finding was supported by Sneed's specific testimony at trial that

Glossip offered him $10,000 if he would immediately kill Van Treese. *Glossip*,

157 P.3d at 148-49 (summarizing Sneed's trial testimony).  On direct appeal,

Glossip asserted the murder-for-remuneration aggravator was not supported by

sufficient evidence. *Id.* at 161.  In particular, Glossip argued Sneed's self-serving

testimony was not credible. *Id.*  He further asserted the only credible explanation

for the events surrounding Van Treese's murder was theft gone awry. *Id.*  In

rejecting Glossip's assertions, the OCCA concluded as follows:

> Glossip claims there was insufficient evidence to support the sole
> aggravating circumstance of murder for remuneration.  Murder for
> remuneration, in this case, requires only that Glossip employed
> Sneed to commit the murder for payment or the promise of payment.
> 21 O.S.2001, § 701.12.

> Here, Glossip claims that Sneed's self-serving testimony was
> insufficient to support this aggravating circumstance.  Glossip claims
> that the murder was only a method to steal the money from Van
> Treese's car.

> The flaw in Glossip's argument is that no murder needed to
> occur for Sneed and Glossip to retrieve the money from Van Treese's
> car.  Because Glossip knew there would be money under the seat, a
> simple burglary of the automobile would have resulted in the fruits of
> their supposed desire.  The fact is that Glossip was not after money,
> he wanted Van Treese dead and he was willing to pay Sneed to do
> the dirty work.  He knew that Sneed would do it for the mere promise
> of a large payoff.  There was no evidence that Sneed had any
> independent knowledge of this money.

> There is sufficient evidence that Glossip promised to pay
> Sneed for killing Van Treese.

*Glossip*, 157 P.3d at 161.

## B.  Analysis

The Fourteenth Amendment's Due Process Clause protects a state-court criminal defendant against conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the [charged] crime." *In re Winship*, 397 U.S. 358, 364 (1970).  In *Jackson v. Virginia*, the Supreme Court explicitly rejected the notion that *Winship*'s requirements are satisfied whenever a proper reasonable-doubt instruction is given at trial and the jury's guilty verdict is supported by some evidence.  443 U.S. 307, 315-18, 320 (1979); *id.* at 316-17 ("The *Winship* doctrine requires more that simply a trial ritual.  A doctrine establishing so fundamental a substantive constitutional standard must also require that the factfinder will rationally apply that standard to the facts in evidence.").  Instead, a reviewing court must ensure, "after viewing the evidence in the light most favorable to the prosecution, [a] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. The rational-factfinder standard set out in *Jackson* also applies to a claim the evidence supporting an aggravating circumstance is constitutionally insufficient. *Lewis v. Jeffers*, 497 U.S. 764, 781-82 (1990).  That is, a particular jury's finding as to the existence of an aggravating circumstance is constitutionally valid only if a rational factfinder could find, based on the evidence in the record, that the aggravating circumstance was proved beyond a reasonable doubt. *Id.*

Glossip asserts the OCCA's resolution of his sufficiency-of-the-evidence claim amounts to an unreasonable application of the *Jackson*/*Lewis* standard because the only evidence supporting the murder-for-remuneration aggravating factor was Sneed's testimony.[14]  According to Glossip, the OCCA was obligated to discount Sneed's testimony because that testimony was not credible.  Stated succinctly, Glossip asserts that given Sneed's strong motive to save his own life and the numerous inconsistencies in his various accounts, his testimony was simply too incredible to support a rational jury finding, beyond a reasonable doubt, that Glossip offered to pay him for carrying out the murder.  Glossip's arguments in this regard are completely lacking in merit.

Glossip's assertion that the OCCA was obligated to second guess the jury's credibility determinations is totally at odds with Supreme Court precedent.  In adopting the rational-factfinder test, the Court made clear that test "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to

---

[14]As Glossip recognizes in his appellate brief, Sneed specifically testified at trial to the following facts: Glossip approached Sneed several times about killing Van Treese, offering Sneed escalating amounts of money to commit the murder. On the night of the murder Glossip offered Sneed $10,000 to kill Van Treese. After Sneed killed Van Treese, Glossip told Sneed to collect his money from a hiding place under the front seat of Van Treese's car.  Sneed retrieved $4000 from Van Treese's car and split the money with Glossip.  This testimony, if believed, is constitutionally sufficient for a reasonable jury to conclude Glossip offered Sneed remuneration to kill Van Treese.

ultimate facts." *Jackson*, 443 U.S. at 319; *see also Lewis*, 497 U.S. at 782 (quoting this passage from *Jackson*). "In *Jackson*, [the Court] emphasized repeatedly the deference owed to the trier of fact and, correspondingly, the sharply limited nature of constitutional sufficiency review." *Wright v. West*, 505 U.S. 277, 296 (1992); *see also Coleman v. Johnson*, 132 S. Ct. 2062, 2062 (2012) (per curiam) ("[O]n direct appeal it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." (quotation omitted)). It is for this very reason that we have consistently stated in habeas cases that this court "may not weigh conflicting evidence nor consider the credibility of witnesses." *Messer v. Roberts*, 74 F.3d 1009, 1013 (10th Cir. 1996).[15]

Given the Supreme Court case law set out above, Glossip cannot credibly argue the OCCA was obligated to reject the jury's decision to credit Sneed's testimony. Instead, there is no doubt the OCCA approached this issue in a manner entirely consistent with the standard articulated by the Court in *Jackson*

---

[15]Even on direct appeal in federal criminal prosecutions, this court will overturn a jury's credibility determination and disregard a witness's testimony only if the testimony is inherently incredible—that is, only if the events recounted by the witness were impossible "under the laws of nature" or the witness "physically could not have possibly observed" the events at issue. *United States v. Oliver*, 278 F.3d 1035, 1043 (10th Cir. 2001) (quotations omitted). It is worth emphasizing that Glossip does not assert Sneed's testimony is inconsistent with the laws of nature or based on facts impossible to observe. Instead, he asserts Sneed was so self-interested and contradictory that a jury was legally precluded from believing him.

and *Lewis* when it held Sneed's testimony provided sufficient evidence for a reasonable jury to conclude Glossip offered to pay Sneed to kill Van Treese. Thus, Glossip has not come close to surmounting the "high bar" that *Jackson* claims face in federal habeas proceedings.  *Coleman*, 132 S. Ct. at 2062.

## V.  Victim Impact Evidence

### A.  Background

During the penalty phase of Glossip's trial, two witnesses not only testified as to the impact Van Treese's murder had on them, but also read victim impact statements of other family members.  For the first time on direct appeal, Glossip argued this procedure violated his Sixth Amendment right to confront the witnesses against him.  The OCCA concluded Glossip had not demonstrated his entitlement to relief under the plain error doctrine:

> Glossip also cites *Grant v. State*, [58 P.3d 783, 797 (Okla. Crim. App.)], *judgment vacated on different grounds in Grant v. Oklahoma*, 540 U.S. 801 (2003), where this Court held that it is error for one person to read the statement of another.  This Court, in *Grant* stated,
>
> > In *Ledbetter v. State*, [933 P.2d 880, 893 (Okla. Crim. App. 1997)], we recognized the fact that "a person designated by the victim or by family members of the victim" may present victim impact statements. However, we held that the legislature intended that the "person chosen to present the victim impact statement" should use his "own thoughts or observations to express the impact of a death on survivors of the victim."  [*Id.*] In *Ledbetter*, our holding allowed the chosen person to observe family members and to use those observations in the statement; however, that person may not receive aid

-64-

in the composition of the statement from outside
sources.  [*Id.*]

Nevertheless, in *Grant* we held that the error did not rise to the
level of plain error as the evidence was presented in a more sterile
manner than if each of the writers of the statements had taken the
stand and read their own statements.

. . . .

Trial counsel objected to victim impact evidence in a pre-trial
motion and hearing.  During the second stage, an in camera hearing
was held and the parties went through the statements.  Defense
counsel made objections to some of the language in some of the
statements and the trial court redacted the statements.  However,
counsel specifically stated that he had no objection to the two
witnesses reading the statements of the remaining "immediate family
members."  Therefore, any claim regarding the method of victim
impact evidence presentation is waived, except that error which is
plain error.

We find that Glossip was not harmed by the State's utilization
of two family members to read the statements of five others.  This
Court will not second guess trial counsel's sound trial strategy.
There is no plain error here.

*Glossip*, 157 P.3d at 162-63 (footnote omitted).

The federal district court concluded Glossip was not entitled to habeas

relief because he had not identified any clearly established Supreme Court

precedent indicating any constitutional infirmity in the way the victim impact

evidence was presented in this case:

During the sentencing stage of the trial, the prosecution
incorporated by reference all of the first-stage evidence and
presented victim impact statements.  Barrie Hall, the victim's oldest
daughter, read her own statement and that of her younger sister and
Donna Van Treese read her own statement and those of three of her

sons.  Glossip contends in Ground VIII that his right to confrontation
was violated when the two witnesses were allowed to read the
statements of other family members. . . .

    . . . .

        Although petitioner identifies several Supreme Court decisions
as providing the "clearly established federal law" applicable to this
claim, none discuss whether it is unconstitutional for an immediate
family member to "both testify on their own behalf and represent
other members of the immediate family." *Glossip*, 157 P.3d at
163. . . .

        Petitioner has not shown that the OCCA's finding of no plain
error was contrary to or an unreasonable application of federal law.
He is not entitled to habeas relief on this ground.  [Footnote 106:
Petitioner cites no cases to support his assertion . . . that his
confrontation rights were violated.  The Tenth Circuit has stated that
"'[i]t is far from clear that the Confrontation Clause applies to a
capital sentencing proceeding.'"  *United States v. Barrett*, 496 F.3d
1079, 1100 (10th Cir. 2007) . . . .  As the court can grant habeas
relief only on the basis of clearly established law as articulated by
the Supreme Court, petitioner's confrontation clause challenge to the
impact victim evidence fails.]

District. Ct. Order at 72-74 (footnote and citation omitted).

**B.  Analysis**

In *United States v. Barrett*, a federal death penalty case, the victim's wife

read to the jury during the penalty phase a short essay written by the victim's

daughter.  496 F.3d 1079, 1099 (10th Cir. 2007).  For the first time on appeal,

Barrett asserted the admission of that evidence violated his Sixth Amendment

right to confrontation.  *Id.* at 1100.  In analyzing Barrett's confrontation claim,

this court noted "it is far from clear that the Confrontation Clause applies to a

capital sentencing proceeding." *Id.* (quotation and alteration omitted) (citing

cases from the Fourth and Eleventh Circuits).  Thus, Barrett could not satisfy the

"plainness" prong of plain error review.  *Id.*

Shortly after the decision in *Barrett*, this court recognized that the absence

of precedent, particularly Supreme Court precedent, precluded habeas relief on a

confrontation claim arising in a capital sentencing proceeding:

> [E]ven if [the witness's] statement qualified as testimonial
> hearsay, we have recently stated that it is "far from clear" whether
> the Confrontation Clause even applies at capital sentencing
> proceedings.  *United States v. Barrett*, 496 F.3d 1079, 1099 (10th
> Cir. 2007) (quoting *United States v. Higgs*, 353 F.3d 281, 324 (4th
> Cir. 2003)); *United States v. Brown*, 441 F.3d 1330, 1361 (11th Cir.
> 2006) (declining to decide because statements were non-
> testimonial); *Szabo v. Walls*, 313 F.3d 392, 398 (7th Cir. 2002) (the
> Confrontation Clause does not apply to capital sentencing).  Given
> that this is habeas review, we can reverse only based on clearly
> established law as articulated by the Supreme Court.

*Wilson v. Sirmons*, 536 F.3d 1064, 1111-12 (10th Cir. 2008).

The Supreme Court has made clear that AEDPA "requires federal habeas

courts to deny relief that is contingent upon a rule of law not clearly established

at the time the state court conviction became final."  *Williams v. Taylor*, 529 U.S.

362, 380 (2000); *see also House*, 527 F.3d at 1018 (holding that the "absence of

clearly established federal law is dispositive under § 2254(d)(1)").  Thus, one

would think it an uncontroversial conclusion that the total absence of Supreme

Court precedent regarding the applicability of the Confrontation Clause to capital

sentencing proceedings spells the end of Glossip's claim.  Glossip resists this

conclusion, however, by asserting that because the only ruling of the OCCA he is challenging is the OCCA's determination of harmlessness, that is the only determination a federal habeas court is entitled to review.[16]  That is, he asserts AEDPA does not empower a federal habeas court to second-guess a state court determination of error.  *See* Appellant's Br. at 99 ("Nothing in [AEDPA] requires Glossip to show that rulings the OCCA made *in his favor* are *supported* by clearly established federal law.  Rather, the statute requires only that he point to an aspect of the OCCA's decision that involved an *unreasonable application* of clearly established Federal law." (alteration and quotation omitted)).

Glossip's argument is directly contrary to binding Tenth Circuit authority.  In *House*, the petitioner argued a "State-initiated transfer of venue" deprived him of his right to equal protection.  527 F.3d at 1020.  "The New Mexico Supreme Court concluded that equal protection principles did apply in the context of venue transfers and employed a modified *Batson* analysis in assessing the legality of the venue transfer . . . ."  *Id.* at 1020-21.  This court concluded the petitioner was not entitled to habeas relief because there was no clearly established law governing

---

[16]In this regard, Glossip correctly notes the following: (1) the OCCA held, two years before his trial, that allowing a witness to read a non-testifying family member's victim impact statement violated the Confrontation Clause; (2) on direct appeal, he cited the relevant OCCA precedent in support of his claim for relief under the Sixth Amendment; (3) the OCCA acknowledged the existence of constitutional error, but concluded the error was harmless, *Glossip*, 157 P.3d at 163.

the petitioner's claim.  *Id.* at 1021 ("No Supreme Court case holds that venue

transfers are subject to scrutiny under the Equal Protection Clause.  Absent

controlling Supreme Court precedent, it follows ineluctably that the New Mexico

Supreme Court's decision to uphold the venue transfer cannot be either contrary

to, or an unreasonable application of, clearly established Federal law." (quotation

and alteration omitted)).   In so doing, we specifically rejected the argument that

because the state court concluded the Equal Protection Clause was implicated, but

not violated, the law was clearly established:

> [T]he New Mexico Supreme Court's conclusion that a modified
> *Batson* analysis could apply to an alleged discriminatory venue
> transfer does not make *Batson* clearly established federal law on the
> issue.  As the federal district court correctly noted, unlike federal
> district courts considering habeas writs, state courts are not required
> to apply only clearly established federal law on direct appeal, rather
> they apply Supreme Court decisions employing their own
> interpretation and analysis.

*Id.* at 1021 n.9 (quotations and alterations omitted); *Littlejohn v. Trammell*, 704

F.3d 817, 850 & n.17 (10th Cir. 2013) ("Where a state court assumes a

constitutional violation in order to address whether the defendant was actually

harmed by the violation . . . , the state court takes the claim on the merits; it just

disposes of it on alternative *merits*-based reasoning.  That is, it renders a decision

that is on the merits for purposes of AEDPA; therefore, our inquiry must adhere

to the analytical framework of AEDPA, which includes an assay into whether

there is clearly established federal law." (citations omitted)).[17]

Glossip does not contest the absence of clearly established Supreme Court

precedent on the applicability of the Confrontation Clause to capital sentencing

proceedings.  *House* makes clear that absence disposes of this issue and prohibits

a federal court from granting Glossip habeas relief.

## VI.  Cumulative Error

This court has reviewed the entire seventeen-volume trial transcript, along

with all exhibits admitted at trial and those Glossip asserts should have been

adduced at trial.  That review demonstrates Glossip received a fundamentally fair

trial.  That is, even aggregating the individual harmless errors recognized or

---

[17]The cases cited in Glossip's brief are not to the contrary.  *See* Appellant's Br. at 99-100 (citing *Mitchell v. Esparza*, 540 U.S. 12 (2003)); *Saiz v. Burnett*, 296 F.3d 1008 (10th Cir. 2002); *Herrera v. Lemaster*, 225 F.3d 1176 (10th Cir. 2000).  First, none of the cases address in any way whether a federal habeas court is bound by a state court determination of constitutional error.  Instead, those cases all appear to involve constitutional errors well established in Supreme Court precedents.  *Mitchell*, 540 U.S. at 16-18; *Saiz*, 296 F.3d at 1011-12; *Herrera*, 225 F.3d at 1178-79.  Second, all three cases predated the Supreme Court's decision in *Carey v. Musladin*, 549 U.S. 70 (2006).  As this court made clear in *House*, "*Musladin* clarified that the threshold determination that there is not clearly established federal law is analytically dispositive in the § 2254(d)(1) analysis." 527 F.3d at 1017-18.  Thus, it is not surprising that prior to *Musladin*, some courts might bypass the threshold clearly-established-federal-law analysis and proceed to determine whether a state court adjudication was either contrary to, or an unreasonable application of, Supreme Court precedent.  *See id.*

assumed above,[18] the error did not have a substantial and injurious effect or influence on either the jury's determination of Glossip's guilt or its decision to impose the ultimate sanction of the death penalty.  *See Cargle v. Mullin*, 317 F.3d 1196, 1206-08 (10th Cir. 2003) (setting out broad understanding of cumulative error review in federal habeas proceedings).[19]

## CONCLUSION

The order of the United States District Court for the Western District of Oklahoma denying Glossip's § 2254 habeas petition is hereby **AFFIRMED**.

ENTERED FOR THE COURT


Michael R. Murphy
Circuit Judge

---

[18]Included in this category are: (1) allowing display of the posters throughout trial; (2) questioning by the prosecutor of the appropriateness of a lesser-included instruction on accessory after the fact; (3) some small amount of irrelevant victim background evidence during the guilt phase; (4) failure to adduce at trial Sneed's competency evaluation; and (5) the prosecution's personal views on the propriety of the death penalty.  It does not include state-law errors or claimed errors for which Glossip did not obtain a COA.

[19]Because Glossip is not entitled to relief even under the broad articulation set out in *Cargle*, this court need not attempt to reconcile *Cargle* with the apparently narrower explanation of the doctrine in *Matthews v. Workman*, 577 F.3d 1175, 1195 n.10 (10th Cir. 2009) (noting that in "the federal habeas context, the only otherwise harmless errors that can be aggregated are federal constitutional errors").